**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL SERVICE
TO THE UNITED STATES, ON THEIR OWN AND ON
BEHALF OF OTHERS SIMILARLY SITUATED,

                           Plaintiffs,

        – against –

MICHAEL R. POMPEO,
c/o United States Department of State
2201 C Street NW, Room 4330,
Washington DC 20037,

CARL C. RISCH,
c/o United States Department of State
2201 C Street NW, Room 4330,
Washington DC 20037,

UNITED STATES DEPARTMENT OF STATE
2201 C Street NW, Room 4330,
Washington DC 20037,

KIRSTJEN NIELSEN,
c/o United States Department of Homeland Security
3801 Nebraska Ave NW,
Washington DC 20016,

L. FRANCIS CISSNA,
c/o United States Department of Homeland Security
3801 Nebraska Ave NW,
Washington DC 20016

DONALD NEUFELD,
c/o United States Department of Homeland Security
3801 Nebraska Ave NW,
Washington DC 20016

                and

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY,
3801 Nebraska Ave NW,
Washington DC 20016,

                       Defendants.

Case No. _____

**CLASS ACTION COMPLAINT**

## INTRODUCTION AND SUMMARY

1.      This class action challenges Defendants' failure to process and adjudicate within a reasonable time the Special Immigrant Visa (*SIV*) applications of Afghan and Iraqi nationals who provided faithful and valuable service to the US government or its allied forces and who, as a consequence of that service, face an ongoing serious threat to their lives in their home countries.  Recognizing that the extreme delays experienced by SIV applicants placed those applicants' lives in continuing danger, Congress, in 2013, ordered Defendants to process SIV applications within nine months.  Notwithstanding this clear congressional direction, SIV application processing times continued to exceed nine months, and, in 2015, at least two groups of plaintiffs brought lawsuits complaining of the government's failure to promptly adjudicate SIV applications.  Nonetheless, today, Defendants themselves publicly admit that they are systemically failing to meet the congressionally-imposed nine-month deadline.  Defendants' failure to abide by their statutory obligations has put proposed class representatives John/Jane Does Alpha, Bravo, Charlie, Delta, and Echo (collectively, *Plaintiffs* or *Allies*)[1] in limbo, fearing for their lives and the lives of their families.

2.      In 2001, in response to the September 11 terrorist attacks, the United States invaded Afghanistan.  Two years later, the United States invaded Iraq.  The United States went on to establish a substantial military presence in both countries for years to come, during which time thousands of ordinary Afghans and Iraqis provided the US military with critical help and assisted the US government with its ongoing work in both countries.

3.      The Allies are among the thousands of ordinary Afghans and Iraqis who risked their own lives and the safety of their family members to assist the United States and the

---

[1]     Plaintiffs have filed a motion to proceed under pseudonym contemporaneously with this class action complaint.

rest of the allied forces.  By working with the United States, the Allies and their families have become targets for retaliation by the Taliban, Al Qaeda, ISIS (a.k.a. Daesh), and other terrorist groups.  This risk is not theoretical: numerous Afghans and Iraqis helping the United States have been targeted and assassinated by these terrorist organizations.

4.     Recognizing the debt of honor that the United States owes the Allies and those like them for the risks they faced and the contributions they made—and recognizing the necessity of protecting those who faithfully serve the United States to ensure that others feel empowered to join as partners—Congress passed the Refugee Crisis in Iraq Act of 2007, Pub. L. 110-181, 122 Stat. 395 (2007) (**RCIA**),[2] signed by President Bush, and the Afghan Allies Protection Act of 2009, Pub. L. 111-8, 123 Stat. 807 (2009) (**AAPA**),[3] signed by President Obama, to create the SIVs for which the Allies applied.

5.     Specifically, these statutes (and subsequent amendments) expanded a preexisting special immigrant visa program by authorizing the issuance of additional SIVs to those who provided "faithful and valuable" service to the US government or allied forces and who face "an ongoing serious threat as a consequence of [their] employment by the United States Government."  AAPA § 602(b)(2)(A)(ii)-(iii); RCIA § 1244(b)(1)(C)-(D).

6.     Unfortunately, Defendants' processing of SIV applications routinely requires SIV applicants to wait several years to receive decisions on their applications while the applicants and their families remain in danger each day that their applications are not determined.

---

[2]     The RCIA is codified as a note to 8 U.S.C. § 1157.  The Complaint cites to provisions of this Act with the Act's abbreviation and section number (e.g., RCIA § 1244) throughout. "Iraqi SIV" as referenced in this Complaint refers to SIVs under the RCIA.

[3]     The AAPA is codified as a note to 8 U.S.C. § 1101.  The Complaint cites to provisions of this Act with the Act's abbreviation and section number (e.g., AAPA § 602) throughout. "Afghan SIV" as referenced in this Complaint refers to SIVs under the AAPA.

7.     In 2013, aware of these ongoing delays in processing SIV applications, Congress amended the AAPA and the RCIA, requiring, inter alia, that Defendants "improve the efficiency by which applications for special immigrant visas . . . are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months" after the applicant's materials are submitted.  AAPA § 602(b)(4)(A); RCIA § 1242(c)(1).  At the same time, Congress ordered Defendants to designate two SIV coordinators to ensure the efficiency and integrity of the SIV application process.  AAPA § 602(b)(2)(D)(ii)(II); RCIA § 1248(h).

8.     Despite the passage of these amendments in 2013, the delays in processing and adjudicating SIV applications persisted.  Forced to wait for longer than nine months for their applications to be processed and adjudicated, at least two groups of SIV applicants filed lawsuits in this Court in 2015, seeking prompt adjudication of their applications.  In one of those cases, this Court found the plaintiffs' claims to be justiciable and denied the government's motion to dismiss.  See Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry, 168 F. Supp. 3d 268 (D.D.C. 2016).  The government settled with the individual plaintiffs soon thereafter.  In the other, the government provided the requested relief without even seeking a dismissal.  See Doe v. U.S. Dep't of State, No. 15-cv-01971(RWR) (D.D.C.).

9.     Yet two years after the decision in Nine Iraqi Allies and over four years after the relevant amendments to the AAPA and RCIA, Defendants continue to fail to meet the congressionally-imposed nine-month deadline to complete all government-controlled steps in the SIV application process.  In fact, each of the Allies commenced the process of applying for an SIV years ago.  Facing violence, death threats, and harassment to not only themselves but also

their family members, the SIV applicants have waited *years* without receiving a dispositive decision on their applications while the US government fails to take necessary action to process and adjudicate applications as ordered by Congress.  For example:

- Mr. Doe-Alpha fled his hometown, and continued threats by the Taliban directed towards those members of his family who stayed behind have made clear that he cannot safely return.

- Ms. Doe-Bravo has received death threats by letter and phone, requiring her to change her family's residence and her phone number numerous times.

- The Taliban attacked Mr. Doe-Charlie's brother, apparently believing that his brother was Mr. Doe-Charlie, and forcing him to move away from his home to protect himself and his family.

- Ms. Doe-Delta, and members of her family, have been followed by masked men and told that they would kill her family if she did not quit her job with a US military contractor.

- Mr. Doe-Echo has been subjected to threats from militants, who have targeted his family and kidnapped and murdered his father.

10.    These threats are real.   Indeed, SIV applicants, or members of their families, have been murdered while waiting for the US government to determine their SIV applications.  For example, Sakhidad Afghan started working as a translator for US forces at age 19 in 2009.  Until 2014, when the base where he worked closed, Mr. Afghan provided faithful and valuable service to the United States.  As a result of this service, in the spring of 2015, he was abducted, tortured, and killed.  The Taliban left him by the side of the road with a death threat stuffed in his pocket addressed to his three brothers, who were also working on behalf of the US forces.  Mr. Afghan had been waiting for an Afghan SIV for over four years when he was abducted.  One of the Allies, Mr. Doe-Echo, experienced such a loss when militants murdered his father.   Another Iraqi, who worked as a forklift operator for US forces, was killed after receiving numerous threats by Jamaat Ansar al-Sunna and other terrorist groups, threats which he brought to the attention of those processing his application, to no effect.

4

11.     The Allies, and others like them, are currently in limbo, unable either to count on the arrival of a US visa or to devote the few resources they have towards trying to secure alternative means of relative safety by moving elsewhere in their home countries or abroad.  Instead, they wait, in mortal danger, for Defendants to fulfill the promise Congress made to them.

12.     The Allies, on behalf of themselves and others similarly situated who have awaited a final decision by Defendants for more than the statutorily-allowed nine months, now seek an order from this Court pursuant to 5 U.S.C. § 706(1) and 28 U.S.C. § 1361 to compel Defendants to adjudicate promptly class members' applications for Afghan or Iraqi SIVs, and to appoint coordinators for the Afghan and Iraqi SIV programs, as required by the AAPA and the RCIA.

## THE PARTIES

13.     Plaintiff John Doe-Alpha is an Afghan citizen and an applicant for an Afghan SIV who applied for an SIV on September 25, 2013, and has not yet received a final decision on his application.  His application has been in Defendants' control for longer than nine months.

14.     Plaintiff Jane Doe-Bravo is an Afghan citizen and an applicant for an Afghan SIV who applied for an SIV on October 15, 2015, and has not yet received a final decision on her application.  Her application has been in Defendants' control for longer than nine months.

15.     Plaintiff John Doe-Charlie is an Afghan citizen and an applicant for an Afghan SIV who applied for an SIV on April 18, 2016, and has not yet received a final decision on his application.  His application has been in Defendants' control for longer than nine months.

16.     Plaintiff Jane Doe-Delta is an Afghan citizen and an applicant for an Afghan SIV who applied for an SIV on December 23, 2016, and has not yet received a final decision on her application.  Her application has been in Defendants' control for longer than nine months.

17.     Plaintiff John Doe-Echo is an Iraqi citizen and an applicant for an Iraqi SIV who applied for an SIV in July 2013, and has not yet received a final decision on his application.  His application has been in Defendants' control for longer than nine months.

18.     Defendant Michael R. Pompeo is sued in his official capacity as the Secretary of State.  Defendant Pompeo exercises authority over Defendant United States Department of State.  Defendant Pompeo, along with Defendant Kirstjen Nielsen, is responsible for the administration of the Afghan SIV program pursuant to the AAPA and the Iraqi SIV program pursuant to the RCIA.

19.     Defendant Carl C. Risch is sued in his official capacity as the Assistant Secretary of State for Consular Affairs.  Defendant Risch has direct oversight over the National Visa Center's operations, which include SIV processing steps such as reviewing SIV applications and scheduling interviews for SIV applicants.

20.     Defendant United States Department of State (*State*) is an agency of the United States and shares responsibility with Defendant United States Department of Homeland Security for the administration of the Afghan SIV program pursuant to the AAPA and the Iraqi SIV program pursuant to the RCIA.

21.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of Homeland Security.  Defendant Nielsen exercises authority over Defendant United States Department of Homeland Security.  Defendant Nielsen, along with Defendant Pompeo, is

responsible for the administration of the Afghan SIV program pursuant to the AAPA and the Iraqi SIV program pursuant to the RCIA.

22.     Defendant L. Francis Cissna is sued in his official capacity as the Director of US Citizenship and Immigration Services (*USCIS*), a component agency of the Department of Homeland Security.   Defendant Cissna directly oversees USCIS's operations, which include determining whether an SIV applicant can be categorized as a special immigrant.

23.     Defendant Donald Neufeld is sued in his official capacity as the Associate Director of Service Center Operations for USCIS.   Defendant Neufeld is responsible for overseeing the USCIS Nebraska Service Center, which processes SIV applicants' documents related to their petitions to be categorized as a special immigrant.

24.     Defendant United States Department of Homeland Security (*DHS* and, together with Mr. Pompeo, Mr. Risch, State, Ms. Nielsen, USCIS, and Mr. Neufeld, *Defendants*) is an agency of the United States and shares responsibility with Defendant State for the administration of the Afghan SIV program pursuant to the AAPA and the Iraqi SIV program pursuant to the RCIA.   USCIS, which has control over certain stages of the SIV application process, is a component agency of DHS.

### FACTUAL BACKGROUND

### Congress Creates the Iraqi and Afghan
### <u>Special Immigrant Visa Programs to Protect Allies from Violent Reprisals</u>

25.     In 2007, as the war in Iraq experienced its "most deadly six months"[4] and the death toll of Iraqis serving alongside the US military rose, Congress unanimously passed the RCIA, recognizing that military personnel, other on-base support staff who performed vital

---

[4]     Bureau of Democracy, Human Rights, & Labor, 2007 Iraq Human Rights Report (Mar. 11, 2008), https://www.state.gov/j/drl/rls/hrrpt/2007/100596.htm.

services, and those who worked as staff for Defendant State and for USAID were crucial to US efforts in Iraq.  Congress acknowledged that those Iraqis who risked their lives and the lives of their families to provide these necessary services were being singled out as collaborators and targeted by death squads, militias, and other terrorist organizations.

26.    To combat this threat, Congress passed the RCIA.  The RCIA expanded a preexisting special visa program and initially authorized up to 5,000 visas annually for a period of five years for Iraqi citizens who provided "faithful and valuable service" as employees of, or on behalf of, the US Government.  RCIA § 1244(b)(1)(C).  In its preamble, the RCIA recognizes that

> [m]any Iraqis who have worked in critical positions in direct support of the United States Government in Iraq have been killed or injured in reprisals for their support of the American effort.  Many more Iraqis associated with the United States have fled Iraq in fear of being killed or injured.

Id.

27.    As the bill became law, former Senator Edward M. Kennedy (D, MA) reported that 257 Iraqi interpreters working for the US forces had been killed in the first four years after the US invaded Iraq.  A few months later, the release of an internal document from the primary government contractor responsible for hiring interpreters listed 667 cases of Iraqis killed or injured while working under contract as translators for US military forces.

28.    Because of the similar threats faced by Afghans associated with US forces, Congress also expanded the preexisting SIV program for Afghan citizens by enacting the AAPA in 2009 to authorize 1,500 visas annually for Afghan citizens who assisted the US government. Like Iraqi SIVs, Afghan SIVs are available to Afghan citizens who provided "faithful and valuable" service to the US government and who face "an ongoing serious threat as a

consequence of [their] employment" by or on behalf of the United States Government. AAPA § 602(b)(2)(A)(iii)-(iv).

### Defendants Establish a Multistep SIV Application Process

29.    Both the AAPA and the RCIA require the Secretary of State, in consultation with the Secretary of Homeland Security, to oversee the issuance of SIVs by establishing or repurposing existing mechanisms for processing applications for admission to the United States.

30.    Before an applicant for an Afghan or Iraqi SIV receives a visa, Defendants verify the following information:

- That the applicant is an Afghan or Iraqi citizen;

- That the applicant meets the employment eligibility requirements:

  o For Afghan SIV applicants, at least one year of employment between October 2001 and December 2020 for or on behalf of the US government in Afghanistan or the International Security Assistance Force or a successor mission if the applicant applied prior to September 30, 2015, or at least two years of employment under the same conditions if the applicant applied after September 2015, or

  o For Iraqi SIV applicants, at least one year of employment for or on behalf of the US government in Iraq between March 2003 and September 2013;

- That the applicant provided "faithful and valuable service" to the US government;

- That the applicant is experiencing an "ongoing serious threat" as a result of the applicant's service to the United States;

- That the applicant is otherwise admissible to the United States under the Immigration and Nationality Act; and

- That the applicant does not pose a national security threat to the United States.

31.     Both Afghan and Iraqi SIV applicants follow the same process to establish that they fulfill these eligibility requirements.   According to Defendants, there are fourteen sequential steps that must be completed to apply for and receive an SIV:

1)  The applicant submits an application for approval by the Chief of Mission (*COM Approval*) to the National Visa Center (*NVC*). Application materials must include a "statement of credible threat" detailing the ongoing threat to the applicant as a result of the applicant's service and a letter of recommendation from a supervisor attesting to the applicant's "faithful and valuable service."

2)  NVC reviews the applicant's documents for completeness.

3)  NVC sends the application materials to the Chief of Mission in Afghanistan for Afghan applicants, or the Chief of Mission in Iraq for Iraqi applicants.

4)  The Chiefs of Mission either approve or deny the applicant's COM Approval application.

5)  The Chief of Mission then advises NVC of the outcome of the application, which is communicated to the applicant.  If denied, the applicant has a statutory right to appeal within 120 days (*COM Appeal*).  According to government reports, many COM Appeals are successful and result in COM Approval.  For example, the percentage of successful appeals in 2017 was as high as 66% for Afghan applicants and 40% for Iraqi applicants.

6)  If the applicant receives COM Approval, the applicant submits a Special Immigrant Petition to USCIS for categorization as a special immigrant.

7)  USCIS adjudicates the Special Immigrant Petition and communicates the results to NVC.

8)  If the applicant is approved, NVC sends a visa application and instructions to the applicant.

9)  The applicant submits the visa application and required documentation to NVC.

10) NVC reviews the applicant's application and supporting documents for completeness.

11) If the applicant is determined admissible to the United States and eligible for a US visa, then NVC contacts the applicant to schedule an interview at the embassy in Afghanistan or Iraq.

12)    The applicant attends an interview conducted by a consular officer.

13)    If the application is not denied, the applicant's case undergoes administrative processing, the phrase used by Defendants to refer to the final level of background checks.

14)    If successful, the applicant is instructed to obtain a medical exam and is issued a US visa.

32.    Defendants acknowledge that, with the exception of the following four steps, each of these steps are in their control: the submission of the application for COM Approval (step 1); the submission of the Special Immigrant Petition (step 6); the submission of the visa application (step 9); and the medical examination (step 14).

33.    With a visa in hand, the successful applicant may travel to the United States. An SIV recipient is eligible to receive resettlement benefits upon arrival and to apply for adjustment of status to seek the status of lawful permanent resident and ultimately of citizen.

**Extreme Delays in Visa Processing Spark Congressional Action**

34.    From the start, the SIV programs faced considerable processing delays that risked the lives of the very applicants they were intended to protect. Applicants waited years to obtain visas, often while enduring threats or acts of violence against themselves and their families because of their assistance to the US Government.

35.    That risk became reality as the casualty list of Afghans and Iraqis killed in relation to their service to the US forces climbed. By December 2009, company officials from the primary government contractor responsible for hiring interpreters and translators in Iraq reported that 1,200 of its employees had been injured and **360 had been killed** since the invasion of Iraq.[5]

---

[5]    T. Christian Miller, Chart: Iraqi Translators, a Casualty List, ProPublica (Dec. 18, 2009), https://www.propublica.org/article/chart-Iraqi-translators-a-casualty-list.

36.     Those who provided assistance to US forces in Afghanistan fared no better.  For example, in 2010, four interpreters were abducted from a wedding procession they were attending and taken to Pakistan.  The next morning, the dead bodies of the groom, his brother, and two others were found on the Afghan side of the border.  The Taliban took credit for the murders.[6]

37.     These tragedies notwithstanding, the SIV application process failed to keep up with the number of qualified applicants who, fearing for their lives, sought SIVs.  By mid-2011, four years into the Iraqi SIV program, nearly 30,000 Iraqi applicants and their family members had applied for SIVs, but only 4,000 applications had been processed.[7]  In Afghanistan, the first SIV was not granted until 2011, two years after Congress passed the AAPA.[8]  By mid-2012, three years after the AAPA was passed, only 32 Afghan SIVs had been granted out of a total of 5,700 applicants.[9]

38.     Congress blamed the Defendants for the delay, asserting that they were dragging their feet in the processing and adjudication of visas for Afghans and Iraqis who risked their lives to assist the US.  For example, the US embassy in Kabul placed inordinate roadblocks in the way of applicants known to be at risk.  As a result, Defendants approved only a trickle of

---

[6]    Rod Nordland, Taliban Say They Killed 4 Afghan Interpreters, N.Y. Times (May 15, 2010), http://www.nytimes.com/2010/05/16/world/asia/16kabul.html.

[7]    George Packer, Iraqi Refugees: A Debt Defaulted, New Yorker (July 29, 2011), https://www.newyorker.com/news/george-packer/Iraqi-refugees-a-debt-defaulted.

[8]    Eline Gordts, America's Afghan and Iraqi Interpreters Risk Lives but Wait Years in Danger for Visas, Huff. Post (June 23, 2013), https://www.huffingtonpost.com/2013/06/23/afghan-Iraq-interpreters-siv_n_3481555.html.

[9]    Kevin Sieff, Facing Taliban threats, Afghan interpreters wait for U.S. visas, Wash. Post (Oct. 25, 2012), https://www.washingtonpost.com/world/asia_pacific/facing-taliban-threats-afghan-interpreters-wait-for-us-visas/2012/10/24/5fc531e2-1d48-11e2-8817-41b9a7aaabc7_story.html?utm_term=.92554e751c9c.

the 9,000 SIVs that had been authorized. These delays were unnecessary, shameful, and harmful to long-term American interests.

39.     In 2013, with the expiration dates of the initial mandates of the AAPA and the RCIA approaching, and as thousands of Afghans and Iraqis lived in fear while waiting out long delays, Congress amended the AAPA and the RCIA to reauthorize the program beyond the original deadlines, to increase the number of available visas, and to require Defendants to improve the efficiency of SIV application processing.

40.     Specifically, these amendments required that Defendants, in consultation with the Department of Defense, "improve the efficiency by which applications for special immigrant visas under [this statute], are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed **not later than 9 months** after the date on which an eligible alien submits all required materials to complete an application for such visa." AAPA § 602(b)(4)(A); RCIA § 1242(c)(1) (emphasis added).

41.     To enforce this timeline, Congress ordered Defendants DHS and State to report first to Congress, and thereafter publicly on a quarterly basis, the following information: the number of SIV applications received each quarter; the reasons for delays of any applications pending longer than nine months; the total number of applications pending due to the failure to (i) receive COM approval, (ii) adjudicate the Special Immigrant Petition, (iii) conduct a visa interview, or (iv) issue a visa to an eligible alien; the average waiting times at each stage of the application process; the number of denials or rejections at each stage of the application process; and the reasons for denial of COM Approval (the *Joint Reports*). AAPA §§ 602(b)(11)(A), (B); RCIA §§ 1248 (f), (g).

13

42. Congress also ordered Defendants to designate two SIV coordinators, one each for Afghanistan and Iraq, to oversee the efficiency and integrity of the processing of Afghan and Iraqi SIVs. See AAPA § 602(b)(2)(D)(ii)(II); RCIA § 1248(h). On information and belief, Defendants have not appointed SIV coordinators.

**Defendants Face Multiple Lawsuits Due to their Delays in Processing SIV Applications**

43. Despite the 2013 amendments to the RCIA and AAPA, the egregious delays in processing and adjudicating SIV applications continued. Since the amendments, at least two separate groups of SIV applicants have filed individual lawsuits against the government seeking the exact same relief, based on the exact same claims, sought here. These plaintiffs sought the prompt adjudication of their SIV applications, which the government had not adjudicated within nine months of submission. In one action, the court found the claims to be justiciable and denied the government's motion to dismiss, see Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry, 168 F. Supp. 3d 268 (D.D.C. 2016); the government then settled the case and agreed to adjudicate the plaintiffs' applications. In the second action, the government promptly agreed to provide the plaintiff with the requested relief without even seeking dismissal. See Doe v. U.S. Dep't of State, No. 15-cv-01971(RWR).

**SIV Processing Times Continue to Far Exceed the Congressional Timeline**

44. Despite Congress's directive to speed up the SIV application process and at least two lawsuits challenging delays, processing times still far exceed the nine-month timeline set by statute. Applicants often wait years for Defendants to process their applications and to receive a final decision, all while facing threats of reprisals for their work with the US government and military. Indeed, all Iraqi applicants now awaiting final decisions have

necessarily been waiting for more than **three and a half years** because the final, statutory deadline for an Iraqi to begin the SIV application process was September 30, 2014.

45.     In the most recent Joint Reports, Defendants DHS and State calculated that Afghan applicants waited **nearly two years** (700 days) for Defendants to complete all government-controlled processing steps (the ***Total Government Processing Time***).[10]  In other words, Defendants readily admit that it takes, even by their calculations, far longer than the congressionally-mandated nine months to complete government-controlled processing steps for Afghan applicants.

46.     Meanwhile, Defendants admit in the most recent Iraqi Joint Report that, on average, Defendants take over eight months to complete only some of the SIV application process that is within their control.  This Iraqi Joint Report excludes from its calculation of the Total Government Processing Time the time that SIV applicants were required to wait to receive COM Approval, a period that, by itself, can take years.  For example, Mr. Doe-Echo spent approximately 490 days waiting for COM Approval, a period excluded from Defendants' Total Government Processing Time in the January 2018 Iraqi Joint Report.

47.     These "averages" presented by Defendants are often far removed from the delays ultimately suffered by SIV applicants, as demonstrated by the experiences of the Allies. For example, when Ms. Doe-Delta submitted a COM application in December 2016, Defendants claimed that, on average, it took 63 days for an applicant to receive a decision on a COM application.  Today, more than 500 days later (or over 8 times the "average" wait time), Ms. Doe-Delta has yet to receive a COM decision.  And Mr. Doe-Alpha, who has waited more than

---

[10]     As of the date this Complaint was filed, the January 2018 Joint Reports, reflecting data from the first quarter of fiscal year 2018, were the last Joint Reports issued by Defendants DHS and State.

1,000 days since his visa interview, has waited over 11 times the current "average" for the government to complete the penultimate step of administrative processing.

48.    In short, the Joint Reports demonstrate that Defendants have failed to comply with the congressionally-imposed nine-month deadline—and, the admissions in those reports are the low-end estimate of the delays Afghan and Iraqi SIV applicants actually face.[11] Defendants' failure to comply with their statutory obligations is of their own doing, caused by the failure of the interagency process, which has resulted in undue delay, needless stress on applicants, and a sizable drop in SIV admissions during the first and second quarters of fiscal year 2018.

### Thousands of SIV Applicants Continue to Face Reprisals and Insecurity.

49.    As of December 31, 2017, there were at least 9,985 applicants with pending applications for Afghan SIVs and at least 143 applicants with pending applications for Iraqi SIVs. Many of these applications have been in government-controlled steps for longer than nine months.

50.    These SIV applicants continue to live under threat while waiting for Defendants to adjudicate their applications. The security situation in both Afghanistan and Iraq remains dangerous. Defendant State describes the security situation in Afghanistan as follows:

> There were major attacks on civilians by armed insurgent groups and targeted assassinations by armed insurgent groups of persons affiliated with the government. The Taliban and other insurgents continued to kill

---

[11]    In addition, Defendants DHS and State fail to provide consistent and timely Joint Reports, making it difficult for the public to identify trends over time and hold Defendants accountable to their congressional mandates. For example, in fiscal year 2017, the Joint Reports inexplicably skipped over the third quarter numbers and instead presented data and information from the second and fourth quarters in consecutive reports. For fiscal year 2018, the first Joint Report (covering October-December 2017) was not published until May 30, 2018, and Defendants DHS and State have yet to issue the second quarter report (covering January-March 2018).

security force personnel and civilians using indiscriminate tactics such as improvised explosive devices (IEDs), suicide attacks, and rocket attacks, and to commit disappearances and torture. The UN Assistance Mission in Afghanistan (UNAMA) attributed 67 percent of civilian casualties (1,141 deaths and 3,574 injured) to nonstate actors. The Taliban used children as suicide bombers, soldiers, and weapons carriers. Other antigovernment elements threatened, robbed, kidnapped, and attacked government workers, foreigners, medical and nongovernmental organization (NGO) workers, and other civilians.[12]

51.     This violence has continued. Multiple recent attacks across Afghanistan have left dozens dead, including 26 government security officers and 57 people lining up to register to vote in the country's upcoming parliamentary elections.[13]

52.     Iraq also remains wracked with violence. Defendant State describes the security situation in Iraq as follows:

> Violence continued throughout the year, largely fueled by the actions of the Islamic State in Iraq and Syria (ISIS). ... ISIS committed the majority of serious abuses and atrocities. ISIS members committed acts of violence on a mass scale, including killings through suicide bombings and improvised explosive devices (IEDs); executions including shootings and public beheadings; use of civilians as human shields; as well as use of chemical weapons. They also engaged in kidnapping, rape, enslavement, forced marriage, and sexual violence, committing such acts against civilians from a wide variety of religious and ethnic backgrounds, including Shia, Sunnis, Kurds, Christians, Yezidis, and members of other religious and ethnic groups.[14]

---

[12]     Bureau of Democracy, Human Rights, & Labor, 2017 Afghanistan Human Rights Report (2018), http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2017&dlid=277275.

[13]     Najim Rahim & Jawad Sukhanyar, Attacks in Afghanistan Leave Dozens Dead and 2 Schools Burned, N.Y. Times (Apr. 15, 2018), https://nyti.ms/2H00QLA; Mujib Mashal Jawad Sukhanyar, 'So Many Bodies': Bomber Kills Dozens Signing Up to Vote in Kabul, N.Y. Times (Apr. 22, 2018), https://nyti.ms/2K6Ohfo.

[14]     Bureau of Democracy, Human Rights, & Labor, 2017 Iraq Human Rights Report (2018), http://www.state.gov/j/drl/rls/hrrpt/humanrightsreport/index.htm?year=2017&dlid=277243.

53.     SIV applicants experience a particular visibility and vulnerability due to their connection with US forces and government agencies.  Stories abound of the state of fear in which SIV applicants live.  One Afghan SIV applicant wrote,

> The Taliban know what they are doing.  That's how they turned this country into hell.  They know how to track you, because they are everywhere.  No matter how long you hide, how long you sneak around, or how many times you change houses; even if you fly from one province to another to avoid getting killed - finally you will do something wrong.  And they're everywhere.  They could be in the street, they could be in the shop, they could be your friend without you knowing.  That's why it's very hard for the interpreters to trust someone.[15]

54.     For some SIV applicants, the wait becomes deadly.  For example, in March 2015, an Afghan former interpreter was tortured and killed by insurgents after waiting for a decision on his SIV application for over four years.  See also supra ¶ 10. An unknown number of SIV applicants have suffered a similar fate while waiting for their applications to be adjudicated.

**The Allies Are Among the Thousands of SIV Applicants Who**
**Must Live in Fear While Awaiting Application Processing by Defendants.**

55.     Allies John/Jane Does Alpha, Bravo, Charlie, Delta, and Echo are all SIV applicants who reside in Afghanistan or Iraq and who, like other SIV applicants, live in fear of reprisal for their service to the US government while they await final decisions from Defendants on their applications.  For each of the Allies, and for many of the hundreds of similarly situated SIV applicants, Defendants have now taken far longer than the statutorily-allowed nine months to complete all government-controlled processing steps.

---

[15]     Afghan Interpreter: 'Taliban don't wait to kill you', Al Jazeera (Apr. 6, 2016), https://www.aljazeera.com/indepth/features/2016/04/afghan-interpreter-taliban-don-wait-kill-160403131005408.html; see also, Sarah Feinberg & Daniel Davis, Save the visa program for Afghan interpreters, Politico (May 31, 2016), https://www.politico.com/agenda/story/2016/05/congress-should-save-visa-program-for-afghan-interpreters-000135.

*John Doe-Alpha Has Spent More Than 52 Months (and Counting)*
*Waiting for Defendants to Process His SIV Application*

56.     Mr. Doe-Alpha is an Afghan citizen who provided faithful and valuable service to the international development projects of a US government contractor from 2011 to 2014, and 2015 to the present.  As a result of that service, he had to flee his hometown, which is controlled by the Taliban.  He now lives with his wife and daughter in a nearby city, and his family members who remained behind have been repeatedly threatened and harassed by people identifying themselves as members of the Taliban (who have even put his parents on house arrest).  As a result, Mr. Doe-Alpha fears he will be targeted if he returns to his hometown.

57.     Mr. Doe-Alpha applied for an SIV **four and a half years** ago, on September 25, 2013.  He is now awaiting administrative processing of his application.  In total, Defendants have taken 52 months—and counting—to process his application: over four months for the initial COM decision; five days for his Special Immigrant Petition; and over twelve months for his visa interview.  Mr. Doe-Alpha had his visa interview thirty-six months ago, on June 11, 2015, and continues to wait for Defendants to complete administrative processing of his application.

*Jane Doe-Bravo Has Spent More Than 31 Months (and Counting)*
*Waiting for Defendants to Process Her SIV Application*

58.     Ms. Doe-Bravo is an Afghan citizen who has worked for a US government-funded development organization since 2013.  After she and her family began receiving frequent death threats, she moved to a new address with her husband and three young children.  She has kept her address secret and has changed her phone number numerous times.  She feels hopeless and cannot trust anyone, even as she recovers from recent childbirth and cares for her newborn.

59.     Ms. Doe-Bravo applied for an SIV over **two and a half years ago**, on October 15, 2015. She is now awaiting a decision on her COM Appeal. In total, Defendants have taken 31 months—and counting—to process her application. Ms. Doe-Bravo waited nearly three months to receive a decision on her application for COM Approval. She appealed that decision over twenty-eight months ago on February 4, 2016, and continues to wait for Defendants decide that appeal.

*John Doe-Charlie Has Spent More Than 22 Months (and Counting)*
*Waiting for Defendants to Process His SIV Application*

60.     Mr. Doe-Charlie is an Afghan citizen who worked as an interpreter and translator for two US military contractors between 2009 and 2013. As a result, Mr. Doe-Charlie and his family have been subjected to death threats. The Taliban attacked and repeatedly stabbed Mr. Doe-Charlie's brother, apparently mistaking him for Mr. Doe-Charlie. Mr. Doe-Charlie has moved in order to protect his family, yet he continues to fear for their safety.

61.     Mr. Doe-Charlie applied for an SIV more than **two years ago**, on April 18, 2016. He is now awaiting a decision on a COM Appeal. In total, Defendants have taken 22 months—and counting—to process his application. Mr. Doe-Charlie first waited more than eight months for a decision on his application for COM Approval. He then appealed that decision over fourteen months ago on April 3, 2017, and continues to wait for Defendants to decide that appeal.

*Jane Doe-Delta Has Spent More Than 17 Months (and Counting)*
*Waiting for Defendants to Process Her SIV Application*

62.     Ms. Doe-Delta is an Afghan citizen who currently works with a US government communications contractor, where she has worked since August 2013. Her role requires her to travel with colleagues to active conflict zones and interact with the public. As a result of her work, she and her family have received threats from the Taliban and have been

followed by masked men.  Both she and her father have been told that her family would be killed if she did not quit her job.  She constantly feels unsafe.

63.   Ms. Doe-Delta is at the beginning of the SIV application process, but has already been waiting over **seventeen months** for Defendants to complete processing of her COM application.  She applied for an SIV on December 23, 2016, and is still waiting for Defendants to decide whether to grant COM Approval.

*John Doe-Echo Has Spent Approximately 53 Months (and Counting)*
*Waiting for Defendants to Process His SIV Application*

64.   Mr. Doe-Echo is an Iraqi citizen who provided faithful and valuable service to the United States as a translator for US forces for more than two years, including eight months training the Iraqi police at the request of the United States.  As a result, Mr. Doe-Echo has been threatened by militants who kidnapped and murdered his father and have shot at his home.  Fearing for his safety after his father's murder, he briefly fled Iraq but, without employment or a means of supporting himself, he was forced to return.  He now lives in hiding in Iraq.

65.   Mr. Doe-Echo applied for an SIV nearly **five years** ago, in July 2013.  He is now awaiting administrative processing of his case.  In total, Defendants have taken at least 53 months—and counting—to process his application: approximately sixteen months for the original COM decision; nearly a month for his COM Appeal to be granted; nearly six months for his Special Immigrant Petition; and nearly three months to schedule and hold his interview.  Mr. Doe-Echo had his visa interview over twenty-eight months ago, on February 3, 2016, and continues to wait for Defendants to complete administrative processing of his application.

## CLASS ACTION ALLEGATIONS

66.     Named Plaintiffs bring this action on behalf of themselves and all others similarly situated.  Plaintiffs' proposed class consists of all people who have applied for an Afghan or Iraqi SIV pursuant to the AAPA or the RCIA by submitting an application for COM Approval, and whose applications have been in government-controlled steps for longer than nine months.

67.     Plaintiffs and the proposed class meet the requirements of Rules 23(a)(1)-(4) and Rule 23(b)(2) because:

- The class is so numerous that joinder of all members of the class is impracticable. Although the precise number of potential class members is within Defendants' control, on information and belief, there are likely hundreds of Afghan and Iraqi SIV applicants who have waited longer than the statutorily-allowed nine-month period for Defendants to complete the processing of their SIV applications;

- There are questions of law and fact common to the proposed class, namely whether Defendants have a nondiscretionary duty to adjudicate SIV applications; whether they have a nondiscretionary duty to do so within a reasonable period of time; whether they are required to do so within the congressionally-mandated nine-month period; and whether their failure to do so merits relief under the APA, 5 U.S.C. § 555(b), or the Mandamus Act;

- The claims of the named Plaintiffs are typical of the claims of the proposed class in that each named Plaintiff applied for either an Afghan or Iraqi SIV and has now waited longer than nine months for Defendants to complete all government-controlled steps in the SIV application process;

- The named Plaintiffs will fairly and adequately represent and protect the interests of the proposed class.  They have no interests that are antagonistic to the proposed class and seek relief that will benefit all members of the proposed class.  They are represented by counsel with significant experience with this type of litigation; and

- By failing to act within the congressionally stipulated timeline, Defendants have acted and continue to act on grounds generally applicable to the entire class, thereby making injunctive or declaratory relief appropriate with respect to the class as a whole.

## FIRST CAUSE OF ACTION
### Declaratory Judgment, Unreasonable Delay,
### on behalf of Plaintiffs and the Class

68.     Pursuant to the AAPA, the RCIA, and the regulations governing the issuance of immigrant visas, Defendants have a nondiscretionary duty to adjudicate applications for SIVs.  AAPA § 602(b); RCIA § 1244(a)-(b); see also 22 C.F.R. § 42.81.

69.     The APA obligates Defendants to complete these nondiscretionary actions within a "reasonable time."  5 U.S.C. § 555(b).

70.     The AAPA and the RCIA require Defendants to process SIV applications such that "all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa."  AAPA § 602(b)(4)(A); RCIA § 1242(c)(1).

71.     Plaintiffs and proposed class members are entitled to a declaratory judgment that Defendants have a nondiscretionary duty to adjudicate their SIV applications, that Defendants must do so within a reasonable period of time, that the reasonable period of time is nine months, and that Defendants have unreasonably delayed the processing and adjudication of all SIV applications that have been pending in government-controlled steps for longer than nine months.

## SECOND CAUSE OF ACTION
### Administrative Procedure Act, Unreasonable Delay,
### on behalf of Plaintiffs and the Class

72.     Pursuant to the AAPA, the RCIA, and the regulations governing the issuance of immigrant visas, Defendants have a nondiscretionary duty to adjudicate applications for SIVs.  AAPA § 602(b); RCIA § 1244(a)-(b); see also 22 C.F.R. § 42.81.

23

73.     The APA obligates Defendants to complete these nondiscretionary actions within a "reasonable time." 5 U.S.C. § 555(b).

74.     The AAPA and the RCIA require Defendants to process SIV applications such that "all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa." AAPA § 602(b)(4)(A); RCIA § 1242(c)(1).

75.     Defendants have failed to adjudicate Plaintiffs' and proposed class members' SIV applications within a reasonable time, which caused and continues to cause irreparable harm to Plaintiffs and proposed class members.

76.     The APA provides that this Court "*shall* … compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1) (emphasis added).

77.     Plaintiffs and proposed class members are entitled to relief pursuant to 5 U.S.C. § 702 and 5 U.S.C. § 706(1) compelling Defendants to adjudicate their SIV applications.

### THIRD CAUSE OF ACTION
**Mandamus to Compel, Adjudication of SIVs,**
**on behalf of Plaintiffs and the Class**

78.     The mandamus statute, 28 U.S.C. § 1361, vests this Court with original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a nondiscretionary duty owed to Plaintiffs.

79.     Pursuant to the AAPA, the RCIA, and the regulations governing the issuance of immigrant visas, Defendants have a nondiscretionary duty to adjudicate applications for SIVs. AAPA § 602(b); RCIA § 1244(a)-(b); see also 22 C.F.R. § 42.81.

24

80.    The APA obliges Defendants to complete these nondiscretionary actions within a "reasonable time."  5 U.S.C. § 555(b).

81.    The AAPA and the RCIA require Defendants to process SIV applications such that "all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa."  AAPA § 602(b)(4)(A); RCIA § 1242(c)(1).

82.    Plaintiffs have brought this action because Plaintiffs have no other means to compel Defendants to perform the duties owed to Plaintiffs.

83.    Plaintiffs and proposed class members are entitled to a writ of mandamus pursuant to 28 U.S.C. § 1361 compelling Defendants to adjudicate their SIV applications.

### FOURTH CAUSE OF ACTION
### Administrative Procedure Act, Appointment of SIV Coordinators, on behalf of Plaintiffs and the Class

84.    Defendants have a nondiscretionary duty imposed by Congress to appoint two SIV coordinators, one each for Afghanistan and Iraq.  AAPA § 602(b)(2)(D)(ii)(II); RCIA § 1248(h).

85.    Upon information and belief, Defendants have not appointed such coordinators.

86.    The APA provides that this Court "*shall* … compel agency action unlawfully withheld."  5 U.S.C. § 706(1) (emphasis added).

87.    Plaintiffs and proposed class members are entitled to relief pursuant to 5 U.S.C. § 702 and 5 U.S.C. § 706(1) compelling Defendants to appoint SIV coordinators.

## FIFTH CAUSE OF ACTION
### Mandamus to Compel, Appointment of SIV Coordinators,
### on behalf of Plaintiffs and the Class

88.     The mandamus statute, 28 U.S.C. § 1361, vests this Court with original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a nondiscretionary duty owed to Plaintiffs.

89.     Defendants have a nondiscretionary duty imposed by Congress to appoint two SIV coordinators, one each for Afghanistan and Iraq.   AAPA § 602(b)(4)(A); RCIA § 1248(h).

90.     Upon information and belief, Defendants have not appointed such coordinators.

91.     Plaintiffs have brought this action because Plaintiffs have no other means to compel Defendants to perform the duties owed to Plaintiffs.

92.     Plaintiffs and proposed class members are entitled to a writ of mandamus pursuant to 28 U.S.C. § 1361 compelling Defendants to appoint SIV coordinators.

## JURISDICTION AND VENUE

93.     Jurisdiction is proper under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), and 5 U.S.C. §§ 701-06 (Administrative Procedure Act).

94.     This Court has personal jurisdiction over Defendants because Defendants are federal agencies or officers of federal agencies, all of which are headquartered in the District of Columbia.

95.     Venue is proper pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies or officers of federal agencies, all of which are headquartered in the District of Columbia, and because a substantial part of the events or omissions giving rise to the Complaint necessarily occurred or failed to occur within the District of Columbia.

26

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Certify a class pursuant to Federal Rule of Civil Procedure 23.

2.      Declare that Defendants' delay in the adjudication of Plaintiffs' SIV applications is unreasonable and that a reasonable period of time to adjudicate SIV application is defined as nine months.

3.      Issue an order pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1), that requires Defendants to adjudicate proposed class members' SIV applications, which have all been in government-controlled processing steps for longer than nine months;

4.      Issue a writ of mandamus, pursuant to 28 U.S.C. § 1361, directing Defendants to adjudicate proposed class members' SIV applications, which have all been in government-controlled processing steps for longer than nine months;

5.      Issue an order pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(1), directing Defendants to appoint an Afghan and an Iraqi SIV coordinator in accordance with AAPA § 602(b)(4)(A) and RCIA § 1248(h);

6.      Issue a writ of mandamus, pursuant to 28 U.S.C. § 1361, directing Defendants to appoint an Afghan and an Iraqi SIV coordinator in accordance with AAPA § 602(b)(2)(D)(ii)(II) and RCIA § 1248(h);

7.      Retain jurisdiction over this action and any attendant proceedings until Defendants have in fact adjudicated Plaintiffs' and class members' SIV applications, and have communicated the results of such adjudication to the class and the Court;

8.      Award Plaintiffs' attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

9.      Award such other and further relief that the Court may deem just and proper.

Dated: New York, New York       By:   _Shannon Leitner_
       June 8, 2018                    Linda H. Martin (D.D.C. Bar No. NY0210)
                                       David Y. Livshiz (application pending)
                                       Shannon M. Leitner (D.D.C. Bar No. NY0268)
                                       Rebecca L. Curwin (D.D.C. Bar No. NY0267)
                                       Allison C. Wilson (D.D.C. Bar No. NY0271)
                                       FRESHFIELDS BRUCKHAUS DERINGER US LLP
                                       601 Lexington Avenue, 31st Floor
                                       New York, New York 10022
                                       Telephone: (212) 277-4000
                                       Facsimile: (212) 277-4001
                                       linda.martin@freshfields.com
                                       david.livshiz@freshfields.com
                                       shannon.leitner@freshfields.com
                                       rebecca.curwin@freshfields.com
                                       allie.wilson@freshfields.com


                                       _D. Alagesan_
                                       Deepa Alagesan (D.D.C. Bar No. NY0261)
                                       Mariko Hirose (D.D.C. Bar No. NY0262)
                                       INTERNATIONAL REFUGEE ASSISTANCE
                                       PROJECT
                                       40 Rector Street, 9th Floor
                                       New York, New York 10006
                                       Telephone: (646) 602-5639
                                       dalagesan@refugeerights.org
                                       mhirose@refugeerights.org

                                       *Attorneys for Plaintiffs and Proposed Class Counsel*