**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
AFGHAN AND IRAQI ALLIES UNDER )
SERIOUS THREAT BECAUSE OF THEIR )
FAITHFUL SERVICE TO THE UNITED )
STATES, ON THEIR OWN AND ON BEHALF )     Civil Action No. 1:18-cv-01388-TSC
OF OTHERS SIMILARLY SITUATED, )
                                                                   )
                    Plaintiffs, )
                                                                   )
        v. )
                                                                   )
MICHAEL POMPEO, *et al.*, )
                                                                   )
                    Defendants. )
_____)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS'MOTION FOR CLASS CERTIFICATION**

## I.    INTRODUCTION

This Court should deny Plaintiffs' Motion for Class Certification, ECF No. 3, because the

class proposed in the motion is impermissibly broad.  Plaintiffs' sweeping proposed class

encompasses a broad range of dissimilarly-situated individuals whose claims are not common,

whose injuries are not typified by the claims of the putative class representatives, and who have

different factual bases for their claims.  Further, the members of the proposed class would be

impossible to discern because Plaintiffs do not, and cannot, temporally define what constitutes an

unreasonable delay, as applied to the entire putative class, in the adjudication of an application

for an immigrant visa.  This task is not actually possible here, where the relevant statutes require

the principal alien to first obtain:

(1)    Chief of Mission Approval from the U.S. Embassy; and

(2)    Special Immigrant Status from U.S. Citizenship and Immigration Services,
        (Form I-360, Petition for Amerasian, Widow(er) or Special Immigrant).

Only upon completing these two prerequisites may an alien apply for an immigrant visa under the Refugee Crisis in Iraq Act of 2007 ("RCIA") or Afghan Allies Protection Act of 2009 ("AAPA"). The determinations involved in these prerequisites unquestionably turn on individual circumstances of each alien. Nonetheless, Plaintiffs propose a class that includes *every* prospective applicant for a special immigrant visa ("SIV Applicant") who merely has submitted an application for Chief of Mission Approval.

Thus, even if Plaintiffs were to prevail in this action, it would be unclear which class members would be entitled to relief under the Administrative Procedure Act ("APA") or the Mandamus Act. Further, the named Plaintiffs are inadequate representatives of the putative class.

Finally, Plaintiffs have proposed a fail-safe class. Because the proposal defines the class based on the criteria for the harm alleged—an unreasonable amount of time in "government-controlled steps"—the gravamen of the Complaint and the membership in the class are necessarily intertwined. As such, Defendants would be denied the benefit of *res judicata* with regard to future litigants who present a similar claim, if the putative class were to be certified.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Iraqi and Afghan Special Immigrant Visa Application Process

The Congressional Research Service published a report on December 12, 2017, entitled *Iraqi and Afghan Special Immigrant Visa Programs* ("Congressional Research Service Report").[1] The report provides an overview of the program, as well as descriptions of the "challenges with respect to application processing, security screening, and visa availability." *Id*.

---

[1] (available at https://fas.org/sgp/crs/homesec/IN10649.pdf) (last checked on July 26, 2018).

at Summary Page.

The report describes the application process, including prerequisite steps that the prospective applicant must complete in order to apply for an Iraqi or Afghan special immigrant visa. Because this litigation deals with the timing of the visa application and submission of documents by a prospective applicant, as well as a determination of eligibility, those portions of the description are highlighted:

> The first step under the programs for Iraqis and Afghans who have worked for or on behalf of the United States is to apply for Chief of Mission approval. To apply, the principal applicant must submit documentation to the Department of State (DOS), including, among other required information, a letter from the applicant's employer confirming employment; a letter of recommendation from the applicant's direct U.S. citizen supervisor; and a statement from the applicant describing the threats he or she received as a result of his or her U.S. government employment. If approval is granted, the applicant receives a Chief of Mission approval letter.
>
> The next step for applicants under the special immigrant programs for Iraqis and Afghans who have worked for, or on behalf of, the United States—and the first step for applicants under the program for translators and interpreters—is to file a petition with the Department of Homeland Security's U.S. Citizenship and Immigration Services (DHS/USCIS) along with accompanying documents. In the case of the program for those who have worked for, or on behalf of, the United States, the required documents include copies of the Chief of Mission approval letter and of the letter of recommendation from the direct supervisor. In the case of the program for translators or interpreters, the required documents include evidence of qualifying employment, a letter of recommendation from the Chief of Mission or a general or flag officer in the relevant U.S. Armed Forces unit, and evidence of a background check and screening by the Chief of Mission or the U.S. Armed Forces.
>
> Petitions for classification as an Iraqi or Afghan special immigrant that are approved by USCIS are forwarded to DOS's National Visa Center (NVC), which contacts the applicant to advise him or her to begin collecting required documents. The applicant must submit forms and documents for all family members applying for visas to the NVC. **In addition to the immigrant visa application, these materials include copies of passport biodata pages, birth certificates, and civil documents; police certificates, if applicable; and a refugee benefits election form**, indicating whether the applicant, if approved to receive a special immigrant visa, would like to participate in DOS's Reception and Placement program and receive associated benefits (see "Resettlement Assistance and Federal Public Benefits").

The NVC schedules an in-person visa interview for the principal applicant and any family members at a U.S. embassy or consulate abroad. **The interview is required to determine eligibility for a visa.** Applicants' fingerprints are taken at the time of the interview. Applicants are also required to have a medical examination at their own cost. After the interview, the consular office informs the applicant about any missing documentation and about any problems with the case that may prevent issuance of a visa. Many cases require additional "administrative processing" after the interview.

*Id*. at 7-8 (emphasis added) (footnotes omitted).

The report also describes the challenges faced by the agencies charged with implementing the program:

There is a fundamental tension in the administration of the Iraqi and Afghan SIV programs between a sense of urgency to issue visas in a timely fashion to eligible individuals and a need to conduct appropriate security screening. This tension is quite sharp because on the one hand these programs are aimed at individuals who assisted the United States and face danger because of it, and on the other hand there are serious concerns that this population may pose security threats. Overlaying this dynamic is the structure of the SIV programs themselves, with statutory timeframes and numerical limitations.

*Id*. at 12.

Speaking at a hearing before the House of Representatives, the DHS Deputy Under Secretary for Analysis described the security issues specifically:

When we look at on [sic] the potential in the future for terrorist groups to exploit the refugee program, we do have concerns. Hence, we have the enhanced security and vetting procedures.... I will tell you that we have intelligence-driven processes regardless of the immigration program that a terrorist actor may seek to use or just travel to the United States. We are reviewing intelligence on a regular basis, sharing that with interagency partners and developing the procedures by which we can help to identify and further [screen] individuals of concern.

Testimony of DHS Deputy Under Secretary for Analysis Dawn Scalici, U.S. Congress, House Committee on Homeland Security, *Terrorist Exploitation of Refugee Program*, hearing, 112th Cong., 2nd sess., December 4, 2012, (Washington: GPO, 2013), p. 18.

The report concludes with this observation:

> There seems to be broad agreement that the United States should admit for permanent residence Iraqis and Afghans who assisted the U.S. government overseas, provided that they do not pose security risks. Yet implementing the SIV programs intended to accomplish this policy goal has proven difficult. Given the seeming consensus that the U.S. government should assist its Iraqi and Afghan employees in need, an ongoing question for Congress is whether the existing SIV provisions are sufficient to accomplish this, or whether further extensions of the temporary SIV programs for Iraqis and Afghans who worked for, or on behalf of, the U.S. government, or other changes to the SIV provisions are warranted.

Congressional Research Service Report at 17.

**B.      The Named Plaintiffs**

There are five named Plaintiffs.

> 1.      <u>Plaintiff John Doe-Alpha</u>

John Doe-Alpha is an Afghan citizen.  ECF No. 23 ¶ 56.  On June 11, 2015, John Doe-Alpha completed the interview on his visa application.  *Id.* ¶ 57.

> 2.      <u>Plaintiff Jane Doe-Bravo</u>

Jane Doe-Bravo is an Afghan citizen.  *Id.* ¶ 58.  On July 6, 2018, Jane Doe-Bravo received a COM Approval.  *Id.* ¶ 59.

> 3.      <u>Plaintiff John Doe-Charlie</u>

John Doe-Charlie is an Afghan citizen.  *Id.* ¶ 60.  On April 3, 2017, John Doe-Charlie submitted an appeal to a denial of an application for a COM Approval.  *Id.* ¶ 61.

> 4.      <u>Plaintiff Jane Doe-Delta</u>

Jane Doe-Delta is an Afghan citizen.  *Id.* ¶ 62.  On December 23, 2016, Jane Doe-Delta submitted an application for a COM Approval.  *Id.* ¶ 63.

> 5.      <u>Plaintiff John Doe-Echo</u>

John Doe-Echo is an Iraqi citizen.  *Id.* ¶ 64.  On February 3, 2016, John Doe-Echo completed the interview on his visa application.  *Id.* ¶ 65.

### C.      Procedural History

On June 12, 2018, Plaintiffs filed their Class Action Complaint.  *See* ECF No. 1.  On the

same day, Plaintiffs filed a Motion for Class Certification and Appointment of Class

Representatives and Counsel.  *See* ECF No. 3.  In the motion, Plaintiffs requested that the Court

certify a class consisting of:

> all people who have applied for an Afghan or Iraqi SIV pursuant to the [AAPA], or
> the [RCIA], by submitting an application for COM Approval and whose
> applications have been in government-controlled steps for longer than nine months
> . . . .

ECF No. 3 at 1.

Plaintiffs ask the Court to appoint the following class representatives:  John/Jane Does

Alpha, Bravo, Charlie, Delta, and Echo.  Finally, the motion asks the Court to appoint

Freshfields Bruckhaus Deringer US LLP and the International Refugee Assistance Project as

Counsel for the Plaintiff Class.  ECF No. 3 at 1.

On July 13, 2018, Plaintiffs filed an Amended Class Action Complaint.  *See* ECF No. 23.

## III.    LEGAL STANDARD

### A.      Class Certification

"The class action is 'an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33

(2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  To fall within the

exception, Plaintiffs "must affirmatively demonstrate [their] compliance" with Rule 23 of the

Federal Rules of Civil Procedure.  *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  A

party seeking certification of a proposed class bears the burden to demonstrate that the required

elements set forth in Rule 23(a) exist, including:  (1) there are questions of law or fact common

to the class ("commonality"); (2) the claims or defenses of the named plaintiffs are typical of

claims or defenses of the class ("typicality"); and (3) the named plaintiffs will fairly and adequately protect the interests of the class ("adequacy of representation").  *See* Fed. R. Civ. P. 23(a).  The Supreme Court has held that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal–Mart Stores, Inc.*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

In addition to meeting the requirements set forth in Rule 23(a), the proposed class must also qualify under Rule 23(b)(1), (2), or (3).  *See Hartman v. Duffey*, 19 F.3d 1459, 1468 (D.C. Cir. 1994); *Franklin v. Barry*, 909 F. Supp. 21, 30 (D.D.C. 1995); *see also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Plaintiffs seek certification under Rule 23(b)(2), ECF No. 3-1 at 20, which permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  *Wal–Mart Stores, Inc.*, 564 U.S. at 350.  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Id.*

The proponents of a class action have the burden of proof as to each of Rule 23's requirements.  *See McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n 9 (D.C. Cir. 1984).  The Supreme Court has held that "actual, not presumed, conformance with Rule 23(a) [is] indispensable."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).  If a court is not fully satisfied, the class cannot be certified.  *Id.*  "While the trial court has broad discretion to certify a

class, its discretion must be exercised within the framework of Rule 23." *Zinser*, 253 F.3d at 1186.  When reviewing a motion for class certification, it "'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Wal–Mart Stores, Inc.*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 160-161).

## IV.   STATUTORY BACKGROUND

### A.   Refugee Crisis in Iraq and Afghan Allies Protection Act[2]

In 2007, Congress passed the RCIA, which temporarily broadened the special immigrant classification under 8 U.S.C. § 1101(a)(27) for certain Iraqi nationals who had worked for or on behalf of the U.S. government in Iraq.  FY2008 National Defense Authorization Act, Pub. L. No. 110-181, § 1244, 122 Stat. 395 (2007).  In 2009, Congress passed the Afghan Allies Protection Act of 2009 ("AAPA"), which temporarily broadened the special immigrant classification under 8 U.S.C. § 1101(a)(27) for certain Afghan nationals who had worked for or on behalf of the U.S. government in Afghanistan.  Omnibus Appropriations Act, Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009).  Once it has been determined that an alien meets the statutory requirements of the APAA or the RCIA, these Iraqi or Afghan nationals may then apply for an immigrant visa.  *See generally* RCIA § 1244; APAA § 602(b).

In establishing a pathway for qualifying aliens, Congress was working within an existing statutory framework of the Immigration and Nationality Act, 8 U.S.C. § 1101, et seq..  Section 1202(a) of Title 8, United States Code, sets out requirements that apply to every immigrant visa

---

[2] Although the language in the statutes vary in some aspects, for purposes of this pleading, Defendants will primarily cite to the statutory sections of the APAA.

issued by the Department of State:

> Every alien applying for an immigrant visa . . . shall make application therefor in such form and manner and at such place as shall be by regulations prescribed.

8 U.S.C. § 1202(a).

Similarly, section 1204 prescribes the requirements for the category of "special immigrant":

> A consular officer may, subject to the limitations provided in section 221 [8 USCS § 1201], issue an immigrant visa to a special immigrant or immediate relative as such upon satisfactory proof, under regulations prescribed under this Act, that the applicant is entitled to special immigrant or immediate relative status.

8 U.S.C. § 1204.

In addition to these general requirements that apply to all applicants for immigrant visas, Congress required that any prospective SIV applicant meet additional criteria before they can apply for a SIV, specifically the alien must receive Chief of Mission Approval ("COM Approval"). *See* RCIA § 1244(b)(4); AAPA § 602(b)(2)(D). After receiving COM Approval, the alien must be approved for special immigrant status by submitting a Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant ("Form I-360 petition"), to U.S. Citizenship and Immigration Services ("USCIS"). *See* RCIA § 1244(a)(3); AAPA § 602(b)(9). Only after USCIS approves the Form I-360 petition can the alien then submit a Form DS-260, Immigrant Visa Application ("visa application"), to the State Department. *See id.*

**B.    2014 Changes to the APAA and RCIA**

In 2014, Congress modified the APAA and RCIA, directing the Secretary of State and Secretary of Homeland of Security to improve the efficiency of processing special immigrant visas under the APAA and RCIA, and to publish quarterly public reports on the efficiency improvements:

RCIA

(c) IMPROVED APPLICATION PROCESS.—

     (1) IN GENERAL.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under section 1244(a), are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

     (2) CONSTRUCTION.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in paragraph (1) to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

     …

     (g) PUBLIC QUARTERLY REPORTS.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014, and every 3 months thereafter, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall publish a report on the website of the Department of State that describes the efficiency improvements made in the process by which applications for special immigrant visas under section 1244(a) are processed, including information described in subparagraphs (C) through (H) of subsection (f)(2).

Pub. L. No. 113-66, § 1218(1), (g), 127 Stat. 672 (Dec. 26, 2013).

APAA

     (4) APPLICATION PROCESS.—

     (A) IN GENERAL.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under paragraph (1), are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

(B) CONSTRUCTION.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in subparagraph (A) to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

…

(13) PUBLIC QUARTERLY REPORTS.—Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014, and every 3 months thereafter, the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall publish a report on the website of the Department of State that describes the efficiency improvements made in the process by which applications for special immigrant visas under this subsection are processed, including information described in clauses (iii) through (viii) of paragraph (12)(B).

Pub. L. No. 113-66, § 1219(2)(A) and (B), (3), 127 Stat. 672 ( Dec. 26, 2013).

To meet these reporting requirements, the Secretaries of State and Homeland Security publish online quarterly reports.  RCIA § 1248(g); AAPA § 602(b)(13).  For illustrative purposes, the Secretaries lay out the process for a prospective SIV applicant to apply for an immigrant visa.  Based upon explicit requirements by Congress, the process is comprised of three parts—each involving an different application.  To proceed through all three applications involves fourteen steps.  RCIA § 1248(g); AAPA § 602(b)(13).[3]

**Application 1:  COM Approval**

> **Step 1.**  The prospective applicant submits COM application package to the Department of State's National Visa Center (NVC.)  A COM applicant must submit seven items to the NVC:  (1) verification of employment in Afghanistan; (2) letter of recommendation; (3) Form DS-157,Supplemental SIV Chief of Mission Application ; (4) evidence of nationality; (5) biographic data; (6)

---

[3] When considering these quarterly reports, the district court in *Nine Iraqis* appeared to rely upon descriptions contained in the report as if they were the result of the notice-and-comment process. *See*, *e.g.*, *Nine Iraqis v. Kerry*, 168 F.Supp.3d 268, 287-89 (D.D.C. 2016) (discussing the denial of a visa at an interview).  While judicial deference to the agency is appropriate with regard to the Foreign Affairs Manual, a binding authority for State Department employees and consular officers, the quarterly reports are produced for the purpose of publicizing particular statistics, not promulgating formal agency policy.

statement of threats received as a consequence of employment; and (7) copy of employee badge. [4]

**Step 2.**  NVC reviews documents for completeness.  NVC reviews the application and determines whether the prospective applicant has submitted all of the required documents.

**Step 3.**  After review, the NVC sends completed COM package to the U.S. Embassy.

**Step 4.**  The U.S. Embassy reviews COM application and makes a decision to approve or deny the COM application.  The U.S. Embassy reviews the documents for veracity of the contents and authenticity.

**Step 5.**  The U.S. Embassy advises NVC if COM application is approved or denied.  The prospective applicant is then notified of the decision.

### Application 2:  Form I-360 Petition

**Step 6.**  The prospective applicant who receives COM approval self-petitions to DHS USCIS using Form I-360.  The prospective applicant submits a Form I-360 petition and supporting documentation:  (1) a completed Form I-360 petition; (2) a copy of the applicant's passport; (3) a copy of the letter of recommendation sent to the NVC in support of the COM application; and, (4) a copy of the COM approval. [5]

**Step 7.**  USCIS adjudicates the Form I-360 petition and sends the petition to the NVC if approved.  USCIS completes certain security checks that are required at the petition stage.  *See, e.g.,* APAA § 602(b)(1)(D) (requiring that an individual "[h]as cleared a background check and appropriate screening as determined by the Secretary of Homeland Security").  If approved, USCIS forwards the approved Form I-360 petition to the NVC.

### Application 3:  DS-260, Immigrant Visa Application

**Step 8.**  NVC notifies the prospective applicant of the receipt of the approved

---

[4] *See, e.g.*, Dep't. of State, How to Apply for Chief of Mission Approval (undated) (available at https://travel.state.gov/content/dam/visas/SIVs/Afghan_SIV_Guidelines_and_DS157_Instruction s_(April%202017).pdf  and https://eforms.state.gov/Forms/ds157.PDF) (last checked on July 26, 2018).

[5] *See, e.g.*, Dep't. of State, Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government (available at https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html#step2) (last checked on July 26, 2018).

petition and sends the instruction packet to applicant requesting standard documents that are required in order to apply for an immigrant visa.

**Step 9.**  The prospective applicant submits the required documentation to NVC:: (1) DS-260; Immigrant Visa and Alien Registration Application; (2) a copy of the biodata page from the passport of each applicant; (3) scanned copies of birth certificate(s); (4) Refugee Benefits Election Form; and, (5) DS-0234, Special Immigrant Visa Biodata Form. [6]

**Step 10.**  NVC reviews documents for completeness.

**Step 11.**  NVC schedules the applicant for next available appointment for a visa interview before a consular officer at the US Embassy.

**Step 12.**  The applicant is interviewed by consular officer on the scheduled appointment date.

**Step 13.**  The applicant's case undergoes any necessary administrative processing.

**Step 14.**  Upon completion of any necessary administrative processing, the applicant is instructed to obtain the medical exam required of an immigrant visa applicant.

*See* Joint Department of State/Department of Homeland Security Report:  Status of the Afghan Special Immigrant Visa Program (Jan. 2018). [7]

## V.   ARGUMENT

Plaintiffs' Amended Complaint and Motion for Class Certification convolute and confuse the process described above.  Because their pleading and motion do not recognize the uniqueness of a visa application within the Immigration and Nationality Act, Plaintiffs fail to propose a class that satisfies the requirements of commonality and typicality.  As such, the putative class is over-

---

[6] *See, e.g.*, Dep't. of State, Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government (available at https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html#step3) (last checked on July 26, 2018).

[7] Available at: https://travel.state.gov/content/dam/visas/SIVs/Afghan%20SIV%20Report_Jan_2018.pdf (last checked on July 26, 2018).

broad, bringing within its ambit differing factual circumstances and differing legal claims.  Yet, to obtain class certification, Plaintiffs must demonstrate that the proposed class members are entitled to common relief.  *See* Fed. R. Civ. P. 23(a)(2), (b)(2).

To establish commonality, the Supreme Court has repeatedly held that "[i]t is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal–Mart Stores, Inc.,* 564 U.S. at 350 (citation omitted).  "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Id.* (citation omitted).

This requirement is likewise present in Rule 23(b)(2), which requires that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  For certification under Rule 23(b)(2), Plaintiffs must show that "declaratory relief is available to the class as a whole" and that the challenged conduct is "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal–Mart Stores, Inc.*, 564 U.S. at 360.  Therefore, Plaintiffs have the burden of demonstrating that the factual differences in the class are unlikely to bear on the individual's entitlement to relief.  *See In re Google AdWords Litigation*, No. 5:08-cv-03369 EJD, 2012 WL 28068 *15-16 (N.D. Cal. Jan. 5, 2012) ("The question of which advertisers among the hundreds of thousands of proposed class members are even entitled to restitution would require individual inquiries.").  If the factual differences have the likelihood of changing the outcome of the legal issue, then class certification is generally not appropriate.

The typicality requirement of Rule 23(a)(3) ensures that the interests of the named representative align with the interests of the class.  As long as the claims "resemble or exhibit the essential characteristics of those of the representatives," Rule 23(a)(3) will be satisfied.  *Kas v.*

*Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C.1984). The typicality requirement is not met, however, if the proposed class representatives are subject to unique defenses. *Id.* At bottom, the typicality requirement is used to ascertain "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001) (citations omitted).

Rule 23(a)'s commonality and typicality requirements occasionally merge: "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named Plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal–Mart Stores, Inc.*, 564 U.S. at 372, n.5 (quoting *Falcon*, 457 U.S. at 157-58, n. 13); *see also Little v. Wash. Metro. Area Transit Auth.*, No. 14-cv-1289 (RMC), 2017 WL 1403122, at *17 (D.D.C. Apr. 18, 2017).

### A.   Plaintiffs' Proposed Class Does Not Present Common Questions or Legal Interests Typical of All Putative Class Members

#### 1.   The Proposed Class Is Overly Broad

Plaintiffs request that the Court certify a class of all those who have "*submit[ed] an application for COM Approval* and whose applications have been in government-controlled steps for longer than nine months." ECF No. 3 at 1 (emphasis added). This criteria for class membership would result in a class that includes many aliens who will never be in a position to file a Form DS-260 application for immigrant visa. Lacking standing, these putative members would disqualify the entire class. *See Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir. 2006) ("[N]o class may be certified that contains members lacking Article III standing."); *see*

*also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012) (absent a "massive advertising campaign … the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading.").

Moreover, where Plaintiffs allege a timeline applies to the agency decisions, they themselves that it only applies to "an eligible alien."  ECF No. 23 ¶ 40.  This is central to Plaintiffs' argument.  Counts One, Two and Three of the Amended Complaint cite AAPA § 602(b)(4)(A) and RCIA § 1242(c)(1) for the proposition that Defendants must process SIV applications within a nine month window.  ECF No. 23 ¶¶ 70, 74, 81.  To the extent these statutes set any sort of benchmark, they clearly prescribe that it applies to "the date **an eligible alien** submits all required materials . . ."  AAPA § 602(b)(4)(A); RCIA § 1242(c)(1) (emphasis added).  Elsewhere, the AAPA and RCIA confirm that eligibility is only determined as part of the culmination of the process, in connection with the visa application interview before a consular officer.  *See* AAPA § 602(b)(12)(v)(IV); RCIA § 1248(f)(2)(E)(iv) (requiring reporting to Congress of the number of applications that are pending due to failure to (1) receive COM Approval; (2) have USCIS adjudicate the Form I-360 petition; (3) conduct a visa interview; or (4) "issue the visa to an eligible alien"); 22 C.F.R. § 42.81(a) (a visa application is not made until it is executed before a consular officer at the time of the interview); *see also* Congressional Research Service Report at 8 ("The interview is required to determine *eligibility* for a visa.") (emphasis added).

Despite their reliance on sections 602(b)(4)(A) and 1242(c)(1) for an essential element of their claims, Plaintiffs' proposed class includes members who are not "eligible aliens" under the APAA and RCIA.  COM Approval is merely a prerequisite for special immigrant status.  *See* AAPA § 602(b)(1), (2); RCIA § 1244(a), (b) (a "principal alien" is someone whose "faithful and

valuable service" has been confirmed by the Chief of Mission; once that service is documented, DHS may provide "principal aliens" "with status of special immigrant under . . . 8 U.S.C. § 1101(a)(27)"). Once the alien has special immigrant status, he may apply for an immigrant visa as a "special immigrant". 8 U.S.C. § 1202(a) ("Every alien applying for an immigrant visa and for alien registration shall make application therefor in such form and manner and at such place as shall be by regulations prescribed."); *id.* § 1153(a)(b)(4) ("Visas shall be made available . . . to qualified special immigrants described in section 1101(a)(27) of this title . . ."); *id.* § 1204 ("A consular officer may, subject to the limitations provided in [§ 1201], issue an immigrant visa to a special immigrant or immediate relative as such upon satisfactory proof, under regulations prescribed under this Act, that the applicant is entitled to special immigrant or immediate relative status.").

Plaintiffs' request for class certification includes aliens who have merely submitted an application for COM Approval, yet links this class with an alleged timeline defined in APAA or RCIA as applicable only to eligible aliens (*i.e.*, those who have, *inter alia*, already received COM Approval). Therefore, Plaintiffs' class is impermissibly overbroad and should not be certified.

2.  Plaintiffs' Proposed Class Lacks Commonality and Typicality

The breadth of Plaintiffs' proposed class also causes it to lack commonality and typicality. This is because the proffered class definition includes groups of aliens whose legal and factual interests differ from each other and differ from the proposed class representatives. The Supreme Court has stated:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will

be fairly and adequately protected in their absence.

*Falcon*, 457 U.S. at 157 n.13.

First, the proposed class lacks commonality because it broadly includes all Afghans and Iraqis who have not yet submitted a visa application but may or may not submit one sometime in the future. *See supra* ¶ IV.C. (noting the difference between an application for a COM Approval, a Form I-360 petition, and a visa). For such individuals there is no visa application to process or a possibility of delay – so they do not have the same legal interest at stake as other class members who have submitted a visa application. These applicants for COM Approval would nonetheless be part of Plaintiffs' proposed class for an Amended Complaint that alleges claims under the APA and Mandamus Act. Only those aliens who have submitted a visa application can allege the State Department has unreasonably delayed their existing visa applications.[8]

Second, Plaintiffs' prayers for relief under both the APA and mandamus causes of action ask this Court to compel the processing of the SIV applications. ECF No. 23 (Prayer for Relief). Plaintiffs' prayer for relief *assumes* that the Department of State and the Department of Homeland Security are not completing their investigations, examinations, and adjudications of the three different applications required for a SIV application within a reasonable amount of time. *Id.* Thus, Plaintiffs would have this Court believe that the basis for any delay greater that nine months is the same for every alien; and that any alleged delay greater than nine months is automatically unreasonable requiring adjudication under the APA section 706(1) or the Mandamus Act. However, the APA and Mandamus Act are not general purpose statutes that

---

[8] Plaintiffs point to the litigation in *Nine Iraqis* as addressing the identical issue raised by their Amended Complaint, but each of the plaintiffs in that case had actually applied for an immigrant visa. *See Nine Iraqis*, 168 F.Supp.3d at 276-279.

automatically grant relief to all Afghan and Iraqi individuals with pending SIV applications.  As this district has previously already noted determining whether the State Department and USCIS are performing their respective duties is a *fact intensive* inquiry.  *See Nine Iraqis*, 168 F. Supp. 3d at 276-279 (detailing the individual circumstances of Plaintiffs, all of whom had *submitted* visa applications and *completed* visa interviews).

In order to make determine whether either a governmental entity has unreasonable delayed adjudication, the Court must consider the factors articulated in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) (hereinafter "*TRAC*") *for every COM Approval application, Form I-360 petition, and visa application*; which include:  (1) whether a "rule of reason" governs the time agencies take to make a decision, (2) timetables mandated by applicable statutory or regulatory schemes, (3) the spheres of regulation in which the agency is imposing delay, (4) the effect expediting delayed action will have on other "agency activities of a higher or competing priority," and (5) "the nature and extent of the interests prejudiced by delay."  *TRAC*, 750 F.2d at 80.  Thus, alleged common questions of law do not traverse the entirety of the proposed class, and there are certainly no common answers.  *See DL v. District of Columbia*, 713 F.3d 120, 126 (2013) (holding that merely alleging that the class members "have all suffered a violation of the same provision of law," is "insufficient to establish commonality given that the same provision of law 'can be violated in many different ways.'") (quoting *Wal–Mart Stores, Inc.,* 564 U.S. at 350).  Consequently, the Court cannot certify Plaintiffs' proposed class.

Third, Plaintiffs' proposed class also includes Afghan and Iraqis who have merely submitted an application for COM approval, and are not "eligible aliens" under the law.  ECF No. 3 at 1.  For example, despite the fact that the Amended Complaint states that each Plaintiff

has provided faithful and valuable service, the proposed class would include aliens for whom the

U.S. Chief of Mission has not yet, and may never, certify faithful and valuable service, which is

only one of the *many requirements* for an alien to be eligible to apply for an immigrant visa.

*See, e.g.,* APAA § 602(b)(2)(a)(iii).  It is unclear how the Court could even identify or predict

which aliens have provided faithful and valuable for purposes of determining who is included in

the class, and that is just the first of a long list of preliminary requirements to be considered an

"eligible alien."

Finally, Plaintiffs assert that the delay should be measured nine months from the

submission of an application for COM Approval.  *See* ECF No. 3 at 1.  Yet, Plaintiffs' class

definition is not consistent with the APAA and RCIA, *see supra*, and does not take into account

that Congress has permitted the Secretaries the time necessary to resolve national security

concerns.  *See, e.g.,* APAA § 602(b)(4) (A)("CONSTRUCTION.  *Nothing* in this section shall be

construed to limit the ability of [the Secretary of Homeland Security and the Secretary of State]

to take longer than 9 months to complete those steps incidental to the issuance of such visas in

high-risk cases for which satisfaction of national security concerns requires additional time.")

(emphasis added).[9]  Thus, in order to provide a common answer to the question of when delay

becomes unreasonable for the adjudication of the applications potentially submitted by *all* class

members (*i.e.* a common answer), this Court would have to identify what period of time is

---

[9] In *Nine Iraqis*, the parties referred to this as a national security "exception."  *See* Def. Mot. to Dismiss the Am. Compl., at 21, ECF No. 36, *Nine Iraqis*, 168 F. Supp. 3d 268 (D.D.C. Sep. 1, 2015); Pl's. Memo. in Opp. to Def's Mot. to Dismiss the Am. Compl., at 26, ECF No. 43, *Nine Iraqis*, 168 F. Supp. 3d 268 (D.D.C. Sep. 25, 2015).  The most natural reading of the statute, however, suggests this is not an exception.  For purposes of the present motion, this Court does not need to resolve whether the provision operates as a rule of construction or as an exception.  It is sufficient to recognize that this provision requires case-by-case consideration, which makes class certification based on claims of unreasonable delay impossible.

reasonable for the adjudication of a visa application that requires additional time to satisfy any national security concerns.  Absent that, it would be unclear when class members would be eligible for whatever class-wide relief the Court might order.  And as this district has already stated in the visa context, "[the D.C.] Circuit has made it clear that each 'unreasonable delay' case 'must be analyzed according to its own unique circumstances.'"  *Skalka v. Kelly*, 246 F. Supp. 3d 147, 152 (D.D.C. 2017) (citations omitted).

 An overly broad class that lacks commonality can also signal that there are problems with typicality.  *See Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14 (2d Cir. 1993) (affirming the district court's holding that a class of "all persons who signed leases" with the defendant was too broad for showing either commonality or typicality).  Here, the fact that every applicant is unique with regard to the merits of the Amended Complaint – whether the delay unreasonable – suggests this is the sort of a-typicality that fails the requirement of Rule 23.  *See Walsh v. Northrop Grumman Corp.,* 162 F.R.D. 440, 445 (E.D.N.Y.1995) ("Minor conflicts, however, do not make a plaintiff's claims atypical; it is when the conflict goes to the very subject matter of the litigation that the conflict will defeat the claim of representative status.").  In a suit alleging discrimination university tenure decisions, the Court of Appeals for the Fifth Circuit held that because "[e]ach tenure denial turns on unique facts" denial of class certification was appropriate.  *Merrill v. S. Methodist Univ.*, 806 F.2d 600, 608 (5th Cir. 1986).  The court observed that "the evidence adduced to prove and rebut institutional discrimination would not have overlapped to an extent consistent with the goal of efficiency that underlies Rule 23(a)."  *Id.* (citing *Falcon*, 457 U.S. at 157 n.13).

 The proposed named Plaintiffs are similar in that they are individual cases with nothing in common, but this is not typicality.  Simply falling into various categories – COM Approval,

Form I-360 petition, or DS-260 visa application– does not address the assortment of issues that apply within the categories making each applicant's situation unique.  Thus, the Court cannot certify Plaintiffs' proposed class.

> 3.    The Proposed Representatives Will Not Fairly and Adequately Protect Class Interests

Pursuant to Rule 23(a)(4), the named Plaintiffs must fairly and adequately protect the interests of other members of the proposed class. Fed. R. Civ. P. 23(a)(4).  To determine whether named Plaintiffs will adequately represent a class, courts must resolve two questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 45 (D.D.C. 2007) (citing *McReynolds v. Sodexho Marriott Serv., Inc.*, 208 F.R.D. 428, 446 (D.D.C. 2002); *Ellis*, 657 F.3d at 985 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).  Ultimately, the adequacy requirement "serves to uncover conflicts of interest between the named plaintiffs and the class they seek to represent."  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997).

Here, the distinct legal and factual circumstances of the proposed class representatives demonstrate potential conflict of interest between putative class members and class representatives.  For example, only two of the named Plaintiffs, John Doe-Alpha and John Doe-Echo, have filed a visa application, ECF No. 3 at 1, and thus meet the definition of "eligible alien," APAA § 602(b)(4)(A).  Such individuals have no incentive to litigate issues related to delay or denial of an application for COM approval, especially to the extent it inhibits their ability to argue for a faster adjudication of their pending visa applications.  In contrast, Plaintiff John Doe-Charlie has a denied application for COM approval, *see* ECF No. 3 at 1, and therefore

fails to meet a base requirement to "confirm employment and faithful and valuable service," APAA § 602(b)(4)(D)(a).  Plaintiff John Doe-Charlie's case is, therefore, distinct as it would be specifically contrary to statute to move his case forward for the adjudication of a visa application, unlike Plaintiffs John Doe-Alpha and John Doe-Echo.  Because Plaintiffs' class is overbroad and includes individuals who none of the named Plaintiffs are capable of representing, and because it fails to define subclasses or otherwise specify which Plaintiffs may be capable of representing individuals with distinct legal issues, this Court should deny Plaintiffs' motion to certify the proposed class in its entirety.

> ### 4.   The Proposed Class Does Not Satisfy the Requirements of Rule 23(b)(2)

Under Rule 23(b)(2), Plaintiffs must demonstrate that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  To meet this burden, Plaintiffs claim that "the injunctive relief Plaintiffs seek—adjudication of SIV applications that have been pending in government control for over nine months—would necessarily result in relief for all SIV applicants in the Class."  ECF No. 3-1 at 20.  As discussed above, however, as each adjudication of a COM Approval application, a Form I-360 petition, and a visa application is an individualized assessment of the specific alien's unique application, and each named Plaintiff and putative class member presents a different set of facts.  Class wide injunctive relief is therefore both unrealistic and unworkable.

Despite this lack of a uniformity, Plaintiffs argue that "the government's inaction is generally applicable to the Class," *id.* at 21, ignoring the statutory eligibility requirements that an alien must meet before the alien can submit a visa application, *see supra* ¶ IV.C.  Thus, relief would not be warranted for the entirety of Plaintiffs' proposed class, as they have not

distinguished between the various stages of the process, nor have they reasonably defined what constitutes an unreasonable delay of adjudication of the numerous steps before an alien becomes eligible to submit a visa application.  For these reasons, Plaintiffs have failed to satisfy Rule 23(b)(2).

### B.  Plaintiffs' Proposed Class is Improper Because it Is Not Adequately Defined

Plaintiffs' proposed class must be "adequately defined" and "clearly ascertainable" before it can be certified.  *Thorpe v. Dist. of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014).  Put more simply, there must actually be a class. 7A Wright & Miller, *Federal Practice & Procedure*, § 1760 (3d ed. 2018).  Moreover, before it can be certified, it must be clear that there will likewise be a class at the end of the litigation.  *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) ("Such a class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound.").  A class that eludes res judicata in this way is known as a fail-safe class.  Plaintiffs' proposed class is problematic from the view of the beginning and the end of the litigation.

### 1.   The Class Is Not Ascertainable at the Outset of Litigation

The general outlines of class membership should be "determinable at the outset of the litigation." *Campbell v. Nat'l R.R. Passenger Corp.*, — F. Supp. 3d — , 2018 WL 1997254, at *25 (D.D.C. Apr. 26, 2018) (citations omitted).  "Accordingly, a class may be certified only when 'an individual would be able to determine, simply by reading the [class] definition, whether he or she [is] a member of the proposed class.'"  *Id.* (quoting *Artis v. Yellen*, 307 F.R.D. 13, 23 (D.D.C. 2014) (citation omitted)).

The Court of Appeals for the First Circuit has held that because a "standard of 'within a

reasonable time' makes class members impossible to identify prior to individualized fact-finding and litigation, the class fails to satisfy one of the basic requirements for a class action under Rule 23 of the Federal Rules of Civil Procedure." *Crosby v. Soc. Sec. Admin. of U.S.*, 796 F.2d 576, 580 (1st Cir. 1986) (citing 7 C. Wright & A. Miller, *Federal Practice and Procedure*, 1760, at 581 (2nd ed. 1972); 3B Moore's Federal Practice 23.04[1], at 23-119 (2nd ed. 1985), 23.40[2] at 23-291-23-292.  The Court noted that due to the individualized nature of an ALJ's determination, "a delay of any particular period of time may be quite reasonable in one case and extremely unreasonable in another."  *Id.*

In the present case, there are two difficulties that emerge in this context. First, Plaintiffs' proposed class is defined by the same sort of "within a reasonable time" evaluation.  The determination of what constitutes "government-controlled steps" will require a determination by this Court.

Second, as noted earlier, the statute that Plaintiffs rely upon for their definition of a "reasonable time" for an agency decision is subject to congressional direction on how it is to be interpreted.  Both the AAPA and the RCIA include the following language:

> CONSTRUCTION.—Nothing in this section shall be construed to limit the ability of a Secretary referred to in paragraph (1) to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.

AAPA § 602(b)(4)(B); RCIA § 1244(c)(2).  This requirement makes it impossible for the Court or putative members of the class to ascertain class membership without a case-by-case evaluation of how the agency has handled a particular application.

### 2.   The Proposed Class Is a Fail-Safe Class

A fail-safe class is "one that includes *only* those who are *entitled* to relief."  *Young*, 693 F.3d at 538.  Where merits issues are comingled with class definition, the class is not

adequately defined. *See id.*; *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794 (7th Cir.

2017) (dismissing restaurant employees' putative class action against a restaurant operator for

alleged violations of wage statute where proposed class definition, which included all persons

separated from hourly employment with the operator who were subject to its vacation policy

and who did not receive all earned vacation pay benefits, described an impermissible "fail

safe" class, since class membership plainly turned on whether a former employee had a valid

claim); *Spread Enters., Inc. v. First Data Merchant Serv. Corp.*, 298 F.R.D. 54 (E.D.N.Y.

2014) (holding that a proposed fail-safe class, which shields putative class members from

receiving an adverse judgment, should not be used to certify a class action because it is unfair

to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is

unmanageable because the members of the class could only be known after a determination of

liability).

Plaintiffs proposed class is a *heads-I-win-tails-you-lose* proposition that will deprive

Defendants of the benefits of res judicata.  Discovery specific to each applicant is necessary

for each and every class member, and even if Defendants were to prevail in this class action,

subsequent plaintiffs could bring individual suits and the only way to determine whether the

lawsuit is barred by *res judicata* would be to answer the question – *has the plaintiff's*

*application been in government-controlled steps for longer than nine months*?  Given that this

is a suit under the APA claim where Plaintiffs have no claim to a substantive review of the

agency's determination, that question is the sum and substance of any plaintiff's inquiry.

## VI.    CONCLUSION

This Court should deny Plaintiffs' Motion for Class Certification because the class

proposed in the motion is impermissibly broad.  Under either definition, however, Plaintiffs'

sweeping proposed class is overly broad and inconsistent with the APAA and RCIA, encompasses a broad range of dissimilarly situated individuals whose claims are not common, whose injuries are not typified by the claims of the proposed class representatives, and who have different factual bases for their unreasonable delay claims.  The proposed class representatives, *i.e.*, the named Plaintiffs, are also inadequate representatives of the proposed class.

Further, the membership of the proposed class would be impossible to discern because Plaintiffs do not, and cannot, temporally define what constitutes a class-wide unreasonable delay, which unquestionably turns on individual circumstances.  Thus, even if Plaintiffs prevailed in this action, it would be unclear which members of the class were entitled to relief under the APA or the Mandamus Act.

For the reasons state herein, the Court should deny Plaintiffs' motion for class certification.

Date:  July 26, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

WILLIAM C. PEACHEY
Director, District Court Section

EDWARD S. WHITE
Senior Litigation Counsel,
District Court Section

/s/ Joseph F. Carilli, Jr.
JOSEPH F. CARILLI, JR.
N.H. Bar Identification No. 15311
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 616-4848
E-mail:  joseph.f.carilli2@usdoj.gov

/s/ William M. Martin
WILLIAM M. MARTIN
Pa. Bar No. 84612
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 598-2377
E-mail:  william.martin3@usdoj.gov

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 26, 2018, the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Joseph F. Carilli, Jr.
JOSEPH F. CARILLI, JR.
N.H. Bar Identification No. 15311
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4848
E-mail: joseph.f.carilli2@usdoj.gov

*Attorney for Defendants*