Case No. 1:18-cv-01388-TSC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AFGHAN & IRAQI ALLIES UNDER SERIOUS THREAT
BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES,
ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,

*Plaintiffs*

v.

MICHAEL R. POMPEO, ET AL,

*Defendants*

**BRIEF OF AMICUS CURIAE AMBASSADOR RYAN C. CROCKER
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**BAKER BOTTS L.L.P.**
Emanuel C. Grillo (N.Y. Bar No. 2480317)
David M. Howard (N.Y. Bar No. 5592514)
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500
emanuel.grillo@bakerbotts.com
david.howard@bakerbotts.com

**BAKER BOTTS L.L.P.**
Evan A. Young (D.D.C. Bar No. TX0161)
98 San Jacinto Boulevard
Austin, Texas 78701-4078
(512) 322-2506
evan.young@bakerbotts.com

COUNSEL FOR AMICUS CURIAE

# TABLE OF CONTENTS

Statement of Interest ................................................................................................ 1

Summary of Argument ............................................................................................. 3

Argument .................................................................................................................. 5

    I.     The Iraqi and Afghan Special Immigrant Visa Programs represent a bipartisan and nearly unanimous statement of the national policy of the United States. ...................................................................................... 5

    II.    Systematic failure to comply with the statutory requirement to timely process SIV applications warrants a preliminary injunction because these statutes are especially important to the national interest. ...................... 9

          A.    SIV applicants—and our national security—will suffer irreparable harm if their applications are not timely processed. ................................ 10

          B.    The balance of equities tips strongly in favor of requiring compliance with the law. ........................................................................ 13

          C.    By definition, requiring compliance with the law furthers the public interest. ........................................................................................... 14

    III.    Opponents of the SIV program have no arguments that justify denying a preliminary injunction ........................................................................... 16

          A.    Those allies eligible for the SIV program are the least likely to pose a substantial threat to Americans. ............................................ 17

          B.    The SIV Program does not lead to any "brain-drain" in Iraq and Afghanistan. ................................................................................ 18

Conclusion .............................................................................................................. 20

Certificate of Compliance ...................................................................................... 21

Certificate of Service ............................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Al-Marri v. Bush*,
    2005 WL 774843 (D.D.C. Apr. 4, 2005) ..............................................................10

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..........................................................................10

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*,
    No. CV 18-1536 (PLF), 2018 WL 3472624 (D.D.C. July 19, 2018) ....................................13

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1977) ..........................................................................14

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................................13

*Omar v. Harvey*,
    No. CIV. A. 05-2374 RMU, 2006 WL 286861 (D.D.C. Feb. 6, 2006) ..................................10

*Open Communities Alliance v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) ....................................................................13

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*,
    263 F. Supp. 3d 293 (D.D.C. 2017) ....................................................................14

*Pursuing America's Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) ........................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................................9

**STATUTES**

Afghan Allies Protection Act of 2009, *codified as a note to* 8 U.S.C. § 1101 .................10, 14, 19

Refugee Crisis in Iraq Act of 2007, *codified as a note to* 8 U.S.C. § 1157 .....................10, 14, 19

National Defense Authorization Act of 2008, Pub. L. No. 110-181, § 1241 *et seq.*,
    122 Stat. 3 (2008) ....................................................................................5, 7

National Defense Authorization Act for Fiscal Year 2014, Pub. L. 113-66, § 1218,
    127 Stat. 671 (Dec. 26, 2013) ..........................................................................7

Omnibus Appropriations Act of 2009, Pub. L. 111-8, § 601 *et seq.*, 123 Stat. 523
(2009) ................................................................................................................................7

**OTHER AUTHORITIES**

154 CONG. REC. H82-4112 (May 19, 2008) (statement of Rep. King) ...................................17, 18

162 CONG. REC. S91-3680 (June 9, 2016) (statement of Sen. McCain)........................................15

162 CONG. REC. S91-3681 (June 9, 2016) (statement of Sen. Reed) ..........................................5, 6

164 CONG. REC. S98-3901 (June 13, 2018) (statement of Sen. Shaheen) .................................7, 20

Alex Nowrasteh, *Syrian Refugees Don't Pose a Serious Security Threat*, CATO
INST. (Nov. 18, 2015) ........................................................................................................18

Alexi Horowitz-Ghazi, *An Afghan Military Interpreter Finds Footing In The U.S.
Gig Economy*, N.P.R. (April 1, 2018) ..................................................................................11

Ambassador Ryan Crocker, *Don't Let the US Abandon Thousands of Afghans
Who Worked for Us*, WASH. POST (May 12, 2016)...........................................................12, 16

Ambassador Ryan Crocker, *The United States must extend its visa program for
Afghan and Iraqi refugees,* WASH. POST (July 25, 2014) .......................................................18

Andrew Borene & Jamil N. Jaffer, *Leave None Who Served With Us Behind*, U.S.
NEWS (June 2, 2016) ..........................................................................................................15

*Congressman Seth Moulton Reads Amendment on Afghan Resettlement in The
United States*, C-SPAN (April 28, 2016)...............................................................................8

Ernesto Londoño, *State Department approves more visas for Afghan interpreters*,
WASH. POST (May 7, 2014) .................................................................................................15

Fault Lines, *Afghan interpreter: 'Taliban don't wait to kill you'*, ALJAZEERA
(April 6, 2016) ...................................................................................................................5

*Hearing Before the Subcommittee on the Middle East and South Asia of the
House Committee on Foreign Affairs*, No. 110-46 (March 26, 2007)
(statement of Rep. Ackerman) .............................................................................................17

Heath Druzin, *Former US interpreters worry Taliban will arrive before visa does*,
STARS & STRIPES (April 22, 2016)........................................................................................19

*IRAP in The Washington Free Beacon: Murder of Afghan Ally Reveals Risk in
Visa Delays,* INT'L REFUGEE ASSISTANCE PROJECT (May 29, 2015).......................................11

*Iraqi Volunteers, Iraqi Refugees: What is America's Obligation: Hearing Before the H. Subcomm. on the Middle East and South Asia of the H. Comm. on Foreign Affairs*, 110th Cong. 21 (March 26, 2007)......................................................8

*Joint Department of State/Department of Homeland Security Report: Status of the Iraqi Special Immigrant Visa Program*, U.S. STATE DEPT. (April 20, 2018).....................7, 14

Joyce Hackel, *Translators who worked for the US military in Iraq wonder if their American dream is slipping away*, PUB. RADIO INT'L (Jan. 29, 2017, 5:15 pm)....................12

Kahlan Rosenblatt, *Combat Translators Saved Their Lives. Now These Veterans Are Fighting to Bring Them to the U.S.*, ABC NEWS (Sept. 4, 2017) ....................................16

Letter from 36 Retired Military Leaders and Veterans Organizations to Congress (Sept. 6, 2016)........................................................................................................9

Letter from Former General David Petraeus to Senator John McCain (May 12, 2016) *reprinted in* 162 CONG. REC. S91-3685 (June 9, 2016)....................................8

Letter from General John Nicholson to Senator John McCain (May 20, 2016) *reprinted in* 162 CONG. REC. S91-3684 (June 9, 2016)......................................8, 15

Letter from Senators Chuck Grassley and Jeanne Shaheen to Senators Richard Shelby, Patrick Leahy, and Lindsey Graham (August 21, 2018) .............................7

Presidential Statement on the Signing of the National Defense Authorization Act of 2008 (January 28, 2008) ...............................................................................7

Presidential Statement on the Signing of the Omnibus Appropriations Act, 2009 (March 11, 2009) ...........................................................................................7

Refugee Crisis in Iraq Act, S. 1651, 110th Cong. (2007).........................................5, 6

Sarah Aziza, *His Father was Killed Because He Helped American Troops in Iraq. After Eight Years, He Hasn't Received a U.S. Visa*, THE INTERCEPT (April 15, 2018) ......................................................................................................11

Sarah Feinberg & Daniel L. Davis, *Save the visa program for Afghan interpreters*, POLITICO (May 31, 2016).......................................................................................6

Stephanie Ott, *What happens to Iraqis who worked with the US military?*, AL JAZEERA (Feb. 1, 2017)...........................................................................................12

Zakariya Al Sagheer, *I'm an Iraqi who risked my life for America. Trump's visa ban puts my family in grave danger*, VOX (Feb. 9, 2017)..........................................12

## STATEMENT OF INTEREST

Amicus curiae is former United States Ambassador Ryan C. Crocker.[1]   Ambassador Crocker served in the United States Foreign Service for nearly 40 years, half of them as the U.S. Ambassador to six countries in the Middle East and Central Asia: Afghanistan (2011-2012), Iraq (2007-2009), Pakistan (2004-2007), Syria (1998-2001), Kuwait (1994-1997), and Lebanon (1990-1993).   In 2004, the Senate confirmed President Bush's nomination of Ambassador Crocker as a Career Ambassador, the highest rank available for an American diplomat.

Ambassador Crocker's experience is directly relevant to the question before this Court and the two statutes that underlie this litigation.  He was the U.S. Ambassador to Iraq when the Refugee Crisis in Iraq Act was enacted and signed into law by President Bush on January 28, 2008, and he became our Ambassador to Afghanistan shortly after the Afghan Allies Protection Act of 2009 was implemented.  During his tenure, while working closely with American military leaders in both countries, Ambassador Crocker witnessed the crucial role of Iraqi and Afghan allies—men and women who supported the United States by acting as translators, guides, and in other roles, despite the constant threat of violence and death against them and their families.  He also recognized how deleterious it was for our national security for those allies to suffer unduly lengthy delays in visa processing when their service made it untenable for them to continue living in their own countries.

During and after his tenure as Ambassador, therefore, Ambassador Crocker strongly advocated legislation that authorizes Special Immigrant Visas.  He continues to advocate for reform

---

[1] No counsel for a party to this case authored this brief in whole or in part, and no such counsel or party contributed monetarily to the preparation or submission of any portion of this brief.  Counsel to Ambassador Crocker represented him in this matter on a *pro bono* basis.  Amicus received consent from all parties to file this brief.

and expeditious execution of this program to adequately protect U.S. national-security interests. Based on his longstanding experience and interest in this program, he now respectfully submits this amicus brief to advise this Court of the continued importance of this program and to illustrate why ordering compliance with its timelines would advance, rather than impair, our national-security interests.

## SUMMARY OF ARGUMENT

Congress enacted the Special Immigrant Visa ("SIV") programs for our Iraqi and Afghan allies in 2008 and 2009, respectively, with virtually unanimous and bipartisan support. That consensus remains intact, and in 2013, Congress amended both statutes to require the government to process SIV applications within nine months of a completed application. Congress and two presidents have decided our nation's policy; the only question here is whether this Court should require the government to follow it.

Asking such a question is almost to answer it: an absolute prerequisite of the rule of law is that the government, no less than (indeed, perhaps far more than) the regulated public, obey its own laws. Even so, Ambassador Crocker fully credits that issuing and processing visas can touch on sensitive matters of national security and territorial integrity. While courts are rightly hesitant to invade the province of the Executive Branch in general, this case involves no request for the Court to superintend our national immigration policy, or even the small corner of it that concerns SIVs. The preliminary injunction that plaintiffs seek would not open the doors of the United States to any particular person or otherwise make any substantive decision regarding admissibility— Plaintiffs merely seek the far more modest step of requiring the government to simply *process* applications under the time-frame that Congress already directed. If an application is then properly denied based on the record, so be it—Ambassador Crocker is not asking this Court to override lawful decisions or to act as a consular officer. But the Court is certainly empowered to compel the Government to make the decisions that the law requires it to make, rather than to leave our Afghan and Iraqi allies in limbo. Congress, after all, provided a specific and time-bounded procedural limitation to aid those allies, and every day that passes when that congressional command goes unheeded presents a threat to their safety and to the United States.

Ambassador Crocker's primary purpose in appearing before this Court, therefore, is to

confirm that the narrow preliminary injunction that Plaintiffs seek would *not* jeopardize America's national security. He would not urge any position that would have such an effect. To the contrary, requiring the government to follow these laws will *advance* our national-security policies. Accordingly, while Plaintiffs justifiably assert their own irreparable harms that they will suffer, Ambassador Crocker focuses here on how those irreparable harms amount to an injury *to the United States*. The perception that our country cannot or will not honor its promises to those who have risked literally everything to help our soldiers and diplomats is by itself an irreparable harm to our operational capacities. Moreover, those perceptions have already become a propaganda tool that will certainly risk diminishing our ability to recruit allies in future conflicts. Basic procedural compliance with these statutes will mitigate the likely harms that will flow from these perceptions.

Said another way, the "balance of equities" and the "public interest" are definitionally advanced by ensuring that the government follow validly enacted laws. A law is itself the best evidence of the public interest—Congress and presidents of both parties have conclusively resolved that question. And when the national honor and the future safety of our servicemen and women and our diplomats are at stake, no governmental interest in disregarding the deadlines for processing SIV applications can be more equitable than requiring the government to follow that procedural obligation.

Ambassador Crocker therefore respectfully urges the Court to grant the relief sought and to do so with full confidence that the preliminary injunction would be in the national interest of the United States.

## ARGUMENT

**I.**     **The Iraqi and Afghan Special Immigrant Visa Programs represent a bipartisan and nearly unanimous statement of the national policy of the United States.**

Our nation's enemies purposefully target those who assist the United States in the Middle East. Our allies are often tortured or killed simply because of their affiliation with the United States—not only as punishment, but to make an example of them to discourage others from such cooperation. *See, e.g.,* Fault Lines, *Afghan interpreter: 'Taliban don't wait to kill you'*, ALJAZEERA (April 6, 2016).[2] The long-term harm to American interests that would flow from even the perception that assisting the United States will inexorably lead to barbaric treatment of oneself and one's family should be self-evident.

Congress recognized that our allies in the Middle East "have been killed or injured in reprisals for their support of the American effort. Many more Iraqis associated with the United States have fled Iraq in fear of being killed or injured." Refugee Crisis in Iraq Act, S. 1651 § 2(4), 110th Cong. (2007).[3] Congress therefore took action—not merely because protecting those who helped our country is the right thing to do (although of course it is). Congress also recognized two key strategic points:

- **The need for reliable allies.** Success now and in the future requires access to allies on the ground in foreign areas of conflict. U.S. military and civilian forces, after all, unquestionably need reliable allies who are familiar with the language and familiar with the area where U.S. forces are located. 162 CONG. REC. S91-3681 (June 9, 2016)

---

[2] *Available at* https://www.aljazeera.com/indepth/features/2016/04/afghan-interpreter-taliban-don-wait-kill-160403131005408.html

[3] This statement is from the unenacted Senate bill, introduced by a bipartisan group of 14 senators in Summer 2007. Its substantive provisions were included in the National Defense Authorization Act of 2008, Pub. L. No. 110-181, § 1241 *et seq.*, 122 Stat. 3, 395 (2008), but still called the Refugee Crisis in Iraq Act of 2007. *See infra* note 6 (describing the passage of both statutes).

(statement of Sen. Reed).  Interpreters, for example, are a vital for our military in the
Iraq and Afghanistan conflicts, and will be needed in all future conflicts.  Without them,
"our personnel—diplomatic, military, and others—will be in jeopardy."  *Id.*

- **The indispensability of American protection to retain and earn allies.**  Desperately
  needed allies will only assist the United States in sufficient numbers if we offer protec-
  tion from torture or death.  Absent such a compact, we cannot reasonably expect to
  have the support we need.  *Id.*  American protection of today's allies, at least in the
  sense of offering an escape hatch should circumstances turn dire, is critical to main-
  taining such support today and earning it anew in the inevitable conflicts that will arise
  with the passage of time.  *See* Sarah Feinberg & Daniel L. Davis, *Save the visa program
  for Afghan interpreters*, POLITICO (May 31, 2016).[4]

Accordingly, American interests require countering our enemies' narrative that those who assist
America will be unable to avoid the most severe retaliation.  If the United States does not at least
keep basic promises to protect our allies, American lives will be lost due to the absence of suffi-
cient local help.

    With bipartisan and almost unanimous majorities, therefore, Congress has provided a
measure of protection for our allies through the Special Immigrant Visa ("SIV") program, which
grants refuge in the United States to carefully-vetted allies, such as interpreters, who are threat-
ened.  It did so by enacting two statutes—the Refugee Crisis in Iraq Act of 2007 and the Afghan
Allies Protection Act of 2009—that took into consideration all the interests described above.  *See*
Refugee Crisis in Iraq Act, S. 1651 § 2(2), 110th Cong. (2007) ("If [Iraqi refugee] needs are not

---

[4]  *Available   at*   https://www.politico.com/agenda/story/2016/05/congress-should-save-visa-pro
gram-for-afghan-interpreters-000135

quickly and adequately met, these populations could become a fertile recruiting ground for terror-ists.")[5]  Congress has likewise reaffirmed the urgency of granting SIVs by subsequently amending both statutes to require all SIV applications to be processed within nine months after a complete submission—the specific statutory requirement at issue here.  *See* National Defense Authorization Act for Fiscal Year 2014, Pub. L. 113-66, § 1218, 127 Stat. 671, 910 (Dec. 26, 2013).

Further illustrating the bipartisanship underlying this issue, presidents from both parties signed these bills into law.[6]  Neither President Bush nor President Obama objected in any way to the SIV program.[7]  President Trump, moreover, provided for 4,000 Afghan SIVs in his budget request, indicating—as Senator Jeanne Shaheen put it—that "[t]he support for this program truly is bipartisan."  164 CONG. REC. S98-3901 (June 13, 2018) (statement of Sen. Shaheen).  Senators Chuck Grassley (Republican of Iowa) and Jeanne Shaheen (Democrat of New Hampshire) have jointly called on the Senate Committee on Appropriations to include the requisite provisions in the fiscal year 2019 appropriations bill to meet this request for additional SIVs.  *See* Letter from Sen-ators Chuck Grassley and Jeanne Shaheen to Senators Richard Shelby, Patrick Leahy, and Lindsey

---

[5] While the Iraqi SIV program expired in 2014, applications are still being processed until all allocated visas are granted.  *Joint Department of State/Department of Homeland Security Report: Status of the Iraqi Special Immigrant Visa Program*, U.S. STATE DEPT. (April 20, 2018), https://travel.state.gov/content/dam/visas/SIVs/Q2%20Iraqi%20SIV%20Report%20April%202018.pdf.  Additionally, the legislative history and congressional motives apply to both the Iraqi and Afghan SIV programs.

[6] Congress enacted the Refugee Crisis in Iraq Act in 2008 as part of the National Defense Author-ization Act signed into law by President George W. Bush.  *See* National Defense Authorization Act of 2008, Pub. L. No. 110-181, § 1241 *et seq.*, 122 Stat. 3, 395 (2008).  The next year, Congress enacted the Afghan Allies Protection Act of 2009 to provide for SIVs for our allies in Afghanistan, passed in the Omnibus Appropriations Act of 2009 and signed by President Barack Obama.  *See* Omnibus Appropriations Act of 2009, Pub. L. 111-8, § 601 *et seq.*, 123 Stat. 523, 807 (2009)*.*

[7] *See* Presidential Statement on the Signing of the National Defense Authorization Act of 2008 (January 28, 2008); Presidential Statement on the Signing of the Omnibus Appropriations Act, 2009 (March 11, 2009).

Graham (August 21, 2018).[8]

Since its enactment, the SIV program has continued to be supported by presidents, representatives, and senators from both sides of the aisle.  As Vice President Pence, then a member of Congress, explained: "I think there is nothing more important than the United States of America saying to people in Iraq or anywhere in the world, if you stand by us, we will stand by you."  *Iraqi Volunteers, Iraqi Refugees: What is America's Obligation: Hearing Before the H. Subcomm. on the Middle East and South Asia of the H. Comm. on Foreign Affairs*, 110th Cong. 21 (March 26, 2007) (statement of Rep. Pence).  Likewise from the Democratic Party, Congressman Seth Moulton of Massachusetts praised these interpreters who "put their lives on the line not just for their country, but for ours.  For that risk and sacrifice, the very least we can offer them is a chance to stay alive."  *Congressman Seth Moulton Reads Amendment on Afghan Resettlement in The United States*, C-SPAN, at 0:58-1:15 (April 28, 2016).[9]

In addition to the strong legislative and presidential support, many current and former military leaders with deep experience on the ground have vigorously advocated the program, including, for example, General John Nicholson, the commander of U.S. forces in Afghanistan.  *See* Letter from General John Nicholson to Senator John McCain (May 20, 2016) *reprinted in* 162 CONG. REC. S91-3684 (June 9, 2016).  General David Petraeus, who was Ambassador Crocker's military counterpart in Iraq, described this program as a matter of national security and our moral debt.  *See* Letter from Former General David Petraeus to Senator John McCain, (May 12, 2016) *reprinted in* 162 CONG. REC. S91-3685 (June 9, 2016).  In 2016, dozens of former military leaders

---

[8] *Available at* https://www.judiciary.senate.gov/imo/media/doc/2018-08-21%20Grassley,%20Shaheen%20to%20Appropriations%20Leaders%20(Special%20Immigrant%20Visas).pdf

[9] *Available at* https://www.c-span.org/video/?c4591147/congressman-seth-moulton-reads-amendment-afghan-resettlement-united-states

sent a letter to Congress advocating for the reauthorization of the SIV program.  *See* Letter from

36 Retired Military Leaders and Veterans Organizations to Congress (Sept. 6, 2016).[10]

Few legislative acts in recent memory have risen to this level of continuous bipartisan approval, where statements from Republicans and Democrats are indistinguishable and equally focused on our nation's interest in protecting our allies.  And few acts of Congress have drawn such universal support from uniformed and diplomatic public servants with vast on-the-ground experience, demonstrating the strong public interest in requiring adherence to the statutory regime laid down by Congress in promptly processing SIV applications.

## II.   Systematic failure to comply with the statutory requirement to timely process SIV applications warrants a preliminary injunction because these statutes are especially important to the national interest.

To obtain a preliminary injunction, Plaintiffs must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).  In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).

Governmental adherence to the law should be a foregone conclusion.  In the view of Ambassador Crocker, the facts and governmental policy interests in this case establish the irreparable harm, balance of equities, and public-interest factors, all of which strongly support granting the preliminary injunction.  Because those factors are so potent, and because what the Plaintiffs are seeking is so modest—basic governmental compliance with existing legal requirements—the

---

[10] *Available at* http://www.humanrightsfirst.org/sites/default/files/Vet-Letter-Congress-Sep-16.pdf

Court should find that Plaintiffs have met their burden.

> **A.     SIV applicants—and our national security—will suffer irreparable harm if their applications are not timely processed.**

The "irreparable harm" prong implicates two showings: (1) the injury "must be both certain and great; it must be actual and not theoretical" and imminent; and (2) "the injury must be beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Plaintiffs readily satisfy the requirement of irreparable harm.

Our allies in Iraq and Afghanistan who assist the U.S. in our operations, such as interpreters, remain under a continuous threat of torture or death. Undoubtedly, the possibility of being tortured or killed constitutes irreparable harm. *See, e.g., Omar v. Harvey*, No. CIV. A. 05-2374 RMU, 2006 WL 286861, at *2 (D.D.C. Feb. 6, 2006) (quoting *Al-Marri v. Bush*, 2005 WL 774843, at *4 (D.D.C. Apr. 4, 2005)). Indeed, to even be *eligible* for an SIV, the applicant must show an "ongoing serious threat as a consequence of the alien's employment by the United States Government." Refugee Crisis in Iraq Act of 2007, § 1244(b)(1)(D), *codified as a note to* 8 U.S.C. § 1157; Afghan Allies Protection Act of 2009, § 602(b)(2)(A)(iv), *codified as a note to* 8 U.S.C. § 1101.

For the United States, the loss of local allies constitutes irreparable harm in two ways. First, more immediately, any loss of allies—including interpreters, who have been vital to American operations abroad—undermines American national-security interests. Second, more broadly, the loss of interpreters demoralizes America's current allies and depresses recruitment of future allies. Congress recognized this—by protecting America's allies through the SIV program, Congress acted to protect American national-security interests. If the Plaintiffs or those similarly situated are tortured or killed because we failed to uphold the promise to protect them (indeed, even if that is just the perception), American efforts in these and other conflicts will be irreparably damaged by the concomitant lack of support. Said another way, Congress acted to forestall these

harms by creating the programs and imposing deadlines, and failure to abide by them is tantamount to inviting the serious harms that Congress sought to avoid.

Based on his deep experience, Ambassador Crocker cannot credit any doubt about the underlying risk to our allies in Iraq or Afghanistan: many of them, and their families, are in serious jeopardy in their own countries.  The data confirm this assessment.  The International Refugee Assistance Project estimated that, in 2014, an Afghan interpreter was killed every thirty-six hours. *See* Alexi Horowitz-Ghazi, *An Afghan Military Interpreter Finds Footing In The U.S. Gig Economy*, N.P.R. (April 1, 2018).[11]  U.S. allies in the Middle East, such as the proposed class Plaintiffs and their families, are under constant threat of death while they wait years for their SIV applications to be processed.  ISIS and al-Qaeda have already tortured and killed many interpreters and our Iraqi allies since the beginning of the war simply because those people were associated with the United States.  *See* Sarah Aziza, *His Father was Killed Because He Helped American Troops in Iraq.  After Eight Years, He Hasn't Received a U.S. Visa*, THE INTERCEPT (April 15, 2018).[12] Worse, whenever an ally who counted on American protection is killed while an SIV application is delayed, that crime becomes a double benefit to those opposing America—not only the death itself, but its propaganda value which terrorists prize.

For example, in 2015, an Afghan interpreter for the U.S., Sakhidad Afghan, was tortured and killed by insurgents.  He had applied for an SIV in 2011 and was still waiting for a decision on his application when he was killed.  *See IRAP in The Washington Free Beacon: Murder of Afghan Ally Reveals Risk in Visa Delays,* INT'L REFUGEE ASSISTANCE PROJECT (May 29, 2015).[13]

---

[11] *Available at* https://www.npr.org/2018/04/01/598256725/an-afghan-military-interpreter-finds-footing-in-the-u-s-gig-economy

[12] *Available at* https://theintercept.com/2018/04/15/iraq-war-translators-trump-refugee-visa/

[13] *Available at* https://refugeerights.org/irap-in-the-washington-free-beacon-murder-of-afghan-ally-reveals-risk-in-visa-delays/

Another U.S. ally, Zakariya Al Sagheer, was tortured while being interrogated by insurgents because of his work with the U.S. military.  Zakariya Al Sagheer, *I'm an Iraqi who risked my life for America. Trump's visa ban puts my family in grave danger*, VOX (Feb. 9, 2017).[14]

Such stories are widely known in Iraq and Afghanistan.  Likewise, the longer an application is delayed, the higher the risk to the applicants and their families.  Joyce Hackel, *Translators who worked for the US military in Iraq wonder if their American dream is slipping away*, PUB. RADIO INT'L (Jan. 29, 2017, 5:15 pm)[15]; Stephanie Ott, *What happens to Iraqis who worked with the US military?*, AL JAZEERA (Feb. 1, 2017).[16]

Ambassador Crocker has seen the harm caused to our allies in the Middle East because of their affiliation with the United States:

> This is truly a matter of life and death.  I know hundreds of people who have been threatened because of their affiliation with the United States.  Some have been killed.  Today, many are in hiding, praying that the United States keeps its word.  We can and must do better.

Ambassador Ryan Crocker, *Don't Let the US Abandon Thousands of Afghans Who Worked for Us*, WASH. POST (May 12, 2016).[17]  He further understands the need for this program to protect our allies, and by doing so, protect our national security.  If the statutory time limits for processing SIV applications go unenforced, our allies will no longer trust our protection.  Any promises to protect potential allies in future conflicts will mean little if we do not honor our promises now; when the day comes where we must rely on allies in some new place, American lives will depend

---

[14] *Available at* http://www.vox.com/first-person/2017/2/9/14500576/trump-immigration-baniraq-siv

[15] *Available at* https://www.pri.org/stories/2017-01-26/translators-who-worked-us-military-iraq-wonder-if-their-american-dream-slipping

[16] *Available at* http://www.aljazeera.com/indepth/features/2017/02/muslim-ban-closing-door-170201050223763.html

[17] *Available at* https://www.washingtonpost.com/posteverything/wp/2016/05/12/dont-let-the-u-s-abandon-thousands-of-afghans-who-worked-for-us/?utm_term=.5657cb2721f4

on the currency of our promises.

**B.     The balance of equities tips strongly in favor of requiring compliance with the law.**

In determining the next factor, courts look to the relative harm to each party if the preliminary injunction is imposed or denied.  *See Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("The balance of the equities weighs the harm to [the plaintiffs] if there is no injunction against the harm to the [federal government] if there is.").  In weighing the harms to the federal government, "the [federal agency's] harm and the public interest are one and the same, because the government's interest *is* the public interest." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)) (emphasis in original).

In this case, the harm to the Plaintiffs vastly outweighs any alleged harm to the government.  The federal government cannot be harmed by an injunction that merely requires compliance with existing law.  *See Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, No. CV 18-1536 (PLF), 2018 WL 3472624, at *8 (D.D.C. July 19, 2018) (quoting *Open Communities Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)) (determining that the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice").  If this Court grants the Plaintiffs' preliminary injunction, it would be to ensure that the government complies with existing law, which is what the government should do even *without* a court order.  No exceptional circumstances exist here to justify disregard of a nine-month processing limit.  In contrast to the government's negligible harm (if any at all) of simply following the statute and timely processing these applications, the risk to the SIV applicants increases as they live under constant fear of violence or death while their application continues pending for years.

Under the unusual circumstances of this case, in short, there is really no "balancing" of the equities for the Court to undertake.  There is no legally cognizable harm to the federal government

13

from following this law.  To the extent that there is any balancing, the equities must tip decisively in favor of granting the Plaintiffs' preliminary injunction.

### C.  By definition, requiring compliance with the law furthers the public interest.

Third, granting the Plaintiffs' preliminary injunction would strongly further the public interest.  Simply by enacting it, Congress has determined that obedience to this statutory regime furthers the public interest.  "[A]n agency's compliance with a mandatory statutory regime is presumably always in the public interest."  *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 301 (D.D.C. 2017) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.")).  And as described above, *these particular* statutes have an especially compelling public-interest component.

Again, this preliminary injunction asks no more of the federal government than to comply with existing law—specifically that the federal agency process the SIV applications within nine months of a complete submission.  *See* Refugee Crisis in Iraq Act of 2007, § 1242(c)(1), *codified as a note to* 8 U.S.C. § 1157; Afghan Allies Protection Act of 2009, § 602(b)(4)(A), *codified as a note to* 8 U.S.C. § 1101.  Yet the government has admitted in its own status reports that it is taking at least *two and a half times that long* to process SIV applications for steps wholly within the government's control.  *Joint Department of State/Department of Homeland Security Report: Status of the Afghan Special Immigrant Visa Program*, U.S. STATE DEPT. (Jan. 2018).[18]  Under those circumstances, the public interest is necessarily advanced by requiring the government to come into compliance.  The national interests described above are fully relevant here: the public interest

---

[18] *Available at* https://travel.state.gov/content/dam/visas/SIVs/Afghan%20SIV%20Report_Jan_2018.pdf

is served by compliance with a law that Congress has (rightly) deemed necessary to advance America's national security.

If the United States does not follow through on its promise to protect our allies now, this will long prevent potential allies in current and future conflicts from assisting the United States. *See* 162 CONG. REC. S91-3680 (June 9, 2016) (statement of Sen. McCain).  Representative Adam Kinzinger supported reauthorizing the SIV program by stating that "America is going to have to go to war again someday, and there is nothing more important than the ability to follow through on our word."  Ernesto Londoño, *State Department approves more visas for Afghan interpreters*, WASH. POST (May 7, 2014) (quoting Rep. Kinzinger).[19]

The public interest requires enforcing Congress's forward-looking approach.  General Nicholson, along with many other current and former military leaders, has also expressed the necessity of the SIV program to protect national security interests:

> It is my firm belief that abandoning this program would significantly undermine our credibility and the 15 years of tremendous sacrifice by thousands of Afghans on behalf of Americans and Coalition partners.

Letter from General John Nicholson to Senator John McCain, *supra* (May 20, 2016).  The U.S. military needs local assistance overseas.  Breaking our promise of protection would work directly against this country's public interest in maintaining peace and fighting the war on terror.  *See* Andrew Borene & Jamil N. Jaffer, *Leave None Who Served With Us Behind*, U.S. NEWS (June 2, 2016).[20]

We cannot repeat the mistakes of the past.  After our withdrawal from the Vietnam

---

[19] *Available at* https://www.washingtonpost.com/world/national-security/state-department-approves-more-visas-for-afghan-interpreters/2014/05/07/bd2b0754-d542-11e3-aae8-c2d44bd79778_story.html?utm_term=.77d74db54e64

[20] *Available at* https://www.usnews.com/opinion/articles/2016-06-02/diluting-siv-visa-program-could-condemn-loyal-military-translators-to-death

Conflict, many of our Vietnamese allies were abandoned. "The [Vietnamese] people who thought they would be saved weren't. If we repeat that again, there will be national shame." Kahlan Rosenblatt, *Combat Translators Saved Their Lives. Now These Veterans Are Fighting to Bring Them to the U.S.*, NBC NEWS (Sept. 4, 2017)[21] (quoting Rebecca Zimmerman, a policy researcher for the think tank RAND Corporation).

Abandoning our allies would destroy our credibility and our military efforts. As Ambassador Crocker has said before, this cannot happen:

> [T]aking care of those who took care of us is not just an act of basic decency; it is also in our national interest. American credibility matters. Abandoning these allies would tarnish our reputation.

Ambassador Ryan Crocker, *Don't Let the US Abandon Thousands of Afghans Who Worked for Us*, WASH. POST (May 12, 2016).[22]

The preliminary injunction here would advance the public interest—including by protecting soldiers who are today just young boys or girls, or perhaps not yet even born. By preventing unduly long delays in processing SIV applications, Congress sought to create the foundations for further cooperation with those in war-torn regions who can translate and guide, saving both American and local lives.

## III.   Opponents of the SIV program have no arguments that justify denying a preliminary injunction.

The SIV program has few opponents. Regardless, Congress has weighed their arguments and has chosen to enact the program. But even assuming that these objections were material to the Court's resolution of the question before it, and without needing to attack the opponents as

---

[21]   *Available at* https://www.nbcnews.com/news/military/combat-translators-saved-their-lives-now-these-veterans-are-fighting-n796731

[22]   *Available at* https://www.washingtonpost.com/posteverything/wp/2016/05/12/dont-let-the-u-s-abandon-thousands-of-afghans-who-worked-for-us/?utm_term=.5657cb2721f4

acting in anything other than good faith, these arguments cannot withstand scrutiny and certainly should not justify systematic disregard of statutory time requirements.

### A. Those allies eligible for the SIV program are the least likely to pose a substantial threat to Americans.

Ambassador Crocker strongly believes that national security *requires* obedience to Congress's vision of the SIV program. But at least some opponents argue that the national-security implications cut in exactly the opposite direction because terrorists may be able to obtain access to the United States through this program. *See, e.g.*, 154 Cong. Rec. H82-4112 (May 19, 2008) (statement of Rep. King). The argument is that the SIV program is not in the public interest if terrorists could abuse this program by disguising themselves as allies, enter the United States, and then carry out attacks against this country. This objection would be powerful—indeed, compelling—if it had foundation. Fortunately, however, it does not. Congress added sufficient safeguards to make such abuse highly unlikely, and the past decade's experience has proven such fears be unfounded.

First, to even be eligible for the SIV program, the applicant must have spent years working with the U.S. forces in Iraq or Afghanistan. Applications require extensive background checks and letters of recommendation from Americans who worked with the applicant in the Middle East. These Iraqi and Afghan allies have already demonstrated their loyalty to the United States well before an application is completed:

> How long does it take to vet somebody? If somebody has worked with our coalition or worked with our military or worked with our State Department and risked their life each and every day, putting their family in danger and at risk, how long does it take to decide that that person is worthy of us saving after they tried to save us?

*Hearing Before the Subcomm. on the Middle East and South Asia of the House Committee on Foreign Affairs*, No. 110-46 (March 26, 2007) (statement of Rep. Ackerman).

Ambassador Crocker is aware of no terrorists or even suspected terrorists who have come

to the United States through the SIV program.  Whether or not one agrees with, for example, the

Cato Institute's recent findings that refugees *in general* do not pose a threat to the U.S., *see, e.g.*,

Alex Nowrasteh, *Syrian Refugees Don't Pose a Serious Security Threat*, CATO INST. (Nov. 18,

2015),[23] SIV recipients almost surely pose a far *lesser* threat.  Those who spent years assisting

U.S. troops and are recommended by those same people for the SIV program are the least likely

to pose a substantial threat to Americans, even before the further vetting that they must undergo.

After all, as Ambassador Crocker has previously observed, these particular visa recipients have

*earned* something that makes them unique:

> Taking care of those who took care of us does not mean doing them a favor.  It
> means acting on fundamental American values.  Afghans and Iraqis risked their
> lives to support our efforts, and all too many gave their lives.

Ambassador Ryan Crocker, *The United States must extend its visa program for Afghan and Iraqi*

*refugees,* WASH. POST (July 25, 2014).[24]  The nine months that Congress allows for processing a

*completed* application—on top of the *years* spent working on behalf of the United States—make

it likely that those who are admitted under the SIV program are individuals of the highest quality

and who most Americans would be honored to host.

### B.      The SIV Program does not lead to any "brain-drain" in Iraq and Afghanistan.

First, some opponents of this program have called the SIV program a "brain-drain"—that

this program will remove well-educated and pro-U.S. and pro-democracy Iraqi and Afghan people

from their countries, hurting the efforts to remake those countries and build a good relationship

with the United States.  *See* 154 CONG. REC. H82-4112 (May 19, 2008) (statement of Rep. King).

---

[23] *Available at* https://www.cato.org/blog/syrian-refugees-dont-pose-serious-security-threat

[24] *Available at* https://www.washingtonpost.com/opinions/the-us-must-extend-visa-program-for-refugees/2014/07/25/61c05a90-1372-11e4-9285-4243a40ddc97_story.html?utm_term=.
482053a95ddc

Karl Eikenberry, the former U.S. Ambassador to Afghanistan immediately prior to Ambassador

Crocker, openly objected to the SIV program, arguing that:

> This act could drain this country of our very best civilian and military partners: our
> Afghan employees.  If we are not careful the SIV (Special Immigrant Visa) program
> will have a significant deleterious impact on staffing and morale, as well as under-
> mining our overall mission in Afghanistan.

Heath Druzin, *Former US interpreters worry Taliban will arrive before visa does*, STARS &

STRIPES (April 22, 2016) (quoting a 2010 cable from then-U.S. Ambassador to Afghanistan Karl

Eikenberry to then-Secretary of State Hillary Clinton).[25]

But this argument has no foundation in fact.  SIV applicants are not traditional refugees.

These U.S. allies are specifically and constantly targeted with threats of violence or death simply

*because of* their association with the United States.  To be eligible for an SIV, the applicant must

show an "ongoing serious threat" because of that affiliation.  Refugee Crisis in Iraq Act of 2007,

§ 1244(b)(1)(D), *codified as a note to* 8 U.S.C. § 1157; Afghan Allies Protection Act of 2009,

§ 602(b)(2)(A)(iv), *codified as a note to* 8 U.S.C. § 1101.

Those allies who are eligible for the SIV program have two options: (1) come to the United

States through the SIV program and survive; or (2) hide from insurgents in their own or a nearby

country with a significant chance they will be tortured and/or killed.  A "brain-drain" is far more

certain if our allies are killed because of their association with our country.  But under either of

these outcomes, our threatened allies can no longer assist the U.S. in our foreign operations.  Only

the first option provides the protection that Congress promised, and it is the only option that pro-

motes our national-security and foreign-affairs interests.  "There is no plan B for these Afghans.

Either we save them by authorizing additional special immigrant visas, or they will die. They will

---

[25] *Available at* https://www.stripes.com/former-us-interpreters-worry-taliban-will-arrive-before-visa-does-1.405738

be killed. Their families will be killed." 164 CONG. REC. S98-3901 (June 13, 2018) (statement of Sen. Shaheen). If we allow SIV applications to continue pending for years, the national-security interests of the United States will be irreparably damaged.

To be clear, the United States *does* have an interest in Iraqis and Afghans who are positively disposed to the United States living in Iraq and Afghanistan. But eliminating the SIV program would impede rather than advance that important interest. Allies who are not subject to reprisal (at least yet) do not seek SIVs, and many of those who do seek them undoubtedly yearn to return to their own countries if conditions change. Regardless, even if the SIV program *did* interfere with the interest against a "brain-drain," Congress has prioritized the SIV program, and the Court should not deny a preliminary injunction based on considerations that did not motivate Congress.

## CONCLUSION

For the foregoing reasons, requiring the government to comply with its own statutory time limits in processing SIV applications will protect the national security interests of the United States. This Court should grant the preliminary injunction and be confident that in so doing it is advancing the vision that Congress had when it repeatedly passed statutes creating and expediting the SIV program.

Date:  September 14, 2018

Respectfully submitted,

By:  */s/ Evan A. Young*

**BAKER BOTTS L.L.P.**
Emanuel C. Grillo (N.Y. Bar No. 2480317)
David M. Howard (N.Y. Bar No. 5592514)
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500
emanuel.grillo@bakerbotts.com
david.howard@bakerbotts.com

**BAKER BOTTS L.L.P.**
Evan A. Young (D.D.C. Bar No. TX0161)
98 San Jacinto Boulevard
Austin, Texas 78701-4078
(512) 322-2506
evan.young@bakerbotts.com

COUNSEL FOR AMICUS CURIAE

20

## CERTIFICATE OF COMPLIANCE

This brief complies with the Local Rules of the United States District Court for the District of Columbia for the following reasons:

1.      This brief complies with the type-volume limitation of Local Rule 7(o)(4) because this motion does not 25 pages.

2.      This brief complies with the typeface requirements of Local Rule 5.1(d) because this brief has been prepared in a proportionally-spaced typeface using the Microsoft Office Word 2016 word processing software in 12-point Times New Roman type style.

By:   */s/ Evan A. Young*

Evan A. Young (D.D.C. Bar No. TX0161)
98 San Jacinto Boulevard
Austin, Texas 78701-4078
(512) 322-2506
evan.young@bakerbotts.com

Emanuel C. Grillo (N.Y. Bar No. 2480317)
David M. Howard (N.Y. Bar No. 5592514)
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2551
emanuel.grillo@bakerbotts.com
david.howard@bakerbotts.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I, Evan A. Young, hereby certify that true and correct copies of the foregoing Brief of

Amicus Curiae in Support of Plaintiffs' Motion for Preliminary Injunction, were served upon the

following parties on September 14, 2018, as follows:

| *Counsel for Defendants*<br><br>Joseph F. Carilli, Jr.<br>William M. Martin<br>United States Department of Justice<br>Civil Division<br>Office of Immigration Litigation<br>District Court Section<br>P.O. Box 868, Ben Franklin Station<br>Washington, D.C. 20044<br>Telephone: (202) 616-4848 | One Copy | ☐ Via First Class Mail<br>☐ Via Hand Delivery<br>☐ Via Overnight Courier<br>☒ Via Electronic Mail<br>☐ Via Electronic Filing<br>(EDIS)<br><br>joseph.f.carilli2@usdoj.gov<br>william.martin3@usdoj.gov |

   */s/ Evan A. Young*
Evan A. Young (D.D.C. Bar No. TX0161)
BAKER BOTTS LLP
98 San Jacinto Boulevard
Austin, Texas 78701-4078
(512) 322-2506
evan.young@bakerbotts.com

22