# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED, | ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 18-cv-01388 (TSC) |
| MICHAEL R. POMPEO, CARL C. RISCH, UNITED DEPARTMENT OF STATE, KIRSTJEN NIELSEN, L. FRANCIS CISSNA, DONALD NEUFELD, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are five anonymous Afghan or Iraqi nationals seeking refuge in the United

States. They allege that they "provided faithful and valuable service to the US government or its

allied forces" in their capacities as employees of or on behalf of the United States government

over the past several years. (ECF. No. 23 ("Am. Compl.") at ¶¶ 1, 56, 58, 60, 62.) They allege

that because of their service, they "face an ongoing serious threat to their lives in their home

countries." (*Id.*) In response to various threats and acts of violence, Plaintiffs submitted Special

Immigrant Visa ("SIV") applications to the U.S. Department of State, seeking lawful admission

into the United States. (*Id.* at ¶¶ 13–17.) Two Plaintiffs submitted their applications in 2013,

one in 2015, and the other two in 2016. (*Id.*) Plaintiffs claim that at the time they filed this

action on June 12, 2018, none of their SIV applications had received a final decision.  (*Id.* at ¶¶ 57, 59, 61, 63, 65.)

Plaintiffs bring this case on behalf of themselves and a class of all people who have applied for an Afghan or Iraqi SIV pursuant to the Afghan Allies Protection Act of 2009, Pub. L. 111-8, 123 Stat. 807, or the Refugee Crisis in Iraq Act of 2007, Pub. L. 110-181, 122 Stat. 395, by submitting an application for Chief of Mission Approval, and whose applications have been awaiting government action for longer than nine months.[1]  (ECF No. 3 ("Mot. Class Certification") at 1.)  Plaintiffs allege that Defendants have failed to process and adjudicate Plaintiffs' SIV applications within a reasonable time.  (Am. Compl. at ¶ 1.)  They request, among other things, that this court (i) enter a declaratory judgment stating that Defendants have unreasonably delayed the processing and adjudication of all applications that have been in government-controlled steps for longer than nine months, (ii) compel Defendants to adjudicate the SIV applications, and (iii) compel Defendants to appoint two SIV coordinators.  (*Id.* at ¶¶ 68–92.)

Defendants have moved, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to partially dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction and failure to state a claim.  Upon consideration of Defendants' motion and the parties' briefs in support thereof and in opposition thereto, and for the reasons set forth below, the motion is hereby **DENIED**.

---

[1] Plaintiffs' motion for class certification is granted on a provisional basis for the sole purpose of resolving Defendants' partial motion to dismiss (ECF No. 30), Plaintiffs' motion for preliminary injunction, (ECF No. 34), and Plaintiffs' motion for expedited discovery (ECF No. 35). Plaintiffs' counsel is appointed to represent the provisional class.

## I.    FACTUAL BACKGROUND[2]

### A. Refugee Crisis in Iraq Act and Afghan Allies Protection Act

In 2007, Congress enacted the Refugee Crisis in Iraq Act ("RCIA"), in part to fulfill the United States' "fundamental obligation to help the vast number of Iraqis displaced in Iraq and throughout the region by the war and the associated chaos, especially those who have supported America's efforts in Iraq." S. Res. 1651, 110th Cong. (2007) (enacted). In so doing, Congress noted:

> Many Iraqis who have worked in critical positions in direct support of the United States Government in Iraq have been killed or injured in reprisals for their support of the American effort. Many more Iraqis associated with the United States have fled Iraq in fear of being killed or injured.

*Id.* Under the RCIA, Iraqi nationals can apply and interview for admission to the United States as special immigrants if they: (1) were or are "employed by or on behalf of the United States Government in Iraq, on or after March 20, 2003, for not less than one year"; (2) "provided faithful and valuable service to the United States Government"; and (3) "experienced or [are] experiencing an ongoing serious threat as a consequence of [their] employment by the United States Government." RCIA §§ 1242(a)(2), 1244(b)(1).

In 2009, Congress enacted the Afghan Allies Protection Act ("AAPA"), with similar objectives. (Am. Compl. ¶¶ 4, 28.) Pursuant to the AAPA, certain Afghan nationals may receive special immigrant status if they: (1) were or are "employed by or on behalf of the United States Government in Afghanistan on or after October 7, 2001, for not less than one year"; (2) "provided faithful and valuable service to the United States Government"; and (3) "experienced

---

[2] Unless otherwise indicated, the following facts are taken from the Amended Complaint, and are assumed to be true for the purposes of deciding the instant motion.

or [are] experiencing an ongoing serious threat as a consequence of [their] employment by the United States Government." AAPA §§ 602(b)(1)–(2).

Plaintiffs allege that after the enactment of the RCIA and AAPA, applicants to both programs experienced "considerable processing delays that risked the lives of the very applicants they were intended to protect." (Am. Compl. ¶ 34.) For example, by mid-2011, four years after the start of the Iraqi SIV program, while nearly 30,000 Iraqi applicants and their family members had applied for the SIV program, only 4,000 applications had been processed. (*Id.* ¶ 37.) And, while some of the Iraqi applicants waited for a decision, they "endur[ed] threats or acts of violence against themselves and their families because of their assistance to the US Government." (*Id.* ¶ 34.)

In 2013, Congress amended the RCIA and AAPA to "improve the efficiency by which applications for special immigrant visas . . . are processed." RCIA § 1242(c)(1); AAPA § 602(b)(4)(A). Per the amendment, all government-controlled steps incidental to issuing the SIVs, "including required screenings and background checks," should be completed within nine months after submission of a complete application. *Id.* However, additional time may be taken to process "visas in high-risk cases for which satisfaction of national security concerns requires additional time." RCIA § 1242(c)(2); AAPA § 602(b)(4)(B). The amendment also required the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, to publish periodic reports describing "the implementation of improvements to the processing of applications for special immigrant visas." RCIA § 1242(f)(2); AAPA § 602(b)(12)(B). These reports must include, among other things, information on enhancements made to provide for the orderly processing of applications without significant delay and "the

reasons for the failure to process any applications that have been pending for longer than 9 months."  *Id.*

### B.  <u>Afghan and Iraqi SIV Application Process</u>

To successfully obtain admission into the United States through the SIV program, Iraqi and Afghan nationals must complete fourteen steps.  (Am. Compl. ¶ 31.)  In the January 2018 joint periodic report, incorporated by reference in Plaintiffs' Amended Complaint (*see id.* ¶¶ 45–46, 48), the steps are grouped together to comprise a four-stage process.  (*See* ECF No. 36-14 at 58–62 ("January 2018 Joint Report").)

The first stage is referred to as the "Chief of Mission ('COM') application process."  (*Id.* at 2.)  It begins at step one with the submission of an application, including "a 'statement of credible threat' detailing the ongoing threat to the applicant as a result of the applicant's service and a letter of recommendation from a supervisor attesting to the applicant's 'faithful and valuable service.'"  (Am. Compl. ¶ 31.)  At steps two through five, the National Visa Center ("NVC") reviews the application and sends it to COM, who either approves or denies it.  (*Id.*)  An applicant who is denied has a statutory right to appeal the decision within 120 days.  (*Id.*)  In 2017, the successful appeal rate at the COM Approval stage was 40% for Iraqi applicants and 66% for Afghan applicants.  (*Id.*)

The second stage is the "Form I-360 adjudication process."  (January 2018 Joint Report at 2.)  It consists of steps six and seven.  (*Id.*)  At step six, the applicant submits a Special Immigrant Petition to U.S. Citizenship and Immigration Services ("USCIS") for categorization as a special immigrant.  (Am. Compl. ¶ 31.)  At step seven, USCIS "adjudicates the Special Immigrant Petition and communicates the results to NVC."  (*Id.*)

The third stage is the "Visa Interview Process"; it includes steps that occur before and after the interview. (January 2018 Joint Report at 3.) At steps eight through eleven, which occur before the interview, the NVC requests and reviews "standard immigrant visa documentation" from the applicant to determine whether the applicant is admissible to the United States and eligible for a United States visa. (Am. Compl. ¶ 31.) If the applicant is eligible, she will be contacted to schedule an interview at the embassy in Afghanistan or Iraq. (*Id.*) Step twelve is an interview with a consular officer. (*Id.*) Following the interview, if the applicant has not been denied, her case undergoes step thirteen, administrative processing. (*Id.*)

The fourth and final stage is known as "Visa issuance to eligible applicants." (January 2018 Joint Report at 3.) This stage consists of only one step—fourteen. *Id.* After obtaining a medical examination, eligible applicants are issued an SIV. *Id.* With an SIV, an individual is "eligible to receive resettlement benefits upon arrival and to apply for adjustment of status to seek the status of lawful permanent resident and ultimately of citizen." (Am. Compl. ¶ 33.)

**C. Provisional Class Representatives**

There are five provisional class representatives: Mr. Doe-Alpha, Ms. Doe-Bravo, Mr. Doe-Charlie, Ms. Doe-Delta, and Mr. Doe-Echo. The provisional class representatives are SIV applicants, who reside in either Iraq or Afghanistan and "live in fear of reprisal for their service to the US government while they await final decisions from Defendants on their applications." (*Id.* ¶ 55.) In the case of each provisional class representative, Plaintiffs allege that "Defendants have now taken far longer than the statutorily-allowed nine months to complete all government-controlled processing steps." (*Id.*)

1. <u>Mr. Doe-Alpha</u>

Mr. Doe-Alpha is an Afghan national who applied to the SIV program on September 25, 2013, following approximately two years of service to a United States government contractor. (*Id.* ¶¶ 13, 56–57.)  Although Mr. Doe-Alpha fled his Taliban-controlled hometown and relocated his wife and daughter to a nearby city, his family members who remained behind have been repeatedly threatened and harassed by individuals self-identifying as the Taliban.  (*Id.* ¶¶ 9, 56.)  In addition, at some point, the Taliban placed Mr. Doe-Alpha's parents under house arrest. (*Id.* ¶ 56.)  As a result, Mr. Doe-Alpha fears that if he returns to his hometown, he will be targeted by the Taliban.  (*Id.*)

When the Amended Complaint was filed, Mr. Doe-Alpha had been seeking a final decision on his SIV application for almost five years.  (*Id.* ¶ 57.)  Defendants took "over four months for the initial COM decision; five days for his Special Immigrant Petition; and over twelve months for his visa interview."  (*Id.*)  On June 11, 2015, Mr. Doe-Alpha had his visa interview.  (*Id.*)  Since then, his application has remained at stage three, step thirteen of the Afghan SIV application process—administrative processing.  (*Id.*)

2. <u>Ms. Doe-Bravo</u>

Ms. Doe-Bravo is an Afghan national who applied to the SIV program on October 15, 2015, following approximately two years of service to a United States government-funded development organization.  (*Id.* ¶¶ 14, 58–59.)  In response to frequent death threats via letter and phone, Ms. Doe-Bravo has changed her phone number and relocated with her husband and three young children numerous times.  (*Id.* ¶¶ 9, 58.)  She alleges that she feels hopeless and unable to trust anyone as she recovers from her recent childbirth and cares for her newborn.  (*Id.* ¶ 58.)

When the Amended Complaint was filed, Ms. Doe-Bravo had been seeking a final decision on her SIV application for almost three years. (*Id.* ¶ 59.) Defendants took nearly three months to issue a denial on her application for COM Approval, which she subsequently appealed. (*Id.*) Twenty-nine months after Doe-Bravo submitted her appeal and four days before she filed her Amended Complaint, Defendants granted her request for COM Approval and informed her that she was authorized to submit her Special Immigration Petition. (*Id.*) At the time of her response to the motion to dismiss, Ms. Doe-Bravo's application was at stage two, step six of the Afghan SIV application process—submission of the Special Immigration Petition to USCIS for categorization as a special immigrant—and she was taking prompt action to make the requisite submission. (*Id.*)

### 3. Mr. Doe-Charlie

Mr. Doe-Charlie is an Afghan national who applied to the SIV program on April 18, 2016, following approximately four years of service as an interpreter and translator for two U.S. military contractors. (*Id.* ¶¶ 15, 60–61.) Mr. Doe-Charlie and his family have received death threats, (*id.* ¶ 60), and the Taliban attacked and repeatedly stabbed Mr. Doe-Charlie's brother, believing he was Mr. Doe-Charlie, (*id.* ¶¶ 9, 60). Although Mr. Doe-Charlie has relocated to protect his family, he continues to fear for their safety. (*Id.*)

At the time of the Amended Complaint, Mr. Doe-Charlie had been awaiting a final decision on his SIV application for over two years. (*Id.* ¶ 61.) Defendants took over eight months to deny his application for COM Approval, which he subsequently appealed on April 3, 2017. (*Id.*) Since that time, Mr. Doe-Charlie has been awaiting a decision on his renewed application for COM Approval, which places his application at stage one, step four of the Afghan SIV application process—COM review. (*Id.*)

### 4. Ms. Doe-Delta

Ms. Doe-Delta is an Afghan national who applied to the SIV program on December 23, 2016, following approximately three years of service to a U.S. government communications contractor. (*Id.* ¶¶ 16, 62–63.) The nature of her position requires her to travel with colleagues to active conflict zones and interact with the public. (*Id.* ¶ 62.) The Taliban has threatened her and her family, and masked men have followed her and her family. (*Id.* ¶¶ 9, 62.) Ms. Doe-Delta and her father also have been threatened with Ms. Doe-Delta's death if she did not quit her job. (*Id.*) As a result, Ms. Doe-Delta constantly feels unsafe. (*Id.* ¶ 62.)

At the time of the Amended Complaint, Ms. Doe-Delta had been awaiting a final decision on her SIV application for over a year and a half. (*Id.* ¶ 63.) Because she has yet to receive a decision on her COM application, her application is in the initial steps of stage one of the Afghan SIV application process. (*Id.*)

### 5. Mr. Doe-Echo

Mr. Doe-Echo is an Iraqi national who applied to the SIV program in July 2013, following approximately two years of service as a translator for U.S. forces, "including eight months training Iraqi police at the request of the United States." (*Id.* ¶¶ 17, 64–65.) Because of his service, Mr. Doe-Echo has been threatened by militants, who shot at his home, and who kidnapped and murdered his father. (*Id.* ¶¶ 9–10, 64.) After his father's murder, Mr. Doe-Echo fled Iraq, but has since had to return because he was unable to find a job or otherwise support himself. (*Id.* ¶ 64.) He now lives in hiding in Iraq. (*Id.*)

At the time of the Amended Complaint, Mr. Doe-Echo had been awaiting a final decision on his SIV application for almost five years. (*Id.* ¶ 65.) Defendants took "approximately sixteen months for the original COM decision; nearly a month for his COM Appeal to be granted; nearly six months for his Special Immigrant Petition; and nearly three months to schedule and hold his

interview." (*Id.*) On February 3, 2016, Mr. Doe-Echo had his visa interview. (*Id.*) Since that time, his application has remained at stage three, step thirteen of the Iraqi SIV application process—administrative processing. (*Id.*)

### D. <u>Procedural History</u>

On June 12, 2018, Plaintiffs filed this action, moved for class certification, and moved for the appointment of class representatives as well as class counsel. (ECF Nos. 1, 3–4.) One month later, on July 12, 2018, Plaintiffs filed an Amended Complaint. (ECF No. 23.) Defendants then moved to partially dismiss Plaintiffs' Amended Complaint on August 13, 2018. (ECF No. 30.)

On September 7, 2018, Plaintiffs filed a motion for preliminary injunction and a motion for expedited discovery shortly before their response to Defendants' partial motion to dismiss. (ECF Nos. 34–36.) Plaintiffs' preliminary injunction motion explained that the additional filings were in response to "Defendants' failure to produce data in informal discovery that should have been simple for them to produce," and "[i]n order to avoid further delay." (ECF No. 34 at 13.) Plaintiffs also requested permission to supplement the preliminary injunction motion once discovery had been completed. (*See id.*)

On September 28, 2018, Defendants filed a reply in support of their pending partial motion to dismiss, a response to Plaintiffs' motion to expedite discovery, and a response to Plaintiffs' motion for a preliminary injunction. (ECF Nos. 41–43.) Defendants argue, in part, that Plaintiffs' motion to expedite discovery should be denied because the court has not ruled on Defendants' partial motion to dismiss. (*See* ECF No. 41 at 5.)

Because Plaintiffs' preliminary injunction motion includes a request to supplement the motion with discovery before the court rules on the merits, the court turns first to Defendants' partial motion to dismiss.

## II.    LEGAL STANDARD

Federal courts are of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  "Limits on subject-matter jurisdiction 'keep the federal courts within the bounds the Constitution and Congress have prescribed,' and those limits 'must be policed by the courts on their own initiative.'" *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)).  Such limits are especially important in the agency review context, where "Congress is free to choose the court in which judicial review of agency decisions may occur." *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Watts*, 482 F.3d at 505).  The law presumes that "a cause lies outside [the court's] limited jurisdiction" unless the party asserting jurisdiction establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted).  Thus, plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).

In evaluating a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, a court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  "Nevertheless, 'the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept [plaintiffs'] legal conclusions.'"

*Disner v. United States*, 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (quoting *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006)).  Importantly, the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing, *inter alia*, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

Conversely, a motion to dismiss under Rule 12(b)(6) for failure to state a claim tests the legal sufficiency of a complaint. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when the factual content allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Plaintiffs' factual allegations do not need to be "detailed," but "the Federal Rules demand more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (citing *Twombly*, 550 U.S. at 570).

## III.    ANALYSIS

### A.  <u>Subject-Matter Jurisdiction</u>

Defendants' motion to dismiss for lack of subject-matter jurisdiction is premised entirely upon their contention that Plaintiffs lack standing to bring the first three causes of action, which seek, in part, a declaration that Defendants' delay is unreasonable as well as an order compelling

Defendants to adjudicate the applications pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), and the Mandamus Act, 28 U.S.C. § 1361. (*See* ECF. No. 30 ("Defs.' Mot. to Dismiss") at 20–32.) In so contending, Defendants explicitly ask this court to reject the reasoning and holding of another court in this district. (*See id.* at 16 n.8.)

In *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016), Judge Gladys Kessler was presented with the question of whether the nine plaintiffs, Iraqi and Afghan citizens who had applied for SIVs, had standing to seek an order compelling the defendants to adjudicate their applications within a reasonable period of time, pursuant to the APA and the Mandamus Act. *Id.* at 272–73. Of those nine plaintiffs, three of them presented factual circumstances akin to those presented here.

In *Nine Iraqi Allies*, one plaintiff—Plaintiff Kilo—had been waiting for COM approval for almost two years. *Id.* at 292. The government contended that Kilo lacked standing because, "not having submitted an SIV application, he [could not] claim that he [was] injured by the Government's failure to adjudicate an SIV application." *Id.* In rejecting this argument, Judge Kessler noted that a statutory provision required Kilo to obtain COM Approval before submitting his full SIV application; that there was nothing he could do without the approval; that review of applications for COM Approval was non-discretionary; and that a statutory provision gave applicants who had been denied a right to appeal. *Id.*

In *Nine Iraqi Allies*, two plaintiffs—Plaintiffs Hotel and Lima—had completed the visa interview and had remained at the "administrative processing" step for over four years. *Id.* at 278–79. The government contended that "administrative processing" was synonymous with "final refusal," and thus Plaintiffs lacked standing to pursue their claims. *Id.* at 284. In ruling in favor of the Plaintiffs, the district court noted that the government's "own actual practices and

statements" belied their assertions. *Id.* For example, "administrative processing" was listed in the Joint Reports to Congress as step 13 of the 14 required steps in the SIV application process. *Id.* In addition, a U.S. Embassy website explained that applicants should see one of three status indicators when logging into the State Department's Consular Electronic Application Center: administrative processing, issued, or refused. *Id.* at 286. Judge Kessler concluded that

> the Government endeavored to enjoy the benefits of consular nonreviewability . . . without having to report to Congress that it has denied the SIV applications of many Iraqis and Afghans who supported the United States' military efforts in their countries. The applications have either been finally denied or they are still working their way through the 14 steps the Government requires to be completed. The Government cannot have it both ways.

*Id.* at 289.

In light of specific factual circumstances attendant to the plaintiffs in each category, the court held that the plaintiffs had standing to bring the claims because (1) they had suffered an injury in fact, "the failure to receive final decisions on their SIV applications within a reasonable period"; (2) their injury was "quite clearly caused by [the] [d]efendants' conduct"; and (3) an order to adjudicate the plaintiffs' applications "would directly redress [the] [p]laintiffs' injury caused by the [g]overnment's failure to decide." *Id.* at 281–82. Judge Kessler further held that the defendants' adjudication of the plaintiffs' SIV application within nine months was non-discretionary, "that judicially manageable standards exist to measure the [g]overnment's performance of its duty, and that the national security exception does not undermine these conclusions." *Id.* at 295.

In this case, Defendants directly challenge two of the court's holdings in *Nine Iraqi Allies*. First, Defendants urge the court to find that none of the Plaintiffs have suffered an injury-in-fact, and therefore have no standing to sue. Second, Defendants argue that Plaintiffs have not identified a non-discretionary agency action to compel.

1. <u>Plaintiffs have standing to bring their claims</u>.

In order to have standing to sue, (1) Plaintiffs must have "suffered an 'injury in fact,'" that was or is "actual or imminent, not 'conjectural' or 'hypothetical'"; (2) there must be a causal relationship between the injury and the basis for the claim; and (3) it must be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560–61 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

### a. *Plaintiffs Doe-Bravo, Doe-Charlie, and Doe-Delta*

Defendants argue that Plaintiffs Doe-Bravo, Doe-Charlie, and Doe-Delta have no standing to sustain the first three causes of action because they have not filed a complete visa application and thus have not suffered a cognizable legal injury that is redressable by the court. (Defs.' Mot. to Dismiss at 21–23.) In the alternative, Defendants assert that the nine-month deadline does not apply to Doe-Bravo, Doe-Charlie, and Doe-Delta because an officer has not yet determined that they are "eligible" for an SIV. (*Id.* at 23.) These arguments are unavailing.

That these three Plaintiffs have yet to reach steps 8 and 9—when they would be directed to submit and subsequently do submit "standard immigrant visa documentation"—is of no consequence where, as here, Plaintiffs can do nothing to advance their applications without non-discretionary action by the government.

When this case was filed, Plaintiff Doe-Bravo was awaiting COM Approval. (Am. Compl. ¶ 59.) Subsequently, she received COM Approval, which allowed her to move to the second stage—the Form I-360 adjudication process. (*Id.*) While a final decision, favorable or unfavorable, would render her claims moot, *see e.g.*, *Nine Iraqi Allies*, 168 F. Supp. 3d at 277–78

(finding claims moot where plaintiffs had received a visa), her progression through the process while this case has been pending does not. As detailed above, once Doe-Bravo submits the requisite documents, she must wait for USCIS, an agency of the Department of Homeland Security, to rule on her petition. USCIS' obligation to issue a decision is non-discretionary. *See* APAA §§ 602(b)(1)(D), (b)(12)(B)(v)(II) (providing that an applicant must clear "a background check and appropriate screening, as determined by the Secretary of Homeland security" and stating that quarterly reports shall include information on the total number of applications that are pending due to USCIS' "failure . . . to complete the adjudication of the Form I-360").

Second, Plaintiffs Doe-Charlie and Doe-Delta, like Plaintiff Kilo in *Nine Iraqi Allies*, are still awaiting COM Approval (Am. Compl. ¶¶ 61, 63), and therefore cannot submit a full SIV application because, pursuant to the APAA, COM Approval confirming their "employment and faithful and valuable service to the United States Government" is a pre-requisite to submitting the full SIV application. APAA § 602 (b)(2)(D)(i). The COM or her designee's obligation to issue a decision is non-discretionary. *See* APAA §§ 602(b)(2)(D)(i), (b)(12)(B)(v)(I) (providing that the appropriate Chief of Mission, or her designee, "shall conduct a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service" and stating that quarterly reports shall include information on the total number of applications that are pending due to USCIS' "failure to receive approval from the Chief of Mission").

Therefore, all three Plaintiffs have carried their burden by showing that they have suffered and continue to suffer an injury in fact: "the failure to receive final decisions on their SIV applications within a reasonable period." *Nine Iraqi Allies*, 168 F. Supp. 3d at 282. Because these three Plaintiffs have established injury-in-fact, without reliance on the nine-month

deadline, the court need not assess Defendants' alternative argument regarding the meaning of the phrase "eligible alien" in the provision referencing the nine-month deadline. *See e.g.*, *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 50 (D.D.C. 2008) (holding that jurisdiction is proper over an unreasonable delay claim even when the applicable statute "does not specify a timeframe for action"); *see also Telecomm. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (setting forth a standard to assess unreasonable delay claims that permits consideration of a Congress-provided timetable, but does not require a timetable for consideration of a claim).

Having determined that an injury-in-fact exists, the court must next assess whether Plaintiffs have carried the remainder of their burden by establishing the other two requirements for standing—a causal relationship and redressability. Defendants do not dispute the causal relationship, nor could they reasonably. As the court found in *Nine Iraqi Allies*, "Plaintiffs' alleged injury—the lack of final decisions on their SIV applications—is quite clearly caused by Defendants' conduct (*i.e.*, Defendants' failure to adjudicate the applications)." *Nine Iraqi Allies*, 168 F. Supp. 3d at 282. In terms of redressability, Defendants summarily contend that were this court to grant the requested relief, Plaintiffs could not submit a complete visa application. (Defs.' Mot. to Dismiss at 23.) But this argument mischaracterizes Plaintiffs' requested relief. Plaintiffs seek final adjudication of their applications; not a specific outcome. If Plaintiffs are granted a visa, their injury will be redressed. If Plaintiffs are finally denied at any of the intermediary steps, although it is not their desired outcome, their injury—the lack of adjudication—also will be redressed.

Accordingly, the court finds that Plaintiffs Doe-Bravo, Doe-Charlie, and Doe-Delta have alleged sufficient facts to establish standing to sue for an order compelling Defendants to adjudicate their SIV applications in a reasonable amount of time.

### b. *Plaintiffs Doe-Alpha and Doe-Echo*

Defendants challenge whether Plaintiffs Doe-Alpha and Doe-Echo have standing to sustain the first three causes of action because they argue that, contrary to the findings in *Nine Iraqi Allies*, "administrative processing" is in fact synonymous with "final refusal." (Defs.' Mot. to Dismiss at 23–29.) Thus, according to Defendants, Plaintiffs Doe-Alpha and Doe-Echo cannot ask this court to "review and reverse discretionary visa denials by consular officers." (*Id.* at 28–29.) In response, Plaintiffs contend that all applicants who complete an interview, regardless of whether they are issued a visa, must go through the administrative processing step, and therefore "administrative processing" and "final refusal" are different steps. Plaintiffs have the better of this argument.

Plaintiffs Doe-Alpha and Doe-Echo, like Plaintiffs Hotel and Lima in *Nine Iraqi Allies*, have completed their visa interviews and remain at step 13—the administrative processing step. (Am. Compl. ¶¶ 57, 65.) Plaintiffs cite to an abundance of evidence indicating that the administrative processing step that Plaintiffs Doe-Alpha and Doe-Echo have been in since 2015 and 2016, respectively, is separate and apart from a final adjudication. First, Plaintiffs have shown that Defendants' policy mandates administrative processing for every applicant who has a visa interview before a final decision can be made. The State Department's website states, "even if your visa interview is successful, you will not receive your visa on the same day. All SIV applicants require additional *administrative processing* after the interview." (ECF No. 36-13 ("Poellot Decl.") Ex. C at 19 (emphasis in original).) And, as discussed above, the Joint Reports state that a visa issues only "[u]pon completion of administrative processing." (*Id.* Ex. A at 5.) Second, Plaintiffs have adduced evidence that, as a matter of practice, after every interview, applicants are handed a form indicating that their "application is 'refused' pending

'administrative processing' and/or pending submission of additional documents requested by DOS." (*Id.* ¶ 10.) The "'refusals' are not treated as and are not intended to be final adjudications of an SIV application. Rather, . . . administrative processing is an expected and anticipated part of the SIV process." (*Id.* ¶ 11.) Third, Plaintiffs have been told that their applications are still being processed and that they will receive further information about their applications. For example, Plaintiff Doe-Alpha was informed that his case was "pending administrative processing in order to verify [his] qualifications for [a] visa." (*See* ECF No. 36-8 ("Doe-Alpha Decl.") Exs. B–D.) And, while Plaintiff Doe-Echo's case was in administrative processing, he was told that his "case [w]as in the final stages of processing" and that while the Immigration Visa Unit could not tell him exactly when he would receive his visa, it would be "relatively soon." (ECF No. 36-2 ("Doe-Echo Decl.") Ex. B.)

These facts establish that administrative processing is not a final adjudication but a mandatory intermediate step. Applicants who languish in that step for unreasonable periods of time suffer and continue to suffer an injury in fact: "the failure to receive final decisions on their SIV applications within a reasonable period." *Nine Iraqi Allies*, 168 F. Supp. 3d at 282. Thus, Plaintiffs have met part of their burden by establishing the first requirement for standing.

As with the other group of Plaintiffs, Defendants cannot reasonably dispute the presence of a causal relationship, and, as to redressability, here again Defendants misapprehend Plaintiffs Doe-Alpha and Doe-Echo's requested relief. They do not seek judicial review of a consular decision, but instead seek a final decision on their applications. Plaintiffs Doe-Alpha and Doe-Echo are in a state of liminality: Will their application be granted so that they can progress to step 14? Or, will their application be denied, which will remove them from consideration altogether? A decision, favorable or unfavorable, will redress their injury.

Accordingly, the court finds that Plaintiffs Doe-Alpha and Doe-Echo have alleged sufficient facts to establish standing to sue for an order compelling Defendants to adjudicate their SIV applications in a reasonable amount of time.

2. Plaintiffs have identified a required action to compel under the APA and the Mandamus Act.

Finally, Defendants argue that all Plaintiffs lack standing to bring claims under the APA and Mandamus Act because their applications have been timely refused or not even submitted, and therefore there is no discretionary action to challenge. (Defs.' Mot. to Dismiss at 29–32.)

The APA and the Mandamus Act each provide a cause of action to remedy a government agency's inaction. More specifically, the APA allows a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.A. § 706. And the Mandamus Act grants district courts original jurisdiction "of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Notably, a claim under either the APA or the Mandamus Act may not be sustained unless the act sought to be compelled is a clear nondiscretionary duty. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("[Section] 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'"); *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 121 (1988) ("The extraordinary remedy of mandamus under 28 U.S.C. § 1361 will issue only to compel the performance of 'a clear nondiscretionary duty.'").

In arguing that Plaintiffs cannot identify a non-discretionary action, Defendants rely only on their proffered understanding of the status of each Plaintiff's application and the notion that the nine-month deadline is inapplicable to applicants unless and until they receive a visa. As detailed above, Defendants' understanding is inaccurate, and Plaintiffs' standing does not

necessarily rise or fall based on the applicability of the nine-month deadline.[3]  Accordingly, the

court finds that Plaintiffs have standing to bring claims under the APA or Mandamus Act.

## B. <u>Sufficiency of Plaintiffs' Cause of Action</u>

Defendants argue that Plaintiffs have failed to state claims under the Declaratory

Judgment Act, the APA, and the Mandamus Act because Congress has not mandated the nine-

month deadline.  (Defs.' Mot. to Dismiss at 32–35.)  This argument is unavailing.

It is true that if the nine-month deadline were mandatory, any delay beyond that time

would likely be *per se* unreasonable.  However, even if the nine-month deadline is not

mandatory, that does not preclude Plaintiffs from using it as a benchmark to assess whether the

current delays are unreasonable in light of Congress's stated intention to "improve the efficiency

by which applications for special immigrant visas . . . are processed."  RCIA § 1242(c)(1);

AAPA § 602(b)(4)(A).  Moreover, Defendants' invocation of the provision permitting the

government to take additional time to process requests for visas in "high-risk cases" where there

are "national security concerns," does not help their position.  RCIA § 1242(c)(2); AAPA

§ 602(b)(4)(B).  That provision appears to carve out an exception to the nine-month deadline,

and the government does not argue that that exception applies here.  Thus, Defendants' motion to

dismiss for failure to state a claim is without merit.

---

[3] At least one court in this district has held that, with respect to all fourteen steps, "the APA, 5 U.S.C. § 555 (b), creates a duty for the Government to reach a final decision on Plaintiffs' applications 'within a reasonable period,' and RCIA § 1242(c)(1) and AAPA § 602(4)(A) clarify that duty is non-discretionary and must 'ordinarily' be completed within nine months."  *Nine Iraqi Allies*, 168 F. Supp. 3d at 282.  In addition, in the FOIA context, another court in this district held that "the statute gives the State Department nine months to adjudicate SIV applications, a timeline which includes all steps incidental to the issuance of [SIV] visas, including . . . COM approval."  *Airaj v. United States*, No.15-cv-983 (ESH), 2016 WL 1698260, at *9 (D.D.C. Apr. 27, 2016), *aff'd* sub nom. *Airaj v. United States Dep't of State*, No. 16-5193, 2017 WL 2347794 (D.C. Cir. Mar. 30, 2017) (internal quotations omitted).

### IV. CONCLUSION

For the foregoing reasons, Defendants' motion for partial dismissal of the Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is hereby **DENIED**.

An appropriate Order accompanies this Memorandum Opinion.

Date: January 30, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge