UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL R. POMPEO, *et. al.*,<br><br>    Defendants. | Civil Action No. 18-cv-01388 (TSC) |

## **MEMORANDUM OPINION**

Plaintiffs represent a class of individuals who, despite real and significant personal risk, aided the United States in its time of need and now look to the United States for protection for themselves and their immediate family members.

Plaintiffs are five anonymous Afghan or Iraqi nationals seeking refuge in the United States. They allege that they "provided faithful and valuable service to the US government or its allied forces" in their capacities as employees of or on behalf of the United States government over the past several years. (ECF. No. 23 ("Am. Compl.") at ¶¶ 1, 56, 58, 60, 62.) They claim that because of their service, they "face an ongoing serious threat to their lives in their home countries." (*Id.*) Because of these threats, they submitted Special Immigrant Visa ("SIV") applications to the U.S. Department of State, seeking lawful admission into the United States. (*Id.* at ¶¶ 13–17.) Two Plaintiffs submitted their applications in 2013, one in 2015, and the other two in 2016. (*Id.*) Plaintiffs claim that at the time they filed this action on June 12, 2018, none of their SIV applications had received a final decision. (*Id.* at ¶¶ 57, 59, 61, 63, 65.)

Plaintiffs bring this case on behalf of themselves and a class of all people who have applied for an Afghan or Iraqi SIV pursuant to the Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, 123 Stat. 807 ("AAPA"), or the Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181, 122 Stat. 395 ("RCIA"), by submitting an application for Chief of Mission ("COM") approval, and whose applications have been awaiting government action for longer than 9 months.[1] (ECF No. 3 ("Mot. Class Certification") at 1.) They claim that Defendants have failed to process and adjudicate their SIV applications within a reasonable time. (Am. Compl. at ¶ 1.)

Plaintiffs moved, pursuant to Federal Rule of Civil Procedure 65, "for a preliminary injunction order declaring unreasonable Defendants' delay in the processing of Plaintiffs' SIV applications and ordering Defendants to (1) submit within 30 days a plan for promptly processing and adjudicating the applications, which should be developed with Plaintiffs' input, and (2) submit progress reports every 30 days thereafter." (ECF. No. 34 ("Pls.' PI Mot.") at 1.)[2] During the July 26, 2019 motions hearing, the court consolidated the hearing on the preliminary injunction with the "trial on the merits," pursuant to Federal Rule of Civil Procedure 65(a)(2); thereby converting Plaintiffs' motion to one for summary judgment. Upon consideration of Plaintiffs' motion and the parties' briefs in support thereof and in opposition thereto, the arguments presented at the July 26, 2019 motions hearing, and for the reasons set forth below, Plaintiffs' motion is hereby **GRANTED**, in part, and **DENIED**, in part.

---

[1] By Memorandum Opinion and Order dated January 30, 2019, Plaintiffs' motion for class certification was granted on a provisional basis for the sole purpose of resolving Defendants' partial motion to dismiss (ECF No. 30), Plaintiffs' motion for preliminary injunction, (ECF No. 34), and Plaintiffs' motion for expedited discovery (ECF No. 35). In addition, Plaintiffs' counsel was appointed to represent the provisional class.

[2] Plaintiffs filed their preliminary injunction motion and memorandum in support as one document; therefore, some page numbers are repeated. This is the only reference to the motion. All other citations are located within the memorandum in support.

# I. BACKGROUND

The court assumes the parties' familiarity with the facts of this case and recites only what is necessary to resolve the narrow issue before the court.[3]

Along with its response to Defendants' motion to dismiss, Plaintiffs also filed a preliminary injunction motion and an expedited discovery motion. (ECF Nos. 34–36.) The motion for a preliminary injunction explained that the additional filings were needed to "avoid further delay" in light of "Defendants' failure to produce data in informal discovery that should have been simple for them to produce." (Pls.' PI Mot. at 13.) Plaintiffs requested permission to supplement the preliminary injunction motion once discovery had been completed. (*See id.*; ECF No. 44 ("Pls.' Reply") at 1, n.2.)

Because Plaintiffs asked to supplement the motion with discovery before the court ruled on the merits, the court turned first to Defendants' partial motion to dismiss and Plaintiffs' motion for expedited discovery. By Memorandum Opinion and Orders dated January 30, 2019 (ECF Nos. 47–49), the court:

1. Granted Plaintiffs' motion for class certification on a provisional basis, for the sole purpose of resolving Defendants' partial motion to dismiss, Plaintiffs' motion for preliminary injunction, and Plaintiffs' motion for expedited discovery;
2. Appointed Plaintiffs' counsel to represent the provisional class;
3. Denied Defendants' motion to dismiss;
4. Granted Plaintiffs' motion to expedite discovery; and
5. Issued a discovery, briefing, and hearing schedule.

Despite some delays, Plaintiffs eventually received most of the discovery that they sought, and supplemented their motion.[4]

---

[3] The January 30, 2019 Memorandum Opinion (ECF No. 47) contains additional background information.

[4] At the July 26, 2019 hearing, Plaintiffs indicated they needed additional discovery to "identify and to determine the magnitude of delays across the entire SIV process." (ECF No. 72 ("Hearing Tr.") at 5:17–6:3.) Defendants abandoned their request to depose Plaintiffs' counsel. (*Id.* at 6:9–7:20.) The court concluded that Plaintiffs had proffered sufficient evidence for the court to advance Plaintiffs' preliminary injunction motion to a trial on the merits. (*Id.* at 7:22–8:13.)

Before expedited discovery began, Plaintiffs used named Plaintiffs' individual circumstances and data mined from the periodic SIV reports and adduced that applicants experienced wait times longer than the 9-month benchmark referenced in the statute. When the preliminary injunction motion was filed, named Plaintiffs had been waiting in government-controlled steps of the process between 18 and 52 months. (Pls.' PI Mot. at 10.) And, given the application deadline, all Iraqi applicants had been waiting over 3.5 years. (*Id.* at 12 n.1.) In addition, Plaintiffs noted that in the SIV reports, Defendants admitted that (1) even if an applicant acted promptly in each of the applicant-controlled steps, the application may pend longer than 9 months in Step 13 alone; and (2) on average, excluding time spent awaiting a COM appeal, applicants spent 2.5 years awaiting adjudication. (*Id.* at 11–12.) Plaintiffs also noted that the Defendants' reported numbers likely undercounted the backlog and delays because the reported averages omit waiting times for applicants who are still awaiting adjudication. (*Id.* at 12.)

Following expedited discovery, Plaintiffs supplemented the record with additional data regarding the time applicants await adjudication:

- At least 7,700 applications have been pending for longer than the 9-month benchmark referenced in the statute. (ECF No. 68 ("Pls.' PI Supp.") at 4.) Of those 7,700 applicants, over 5,300 have waited an average of 2.5–5 years for COM approval, and over 2,300 have waited an average of three years after receiving COM approval.[5] (ECF No. 68-12 ("Onken Decl.") at ¶¶ 13, 44.)

- When Defendants produced the data, "over 7,000 applicants had been pending only in their current step for longer than nine months (not including time spent awaiting government action in previous steps)." (Pls.' PI Supp. at 11 n.10 (emphasis in original) (citing Onken Decl. at ¶¶ 13, 28, 33, 40).)

---

[5] Plaintiffs were unable to track the complete average wait time because Defendants do not maintain information that links applicants across all stages except for their names and birthdays, and Plaintiffs were provided only anonymized data. (Pls.' PI Supp. at 4 n.3.)

- Over 80% of the Afghan applications that have been designated as complete have been pending over 9 months, awaiting a decision at the COM approval stage. (Onken Decl. at ¶ 13.)
- The Iraqi class members have waited over 5 years for an initial decision on their COM application. (*Id.*)
- There are over 6,300 applicants who have already waited at least 9 months for a decision on their COM appeal. (*Id.* at ¶ 20.) This figure represents 94% of all individuals awaiting a COM appeal decision. (*Id.*) The average wait for Afghan applicants is 2 years and 8 months; for Iraqi applicants, the average wait is 3 years and 8 months. (*Id.*) Historically, COM appeals are successful 50% of the time. (*See generally* ECF No. 34-6 ("Afghan SIV Joint Reports Jan. 2016 – Apr. 2018") and ECF No. 34-7 ("Iraqi SIV Joint Reports Jan. 2016 – Apr. 2018").)
- On average, after obtaining COM approval, Afghan and Iraqi applicants spend more than 9 months awaiting final adjudication.[6] (Onken Decl. at ¶ 44.) Ninety-eight percent of applicants who have completed an interview have been waiting over 9 months for a final adjudication. (*Id.*) Those who received a final adjudication waited on average 1 year and 4 months. (*Id.*)

Plaintiffs also identified several potential problems with Defendants' method of tracking and reporting SIV application processing times:

- Defendants' recorded application completion date is unreliable for two reasons. First, an application that was complete upon receipt would not be marked as complete until the date it was reviewed. (ECF No. 68-8 ("Ockerman Dep. II") at 237:19–238:3.)

---

[6] Plaintiffs note that their calculations do not encompass applicants who have waited less than nine months after receiving COM approval, "but have spent nine months awaiting government action if the time spent awaiting COM approval were added to the time spent awaiting government decision-making in the remaining steps." (Pls.' PI Supp. at 8 n.8.)

5

Second, the application completion date can be modified after an application is marked as complete. (ECF No. 68-10 ("May 2019 Carilli Email") at 1.)

- The time spent awaiting a COM appeal decision is unreliable in some instances because an appeal that was complete upon receipt would not be marked as complete until the date it was reviewed. (Ockerman Dep. II at 239:13–240:11.)
- The periodic SIV reports exclude time spent awaiting the adjudication of a COM appeal. (Pls.' PI Supp. at 11.)
- Defendants' average wait calculation results in an undercount for at least the following reasons:
  - At step 2, instead of capturing the time it takes for the National Visa Center to review an application for completion, Defendants' figures reflect the time it takes to respond to any communication from an applicant. (Ockerman Dep. II at 277:16–278:15.)
  - At step 4, the COM review stage, regardless of how many applications are actually reviewed, Defendants select 40 to 50 applications from which to calculate the average wait times, instead of including all applicants. (*Id.* at 279:24–282:20.) In so doing, they exclude time spent seeking information from third parties such as employers. (*Id.* at 281:12–282:11.)
  - At step 7, the I-360 review stage, Defendants exclude applicants who undergo additional background checks from the figures reported in the periodic SIV reports. (ECF No. 68-5 ("Afuh Dep. II") at 189:2–20.)
  - At step 11, when calculating the interview wait times, instead of capturing the actual date of an interview, Defendants capture the date the interview was scheduled. (Ockerman Dep. II at 288:22–289:12.) Interviews are scheduled 6

- weeks to 3 months in advance. (ECF No. 68-7 ("Ockerman Dep I") at 153:12–14.)
  - At steps 5 and 12, the processing times are not calculated using actual processing times, but instead are constant numbers based on the practices of the review team. (Ockerman Dep. II at 286:1–10 & 293:7–23.)
  - At step 14, the visa issuance stage, Defendants do not appear to track the time it takes to make a final decision because they characterize this time as "applicant-controlled." (ECF No. 68-9 ("Oct. 2018 Joint Report") at 3.)

Moreover, in a Notice of Supplemental Authority, Plaintiffs alerted the court to the April 2019 Iraqi Joint Report, covering January 1, 2019 to March 31, 2019. (ECF No. 73 ("Pls.' Supp. Authority") at 1.) In the report, Defendants note that the current wait time for Iraqi applicants is 537 days, which Plaintiffs allege is more than four times the wait time in the prior report.[7] (*Id.* at 2.) The report states that the "growth in processing times . . . is due to the resolution of several longstanding cases which caused the overall average to jump significantly" and notes Defendants' policy of excluding pending cases in its calculation of average processing times. (ECF No. 73-1 at 99.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the record shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment

---

[7] On August 21, 2019, Defendants filed a response to Plaintiffs' Notice of Supplemental Authority (ECF No. 74), in which they did not contest that the Iraqi applicant wait times had increased, but noted that the Afghan applicant wait time decreased from 708 days to 564 days (*id.* at 2).

determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

"[A] motion for summary judgment adequately underpinned is not defeated simply by a bare opinion or an unaided claim that a factual controversy persists." *Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 314 (D.C. Cir. 1988). If, however, "material facts are genuinely in issue or, though undisputed, are susceptible to divergent inferences bearing upon an issue critical to disposition of the case," summary judgment should be denied. *See id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

### III. ANALYSIS[8]

By Memorandum Opinion and Order dated January 30, 2019, the court denied Defendants' motion to dismiss and declined Defendants' invitation to reject the reasoning and holding of *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Service to the United States v. Kerry*, 168 F. Supp. 3d 268 (D.D.C. 2016). In so doing, the court held, in part, that (1) Plaintiffs have standing to sue for an order compelling Defendants to adjudicate their SIV applications in a reasonable amount of time, and (2) Plaintiffs identified a required action to compel that does not rise or fall based on whether the 9-month deadline is congressionally mandated.

Given the court's prior ruling, it will now address the merits of Plaintiffs' unreasonable delay claim and the appropriate remedy.

A. <u>UNREASONABLE DELAY CLAIM</u>

The Administrative Procedure Act requires an agency to "proceed to conclude a matter presented to it" within "a reasonable time," 5 U.S.C. § 555(b), and directs courts to "compel agency

---

[8] Plaintiffs' Complaint states an unreasonable delay claim under both the Administrative Procedure Act and the Mandamus Act. Because Plaintiffs' motion addresses only the Administrative Procedure Act claim (Pls.' PI Mot. at 17 n.13), the court's analysis is confined to that claim.

action . . . unreasonably delayed." *Id.* § 706(1). Together, "[t]hese provisions give courts authority to review ongoing agency proceedings to ensure that they resolve the questions in issue within a reasonable time." *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 32 (D.C. Cir. 1984).

In *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984) ("*TRAC*"), the D.C. Circuit identified six factors for the court to consider when determining "whether the agency's delay is so egregious" as to warrant relief:[9]

1. Whether a "rule of reason" governs the time an agency takes to make a decision;

2. Whether Congress has provided in the enabling statute a timetable or other indication of the speed with which it expects the agency to proceed, thus supplying content for the rule of reason;

3. The affected sphere of regulation, because delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

4. The effect of expediting delayed action on agency activities of a higher or competing priority;

5. The nature and extent of the interests prejudiced by delay; and

6. Any impropriety of the agency, although the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Id.* at 80.

The court will address each factor—excluding the sixth factor, which is not necessary—in turn.

### 1. First and Second *TRAC* Factors

Through discovery, Plaintiffs determined that class members with pending COM applications wait, on average, 2.5 years for a decision on their COM application. (Pls.' PI Supp. at 13.) Class members who receive COM approval wait an additional 3 years for a final adjudication. (*Id.* at 13–14.) Plaintiffs contend that these delays violate the AAPA and RCIA's 9-month timetable for reasonableness. (Pls.' PI Mot. at 19–20.) And, 9-month timetable aside, Plaintiffs assert that

---

[9] The court disagrees with Defendants' contention that the *TRAC* factors should not apply because Plaintiffs seek programmatic change as opposed to discrete and mandatory action in Counts 1 and 2 of their Amended Complaint. (*See* ECF No. 42 ("Defs.' Opp.") at 8–9.)

9

Defendants' dilatory pace violates Congress' intent that Defendants process the SIV applications quickly. (*Id.* at 20–21.)

Defendants respond that Plaintiffs over rely on the length of the delays, which are due to (1) Defendants' efforts to balance individual eligibility for a visa and national security, and (2) the complex nature of the adjudication of the applications. (*See* ECF No. 42 ("Defs.' Opp.") at 9; ECF No. 70 ("Defs.' Supp.") at 6–19.) Defendants also argue that the 9-month deadline relates to institutional efficiency, and is not a timetable. (*See* Defs.' Opp. at 9.)

The first factor, which asks whether Defendants' SIV application adjudication time is governed by rule of reason, carries the most weight in the analysis. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) ("The first and most important factor is that 'the time agencies take to make decisions must be governed by a "rule of reason."'" (quoting *TRAC*, 750 F.2d at 80)). The second factor provides that "[i]f a specific deadline for final agency action is provided by Congress, the reasonableness of the delay can be measured in relation to this deadline." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 38 (D.D.C. 2000). "[T]hese factors get at whether the agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale." *Ctr. for Sci. in the Pub. Interest v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014). Because of their interrelatedness, factors one and two are often assessed in tandem.

At oral argument, Defendants' counsel minimized the significance of the discrepancy between the 9-month statutory benchmark and the 5-year average wait time. (*See* ECF No. 72 ("Hearing Tr.") at 5:17–6:3.) The court takes a different view.[10] However, its inquiry cannot end here. Whether the amount of time Defendants are taking to act on the SIV applications satisfies the rule of reason "cannot be decided in the abstract, by reference to some number of months or years beyond which agency

---

[10] Defense counsel appeared to take issue with Plaintiffs' inclusion of applications submitted since January 1, 2013. (*See* Hearing Tr. at 17:15–20.) However, as Plaintiffs' counsel noted, the applications dating back to 2013 "are all pending cases where a final decision has not been rendered." (*See id.* at 50:14–17.) Therefore, the court takes no issue with the inclusion of these data points.

10

inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). Therefore, the court must consider the delays in conjunction with Defendants' explanations for their pace.

Defendants argue that the delays are a result of their obligation to balance national security with individual eligibility for a visa. However, the construction of the statute makes clear that Congress was patently aware of the national security implications when it set the 9-month time limit.[11] The statute provides:

> 4) Application process.--
>
> A) In general.--Not later than 120 days after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2014 [Dec. 26, 2013], the Secretary of State and the Secretary of Homeland Security, in consultation with the Secretary of Defense, shall improve the efficiency by which applications for special immigrant visas under paragraph (1), are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.
>
> (B) Construction.--<u>Nothing in this section shall be construed to limit the ability</u> of a Secretary referred to in subparagraph (A) <u>to take longer than 9 months</u> to complete those steps incidental to the issuance of such visas <u>in high-risk cases for which satisfaction of national security concerns requires additional time</u>.

AAPA § 602(b)(4) (emphasis added), RCIA § 1242(c) (same, except title is "Improved application process"). And as Plaintiffs contend, "[t]o give meaning to both the nine-month provision and the rule-of-construction provision, the latter must be read as creating an exception to the nine-month timeframe for high risk cases." (Pls.' Reply at 7.) Defendants' interpretation of the statute—that Congress gave "unequivocal direction" to Defendants "to

---

[11] During oral argument, Defense counsel referred to the nine-month timeframe as both a "benchmark" and a "time limit." (Hearing Tr. at 19:23, 25:3.)

take whatever time is required to resolve national security concerns" on cases that have not been designated as high risk (Defs.' Supp. at 15–16)—is tortured and untenable.

Similarly, the fact that the adjudication process is a complex one does not excuse delays of such magnitude, because Congress explicitly referenced that complexity in the 9-month provision. The statutes provide that "<u>all steps</u> under the control of the respective departments <u>incidental to the issuance of such visas, including required screenings and background checks</u>, should be completed not later than 9 months." AAPA § 602(b)(4)(A) (emphasis added), RCIA § 1242(c)(1) (same). To date, despite receiving reports relaying the complex nature of the adjudication process, Congress has chosen not to extend the 9-month time limit. In addition, contrary to Defendants' assertion that "any delay, which is a result of these complex background checks and screening, is reasonable" (Defs.' Supp. at 15), complexity alone does not justify extensive delay, *see Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001) ("[N]either a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay, nor can the government claim that it has become subject to unreasonable expectations [when it has been aware of its obligations for years and failed to discharge its duties in a timely fashion]."), *vacated on other grounds,* 392 F.3d 461 (D.C. Cir. 2004).

Moreover, Defendants' argument that the 9-month time limit cannot provide a rule of reason timetable has shifted. In briefing, Defendants argued that the 9-month "provision is specifically directed at intuitional [sic] efficiency—operations in the aggregate[]—and provides an explicit rule of construction that forecloses application of a timetable." (Defs.' Opp. at 9.) Then, at oral argument, Defendants' counsel argued that "in looking at the adjudication of an individual application, in other words, the singular named plaintiffs and not the class claims, [] the Court can use that nine-month benchmark as something to gauge when assessing whether . . . the TRAC factor 2 applies." (Hearing Tr. at 22:23–23:3.) He continued, "[b]ut [], when we are seeking classwide relief, which is relief that is seeking to change the process of which the government is using—which is not a discrete act . . . the [c]ourt needs to view that very differently." (*Id.* at 23:5–9.) This most recent version of Defendants'

12

argument would require the court to view Plaintiffs' requested relief as programmatic in nature. The court declines to take such a view. Plaintiffs' first and second causes of action ask this court only to (1) declare the delay unreasonable and (2) compel Defendants to adjudicate Plaintiffs' SIV applications. (Am. Compl. at ¶¶ 71, 77.) In addition, it would be an inefficient use of the court's resources to require each of the 7,700 class members to bring an individual claim in order to avail themselves of the 9-month benchmark.

Finally, Defendants have not proffered a time frame for when they expect to adjudicate Plaintiffs' applications. Therefore, the court cannot comply with the D.C. Circuit's edict that trial courts "should ascertain the length of time that has elapsed since the agency came under a duty to act, and should evaluate any prospect of early completion." *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987); *see also Muwekma Tribe*, 133 F. Supp. 2d at 37 (finding unreasonable delay where "defendants' refusal to provide the plaintiff with a definite time frame for review of its petition [did] not enable the court to evaluate any prospect of completion").

Accordingly, the court finds that the first and second *TRAC* factors weigh in favor of Plaintiffs. It is clear that Congress did not intend to give Defendants an unbounded, open-ended timeframe in which to adjudicate SIV applications. And although Defendants have noted that they spend some time working "with individual applicants to help the applicant establish this [sic] or her eligibility" (Defs.' Supp. at 17), they have not established how much of the delay is attributable to providing additional assistance, and providing additional assistance does not *per se* justify extensive delay, *see, e.g.*, *Muwekma Tribe*, 133 F. Supp. 2d at 39 (finding unreasonable delay where the defendants "assert[ed] that an open-ended time frame affords certain advantages, including the ability to conduct preliminary reviews of petitions to inform petitioners of deficiencies or omissions in their petitions").

### 2. Third and Fifth *TRAC* Factors

The third and fifth *TRAC* factors are best analyzed together here because of their overlap. "The third looks to whether human health and welfare are at stake—in which case compulsion is more

13

justified—and the fifth assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Interest*, 74 F. Supp. 3d at 304 (internal quotation marks omitted).

Plaintiffs argue that "given the purpose of the AAPA and the RCIA to protect the Allies from danger, the systemic delays in processing of SIVs is egregious and merits relief." (Pls.' PI Mot. at 21.) They have provided the court with first-hand accounts from those facing harm as they await the adjudication of their SIV applications, as well as statements, from those intimately involved with the SIV application process, attesting to the interests prejudiced by the delay. (*See, e.g.*, ECF Nos. 3-5 ("Alpha Decl."), 3-6 ("Bravo Decl."), 3-7 ("Charlie Decl."), 3-8 ("Delta Decl."), 3-9 ("Echo Decl."), 34-2 ("Miska Decl."), and 34-5 ("Poellot Decl.").) In these submissions, Plaintiffs have provided support for their argument that the delays (1) place Plaintiffs' lives in danger, (2) cause Plaintiffs to live with the stress and anxiety of trying to protect themselves and their families from danger, (3) prevent Plaintiffs from adequately planning for the future, and (4) harm national interests, because delays undermine other countries' trust in this country's commitments. (Pls.' PI Mot. at 21–23.) On this last point, former United States Ambassador Ryan C. Crocker, who was the U.S. Ambassador to Iraq when the RCIA was enacted and who became the U.S. Ambassador to Afghanistan shortly after the AAPA was enacted, filed an amicus brief expounding on the ways in which the delays injure American interests. (ECF No. 40 ("Crocker Amicus Br."))

Defendants did not challenge Plaintiffs' assertions regarding the third factor in their briefs; instead they contend that "the nature and extent of the interests prejudiced by delay—is addressed by the statute where the agencies are given the discretion to keep applications as pending even where the time exceeds nine months." (Defs.' Opp. at 9–10.) However, as stated above, the discretion to keep applications pending longer than 9 months is limited to "high risk cases" and Defendants do not contend that any cases have been so designated. (*See, e.g.*, Hearing Tr. at 26:12–15.)

At oral argument, Defendants proffered two additional justifications. One, that an applicant's risk is the same on the day she submits an application until the day she receives a final decision, and

14

two, with regard to harm, a decision would relieve only uncertainty because admission is not guaranteed. (*Id.* at 36:18–37:2.) But Defendants cannot credibly argue these points and simultaneously acknowledge that "Congress passed this statute in an attempt to try to help [individuals who worked for U.S. forces and now face a risk of harm] alleviate the harm." (*Id.* at 36:10–11.) While the nature of the harm (*i.e.*, death or severe bodily injury) may indeed be constant, the probability of actual harm and the related stress are compounded each day an applicant waits for adjudication. Moreover, if the harm did not increase in some fashion during the pendency of an application, why would Congress include a benchmark and repeatedly express interest in the prompt adjudication of SIV applications? Defendants also understate the importance of the relief and ability to plan for the future that comes with certainty. *See Geneme v. Holder*, 935 F. Supp. 2d 184, 194 (D.D.C. 2013) (finding that third and fifth factors weighed in favor of plaintiff who argued "that she cannot adequately plan for her future without knowing whether or not she will be permitted to adjust her status" from asylee to permanent resident). In addition, the level of uncertainty increases for some applicants the longer they wait for processing because the passage of time makes it more difficult to obtain the requisite verifications and information to pass background checks.

Accordingly, the court finds that the third and fifth factors weigh in favor of Plaintiffs.

### 3. Fourth *TRAC* Factor

The fourth factor requires the court to consider the possible effects of Plaintiffs' requested relief on Defendants' activities of a higher or competing priority. In assessing this factor, courts examine whether the defendants' specific, proffered activities will be de-prioritized, in error, if the plaintiff is successful. *See Muwekma Tribe*, 133 F. Supp. 2d at 40–41 (assessing whether prioritizing the plaintiff's petition would unduly expense other tribe's petitions); *Ctr. for Sci. in the Pub. Interest*, 74 F. Supp. 3d at 305 (finding that prioritizing plaintiff's relief would "draw resources from actually resolving issues related to mercury consumption" and noting that the agency was also responsible for implementing "new regulatory framework for infant formula" and upgrading "nutrition panels"). If

"an order compelling agency action will serve only to delay other important [agency] matters, then the delay in question may be considered reasonable." *Muwekma Tribe*, 133 F. Supp. 2d at 40.

In its written submissions, Defendants did not proffer any specific agency activities that would be adversely affected,[12] however at oral argument they argued that a February 2019 amendment changed the type of applicant who should receive priority. (*See* Hearing Tr. at 45:5–46:9.) Specifically, Defendants argued that the amendment required them to prioritize the applications of "those individuals that are working directly for U.S. forces, that face the most harm, that have been involved in combat operations with U.S. forces." (*Id.* at 45:9–15.) But Defendants did not clearly identify the portion of the amendment that supported this argument.[13] The amendment provides:

> (a) AFGHAN ALLIES.—Section 602(b)(3)(F) of the Afghan Allies Protection Act of 2009 (division F of Public Law 111–8), as amended, is further amended by substituting "18,500" for "14,500" in the matter preceding clause (i).
>
> (b) CONDITIONS.—None of the funds appropriated by this Act may be made available for the additional special immigrant visas made available under subsection (a) until the Secretary of State—
>
> (1) <u>develops and implements a system to prioritize the processing of Afghan applicants for special immigrant visas under section 602 of the Afghan Allies Protection Act of 2009</u> (8 U.S.C. 1101 note); and
>
> (2) submits to the appropriate congressional committees, as defined in section 602(a) of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note), the following reports:

---

[12] Defendants argued in its briefs that Congress' exercise of oversight precludes judicial intervention and that national security and accurate decision-making were competing priorities. (*See* Defs.' Opp. at 9; Defs.' Supp. at 16, 42.) The court finds the first argument without merit because Defendants have not demonstrated how this case is any different from other cases in which a court ordered an agency to comply with a provision promulgated by Congress. The second argument is similarly baseless because Congress was aware of the competing priorities when it imposed the 9-month time limit. *See In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (dismissing agency argument that the court cannot rule that it was not acting quickly enough because it "must make a decision in this matter while carrying out duties of the most paramount importance, addressing nearly constant emergencies" and finding that "Congress undoubtedly knew the enormous demands placed upon the Secretary and nonetheless limited her time to act on a petition for revocation to 180 days"). Defendants have not demonstrated how these considerations, which exist in every immigration-related delay case, are unique.

[13] Defendants' counsel mentioned a "report to Congress about that section of the CAA," but did not provide the report or connect the report to the final version of the statute. (Hearing Tr. at 45:25–46:1.)

> (A) the report required under paragraph (12) of section 602(b) of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note), as amended by section 1222 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232);
>
> (B) a report on the procedures and processes used by the Chief of Mission to determine whether an Afghan applicant for a special immigrant visa under section 602 of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note) has experienced, is experiencing, or may reasonably be expected to experience an ongoing, serious threat as a result of the qualifying service of the applicant; and
>
> (C) a report on the procedures for background and security checks on Afghan applicants for special immigrant visas under such section.

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13 (emphasis added).

This amendment does not appear to alter Defendants' mandate under the Afghan SIV program: to prioritize Afghan applicants for special immigrant visas under the program. If the amendment has not shifted the prioritization, then Defendants have failed to provide the court with any evidence of a competing activity that justifies the delay in processing the applications. *See Liu v. Novak*, 509 F. Supp. 2d 1, 10 (D.D.C. 2007) (finding that "defendants have not provided any information that would allow the Court to find this factor in their favor" where defendants "failed to submit any information regarding the extent of this potential impact on the processing of other applications"). Alternatively, if Defendants are to prioritize applicants by the type of work they performed, this issue can be addressed in the structure of the class and the scope of the remedy, thus obviating any concerns of queue-jumping. *Cf. Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 116–18 (D.D.C. 2005) (finding in favor of agency where the agency's "first-in, first out" processing of applications "would simply move petitioners to the front of the queue, at the expense of other similarly situated applicants").

Accordingly, the court finds that the fourth factor is either neutral or weighs in favor of Plaintiffs.

B. REMEDY

Plaintiffs do not ask this court to order the immediate adjudication of the applications as a remedy for Defendants' delay. Instead, they seek an order directing Defendants to "(1) submit within 30 days a plan for promptly processing and adjudicating the applications, which should be developed with Plaintiffs' input, and (2) submit progress reports every 30 days thereafter." (Pls.' PI Mot. at 1.)

The remedy of requiring an agency to create a plan and submit periodic progress reports is common in this district. *See Solenex LLC v. Jewell*, 156 F. Supp. 3d 83, 85 (D.D.C. 2015) ("Indeed, our Circuit Court frequently orders recalcitrant agencies to establish schedules, subject to court approval, to finish their reviews and reach final agency decisions.") (collecting cases); *MCI Telecomms. Corp. v. F.C.C.*, 627 F.2d 322, 345–46 (D.C. Cir. 1980) (ordering agency to develop a plan, setting timeline for any objections to plan, stating that court would review the plan, and retaining jurisdiction to ensure compliance with the plan); *TRAC*, 750 F.2d at 81 (ordering agency to propose a plan and file progress reports every 60 days); *see also Mashpee Wampanoag Tribal Council, Inc.*, 336 F.3d at 1102 ("[I]f the district court is unable to conclude that the delay to date has been unreasonable, then it may nevertheless retain jurisdiction over the case in order to monitor the agency's assurances that it is proceeding as diligently as possible with the resources available to it.").

Having considered the arguments advanced by Plaintiffs and Defendants both in their written submissions (*see* Pls.' PI Mot. at 24–26; Pls.' Reply at 11–13; Pls.' PI Supp. at 15–19; Defs.' Opp. at 8–9; Defs.' Supp. at 39–44) and at oral argument, the court finds that the plan-progress report remedy will aid Plaintiffs in their quest for an adjudication without unduly intruding into Defendants' province.[14] However, the court will make some modifications to Plaintiffs' proposed order to ensure that it is no more intrusive than necessary. For example, Plaintiffs propose that this court require Defendants to obtain Plaintiffs' input before submitting the initial plan for court review <u>and</u> permit

---

[14] The court has reviewed Defendants' recent efforts to improve the application process, and finds that while the efforts are much needed, they do not obviate the need for judicial monitoring.

18

Plaintiffs to file objections to the submitted plan, a process that the court finds unduly intrusive. While Defendants may—and are encouraged to—consult with Plaintiffs regarding the proposed plan, they are not required to do so.

Accordingly, within thirty days of the resolution of the class certification dispute, Defendants shall submit a plan for promptly processing and adjudicating the applications of current class members; Defendants may consult with Plaintiffs regarding the proposed plan. Plaintiffs shall file any objections to the plan within twenty-one days, at which time the court may schedule further proceedings or take such other steps as may be needed before deciding whether to approve the plan. Once the court approves the plan, Defendants will be required to submit progress reports every 60 days thereafter; Defendants may consult with Plaintiffs regarding the format of the progress reports. In the progress reports, Defendants are encouraged to include the following information: (1) data on currently pending applications and processing times; (2) whether Defendants have met the target timeframes and interim benchmarks; and (3) if the target timeframes and benchmarks have not been met, an explanation of the failure and a description of the actions that will be taken to address the issue.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion is hereby **GRANTED**, in part, and **DENIED**, in part.

An appropriate Order accompanies this Memorandum Opinion.

Date: September 20, 2019

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge