**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL R. POMPEO, *et. al.*,<br><br>Defendants. | Civil Action No. 18-cv-01388 (TSC) |

## MEMORANDUM OPINION

Plaintiffs—five anonymous Afghan or Iraqi nationals—represent a class of individuals who, despite significant personal risk, aided the United States in its time of need and now look to the United States for refuge for themselves and their immediate family members.  They allege that they "provided faithful and valuable service to the US government or its allied forces" in their capacities as employees of or on behalf of the United States government over the past several years, and that because of their service, they "face an ongoing serious threat to their lives in their home countries."  (ECF No. 23, Amended Complaint ("Am.  Compl.") at ¶¶ 1, 56, 58, 60, 62, 64.)

In response to these threats, Plaintiffs submitted Special Immigrant Visa ("SIV") applications to the U.S. Department of State, seeking lawful admission into the United States.  (*Id*. at ¶¶ 13–17.)  Two Plaintiffs submitted their applications in 2013, one in 2015, and the other two in 2016.  (*Id.*)  At the time they filed this action on June 12, 2018, none of their SIV

applications had received a final decision.  (*Id*. at ¶¶ 57, 59, 61, 63, 65.)  They claim that

Defendants have failed to process and adjudicate their SIV applications within a reasonable time.

(*Id*. at ¶ 1.)

Plaintiffs have moved for class certification.[1]  (ECF No. 3 ("Mot. for Class

Certification".)  After three rounds of briefing, Defendants have shown that implementing this

court's remedy—a plan for prompt adjudication—does present certain administrative challenges.

However, the court finds that despite these challenges, the requirements for class certification are

satisfied.  Moreover, the administrative challenges pale in comparison to the inefficiency, cost,

and waste of resources that would result if each applicant (there are hundreds), were to bring

individual claims.  The burden of such inefficient and needlessly duplicative litigation would be

borne by the court, the Defendants, and the Plaintiffs, whose lives, and whose families' lives, are

at risk every day their applications are pending.  (*See* ECF No. 3-13 (describing recent murders

of individuals with pending SIV applications).)

Having reviewed the parties' filings, the record, and the relevant case law, the court will

GRANT Plaintiffs' motion for class certification.  The relevant class is defined as all people who

have (1) applied for an Afghan or Iraqi SIV pursuant to the Afghan Allies Protection Act of

2009, Pub. L. No. 111-8, 123 Stat.  807, or the Refugee Crisis in Iraq Act of 2007, Pub. L. No.

110-181, 122 Stat. 395, by submitting an application for Chief of Mission ("COM") approval,

and (2) whose applications have been awaiting government action for longer than 9 months.

---

[1] By Memorandum Opinion and Order dated January 30, 2019, the court granted Plaintiffs'
motion for class certification on a provisional basis for the sole purpose of resolving Defendants'
Partial Motion to Dismiss (ECF No. 30 ("Defs. Mot. to Dismiss"), Plaintiffs' Motion for
Preliminary Injunction, (ECF No. 34 ("Pls. PI Mot."), and Plaintiffs' Motion for Expedited
Discovery (ECF No. 35 ("Pls. Mot. for Exp. Discovery")).  Plaintiffs' counsel was also
appointed to represent the provisional class.  (*See* ECF No. 47, 48).

# I. BACKGROUND

A.          <u>Refugee Crisis in Iraq Act and Afghan Allies Protection Act</u>

In 2007, Congress enacted the Refugee Crisis in Iraq Act ("RCIA"), in part to fulfill the

United States' "fundamental obligation to help the vast number of Iraqis displaced in Iraq and

throughout the region by the war and the associated chaos, especially those who have supported

America's efforts in Iraq."  S. Res. 1651, 110th Cong. (2007) (enacted).  In so doing, Congress

noted:

> Many Iraqis who have worked in critical positions in direct support of the United
> States Government in Iraq have been killed or injured in reprisals for their support
> of the American effort.  Many more Iraqis associated with the United States have
> fled Iraq in fear of being killed or injured.

*Id.*  Under the RCIA, Iraqi nationals can apply and interview for admission to the United States

as special immigrants if they: (1) were or are "employed by or on behalf of the United States

Government in Iraq, on or after March 20, 2003, for not less than one year"; (2) "provided

faithful and valuable service to the United States Government"; and (3) "experienced or [are]

experiencing an ongoing serious threat as a consequence of [their] employment by the United

States Government."  RCIA §§ 1242(a)(2), 1244(b)(1).

In 2009, Congress enacted the Afghan Allies Protection Act ("AAPA"), with similar

objectives.  Pursuant to the AAPA, certain Afghan nationals may receive special immigrant

status if they: (1) were or are "employed by or on behalf of the United States Government in

Afghanistan on or after October 7, 2001, for not less than one year"; (2) "provided faithful and

valuable service to the United States Government"; and (3) "experienced or [are] experiencing

an ongoing serious threat as a consequence of [their] employment by the United States

Government."  AAPA §§ 602(b)(1)–(2).

Plaintiffs allege that after the enactment of the RCIA and AAPA, applicants to both programs experienced "considerable processing delays that risked the lives of the very applicants they were intended to protect." (Am. Compl. ¶ 34.)  For example, by mid-2011, four years after the start of the Iraqi SIV program, while nearly 30,000 Iraqi applicants and their family members had applied for the SIV program, only 4,000 applications had been processed. (*Id.* ¶ 37.)  And, while some of the Iraqi applicants waited for a decision, they "endur[ed] threats or acts of violence against themselves and their families because of their assistance to the US Government." (*Id.* ¶ 34.)

In 2013, Congress amended the RCIA and AAPA to "improve the efficiency by which applications for special immigrant visas . . . are processed."  RCIA § 1242(c)(1); AAPA § 602(b)(4)(A).  Per the amendment, all government-controlled steps incidental to issuing the SIVs, "including required screenings and background checks," should be completed within 9 months after submission of a complete application.  RCIA § 1242(c)(1); AAPA § 602(b)(4)(A).  However, additional time may be taken to process "visas in high-risk cases for which satisfaction of national security concerns requires additional time."  RCIA § 1242(c)(2); AAPA § 602(b)(4)(B).

## B.  Afghan and Iraqi SIV Application Process

To successfully obtain admission into the United States through the SIV program, Iraqi and Afghan nationals must complete fourteen steps:

> 1) The applicant submits an application for approval by the Chief of Mission (COM Approval) to the National Visa Center (NVC). Application materials must include a "statement of credible threat" detailing the ongoing threat to the applicant as a result of the applicant's service and a letter of recommendation from a supervisor attesting to the applicant's "faithful and valuable service."
> 2) NVC reviews the applicant's documents for completeness.

3) NVC sends the application materials to the Chief of Mission (COM) in either Afghanistan or Iraq.
4) The COM approves or denies the applicant's COM Approval application.
5) The COM advises NVC of the outcome of the application, which is communicated to the applicant.  If denied, the applicant has a statutory right to appeal within 120 days (COM Appeal).
6) If COM Approval is granted, the applicant submits a Special Immigrant Petition to USCIS for categorization as a special immigrant.
7) USCIS adjudicates the Special Immigrant Petition and communicates the results to NVC.
8) If the applicant is approved, NVC requests standard immigrant visa documentation from the applicant.
9) The applicant submits the required documentation to NVC.
10) NVC reviews the applicant's documents for completeness.
11) If the applicant is determined admissible to the United States and eligible for a US visa, NVC contacts the applicant to schedule an interview at the embassy in Afghanistan or Iraq.
12) The applicant attends an interview conducted by a consular officer.
13) If the application is approved, the applicant's case undergoes administrative processing, the final level of background checks.
14) If successful, the applicant is instructed to obtain a medical exam and is issued a US visa.

### C.  **Class Representatives**

There are five class representatives: John Doe-Alpha, Jane Doe-Bravo, John Doe-Charlie, Jane Doe-Delta, and John Doe-Echo.  All are SIV applicants who resided in Iraq or Afghanistan and allege that they lived "in fear of reprisal for their service to the US government" while they awaited "final decisions from Defendants on their applications."  (Am. Compl. ¶ 55.)  For each of them, "Defendants [took] far longer than the statutorily-allowed 9 months to complete all government-controlled processing steps."  (*Id.*)  Their application processes are now complete, as Defendants adjudicated each of their cases after Plaintiffs' filed their Complaint.  (*See* ECF No. 78-1, Supplemental Declaration of Evangeline Howard ("Howard Decl.").)

### 1. John Doe-Alpha

John Doe-Alpha is an Afghan national who applied to the SIV program on September 25, 2013, following approximately two years of service to a United States government contractor. (Am. Compl. ¶¶ 13, 56–57.)  Although John Doe-Alpha fled his Taliban-controlled hometown and relocated his wife and daughter to a nearby city, his family members who remained have been repeatedly threatened and harassed by individuals self-identifying as the Taliban.  (*Id.* ¶¶ 9, 56.)  The Taliban also placed John Doe-Alpha's parents under house arrest.  (*Id.* ¶ 56.)  As a result, he fears that if he returns to his hometown, he will be targeted by the Taliban.  (*Id.*)

When the Amended Complaint was filed on July 12, 2018, John Doe-Alpha had been seeking a final decision on his SIV application for almost five years.  (*Id.* ¶ 57.)  Defendants took "over four months for the initial COM decision; five days for his Special Immigrant Petition; and over twelve months for his visa interview."  (*Id.*)  On June 11, 2015, John Doe-Alpha had his visa interview.  (*Id.*)  His application then remained at step thirteen until February 20, 2019, when he was found ineligible for an immigrant visa under 9 U.S.C. § 1182(a)(3)(B), which lists terrorism-related inadmissibility grounds.  (Howard Decl. at ¶ 4.)

### 2. Jane Doe-Bravo

Jane Doe-Bravo is an Afghan national who applied to the SIV program on October 15, 2015, following approximately two years of service to a United States government-funded development organization.  (Am. Compl. ¶¶ 14, 58–59.)  In response to frequent death threats via letter and phone, Jane Doe-Bravo has changed her phone number and relocated with her husband and three young children numerous times.  (*Id.* ¶¶ 9, 58.)  She claims that she feels hopeless and unable to trust anyone as she recovers from recent childbirth and cares for her newborn. (*Id.* ¶ 58.)

When the Amended Complaint was filed, Jane Doe-Bravo had been seeking a final decision on her SIV application for almost three years.  (*Id.* ¶ 59.)  Defendants took nearly three months to issue a denial on her application for COM Approval, which she subsequently appealed.  (*Id.*)  Twenty-nine months after she appealed (and six days before she filed the Amended Complaint), Defendants granted her request for COM Approval and informed her that she was authorized to submit her Special Immigration Petition.  (*Id.*)  She promptly made the requisite submission.  (*Id.*)  On March 28, 2019, a consular officer issued Jane Doe-Bravo an immigrant visa.  (Howard Decl. ¶ 6.)

### 3. <u>John Doe-Charlie</u>

John Doe-Charlie is an Afghan national who applied to the SIV program on April 18, 2016, following approximately four years of service as an interpreter and translator for two U.S. military contractors.  (Am. Compl. ¶¶ 15, 60–61.)  John Doe-Charlie and his family have received death threats, (*id.* ¶ 60), and the Taliban attacked and repeatedly stabbed John Doe-Charlie's brother, believing he was John Doe-Charlie (*id.* ¶¶ 9, 60).  Although John Doe-Charlie has relocated to protect his family, he continues to fear for their safety.  (*Id.*)

At the time the Amended Complaint was filed, John Doe-Charlie had been awaiting a final decision on his SIV application for over two years.  (*Id.* ¶ 61.)  Defendants took over eight months to deny his application for COM Approval, which he successfully appealed on April 3, 2017.  (*Id.*)  On September 28, 2019, a consular officer issued John Doe-Charlie an immigrant visa.  (Howard Decl. ¶ 8.)

### 4. <u>Jane Doe-Delta</u>

Jane Doe-Delta is an Afghan national who applied to the SIV program on December 23, 2016, following approximately three years of service to a U.S. government communications

contractor.  (Am. Compl. ¶¶ 16, 62–63.)  The nature of her position requires her to travel with

colleagues to active conflict zones and interact with the public.  (*Id.* ¶ 62.)  The Taliban has

threatened her and her family, and they have been followed by masked men.  (*Id.* ¶¶ 9, 62.)  Jane

Doe-Delta and her father also have been threatened with Jane Doe-Delta's death if she did not

quit her job.  (*Id.*)  As a result, Jane Doe-Delta constantly feels unsafe.  (*Id.* ¶ 62.)

At the time the Amended Complaint was filed, Jane Doe-Delta had been awaiting a final

decision on her SIV application for over a year and a half.  (*Id.* ¶ 63.)  On December 20, 2018,

U.S. Embassy Kabul denied Jane Doe-Delta's application for COM approval.  (Howard Decl.

¶ 13.) On April 23.  2019, Jane Doe-Delta appealed the denial, and on August 30, 2019, the U.S.

Embassy Kabul denied her appeal.  (*Id.* ¶ 14.)

### 5. John Doe-Echo

John Doe-Echo is an Iraqi national who applied to the SIV program in July 2013,

following approximately two years of service as a translator for U.S. forces, "including eight

months training Iraqi police at the request of the United States."  (Am. Compl. ¶¶ 17, 64–65.)

Because of his service, John Doe-Echo has been threatened by militants, who shot at his home,

and kidnapped and murdered his father.  (*Id.* ¶¶ 9–10, 64.)  After his father's murder, John Doe-

Echo fled Iraq, but has since had to return because he was unable to find a job or otherwise

support himself.  (*Id.* ¶ 64.)  He now lives in hiding in Iraq.  (*Id.*)

At the time the Amended Complaint was filed, John Doe-Echo had been awaiting a final

decision on his SIV application for almost five years.  (*Id.* ¶ 65.)  Defendants took

"approximately sixteen months for the original COM decision; nearly a month for his COM

Appeal to be granted; nearly six months for his Special Immigrant Petition; and nearly three

months to schedule and hold his interview."  (*Id.*)  On February 3, 2016, John Doe-Echo had his

visa interview.  (*Id.*)  On March 19, 2019, a consular officer issued him an immigrant visa. (Howard Decl. ¶ 10.)

### D.  <u>Procedural History</u>

On June 12, 2018, Plaintiffs filed this action and moved for class certification and the appointment of class representatives and class counsel.  (ECF No. 1; Mot. for Class Certification.)  One month later, on July 12, 2018, Plaintiffs filed an Amended Complaint.  (Am. Compl.)  Defendants then moved to partially dismiss Plaintiffs' Amended Complaint on August 13, 2018.  (Defs. Mot. to Dismiss.)  On September 7, 2018, Plaintiffs filed a motion for preliminary injunction and a motion for expedited discovery shortly before their response to Defendants' partial motion to dismiss.  (Pls. PI Mot.; Pls. Mot. for Exp. Discovery; ECF No. 36 ("Pls. Opp. to Mot. to Dismiss").)  On September 28, 2018, Defendants filed a reply in support of their motion to dismiss, a response to Plaintiffs' motion to expedite discovery, and a response to Plaintiffs' motion for a preliminary injunction.  (ECF No. 41–43; ECF No. 44 ("Pls. Reply") at 1, n.2.))

Because Plaintiffs asked to supplement the motion with discovery before the court ruled on the merits, the court turned first to Defendants' partial motion to dismiss and Plaintiffs' motion for expedited discovery.  By Memorandum Opinion and Orders dated January 30, 2019 (ECF No. 47–49), the court:

1. Granted Plaintiffs' motion for class certification on a provisional basis, for the sole purpose of resolving Defendants' partial motion to dismiss, Plaintiffs' motion for preliminary injunction, and Plaintiffs' motion for expedited discovery;
2. Appointed Plaintiffs' counsel to represent the provisional class;
3. Denied Defendants' motion to dismiss;
4. Granted Plaintiffs' motion to expedite discovery; and
5. Issued a discovery, briefing, and hearing schedule.

In so doing, the court held, in part, that (1) Plaintiffs have standing to sue for an order compelling Defendants to adjudicate their SIV applications in a reasonable amount of time, and (2) Plaintiffs identified a required action to compel that does not rise or fall based on whether the 9-month timetable is congressionally mandated.  (*See* ECF No. 47 at 20–21.)

Despite some delays, Plaintiffs eventually received most of the discovery that they sought and supplemented their motion.[2]  Before expedited discovery began, Plaintiffs used named Plaintiffs' individual circumstances and data mined from the periodic SIV reports and adduced that applicants experienced wait times longer than the 9-month benchmark referenced in the statute.  When the preliminary injunction motion was filed, named Plaintiffs had been waiting in government-controlled steps of the process between 18 and 52 months.  (Pls. PI Mot. at 10.) And, given the application deadline, all Iraqi applicants had been waiting over 3.5 years.  (*Id.* at 12 n.1.)  Following expedited discovery, Plaintiffs supplemented the record with additional data regarding the time applicants await adjudication:[3]

- At least 7,700 applications have been pending for longer 9 months.  (ECF No. 68 ("Pls. PI Supp.") at 4.)  Of those 7,700 applicants, over 5,300 have waited an average of 2.5–5 years for COM approval, and over 2,300 have waited an average of three years after receiving COM approval.[4]  (ECF No. 68-12 ("Onken Decl.") at ¶¶ 13, 44.)

---

[2] At the July 26, 2019 hearing, Plaintiffs indicated they needed additional discovery to "identify and to determine the magnitude of delays across the entire SIV process."  (ECF No. 72 ("Hearing Tr.") at 5:17–6:3.)  The court concluded that Plaintiffs had proffered sufficient evidence for the court to advance Plaintiffs' preliminary injunction motion to a trial on the merits.  (*Id at* 7:22–8:13.)

[3] Plaintiffs also identified several potential problems with Defendants' method of tracking and reporting SIV Application processing times.  (*See* Pls. PI Supp. at 9–11.)

[4] Plaintiffs were unable to track the complete average wait time because Defendants do not maintain information linking applicants across all stages except for their names and birthdays, and Plaintiffs were provided only anonymized data.  (Pls. PI Supp. at 4 n.3.)

- When Defendants produced the data, "over 7,000 applicants had been pending only in their <u>current</u> step for longer than 9 months (not including time spent awaiting government action in previous steps)." (Pls. PI Supp. at 11 n.10 (emphasis in original) (citing Onken Decl. at ¶¶ 13, 28, 33, 40).)
- Over 80% of the Afghan applications that have been designated as complete have been pending over 9 months, awaiting a decision at the COM approval stage. (Onken Decl. at ¶ 13.)
- The Iraqi class members have waited, on average, over 5 years for an initial decision on their COM application. (*Id.*)
- More than 6,300 applicants have already waited at least 9 months for a decision on their COM appeal. (*Id.* at ¶ 20.) This figure represents 94% of all individuals awaiting a COM appeal decision. (*Id.*) The average wait for Afghan applicants is 2 years and 8 months; for Iraqi applicants, the average wait is 3 years and 8 months. (*Id.*) Historically, COM appeals are successful 50% of the time. (*See generally* ECF No. 34-6 ("Afghan SIV Joint Reports Jan. 2016 – Apr. 2018"); ECF No. 34-7 ("Iraqi SIV Joint Reports Jan. 2016 – Apr. 2018").)
- Ninety-eight percent of applicants who have completed an interview have been waiting over 9 months for a final adjudication. (Onken Decl. at ¶ 44.)

Subsequently, in a Notice of Supplemental Authority, Plaintiffs alerted the court to the April 2019 Iraqi Joint Report, covering January 1, 2019 to March 31, 2019. (ECF No. 73 ("Pls. Supp. Authority") at 1.) In the report, Defendants note that the current wait time for Iraqi applicants is 537 days, which Plaintiffs allege is more than four times the wait time in the prior report.[5] (*Id* at 2.) The report states that the "growth in processing times . . . is due to the resolution of several longstanding cases which caused the overall average to jump significantly" and notes Defendants' policy of excluding pending cases in its calculation of average processing times. (ECF No. 73-1 at 99.) Despite the long delays, when asked on the record whether it was Defendants' position that the nine-month timeline was impossible, Mr. Carilli responded for the Defendants that "[he] do[es]n't think the government's position is that it's impossible." (Hearing Tr. 32:15–20.)

---

[5] On August 21, 2019, Defendants filed a response to Plaintiffs' Notice of Supplemental Authority (ECF No. 74), in which they did not contest that the Iraqi applicant wait times had increased, but noted that the Afghan applicant wait time decreased from 708 days to 564 days (*Id.* at 2.)

By Memorandum Opinion and Order dated September 20, 2019 (ECF Nos. 75, 76), the court granted in part and denied in part Plaintiffs' motion for a preliminary injunction, ordering that:

- Within thirty days of the resolution of the instant class certification dispute, Defendants shall submit a plan for promptly processing and adjudicating the applications of current class members.
- Within twenty-one days after submission of the plan, Plaintiffs shall file any objections to the plan.
- Upon approval by the court of the plan, Defendants shall file a progress report every 60 days.

(ECF No. 75 at 19.)  Defendants then filed a second supplemental memorandum in opposition to Plaintiffs' motion for class certification (ECF No. 78 ("Defs. 2nd Supp. Opp.")) as well as a Motion for Reconsideration of the court's preliminary injunction (ECF No. 79) that is addressed by this court in a separate memorandum opinion and order.  The court will now address the question of whether Plaintiffs' proposed class satisfies Rule 23 of the Federal Rules of Civil Procedure.

## II.  ANALYSIS

Under Fed. R. Civ. P. 23(a), the proponent of the class action must establish that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  The proposed class must also meet one of the three additional requirements set forth in Rule 23(b).  Relevant here is Rule 23(b)(2)'s requirement that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, such that injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Class certification is not automatic, and sets forth more than a pleading standard—Rule 23 demands affirmative demonstration of compliance, and requires proof that "there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 249 (D.C. Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (emphasis in original) (internal quotation marks omitted).  While the court may find it "necessary . . .  to probe behind the pleadings before coming to rest on the certification question," *In re Rail Freight Fuel Surcharge*, 725 F.3d at 249 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)) (internal quotation marks omitted), in determining whether to certify a class, a court may not examine whether "plaintiffs have stated a cause of action or will prevail on the merits."  *In re Veneman*, 309 F.3d 789, 794 (D.C. Cir. 2002) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)) (internal quotation marks omitted).

## A. **Numerosity**

A proposed class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Although the absolute number of class members is not the sole determining factor, joinder will usually be impracticable when the class is large."  *Council of and for the Blind of Delaware Cnty. Valley, Inc. v. Regan,* 709 F. 2d 1521, 1543 n. 48 (D.C. Cir. 1983).  Still, "[t]here is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, the determination 'requires examination of the specific facts of each case and imposes no absolute limitations.'"  *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007) (quoting *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)).  Moreover, plaintiffs "need not provide the exact number of potential class members to satisfy the requirement, so long as there is a reasonable basis for the estimate provided."  *Lightfoot v. District of Columbia*, 246

F.R.D. 326, 335 (D.D.C. 2007) (citing *Bynum v. District of Columbia*, 214 F.R.D. 27, 32–33 (D.D.C. 2003)).

Plaintiffs argue that joinder is impracticable because the putative class size is in the "hundreds." (Mot. for Class Certification at 12.) They further argue that adjudicating the class members' claims individually would take years, during which time the class members' lives would be at risk and the court's resources needlessly tied up. (*Id*. at 14.) Plaintiffs note that earlier, successful lawsuits on this issue (but with small groups of applicants) failed to bring Defendants into compliance with statutory obligations, thus necessitating a class action. (*Id.*) Defendants do not contest numerosity. (ECF No. 27 ("Defs. Opp. to Mot. for Class Certification"); ECF No. 59-1 ("Defs. Supp. Opp. to Mot. for Class Certification"); Defs. 2nd Supp. Opp.)

The court finds that: (1) there is a reasonable basis for Plaintiffs' estimation of the putative class size; and that (2) joinder is impracticable. Plaintiffs' estimations are based on data provided by Defendants DHS and State and form a reasonable basis to believe that the class numbers in the hundreds. *See Lightfoot*, 246 F.R.D. at 335 (noting that "plaintiff need not provide the exact number of potential class members to satisfy the requirement, so long as there is a reasonable basis for the estimate provided"). Joinder is impracticable for hundreds of individuals, especially when they are geographically dispersed internationally. *See Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999) (finding geographical dispersion relevant to impracticability of joinder). Moreover, the inefficiency of bringing individual cases is costly, where, as here, class members are at risk of being killed each passing day. (*See* ECF No. 3-13) (describing recent murders of individuals with pending SIV applications).

B. **Commonality**

Commonality requires that "there are questions of law or fact common to the class." Fed.

R. Civ. P. 23(a)(2).   Members of the proposed class must "have suffered the same injury," *Wal-*

*Mart Stores, Inc.*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 152) (internal quotation marks

omitted), to support the existence of a common contention that "is capable of classwide

resolution," meaning "that determination of its truth or falsity will resolve an issue that is central

to the validity of each one of the claims in one stroke." *Id.*   The commonality requirement is

satisfied where the challenge is to "a uniform policy or practice that affects all class members."

*DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013); *see also R.I.L.-R v. Johnson*, 80

F. Supp. 3d 164, 181 (D.D.C. 2015).

Plaintiffs argue that all class members suffered the same injury: unreasonable delay in the

adjudication of their SIV applications.  (Mot. for Class Certification at 16.)  And that all class

members challenge the same policy or practice: "Defendants' systematic and unaddressed failure

to complete processing and adjudication of their SIV applications within nine months."  (*Id.*)

Plaintiffs further argue that there are multiple questions of law applicable to all class members,

including whether Defendants are required to adjudicate SIV applications, whether Defendants

must adjudicate SIV applications within 9 months, and whether Defendants' failure to adjudicate

SIV applications merits relief from this court.  (*Id.* at 15.)

Defendants argue that there is insufficient commonality because factual differences

between class members necessitate case-by-case adjudication.  (ECF No. 27 at 17–21.)  But

courts regularly certify classes where individual members have different factual circumstances.

*See, e.g.*, *Nio v. U.S. Dep't. of Homeland Sec.,* 323 F.R.D. 28, 32 n.2 (D.D.C. 2017) (class

certified of people alleging unreasonable delays to naturalization applications, even though

"class members' naturalization applications may have applications with varying times of delay that could influence the type of relief this Court could grant"); *Bynum*, 214 F.R.D. at 34 (class certified despite differences in lengths of detainment because systemic detainment after scheduled date of release was a common issue). Here, the factual variations among the class members (such as the date they applied and the kind of threat they face) are not fatal to commonality because they do not undermine the class's common characteristics—that they have submitted SIV applications and have been waiting longer than 9 months for final adjudication.

Defendants' stronger argument is that commonality is defeated because the class as currently defined would include individuals with "high-risk" cases who stand on a different legal footing than the rest of the class. (Defs. Opp. to Mot. for Class Certification at 20–21.) Under AAPA § 602(b)(4) and RCIA § 1242(c), Defendants may take longer than 9 months "in high-risk cases for which satisfaction of national security concerns requires additional time." Defendants note that one of the class representatives—John Doe-Alpha—fits within this exception because a consular officer found him ineligible for a visa for national security reasons. (Defs. Supp. Opp. to Mot. for Class Certification at 3.) Apart from John Doe-Alpha, however, Defendants point to no other applicants who are high-risk and require additional processing time, and it is the Defendants who decide which applicant is high-risk.

While the difference between a high-risk applicant and one that is not is legally relevant, it is nonetheless insufficient to undermine commonality here given the generality of Plaintiffs' claim, the indeterminate nature of what it means to be high-risk, and the fact that the court's relief allows Defendants flexibility in processing high-risk applications. First, all class members, including those considered high-risk, assert a common legal injury: that Defendants have breached their duty under the APA to adjudicate SIV applications without unreasonable delay.

(Am. Compl. ¶ 73.)  While the RCIA and the AAPA create an exception for high-risk cases that require more time, the APA applies to all applicants.  *See* 5 U.S.C. § 706(1); *see also Telecomm. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (setting forth a standard to assess unreasonably delay claims that does not require a Congressional timetable for consideration of a claim).  And as Plaintiffs make clear, they "challenge Defendants' failure to address and adjudicate their SIV applications within a reasonable time . . .  Plaintiffs do not seek to enforce the nine-month timeframe in this action."  (Pls. Opp. to Mot. to Dismiss at 2.) This claim is common to all class members, regardless of high-risk status.

Second, high-risk cases do not follow a set path.  Merely because a case is considered high-risk does not mean that it will continue permanently in that status.  (*See* Defs. Supp. Opp. to Mot. for Class Certification at 4–5) ("Defendants conduct required background and security checks throughout the adjudication of each application[.]")  In fact, Defendants explained at oral argument that the statute does not require them to "designate" cases as high-risk.  (Hearing Tr. at 25:7–10.)  Accordingly, given the fluidity of the process, it is possible that an applicant may not be considered high-risk until after extensive, unreasonable delay.  John Doe-Alpha, for example, waited five years before he was considered high-risk.  (Howard Decl. ¶¶ 3–4; Am. Compl., ¶ 57.) In his case, it would strain credulity to argue that his classification as "high-risk" caused the delay given that the delay occurred well before that classification.

Moreover, just because a case is considered high-risk does not mean that additional time is required.  Notably, the statutory exception permits Defendants to take longer than 9 months in only those high-risk cases "for which satisfaction of national security concerns *requires additional time*."  AAPA § 602(b)(4)(B) (emphasis added); RCIA § 1242(c)(2) (same).  And while some high-risk cases will require additional time, there is nothing to indicate that this is

17

true for all such cases.  Therefore, while it is true that the statute does allow Defendants to take longer than nine months for high-risk cases that require additional time, it does not necessarily follow that high-risk status automatically means there has been no unreasonable delay.  Nor does it vitiate the ability of a high-risk applicant to raise a claim under the APA.  Finally, it does not even establish, without more, that additional time is needed.  John Doe-Alpha, the only class member that Defendants have declared high-risk, exemplifies this point: his case was not considered high-risk until after he experienced extensive and unreasonable delay, and Defendants have not indicated that his high-risk status had anything to do with the delay.

Finally, all class members, including those whose applications require additional processing time because they are high-risk, seek and will benefit from the same remedy.  In the September 20, 2019 Memorandum Opinion and Order (ECF Nos. 75, 76) this court ordered Defendants to "submit a plan for promptly processing and adjudicating the applications of current class members" within "thirty days of the resolution of the class certification dispute." (ECF No. 75 at 19.)  Such a remedy is applicable to all class members, including those with high-risk applications like John Doe-Alpha, because it is sufficiently flexible to enable Defendants to specify which applications require additional processing time because they are high-risk.  If the "government credibly claim[s] that a particular case [is] high risk" and requires additional time, a court should "defer to the government's expertise in the area of foreign policy and national security." *Nine Iraqi Allies v. Kerry,* 168 F. Supp. 3d 268, 295 (D.D.C. 2016).  The court's remedy allows Defendants to incorporate such expertise into its proposed plan, and provides the government with flexibility to process high-risk applications that require extra time. That certain applications may require more than 9 months to process does not undermine commonality.

For all the foregoing reasons, and based on the record before it, the court concludes that Plaintiffs have satisfied the commonality requirement.  Plaintiffs challenge a uniform act and allege a uniform harm for which there is a common remedy.[6]  *See Wal-Mart Stores, Inc.*, 564 U.S. at 350.

## C. **Typicality**

Rule 23's typicality requirements are met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Unlike commonality, which is concerned with the similarity of class members' injuries, the typicality requirement "focuses on whether the representatives of the class suffered a similar injury from the same course of conduct."  *Bynum*, 214 F.R.D. at 34.  The requirement "ensures that the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class." *Littlewolf v. Hodel*, 681 F.  Supp. 929, 935 (D.D.C. 1988), *aff'd sub nom.*, *Littlewolf v. Lujan*, 877 F.2d 1058 (D.C. Cir. 1989).  Typicality is established if "[a] plaintiff's claim . . .  arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory."  *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997) (quoting *EEOC v. Printing Indus.*, 92 F.R.D. 51, 54 (D.D.C. 1981)).

---

[6] Defendants also argue that commonality is defeated because the proposed class includes individuals without standing to sue.  (Defs. Opp. to Mot. for Class Certification at 15.)  The premise of this argument, that only applicants at certain steps benefit from the 9-month timetable has already been rejected by this court and others.  *See Nine Iraqi Allies,* 168 F. Supp. 3d at 292; *Airaj v. United States*, No. CV 15-983 (ESH), 2016 WL 1698260, at *9 (D.D.C. Apr. 27, 2016).

The named Plaintiffs argue that their claims are typical of the class because they all share the same injury ("Defendants' systematic failure to adjudicate their SIV application within the 9-month statutory requirement"), and because they all share common characteristics (they "worked for the US government or allied forces; applied for SIVs; face threats to their safety and that of their families; and have been waiting for longer than 9 months for the government to complete government-controlled steps to process and adjudicate the SIV application.").  (Mot. for Class Certification at 18.)  Defendants counter with the same arguments they proffered against commonality.  (Defs. Opp. to Mot. for Class Certification at 21–22.)  Just as those arguments do not defeat commonality, neither do they defeat typicality.  The differences between the named Plaintiffs and the class members that Defendants highlight (applicants who are at different steps in the process and who are considered high-risk), do not undermine the relevant shared characteristics between the named Plaintiffs and the class as a whole.  All class members' claims "arise from the same event or practice or course of conduct" and, as discussed above, are "based on the same legal theory."  *Stewart*, 948 F. Supp. at 1088.  Moreover, "factual variations between the claims of class representatives and the claims of other class members . . .  do not negate typicality."  *Bynum*, 214 F.R.D. at 34; *see also Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987) (noting that "[c]ourts have held that typicality is not destroyed merely by 'factual variations'"); *United States v. Trucking Emp., Inc.*, 75 F.R.D. 682, 688 (D.D.C. 1977) (collecting cases and noting that "where the claims or defenses raised by the named parties are typical of those of the class, differences in the factual patterns underlying the claims or defenses of individual class members will not defeat the action").[7]

---

[7] Defendants also argue that the named Plaintiffs are not typical of the class because their claims are moot.  (Defs. Supp. Opp. to Mot. for Class Certification at 3.)  This issue is addressed in the discussion of adequacy below.  (*See supra*, pp. 25–28.)

The court concludes that the named Plaintiffs' claims are typical of those of the proposed class. The record establishes that the course of conduct at issue (the application of Defendants' policies), the injury itself, and the legal theory underlying the claims are the same in all material respects between the named Plaintiffs and the rest of the class. *See Stewart*, 948 F. Supp. at 1088 (noting that claims arising from "the same event or practice or course of conduct" and based on the same legal theory as other class members are considered typical).

### D. **Adequacy**

Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy of representation is typically measured by two criteria: (1) whether the named representative has antagonistic or conflicting interests with the members of the class, and (2) whether the representative appears capable of vigorously prosecuting class interests through qualified counsel. *See Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 41 (D.D.C. 2017); *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575–76 (D.C. Cir. 1997). The first criterion focuses on conflicts of interest, which "prevent named plaintiffs from satisfying the adequacy requirement only if they are fundamental to the suit and . . . go to the heart of the litigation." *Nat'l Veteran Legal Servs. Program*, 235 F. Supp. 3d at 41 (quoting *Keepseagle v. Vilsack,* 102 F. Supp. 3d 205, 216 (D.D.C. 2015)). Speculative or hypothetical conflicts will not defeat the adequacy requirement. *Nat'l Veteran Legal Servs. Program*, 235 F. Supp. 3d at 41. The second criterion ensures that class counsel is competent. *See id.* at 43.

Plaintiffs contend that the named Plaintiffs' interests do not conflict with those of the class members, since all class members will benefit from the remedy named Plaintiffs seek:

prompt adjudication of all SIV applications pending in excess of 9 months.  (Mot. for Class

Certification at 19–20.)  Defendants argue, *inter alia*, that Plaintiffs are not adequate

representatives because there is a conflict between individuals with applications pending before

Step 10 and those with applications pending after Step 10.  (Defs. Opp. to Mot. for Class

Certification at 22–23.)  Defendants also argue that there is a tension between those plaintiffs

who prefer "the near-term certainty of an agency decision" and those who would prefer

uncertainty to "maximize[] eligibility and thus the opportunity for a favorable decision."  (Defs.

2nd Supp. Opp. at 13.)  Finally, Defendants argue that because the named Plaintiffs' claims are

now moot, they are not adequate representatives for class members with live claims.  (*Id.* at 14.)

    None of the conflicts alleged by Defendants would prevent the named Plaintiffs from

"fairly and adequately protect[ing] the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The

alleged tension between those before and those after Step 10 is illusory given this and other

courts' holdings that applicants at all government-controlled steps are covered by the 9-month

timetable.  *See Nine Iraqi Allies*, 168 F. Supp. 3d at 292; *Airaj*, 2016 WL 1698260 at *9.

Additionally, Defendants' argument about the tension between speed of process and success on

the merits is unavailing because Defendants offer no evidence that delay "maximizes" the

"opportunity for a favorable decision."  (Defs. 2nd Supp. Opp. at 13.)  To the contrary, the

record suggests that delay *harms* an applicant's chance of success, because, with the passage of

time, documents can be harder to locate and supervisors harder to contact.  (*See* ECF No. 34-5 ¶

18.)  And while Defendants provide some evidence that staff members work with applicants to

fill gaps in their applications (*see* ECF No. 70 at 17–19), there is no reason that such support

cannot be provided within the timeline set by Congress.

Lastly, Defendant's argument that mootness undermines adequacy is unpersuasive because this case fits within the "inherently transitory" exception to the mootness doctrine.  This exception exists for claims that "are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980); *see also Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991); *Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975) ("There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion.").  The exception applies when "the individual claim might end before the district court has a reasonable amount of time to decide class certification, and  .  .  .  some class members will retain a live claim at every stage of litigation."  *J.D. v. Azar,* 925 F.3d 1291, 1311 (D.C. Cir. 2019).

Because this case involves visa applications, the class is inherently transitory, and its membership is not fixed.  Some Plaintiffs have already received decisions on their applications, and others could receive decisions while this litigation is ongoing.  Thus, even though the proposed class likely includes many individuals with visa applications that will remain pending long enough for a court to rule on class certification, Plaintiffs have no way of ensuring that any particular class representative will be in that group.  *See Thorpe v. District of Columbia,* 916 F. Supp. 2d 65, 67 (D.D.C. 2013) ("The length of any individual's stay in a nursing facility is impossible to predict, so even though there are certainly individuals whose claims will not expire within the time it would take to litigate their claims, there is no way for plaintiffs to ensure that the Named Plaintiffs will be those individuals").  Indeed, while the five named Plaintiffs' claims have been resolved, most of the hundreds of class claims have not.  (Mot. for Class Certification

at 12; Onken Decl.)  Where a live controversy exists for class members, mootness alone does not render the named Plaintiffs inadequate.  *See Basel v. Knebel,* 551 F.2d 395, 397 n.1 (D.C. Cir. 1977).

For these reasons, the court rejects Defendants' contention that named Plaintiffs are unable to vigorously prosecute class interests because their claims are now moot.  The court concludes that: (1) an exception to the mootness doctrine applies, and that (2) the named Plaintiffs have no conflicts of interest with the class and are capable of vigorously prosecuting class interests.

The court further finds that Freshfields Bruckhaus Deringer US LLP (Freshfields) and the International Refugee Assistance Project (IRAP) are capable of vigorously prosecuting class interests as class counsel.  *See Nat'l Veterans Legal Servs. Program*, 235 F. Supp., at 41.  In appointing class counsel, the court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  Freshfields and IRAP have litigated APA claims brought by SIV applicants in the past, *see Nine Iraqi Allies*, 168 F. Supp. 3d at 268, have handled other immigration related class actions and complex litigation, (*See* ECF No. 3-10 ¶¶ 5, 7; ECF No. 3-11 ¶¶ 5, 7–8), and have invested significant resources into developing the claims in this case (Mot. for Class Certification at 22).  Thus, finding Freshfields and IRAP qualified and capable of vigorously prosecuting this litigation, the court will appoint them class counsel.

### E. __Rule 23(b)(2)__

A plaintiff seeking class certification must also satisfy one of the three Rule 23(b) requirements.  Relevant here is the requirement that the defendant "has acted or refused to act on grounds that apply generally to the class," such that declaratory or injunctive relief is appropriate as to the whole class.  Fed. R. Civ. P. 23(b)(2).  A Rule 23(b)(2) action is specifically "intended for civil rights cases" involving allegations of class-based discrimination.  *In re D.C.*, 792 F.3d 96, 102 (D.C. Cir. 2015).  Under Rule 23(b)(2), "(1) the defendant's action or refusal to act must be 'generally applicable to the class', and (2) plaintiff must seek final injunctive relief or corresponding declaratory relief on behalf of the class."  *Steele v. United States*, 159 F. Supp. 3d 73, 81 (D.D.C. 2016), *on reconsideration in part,* 200 F.  Supp. 3d 217 (D.D.C. 2016) (quoting *Disability Rights Council of Greater Wash.,* 239 F.R.D. 9, 28 (2006)); *see also Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1003 n.7 (D.C. Cir. 1986).  Certification under Rule 23(b)(2) is appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class," and not where each member would have grounds to seek a different injunction or declaratory judgment.  *Wal-Mart Stores, Inc.*, 564 U.S. at 360–61.

Plaintiffs contend that the class meets Rule 23(b)(2)'s requirements because it seeks injunctive rather than monetary relief, and the injunctive relief sought (prompt adjudication of applications pending in government-controlled steps for longer than 9 months) "would necessarily result in relief for all SIV applicants in the class."  (Mot. for Class Certification at 20.)  Defendants respond that because Plaintiffs have unique factual circumstances, "class wide injunctive relief is therefore both unrealistic and unworkable."  (Defs. Opp. to Mot. for Class Certification at 23–24.)

25

The court finds that in this case, "the defendant[s'] action or refusal to act [is] 'generally applicable to the class.'" *Steele*, 159 F. Supp. 3d at 81.  Specifically, Defendants have unreasonably delayed the adjudication of all putative class members' SIV applications. Moreover, "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc.*, 564 U.S. at 360–61.  Plaintiffs seek, and this court has ordered, a plan for prompt adjudication.  Consequently, this injunction does provide relief to each class member, including those deemed high-risk, since the APA itself prohibits unreasonable delay.  *See* 5 U.S.C. § 706(1); *see also Telecomm. Research & Action Ctr.*, 750 F.2d at 80.  Therefore, the court finds that the proposed class meets Rule 23(b)(2)'s requirements.

## F.  Ascertainability

Defendants argue that that the "general outlines of class membership" are not ascertainable here because the proposed class is defined by a "within a reasonable time evaluation."  (Defs. Opp. to Mot. for Class Certification at 24–25) (internal quotation marks omitted).  But this misstates the proposed class definition, which requires 9 months in government-controlled steps, not "a reasonable time."  Defendants also assert that the proposed class is a "fail-safe class" because class members stand to benefit from success but will not be bound by a loss.  (*Id.*)  That is not the case.  If the court were to certify the class and find the delay reasonable and that relief was not warranted, *res judicata* would apply to the class members.  Moreover, while this Circuit has not addressed the issue, the ascertainability requirement has been disavowed by four Circuits courts.[8]  *See Hoyte v. District of Columbia,* 325

---

[8] See *Briseno v. ConAgra Foods, Inc.* 844 F. 3d 1121 (9th Cir. 2017); *Sandusky Wellness Ctr., LLC, v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015); *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015).

F.R.D. 485, 490 n.3 (D.D.C. 2017) (collecting cases).  Thus, "it is far from clear that there exists

in this district a requirement that a class certified under Rule 23(b)(2) must demonstrate

ascertainability to merit certification."  *Ramirez v. U.S. Immigration and Customs Enf't.,* 338 F.

Supp. 3d 1, 48 (D.D.C. 2018).  However, even if such a requirement did exist, the proposed class

would satisfy it.

### G.  Recent Statutory Changes

Defendants argue that the practical implications of a February 2019 statutory amendment

militate against certifying this class.  (Defs. 2nd Supp. Opp. at 15–22.)  The amendment

provides:

> (a) AFGHAN ALLIES.—Section 602(b)(3)(F) of the Afghan Allies Protection Act of 2009 (division F of Public Law 111–8), as amended, is further amended by substituting "18,500" for "14,500" in the matter preceding clause (i).

> (b) CONDITIONS.—None of the funds appropriated by this Act may be made available for the additional special immigrant visas made available under subsection (a) until the Secretary of State—

> (1) develops and implements a system to prioritize the processing of Afghan applicants for special immigrant visas under section 602 of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note); and

> (2) submits to the appropriate congressional committees, as defined in section 602(a) of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note), the following reports:

>> (A) the report required under paragraph (12) of section 602(b) of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note), as amended by section 1222 of the John S.  McCain National Defense Authorization Act for Fiscal Year 2019 (Public Law 115–232);

>> (B) a report on the procedures and processes used by the Chief of Mission to determine whether an Afghan applicant for a special immigrant visa under section 602 of the Afghan Allies Protection Act of 2009 (8 U.S.C. 1101 note) has experienced, is experiencing, or may reasonably be expected to experience an ongoing, serious threat as a result of the qualifying service of the applicant; and

> (C) a report on the procedures for background and security checks on Afghan applicants for special immigrant visas under such section.

Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 7076 133 Stat. 13, 391. Because nothing in this amendment eliminates the 9-month timetable or in any way relieves Defendants of that obligation, the amendment does not undermine the certification of the class or the court's remedy. Furthermore, to the extent the amendment does lead to policy changes by Defendants regarding prioritization, Plaintiffs' requested relief accommodates such changes, because they seek a plan for prompt adjudication rather than a fixed outcome as to any particular applicant. Plaintiffs simply ask that whatever prioritization the agency chooses be consistent with prompt adjudication.

## IV.   CONCLUSION

While the SIV process is complex and resource-intensive, Defendants have a non-discretionary duty to fully adjudicate applications without unreasonable delay. Plaintiffs filed this suit as a class to efficiently and effectively bring Defendants into compliance with that statutory duty. Because Plaintiffs' proposed class meets the requirements of Federal Rule of Civil Procedure 23, the motion to certify the class (ECF No. 3) will be GRANTED.

An appropriate Order accompanies this Memorandum Opinion.

Date:  February 5, 2020

*Tanya S. Chutkan*
TANYA S.  CHUTKAN
United States District Judge