**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
AFGHAN AND IRAQI ALLIES UNDER    )
SERIOUS THREAT BECAUSE OF THEIR   )
FAITHFUL SERVICE TO THE UNITED    )
STATES, ON THEIR OWN AND ON BEHALF )
OF OTHERS SIMILARLY SITUATED,     )
                          )
      Plaintiffs,           )
                          )
     v.                )    Civil Action No. 1:18-cv-01388-TSC
                          )
ANTONY BLINKEN, _et al._,       )
                          )
      Defendants.        )
_____)

## JOINT STATUS REPORT

Plaintiffs and Defendants (hereinafter "Parties"), by and through undersigned counsel, respectfully file this Joint Status Report pursuant to the Court's April 28, 2022, Minute Order. The Court directed, _inter alia_, the parties to "meet and confer and file a Joint Status Report on or before May 13, 2022 jointly responding to the Court's May 27, 2021 Minute Order." Minute Order (Apr. 28, 2022). In the Court's May 27, 2021, Minute Order, the Court directed:

> Having considered the parties' joint status report [137], and in light of the actions mandated by Executive Order 14012 and Executive Order 14013, the court hereby ORDERS that the parties shall meet, confer, and file a joint status report by November 22, 2021 advising the court of: (1) any relevant developments affecting this litigation; (2) any portion or portions of this case which the parties believe to have been mooted by Defendants' actions in response to the aforementioned Executive Orders; and (3) any portion or portions of this case which the parties wish to stay for any reason, including to await further action stemming from the aforementioned Executive Orders. The report shall be accompanied by a jointly proposed order as appropriate.

Minute Order (May 27, 2021). On April 28, 2022, this Court ordered the parties to meet and confer, which the Parties did on May 9, 2022.

Plaintiffs' Statement

The parties agree on two key points.  First, none of the actions that Defendants have taken in response to Executive Orders 14012 or 14013—and which Defendants argued might moot this case—in fact render this case moot.  Second, none of the other "developments" cited in Defendants' filings since March of this year—and which Defendants asserted as recently as last month were "mooting events"—in fact moot this case, either.  The bottom line is that thousands of SIV applications of Afghan and Iraqi class members that have been unlawfully delayed remain to be adjudicated.

Where the parties disagree is with respect to whether Defendants may nevertheless avoid their obligations under the Approved Adjudication Plan, ECF No. 113-1—in connection with both the stay of the Plan they are currently benefiting from and wish to continue, and a motion for relief from the Plan that they intend to file.  Plaintiffs reiterate their opposition to the existing stay and any continuation of it, whether on the basis of the hypothetical "mooting events" that never materialized or "changed circumstances" that do not provide any cognizable basis for a stay, and request that the Court lift it.  Plaintiffs' proposed order is attached as Exhibit 1.

In accordance with the Court's April 28, 2022 minute order, Plaintiffs address the topics set out in the Court's May 27, 2021 minute order in turn.

I.   **Developments since the parties submitted the Plan in May 2020 underscore the need for continued—and, if anything, more robust—judicial oversight.**

The Court requested an update on "any relevant developments affecting this litigation."

A.   As a preliminary matter, the parties agree that none of the developments that Defendants previously asserted "may potentially moot key aspects of this case" render anything moot.  *Compare* Joint Status Report, Mar. 16, 2022, ECF No. 154, at 2 (Defs.' statement); *with* Defs.' Statement Part II (declining to argue that the supposed "changes" and "developments" that

they had mentioned render this case moot and instead repeating arguments from their April 2020 motion to dismiss); *see also* Exhibit 2 (email correspondence summarizing the parties' meet-and-confer).

This case centers on Defendants' unreasonable delay in adjudicating Plaintiffs' SIV applications and Plaintiffs' request for the prompt processing and adjudication of those already-unreasonably-delayed applications.  *See, e.g.*, Mem. Op., Feb. 5, 2020, ECF No. 88, at 26, 28.  Though Defendants are not currently required to provide, and have declined to provide voluntarily, information about the status of their adjudication of class members' applications, *see* Joint Status Report, Mar. 16, 2022, ECF No. 154, at 6 (Pls.' statement), there is no dispute that Defendants still owe Plaintiffs the relief they have been seeking: adjudication of their cases.  *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (explaining that a case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (internal quotations omitted)).  In October 2021, after Defendants consistently failed to meet target timeframes for more than a year, "thousands" of class members covered by the Plan (*i.e.*, those whose applications were already unreasonably delayed as of May 2020) were still awaiting final adjudication.  *See* Joint Stip., ECF No. 144, at 2.  Moreover, available information indicates that additional SIV applicants have entered the class of those harmed from Defendants' persisting unlawful delays.  *See infra*.

**B.**  Far from suggesting that this case is moot, developments since the parties proposed the Plan in May 2020 show the importance of the Plan and the costs of its suspension, and underscore the need for continued, if not additional, judicial oversight.

- *Defendants' faulty reporting and recordkeeping:*

The parties' experience demonstrates the importance of the Court-ordered meet-and-

confers under the Plan for ensuring that unreasonably delayed applications are processed.  While the Plan was in place, Plaintiffs brought numerous discrepancies and inconsistencies in Defendants' compliance reporting to Defendants' attention, resulting in Defendants making corrections to each of their filings.  Crucially, Plaintiffs were able to alert Defendants to applications Defendants had lost track of and to press Defendants to ensure that such applications were processed.  For instance, in 2021, after Plaintiffs' counsel alerted Defendants to a discrepancy in reporting, Defendants acknowledged that they had overlooked the applications of dozens of Iraqi class members awaiting decision at the COM stage of the SIV application process.  *See* Defs.' Notice of Lodging Corrected Progress Reports, ECF No. 149, at 2.  With the Plan suspended, Plaintiffs are unable to assess the full extent of the delay these applicants suffered as a result,[1] and to ensure that their applications continue to be processed.  Furthermore, Defendants apparently still lack the ability to track applications across their life cycle, which prevents Defendants from meaningfully assessing their own performance with respect to their congressional and Court-ordered obligations.  The Plan is a crucial check on Defendants' recordkeeping, which evidently remains deficient and results in further delays for applicants.

- *Defendants' mismanagement of the SIV programs:*

    In the months since Defendants last filed a report under the Plan and were accountable to the Court and Plaintiffs for promptly processing and adjudicating unlawfully delayed applications, Defendants have mishandled their processing of SIV applications.

    Plaintiffs highlight two such examples here.  First, having made no advance arrangements for Afghan SIV applicants ahead of the U.S. withdrawal from Afghanistan, Defendants widely

---

[1] Reports that Defendants were required to file while the Plan was in place indicate that the applications were stalled at the very least for a year.  *See* Pls.' Opp., ECF No. 156, at 6.

publicized the email inbox AfghanSIVApplication@state.gov in August 2021, in the midst of the

Afghan crisis, for, among other things, "[g]eneral inquiries about the Special Immigrant Visa

(SIV) program." *See, e.g.*, U.S. Embassy in Afghanistan, Update on Visa Processing at U.S.

Embassy Kabul, https://af.usembassy.gov/visas/tourism-visitor/ (last updated Aug. 24, 2021).

Predictably, the inbox, which is otherwise used by applicants to submit applications and

supplemental application materials, was inundated with messages—many of which had nothing

to do with active SIV applications.

　　　　While Defendants attempt to capitalize on their own mismanagement to suggest that it

"warrant[s] relief" for Defendants, *see* Defs.' Statement Part I, this mismanagement in fact

illustrates the pressing need for oversight.  Because the Plan is not in place, Defendants are not

accountable to Plaintiffs, the Court, or the public for explaining what, if anything, they are doing

to ensure that class members who had already faced unreasonable delay as of May 2020 and who

would be entitled to prompt adjudication under the Plan are not negatively affected by the

backlog.  Reports from staff of the National Visa Center (NVC), which is responsible for

reviewing emails, suggest that Defendants have no plan for resolving the backlog or for

preventing it from creating a further backlog.  On their website, Defendants continue to direct

Afghan SIV applicants to submit application materials and related correspondence to the same

backlogged AfghanSIVApplication@state.gov email inbox even as, as of today, NVC staff

report that they are still reviewing emails from August 29, 2021.  NVC staff purport to be

reviewing messages on a first in, first out basis, but even this process has been haphazard.  In

early March, having reached emails from September 3, 2021, they regressed to August 22, 2021,

after discovering what were apparently thousands of emails from August that had been lost.

Second, Defendants have failed to issue clear guidelines about how applicants at various stages of visa processing can continue to pursue their applications notwithstanding the closure of the embassies in Kabul and Baghdad.  For example, the State Department proactively assigns alternative visa processing posts for any so-called "homeless visa applicant," defined as "one who is a national of a country in which the United States has no consular representation or in which the political or security situation is tenuous or uncertain enough that the limited consular staff is not authorized to process IV applications."  9 FAM 504.4-8(E)(1).  Yet nine months after the most recent closure of Embassy Kabul and over two years after the suspension of immigrant visa processing at Embassy Baghdad, Afghan and Iraqi immigrant visa applicants have yet to be considered "homeless."  Ukrainian nationals, by contrast, have been designated as "homeless," and have had access to the alternative posts of Frankfurt and Warsaw, since at least March 2—six days after the Russian invasion.  *Id.*

These are only some of the issues with Defendants' processing: as long as Defendants are not subject to the Plan and not accountable to Plaintiffs and the Court, most information is within Defendants' sole knowledge.

- *Growth of the class:*

Defendants have declined to report on the size of the class and have refused to provide an accounting of the status of the applications of class members covered by the Plan.  Yet Defendants' most recently reported average processing timelines and Defendants' delays in receipting applications alone indicate that many applicants to the Afghan SIV program have joined the class since May 2020 or will soon join the class.  *See* Dep't of State & Dep't of Homeland Sec., *Status of the Afghan Special Immigrant Visa Program* (Jan. 2022), https://tinyurl.com/mrykewz6 (reporting a cumulative average processing time of 734 days).

- *Increased harm faced by class members:*

The SIV programs were created and structured to allow for the expeditious resettlement of Afghan and Iraqi nationals who worked on behalf of the United States in light of the serious threats they face due to that affiliation.  As the Court noted in granting Plaintiffs summary judgment, the delays "(1) place Plaintiffs' lives in danger, (2) cause Plaintiffs to live with the stress and anxiety of trying to protect themselves and their families from danger, (3) prevent Plaintiffs from adequately planning for the future, and (4) harm national interests, because delays undermine other countries' trust in this country's commitments."  *Afghan & Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Pompeo*, No. 18-CV-01388 (TSC), 2019 WL 4575565, at *8 (D.D.C. Sept. 20, 2019).  What is more, as the Court found, "the probability of actual harm and the related stress are compounded each day an applicant waits for adjudication," and "the level of uncertainty increases for some applicants the longer they wait for processing because the passage of time makes it more difficult to obtain the requisite verification and information to pass background checks."  *Id.* at *9.

The risk of harm as a result of Defendants' delays has escalated since the Court granted summary judgment for Plaintiffs.  According to a February 2022 report of the veteran-led Association of Wartime Allies, based on a survey of thousands of Afghan SIV applicants:

> Of the thousands surveyed, they convey a universal desperation - they are dismayed and exasperated that the United States failed to evacuate the vast majority of our SIV eligible allies. . . .  [SIV applicants'] lives have been devastated by being left behind with seemingly no verifiable path to safety. In the six months since the evacuation, of those surveyed, nearly 30% have been imprisoned by the Taliban at some point and 52% have been stopped and questioned . . . .  Fear has gripped the SIV population, with 84% reporting going without medical care due to angst about leaving the home and receiving reprisals from the Taliban. Fueling this fear, 77% have witnessed some form of physical violence against others for their service to the United States.

Kim Staffieri, Matt Zeller, & Michael Trudeau, *The Left Behind Afghans*, Association of Wartime Allies (Feb. 2022), https://tinyurl.com/mww76d7u.[2]  Iraqi applicants face deepening anti-Western sentiment and increased ISIS activity.  *See* Pls.' Opp., ECF No. 156, at 17-18.  As the Court predicted, the passage of time has undermined applicants' ability to successfully make their cases.  Records, for example, have been lost or destroyed.  *See, e.g.*, Christiaan Triebert & Haley Willis, *Covert Evacuations and Planned Demolitions:  How the C.I.A. Left Its Last Base in Afghanistan*, N.Y. Times (updated Oct. 5, 2021), https://tinyurl.com/yna9eva6 (describing the U.S. government's destruction of buildings that "very likely contained documents, hard drives and other sensitive information"); Ashley Collman, *US Officials Destroyed Afghans' Passports As They Evacuated the Kabul Embassy*, Business Insider (Aug. 18, 2021), https://tinyurl.com/4jzp39nm (describing the destruction of passports); Defs.' Notice of Lodging Corrected Progress Reports, ECF No. 149, at 15 (Corrected Q2 Report), 20 (Corrected Q3 Report) (describing destruction of immigrant visa paper files at Embassy Baghdad and need to recreate cases before they could be transferred for continued processing).

     **C.**     Though Plaintiffs cannot respond fully to Defendants' catalog of supposedly "relevant developments," *see* Defs.' Statement Part I, because Defendants rely on declarations totaling 58 pages that they did not share until 6:10 p.m. on the day of filing and have not explained why the developments they list are relevant, Plaintiffs make the following preliminary observations:

---

[2] Defendants notably provide no update on how many Afghan class members—that is, Afghan SIV applicants who have been waiting in government-controlled steps for longer than nine months—were included in their evacuation efforts except to suggest that relatively few were.  *See* Defs.' Statement Part I.A. (pointing to evacuation of 33,000 people who either "hold[] SIVs" (*i.e.*, whose cases had already been finally adjudicated) or "are eligible to apply for Special Immigrant status and are expected to do so" (*i.e.*, who had not yet applied for SIVs)).

- Defendants continue to avoid providing information about the status of Plaintiffs' applications.

- None of the cited developments affects the nine-month statutory timeline.  In fact, in the July 2021 legislative amendments that Defendants cite, Congress underscored the importance of expeditious processing of SIV applications and confirmed that the nine-month timeline encompasses all stages of the SIV process even as it sought to render more Afghans eligible, *see* Emergency Security Supplemental Appropriations Act, 2021, Pub. L. No. 117-31, 135 Stat. 309, 316 (2021).  *See also* Mem. Op., Feb. 5, 2020, ECF No. 88, at 28 ("Because nothing in this amendment eliminates the 9-month timetable or in any way relieves Defendants of that obligation, the amendment does not undermine the certification of the class or the court's remedy.").

- A significant portion of the supposed developments that Defendants cite pre-date the parties' May 21, 2020 proposal of the Plan.

- Few of the supposed developments pertain to the Iraqi program.

- Defendants spend much of their statement describing country conditions and embassy closures without acknowledging that nearly all of the processing of SIV applications (*i.e.*, up until the interview stage, and much of post-interview processing) is conducted remotely and has been for years.

- Defendants do not explain why the "emerging refugee crisis" as a result of the war in Ukraine should affect the relief due to Afghan and Iraqi SIV applicants any more than the circumstances facing millions of other displaced people worldwide, including members of the Rohingya Muslim ethnic minority group, *see* UNHCR, *Rohingya Refugee Crisis Explained*, https://tinyurl.com/35zhzp5a (describing crisis facing over a million people

since August 2017), and Ethiopians and Eritreans from Ethiopia's Tigray region,

UNHCR, *Ethiopia Tigray emergency*, https://tinyurl.com/yc5xmfdh (describing crisis

facing hundreds of thousands of people since November 2020).  The United States has

been responding to such crises throughout the life of the Afghan and Iraqi SIV programs

and this litigation.

- All of the cited information reinforces the importance of the accountability required by

  the Plan.  Defendants committed through the Court-ordered Plan to meet specific

  processing timeframes, to disclose to the Court and Plaintiffs when their efforts fall short,

  and to explain what they will do to improve their performance.  *See* Approved

  Adjudication Plan, ECF No. 113-1, at 7-8.  Absent the Plan, Defendants need only file

  the congressionally mandated quarterly reports, whose deficiencies have been well

  documented,[3] and whose publication Defendants consistently delay, even further limiting

  their utility.[4]

---

[3] *See Afghan & Iraqi Allies*, 2019 WL 4575565, at *3-*4 (outlining problems with Defendants' method of tracking and reporting SIV application processing times identified by Plaintiffs); Office of Inspector General, U.S. Department of State, Management Assistance Report: Quarterly Reporting on Afghan Special Immigrant Visa Program Needs Improvement, https://tinyurl.com/5n7yrv73 (Jun. 2020) (concluding that the State Department's "method for collecting, verifying, and reporting on applicant wait times is inconsistent and potentially flawed").

[4] Defendants have yet to publish an Afghan or Iraqi report for the second quarter of the 2022 fiscal year (January 2022-March 2022), nearly two months after the quarter ended.  Defendants avoided publishing their reports for the first quarter of the fiscal year (October 2021-December 2021) for nearly four months, until approximately April 22, 2022.  *Compare, e.g.*, https://tinyurl.com/yxxs6sek (archival copy of the Afghan SIV webpage, captured at 1:01 a.m. G.M.T. on April 22, 2022, with no link to any report for the 2022 fiscal year) *with* https://tinyurl.com/dnxpsb92 (archival copy of the Afghan SIV webpage, captured at 4:59 a.m. G.M.T. on April 23, 2022, and displaying the first quarter's report).

II.     **The parties agree that the actions Defendants describe having taken in response to Executive Orders 14012 and 14013 do not moot any aspect of this case.**

The Court also requested an update on "any portion or portions of this case which the parties believe to have been mooted by Defendants' actions in response to . . . Executive Orders [14012 and 14013]."

The parties agree that no portion or portions of this case have been mooted by Defendants' actions in response to the Executive Orders. *See supra* Part I.A.  In their response to the Court's question, Defendants refer to the topics of their April 2020 motion to dismiss.  *See* Defs.' Statement Part II.  These topics have nothing to do with Defendants' actions in response to the Executive Orders, and the Court has already invited Defendants to refile their motion with any updated facts if they wish.  *See id.*; Min. Order, Jan. 11, 2022.  Plaintiffs expect that they would again oppose such a motion.

III.    **Plaintiffs do not wish to stay any aspect of this case.**

The Court finally asked whether there was "any portion or portions of this case which the parties wish to stay for any reason, including to await further action stemming from the aforementioned Executive Orders."  As Plaintiffs have previously explained, *see* ECF Nos. 154, 156, 157, 160, the stay that is currently in place is improper.  Plaintiffs wish neither for this stay nor for any other stay to be in place.

Defendants have had the opportunity to share with the Court their response to the Court's May 27, 2021 minute order—upon which their request for the stay of the Plan was premised— and have failed to deliver on their repeated, vague suggestions that Plaintiffs' unreasonable delay claims might now be moot.  *See* Defs.' Mot., ECF No. 155, at 11 (requesting the stay be continued "until the Court is able to review the parties' submissions"); *see also* Joint Status Report, Mar. 16, 2022, ECF No. 154, at 2 (Defs.' statement).  In explaining why a stay would be

appropriate, Defendants had asserted that "several changed circumstances over the last two years . . . may potentially moot key aspects of this case."  Joint Status Report, Mar. 16, 2022, ECF No. 154, at 2 (Defs.' statement).  And they objected to Plaintiffs' request that the parties file a status report jointly because "Plaintiffs ha[d] already indicated that they d[id] not believe that any mooting events have occurred."  Defs.' Opp., ECF No. 159, at 9-10.  Now, even as they continue loosely to insinuate without any basis that a further stay of the Plan is appropriate in light of "myriad mooting events," *see* Defs' Statement Part III, Defendants have been forced to concede that nothing that they sought to put before the Court moots this case.  They can only repeat the arguments from their April 2020 motion to dismiss counts 3-5 of the complaint, which, ironically, rely in part on the notion that the very Plan that is currently stayed at their request provides Plaintiffs "all the relief that [they] ha[ve] sought."  *See* Defs.' Statement Part II (citing the Approved Adjudication Plan).  In light of the parties' responses, Plaintiffs reiterate that the stay should not be in place.  *See Marsh v. Johnson*, 263 F. Supp. 2d 49, 52-53 (D.D.C. 2003) (lifting a stay *sua sponte* and retroactively).

       As to Defendants' request for a further stay, Defendants informed Plaintiffs last night that they would soon file a motion under Rules 54(b) and 60(b) of the Federal Rules of Civil Procedure.  But the federal rules define the parameters according to which a party may be granted relief from an injunction, and Defendants have not met the burden of those rules.  For example, a party that files an appeal, as Defendants have signaled they intend to do again, may move for relief pending appeal under Rule 62(d).  Rule 60(b) is another vehicle for seeking relief from an injunction that has long been available to Defendants.  Neither of these rules countenances a "stay" of relief pending consideration of such a motion for relief, or for any separate reason, such as "changed circumstances."  *See* Defs' Statement Part III.  Such a stay

would effectively grant Defendants relief based on a presumption that they could make the requisite showing, contrary to the rules' assignment of the burden to Defendants to establish their entitlement to relief.  And it would preemptively and unjustly deprive Plaintiffs of a Court-ordered remedy in their pursuit of the adjudication of their SIV applications before they have had the opportunity to rebut Defendants' showing.

Defendants' Statement

## I.   Relevant Developments Affecting this Litigation

Global events such as the withdrawal of United States forces from Afghanistan, the continuing COVID-19 pandemic, and an emerging refugee crisis have impacted this case in ways that could not have been anticipated at the time of the Court's September 20, 2019 summary judgment decision. Congress has also made material legislative changes to the Special Immigrant Visa ("SIV") program, greatly increasing the number of eligible applicants which, in combination with the crisis in Afghanistan, resulted in a sudden and dramatic surge in applications starting in August 2021 that impacted Defendants' timelines for processing applications. In light of these material changes in the facts and law relevant to this litigation, Defendants intend to move for relief from the Court's previous summary judgment decision and injunction.[5] In that motion, Defendants will describe in greater detail the changed circumstances warranting relief, although they summarize those changes here.

### A.   Global Events

In August 2021, after months of increasing unrest and instability within Afghanistan, the United States completed its military withdrawal from that country and suspended all operations at

---

[5] Defendants intend to imminently file a motion under Rule 54(b) and Rule 60(b)(5)–(6) with the Court.  On May 12, 2022, government counsel requested to meet and confer with Plaintiffs' counsel on this motion, and the parties agreed to do so on May 16, 2022.

the U.S. Embassy in Kabul. Declaration of Maren Brooks ("Brooks Decl.") (attached as Ex. A) ¶¶ 7, 22. At the same time, the U.S. government executed a historic series of airlifts, relocating approximately 120,000 individuals from Afghanistan, including more than 33,000 individuals either holding SIVs or that are eligible to apply for Special Immigrant status and are expected to do so. *Id.* ¶ 7. During the period of August to October 2021, the National Visa Center received 432,893 email inquiries or submissions—an increase of approximately 3,500 percent over the same period in 2020. *Id.* ¶¶ 65–66. With no operating embassy in Kabul, the Department of State cannot process Afghan SIV applications from within Afghanistan. *Id.* ¶ 22. Nonetheless, the Department of State has taken significant steps to continue processing Afghan SIV applications, including prioritizing SIV applicants for visa interviews at whichever third-country immigrant visa processing post the applicant is able to travel and appear, coordinating with other countries in the region to continue to relocate Afghan SIV applicants, and establishing an expedited processing framework at the primary relocation center in Qatar. *Id.* ¶¶ 48–52, 55–63. Notwithstanding the Department of State's robust adaptations to compensate for losing the ability to process visa applications within Afghanistan, factors outside of Defendants' control, including security concerns and travel restrictions imposed by Taliban control, as well as other third-country requirements such as valid passports and visas to travel to that third country, continue to impact the process. *See* Declaration of Mark R. Evans (attached as Ex. B) ¶¶ 35–41.

With respect to the Iraqi SIV program, in December 2019, Iranian-backed militias assaulted the U.S. Embassy in Baghdad and caused severe damage to the Embassy compound's three primary access points, rendering the Consular Compound Access Control ("CAC") and both alternate CACs unusable. Declaration of Daniel Mickelson ("Mickelson Decl.") (attached as Ex. C) ¶ 3. Baghdad suffered subsequent threats and indirect fire attacks in early 2020, which

prevented locally employed staff from working at the Embassy during that period. *Id.* ¶ 5. Due to the ongoing security threats and ongoing COVID-19 challenges, the damage caused to the Embassy's primary access points has not yet been fully repaired, making the screening of non-Embassy personnel for in-person visa processing impossible. *Id.* ¶ 3. In March 2020, the Department of State ordered the departure of designated U.S. Embassy personnel due to deteriorating security conditions and the COVID-19 pandemic. *Id.* ¶ 26. In response to these challenges, the Department of State made significant adjustments to continue Iraqi SIV processing, including transferring application processing to U.S. embassies in neighboring countries, when possible, and maximizing the use of consular services outside of Baghdad to assist on a priority basis. *Id.* ¶¶ 32–46.

Further, the global COVID-19 pandemic seriously upended Defendants' ability to process SIV applications for both the Afghan and Iraqi programs. Host governments have imposed restrictions on posts' ability to operate, including limiting public gatherings, stay-at-home orders, and restrictions on movement. Brooks Decl. ¶¶ 7, 26; Mickelson Decl. ¶¶ 10–12. Consular sections have also implemented safeguards such as physical distancing in waiting rooms and workspaces and staggering in-office schedules. Brooks Decl. ¶ 26; Mickelson Decl. ¶¶ 11–12. The pandemic has also led to personnel shortages due to employee illnesses and absences, mandatory quarantine, and even employee deaths in both the Baghdad and Kabul Embassies. Brooks Decl. ¶ 33; Mickelson Decl. ¶¶ 10–12. Prior to the fall of Kabul, the Embassy there remained closed due to COVID until February 2021, which meant no in-person interviews could be conducted, resulting in a backlog of 853 SIV applications. Brooks Decl. ¶ 28. Worldwide, there has been a more than 440 percent increase in backlog in immigrant visa applications. *See* Declaration of Sara Craig

("Craig Decl.") (attached as Ex. D) ¶ 3. This is directly attributable to both a massive spike in demand and severe limitations on resources due to the pandemic.

Most recently, the war in Ukraine has resulted in the United States' commitment to bring in 100,000 Ukrainian refugees fleeing the war, and President Biden has directed resources from the State Department and Homeland Security to aid that goal. *See Remarks By President Biden Providing an Update on Russia and Ukraine*, The White House Briefing Room (Apr. 21, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/21/remarks-by-president-biden-providing-an-update-on-russia-and-ukraine-3/; *See also* Eric Katz, *Biden Is Tapping Federal Resources to Expedite Fleeing Ukrainians' Entry to the United States*, Government Executive (Apr. 21, 2022), https://www.govexec.com/management/2022/04/biden-tapping-federal-resources-expedite-fleeing-ukrainians-entry-us/365950/. The Ukrainian humanitarian crisis has added a significant policy consideration to both the Department of State's and U.S. Citizenship and Immigration Services' allocation of resources. For example, the Department of State has sent 82 temporary duty personnel to posts in Europe to assist with the need for American citizen services and visa services in the wake of the situation in Ukraine. *See* Craig Decl. ¶ 14.

### B. Legislative Amendments

Congress continues to serially amend the RCIA and AAPA. *See generally* Refugee Crisis in Iraq Act of 2007 ("RCIA"), Pub. L. No. 110-181, § 1244, 122 Stat. 395 (2006), *codified as amended in* 8 U.S.C. § 1157 note; and Afghan Allies Protection Act of 2009 ("AAPA"), Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note. On July 30, 2021, President Biden signed into law the Emergency Security Supplemental Appropriations Act, 2021 ("ESSAA"), which includes numerous changes to the Afghan SIV program. Pub. L. No. 117-31, tit. IV, 135 Stat 309. The ESSAA explicitly included the COM approval phase in the nine-

month period. ESSAA § 401(a)(3). It expanded the COM appeals framework by permitting applicants to submit one written appeal of a COM denial per denial, and allowing written appeals more than 120 days after a denial, at the discretion of the Secretary of State. *Id.* § 401(a)(1)(B). The ESSAA also reduced from two years to one year the period of qualifying employment, and modified the eligibility requirements for applicants by removing the previous requirement that applicants must have performed "sensitive and trusted" activities. *Id.* § 401(a). The law recognized Defendants' authority to "adopt[] appropriate measures to prevent the spread of communicable diseases, including COVID-19, to the United States." *Id.* § 402(f). Finally, the ESSAA increased the number of Afghan SIVs available for applicants, from 26,500 to 34,500 per year. *Id.* § 401(a)(2).

Sections 402(a)–(c) of the ESSAA authorized the Secretary of State and the Secretary of Homeland Security to issue jointly a blanket waiver of the medical exam requirement for Afghan SIVs prior to the issuance of an immigrant visa or admission to the United States. Section 402(d) requires the Department of Homeland Security, in consultation with the Department of Health and Human Services, to establish procedures to complete medical exams for applicants whose exams were waived pursuant to the ESSAA not later than 30 days after admission into the United States. Applicants whose medical exams were waived are considered lawful permanent residents admitted on a conditional basis, with conditions removed upon a complete exam. Brooks Decl. ¶ 12. On August 12, 2021, the Secretaries of State and Homeland Security exercised their delegated authority to jointly issue a blanket waiver of the medical exam requirement for Afghan Special Immigrant Visa applicants who are in Afghanistan and have met all requirements for SIV issuances other than the medical exam, when the Chief of Mission has determined that they are unable to complete the required medical exam in a timely manner without undue hardship or risk to personal

safety. *Id.* ¶ 13. The Chief of Mission made the requisite determination the following day. *Id.* ¶ 14. Accordingly, the Department of State began to apply the medical waiver and, as a further time-saving measure during a critical period, issue foil-less SIVs to eligible individuals to further expedite the process. *Id.* ¶ 15.

The expanded eligibility requirements for Afghan SIVs following the ESSAA enactment significantly increased the pool of potentially eligible Afghan SIV applicants, causing an increase in applicants, at a time that the agencies are also grappling with a significant increase in inquiries and interest in the SIV program due to the crisis in Afghanistan. Brooks Decl. ¶¶ 16; 64–67.

### C.    Other Relevant Developments

The Department of State has significantly increased staff dedicated to SIV processing. For example, beginning with training in May 2021, the Department surged 54 additional processors to the SIV unit of the National Visa Center ("NVC") so that, by August 2021, there were 63 processors focused on SIV case processing. Declaration of Peggy Petrovich (attached as Ex. E) ¶ 11. This represents a 700 percent increase in staffing for SIV cases processing at NVC. NVC anticipates more than doubling that number with approximately 140 case processors expected to be on board or in training by summer 2022. *Id*. Specific to ASIV Unit processing, the Department of State added 40 staff members to the ASIV unit in calendar year 2021—a 600 percent increase in the size of the unit—and is hiring additional staff. Schubert Decl. ¶ 4.

In the summer of 2021, the Department of State introduced a number of technological improvements that increased efficiency in reviewing Chief of Mission ("COM") applications. Declaration of Melissa Schubert ("Schubert Decl.") (attached as Ex. F) ¶ 5–9. Previously, each COM decision letter underwent an individual conversion to a PDF file and was then uploaded manually to a database. *Id.* ¶ 6. This process was time and labor intensive, with accumulative time

costs when applied across hundreds of COM applications. *Id.* In August 2021, the Department of State's Office of Consular Systems and Technology ("CA/CST") assisted the Afghan Special Immigrant Visa ("ASIV") Unit in developing a software modification that allows ASIV Unit staff to automatically batch upload large selections of COM decision letters to the database in a matter of seconds. *Id.*

The Department of State has made a number of additional process changes in the wake of the Executive Orders 14012 and 14013. For example, in August 2021, the Chief of Mission dissolved the COM Committee. Brooks Decl. ¶ 21. Following that change, COM applications are now reviewed by the ASIV unit and then submitted directly to the COM designee for a decision. *Id.* This change established a more streamlined and expeditious process for the review of COM applications and decreased the time required for a COM decision. *Id.*

In December 2021, the Department ceased requiring that the letter of recommendation in support of the COM application be submitted by a U.S. citizen supervisor or co-signed by a U.S. citizen, allowing for more approval decisions, as well as more efficient processing of COM applications. Brooks Decl. ¶ 21. The same month, the letter of recommendation verification process was updated such that NVC now deems an applicant documentarily complete and forwards the application for COM approval without seeking to first verify the letter of recommendation, facilitating a more efficient process for determining that applicants are documentarily complete and referring them to the COM for review. *Id.*

Taken together, these changed circumstances, as well as the events detailed *supra,* warrant relief from the Court's previous summary judgment decision and injunction.  As referenced in note 1, the Government intends to seek such relief in a separate filing.

## II.   Portion(s) of this Case Which the Parties Believe to Have Been Mooted by Defendants' Actions in Response to Executive Orders 14012 and 14013

There are three causes of action in this case that the Court has not yet adjudicated: Count Three, which seeks a writ of mandamus pursuant to 28 U.S.C. 1361 compelling Defendants to adjudicate Plaintiffs' SIV applications; Count Four, which seeks relief pursuant to the APA compelling Defendants to appoint SIV coordinators; and Count Five, which seeks a writ of mandamus pursuant to 28 U.S.C. 1361 compelling Defendants to appoint SIV coordinators. These three remaining counts are moot.

Beginning with Count Three, the Court has already afforded Plaintiffs the relief they seek. That is, Count Three seeks adjudication of Plaintiffs' SIV applications, and the Court has ordered Defendants to do just that. An issue is moot when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (cleaned up). The issues presented in Count Three are thus "no longer live." *Id. See* Summary J. Op. 19; Approved Adjudication Plan.

Similarly, Counts Four and Five are moot because the relief Plaintiffs seek in those counts has been in place for more than two years. As Defendants pointed out in their previous motion to dismiss, *see* ECF No. 101, Defendants appointed SIV coordinators in April 2020 and have made adjustments to the positions in the intervening years. *See* ECF No. 139. For example, on June 1, 2021, Secretary of State Blinken designated the Deputy Secretary of State for Management and Resources ("D/MR") as the Senior Coordinating Official for the Iraqi and Afghan Special Immigrant Visa Program. Brooks Decl. ¶ 23. On July 27, 2021, Secretary of Homeland Security Alejandro Mayorkas modified the Department of Homeland Security's Senior Coordinating Official for both the Afghan and Iraqi SIV programs as well, designating the Associate Director of the Refugee, Asylum, and International Operations Directorate. *See* ECF No. 139. These

designations demonstrate Defendants' focus on and commitment to the SIV program at the highest levels of government. *See* Brooks Decl. ¶ 24.

The Executive Branch continues to review submitted reports and direct further action in light of those reports. ECF No. 136 at 3 n.1. The review directed by the Executive Orders remains ongoing, and Defendants intend to make further improvements as the political branches continue to respond to the major events in Section I, *supra*, and allocate resources accordingly. If and when these events rise to the level of mooting the case entirely, Defendants will inform the Court accordingly.

### III.    Portion(s) of this Case Which the Parties Wish to Stay for any Reason, Including to Await Further Action Stemming from the Aforementioned Executive Orders

On March 15, 2022, this Court stayed this case, *nunc pro tunc*, pending further order of this Court. Minute Order (Mar. 15, 2022). The Court extended that stay pending further order of the Court. Minute Order (Apr. 28, 2022). The Court should continue the stay, including Defendants' obligations under the Plan. The global events mentioned above support a stay so that Defendants may continue to "assess the changed circumstances and the steps necessary for prompt adjudication of class members' outstanding applications, in particular in light of the suspension of operations at the U.S. Embassy in Kabul." ECF No. 144 at 2. Indeed, absent a stay, the parties would return to the Plan, which is inconsistent with and does not take into account *any* of the myriad mooting events or changed circumstances discussed in this response. A continued stay would thus allow the parties and the Court to focus on the current state of law and facts relevant to this litigation concerning specific provisions of the Plan in order to determine the best prospective course.

Finally, Executive Branch review of the SIV program in response to Executive Order 14013 remains ongoing. Accordingly, a continued stay will allow Defendants to continue

evaluating and making changes to the SIV program without diverting resources to an injunction that does not take into account current circumstances. A stay during this time period is consistent with a "flexible approach" that is critical to "ensure that responsibility for discharging the [government's] obligations is returned promptly to the [government] and its officials when the circumstances warrant." *Horne v. Flores*, 557 U.S. 443, 450 (2009). Consequently, the Court should continue the stay of the litigation to consider these intervening developments and programmatic and policy changes and their impact on SIV program implementations.[6]

Dated: May 13, 2022

_/s/ Deepa Alagesan_____
Deepa Alagesan (D.D.C. Bar No. NY0261)
Kathryn Austin (D.D.C. Bar No. NY0331)
Alexandra Zaretsky (D.D.C. Bar No.
NY0434)
Mariko Hirose (D.D.C. Bar No. NY0262)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, New York 10004
Telephone: (516) 838-7044
dalagesan@refugeerights.org
kaustin@refugeerights.org
azaretsky@refugeerights.org
mhirose@refugeerights.org

Melissa S. Keaney (admitted *pro hac vice*)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
P.O. Box 2291
Fair Oaks, California
Telephone: (916) 545-6125
mkeaney@refugeerights.org

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

WILLIAM C. PEACHEY
Director
Office of Immigration Litigation,
District Court Section

YAMILETH G. DAVILA
Assistant Director

STEVEN A. PLATT
Senior Litigation Counsel

SEAN L. KING
RUTH ANN MUELLER
Trial Attorneys

_/s/ Vaughn Spencer_____
VAUGHN SPENCER
FL. Bar. No. 566764
Trial Attorney
U.S. Department of Justice, Civil Division

---

[6] Defendants' Proposed Order accompanies this Joint Status Report (Ex. G).

*/s/ Olivia P. Greene*

Linda H. Martin (D.D.C. Bar No. NY0210)
David Y. Livshiz (D.D.C. Bar No. NY0269)
Olivia P. Greene (admitted *pro hac vice*)
Wang Jae Rhee (admitted *pro hac vice*)
FRESHFIELDS BRUCKHAUS DERINGER
USLLP
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
linda.martin@freshfields.com
david.livshiz@freshfields.com
olivia.greene@freshfields.com
wangjae.rhee@freshfields.com

Justin C. Simeone (D.D.C. Bar No. 252751)
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
700 13th Street, NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4543
justin.simeone@freshfields.com

*Attorneys for Plaintiffs and Class Counsel*

Office of Immigration Litigation
District Court Section
P.O. Box. 868, Washington, DC 20044
202-598-7593
vaughn.d.spencer@usdoj.gov

*Attorneys for Defendants*