Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL SERVICE
TO THE UNITED STATES, ON THEIR OWN AND ON
BEHALF OF OTHERS SIMILARLY SITUATED,

Plaintiffs,

– against –

ANTONY BLINKEN, *et al.*,

Defendants.

Case No. 18-cv-01388-TSC

## DECLARATION OF MAREN BROOKS

I, Maren Brooks, hereby submit this declaration under penalty of perjury:

(1) I am employed by the U.S. Department of State as the Senior Advisor to the Deputy Secretary of State for Management and Resources, Brian P. McKeon. The Deputy Secretary for Management and Resources ("D/MR") serves as the Chief Operating Officer of the Department, as well as the principal adviser to the Secretary of State on overall supervision and direction of resource allocation and management activities of the Department. The Deputy Secretary for Management and Resources assists in carrying out the Secretary of State's authority and responsibility for the overall direction, coordination, and supervision of operational programs of the Department.

(2) By virtue of the authority vested in the Secretary of State by Section 1248 of the Refugee Crisis in Iraq Act of 2007 (8 U.S.C. § 1157 note) and Section 602(b) of the Afghan Allies Protection Act of 2009 (8 U.S.C. § 1101 note), as amended by Sections 1218 and 1219 of the National Defense Authorization Act for Fiscal Year 2014, the Secretary of State designated the Deputy Secretary for Management and Resources on June 1, 2021, as the Department of State's Senior Coordinating Official for the Afghan and Iraqi Special Immigrant Visa (SIV) programs to oversee the efficiency and integrity of the processing of Afghan and Iraqi SIVs. The decision to designate the Deputy Secretary for Management and Resources as the Senior Coordinating Official signifies that the Department is focused on the SIV program at the highest levels, reflecting the importance that the Department places on the SIV program.

(3) In my capacity as Senior Advisor to the Deputy Secretary for Management and Resources, I have knowledge of the substantial efforts that the Department of State is undertaking to support the Afghan SIV Program, which includes knowledge of the robust and ongoing work undertaken by State Department officials involved in the processing of SIV applications and the improvement of the efficiency of processing SIV applications, as well as the extraordinary efforts undertaken by the Department in the period leading up to, during, and after the withdrawal of the United States from Afghanistan.

(4) The purpose of this declaration is to provide the court with information regarding the wide range of changed circumstances that have occurred since the court's injunction that have impacted the Afghan Special Immigrant Visa (SIV) program established under the Afghan Allies Protection Act of 2009 (AAPA) by the Department of State ("Department"). These extraordinary circumstances demonstrate both the Department's enduring, high-level commitment to expedite SIV processing as much as practicable, as well as the significant challenges that the Department has confronted and continues to confront in its mission to do so.

(5) These changed circumstances include changes in the law, such as:

- Legislative modifications, such as the Emergency Security Supplemental Appropriations Act, 2021 (Public Law 117-31), that relaxed eligibility requirements, reducing the minimum time-in-service requirement from two years to one year contributed to the significant increase in applicants to the program;

(6) These changed circumstances also include changes and improvements to the SIV process, such as:

- President Biden's Executive Order 14103, which called for a comprehensive review of the Afghan and Iraqi SIV programs, and the intensive interagency process – that continues through the present – to identify any possible means to streamline SIV processing and reduce the burden on SIV applicants while still complying with statutory requirements;
- The Secretary of State's designation on June 1, 2021 of the Deputy Secretary of State for Management and Resources (D/MR) as the senior coordinating official overseeing the Afghan and Iraqi SIV programs, reflecting the Department's priority commitment to the SIV program;

- The Department of State's significant investment of resources in the SIV program, including staffing increases, expenditures, and information technology modifications at the pre-COM, COM, and visa processing stages in order to expedite case processing to the maximum extent possible;

- The continued prioritization of SIV processing at every stage under the Department's control to expedite processing as much as practicable.

(7) Last, these changed circumstances also include significant challenges and herculean efforts by the Department of State in response, such as:

- The COVID-19 pandemic and the March 2020 worldwide suspension of visa services, and periodic restrictions on in-person visa services thereafter depending on local pandemic conditions, in order to protect the health and safety of Department of State personnel and the public, including at the U.S. Embassy in Kabul ("the Embassy" or "Embassy Kabul");
- The ordered departure of personnel from Embassy Kabul, the Taliban takeover, the evacuation of Embassy Kabul, and the relocation of over 120,000 people, including tens of thousands of at-risk Afghans from the international airport in Kabul by U.S. military aircraft, including 33,000 Afghan nationals who either had pending SIV applications at the time of the evacuation or who have since been determined to be SIV eligible;

- The Department of State's extraordinary efforts to support Operation Allies Refuge during the summer of 2021 in order to relocate late-stage Afghan SIV applicants;

- Operation Allies Welcome, a civilian-led continuation of Operation Allies Refuge intended to coordinate ongoing efforts across the federal government to support vulnerable Afghans, including Afghan SIVs, as they safely resettle in the United States;

- The sudden and significant increase in demand under the SIV program overloaded the National Visa Center (NVC), an immigrant visa pre-processing center located in the United States that services U.S. embassies and consulates worldwide. NVC worked diligently to address this spike in incoming cases and email inquiries while at the same time maintaining a robust throughput in cases processed through the pre-COM and COM stages;

(8) The results of the Department's efforts to expedite SIV processing, particularly since February 2021, are reflected in the significant increases in throughput of SIV cases and case processing times, when caseload volume is taken into account, as reflected in the table below:

Pre-COM Processing

| | As of June 30, 2020 | As of June 30, 2021 | As of December 31, 2021 | As of March 31, 2022[1] |
|---|---|---|---|---|
| Total Afghan SIV applicants pending at NVC | 8,341 | 10,682 | 29,913 | 34,371 |
| Average processing time at NVC for the previous quarter | 10 days | 28 days | 88 days | 168 |
| Number of cases processed during the previous quarter | 776[1] | 12,650 (number of case reviews conducted by the NVC within the quarter, counted each time an SIV applicant submits additional documents to complete their case.) | 93,346 (number of case reviews conducted by the NVC within the quarter, counted each time an SIV applicant submits additional documents to complete their case.) | 117,886 (number of case reviews conducted by the NVC within the quarter, counted each time an SIV applicant submits additional documents to complete their case.) |
| Number of dedicated SIV case processors | 9 | 54 | 63 | 54 |

COM Processing

| | As of June 30, 2020 | As of June 30, 2021 | As of December 31, 2021 | As of March 31, 2022 |
|---|---|---|---|---|
| Total documentarily complete applicants pending decision on their COM application | 9,814 | 5,355 | 3,871 | 6,480 |
| Average processing time for COM applications | 510 days | 554 days | 312 days | 173 days |

---

[1] These figures are estimates and subject to change.

| during previous quarter | | | | |
|---|---|---|---|---|
| Number of cases processed during the previous quarter by COM | 997 | 1,837 | 6,307 | 4,896 |
| Number of dedicated SIV case processors | 8 (as of May 2021) | 38 | 48 | 48 |

## Legislative Amendment:  Emergency Security Supplemental Appropriations Act

(9) On July 30, 2021, President Biden signed into law the Emergency Security Supplemental Appropriations Act, 2021 (ESSAA). See Public Law 117-31.

(10)   Among other things, the ESSAA reduced the eligibility requirements for Afghan SIVs by lowering the service requirement from two years to one year. See Section 401(a)(1)(A). This greatly expanded the number of individuals potentially eligible for an Afghan SIV.

(11)   Additionally, section 401(a)(1)(B) of the ESSAA expanded the COM appeals framework by permitting applicants to submit one written appeal of a COM denial per denial, and allowing written appeal more than 120 days after a denial, at the discretion of the Secretary of State.

(12)   Sections 402(a)-(c) of the ESSAA authorized the Secretary of State and the Secretary of Homeland Security to jointly issue a blanket waiver of the medical exam requirement for Afghan SIVs prior to the issuance of an immigrant visa or admission to the United States.  Section 402(d) requires the Department of Homeland Security, in consultation with Health and Human Services, to establish procedures to complete medical exams for applicants whose exam was waived pursuant to the ESSAA not later than 30 days after admission into the United States. Applicants who receive waived medical exams are considered lawful permanent residents admitted on a conditional basis, with conditions removed upon complete of exam.

(13)   Pursuant to this authority established by the ESSAA, on August 12, 2021, the Secretary of State and the Secretary of Homeland Security exercised their delegated authority to jointly issue a blanket waiver of the medical exam requirement for Afghan Special Immigrant Visa applicants who are in Afghanistan and have met all requirements for SIV issuances other than the medical exam, when the Chief of Mission has determined that they are unable to complete the required medical exam in a timely manner without undue hardship or risk to personal safety.

(14)   On August 13, 2021, the Chief of Mission determined after assessing all relevant factors regarding conditions in Afghanistan, including availability of qualified panel

physicians and the current security environment, that Afghan SIV applicants are unable to complete the required medical exam in a timely manner without undue hardship or risk to personal safety.

(15)     Accordingly, the Department of State began to apply the medical waiver and, as a further time-saving measure during a critical period, issue foil-less SIVs to those individuals who were located in Afghanistan at the time of issuance, had completed all portions of the SIV process, with the exception of the medical exam required under section 221(d) of the Immigration and Nationality Act (INA), and who were traveling on U.S. government-chartered flights. Commercial airlines cannot verify foil-less visas, thus travel on foil-less visas was only available to individuals flying on USG charters. Individuals issued these foil-less visas under the medical waiver were required to complete the medical exam within 30 days of admission into the United States.

(16)     Decreasing the eligibility requirement regarding the service requirement by lowering it from two years to one year increased the pool of potentially eligible Afghan SIV applicants significantly, which led to an increase in application submissions. Increased demand, particularly when combined with other increases in demand in proximity to the U.S. withdrawal from Afghanistan, renders every step in the AAP more challenging by requiring more resources to maintain processing pace. The medical exam waiver changes the program fundamentally for those applicants who were able to process inside of Afghanistan, impacting Step 14 of the AAP in particular. These impacts remain in effect as of April 2022, although the number of applicants who are eligible for the medical waiver depends on the number of Afghan SIV applicants inside Afghanistan who are otherwise issuable but for the medical exam.

**Legislative Amendment:  Continuing Resolution Appropriations**

(17)     On September 30, 2021, President Biden signed a package of Continuing Resolution Appropriations Issues for FY 22 legislation (H.R. 5305) into law as P.L. 117-43 ("CR Anomaly legislation").

(18)     The CR Anomaly legislation rendered any Afghan national who is paroled into the United States between July 31, 2021 and September 30, 2022, and who successfully completes security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security, to be eligible for the same resettlement benefits to resettlement assistance, entitlement programs, in addition to other benefits available to refugees admitted under section 207 of the INA. See Section 2502(a) of P.L. 117-43. This is relevant for the Afghan nationals who were paroled into the United States as part of Operation Allies Refuge and/or Operation Allies Welcome, including those who may have been eligible to apply for an SIV, by ensuring that the benefits to which they are entitled are in parallel with those that an Afghan national admitted on an SIV would receive.

(19)   The CR Anomaly legislation also established an expedited adjudication process for asylum applications. See Section 2502(a) of P.L. 117-43.

**Executive Order 14013 and Streamlining Efforts**

(20)   On February 2, 2021, President Biden signed Executive Order 14013, *Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration*, 86 Fed. Reg. 8839 (Feb. 4, 2021). Exec. Order 14013 provides, in part, that "the Secretary of State, in consultation with the Secretary of Defense and the Secretary of Homeland Security, shall complete a review of the Iraqi and Afghan SIV programs and submit a report to the President with recommendations to address any concerns identified" within 180 days.

(21)   Accordingly, the Department, joined by the Department of Homeland Security ("DHS") and other agencies, undertook a process by which to review the Iraqi and Afghan SIV programs in alignment with the parameters noted above. The Department continues to undertake ongoing efforts to identify additional opportunities to improve processing efficiencies. These efforts include:

- **Resource Increases:**

   o   **The National Visa Center ("NVC"):** By July 2021, NVC had reallocated and trained additional staff from other units to process SIV applications, increasing the SIV Unit's total staffing by a factor of seven.

   o   **The Afghani Special Immigrant Visa ("ASIV") Unit:** By July 2021, the Department had added 34 additional staff for the ASIV unit (a team of contractors and U.S. direct-hire employees dedicated exclusively to processing COM approvals), for a total of 42 staff. As of May 2022, the ASIV Unit had 46 total staff.

   o   **Third-Country SIV Processing:** Beginning in November 2021, the Department has sent 49 temporary duty staff on consistent rotation to support SIV processing at Camp As Sayliyah (CAS), a U.S. Army base outside of Doha, Qatar, as well as other high-volume SIV processing posts, such as Islamabad and Abu Dhabi. - These personnel surges are in addition to the surges of consular officers sent to Afghanistan and third countries to support relocation efforts and processing of relocated Afghans leading up to and following the withdrawal of U.S. forces from Afghanistan.

- **Process Improvements:**

  - **Streamlined COM processing for U.S. government agencies who employed Afghan SIV applicants and provide letters of recommendation on their behalf:** Following a review of the statutory framework under the AAPA, the Department established a framework by which it can more expeditiously verify the employment details of SIV applicants who worked for or on behalf of other U.S. government agencies where that agency is able to verify employment and provide a letter of recommendation to the Department directly on the applicant's behalf. This collaboration has produced exceptional results and supported the COM's ability to process benefiting COM applicants expeditiously. For instance, these processes eliminate the verification stage of processing on the part of the ASIV Unit, and greatly enhance the speed of the data entry and analysis stages of the COM approval process. As of February 2021, one U.S. agency had identified and verified employment for over 5,000 individuals in the Afghan SIV applicant pool, allowing these applicants to expeditiously obtain decisions on their COM application.

  - **Credible Threat Determination:** On August 25, 2021, the Deputy Chief of Mission for Afghanistan determined that any noncitizen who was employed in Afghanistan by or on behalf of the U.S. government, by the International Security Assistance Force (ISAF) or any successor mission, has experienced or is experiencing an ongoing serious threat as a consequence of the alien's employment. As a result, Afghan SIV applicants no longer need to submit a statement to establish that they have experienced an ongoing serious threat as part of their COM application. This has improved the efficiency of COM processing (and thereby positively impacting Step 4 of the AAP) by reducing the application burden on applicants as well as the processing burden on the ASIV Unit.

  - **Dissolution of the Chief of Mission Committee:** On August 19, 2021, the Chief of Mission dissolved the Chief of Mission (COM) Committee. As such, following that change, COM applications are reviewed by the ASIV Unit and then submitted directly to the COM designee for a decision. This change established a more streamlined and expeditious process for the review of COM applications and has decreased the time required for a COM decision by approximately two weeks. Decreasing the time required for a COM decision has improved processing times at Step 4 of the AAP.

  - **Increase in COM application intake frequency:** Additionally, beginning in July 2021, the ASIV Unit increased its intake of new cases from a monthly timeframe to a twice a week timeframe, such

that the ASIV unit now receives new cases directly from NVC biweekly and need not wait one month to receive a batch of new cases. This has also increased the rate of COM adjudications, thereby improving processing times at Step 4 of the AAP.

o   **Increase in COM approval agenda frequency:** The ASIV Unit also began preparing daily agendas of COM approval applications for the COM designee to review, instead of bimonthly as had previously been the case. This has also increased the rate of COM adjudications, thereby improving processing time at Step 4 of the AAP.

o   **Removal of U.S. citizen supervisor requirement:** As of December 21, 2021, the Department ceased requiring that the letter of recommendation in support of the COM application be submitted by a U.S. citizen supervisor or co-signed by a U.S. citizen. The Department's Foreign Affairs Manual guidance was updated in accordance. This has allowed for more approval decisions, as well as more efficient processing of COM applications, positively impacting Step 4 of the AAP.

o   **Streamlining of NVC/ASIV letter of recommendation:** The letter of recommendation verification process was updated such that as of December 21, 2021, NVC deems an applicant documentarily complete and forwards the application for COM approval without seeking to first verify the letter of recommendation. Instead, this verification is undertaken by ASIV Unit analysts. This facilitates a more efficient process for determining that applicants are documentarily complete and referring them to the COM for review. This supports the Department's efforts to streamline Step 2 and Step 3 of the AAP. Additionally, this approach is not expected to increase Step 4 processing time as the ASIV Unit submits verification requests for both the letter of recommendation and the human resources letter simultaneously.

(22)   As a result of these resource increases and streamlining efforts, the Department has observed significant improvements in the SIV process. For instance:

   •   By the end of May 2021, the Department had reduced the average processing time by more than 200 days.

   •   Embassy Kabul increased the rate of SIV issuances from approximately 100 visas per week in March 2021 to more than 800 per week in August 2021, when relocation efforts began and the U.S. Embassy in Kabul subsequently suspended operations on August 31, 2021. From February 1, 2021 through August 15, 2021, Embassy Kabul processed nearly 12,000 SIV applicants. This 6-month total is greater than the amount processed in the preceding 18

months (August 2019 through February 2021) combined. This demonstrates significant throughput in overall SIV processing, including Steps 11-13 of the AAP, up until the suspension of operations at Embassy Kabul. Since August 31, 2021, and continuing to present, Embassy Kabul is no longer able to adjudicate SIVs due to the suspension of operations.

- COM adjudication rates have increased dramatically:
  - In October 2021, ASIV completed processing on 1,616 COM applications. In November 2021 ASIV completed processing on 1,632 COM applications. In December 2021, ASIV completed processing on 3,059 COM cases. In combination, within the first quarter of Fiscal Year 2022, ASIV processed 6,307 COM applications in total. Improving even further upon this trend, from January 1, 2022 through April 26, 2022, the ASIV Unit processed 6,638 cases.

  - This is a significant increase from the prior average rate of decisions. For instance, in the period between April 1, 2020 and June 30, 2020, a total of 997 COM decisions were rendered. See Joint Department of State/Department of Homeland Security Report: Status of the Afghan Special Immigrant Visa Program, July 2020, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html (last accessed March 22, 2022). Similarly, in the period between July 1, 2020 and September 30, 2020, 1,841 COM decisions were rendered. See Joint Department of State/Department of Homeland Security Report: Status of the Afghan Special Immigrant Visa Program, October 2020, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html (last accessed March 22, 2022). These statistics demonstrate a significant increase in the throughput of COM cases at Step 4 of the AAP. In the first quarter of Fiscal Year 2022, ASIV processed 4,466 more COM cases than during the fourth quarter of Fiscal Year 2020, and 5,310 more COM cases than during the third quarter of Fiscal Year 2020.

  - By further comparison, in the **first quarter of Fiscal Year 2021,** the ASIV Unit rendered a decision on 3,273 COM applications. In the **second quarter of Fiscal Year 2021,** the ASIV Unit rendered a decision on 2,032 COM applications. In the **third quarter of Fiscal Year 2021,** the ASIV Unit rendered a decision on 1,837 COM applications. In the **fourth quarter of Fiscal Year 2021,** the ASIV Unit rendered a decision on 5,349 COM applications. See Joint Department of State/Department of Homeland Security Report: Status of the Afghan Special Immigrant Visa Program,

October 2021, July 2021, April 2021, and January 2021 respectively. Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government (state.gov) (last accessed May 11, 2022).

**Designation of Deputy Secretary of State for Management and Resources as the Senior Coordinating Official for the Iraqi and Afghan Special Immigrant Visa programs**

(23)   On June 1, 2021, Secretary of State Antony Blinken designated the Deputy Secretary of State for Management and Resources (D/MR) as the Senior Coordinating Official for the Iraqi and Afghan Special Immigrant Visa programs. *See* Dep't of State Delegation of Authority 481-1 of June 1, 2021 (rescinding Delegation of Authority 481 of March 15, 2020). This designation has not been altered and remains current as of the date of this declaration.

(24)   The decision to designate the Deputy Secretary for Management and Resources as the Senior Coordinating Official signifies that the Department is focused on the SIV program at the highest levels, reflecting the importance that the Department places on the SIV program.

**The COVID-19 Pandemic**

(25)   Due to the COVID-19 pandemic, the State Department suspended routine visa services worldwide in March 2020, and started a phased resumption of routine services in July 2020. The impacts of COVID-19 have affected all stages of SIV processing under the control of the Department of State for periods of time between March 2020 to present day, depending on local conditions, most notably the ability to conduct in-person visa interviews at consular posts abroad, restrictions on which continue to present day.

(26)   Numerous factors stemming from COVID-19 impact consular sections' ability to resume routine visa services worldwide in a way that would allow them to meet the demand from all prospective visa applicants. Host governments may impose COVID-related restrictions that affect a posts' ability to operate, such as putting limits on the size of public gatherings, which can impact line management and waiting room capacity at our facilities, mandatory quarantines or stay-at-home orders, and restrictions on public movement. Consular sections have also implemented safeguards intended to reduce the transmission of COVID-19, such as implementing physical distancing in our facilities including waiting rooms and workspaces, disinfecting high touch areas, staggering in-office schedules for consular personnel, and complying with other local health and safety regulations, all of which limits the number of applicants consular sections are able to process in a day. In addition, many posts' staffing levels have been affected by employees' illnesses, absence to care for family members, or mandatory quarantine after possible exposure to the virus. In short, the COVID-19 pandemic drastically reduced the number of people, including visa applicants, U.S. officials, and locally employed staff, who can safely be in a

consular section on any given day. As a result, there is an unprecedented backlog of applicants worldwide waiting for immigrant and nonimmigrant visa appointments in a variety of categories.

(27)    To illustrate this, in January 2020, prior to the pandemic, the NVC had a backlog of approximately 75,000 documentarily qualified immigrant visa applicants from around the world who were eligible and waiting to schedule an appointment for an in-person visa interview. See: https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html (last visited March 16, 2022). See also: https://www.state.gov/briefing-with-consular-affairs-acting-deputy-assistant-secretary-for-visa-services-julie-m-stufft-on-the-current-status-of-immigrant-visa-processing-at-embassies-and-consulates/ (last visited March 16, 2021). As of March 31, 2022, there were approximately 453,797 documentarily qualified immigrant visa applicants awaiting appointments at U.S. embassies and consulates around the world. The backlog number is updated monthly at the following site: https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html. As such, in January 2020, the backlog was just an approximated 15% of the volume that it is as of February 2022. The volume of demand posed on the Department of State, and the steps required to reduce this backlog, impose significant resource burdens on the Department. These additional priorities and resource demands impact all steps in the Approved Adjudication Plan ("AAP") because finite Department resources must be distributed to reduce immigrant visa processing backlogs (a high priority for the Department) and the SIV program, which is a high priority for the Department as well.

(28)    As a result of the COVID-19 pandemic, routine visa processing services were suspended at Embassy Kabul from March 2020 until the Embassy reopened for in-person immigrant visa services in February 2021. The Embassy was unable to conduct interviews and local staff were unable to work in the office throughout this period. When Embassy Kabul resumed in-person visa interviews in February 2021, there was a backlog of approximately 853 SIV principal applicants awaiting a visa interview.

(29)    Even following the reopening of the Embassy for in-person consular services, COVID-19 continued to have an impact on the Embassy's operations. For instance, Embassy Kabul continued to have limited waiting room capacity due to social distancing and masking requirements. In-person staffing in the Embassy also remained reduced. COVID-19 also caused fluctuations in staffing and other issues that impacted processing at multiple steps in the process, including COM processing. This impacted Steps 11 and 12 of the AAP, by challenging the Embassy's ability to schedule and complete immigrant visa interviews.

(30)    Nonetheless, the Department of State took concerted action to support immigrant visa processing, particularly SIV processing. By May 2021 (just three months after resuming some visa processing), Embassy Kabul had cleared the entire backlog of

cases that had built up from March 2020 through February 2021 due to the COVID pandemic.

(31)     This effort was supported in part by a surge in staff, which included three temporary duty staff assigned to support SIV processing at the Embassy in April 2021. Additionally, in February 2021, the Department doubled the number of permanent staff assigned to Embassy Kabul, for a total of six officers. In May 2021, Embassy Kabul had six temporary duty staff and eight officers; in June 2021, the Embassy had three temporary duty staff and five officers; in July 2021, the Embassy had three temporary duty staff and seven officers; in August 2021, the Embassy had 30 temporary duty officers and nine officers. These staffing increases allowed the Embassy to interview at its maximum capacity of 850 SIV cases per month. Furthermore, the Embassy recruited 15 additional personnel to provide voluntary assistance to SIV processing in addition to their full-time duties during the month of August 2021. Additionally, from 31 July to 15 August, Department personnel worked seven days per week on SIV processing.

(32)     Although these actions by the Department successfully eliminated the backlog at Embassy Kabul before operations there were suspended on August 31, 2021, as discussed more fully below, the impacts of COVID-19 continue to limit consular posts' capacity in other countries around the world where Afghan SIV applicants may now seek to have their cases transferred for interview. COVID-19 is thus just one of many factors outside the Department's control that directly impacts processing times at Steps 11 and 12 of the AAP.

**COVID-19 Outbreak at the U.S. Embassy in Kabul**

(33)     On June 13, 2021, the U.S. Embassy in Kabul suspended visa interviews due to highly adverse COVID conditions directly impacting the Embassy and ultimately leading to the death of one staff member.

(34)     Despite these adverse conditions, the Embassy nonetheless continued to conduct activities that did not require lengthy in-person interaction, such as distributing issued visas to applicants after processing medical exams.

(35)     Between June 13 and June 29, 2021, the Embassy produced 1,483 completed SIVs despite the suspension of visa interviews.

**Relocation of Afghan SIVs through Operation Allies Refuge**

(36)     On July 14, 2021, President Biden announced an effort called Operation Allies Refuge to provide relocation flights for interested and eligible Afghan SIV applicants and their eligible family members. See https://www.state.gov/briefing-with-deputy-secretary-for-management-and-resources-brian-p-mckeon-and-afghanistan-task-force-director-ambassador-tracey-jacobson-with-on-background-qa-by-senior-state-department-officials-o/. From July 2021 through present day, the Department has

dedicated significant resources to supporting efforts to provide relocation to Afghan Special Immigrant visa applicants or recipients, and other eligible Afghans at risk.

(37)    On July 19, 2021, the Department of State activated the Afghanistan Coordination Task Force ("ACTF"). The ACTF was headed by Ambassador Tracey Jacobson and included participation from multiple U.S. government agencies.

(38)    The ACTF's mission included oversight of the Department's planning, management, and logistics to relocate certain Afghan SIV applicants while their applications are in process. The ACTF was also mandated to coordinate policy and logistical considerations amongst Department bureaus and offices, and with interagency partners and other stakeholders.

(39)    To support the implementation of these relocation flights, the Department of State undertook several lines of effort, including:

- **Provision of pre-flight medical exams**: To streamline the panel physician medical exam process in Kabul, the Department collaborated with the CDC to develop a framework whereby the "fit to fly" examination required prior to travel to the U.S. could be simultaneously utilized to also fulfill the required immigration medical exam required under section 221(d) of the Immigration and Nationality Act, and developed a framework for Afghan SIV applicants to obtain and utilize such exams through first the German Medical Clinic and then the American Medical Clinic in Kabul. These efforts had implications for Step 14 of the AAP and the Department's efforts to adjudicate SIVs, by facilitating the medical exam to support SIV adjudication.

- **Provision of medical exams inside the United States**: To expedite departures from Afghanistan, SIV applicants who arrived in the United States without a medical exam were paroled in and the Secretary of Homeland Security exercised his authority under Section 602(b)(1) of the Afghan Allies Protection Act to provide these applicants Special Immigrant status upon completing an I-693 medical exam.

- **Electronic proof of recent visa issuance**: The Department collaborated with the Department of Homeland Security to provide electronic proof of recent visa issuance, avoiding the need to put a visa foil in a passport for SIV recipients traveling under U.S. government care. This was the first time the Department ever issued "foil-less" visas. This effort facilitated Step 14 of the AAP and the Department's ability to issue approved SIVs on an expedited basis

(40)    On July 29, 2021, the United States Government initiated the first chartered flights to relocate SIV holders and applicants from Afghanistan to the United States. On July 30, 2021, President Biden issued a statement announcing the arrival of the first flight under Operation Allies Refuge to Washington Dulles International Airport, carrying Afghans eligible for SIVs and their immediate families. See

https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/30/statement-of-president-joe-biden-on-the-arrival-of-the-first-flight-of-operation-allies-refuge/

(41)     From July 30 through August 15, 10 chartered flights arrived in Dulles under this Operation, carrying a total of 1,962 SIV holders, applicants, and family members.

(42)     Throughout this time, processing of SIV applicants inside Afghanistan continued at an accelerated pace.  By early August 2021, the Department was issuing more than 800 visas per week.  On August 12, 2021, the Department increased the permanent staffing level in Embassy Kabul by another third, from six permanent staff as of February 2021, to nine permanent staff as of August 2021.

**Operation Allies Welcome**

(43)     On August 29, 2021, the President directed the Department of Homeland Security to lead Operation Allies Welcome, a civilian-led continuation of Operation Allies Refugee intended to coordinate ongoing efforts across the federal government to support vulnerable Afghans, including Afghan SIVs, as they safely resettle in the United States.  See https://www.dhs.gov/allieswelcome.

(44)     In describing the mission of Operation Allies Welcome, Robert Fenton, Senior Response Official for the Operation, stated on October 4, 2021, that "[t]he ultimate goal of Operation Allies Welcome is to successfully resettle our Afghan allies into local communities while prioritizing national security and public health. . . This historic effort is part of our enduring commitment to those who supported or worked on behalf of our Nation over the last twenty years."  See Operation Allies Welcome Completes Vaccination Campaign for Measles and Varicella for Afghan Evacuees | Homeland Security (dhs.gov).

(45)     Through Operation Allies Welcome, the Department of State has continued to undertake  efforts to relocate certain populations, including certain Afghan SIV applicants and their eligible family members.

(46)     In support of that effort, the Department of State appointed the Coordinator for Afghanistan Relocation Efforts (CARE) in September 2021.  CARE's mission is focused on four primary areas of responsibility:  Relocation out of Afghanistan; third-country transit and processing outside the United States; resettlement in the United States; and overall outreach and engagement.

(47)     Since U.S. military flights ceased on August 31, 2021, the Department has worked across the interagency, with partner governments, and with private organizations to facilitate departures via various means, including via flights operated by commercial carriers.  Although this effort has faced continual challenges, the U.S. government has continued to assist SIV holders and applicants and their eligible

family members to depart Afghanistan as operational and security conditions allow. These efforts remain a top priority.

(48)   Post-August 2021 flights transporting individuals eligible for potential entry in the United States, including for Afghan SIV holders and COM-approved SIV applicants, have taken place as early as September 28, 2021, with transport from Kabul to Doha, as a result of coordinated efforts by the United States and Qatar and intensive diplomacy to initiate these flights.

(49)   Afghan nationals, including Afghan SIVs, who depart Afghanistan via these flights are relocated to Doha, Qatar, as well as select other destinations for further processing, including national security-related screening, before potential onward travel to the United States. These efforts are one potential pathway by which certain applicants may be able to access the consular services necessary to complete visa processing, with implications for Steps 11 through 14 of the AAP. However, the ability of these flights to proceed are reliant on third-party action outside of the Department's control, including by third countries receiving individuals who have departed from Afghanistan as well as by the Taliban. The Department is unable to proceed with departures without the cooperation of these entities and does not have the ability to dictate third country rules and regulations, including those pertaining to travel and required travel documents. As such, despite the extraordinary efforts of the Department, significant aspects of the Department's ability to effectuate Steps 11 through 14 of the AAP are outside of the Department's control.

(50)   The Department has also engaged with groups seeking to privately arrange flights, which required both arranging departure and safe passage out of Afghanistan as well as determining where such individuals can go temporarily and eventually permanently resettle. The Department has supported privately organized flights on a case-by-case basis. Such support included evaluating the passenger manifest provided by the group to identify which proposed passengers were potentially eligible for permanent resettlement in the United States through some affiliation with the U.S. government. In some cases, these flights posed significant challenges. In several instances, privately organized flights raised issues whereby identity checks on arrival at transit destinations revealed that many passengers were not eligible for relocation to the United States, and, in some cases, the manifests were not accurate, despite the best efforts of the private organizing group. This put the individual travelers at risk with no plan for relocation to the United States, damaged the bilateral relationship of the United States with destination countries, and made it more difficult for the U.S. government to engage with those partner countries to assist in future relocations out of Afghanistan. These flights have relevance to the Department's ability to comply with Steps 11 and 12 of the AAP, because in order to proceed with an immigrant visa interview applicants must make an in-person appearance before a consular officer. Due to the suspension of operations by the U.S. Embassy in Kabul, applicants must travel to a third country consular post in order to complete their immigrant visa interview. The privately organized flights described in this paragraph are one such mechanism by which applicants have sought to travel to a third country.

(51)    On September 5, 2021, Secretary Blinken traveled to Doha, Qatar and Ramstein, Germany to meet with foreign leaders, thank them for their support in the safe transit of U.S. citizens, Afghans, and other individuals departing from Afghanistan, and to further discuss coordination of relocation efforts with Qatar. See Secretary Blinken's Travel to Qatar and Germany - United States Department of State.

(52)    To support the relocation efforts of Operation Allies Welcome, on November 12, 2021, the United States and Qatar executed a Memorandum of Understanding Between the United States of America and the State of Qatar on Cooperation in Temporary Hosting of Individuals at Risk Due to the Situation in Afghanistan (US-Qatar MOU). In the US-Qatar MOU, the Government of Qatar agreed to host Afghan SIV holders and applicants for the pendency of their SIV processing until September 1, 2022 (unless the agreement is amended), to be housed at Camp As Sayliyah and/or Al Udeid Air Base. While residing at these U.S. military bases, Afghan guests are provided with housing, food, education for kids, assistance with assurances from IOM, and medical attention, among other services. Additionally, Afghan SIV applicants may obtain the medical exam required for visa issuance at no cost. The US-Qatar MOU has implications for Steps 11 through 14 of the AAP, as processing in Doha, Qatar is one pathway by which the Department seeks to provide immigrant visa processing services to some SIV applicants. The MOU also illustrates that the Department's ability to provide consular services to applicants who have departed Afghanistan with U.S.-facilitated assistance, such as immigrant visa interviews and the adjudication and printing of issued visas, depends on the agreement and support of third-party countries. The US-Qatar MOU remains in effect as of April 2022.

(53)    Throughout this time and continuing to present, the Department of State continues to process any Afghan SIV applicant who can appear at any designated Immigrant Visa processing post world-wide, on a priority basis. Between September 1, 2021 and April 17, 2022, 2,726 Afghan SIV applicants have had their applications adjudicated by third-country Posts.

(54)    The Department also continues to prioritize all steps in the Afghan SIV process that do not require the applicant to appear in person before a consular officer.

**State Department Engagement with Third Countries**

(55)    In his testimony to the Senate Foreign Affairs Committee on September 14, 2021, Secretary Blinken underscored that "more than two dozen countries . . . have helped with the relocation efforts."

(56)    As a result of the Department's efforts, the United States entered into agreements and non-binding arrangements with many countries to facilitate the evacuation and relocation of individuals from Afghanistan. Illustrative, non-exhaustive examples include:

- **Italy** – Temporary Relocation Transit Agreement entered into force August 20, 2021. See T.I.A.S. 21-820.1.
- **Kosovo** – Temporary Relocation Transit Agreement entered into force August 25, 2021. See T.I.A.S. 21-825.
- **Kuwait** – Temporary Relocation Transit Agreement entered into force August 22, 2021. See T.I.A.S. 21-822
- **Oman** – Temporary Relocation Transit Agreement entered into force September 2, 2021. See T.I.A.S. 21-902.
- **Qatar** – Temporary Relocation Transit Agreement entered into force November 12, 2021. See T.I.A.S. 21-1112.

## Visa Processing for Afghan SIV Applicants Relocated Through Operation Allies Welcome

(57)     The Department of State has initiated expedited processing of SIVs to Afghan applicants in certain overseas locations, including Qatar and the United Arab Emirates.

(58)     On February 8, 2022, the U.S. government announced establishment of an expedited processing framework in Camp As Sayliyah (CAS), a U.S. military base outside of Doha, Qatar, to facilitate the ability of eligible Afghans to be issued SIVs prior to entering the United States.  Eligible Afghans will complete interviews, medical exams, and screening at CAS through this framework.

(59)     The Department has faced extraordinary challenges in establishing this SIV processing framework in CAS.  Initially, the Department had access to no consular systems within CAS and was unable to reliably transport applicants from CAS to the U.S. Embassy in Doha for interviews.  The Department incurred significant logistical expenses, exceeding tens of millions of dollars, to transport and house applicants. Additionally, to support SIV interviewing in CAS, the Department has established the first Consular Section outside of an Embassy or Consulate in the Department's known history.  Nonetheless, despite these significant accomplishments, the Department's ability to support the relocation and processing of SIV applicants in Doha depends on Taliban cooperation in allowing applicants to depart Afghanistan.

(60)     The efforts undertaken at CAS affect the SIV program by providing expedited processing for SIV applications who have departed Afghanistan with U.S. assistance, allowing those who are favorably issued an SIV to travel onwards to the United States and seek admission as a Special Immigrant.

(61)     The Department of State continues to seek to facilitate travel for eligible travelers on flights from Doha to Kabul, including to facilitate SIV processing at CAS for eligible individuals.  However, the Department's ability to do so depends on third-party cooperation.

(62)     Additionally, the Department of State is taking concerted steps to process an SIV population that is located in the United Arab Emirates, including individuals who

were not formally relocated by Operation Allies Welcome. The Department is coordinating with the United Arab Emirates to conduct the required interviews, medical exams, and screening to process as many applications to completion as possible. This is applicable to Steps 11 through 14 of the AAP, as it is one pathway by which the Department seeks to provide immigrant visa services to certain SIV applicants. However, the success of these efforts is contingent on the cooperation of the United Arab Emirates government.

(63)    For SIV cases processing through CAS or through the United Arab Emirates in these frameworks, the NVC is expediting pre-processing and facilitating the process by which an immigrant visa case is created and sent to the appropriate processing entity.

**Dramatic Surge in Inquiries and New Case Submissions**

(64)    Beginning in August 2021, the NVC began to receive an unprecedented volume of inquiries and submissions via email.

(65)    In August 2021, NVC received 235,196 inquiries or submissions, counted as individual e-mails. In September 2021, NVC received another 117,280 inquiries or submissions. In October 2021, NVC received 80,417 inquiries or submissions.

(66)    Comparatively, in August 2020, NVC received 3,818 inquiries or submissions. In September 2020, NVC received 4,721. In October 2020, NVC received 3,611 inquiries or submissions. To put the surge into perspective, NVC received more email inquiries in August and September 2021 (352,476 inquiries), than during the five year and nine-month period from March 2015 to December 2020 (325,378).

(67)    This dramatic increase in inquiries and application submissions has also led to a significant increase in the number of applications submitted into the Afghan SIV pipeline.

   • As of September 30, 2019, there were approximately 7,996 principle SIV applicants who had lodged applications and were pre-COM decision.

   • As of July 1, 2021, prior to the enactment of the ESSAA, there were approximately 10,682 principal SIV applicants who had lodged applications and were pre-COM decision.

   • As of August 1, 2021, there were approximately 12,194 principal SIV applicants who had lodged applications and were pre-COM decision.

   • As of May 10, 2022, there were approximately 41,581 principal SIV applicants who had lodged applications and were pre-COM decision.

(68)    To assist in managing the increase in inquiries and submissions, NVC's contractor reallocated 53 staff members from other processing units to assist with SIV processing. To further assist with the increase in SIV correspondence, a U.S. Mission abroad contributed 19 officers and 64 locally engaged staff to remotely respond to over 120,000 inquiries.

(69)    The Department also updated policy requirements for the Letter of Recommendation and Human Resources letter to streamline those requirements to the greatest degree possible while still meeting statutory obligations. These streamlining measures reduce the burden on applicants and allow the NVC to documentarily complete more cases, leading to faster processing times for applicants

(70)    The Department has also pursued technological advancements to assist NVC's ability to manage the increase in demand. In March 2022, after rigorous development and testing efforts, NVC instituted a new technological platform to assist in its ability to manage the increase in inquiries and submissions. In its first weeks of use, NVC observed an approximately 25% increase in its processing ability.

**Impact of Reporting Burden on Processing Special Immigrant Visa Applications**

(71)    Many of the key State Department staff engaged in processing SIV applications or improving the efficiency of SIV processing are the same officials who have been responding to the reporting requirements in the AAP and further requests for information from Plaintiffs in this litigation.

(72)    The last quarterly Progress Report filed in the litigation was filed in July 2021.

(73)    In July 2021, State Department staff reported that they expended approximately 141 hours per week on litigation-related efforts, with an additional 40 hours expended in the two weeks prior to the submission of the Progress Report. A significant portion of these are hours which otherwise could be dedicated to SIV processing.

(74)    In July 2021, staff who engage in processing SIV applications and/or increasing the efficiency of SIV processing reported that they collectively engaged in approximately 1,194 hours of work per week that was dedicated to the processing of SIV applications.

(75)    In July 2021, staff who engage in processing SIV applications and/or increasing the efficiency of SIV processing reported that they collectively engaged in approximately 518 hours of work per week that was dedicated to increasing the efficiency of SIV processing.

(76)    In July 2021, staff who engage in processing SIV applications and/or increasing the efficiency of SIV processing reported that they collectively engaged in approximately 564 hours of work per week that was dedicated to interagency

processes such as National Security Council meetings, follow-up taskings, legislative proposal efforts, and similar.

(77)   In July 2021, staff who engage in processing SIV applications and/or increasing the efficiency of SIV processing reported that they collectively engaged in approximately 141 hours of work per week that was related to the *Afghan Allies* litigation case, including the generation of data for Progress Reports, coordinating, drafting, reviewing, and finalizing Progress Reports; reviewing correspondence and requests from Plaintiffs' counsel; coordinating, drafting, reviewing, and finalizing formal replies to correspondence and requests from Plaintiffs' counsel; and other litigation-driven tasks. Additionally, in the two weeks preceding the submission of Progress Reports, one Visa Policy Analyst typically dedicated approximately 40 hours exclusively to the production of the report.


I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Dated:  May 13, 2022

Maren Brooks
Senior Advisor
Office of the Deputy Secretary for Management and Resources
United States Department of State