# Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>                      Plaintiffs,<br><br>   – against –<br><br>ANTONY BLINKEN, *et al.*,<br><br>                      Defendants. | Case No. 18-cv-01388-TSC |

I, Daniel Mickelson hereby submit this declaration under penalty of perjury:

(1) I am employed by the U.S. Department of State as the Division Chief of the Office of the Immigration and Employment Division in the Visa Office/Office of Field Operations, Bureau of Consular Affairs (CA).

(2) In that capacity I have knowledge of the responsibilities and efforts of the Department of State as it pertains to the processing of Iraqi Special Immigrant Visa (SIV) applicants, as well as the events and circumstances that impact the processing of Iraqi SIV applicants in the U.S. Embassy in Baghdad and the U.S. Consulate General in Erbil.

**December 2019 Attack**

(3) On December 31, 2019, Iranian-backed militias assaulted the U.S. Embassy in Baghdad and caused severe fire damage to the Baghdad Embassy Compound's three primary access points, rendering the Consular Compound Access Control (CAC) and both

alternate CACs unusable. Without a useable CAC, the Embassy lost the ability to appropriately screen and move applicants to and from the Consular Section. Public consular services at the Embassy remain suspended until further notice as a result of these terrorist attacks on the Embassy compound.

(4) In the immediate aftermath of the attack, a handful of Nonimmigrant and/or Immigrant Visa cases that were close to completion were flown to the U.S. Consulate in Erbil for issuance. As a precaution, visa materials and files for cases that could not be immediately transferred were destroyed.

(5) The Embassy suffered subsequent threats and indirect fire attacks in January and February, which prevented locally employed staff from working at the Embassy during that period.

(6) In February 2020, the U.S. Embassy in Baghdad restarted processing official and diplomatic visa applications that do not require in-person appearances.

(7) After delays caused in part by the COVID-19 pandemic, reconstruction of a CAC commenced in February 2022. It is anticipated that upon completion the reconstructed CAC will resolve the Embassy's challenges to reopening to the public caused by the lack of a useable CAC. However, the COVID-19 and security issues detailed below present ongoing barriers to reopening the Embassy to the public, and the Embassy will be unable to fully reopen until these issues are also adequately resolved.

(8) Until the Embassy is able to reopen to the public, the Department's ability to fulfill Steps 11 through 14 of the Approved Adjudication Plan ("AAP") is severely compromised for any Iraqi SIV applicants who do not independently have access to the Baghdad Embassy Compound, because the U.S. Embassy in Baghdad is unable to conduct in-personimmigrant visa interviews, a required component of immigrant visa processing. The Department has made good faith efforts to process Iraqi SIVs wherever possible. U.S. Embassy in Baghdad is prioritizing the adjudication of Iraqi SIV cases wherein the applicant does not require in-person processing, or already has access to the Baghdad Embassy Compound. Remaining cases have been transferred to Ankara or another Immigrant Visa- processing post. The U.S. Embassy in Ankara is prioritizing Iraqi SIV processing. At least one SIV applicant informed Embassy Baghdad that they prefer to be interviewed in Baghdad and will wait for resumption of public services before resuming their application.

(9) As of December 31, 2021, pending Iraqi SIV cases included the following[1]:

---

[1] For all information in this paragraph, see Report to Congress on Progress by which Applications for Special Immigrant Visas under Special Immigrant Status for Certain Iraqis are Processed, Section 1218(g) of the National Defense Authorization Act of 2014 (P.L. 113-66), available at Special Immigrant Visas for Iraqis - Who Were Employed by/on Behalf of the U.S. Government (state.gov) (last accessed May 13, 2022).

- Step 1 – There were no new COM applications submitted by Iraqi principal applicants pending at NVC during this period. The deadline for Iraqis to apply for COM approval was September 30, 2014. Thirty-one principal applicants were in appeal status during the first quarter of Fiscal Year 2022.[2]
- Step 7 – Fifty-six Iraqi principal applicants had a Form I-360 petition pending with USCIS.
- Step 11 – There was one principal applicant and one derivative family member pending scheduling for visa interviews.
- Step 13 – Applications for 49 principal applicants and 24 family members were undergoing administrating processing as of December 31, 2021.

**COVID-19**

(10)    Due to the COVID-19 pandemic and its catastrophic global impacts, the State Department suspended routine visa services worldwide in March 2020, and started a phased resumption of routine services (where conditions allowed) in July 2020.

(11)    Accordingly, starting in March 2020, the U.S. Embassy in Baghdad suspended all routine visa processing. The Embassy was able to continue processing only official and diplomatic visas that did not require in-person processing.

(12)    The COVID-19 pandemic has had significant impacts on the U.S. Embassy, including that one locally employed staff member assigned to the U.S. Embassy in Baghdad passed away due to COVID-19. From March 2020 to September 2021 there was usually only one locally employed staff member available to work in the Consular Section because of COVID restrictions. This compromised the Department's ability to fulfill Steps 11-14 of the AAP by constraining the staffing resources that the Department was able to safely dedicate to the processing of SIV applications at the Immigrant Visa processing stage.

(13)    The U.S. Consulate in Erbil has also been impacted by the COVID-19 pandemic. For instance, from March 2020 and November 2020 locally employed staff were not authorized to work in-person in the Consulate General. From March 2020 to December 2020, Erbil handled only emergency passport cases and Nonimmigrant Visa cases subject to a national interest exception, to protect the health and safety of its staff as well as the general public, the U.S. Consulate in Erbil has had to restrict its waiting room access to one applicant or family group at a time.

---

[2] The 31 applicants with outstanding appeal cases were all informed of COM decisions in January 2022 and will be reported in the Fiscal Year 2022 Congressional quarterly report for the second quarter. One case reported in the Fiscal Year 2021 report for the fourth quarter was determined not to require a new decision as their case had in fact already received a determination.

**Ongoing Security Threats**

(14) The security situation in Iraq presents ongoing and highly challenging barriers to the Embassy's ability to resume public consular services.

(15) The State Department has issued a Level 4 Travel Advisory ("Do Not Travel") for Iraq, due to terrorism, kidnapping, armed conflict, civil unrest, and Mission Iraq's limited capacity to provide support to U.S. citizens. Terrorist and insurgent groups regularly attack both Iraqi security forces and citizens. Anti-U.S. sectarian militias threaten U.S. citizens and Western companies throughout Iraq. Attacks using improvised explosive devices (IEDs) occur in many parts of the country, including Baghdad. Demonstrations, protests, and strikes occur frequently. These events can develop quickly without prior notification, often interrupting traffic, transportation, and other services, and have the potential to turn violent. See [Iraq Travel Advisory (state.gov)](#) (last accessed April 13, 2022).

(16) The Islamic State in Iraq and Syria, also known as ISIS, ISIL, or Da'esh, is a designated terrorist organization that is active in Syria and near the Iraq border. ISIS and its associated terrorist groups indiscriminately commit attacks and violent atrocities in Iraq despite improved Iraqi government control. ISIS, militia groups, and other groups target U.S. citizens for attacks and hostage-taking. Due to security and safety threats, U.S. government personnel live and work under strict security guidelines that limit their movements and interactions in Iraq. See [Iraq International Travel Information (state.gov)](#) (las accessed March 22, 2022).

(17) The U.S. Embassy in Baghdad is located within the "International Zone" of Baghdad, also called the "Green Zone." The International Zone is a 10 square kilometer area in the Karkh district of central Baghdad, where government facilities and embassies, including the U.S. Embassy, are located.

(18) The International Zone is subject to exacerbated security threats and is a frequent target of rocket fire and other security threats.

(19) For instance, in May 2021 the Iraqi government arrested Qasim Muslih, the commander of Iraq's Popular Mobilization Forces (PMF) in Anbar. In response to the arrest, armed Iran-backed PMF entered the International Zone and took control of and blocked movement into an entrance to the International Zone. There have been repeated instances of other arrests of Iran-backed militia members, followed by incursions by gunmen in vehicles towards government buildings in the International Zone.

(20) The International Zone also suffers regular rocket fire. As illustrative recent examples, in December 2021, two Katyusha rocketeers were fired into the International

>    Zone. In January 2022, four rockets targeting the U.S. Embassy in Baghdad were fired into the International Zone.
>
> (21)   Within the past year, drones armed with explosives have targeted U.S. Embassy facilities in Baghdad on at least five occasions. On November 7, 2021, armed drones were used to target the Iraqi Prime Minister at his residence in the International Zone.
>
> (22)   To enter the U.S. Embassy, members of the public (including visa applicants) must first enter the International Zone.
>
> (23)   To enter the International Zone, members of the public must pass through an entry control point (ECP) at the threshold of the International Zone, staffed by Iraqi Special Division troops. To pass this ECP, members of the public must have an "International Zone badge" or a letter of invitation provided by an Embassy or other sponsor, and be personally met at the ECP by one of the limited number of approved escorts who holds an appropriate escort badge. To travel from the ECP to the Embassy gate, one kilometer away, members of the public must be escorted at all times and would typically travel via busses that are staffed with security guards and an Embassy escort. Before boarding a bus staffed by Embassy personnel, visitors must be screened by Embassy security staff.
>
> (24)   If the International Zone is not sufficiently secure so as to enable operations to transport visa applicants through the International Zone, the Embassy is unable to provide Immigrant Visa services to the public. As a result, the Embassy is unable to schedule or conduct Immigrant Visa interviews for SIV applicants who do not already have access to the Baghdad Embassy Compound.
>
> (25)   The December 31 2019 attack also forced the removal of all U.S. security personnel from the ECPs adjacent to the Embassy. These personnel included K9 units, interpreters, and security guards. Until these personnel are replaced, the Embassy's ability to pre-screen visitors to the Embassy or safely escort them from the ECP will remain severely limited.
>
> (26)   Due to ongoing security threats in the International Zone, safe and secure transport into and through the International Zone sufficient to facilitate routine immigrant visa operations is not currently possible. The Embassy will be unable to reopen to the public and provide routine visa services until it is possible to safely and securely transport members of the public through the International Zone and into the Embassy Compound. As set forth above, this frustrates the Department's ability to implement Steps 11 and 12 of the AAP.

**Ordered Departure**

(27)   On March 25, 2020, the Department of State ordered the departure of designated U.S. government employees from the U.S. Embassy in Baghdad and the Baghdad Diplomatic Support Center due to security conditions and the COVID-19 pandemic. That ordered departure remains in place.

(28)   As a result, from March 2020 until June of 2021, the U.S. Embassy in Baghdad's staffing was primarily limited to one U.S. citizen consular officer and one locally employed staff member.

(29)   These limitations in staffing due to security conditions and the COVID-19 pandemic impacts the Department's ability to implement Steps 11 through 14 of the AAP, by constraining the overall resources that the Department is able to deploy to support the services provided by the Embassy. These constraints are current as of April 2022. Nonetheless, the Embassy continues to prioritize SIV processing within these resource constraints.

**SIV Processing**

(30)   Operating within these highly challenging circumstances, the U.S. Embassy in Baghdad prioritizes SIV processing. As a top priority, the Embassy process to conclusion SIV cases that do not require an in-person appearance and thereby can be processed notwithstanding the Embassy's ongoing closure to the public. This supports the Department's engagement on Steps 13 and 14 of the AAP and facilitates the streamlined processing of applicable cases by allowing them to process to completion in-country, without necessitating travel by the applicant to another Immigrant Visa-designated Post.

(31)   Furthermore, in the Fall of 2021, the U.S. Embassy in Baghdad reinitiated the scheduling of in-person appointments for SIV applicants who are current employees and have access to the Baghdad Embassy Compound, and thereby do not implicate the barriers raised above because they are already located in the Compound. This supports the Departments engagement on Steps 11 through 14 of the AAP and facilitates the streamlined processing of applicable cases by allowing them to process to completion in-country, without necessitating travel by the applicant to another Immigrant-Visa designated Post.

(32)   As of March 22, 2022, there is only one Iraqi SQ-SIV case that is assigned to the U.S. Embassy in Baghdad that requires in-person processing and cannot be processed by the U.S. Embassy in Baghdad until the Embassy can resume public consular services. This case may pursue transfer to any Immigrant Visa-designated Post to complete processing.

**Transfers to Third Country Posts**

(33) Starting in March 2020, in light of the assault on the U.S. Embassy in Baghdad and resulting closure of the Embassy to the public, the National Visa Center began reassigning all Immigrant Visa applications that were originally destined for U.S. Embassy Baghdad to U.S. Embassy Ankara.

(34) The U.S. Embassy in Ankara prioritizes Iraq SQ-SIV cases, including by providing priority interview appointments. This supports the Department's efforts in relation to Steps 11 through 14 of the AAP, facilitating the interviews and adjudication of SIV cases that are unable to process through the U.S. Embassy in Baghdad due to the factors detailed above.

(35) As of March 24, 2022, there were 32 pending Iraqi SQ-SIV cases assigned to the U.S. Embassy in Ankara that have not yet been interviewed. None of these cases were documentarily complete as of March 24, 2022. This means that as of March 24, 2022, there was no further action that the Department was able to take on the cases assigned to the U.S. Embassy in Ankara, and these cases were awaiting applicant action in order to move forward in scheduling an interview under Step 11 of the AAP.

(36) Any cases that were previously assigned to the U.S. Embassy in Baghdad may request a transfer to any Immigrant Visa-designated Post to complete their processing. Additionally, applicants that have been assigned to the U.S. Embassy in Ankara but wish to process elsewhere may request a transfer to another Immigrant Visa-designated Post. These procedures impact Steps 11 through 14 of the AAP, providing alternative processing avenues for applicants that are unable to complete their Immigrant Visa processing at the U.S. Embassy in Baghdad.

(37) On or around February 28, 2022, the U.S. Embassy in Baghdad contacted all remaining cases that are assigned to the U.S. Embassy in Baghdad that have not been interviewed and have not either requested a transfer or expressed a preference to be interviewed in Baghdad upon the reopening of the Embassy to the public. The Embassy reiterated that the applicants may request transfer to a third country processing post to which they are able to travel. This effort impacts Steps 11 through 14 of the AAP, reminding applicants of the alternative processing avenues that they may seek to complete their Immigrant Visa processing while they are unable to complete processing at the U.S. Embassy in Baghdad.

**Engagement with U.S. Consulate General in Erbil**

(38) The U.S. Consulate General in Erbil is not an Immigrant Visa-designated Post. It does not have the required systems configuration to issue Immigrant Visas. As a result, the Consulate can only process Nonimmigrant Visas or provide American Citizen services. Posts that are not Immigrant Visa-designated Posts do not have the requisite

software or access to the necessary databases and other systems in order to process Immigrant Visas, nor is it technologically possible to transfer cases from an Immigrant Visa Post to a Post that is not Immigrant Visa-designated.

(39) The U.S. Consulate General in Erbil works within a very tight physical space, with only three service windows and one cashier window, and a small waiting room that had the capacity for only 15 applicants prior to the COVID-19 pandemic. The Consulate General does not have the physical capacity to safely store and process the significant physical paper filings associated with routine Immigrant Visa processing, and does not have the physical space to expand its storage capacities to provide such filing capabilities.

(40) Furthermore, although the U.S. Consulate General in Erbil is also impacted by COVID-19 and security challenges as detailed above, it was only able to provide limited appointments for Nonimmigrant Visa interviews until February 2022, when it restored full Nonimmigrant Visa operations

(41) The U.S. Consulate General in Erbil undertakes significant American Citizen services work, and has largely absorbed the American Citizen services previously provided by the U.S. Embassy in Baghdad. Due to this workload combined with the restrictions caused by COVID-19, the Consulate General was unable to engage in significant visa services until October 2021.

(42) Nonetheless, following the December 2019 attack and subsequent closure to the public of the U.S. Embassy in Baghdad, the U.S. Consulate General in Erbil has taken significant steps within these limitations to assist in the processing of SIV cases.

(43) For instance, beginning in the early part of 2020, the U.S. Consulate General in Erbil provided assistance to SIV processing by managing email traffic and conducting processing work on SIV cases that do not require an in-person appearance from an applicant. This supported Steps 13 and 14 of the AAP, and helped streamline SIV processing by providing support to and moving forward applications while the U.S. Embassy in Baghdad was unable to do so due to the limitations noted above.

(44) The U.S. Embassy in Baghdad assigned a locally employed staff member to provide SIV-specific assistance in the U.S. Consulate General in Erbil in January 2020. This included assistance to the activities described above. This supports the Department's efforts on Steps 13 and 14 of the AAP, and streamlines the SIV process by moving forward applications even while the Embassy is otherwise closed to the public.

(45) Beginning in December 2021, the U.S. Embassy in Baghdad regained the capacity to process cases that can be finalized without an in-person appearance by the applicant (such as applicants that previously made a personal appearance and who do not need to

(46)    Additionally, the U.S. Consulate General in Erbil attempted to utilize a new software technology to access the Baghdad Immigrant Visa data base in order to provide certain processing support to Baghdad Immigrant Visa cases, and in particular SIV cases. However, despite best efforts, this attempted software technology was largely unsuccessful in facilitating the effective processing of Immigrant Visa cases, either causing untenable processing delays due to technological failure or failing to perform at all.

(47)    The U.S. Consulate in Erbil continues to provide assistance in SIV processing for certain cases that have already been interviewed but require an in-person appearance prior to adjudication, such as a renewed oath or the taking of fingerprints. This has provided a significant contribution to SIV processing; in the month of March 2022, Erbil's assistance facilitated fingerprinting for 21 SIV applicants. This supports the Department's efforts in relation to Steps 13 and 14 of the AAP, and streamlines SIV processing by facilitating the adjudication of SIV applicants without necessitating their travel to another Immigrant Visa-designated Post.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

*[signature: Daniel G. Mickelson, May 13, 2022]*

Dated: May 13, 2022

_____
Daniel Mickelson
Division Chief
Visa Office
Bureau of Consular Affairs
United States Department of State