# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>– against –<br><br>ANTONY BLINKEN, *et al.*,<br><br>Defendants. | Case No. 18-cv-01388-TSC |

I, Sara M. Craig, hereby submit this declaration under penalty of perjury:

(1) I am employed by the U.S. Department of State as the Managing Director for Visa Services in the Directorate of Visa Services (VO).

(2) Within VO, several offices are involved with the Special Immigrant Visa (SIV) program.  The Office of Field Operations (F) provides policy and procedural guidance to consular officers in the field, drafts a variety of reports relating to the SIV program, and coordinates with other Department of State bureaus and other government agencies on SIV issues.  The Office of Screening, Analysis, and Coordination (SAC) administers in-house security checks for some applicants and facilitates and coordinates other SIV applicants for interagency processing.  The Office of Domestic Operations (DO), which includes the National Visa Center (NVC), handles pre-processing and case creation for the Chief of Mission approval process, inquiries from applicants and congressional offices, as well as SIV petition intake and visa application processing and scheduling.  The Office of Information Management and Liaison (I) monitors and assists consular officers in the field with visa-related systems issues.

**Effect of COVID-19 on Visa Processing**

(3) The Department of State's ability to carry out visa operations in a country depends on ensuring a safe and secure environment for staff and applicants.  In response to the COVID-19 pandemic, the Department suspended visa services from March 20, 2020, until July 15, 2020.  Since July 2020, VO has worked with posts on the resumption of visa services based on fluid global and country-specific conditions, which include COVID-19 infection rates, new COVID-19 variants, and the feasibility of

various safety measures given the need for in-person processing.  The impact of COVID-19 on the Department's operations has been severe.  Total nonimmigrant and immigration visa adjudications for 2020 fell to 46 percent of what they were in 2019.  In 2021, visa adjudications were 28 percent of what they were in 2019.  During this period, backlogs for visa services increased considerably at nearly all posts.  For family- and employment-based immigrant visas (IVs), which include Afghan SIVs, the backlog of applicants deemed ready for interview but waiting availability of an IV interview at a post overseas increased by approximately 440 percent from approximately 78,000 in January 2020 to 421,136 in May 2022.

**Prioritization of Afghan SIV Applicants**

(4) Because of the significant and sustained reduction in visa operations and the resulting backlog in visa applications, the Department instructed posts on how to prioritize visa operations during the phased resumption of routine visa services in November 2020.  After American Citizen Service, IVs were the highest priority consular service and Afghan SIVs were a top priority category for IVs.  The Department's prioritization of Afghan SIVs reflected its commitment to ensuring the fastest possible adjudication of these cases.  In November 2021, the Department informed posts that the prioritization guidance no longer applied and that consular chiefs had flexibility to prioritize their workloads based on the specific conditions at their posts.  However, the Department instructed posts that they should continue to prioritize Afghan SIVs.  Afghan SIV applicants who request to be processed at a post are automatically scheduled for an interview during the post's next monthly scheduling cycle and posts may take further action to ensure such applicants' applications are further expedited in their scheduling and adjudication.

**Suspension of Services at U.S. Embassy Kabul and Department of State Response**

(5) On August 31, 2021, the Department suspended all operations at the U.S. Embassy Kabul because of the worsening security situation in the country, and operations remain suspended.  On August 15, 2021, personnel from the U.S. Embassy in Kabul evacuated from the embassy compound to the Kabul International Airport.  Despite a volatile security environment, the Department of State flew in 28 temporary duty officers into Afghanistan to support relocation efforts, including for Afghan SIVs, at the Kabul International Airport.

(6) Applicants in Afghanistan face significant hurdles to travel to a third country for the requisite in-person steps of the Afghan SIV process.  To name a few challenges, applicants may have difficulty securing a passport from the current government in Afghanistan, obtaining a visa from a third-country government, securing flights or other modes of transportation out of the country, and paying expenses associated with travel.  These and other factors that the Department does not control can significantly delay U.S. visa processing.

(7) After the suspension of operations at Embassy Kabul in August 2021, CA worked to establish the Afghan Affairs Unit (AAU) to operate from Camp As Sayliyah (CAS), a U.S. Army base in Qatar.  In November 2021, the governments of the United States and Qatar entered into an agreement to permit up to 8,000 Afghans to be temporarily admitted into Qatar at any given time while onward processing is completed, including the adjudication of Afghan SIVs.  Because of challenges in transporting Afghan

SIV and other applicants from CAS to U.S. Embassy Doha, CA worked extensively to set up visa service operations at CAS. The AAU consular section at CAS allows U.S. consular staff to capture SIV applicants' biometrics and perform interviews. The Department also has an onsite panel physician to conduct the required immigration medical exams at no cost to applicants. This is the first operation of its kind worldwide and was a major initiative requiring coordination between multiple agencies within the U.S. government. The cost associated with setting up and maintaining these operations is in the tens of millions of dollars.

(8) There are currently six consular officers, including temporary duty staff, and three locally employed staff at AAU. The AAU consular section devotes the vast majority of its time to providing visa services for Afghan SIV cases. Additionally, consular staff at posts worldwide also provide visa services to Afghan SIVs wherever they may appear. VO has increased its stateside staffing from one analyst handling the Afghan SIV portfolio in 2020 to three analysts that now handle the portfolio. This is just staff devoted to these portfolios; the Department also involves other staff to assist with overflow work and as-needed for certain tasks and projects related to Afghan SIVs. For example, VO staff from various groups have been contributing a significant number of hours to preparing data for quarterly congressional reports and litigation reports as well as working with Department of State's Office of the Inspector General (OIG) on a review of the Afghan SIV program.

(9) Consular officers in the AAU interview Afghan SIV applicants who are admitted to CAS as well as coordinate with other posts and stakeholders to support processing for cases that were previously assigned to the U.S. Embassy Kabul, to the extent possible. The creation of the AAU was an extraordinary step to retain expertise within the region, including expertise specialized to the processing of Afghan SIV applications. In March 2022, the most recent month for which data is available, consular officers conducted a total of 252 Afghan SIV interviews at CAS.

(10) Outside of cases processed at CAS, Afghan SIV applicants frequently have difficulty obtaining the required medical exams upon arrival to a third country. There are currently no panel physicians in Afghanistan that can perform the required exams prior to an applicant's departure. As a result, applicants that appear at a third-country post often require additional time before or after their interviews to meet all medical eligibility requirements, which can lengthen the time required to process their visas.

**Post-Interview Administrative Processing of Afghan SIV Applicants**

(11) After an applicant is interviewed, his or her case may be refused and placed into administrative processing to resolve any questions on the applicant's eligibility for the Afghan SIV. The amount of time needed for administrative processing varies based on several factors, including whether it is security-related, the nature and complexity of the issue requiring resolution, and whether third-party input is requested. In many cases, interagency administrative processing is coordinated by SAC.

(12) VO has instituted several measures to ensure the expeditious resolution of administrative processing for Afghan SIV applicants. In August 2021, at VO's request, the interagency removed a step in administrative processing for Afghan SIVs to facilitate faster resolution. In the fourth quarter of fiscal year 2021, administrative processing for 87 percent of Afghan SIVs was completed within 30 days

of initiation.  SAC currently does not have any cases solely in the control of the Department of State that have been pending for more than 90 days.  A small percentage of Afghan SIV cases require more than 90 days to process, which is generally due to security concerns requiring third-party agency input.  The Department has instituted a blanket policy for requesting expedites from third-party agencies for all Afghan SIV cases.

**Systems Limitations and Visa Processing Times**

(13)     Due to systems limitations, VO is unable to disaggregate pre- and post-interview processing time that is attributable to the applicant or to the Department.  As discussed above, Afghan SIV applicants are scheduled in the next monthly scheduling cycle once they indicate that they can appear at an IV-processing post.  The Department is unable to disaggregate time associated with applicant-controlled actions, such as before the applicant indicates that they are able to travel and any time that the applicant must delay their appointment.  Further, VO is also unable to disaggregate any administrative processing time that is a result of internal Department administrative processing or awaiting third-party agency input.  For these reasons, the reported processing times are overestimations of the actual processing time that is attributable to the Department.

**Effect of Real-World Events on Visa Operations**

(14)     VO remains committed to supporting Afghan SIVs at every step of the process.  This commitment will not wane as we face other country-specific and global challenges.  The situation in Ukraine, like the COVID-19 pandemic, demonstrates the kind of unforeseen circumstances that arise in the implementation of worldwide visa operations.  The Department has taken extraordinary steps to address the demand for consular services arising from the situation in Ukraine, including sending 82 temporary duty personnel to Warsaw, Krakow, Rzeszow, Frankfurt, Berlin, Prague, Bratislava, Budapest, Bucharest, and Chisinau.  These consular personnel provide emergency American citizen services for U.S. citizens killed or injured in Ukraine, document U.S. citizen babies born of surrogacy in Ukraine, help U.S. citizens and their immediate family members return to the United States, accept I-130 immigrant visa petition filings from U.S. citizens for their immediate relatives, and conduct immigrant and nonimmigrant visa interviews for Ukrainian applicants.  Although the situation in Ukraine has required a particularly significant response, the Department must constantly make decisions about how to allocate consular resources due to changes in country conditions.  Just in the last year, the Department has had to make such decisions in response to the civil war in Ethiopia, the drawdown of our diplomatic corps in Moscow, strict restrictions in China due to COVID-19, and protests in Kazakhstan.  While such unforeseen circumstances test our resources, they do not affect our devotion to fulfilling our obligations across the globe.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.


Dated: May 13, 2022

                                            Sara M. Craig
                                            Managing Director for Visa Services
                                            Directorate of Visa Services
                                            United States Department of State