**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

AFGHAN AND IRAQI ALLIES,

      Plaintiffs,

    v.

ANTONY J. BLINKEN, *et al.*,

      Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:18-cv-01388-TSC

**DEFENDANTS' MOTION FOR RELIEF FROM THE COURT'S**
**SUMMARY JUDGMENT ORDER AND THE APPROVED ADJUDICATION PLAN**

      Pursuant to Fed. R. Civ. P. 54(b) or, in the alternative, Fed. R. Civ. P. 60(b)(5) and (b)(6),

Defendants move this Court for relief from its September 20, 2019 Memorandum Order granting

partial summary judgment to Plaintiffs and its June 14, 2020 Approved Adjudication Plan.[1]

Specifically, Defendants request that the Court revise its summary judgment decisions on Counts

1 and 2 of the Amended Complaint and vacate the Approved Adjudication Plan. Should the court

decline to terminate the injunction and instead find that modification is appropriate, Defendants

request the opportunity to propose, within 30 days of resolution of this motion, a new plan for

promptly processing and adjudicating the applications of current class members. A

Memorandum of Points and Authorities, exhibits, and Proposed Order accompany this Motion.

_____

[1] On May 16, 2022, and pursuant to Local Rule 7(m), Defendants' counsel conferred with
Plaintiffs' counsel regarding this motion via telephone. Plaintiffs' counsel stated that they oppose
the motion.

Dated: May 24, 2022                     Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        WILLIAM C. PEACHEY
                                        Director, Office of Immigration Litigation
                                        District Court Section

                                        YAMILETH G. DAVILA
                                        Assistant Director

                                        STEVEN A. PLATT
                                        Senior Litigation Counsel

                                        SEAN L. KING
                                        VAUGHN D. SPENCER
                                        Trial Attorneys

                                        */s/Ruth Ann Mueller*
                                        RUTH ANN MUELLER
                                        D.C. Bar No. 1617339
                                        Trial Attorney
                                        U.S. Department of Justice, Civil Division
                                        Office of Immigration Litigation
                                        District Court Section
                                        P.O. Box 868, Washington D.C. 20044
                                        202-598-2445
                                        ruth.a.mueller@usdoj.gov

                                        *Counsel for Defendants*

## TABLE OF CONTENTS

**Page**

GLOSSARY..............................................................................................................................

INTRODUCTION.......................................................................................................................1

LEGAL AND PROCEDURAL BACKGROUND ...................................................................3

I.    AFGHAN AND IRAQI SPECIAL IMMIGRANT VISA PROGRAM.........................3

II.   PROCEDURAL BACKGROUND ...............................................................................5

III.  GLOBAL EVENTS AND PROGRAM IMPROVEMENTS SINCE SEPTEMBER 20, 2019 ..............................................................................................................................7

ARGUMENT ..............................................................................................................................9

I.    THE COURT SHOULD REVISE ITS UNDUE DELAY DETERMINATION AND VACATE THE INJUNCTION TO ACCOUNT FOR CHANGED LAW AND FACTS UNDER RULE 54(b)........................................................................................9

    A.   Legal Standard under Rule 54(b) ...............................................................9

    B.   There Are Good Reasons to Revise the *TRAC* Analysis ......................10

    C.   Factors 1 and 2 Favor Defendants Because The Agencies' Implementation of the SIV Program Is Reasonable Given the Circumstances ................................11

    D.   Factors 3 and 5 Favor Defendants Because Delays in Processing SIVs Are Not Egregious Where the Program Implicates Foreign Affairs, Immigration, and National Security Decision-Making ..........................................................................27

    E.   Factor 4 Favors Defendants Because Compelling the Agencies to Transfer Further Resources to SIV Processing Would Adversely Affect the Agencies' Ability to Act on Competing Priorities .................................................................31

    F.   Factor 6 Favors Defendants Because They Have Acted in Good Faith .............34

II.   ALTERNATIVELY, IF THE COURT FINDS THAT RULE 54(b) DOES NOT APPLY, DEFENDANTS ARE STILL ENTITLED TO RELIEF UNDER RULE 60(b)(5) AND (b)(6) ...................................................................................................36

    A.   Legal Standard for Relief under Rules 60(b)(5) and (b)(6) ..................................36

i

**B.      Control of the SIV Program Should Be Returned to the Political Branches**......37

**C.      Applying the Previous Orders Prospectively Is No Longer Equitable**................39

**D.      Compliance with the Injunction Is No Longer Practicable** ..................................43

**III.    IF THE COURT OPTS TO MODIFY THE PLAN, IT SHOULD ALLOW DEFENDANTS TO PROPOSE A NEW PLAN** ................................................................43

**CONCLUSION** ........................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

### CASE LAW

*Ackermann v. United States*,
  340 U.S. 193 (1959)................................................................................. 37, 42

*Action on Smoking & Health v. Dep't of Labor*,
  100 F.3d 991 (D.C. Cir. 1996)................................................................ 32

*\*Afghan & Iraqi Allies v. Pompeo*,
  2019 WL 4575565 (D.D.C. Sept. 20, 2019)....................................... 5, 29

*Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*,
  750 F.2d 81 (D.C. Cir. 1984)............................................................... 10, 11

*Am. Council of the Blind v. Mnuchin*,
  878 F.3d 360 (D.C. Cir. 2017)............................................................. 36, 39

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d (D.C. Cir. 2016)..................................................................... 34

*Bankers Mortg. Co. v. United States*,
  423 F.2d 73 (5th Cir. 1970).................................................................. 37, 43

*Cobell v. Jewell*,
  802 F.3d 12 (D.C. Cir. 2015)................................................................ 9

*Cobell v. Norton*,
  224 F.R.D. 266 (D.D.C. 2004)............................................................. 9

*\*Cobell v. Norton*,
  355 F. Supp. 2d 531 (D.D.C. 2005)..................................................... 9

*Ctr. for Sci. in the Pub. Int. v. United States Food & Drug Admin.*,
  74 F. Supp. 3d 295 (D.D.C. 2014).................................................. 27, 32, 34

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987)............................................................. 25

*Dastagir v. Blinken*,
  557 F. Supp. 3d 160 (D.D.C. 2021)..................................................... 18

*\*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

*EMR Network v. FCC*,
   391 F.3d 269 (D.C. Cir. 2004) ................................................................. 32

*FEC v. Rose*,
   806 F.2d 1081 (D.C. Cir. 1986) ............................................................... 32

*Good Luck Nursing Home, Inc. v. Harris*,
   636 F.2d 572 (D.C. Cir. 1980) ................................................................. 43

*Grand Canyon Air Tour Coal. v. FAA*,
   154 F.3d 455 (D.C. Cir. 1998) ................................................................. 26

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) ................................................................................. 27

*Heath v. De Courcy*,
   888 F.2d 1105 (6th Cir. 1989) ................................................................. 41

*Horne v. Flores*,
   557 U.S. 433 (2009) ............................................................ 36, 37, 40, 43

*In re Aiken Cnty.*,
   725 F.3d 255 (D.C. Cir. 2013) ................................................................. 26

*In re Am. Fed'n of Gov't Emps.*,
   837 F.2d 503 (D.C. Cir. 1988) ................................................................. 34

*In re Am. Rivers & Idaho Rivers United*,
   372 F.3d 413 (D.C. Cir. 2004) ................................................................. 26

*In re Barr Labs., Inc.*,
   930 F.2d 72 (D.C. Cir. 1991) ..................................... 14, 32, 33, 38

*In re Pearson*,
   990 F.2d 653 (1st Cir. 1993) ................................................................... 38

*In re Pub. Emps. for Env't*,
   *Resp.*, 957 F.3d 267 (D.C. Cir. 2020) ....................................... 11, 24, 40

*In re United Mine Workers*,
   190 F.3d 545 (D.C. Cir. 1999) ................................................................. 10

*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

iv

*INS v. Miranda*,
  459 U.S. 14 (1982) ............................................................................................ 11, 21

*Jolly v. Listerman*,
  672 F.2d 935 (D.C. Cir. 1982) .................................................................................... 25

*Jud. Watch v. Dep't of Army*,
  466 F. Supp. 2d 112 (D.D.C. 2006) ............................................................................. 9

*Khan v. Blinken*,
  No. CV 21-1683 (JEB), 2021 WL 5356267 (D.D.C. Nov. 17, 2021) .................................... 18

*Klapprott v. United States*,
  335 U.S. 601 (1949) .................................................................................................. 43

*Liberty Fund, Inc. v. Chao*,
  394 F. Supp. 2d 105 (D.D.C. 2005) ............................................................................. 34

*\*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ......................................................................... *passim*

*\*Mathews v. Diaz*,
  426 U.S. 67 (1976) ............................................................................................. 27, 38

*Murway v. Blinken*,
  No. CV 21-1618 (RJL), 2022 WL 493082 (D.D.C. Feb. 16, 2022) ...................................... 18

*Muwekma Tribe v. Babbitt*,
  133 F. Supp. 2d 30 (D.D.C. 2000) .............................................................................. 32

*Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*,
  168 F. Supp. 3d 268 (D.D.C. 2016) ....................................................................... 28, 29

*Palakuru v. Renaud*,
  521 F. Supp. 3d 46 (D.D.C. 2021) .............................................................................. 35

*Petties ex rel. Martin v. D.C.*,
  662 F.3d 564 (D.C. Cir. 2011) ................................................................................... 42

*Potomac Elec. Power Co. v. ICC*,
  702 F.2d 1026 (D.C. Cir. 1983) ................................................................................. 26

*\*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

*Rufo v. Inmates of Suffolk Cnty. Jail,*
  502 U.S. 367 (1992) ........................................................................ 36, 38, 42, 43

*Sierra Club v. Thomas,*
  828 F.2d 783 (D.C. Cir. 1987) ........................................................ 33, 34

*Skalka v. Kelly,*
  246 F. Supp. 3d 147 (D.D.C. 2017) ................................................ 27, 37

*Telecomm. Rsch. & Action Ctr. v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) ........................................................ *passim*

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) .................................................................. 38

*United States v. All Assets Held at Bank Julius Baer & Co.,*
  308 F. Supp. 3d 186 (D.D.C. 2018) ................................................ 10

*United States v. Maria,*
  186 F.3d 65 (2d Cir. 1999) ............................................................ 25

*United States v. W. Elec. Co.,*
  46 F.3d 1198 (D.C. Cir. 1995) ...................................................... 42

*Uranga v. USCIS,*
  490 F. Supp. 3d 86 (D.D.C. 2020) ................................................ 35

*Zaman v. U.S. Dep't of Homeland Sec.,*
  No. CV 19-3592 (ABJ), 2021 WL 5356284 (D.D.C. Nov. 16, 2021) ..................... 18

## FEDERAL STATUTES

8 U.S.C. § 1101 ............................................................................ 3

8 U.S.C. § 1157 ............................................................................ 3

8 U.S.C. § 1201(g) ........................................................................ 28

8 U.S.C. § 1202(e) ........................................................................ 13

*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

## FEDERAL REGULATIONS

22 C.F.R. § 42.62(a) ................................................................................................ 13

22 C.F.R. § 42.62(b) ................................................................................................ 13

## PUBLIC LAW

Pub. L. No. 110-181 ................................................................................................... 3

Pub. L. No. 111-8 ....................................................................................................... 3

Pub. L. No. 113-66 ..................................................................................................... 4

Pub. L. No. 117-31 ..................................................................................................... 5

## FEDERAL RULES OF CIVIL PROCEDURE

*Fed. R. Civ. P. 54(b) .......................................................................................... *passim*

*Fed. R. Civ. P. 60(b)(5) ...................................................................................... *passim*

*Fed. R. Civ. P. 60(b)(6) ...................................................................................... *passim*

Fed. R. Civ. P. 65(a)(2) .............................................................................................. 5

## FEDERAL REGISTER

Exec. Order No. 14012, 86 Fed. Reg. 8277 (Feb. 2, 2021) .................................. 18, 19

Exec. Order No. 14013, 86 Fed. Reg. 8839 (Feb. 4, 2021) .................................. 19, 30

## MISCELLANEOUS

U.S. DOS, *Report to Congress on Joint Department of State/Department of Homeland Security
   Report: Status of the Afghan Special Immigrant Visa Program* (Jan., 2022),
   https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q1-January-
   2022.pdf .................................................................................................................. 15

*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

U.S. DOS, *Report to Congress on Process by which Applications for Special Immigrant Visas under Special Immigrant Status for Certain Iraqis Are Processed Section 1218 (g) of the National Defense Authorization Act of 2014 (P.L.113-66)* (Jan., 2022), https://travel.state.gov/content/dam/visas/SIVs/Iraqi-Public-Quarterly-Report-Q1-January-2022.pdf.................................................................................................................... 15

U.S. DOS, *Visas* (2022), https://af.usembassy.gov/visas/ ................................................................................................ 12

U.S. DOS, *Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government* (2022), https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html.................................................................................................................. 6

*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

## **GLOSSARY OF ABBREVIATIONS**

| | |
|---|---|
| AAPA | Afghan Allies Protection Act of 2009 |
| APA | Administrative Procedure Act |
| ASIV | Afghan Special Immigrant Visa Unit |
| BIA | Bureau of Indian Affairs |
| CAC | Consular Compound Access Control |
| CA/CST | Department of State's Office of Consular Systems and Technology |
| COM | Chief of Mission |
| ESSAA | Emergency Security Supplemental Appropriations Act, 2021 |
| FDA | Food and Drug Administration |
| NVC | National Visa Center |
| RCIA | Refugee Crisis in Iraq Act of 2007 |
| RFE | Request for Evidence |
| SCOPS | USCIS's Service Center Operations Directorate |
| SIV | Afghan and Iraqi Special Immigrant Visa |
| *TRAC* | *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) |
| USCIS | U.S. Citizenship and Immigration Services |

## INTRODUCTION

The circumstances that gave rise to this case have changed dramatically since the Court issued its orders finding unreasonable delay and adopting an adjudication plan for the processing of Special Immigrant Visa ("SIV") cases. The centerpiece of that plan for Afghan SIV applicants was an immigrant visa interview of the Afghan national principal applicant and their derivatives at the U.S. Embassy in Kabul. But since the Court last addressed substantive issues in this case, the Taliban seized control of Afghanistan and the United States suspended operations at its embassy in Kabul, rendering it impossible to provide visa services in Afghanistan. The Taliban takeover also precipitated a humanitarian crisis that has exponentially increased inquiries and submissions to the Defendant agencies from those attempting to flee the country. For example, the Department of State's National Visa Center ("NVC") received 352,476 SIV-related inquiries in August 2021 and September 2021 *alone*, more than it received over the course of almost six years from March 2015 to December 2020. Defendants are committed to processing SIV cases, and indeed (as explained below) have surged resources to do so. But Defendants are now largely dependent on each applicant's ability and resources to travel outside of Afghanistan to complete their visa application interviews at another U.S. Embassy or consular post. Meanwhile, the Taliban continues to hinder Department of State efforts to facilitate relocation flights for Afghan nationals, including Afghan SIV applicants.

The Taliban takeover in Afghanistan is not the only major development that has affected the SIV program. Defendants' operations worldwide have been affected by the COVID-19 pandemic, which for two years has substantially curtailed their ability to conduct in-person operations, including immigrant visa interviews. The U.S. Embassy in Baghdad has been subject to a continuing security crisis over the last two years, which has prevented the full reopening of

the embassy and consequently the embassy's ability to conduct immigrant visa interviews for most applicants in Iraq.

All of this has come at a time when Congress has *expanded* eligibility for SIVs, thus significantly increasing the number of applications that Defendants must review. Despite all of these challenges, Defendants have demonstrated their ongoing commitment to improving the SIV program to reduce wait times and prioritize resources. As explained below and in the accompanying declarations, Defendants have increased staffing, streamlined individual processing steps, made technological improvements, and rotated temporary duty staff to support third-country processing, among other efforts. But the fact remains that Defendants are managing Afghan and Iraqi SIV programs unrecognizable from those that existed in 2019 and 2020.

Under current circumstances, Defendants are not unreasonably delaying the processing of SIV applications. Whatever might have been the case in 2019 and 2020, the attached declarations show that Defendants, fully cognizant of the situation facing many SIV applicants, are moving as expeditiously as possible to adjudicate the significantly increased number of SIV applications. In fact, and as discussed more below, Defendants have already reduced the total average processing time for an Afghan SIV application to 587 days in the most recent quarter of the fiscal year.

For these reasons and those explained further below, the Court should exercise its authority under Rule 54(b) to revise its interlocutory summary judgment decisions on Counts 1 and 2 of the Amended Complaint, enter judgment for Defendants, and vacate the Court's corresponding remedy, the Approved Adjudication Plan (the "Plan"). Alternatively, should the Court find that its summary judgment decision and corresponding Plan do not fall under the purview of Rule 54(b), the Court should still relieve Defendants of the Court's orders under Rule 60(b)(5) because "applying [the Court's orders] prospectively is no longer equitable" and under

Rule 60(b)(6) for "any other reason that justifies relief." Finally, if the Court concludes that terminating the injunction is not warranted, Defendants request that the Court modify the injunction and permit Defendants to propose within 30 days of resolution of this motion a new plan for promptly processing and adjudicating the applications of current class members.

## LEGAL AND PROCEDURAL BACKGROUND

### I.    AFGHAN AND IRAQI SPECIAL IMMIGRANT VISA PROGRAM

Certain Afghan and Iraqi nationals who have worked for or on behalf of the U.S. government in their home countries, and who experienced threats because of their service, are eligible for SIVs entitling them to apply for admission into the United States. Refugee Crisis in Iraqi Act of 2007 ("RCIA"), Pub. L. No. 110-181, § 1244, 122 Stat. 395 (2006), *codified as amended in* 8 U.S.C. § 1157 note; Afghan Allies Protection Act of 2009 ("AAPA"), Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009), *codified as amended in* 8 U.S.C. § 1101 note. Congress established a 14-step process for an Afghan or Iraqi national to obtain an SIV. *See* ECF No. 113-1. As part of that process,[2] the applicant must submit three distinct applications to be reviewed

---

[2] In September 2019, the 14 steps were:
1) The applicant submits to the NVC an application for approval by the COM. Application materials must include a "statement of credible threat" detailing the ongoing threat to the applicant as a result of the applicant's service and a letter of recommendation from a supervisor attesting to the applicant's "faithful and valuable service."
2) NVC reviews the documentation for completeness.
3) NVC sends the application materials to the COM in either Afghanistan or Iraq.
4) The COM adjudicates the application.
5) NVC informs the applicant of the result. If COM approval is denied, the applicant has 120 days to appeal.
6) If COM approval is granted, the applicant submits to U.S. Citizenship and Immigration Services ("USCIS") a I-360 petition for categorization as a special immigrant.
7) USCIS adjudicates the I-360 petition.
8) If the petition is approved, NVC requests standard documentation for the immigrant visa from the applicant.

and decided by three distinct governmental entities, each accompanied by supporting documentation: (1) an application for Chief of Mission ("COM") approval; (2) a Form I-360 petition; and (3) a visa application. *Id.*

Congress has amended the RCIA and AAPA several times. In 2013, Congress created four new positions to help coordinate and oversee the SIV program. Congress required the Secretaries of State and Homeland Security to each designate a "senior coordinating official." National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, 127 Stat 672 (Dec. 26, 2013). Congress also directed the Secretary of State to designate an "Afghan Special Immigrant Visa Coordinator" and an "Iraqi Special Immigrant Visa Coordinator" in the U.S. Embassies in Kabul and Baghdad, respectively. AAPA § 602(b)(2)(D)(ii)(II); RCIA § 1244(b)(2)(D)(ii). In 2020, the Department of State designated such officials, and both the Department of State and the Department of Homeland Security additionally designated a respective Senior Coordinating Official for the Iraqi and Afghan Special Immigrant Visa Programs, for a total of four coordinating roles. Defendants each made further changes to the Senior Coordinating Official designations in 2021. ECF No. 101-1; ECF No. 139.

---

9)   The applicant submits that documentation along with an immigrant-visa application to NVC.

10)  NVC reviews the documentation for completeness and eligibility.

11)  NVC determines that the applicant is documentarily eligible, it contacts the applicant to schedule an interview at the embassy in Afghanistan or Iraq.

12)  The applicant attends an interview conducted by a consular officer at the embassy.

13)  If the application is otherwise qualified, the applicant's case may undergo background checks.

14)  If the applicant's case clears background checks, the applicant is directed to obtain a medical exam. Once submitted, the Department of State reviews the medical exam results and issues the immigrant visa if the applicant is eligible.

*See* Plan 2–7 (ECF No. 113-1) (recognizing these steps).

In July 2021, and as discussed in greater detail *infra*, Congress once again materially amended the Acts, including by making explicit that "all steps, including Chief of Mission approval, under the control of the respective departments incidental to the issuance of [SIVs] . . . should be completed not later than 9 months" after the date on which an applicant has submitted all required materials to complete an application for an SIV. Emergency Security Supplemental Appropriations Act, 2021 ("ESSAA"), Pub. L. No. 117-31, tit. IV, 135 Stat 309. Congress also modified certain employment criteria, substantially broadening those eligible to apply for SIVs: In particular, Congress reduced from two years to one year the period of qualifying employment and removed the previous requirement that those applicants have performed "sensitive and trusted" activities. *Id.* § 401(a). Congress also required a new comprehensive report on the SIV program to be delivered in July 2022. *Id.* § 401(c).

## II.     PROCEDURAL BACKGROUND

In July 2018, Plaintiffs filed an amended, five-count, putative class-action complaint. Am. Compl. (ECF No. 23). In Count 1, Plaintiffs seek a declaration that the government has failed to satisfy its non-discretionary duty to adjudicate their SIV applications within 9 months. *Id.* ¶¶ 68–71. Count 2 seeks an order under the Administrative Procedure Act ("APA") "compelling [the government] to adjudicate their SIV applications." *Id.* ¶¶ 72–77. Count 3 seeks a writ of mandamus to adjudicate their SIV applications, and Counts 4 and 5 seek the government's appointment of SIV coordinators. *Id.* ¶¶ 78–92.

Plaintiffs moved for a preliminary injunction in September 2018, and the Court heard argument in July 2019. ECF Nos. 34, 72. In September 2019, the Court consolidated that motion with the trial on the merits under Fed. R. Civ. P. 65(a)(2), and granted summary judgment to Plaintiffs on Counts 1 and 2. *Afghan & Iraqi Allies v. Pompeo*, 2019 WL 4575565 at *1 (D.D.C.

Sept. 20, 2019). Applying the six *TRAC* factors, the Court determined that Plaintiffs were entitled to relief because Defendants' timelines for processing and adjudicating SIV applications were unreasonable. *Id.* at *5 (citing *Telecomm. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984)). The Court ordered Defendants to submit a plan for the prompt adjudication of SIV applications.[3] *Id.* at *11. After rejecting Defendants' proposed adjudication plan, on April 15, 2020, the Court ordered the parties to propose an adjudication plan consistent with its summary judgment order. ECF No. 106. On June 14, 2020, the Court approved the Plan which provided relief to class members waiting in government-controlled steps for nine months or longer as of May 21, 2020. ECF No. 113.

The Plan imposes two general requirements on Defendants. First, the Plan provides a timing benchmark for each of the 14 steps of the SIV process. For example, at Step 2, NVC must complete review within 15 days of receipt of a COM application to determine whether the applicant submitted all of the required items for COM review. Plan at 2 (ECF No. 113-1). Second, the Plan requires Defendants to submit regular quarterly progress reports that tag and track the specific class members to whom the Plan applies through the steps of the SIV process.[4] *Id.* at 7–8. These progress reports must identify the number of class members within each step

---

[3] On February 5, 2020, the Court certified a class of "all people who have (1) applied for an Afghan or Iraqi SIV pursuant to the [AAPA or RCIA], by submitting an application for COM approval, and (2) whose applications have been awaiting government action for longer than 9 months." ECF No. 89 at 1.

[4] The Plan imposes reporting obligations that are significantly more burdensome than those imposed by Congress. The AAPA and RCIA require Defendants to submit detailed congressional reports every quarter, as discussed in further detail in Argument section I.D. These congressional reports assess the average processing times within each step of the SIV program and address whether Defendants are meeting the nine-month benchmark under the AAPA and RCIA. *See, e.g.,* https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html. The Plan, however, established benchmarks for *each* of the 14 steps of the SIV process and requires Defendants to report on their progress in meeting those benchmarks, as well as an explanation for why any benchmark is not met. ECF No. 113-1.

during the relevant reporting period and the movement of those individuals between those steps. *See id*. If Defendants' performance does not meet the target timeframe for any step, the report must "explain why Defendants' performance did not meet the target timeframe and, if appropriate," include "actions to be taken to bring performance back in line with the performance standard." *See id*. Since the Plan was entered, Defendants have submitted four quarterly progress reports, most recently in July 2021, after which the parties stipulated to stay proceedings and the Plan to pursue settlement discussions. *See* ECF No. 144; *see also* Am. Joint Stipulation & Proposed Stipulated Order (ECF No. 147). The Court has since continued the stay pending further order of the Court.

## III.   GLOBAL EVENTS AND PROGRAM IMPROVEMENTS SINCE SEPTEMBER 20, 2019

Significant changed circumstances over the last two years—including the United States' withdrawal from Afghanistan, the fall of Kabul, and the suspension of operations at U.S. Embassy Kabul—have fundamentally altered the SIV program and Defendants' implementation of it. Because of the ongoing humanitarian crisis in Afghanistan, the Department of State is facing an unprecedented surge of inquiries and submissions to the NVC inbox that services SIV applicants. For example, Defendants received more inquiries and submissions to that NVC inbox in August 2021 and September 2021 *alone* than they received over the course of almost six years before. Ex. A, Declaration of Maren Brooks ("Brooks Decl.") ¶ 66. And as of May 10, 2022, approximately 41,581 applications were pending at the pre-COM phase, up from 7,996 applications as of September 30, 2019. *See id.* ¶ 67.

Not only have new applications and inquiries inundated the agencies, the suspension of operations at Embassy Kabul has rendered it impossible for the Department of State to complete visa application interviews in Afghanistan for those SIV applicants in the final steps of the Plan.

Applicants must now travel to a U.S. Embassy or consular post in a third country to complete their immigrant visa interview for Plan Steps 11 through 14. Whether and when such travel occurs depends on numerous factors outside of Defendants' control, including each applicant's willingness and ability to travel, third-country cooperation, and inconsistent and changing Taliban restrictions on movement. Brooks Decl. ¶¶ 45–63. Nevertheless, the Department of State continues to prioritize Afghan SIV applicants that are able to appear at any immigrant visa processing post outside of Afghanistan and to complete all other steps of the process that do not require an in-person appearance. *Id.* ¶¶ 49–50.

The COVID-19 pandemic and the current security situation in Iraq have presented additional challenges to SIV processing. In particular, pandemic-related delays in rebuilding U.S. Embassy Baghdad's consular compound, and ongoing threats and attacks, have prevented that embassy from fully reopening for public consular services necessary to complete immigrant visa processing for most Iraqi SIV applicants. *See* Ex. B, Declaration of Daniel Mickelson ("Mickelson Decl.") ¶¶ 3–8.

Despite all of these challenges, Defendants have been working assiduously to improve the SIV program's efficiency. Defendants have increased staffing at all SIV program offices, assigned temporary duty staff to support third-country SIV processing, made technological improvements to streamline the COM and I-360 phases of the Plan, and simplified various steps at the COM phase to reduce the burdens on applicants. *See* Brooks Decl. ¶¶ 21–22. Despite the extraordinary and sudden increase in demand, these measures have improved processing times in such areas as the COM approval phase and expanded the NVC's ability to process the flood of inquiries and submissions. *See, e.g., id.* ¶ 8.

## ARGUMENT

The confluence of global events, process changes, and resource investments made by the political branches have placed the SIV program in a materially different posture as compared to two years ago. Applying the *TRAC* factors to the current circumstances, Defendants are processing SIV applications in a reasonable amount of time and thus continued judicial supervision of the SIV program is unnecessary. Changed circumstances therefore warrant revising the Court's September 2019 interlocutory order and the corresponding remedy pursuant to Rule 54(b) or, in the alternative, Rule 60(b)(5) and (b)(6). Should the Court find that modification of the Plan is instead appropriate, Defendants request the opportunity to propose a modified plan by 30 days of the resolution of this motion.

## I. THE COURT SHOULD REVISE ITS UNDUE DELAY DETERMINATION AND VACATE THE INJUNCTION TO ACCOUNT FOR CHANGED LAW AND FACTS UNDER RULE 54(b)

### A. Legal Standard under Rule 54(b)

A district court may revise "any order or other decision, however designated, that adjudicates fewer than all of the claims….at any time before the entry of" final judgment. Fed. R. Civ. P. 54(b). Courts may reconsider an interlocutory order under Rule 54(b) "as justice requires," *Cobell v. Norton*, 224 F.R.D. 266, 272–73 (D.D.C. 2004), including when "a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court." *Jud. Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 123 (D.D.C. 2006) (internal citation omitted). Because reconsideration of an interlocutory order does not implicate the same finality and judicial resource concerns as the reconsideration of a final order, the Rule 54(b) standard is "more flexible" than Rule 59(e), which governs the reconsideration of final judgments. *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015). The court has discretion to grant

reconsideration under Rule 54(b) so long as there are "good reasons for doing so." *United States v. All Assets Held at Bank Julius Baer & Co.*, 308 F. Supp. 3d 186, 193 (D.D.C. 2018) (citing *Cobell v. Norton*, 355 F. Supp. 2d 531, 540 (D.D.C. 2005)).

### B. There Are Good Reasons to Revise the *TRAC* Analysis

As a threshold matter, Rule 54(b) applies here because this Court's summary judgment decision and order of September 20, 2019, and the corresponding injunction, are each interlocutory. The Court has not entered final judgment in this case; it granted partial summary judgment and entered relief only as to Counts 1 and 2 of the Amended Complaint and did not enter judgment on any other counts. *See* Order (Sept. 20, 2019) (ECF No. 76). Rule 54(b) therefore permits the Court to revise its previous undue delay determination and to relieve Defendants from the Plan.

Given the significantly changed circumstances since this Court entered its order, it is appropriate for the Court to grant relief under Rule 54(b). The undue delay determination and remedial order entered by the Court were directly tied to circumstances that no longer exist. The D.C. Circuit has made clear that equitable relief under the APA's unreasonable-delay provision "is an extraordinary remedy [and requires] similarly extraordinary circumstances to be present before we will interfere with an ongoing agency process." *In re United Mine Workers*, 190 F.3d 545, 549 (D.C. Cir. 1999). Thus, courts will not intervene into an agency's administration of a program unless the agency's delay is "so egregious" as to warrant relief. *TRAC*, 750 F.2d at 79. The D.C. Circuit has identified six factors relevant to that determination:

1) [T]he time agencies take to make decisions must be governed by a rule of reason;
2) [W]here Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

3) [D]elays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
4) [T]he court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
5) [T]he court should also take into account the nature and extent of the interests prejudiced by delay; and
6) [T]he court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Id.* at 80 (citations and quotations omitted). No one factor is determinative, and "[e]ach case must be analyzed according to its own unique circumstances." *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984). The first factor, however, which asks whether the agency's adjudication conforms to a rule of reason, carries the most weight. *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 273–74 (D.C. Cir. 2020) ("Time is the first and most important factor.") (alteration omitted).

## C.    Factors 1 and 2 Favor Defendants Because The Agencies' Implementation of the SIV Program Is Reasonable Given the Circumstances

The first and second *TRAC* factors are typically considered together and ask whether the agency's timeline conforms to a "rule of reason," which may be informed by the agency's underlying statutory scheme. *See Pub. Emps. for Env't Resp.*, 957 F.3d at 273–74. The rule of reason is flexible and takes into account changes in agency policy or practice, new information that may become relevant, and the factors that contribute to the agency delay. *Id.* at 273; *see also e.g.*, *INS v. Miranda*, 459 U.S. 14, 18 (1982). The rule of reason "will depend in large part . . . upon the complexity of the task at hand, [and] the significance (and permanence) of the outcome." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003) (explaining that the rule of reason "cannot be decided in the abstract").

These factors strongly favor Defendants. Neither the governing law nor the facts are the same today as they were when the Court last considered Plaintiffs' claims, and Defendants' processing times are reasonable under the present, significantly changed circumstances.

i.   *Global Events, Embassy Operations, and COVID-19 Pandemic*

In April 2021, the Taliban launched an offensive against the Afghan government, quickly advancing as Afghan government forces collapsed. *See* Ex. C, Declaration of Mark R. Evans ("Evans Decl.") ¶¶ 2, 6–8. By August 2021, the Taliban once again controlled a vast majority of Afghan territory and had recaptured the capital city of Kabul. *Id.* ¶ 6. These circumstances had a significant impact on Afghan SIV processing. *See id.* ¶¶ 3–4, 20. Nonetheless, Embassy Kabul continued to process SIV applications at an accelerated rate through August 2021. *See id.* ¶ 5.

On July 14, 2021, the United States launched Operation Allies Refuge to provide U.S.-facilitated departures from Afghanistan for Afghan SIV applicants and their eligible family members. Brooks Decl. ¶ 36. The U.S. military facilitated flights from Kabul until August 31, 2021, when the United States completed its withdrawal of troops from Afghanistan. Evans Decl. ¶¶ 18, 21. Embassy Kabul suspended operations that same day—meaning SIV immigrant visa applications (or any other visa application) could no longer be processed in-country. *See id.* ¶ 22; https://af.usembassy.gov/visas/. In this effort, the United States conducted one of the biggest airlifts in history, relocating approximately 120,000 individuals. Evans Decl. ¶ 18. Of these, more than 3,000 were Afghan SIV holders and an additional estimated 30,000 were or are eligible to apply for SIVs. *Id.*

Because of these events in Afghanistan, NVC received an unprecedented volume of inquiries and submissions in late 2021. Brooks Decl. ¶ 64. In August 2021, NVC received 235,196 inquiries or submissions, followed by another 117,280 in September 2021, and then

80,417 in October 2021. *Id.* ¶ 65. In total, NVC received more than 530,000 COM SIV inquiries

from August 2021 through December 2021, almost half of which arrived in the last two weeks of

August 2021. Ex. D, Declaration of Peggy Petrovich ("Petrovich Decl.") ¶ 7. By comparison, in

August 2020, NVC received 3,818 inquiries or submissions, followed by 4,721 in September

2020, and 3,611 in October 2020. Brooks Decl. ¶ 66. Indeed, NVC received more email inquiries

in August and September 2021 (352,476 inquiries) than it did during the preceding almost six

years combined, from March 2015 to December 2020 (325,378). *Id.* The sustained surge of

incoming emails from August to December 2021 represents an 816% increase in monthly

volume of case inquiries requiring processing (comparing the average number of inquiries

received monthly between these two periods). Petrovich Decl. ¶ 7. Further illustrating the scale

of the sudden increase in workload, between August 1 and December 31, 2021, the number of

new SIV cases created by NVC nearly quadrupled to 25,903, roughly 5,180 a month, which

represents a monthly increase of 443 percent over the months prior to the evacuation. *Id.* ¶ 9.

The Taliban's return to power in Afghanistan required the suspension of operations,

including visa services, at Embassy Kabul. Defendants' ability to process immigrant visas of any

classification (including SIVs) now depends on each applicant's ability to travel to and appear

before a consular officer at an immigrant visa processing post in another location outside of

Afghanistan. *See* Evans Decl. ¶ 41; 8 U.S.C. § 1202(e), 22 C.F.R. §§ 42.62(a)–(b) (setting forth

personal appearance requirement for visa application interview and signing and execution of a

visa application before a consular officer). The Department of State and other U.S. government

components have undertaken significant diplomatic efforts to facilitate safe passage of Afghans

and others seeking to depart Afghanistan. *See id.* ¶¶ 28–35. Nevertheless, Taliban restrictions

and third-country requirements consistently impede Defendants' effort to support travel from

Afghanistan to third-country locations for visa processing. *Id.* ¶¶ 28–29. For example, in early September 2021, the Taliban refused to permit flights to depart Afghanistan, claiming that some passengers did not have required documentation. *Id.* ¶ 30. And in December 2021, a disagreement between Qatar and the Taliban temporarily paused U.S. efforts to facilitate flights. *Id.* ¶ 32; *see id.* ¶¶ 33–40 (itemizing disruption in U.S.-facilitated flight efforts by Taliban). These challenges to U.S.-facilitated flight efforts implicate Plan Steps 11 through 14 as Defendants' ability to process SIVs now depends on an applicant's ability to appear before an immigrant-visa post in another location outside of Afghanistan. *Id.* ¶ 41.

Any rule-of-reason analysis must account for these changed circumstances. In *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100–01, the Mashpee applied to the Bureau of Indian Affairs ("BIA") for recognition as an Indian tribe. In overturning the district court's determination of undue delay in adjudication, the D.C. Circuit emphasized that a recent increase in applications exacerbated the BIA's shortage of resources to undertake the "extremely complex and labor-intensive task" of tribal recognition, with no corresponding increase in appropriations from Congress. *Id.* at 1100. The D.C. Circuit criticized the district court for failing to account for the agency's "limited resources" and "competing priorities," noting that there was no evidence the agency had treated the Mashpee differently from anyone else or that idle agency officials "'[were just] twiddling their thumbs.'" *Id.* (quoting *In re Barr Labs., Inc.,* 930 F.2d 72, 75 (D.C. Cir. 1991)).

Here as well, Defendants are confronted with a huge increase in applications implicating a complex and sensitive task. Defendants nonetheless have quickly responded to this increased demand by surging resources, including investing in technological improvements. Defendants

14

significantly increased staffing at NVC, the Department of State's Afghan SIV ("ASIV") Unit,[5] and USCIS's Service Center Operations Directorate ("SCOPS"). *See, e.g.*, Brooks Decl. ¶ 21; Ex. E, Declaration of Melissa A. Schubert ("Schubert Decl.") ¶ 4; Petrovich Decl. ¶ 11; Ex. F, Declaration of Connie L. Nolan Decl. ("Nolan Decl.") ¶ 6; Ex. G, Declaration of Neal R. Vermillion ("Vermillion Decl.") ¶ 8. The agencies' technological improvements streamlined management of incoming SIV inquiries and workflow and have already increased productivity by 20 to 25 percent. Petrovich Decl. ¶ 12; *see also* Ex. H, Declaration of Evelyn Martin ("Martin Decl.") ¶ 20 (discussion of USCIS's Tableau platform to improve labor intensive reporting). NVC also leveraged U.S. Mission in Brazil staff to respond to more than 120,000 emails between August and October 2021. Petrovich Decl. ¶ 11.

These resource investments and changes bore results. Notwithstanding the critical challenges, COM adjudication rates have increased significantly. ASIV completed processing on 1,616 COM applications in October 2021, 1,632 in November 2021, and 3,059 in December 2021. Brooks Decl. ¶ 22. And "within the first quarter of Fiscal Year 2022, ASIV processed 6,307 COM applications in total." *Id*. This is a striking increase; comparatively, in the second quarter of 2020, a total of 997 COM decisions were rendered, and in the third quarter of 2020, a total of 1,841 COM decisions were rendered. *Id.*

Defendants have also reduced the total average processing time to 734 days for the Afghan SIV program and 440 days for the Iraqi SIV program in the first quarter of Fiscal Year 2022. *See* https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q1-January-2022.pdf; https://travel.state.gov/content/dam/visas/SIVs/Iraqi-Public-Quarterly-Report-

---

[5] The ASIV Unit is a team of contractors and U.S. direct-hire employees dedicated exclusively to processing COM approvals, affecting Plan Steps 1 through 4. Brooks Decl. ¶ 21.

Q1-January-2022.pdf. Defendants further reduced this number for the Afghan SIV program in the second quarter down to 587 days. Vermillion Decl. ¶ 13. This is a significant acceleration from the 2.5- to 5-year average processing time the court found in 2019, which was the average processing time for COM approval *alone,* whereas the accelerated average times provided above cover the COM approval phase, the I-360 petition phase, *and* immigrant visa processing. *See* ECF No. 75 at 4. But even these new processing times overestimate the time taken under Defendant-controlled steps, given limitations in Defendants' ability to track when certain actions may be within the control of applicants or third parties. *See* Petrovich Decl. ¶ 5; Schubert Decl. ¶ 13; Vermillion Decl. ¶ 14. These reductions in processing times are particularly impressive given the new and massive demands on the Afghan SIV program since August 2021. The Court's analysis must account for these changes, as whether delay is unreasonable "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful." *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102. The analysis instead must "depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Id.*

The Court's undue delay analysis should also take account of security complications in Iraq that were not present when the Court issued its ruling in September 2019. *See* Mickelson Decl. ¶ 3. On December 31, 2019, Iranian-backed militias assaulted Embassy Baghdad and caused severe damage to the Baghdad Embassy Compound's three primary access points, rendering the Consular Compound Access Control ("CAC") and both alternate CACs unusable. *Id.* In January and February 2020, Embassy Baghdad suffered threats and indirect fire attacks, preventing locally employed staff from working at the embassy during that period. *Id.* ¶ 5. In response to these attacks and the COVID-19 pandemic (*see infra*), on March 25, 2020, the

Department of State ordered the departure of designated U.S. government employees from Embassy Baghdad and the Baghdad Diplomatic Support Center. *Id.* ¶ 27. As a result, from March 2020 until June 2021, Embassy Baghdad staffing was primarily limited to one U.S. citizen consular officer and one locally employed staff member. *Id*. ¶¶ 27–28. The embassy has not reopened for routine in-person appearances, and the Department of State's ordered departure remains in place. *Id.* ¶ 27.

This security situation prevents Embassy Baghdad from resuming public consular services, including the processing of SIV applicants who must physically appear before a consular officer. *Id.* ¶ 14; *see id.* ¶¶ 15–20 (discussion of Department of State's Travel Advisory, regular terrorist and insurgent attacks, and International Zone impediments). Embassy Baghdad suffers regular rocket fire by terrorist and insurgent groups; most recently, four rockets targeted the embassy in January 2022. *Id.* ¶ 20. To ensure that SIV processing could continue notwithstanding Baghdad's dire security situation, Defendants used Consulate Erbil and Embassy Ankara to help prioritize Iraq SIV cases, including by providing priority interview appointments at Embassy Ankara. *Id.* ¶¶ 8, 33, 38–47. But applicants must be able and willing to travel to Ankara to complete application processing, a factor not within Defendants' control.

The rule of reason must also take into account the serious operational consequences of the global pandemic, which has complicated and delayed visa processing throughout the world. At the COVID-19 pandemic's onset, Defendants temporarily suspended routine visa services at all U.S. embassies and consulates worldwide, resulting in an unprecedented "backlog" of visa applications. Brooks Decl. ¶¶ 25–32. The COVID-19 pandemic drastically reduced the number of U.S. officials and locally employed staff who could safely conduct business at a consular section on any given day. *Id.* ¶ 26. Although many services have resumed, Defendants are now

working through the backlog and navigating ongoing restrictions. *See id*. These operational challenges due to the COVID-19 pandemic further demonstrate that Defendants' processing times are reasonable. *Murway v. Blinken*, No. CV 21-1618 (RJL), 2022 WL 493082, at *3 (D.D.C. Feb. 16, 2022); *see, e.g.*, *Khan v. Blinken*, No. CV 21-1683 (JEB), 2021 WL 5356267, at *3 (D.D.C. Nov. 17, 2021) ("Given that courts have countenanced far longer processing delays under pre-pandemic circumstances, the Court finds no basis to conclude that the Government's timeline for adjudicating [plaintiff]'s application lacks reason, especially given the logistical challenges that COVID-19 has imposed."); *Zaman v. U.S. Dep't of Homeland Sec.*, No. CV 19-3592 (ABJ), 2021 WL 5356284, at *6 (D.D.C. Nov. 16, 2021) ("The significant public health considerations impacting consular staff and the suspension of visa activities in Bangladesh are circumstances well beyond the agency's control, and they weigh in favor of defendants on the first two *TRAC* factors."); *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 166 (D.D.C. 2021) ("Issues like a pandemic and local government restrictions . . . offer sufficient rhyme and reason to explain the Government's response time.") (citation, quotations, and alterations omitted).

In sum, demand surges and ongoing logistical challenges occasioned by these historic events represent significant changes since September 2019 that must be taken into account in addressing Plaintiffs' unreasonable delay claim. As in *Mashpee Wampanoag Tribal Council*, Defendants are acting reasonably in the face of serious logistical and resource constraints. Recognizing these complexities, Congress has given the agencies broad latitude to manage their workloads and prioritize resources without burdening the agencies with unnecessary intervention beyond quarterly reporting. For example, Congress in the ESSAA requires a singular report detailing information such as the total number of Afghan SIVs issued, average processing times, the number of pending applications at different phases, and the estimated number of potentially

eligible individuals who have yet to apply. ESSAA § 401(c). And Congress and the Executive

Branch are actively engaged in oversight and management of the SIV program. *See infra*. The

Court should take a similarly flexible approach that provides broad latitude to the agencies and

that accounts for significant global events and processing changes undermining Plaintiffs' claim

of undue delay.

> ii.   *Major Improvements to the SIV Program in Response to Executive Orders and Statutory Changes*

Within two weeks of taking office, President Biden signed Executive Order 14,012. That

Executive Order requires the Secretary of State, the Attorney General, and the Secretary of

Homeland Security to conduct a comprehensive review to "identify barriers that impede access

to immigration benefits and fair, efficient adjudications of these benefits and make

recommendations on how to remove these barriers, as appropriate and consistent with applicable

law." Exec. Order 14,012 § 3(a)(i). Executive Order 14,012 requires these officials to submit a

plan to the President describing the steps their respective agencies will take to advance the

policies identified in the Executive Order, and to follow up with a progress report on

implementation. *Id.* §§ 3(b)–(c). Further, on February 4, 2021, President Biden signed Executive

Order 14,013, which provides that "the Secretary of State, in consultation with the Secretary of

Defense and the Secretary of Homeland Security, shall complete a review of the Iraqi and

Afghan SIV programs and submit a report to the President with recommendations to address any

concerns identified." Exec. Order 14,013 § 3(a). This report must include, *inter alia*, an

assessment of whether there are undue delays in meeting statutory benchmarks for timely

adjudication of SIV applications, including due to insufficient staffing levels; a plan to track the

progress of Senior Coordinators; and a directed review of the procedures for COM approval of

applications. *See id.* §§ 3(a)–(e). In response to these Executive Orders, Defendants implemented

a host of changes (*see infra*) fundamentally transforming the SIV program from what the Court evaluated when it issued the Plan.

Additionally, a legislative amendment via the ESSAA signed into law on July 31, 2021 significantly broadened SIV eligibility, triggering a surge of applications from newly eligible applicants and taxing available processing resources. *See* Brooks Decl. ¶ 16. The ESSAA reduced, from two years to one year, the period of qualifying employment, and removed the previous requirement that those applicants have performed "sensitive and trusted" activities. ESSAA § 401(a). The ESSAA also explicitly included the COM approval phase in the nine-month period, § 401(a)(3), and expanded the COM appeals framework by permitting applicants to submit one written appeal for each COM denial and allowing written appeals to be submitted more than 120 days after a denial, at the Secretary of State's discretion. *Id.* § 401(a)(1)(B). The amendment also recognized Defendants' authority to "adopt[] appropriate measures to prevent the spread of communicable diseases, including COVID-19, to the United States." *Id.* § 402(f). Finally, the amendment increased the number of Afghan SIVs available for Defendants to issue, from 26,500 to 34,500. *Id.* § 401(a)(2). Sections 402(a)–(c) of the ESSAA further authorized the Secretaries of State and Homeland Security to issue jointly a blanket waiver of the medical exam requirement for Afghan SIVs prior to the issuance of an immigrant visa or admission to the United States, which the Secretaries did on August 12, 2021. Brooks Decl. ¶¶ 12–13.

The ESSAA's eligibility changes increased the pool of potentially eligible Afghan SIV applicants significantly. *Id*. ¶ 16. The medical exam waiver fundamentally changed the SIV program for those inside Afghanistan, affecting Plan Step 14. *Id*. The surge of new applications—and the resources required for Defendants to adjust their processing procedures to account for changes to the statutory scheme—provides further context undermining any claim of

egregious delay. *See Miranda*, 459 U.S. at 18 (recognizing that "[b]oth the number of applications received . . . and the need to investigate their validity may make it difficult for the agency to process an application" promptly).

Defendants responded to these Executive and Legislative changes—and the significantly increased workloads they created—by improving the SIV program at every stage. *See* Brooks Decl. ¶ 21. Described in greater detail in the accompanying declarations, these improvements include:

1. *Increased staffing to process SIV applications at the NVC, the ASIV Unit, the Visa Office ("VO"), and USCIS's SCOPS.* By July 2021, NVC increased the SIV Unit's total staffing by a factor of seven. Brooks Decl. ¶ 21. NVC projects that by summer 2022, it will have approximately 140 staff either fully trained as SIV case processers or in training. Petrovich Decl. ¶ 11. By July 2021, the Department of State had added 34 additional staff for the ASIV Unit, for a total of 42 staff; as of May 2022, the ASIV Unit had 46 total staff. Brooks Decl. ¶ 21. USCIS SCOPS also implemented a series of measures designed to shift resources to train and assign additional officers and contractors to support the SIV adjudicative process. Nolan Decl. ¶¶ 5–6. In addition to the five trained adjudicators, NSC has trained an additional 16 adjudicators who are available to supplement the team when there is an increase in Form I-360 filings. *Id*. ¶ 6.

2. *Technological improvements that increased the ASIV Unit's efficiency in reviewing COM applications.* Previously, each COM decision letter underwent an individual conversion to a PDF file and was then uploaded manually to a database. Schubert Decl. ¶¶ 5–8. This process was time and labor-intensive, especially as applied across hundreds of COM applications. *Id.* ¶ 6. In August 2021, the Department of State's Office of Consular Systems and Technology ("CA/CST") assisted the ASIV Unit in developing a software modification that allows ASIV

Unit staff to automatically batch upload large selections of COM decision letters to the database in a matter of seconds. *Id.* ¶¶ 6–7.

     3. *Increase in COM application intake frequency*. Brooks Decl. ¶ 21; Schubert Decl. ¶ 10. Starting in July 2021, the ASIV Unit increased its intake of new cases from a monthly timeframe to a twice-per-week timeframe. Schubert Decl. ¶ 10. This increased the rate of COM adjudications and improved processing times at Plan Step 4. *Id.*

     4. *Streamlined COM processing for U.S. government agencies who employed SIV applicants and provide letters of recommendation on their behalf.* The Department of State established a framework that expeditiously verifies the employment details of SIV applicants who worked for or on behalf of other U.S. government agencies where that agency is able to verify employment. *Id.* ¶ 10. This process eliminates the verification stage of processing on the part of the ASIV Unit, and greatly enhances the speed of the data entry and analysis stages of the COM approval process. *Id.*

     5. *Dissolution of the COM Committee.* On August 19, 2021, the Chief of Mission in Afghanistan dissolved the COM committee. *Id.* ¶ 10. This change eliminated an unnecessary step in the process, and COM applications are now reviewed by the ASIV Unit and then submitted directly to the COM designee for a decision. *Id.* This change decreased the time required for a COM decision by approximately two weeks, improving processing times at Plan Step 4. *Id.*

     6. *Technological upgrades that eliminate Plan Step 5*. During the first quarter of Fiscal Year 2022, the Department of State upgraded its system to allow for applicants to be notified automatically by e-mail once their COM cases receive a decision, rendering the time spent on this activity negligible and Step 5 obsolete. Defendants have notified Congress of the elimination of this Step and their intention to no longer report on it to Congress. Petrovich Decl. ¶ 2.

7. *Expeditious resolution for applicants in administrative processing*. After an applicant is interviewed by a consular officer at Plan Step 12, the applicant may be refused a visa and placed into administrative processing to resolve any questions on the applicants' SIV eligibility as part of Plan Step 13. *See* Vermillion Decl. ¶ 11; ECF No. 113-1. In August 2021, the Department of State streamlined this process for applicants placed in administrative processing. Vermillion Decl. ¶ 12. In the fourth quarter of fiscal year 2021, administrative processing for 87% of Afghan SIVs was completed within 30 days. *Id.*

8. *Operational changes to I-360 review*. USCIS SCOPS established a process by which adjudicators conduct a prima facie review of Form I-360 visa petitions to identify those petitions that are documentarily complete and ready to proceed to adjudication. Martin Decl. ¶ 11. USCIS has expanded coordination with the Department of State on COM approvals, which has facilitated COM verifications and authenticity determinations. *Id.* ¶ 13. I-360 adjudicators now have more information about the authenticity of the associated COM approvals that are included in an applicant's submission. *Id.* ¶ 16. Further, if a petition is submitted without documentation of the required COM approval, USCIS adjudicators can now check a list provided by the Department of State to verify that the applicant successfully met that eligibility requirement, allowing the adjudicator to move forward with adjudication, rather than issue a Request for Evidence ("RFE") as has been done in the past. *Id.* ¶ 14. This process has decreased the number of RFEs issued to petitioners and increased adjudication efficiency at Step 7. *Id.* ¶ 17.

These resource initiatives and streamlining measures have significantly increased the number of SIV applications that Defendants have processed. *See* Brooks Decl. ¶ 21. For example, Embassy Kabul increased the rate of SIV issuances from approximately 100 visas per week in March 2021 to more than 800 per week in August 2021, before Embassy Kabul

suspended operations on August 31, 2021. *Id.* ¶ 22; *see supra.* Embassy Kabul accomplished this increased workload despite COVID-19 restrictions and serious security threats, until Taliban control of Afghanistan precipitated the suspension of the Embassy's operations. Additionally, in the first quarter of Fiscal Year 2022, the ASIV Unit processed 6,307 COM applications in total. Brooks Decl. ¶ 22. This is a substantial increase from the prior average rate of COM decisions, as demonstrated in the following table.

**Comparison of Number of COM Applications Processed by ASIV**

| Fiscal Year/ Quarter | Number of COM applications processed by ASIV/NVC |
|---|---|
| FY 2020 Q3 | 997 |
| FY 2020 Q4 | 1,841 |
| FY 2021 Q1 | 3,273 |
| FY 2021 Q2 | 2,032 |
| FY 2021 Q3 | 1,837 |
| FY 2021 Q4 | 5,349 |
| FY 2022 Q1 | 6,307 |
| January 2022 – April 26, 2022 | 6,638 |

Brooks Decl. ¶ 22; *see* Schubert Decl. ¶ 11 (chart analyzing the increase and rate for COM application processing). And notwithstanding the workload increase, USCIS continues to process I-360 petitions with an average processing time of 30 to 45 days. *See* Martin Decl. ¶ 12; Nolan Decl. ¶¶ 7–15.

> iii.    *The Statutory Benchmark Does Not Supplant the Flexible Rule of Reason*

Although Congress, in the ESSAA, supplied a nine-month benchmark for processing SIV applications, that timeline does not supersede the rule-of-reason analysis required by *TRAC*. Although a statutory scheme may supply context for the rule of reason, *TRAC* makes clear that the mere existence of a statutory timeline does not require or warrant judicial intervention whenever that timeline is not met; courts must still consider whether any delay is "unreasonable" given all the surrounding circumstances. Thus, Factor 2 takes account of any timetable or other

indication of the speed with which Congress expects the agency to proceed, *TRAC*, 750 F.2d at 80, but such timetables are not dispositive; the rule of reason is *flexible*, accommodating changes in agency policy or practice, new information that may become relevant, and the possibility that one adjudication may impact another.

Here, the reasonableness inquiry does not end with the ESSAA's explicit inclusion of the COM approval phase in the nine-month period. ESSAA § 401(a)(3). Both courts and Congress have often recognized that agencies may not be able to meet a statutory timetable—even if they are making extraordinary efforts to do so. That is why courts look to the totality of the circumstances to determine whether an agency's delay is unreasonable, not just to statutory timeframes. In *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987), the D.C. Circuit reversed a district court decision that took issue with the Food and Drug Administration's ("FDA") failure to identify a deadline for agency action to enforce certain drug classification safety mandates, and held that the district court was required to evaluate all the *TRAC* factors, including consideration of congressional timelines *and* the rule of reason, to determine whether the agency's delay was unreasonable and warranted judicial intervention. *Id.* at 897. Moreover, the D.C. Circuit emphasized that the court should, in the absence of bad faith, "consider the agency's explanation, such as administrative necessity, insufficient resources, or the complexity of the task confronting the agency." *Id.* at 898.

So too here, the statutory timeframe does not end the inquiry, especially because the RCIA and AAPA provide only that the agencies "should" complete processing under the specified terms. RCIA § 1242(c)(1); AAPA § 602(b)(4)(A) ("[A]ll steps, including Chief of Mission approval . . . should be completed not later than 9 months"). "Should" denotes discretion. *Jolly v. Listerman*, 672 F.2d 935, 945 (D.C. Cir. 1982) ("The use of the word 'should'

. . . detracts significantly from any claim that this guideline is more than merely precatory."); *United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) ("'[S]hould' implies, suggests, and recommends, but does not require."). This evinces Congress's recognition that this timeline might be unattainable despite the agencies' best efforts. In fact, if there is ever a time when "should" means "should," it is in the context of the extraordinary circumstances confronting Defendants over the last two years.

That is why courts have emphasized that, under *TRAC*, "[t]here is no per se rule as to how long is too long to wait for agency action." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). The D.C. Circuit "has not hesitated to deny [*TRAC* claims] even when an agency has missed a statutory deadline by far more than . . . two years." *In re Aiken Cnty.*, 725 F.3d 255, 268 (D.C. Cir. 2013) (Garland, C.J., dissenting); *see also, e.g.*, *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100–01 (vacating and remanding the district court's determination that a five-year delay was unreasonable); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 477–78 (D.C. Cir. 1998) (declining to order agency action notwithstanding a ten-year delay in issuing a rule and a 20-year delay in achieving the rule's statutory objective); *cf. Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1035 (D.C. Cir. 1983) (eight-year delay unreasonable); *TRAC*, 750 F.2d at 81 (delays of approximately five years and two years by the agency did not warrant mandamus, but prompted the Court to retain jurisdiction). Here, the agencies face dramatically changed circumstances that have led to a huge upsurge in SIV applications, but they have also directed resources to address that upsurge. And Defendants have reduced the average total processing time for an Afghan SIV application to 734 days in the first quarter of Fiscal Year 2022 and 587 days in the second quarter, and an Iraqi SIV application to 440 days as of first quarter Fiscal Year 2022, *supra* at 15–16, which is a far cry from the

unreasonable delay evaluated in the aforementioned cases. Reference to the statutory timeframe alone is insufficient, and Factors 1 and 2 favor Defendants.

### D. Factors 3 and 5 Favor Defendants Because Delays in Processing SIVs Are Not Egregious Where the Program Implicates Foreign Affairs, Immigration, and National Security Decision-Making

Factors 3 and 5, both of which consider the nature of the interests implicated by any agency delay, overlap in this case. "The third looks to whether human health and welfare are at stake—in which case compulsion is more justified—and the fifth assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Int. v. United States Food & Drug Admin.*, 74 F. Supp. 3d 295, 304 (D.D.C. 2014) (internal quotation marks omitted). Without question, delays in processing SIVs implicate questions of safety and danger to those applicants the statutes intend to protect. Defendants take very seriously the risks posed to SIV applicants and the importance of timely processing applications. *See, e.g*., Brooks Decl. ¶ 49 (discussion of Defendants' relocation efforts' dependence on Taliban cooperation); *see supra* at 13–14, 16–17 (discussion of Taliban impediments for Afghan SIVs and terrorist attacks at Embassy Baghdad).

Partly because of the sensitivity and importance of the SIV program, Factors 3 and 5 must also consider whether judicial management represents "a substantial intrusion" into the workings of the political branches entrusted to manage immigration policies. *Skalka v. Kelly*, 246 F. Supp. 3d 147, 154 (D.D.C. 2017) (dismissing undue delay challenge to policy choice to suspend visa investigations where "[c]ompelling agency action otherwise would insinuate the Court into the agencies' judgment about whether they could accurately adjudicate these cases"); *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (recognizing that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations" and that "[s]uch matters are so exclusively entrusted to the political

branches of government as to be largely immune from judicial inquiry or interference."). Immigration policy involves "changing political and economic circumstances" that are best suited for Legislative or Executive decisionmaking. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Thus, the Court must consider the complex considerations inherent to foreign affairs, immigration, and national security. *See Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 297 (D.D.C. 2016) (in SIV delay case, acknowledging that "[w]hat efforts are reasonable will depend upon 'complex concerns involving security and diplomacy' far beyond the expertise of the Court—but squarely within that of the Secretary") (citations omitted).

The SIV application process implicates significant considerations of security and foreign relations. As shown, *supra*, processing SIV applications has been significantly complicated by the security situations in Afghanistan and Iraq. Those challenges cannot be resolved simply by devoting more resources to visa processing, although Defendants are certainly doing so; but Defendants cannot deploy a visa processing function in countries where the security and foreign-relations situation precludes it. In addition, SIV applications by their very nature involve complex security issues. Congress has required Defendants to subject each SIV applicant to intensive background checks and screening. *See* RCIA § 1244(a)(4); AAPA § 602(b)(1)(D) (requiring that each applicant "clear[] a background check and appropriate screening, as determined by the Secretary of Homeland Security"). Further, once applicants reach the visa application stage, the amount of time needed for administrative processing for those SIV applications refused under Immigration and Nationality Act Section 221(g), 8 U.S.C. § 1201(g), varies based on several factors, including whether the required administrative processing is security-related, the nature and complexity of the issue requiring resolution, and whether third-

party government agencies are engaged as part of national security vetting. Vermillion Decl. ¶ 11; Plan at 6–9. Nevertheless, the Department of State has streamlined the process by requesting third-party agencies to expedite review on all SIV cases. Vermillion Decl. ¶ 12. At base, Factors 3 and 5 counsel judicial restraint where—as here—a claim implicates complex national security and diplomatic concerns. *Nine Iraqi Allies*, 168 F. Supp. 3d at 297.

Factors 3 and 5 also favor the government because resource intensive monitoring of and reporting on the SIV process may actually hinder Defendants' ability to quickly process applications, thus injuring Plaintiffs' interests. The Plan requires Defendants to track individual class members manually throughout multiple government IT systems. Petrovich Decl. ¶ 15. The Plan also requires Defendants to submit quarterly reports tracking these class members through each of the 14 steps of the process (some of which are now obsolete) and assess performance against the benchmarks for each step; these quarterly reports are in addition to the quarterly reports required by Congress to similarly assess the agencies' performance as compared to the nine-month benchmark. In addition, the Plan requires the parties to meet and confer on Defendants' performance reporting if Plaintiffs on a good faith basis do not believe that Defendants' explanation or revised plan for adjudicating applications is sufficient.

The resources devoted to reporting under the Plan and this meet-and-confer obligation are significant. In July 2021 (when the last quarterly progress report in this litigation was filed), "State Department staff reported that they expended approximately 141 hours per week on litigation-related efforts, with an additional 40 hours expended in the two weeks prior to the submission of the Progress Report. A significant portion of these are hours which could otherwise be dedicated to SIV processing." Brooks Decl. ¶ 73; *see also id.* ¶¶ 71–77 (outlining dedicated hours to the SIV program). At USCIS, progress reporting alone requires one first-line

supervisor and three adjudicating officers to manually update and evaluate data related to the progress report, averaging a total of 90 hours per week. Martin Decl. ¶ 6. Time dedicated to the progress report follow-up by the supervisor or the adjudicator diverts resources from expeditiously processing I-360 petitions. *Id.* ¶ 8; *see id.* ¶¶ 7–9 (outlining the duties of USCIS employees with respect to progress report demands). This is at odds with the Court's intention that the Plan would not "unduly intrud[e] into Defendants' province." 2019 WL 4575565, at *11. Similarly, Plaintiffs foreswore "an opportunity to comment necessarily on how [Defendants] choose to achieve certain interim benchmarks." Mot. Prelim. Inj. Hr'g. Tr. 52:22–23 (July 26, 2019) (ECF No. 72).

Finally, the performance of the SIV program has not escaped Executive and Legislative attention. Quite the contrary; since 2019, the Executive and the Legislative Branches have been actively involved in restructuring the SIV program to improve the processing of SIV applications. Executive Order 14,013 ordered Defendants to complete a review of the SIV programs and to submit a report that includes an assessment of whether there are undue delays in meeting statutory benchmarks for timely adjudication of SIV applications, a plan to track the progress of Senior Coordinators, and a directed review of the procedures for COM approval of applications. Exec. Order 14,013 §§ 3(a)–(e). These efforts have produced measurable improvements in SIV processing. *See* Brooks Decl. ¶¶ 21–22. As discussed above, Embassy Kabul increased the rate of SIV issuances from approximately 100 visas per week in March 2021 to more than 800 per week in August 2021, before Embassy Kabul suspended operations on August 31, 2021. *Id.* ¶ 22; *see supra* at 21–23 (significant changes to SIV processing in summer 2021)*.* In the first quarter of Fiscal Year 2022, the ASIV Unit processed 6,307 COM applications

in total. Brooks Decl. ¶ 21. This is a substantial increase from the prior average number of

decisions. Likewise, as NVC Director Petrovich sets out:

> Since September 2019, the Department and NVC have surged staff and other
> resources to support more expeditious processing of Afghan and Iraqi SIV cases at
> both the pre-Chief of Mission (pre-COM) and pre-visa application stages of the
> process. At the time of the court's injunction in September 2019, the SIV unit at
> NVC was staffed by 9 case processors. Beginning with training in May 2021, the
> Department surged 54 additional processors to the SIV unit so that, by August 2021,
> there were 63 processors focused on SIV case processing. This represents a 700
> percent increase in staffing for SIV cases processing at NVC and reflects the high
> priority of the SIV program.

Petrovich Decl. ¶ 5.

These substantial changes demonstrate the continuing commitment to, and priority that

Defendants place on, Plaintiffs' welfare, and the significant efforts and resources that they have

dedicated to this end. Plaintiffs' safety interest is better served without ongoing judicial

monitoring that largely duplicates congressional oversight and does not add to program

improvements and unnecessarily drains available resources.

Even if Factors 3 and 5 favor Plaintiffs, those factors cannot be considered in isolation.

*See Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100. Where "competing priorities"

weigh in an agency's favor, courts have "refused to grant relief, even though all the other factors

considered in *TRAC* favored it." *Id.* Factors 3 and 5 do not support a finding of unreasonable

delay and continued judicial intervention.

E.     **Factor 4 Favors Defendants Because Compelling the Agencies to Transfer
       Further Resources to SIV Processing Would Adversely Affect the Agencies'
       Ability to Act on Competing Priorities**

Factor 4 considers how compelling agency action would affect "agency activities of a

higher or competing priority." *TRAC*, 750 F.2d at 80; *see also Mashpee Wampanoag Tribal

Council*, 336 F.3d at 1101–02 (district court erred by disregarding the importance of "competing

priorities" for limited resources in finding a five-year delay in agency action constituted

unreasonable delay). Courts recognize that agencies constantly need to shift resources to respond

to other pressing concerns; "[i]f, for example, an order compelling agency action will serve only

to delay other important [ ] matters, then the delay in question may be considered reasonable."

*Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 40 (D.D.C. 2000) (citing *FEC v. Rose,* 806 F.2d

1081, 1091 (D.C. Cir. 1986) (finding delay reasonable in part because order compelling action

would only delay other pending matters)).

The D.C. Circuit has emphasized that in cases alleging unreasonable agency delay,

agencies should have a primary role in determining how to direct their scarce and finite

resources. *See Barr Labs.*, 930 F.2d at 76 ("The agency is in a unique—and authoritative—

position to view its projects as a whole, estimate the prospects for each, and allocate its resources

in the optimal way."); *see also EMR Network v. FCC*, 391 F.3d 269, 273 (D.C. Cir. 2004)

("[P]riority-setting in the use of agency resources . . . is least subject to second-guessing by

courts."). Even where an agency fails to meet a statutory deadline for action, courts hesitate to

reset agency priorities. *See, e.g.*, *Action on Smoking & Health v. Dep't of Labor*, 100 F.3d 991,

994–95 (D.C. Cir. 1996).

In *Ctr. for Sci. in the Pub. Int.*, 74 F. Supp. 3d at 296, this district court evaluated an

undue delay challenge by a citizens' group that had petitioned the FDA to initiate rulemaking

requiring mercury recommendations for certain seafood consumption. While acknowledging the

plaintiffs' important health and safety concerns because "[m]ercury is toxic, especially to young

children and developing fetuses," the court declined to impose a judicial remedy. *Id.* Rather, the

court determined that by virtue of its very mission, FDA routinely faces difficult decisions about

how to prioritize safety initiatives and "[d]ue to its expertise, the Administration must be

permitted flexibility in navigating the tough choices that come along with its expansive safety docket." *Id.* at 305 (citing *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) (noting EPA's "very broad mandate" but "finite resources")). The court thus declined to second-guess FDA's "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Id.* (quoting *Barr Labs.*, 930 F.2d at 76) (refusing mandamus relief even where FDA had violated a statutory deadline, because so doing, although beneficial to the plaintiff, would likely impose offsetting burdens on other parties equally worthy of agency action).

Likewise here, the agencies must balance critical, competing priorities. During and after the Taliban's seizure of Afghanistan, the agencies dedicated enormous resources to help vulnerable Afghans, including but not limited to SIV applicants. Ex. I, Declaration of John Lafferty ("Lafferty Decl.") ¶ 5 (describing DHS efforts to deploy approximately 400 personnel worldwide to support relocation efforts). The Department of State undertook the intensive diplomatic work of entering agreements with many countries (including Italy, Kosovo, Kuwait, Oman, and Qatar) to facilitate relocations. Brooks Decl. ¶ 56. The efforts to facilitate departures from Afghanistan included quickly configuring pre-fly medical exams, providing medical services, and collaborating with the Department of Homeland Security to employ—for the first time ever—electronic proof of visa issuance instead of a passport foil. *Id.* ¶ 39. These efforts required an "all-hands-on-deck" response from Defendants and urgently required the direction of resources that could not be made available for SIV processing.

Similarly, the agencies' commitment to provide assistance to address global events such as the Ukrainian refugee crisis, COVID-19 visa backlog, the civil war in Ethiopia, and the lack of consular services in Moscow necessarily has implications for the resources that can be

33

dedicated to SIV processing. *See* Vermillion Decl. ¶ 15. Defendants must constantly make decisions about how to allocate consular resources in light of international events. *Id.* Defendants' support for the SIV program does not wane as they face other country-specific and global challenges, but the situation in Ukraine illustrates the types of unforeseen circumstances that challenge Defendants and their implementation of worldwide visa operations. *Id.*

Defendants constantly face humanitarian and foreign relations concerns of pressing urgency. Evans Decl. ¶¶ 16–17 (discussing surge of staff to Kabul and other locations to assist efforts for U.S.-facilitated flights); Brooks Decl. ¶ 21 (discussing rotation of staff to support SIV processing in third country since November 2021). Thus, as the D.C. Circuit has noted, "'although this court has required greater agency promptness as to actions involving interests relating to human health and welfare, . . . this factor alone can hardly be considered dispositive when, as in this case, virtually the entire docket of the agency involves issues of this type.'" *Ctr. for Sci. in the Pub. Int.*, 74 F. Supp. 3d at 304 (quoting *Sierra Club*, 828 F.2d at 798).

At the time the Court rendered its *TRAC* factor analysis in September 2019 and entered relief in June 2020, the Court could not have considered the toll caused by over two years of a global pandemic, the Taliban takeover of Afghanistan, and the situation in Ukraine. The Court should revise its "unreasonable delay" analysis to recognize that, under all the circumstances, Defendants are doing what is reasonably possible to process SIV applications.

### F.     Factor 6 Favors Defendants Because They Have Acted in Good Faith

Factor 6 examines whether the agencies have acted in good faith. *See TRAC*, 750 F.2d at 80. "[T]he good faith of the agency in addressing the delay weighs against" relief. *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 120 (D.D.C. 2005) (citing *In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 507 (D.C. Cir. 1988)); *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d at 192–93

(D.C. Cir. 2016) ("[T]he district court also correctly concluded that the Secretary's good faith efforts to reduce the delays within the constraints she faces . . . push in the same direction [against issuing a finding of unreasonable delay.]").

Factor 6 favors Defendants. The agencies have continuously labored to complete all SIV application steps as expeditiously as possible under challenging circumstances that have unfolded since September 2019. For example, the Departments of State and Homeland Security coordinated Operation Allies Welcome as part of a massive effort to support vulnerable Afghans, including Afghan SIV applicants. Brooks Decl. ¶¶ 43–45; *see* Lafferty Decl. ¶¶ 7–10 (discussion of resettlement efforts). This includes interagency coordination for the arrival of SIV applicants in the United States to be paroled in without a medical exam, as well as to provide electronic proof of visa issuance for SIV recipients traveling under U.S. government auspices. Brooks Decl. ¶ 39. And as discussed throughout this brief, Defendants have dedicated additional resources to SIV processing and labored to improve the application process as much as possible, all while under oversight from the Executive and Congress.

In sum, notwithstanding the statutory timeframe, the *TRAC* factors on the whole favor the government. *See Palakuru v. Renaud*, 521 F. Supp. 3d 46, 52 (D.D.C. 2021) (quoting *Uranga v. USCIS*, 490 F. Supp. 3d 86, 103–06 (D.D.C. 2020) (holding the statute provided "an indication of what the legislature had in mind," but still concluding that the "plaintiff ha[d] failed to state a claim for unreasonable delay" because two *TRAC* factors favored the government.)). As Defendants' exhibits show, the agencies take very seriously their obligations to review SIV applications both thoroughly and expeditiously, and they have surged resources to do so, to the extent possible given competing demands. The Court should not second-guess myriad immigration, foreign affairs, and national security judgments concerning SIV processing, which

go to "the very heart of the expertise that should be exercised by a U.S. Government official who is intimately familiar with the facts [overseas] and not a District Court judge who is ordering agency action in Washington, D.C." *Skalka*, 246 F. Supp. 3d at 154.

## II.    ALTERNATIVELY, IF THE COURT FINDS THAT RULE 54(b) DOES NOT APPLY, DEFENDANTS ARE STILL ENTITLED TO RELIEF UNDER RULE 60(b)(5) AND (b)(6)

Even if the Court finds that its previous orders are not interlocutory (and therefore Rule 54(b) does not apply), Defendants are still entitled to relief from those orders under Rule 60(b)(5) and (b)(6). As Defendants have shown, they have made significant improvements to the processing of SIV applicants and have dedicated extensive resources to that process—but a series of quickly changing global humanitarian crises, unforeseeable when the Plan was adopted, warrant relief from its strictures. Thus, under the circumstances, Defendants' timelines are reasonable and the Plan is a poor fit for the present reality. These significant changes support Rule 60(b) relief from the Court's previous orders.

### A.    Legal Standard for Relief under Rules 60(b)(5) and (b)(6)

Federal Rule of Civil Procedure 60(b)(5) provides that "a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). The "party seeking relief bears the burden of establishing that changed circumstances warrant relief." *Id.* Where, as here, an injunction remains in place for several years, the court "must take a 'flexible approach' to Rule 60(b)(5) motions." *Id.* at 450 (quoting *Rufo*, 502 U.S. at 381); *see also Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017). A "flexible approach" is critical to "ensure that responsibility for discharging the [the government's]

36

obligations is returned promptly to the [government] and its officials when the circumstances warrant." *Horne,* 557 U.S. at 450 (citation and internal quotations omitted). "Injunctions issued . . . often remain in force for many years, and the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Id.* at 447–48.

Further, Rule 60(b)(6) authorizes relief from a final judgment, order, or proceeding "for any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Such relief may be granted where "[e]xtraordinary circumstances" are present. *See Ackermann v. United States*, 340 U.S. 193, 199 (1959). The rule preserves "the delicate balance between the sanctity of final judgments . . . and the incessant command of the court's conscience that justice be done in light of all of the facts." *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970).

### B.      Control of the SIV Program Should Be Returned to the Political Branches

The Supreme Court has repeatedly expressed concern with long-term judicial supervision of government institutions. In *Horne*, 557 U.S. at 439, the Court held that a district court was required to account for changed circumstances in evaluating whether a longstanding injunction governing state educational programs should remain in place. The Court emphasized that a "flexible approach allows courts to ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id*. at 450 (internal quotations and citation omitted). Indeed, the "longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic process." *Id*. at 453. Courts must therefore consider "whether, as a result of the

important changes during the intervening years, the [government is] fulfilling its obligations under the [law] by other means." *Id.* at 439.

Likewise, in *Rufo*, 502 U.S. at 381–82, the Supreme Court noted that "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees reach beyond the parties involved directly in the suit and impact the public's right to the sound and efficient operation of its institutions." Indeed, "the public interest and considerations based on the allocation of powers within our federal system require that the district court defer to [government officials] who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Id.* at 392 (cleaned up and citations omitted); *see also In re Pearson,* 990 F.2d 653, 658 (1st Cir. 1993) (stating that a district court is "not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest.").

Here, continued enforcement of the Court's injunction interferes with the iterative process necessary to make administrative improvements and the Executive Branch's ability to allocate resources to respond to global crises, instead placing authority over immigration policy in the control of class counsel and the courts, indefinitely. "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (citation omitted); *see Mathews*, 426 U.S. at 81 ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien

visitors has been committed to the political branches of the Federal Government" and cautioning

against "inhibit[ing] the flexibility of the political branches . . . to respond to changing world

conditions"). Particularly in the face of the quickly (and dramatically) changing circumstances

described in this brief, Defendants are in a "unique—and authoritative—position" to order

competing priorities and allocate scarce resources. *Barr Labs.,* 930 F.2d at 76 (refusing

mandamus relief even where FDA had violated a statutory deadline, because so doing, although

beneficial to the plaintiff, would likely impose offsetting burdens on other parties equally worthy

of agency action). Since the injunction was entered in 2019, not only have the circumstances in

Iraq, Afghanistan, and worldwide changed due to the pandemic, but both Congress and the

Executive have been active in reforming the SIV program through statutory amendment and

administrative overhaul.

      The Court's injunction is the very type of institutional-reform injunction that the Supreme

Court cautioned against: it interferes with the government's exercise of constitutional powers to

develop new policies to address the changes in immigration to the United States. Because the

current statutory and administrative landscape adequately provides new processes to improve

SIV adjudication speed—the purpose for which this litigation was originally instituted and the

injunction entered—the Court should return responsibility for determining and executing that

policy to the Executive Branch.

## C.    Applying the Previous Orders Prospectively Is No Longer Equitable

      As established above, the confluence of global events such as Taliban takeover of

Afghanistan, security crises in Iraq, the pandemic, legislative reform, and Executive action to

review and improve administration of the SIV program collectively warrant relief under Rule

60(b). In *American Council of the Blind*, 878 F.3d at 367, the D.C. Circuit explained that a Rule

60(b)(5) motion "permits a court to alter an injunction to respond to unanticipated factual changes," at least if they are sufficiently "significant."

Here, the changed circumstances are both unanticipated and significant. To start, the Plan contemplates Defendants' responsibility under Steps 11 through 14 to timely schedule and adjudicate visa application interviews in Afghanistan, which is no longer possible after the suspension of operations at Embassy Kabul. *See* Evans Decl. ¶¶ 22, 41. The security situation in Iraq also presents continuing barriers to Embassy Baghdad's ability to resume public consular services and process SIVs at these final steps, fundamentally changing how the agencies implement the Iraqi SIV program. Mickelson Decl. ¶¶ 3–8. Even as Defendants support transfer of SIV applicants' cases to other consular posts, the Plan, in essence, requires Defendants to meet processing timelines for non-existent Steps, which cannot be considered "equitable" under Rule 60(b)(5). Likewise, the Plan Steps 1 through 5 at the COM Phase contemplates processing timelines that reflect a more routine influx of applications—not the unprecedented, exponential increase that Defendants are now facing. This increase encompasses not only the Afghan humanitarian crisis, but also the ESSAA's significantly broadened SIV eligibility requirements that triggered a surge of eligible applicants and has taxed the Defendants' processing resources. *See* Brooks Decl. ¶ 16. Again, the Plan can no longer be considered "equitable" to require Defendants to meet timing benchmarks that do not account for the current realities of SIV processing. *See Pub. Emps. for Env't Resp.*, 957 F.3d at 274 ("Mandamus relief can't make money grow on trees.").

Moreover, legislative and administrative changes to the SIV process establish "changes in the nature of the underlying problem" and "new policy insights" on Plaintiffs' unreasonable delay claims "that warrant reexamination of the original judgment." *See Horne*, 557 U.S. at 447–

48. The Executive and the Legislative Branches' active restructuring of the SIV program has produced several positive administrative changes and measurable SIV processing improvements that did not exist at the time of the injunction, as discussed at length above. Brooks Decl. ¶ 21; *see supra* at 20–23. These substantial changes to the administration of the SIV program establish Defendants are meeting the injunction's intent—to reduce adjudication time and increase throughput—even while facing extraordinary demands stemming from the humanitarian crisis. Defendants' response to these changed circumstances has allowed them to process an extraordinary volume of SIV applications even under these demands. *See* Brooks Decl. ¶ 8; *see supra* at 12–13 (discussion of exponential increase in inquiries at NVC); Petrovich Decl. ¶ 9 ("Between August 1 and December 31, 2021, the number of new SIV cases created nearly quadrupled to 25,903, roughly 5,180 a month, which represents a monthly increase of 443 percent over the months prior to the evacuation."). In response to surging demand, Defendants took immediate action by increasing staffing and implementing technological improvements. *See, e.g.*, Brooks Decl. ¶ 21; Schubert Decl. ¶ 4; Petrovich Decl. ¶ 11; Nolan Decl. ¶ 5; *see supra* at 14–15 (discussion on staffing, including leveraging staff from other U.S. missions, and technological improvements). This has led to significant improvements—reducing average processing times for new applications and reapplications by approximately 265 days at the COM phase (from 441 days to 173 days) as of the second quarter of Fiscal Year 2022, and upgrading NVC's ability to review and process the high volume of inquiries and submissions. *See* Schubert Decl. ¶¶ 11–12; Petrovich Decl. ¶¶ 5–6. These are the exact type of resource commitments and policy adjustments that demonstrate significant changed circumstances warranting relief.

Termination of the Plan under Rule 60(b)(5) is appropriate even though Defendants continue to face challenges in processing SIV applications. The Supreme Court has instructed

41

that district courts must employ "a flexible modification standard" in institutional reform litigation because such decrees "often remain in place for extended periods of time" such that "the likelihood of significant changes occurring during the life of the decree is increased." *Rufo*, 502 U.S. at 380–81. The Court reasoned that a flexible standard is in the public interest "because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Id.* at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)). It is neither equitable nor in the public interest to leave the injunction in place despite the significant changed circumstances to which the political branches have been required to adapt.

Defendants have, where possible, improved the processing of SIV applications and have recently restructured the SIV program as directed by the political branches. Thus, the central purpose of the Plan has been achieved—namely, to ensure that Defendants do not unreasonably delay adjudicating applications. *See* ECF No. 106 at 2; *see United States v. W. Elec. Co.*, 46 F.3d 1198, 1207 (D.C. Cir. 1995) ("So long as the central purpose of the decree remains intact . . . it is enough that the district court saw fit to exercise its considerable discretion under Rule 60(b)(5) on the bases that conditions had markedly changed."). Defendants' reform process is underway and aimed at producing durable solutions. Relief under Rule 60(b)(5) is therefore warranted. *See Petties ex rel. Martin v. D.C.*, 662 F.3d 564, 571 (D.C. Cir. 2011) (noting the district court erred in failing to assess whether the risk of imminent harm that warranted injunctive relief "had been ameliorated, if not eliminated, as a result of changed circumstances.").

### D.    Compliance with the Injunction Is No Longer Practicable

Rule 60(b)(6) authorizes an order to be set aside for "any other reason justifying relief from the operation of the judgment." Relief under that clause is appropriate for "extraordinary

cases." *Ackerman*, 340 U.S. at 199. Here, the standard is met because the changed circumstances since 2019 are so significant and "so central to the litigation that it shows the initial judgment to have been manifestly unjust." *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980). If the injunction were to stand, the government would be compelled to follow the Plan even though intervening events render compliance impracticable. *See supra* at 13–14, 16–17 (discussing inability to process visa applications at Kabul and Baghdad); 12–13 (massive upsurge in SIV applications). These extraordinary changes justify relief under Rule 60(b)(6). "In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 614–15 (1949). The Court should exercise its discretion to reexamine the injunction in light of its duty to ensure "that justice be done in light of all of the facts." *Bankers Mortg. Co.*, 423 F.2d at 77. Justice requires termination of the Plan where compliance is no longer practicable.

## III.   IF THE COURT OPTS TO MODIFY THE PLAN, IT SHOULD ALLOW DEFENDANTS TO PROPOSE A NEW PLAN

Should the Court decide not to terminate the September 2019 summary judgment decision and the June 2020 Plan, Defendants request that the Court modify the injunction and permit Defendants to propose, within 30 days of resolution of this motion, a new plan for promptly processing and adjudicating the applications of current class members. As discussed above, district courts must employ "a flexible modification standard" in institutional reform litigation because such decrees "often remain in place for extended periods of time" such that "the likelihood of significant changes occurring during the life of the decree increased." *Rufo*, 502 U.S. at 380–81. Indeed, the significant changes to the implementation of the SIV program "warrant reexamination" of a two-year-old Plan. *See Horne*, 557 U.S. at 447–48.

First, Defendants should be afforded the opportunity to propose any new modification. Both Plaintiffs and the Court have recognized that Defendants are uniquely poised to propose what a new Plan should look like. *See* Pl.'s Supp. in Support of Their Mot. for Prelim. Inj. (ECF No. 68) at 18 ("[Plaintiffs'] requested relief recognizes that Defendants are best positioned to propose how they will comply with their legislative mandates and is an appropriate first instance remedy for Defendants' unreasonably delayed action."). The Court further ordered the Plan in a manner "to ensure that it is no more intrusive than necessary" into Defendants' province. ECF No. 75 at 18. Although the Court later ordered the parties to submit a Joint Plan for the Court's consideration, ECF No. 106, as Plaintiffs have acknowledged, Defendants are "the ones with the power to adjudicate these applications and the knowledge of how best do so" given the myriad events and changes to the SIV program since the Court entered the Plan. *See* ECF No. 68 at 18. Indeed, the suspension of operations at Embassy Kabul, *at a minimum*, makes compliance with Plan Steps 11 through 14 in Afghanistan impossible. The Court should afford Defendants the necessary "discretion to determine in the first instance" how the Plan should be modified in light of these exigent circumstances. *Cobell*, 240 F.3d at 1109 (citation omitted); *see id*. ("The government must develop written policies and procedures, but the Court does not tell the government what these procedures must entail.").

Second, any modification proposal should wait until *after* resolution of this motion. The Court's written opinion addressing this motion—including its new *TRAC* analysis and assessment of delay, treatment of each changed circumstance, and views on the various equitable considerations Defendants have proffered—will need to be incorporated into any modified plan. Accordingly, and to best leverage their unique expertise regarding the SIV program's many

moving parts, Defendants request 30 days to submit a modified plan to the Court incorporating any further direction from the Court on the issues presented by this motion.

## **CONCLUSION**

For the foregoing reasons, under either Rule 54(b) or Rule 60(b), the Court should vacate its September 20, 2019 Memorandum Opinion and Order granting partial summary judgment to Plaintiffs (ECF Nos. 75, 76) and its June 14, 2020 Approved Adjudication Plan (ECF No. 113). If the Court declines to vacate and instead allows modification of the injunction, Defendants request that the Court permit Defendants to propose, within 30 days of resolution of this motion, a new plan for promptly processing and adjudicating the applications of current class members.

Dated: May 24, 2022                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General
                                       Civil Division

                                       WILLIAM C. PEACHEY
                                       Director, Office of Immigration Litigation
                                       District Court Section

                                       YAMILETH G. DAVILA
                                       Assistant Director

                                       STEVEN A. PLATT
                                       Senior Litigation Counsel

                                       SEAN L. KING
                                       VAUGHN D. SPENCER
                                       Trial Attorneys

                                       */s/Ruth Ann Mueller*
                                       RUTH ANN MUELLER
                                       D.C. Bar No. 1617339
                                       Trial Attorney
                                       U.S. Department of Justice, Civil Division
                                       Office of Immigration Litigation
                                       District Court Section
                                       P.O. Box 868, Washington D.C. 20044
                                       202-598-2445
                                       ruth.a.mueller@usdoj.gov

                                       *Counsel for Defendants*