**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL SERVICE
TO THE UNITED STATES, ON THEIR OWN AND ON
BEHALF OF OTHERS SIMILARLY SITUATED,

                             Plaintiffs,

         – against –

ANTONY BLINKEN, *et al.*,

                             Defendants.

Case No. 18-cv-01388-TSC

---

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR RELIEF
FROM THE COURT'S ORDERS AND CROSS-MOTION TO ENFORCE AND
CLARIFY THE COURT'S ORDERS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 2

I.    Defendants Delay the Adjudication of Afghan and Iraqi Special Immigrant
      Visa Applications. ................................................................................................ 2

II.   The Court Holds Defendants' Delays To Be Unlawful at Summary Judgment. ..................... 4

III.  The Court Enters the Approved Adjudication Plan. .................................................... 7

IV.   Defendants' Performance Under the Plan Exposes Their Deficient
      Recordkeeping and Underscores the Need for Monitoring. .......................................... 9

V.    Defendants Seek Relief from the Summary Judgment Ruling and the Plan. ..................... 11

VI.   In the Meantime, Harm Has Escalated. .................................................................. 14

ARGUMENT ................................................................................................................. 17

I.    THE COURT SHOULD DENY DEFENDANTS' MOTION. .......................................... 17

      A.   The Court Should Analyze Defendants' Request for Relief Under Rule
           60(b). ........................................................................................................ 18

      B.   Defendants Have Failed To Carry Their Burden Under Rule 60(b). ........................ 19

           1.   Defendants have not implemented a durable remedy or otherwise
                fulfilled the purpose of this Court's orders. ......................................... 20

           2.   Defendants have failed to show that relief is substantially more
                onerous. ........................................................................................ 22

           3.   Defendants have failed to show that relief is unworkable. ..................... 23

           4.   Defendants have failed to show that relief is detrimental to the
                public interest. ............................................................................... 25

           5.   Defendants have failed to show that vacatur in full or modification is
                suitably tailored to the supposed harms Defendants describe. .............. 25

           6.   Defendants have failed to justify relief under Rule 60(b)(6). ................ 26

      C.   Even If the Court Is Inclined To Entertain Defendants' Request Under
           Rule 54(b), Defendants Have Failed To Show That Justice Requires
           Reconsideration. ......................................................................................... 27

           1.   There is no basis to disturb the Court's conclusion that the "rule of
                reason" factors (1 and 2) favor relief. ................................................ 29

           2.   There is no basis to disturb the Court's conclusion that the prejudice
                factors (3 and 5) favor relief. ........................................................... 33

3.      There is no basis to disturb the Court's conclusion that the competing priorities factor (4) favors relief, or is at the very least neutral. ................................................................................... 35

4.      Though there is no need for the Court to evaluate the impropriety factor (6), this factor would favor relief. ................................. 37

D.      Plaintiffs Should Have the Opportunity To Take Discovery If the Court Is Inclined To Grant Defendants' Motion in Any Part. ................................. 38

II.     THE COURT SHOULD ENFORCE AND CLARIFY ITS ORDERS. ............................... 41

A.      An Accounting Is Necessary Because Nearly One Year Has Passed Since Defendants Reported on the Status of Class Members' Applications. ........................... 41

B.      Additional Relief Is Necessary So That the Court and the Parties Can Meaningfully Evaluate Defendants' Compliance. ........................................................ 42

C.      Clarification Is Necessary So That All Class Members Are Able To Obtain Relief. ................................................................................................. 43

D.      Referral to a Magistrate Judge Would Efficiently Resolve Issues Concerning the Development and Implementation of Any Plans Proposed by Defendants. ................................................................................ 45

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Afghan & Iraqi Allies v. Blinken*,
    No. 20-5251, 2021 WL 4765441 (D.C. Cir. Sept. 16, 2021)...................................................11

*\*Afghan & Iraqi Allies v. Pompeo* ("*Afghan & Iraqi Allies II*"),
    No. 18-cv-01388 (TSC), 2019 WL 4575565 (D.D.C. Sept. 20, 2019)........................... *passim*

*\*Afghan & Iraqi Allies v. Pompeo* ("*Afghan & Iraqi Allies III*"),
    No. 18-cv-01388 (TSC), 2020 WL 587878 (D.D.C. Feb. 5, 2020)....................................7, 18

*\*Afghan & Iraqi Allies v. Pompeo* ("*Afghan & Iraqi Allies IV*"),
    334 F.R.D. 449 (D.D.C. 2020)...........................................................................................8, 32

*Agostini v. Felton*,
    521 U.S. 203 (1997)................................................................................................................22

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013)...............................................................................................38

*All. of Artists & Recording Cos. v. Gen. Motors Co.*,
    306 F. Supp. 3d 413 (D.D.C. 2016).......................................................................................44

*Am. Hosp. Ass'n v. Burwell*,
    812 F.3d 183 (D.C. Cir. 2016)...............................................................................................37

*\*Banks v. Booth*,
    518 F. Supp. 3d 57 (D.D.C. 2021)..........................................................................28, 31, 38

*In re Barr Labs., Inc.*,
    930 F.2d 72 (D.C. Cir. 1991)................................................................................................38

*Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*,
    630 F.3d 217 (D.C. Cir. 2011)..............................................................................................27

*Ctr. for Sci. in the Pub. Int. v. F.D.A.*,
    74 F. Supp. 3d 295 (D.D.C. 2014).........................................................................................36

*Comput. Pros. for Soc. Resp. v. U.S. Secret Serv.*,
    72 F.3d 897 (D.C. Cir. 1996).................................................................................................18

*In re Core Commc'ns, Inc.*,
    531 F. 3d 849 (D.C. Cir. 2008)..............................................................................................29

*Curtiss-Wright Corp. v. Gen. Elec. Co.*,
    446 U.S. 1 (1980)...................................................................................................................18

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ........................................................................31

*Damus v. Wolf*,
  No. CV 18-578 (JEB), 2020 WL 601629 (D.D.C. Feb. 7, 2020) ...........................41

*Dastagir v. Blinken*,
  557 F. Supp. 3d 160 (D.D.C. 2021) .................................................................33

*Decatur Liquors, Inc. v. Dist. of Columbia*,
  No. Civ.A. 04-1971 (RMC), 2005 WL 607881 (D.D.C. Mar. 16, 2005) ...............19

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
  319 F. Supp. 3d 70 (D.D.C. 2018) .......................................................19, 27, 28

*Evans v. Fenty*,
  701 F. Supp. 2d 126 (D.D.C. 2010) ..........................................20, 21, 22, 26

*Fox Television Stations, Inc. v. Filmon X LLC*,
  968 F. Supp. 2d 134 (D.D.C. 2013) .................................................................19

*Goldstein v. Treasury Inspector Gen. for Tax Admin.*,
  278 F. Supp. 3d 131 (D.D.C. 2017) .................................................................18

*Grand Canyon Air Tour Coal. v. F.A.A.*,
  154 F.3d 455 (D.C. Cir. 1998) ........................................................................31

*Hall & Assocs. v. E.P.A.*,
  210 F. Supp. 3d 13 (D.D.C. 2016) ...................................................................27

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ......................................................................................34

*Horne v. Flores*,
  557 U.S. 433 (2009) .................................................................................19, 20

*Johnson v. Ashcroft*,
  223 F. Supp. 2d 116 (D.D.C. 2002) .................................................................18

*Khan v. Blinken*,
  No. 21-1683 (JEB), 2021 WL 5356267 (D.D.C. Nov. 17, 2021) .........................33

*Kirwa v. U.S. Dep't of Defense*,
  Order, No. 17-01793 (ESH), ECF No. 71 (D.D.C. Feb. 21, 2018) .......................42

*Kramer v. Gates*,
  481 F.3d 788 (D.C. Cir. 2007) ........................................................................20

*Liberty Fund, Inc. v. Chao,*
394 F. Supp. 2d 105 (D.D.C. 2005) ...................................................................37

*\*Petties v. Dist. of Columbia,*
662 F.3d 564 (D.C. Cir. 2011) ...............................................................19, 21

*Marsh v. Johnson,*
263 F. Supp. 2d 49 (D.D.C. 2003) ...................................................................41

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
336 F.3d 1094 (D.C. Cir. 2003) ...................................................................31

*Mathews v. Diaz,*
426 U.S. 67 (1976) ...................................................................34

*\*LaShawn A. v. Fenty,*
701 F. Supp. 2d 84 (D.D.C. 2010), *aff'd sub nom.*
*LaShawn A. v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011) ...........................20, 22, 26

*Murway v. Blinken,*
No. 21-1618 (RJL), 2022 WL 493082 (D.D.C. Feb. 16, 2022).............................33

*\*N.L.R.B. v. Harris Teeter Supermarkets,*
215 F.3d 32 (D.C. Cir. 2000) ...............................................................20, 22, 23, 25

*\*N.S. v. Hughes,*
No. 1:20-cv-101-RCL, 2020 WL 4260739 (D.D.C. July 24, 2020) .........................19

*\*Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.,*
842 F. Supp. 2d 127 (D.D.C. 2012) ...................................................................39

*Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.,*
98 F. Supp. 2d 25 (D.D.C. 2000) ...................................................................42

*Nine Iraqi Allies v. Kerry,*
168 F. Supp. 3d 268 (D.D.C. 2016) ...................................................................34

*\*In re People's Mojahedin Org. of Iran,*
680 F.3d 832 (D.C. Cir. 2012) ...................................................................30, 36

*\*Potomac Elec. Power Co. v. Interstate Com. Comm'n,*
702 F.2d 1026 (D.C. Cir. 1983) ...................................................................30

*\*In re Pub. Emps. for Envtl. Resp.,*
957 F.3d 267 (D.C. Cir. 2020) ...................................................................31, 36

*Rufo v. Inmates of Suffolk Cnty. Jail,*
502 U.S. 367 (1992) ...................................................................20, 23, 25

*Saint-Jean v. Dist. of Columbia*,
    No. 08-1769 (ABJ), 2016 WL 10829006 (D.D.C. Oct. 7, 2016) ..........................................28

*\*Salazar v. Dist. of Columbia*,
    633 F.3d 1110 (D.C. Cir. 2011) ...........................................................................................27

*Salazar v. Dist. of Columbia*,
    896 F.3d 489 (D.C. Cir. 2018) .............................................................................................42

*Salazar v. Dist. of Columbia*,
    No. 93-cv-452 (TSC), 2022 WL 990742 (D.D.C. Mar. 31, 2022) ........................................33

*Saunders v. White*,
    191 F. Supp. 2d 95 (D.D.C. 2002) ........................................................................................40

*Shapiro v. Dep't of Just.*,
    No. 12-cv-313 (BAH), 2020 WL 5970640 (D.D.C. Oct. 8, 2020) ........................................18

*Skalka v. Kelly*,
    246 F. Supp. 3d 147 (D.D.C. 2017) ......................................................................................34

*Telecomms. Rsch. & Action Ctr. v. F.C.C.*,
    750 F.2d 70 (D.C. Cir. 1984) ...................................................................................... *passim*

*Twelve John Does v. Dist. of Columbia*,
    861 F.2d 295 (D.C. Cir. 1988) .......................................................................................24, 26

*Yi Tao v. Roberts*,
    No. 18-1233, 2021 WL 3856620 (D.D.C. Aug. 30, 2021) ....................................................19

*Zaman v. U.S. Dep't of Homeland Sec.*,
    No. 19-3592 (ABJ), 2021 WL 5356284 (D.D.C. Nov. 16, 2021) .........................................33

**Statutes**

28 U.S.C. § 1292(a)(1)..........................................................................................................11, 19

Afghan Allies Protection Act of 2009,
    Pub. L. No. 111-8, § 602, 123 Stat. 807 (2009)......................................................................2

Emergency Security Supplemental Appropriations Act, 2021,
    Pub. L. No. 117-31 § 401, 135 Stat. 309 (2021)...................................................................16

Pub. L. No. 113-66 §§ 1218-19, 127 Stat. 910 (2013) ...............................................................3

Pub. L. No. 114-92 § 1216(a)(2), 128 Stat. 1045 (2015)...........................................................16

Pub. L. No. 114-328 § 1214(a), 130 Stat. 2479 (2016) .............................................................16

Pub. L. No. 116-92 § 1219(a), 133 Stat. 1636 (2019) ....................................................16

Refugee Crisis in Iraq Act of 2007,
    Pub. L. No. 110-181 § 1244, 122 Stat. 395 (2008).............................................2

**Federal and Local Rules**

Fed. R. Civ. P. 23 .....................................................................................................44

Fed. R. Civ. P. 54 ............................................................................................... *passim*

Fed. R. Civ. P. 56 ................................................................................................27, 40

Fed. R. Civ. P. 59 ...................................................................................................7, 18

Fed. R. Civ. P. 60 ............................................................................................... *passim*

Fed. R. Civ. P. 65 .........................................................................................................5

Local Civ. Rule 7(m) .................................................................................................41

**Other Authorities**

159 Cong. Rec. 13543 (2013) .......................................................................................3

159 Cong. Rec. 14745 (2013) .......................................................................................3

167 Cong. Rec. S5156 (daily ed. July 29, 2021) ........................................................17

167 Cong. Rec. S5214 (daily ed. July 30, 2021) ........................................................17

# INTRODUCTION

Plaintiffs are a class of Afghan and Iraqi special immigrant visa applicants whose cases have been pending in government control for over nine months despite Congress's instruction that the Defendant agencies complete processing within nine months. Congress enacted the nine-month timeline in 2013 in recognition of the serious threats that applicants face. Recently—in the midst of the COVID-19 pandemic, the withdrawal of U.S. troops from Afghanistan, and escalating risks to applicants—Congress reaffirmed that timeline.

In September 2019, this Court granted Plaintiffs summary judgment, declaring Defendants' delays in adjudicating Plaintiffs' applications to be unreasonable and requiring Defendants to develop an adjudication plan for promptly processing Plaintiffs' applications to completion. But to date, thousands of class members whom the parties identified as having already experienced unreasonable delay in May 2020, when the adjudication plan was proposed, still have not received final decisions. Further, Defendants' actions and inaction continue to harm class members and to increase their ranks: Iraqi applicants are still waiting despite submitting applications over seven years ago. Afghan applicants now wait over nine months for Defendants even to acknowledge submissions as complete. And Defendants have admitted to losing and failing to track applications.

It is in this context that Defendants seek to be relieved of their obligations to the class, and it is not surprising that Defendants fail to meet their burden. Because the Court's grant of summary judgment was a final order, the Court should analyze Defendants' motion under Rule 60(b) rather than under Rule 54(b). Either way, however, the supposedly changed circumstances that they cite—including embassy closures that are not new; problems with the management of applications that are of their own making; and alleged program improvements that they fail to link to application processing times or to properly substantiate, and which in any event have come nowhere close to curing the delays—do not warrant the relief Defendants seek under either rule.

If anything, the record establishes that the Court should grant further relief to Plaintiffs. First, because Defendants have filed no reports under the adjudication plan since July 2021, Plaintiffs request that the Court order Defendants to provide an accounting of the status of the plan's beneficiaries once the plan resumes. Second, so that the parties and the Court can reliably monitor Defendants' progress, Plaintiffs request that the Court order Defendants to propose a plan for tracking and reporting the time they take to adjudicate a special immigrant visa application within and across processing stages. Third, Plaintiffs request that the Court clarify its summary judgment order; to the extent the injunctive relief was not limited to applicants who were class members when the solicited adjudication plan was proposed, Plaintiffs further request that the Court order Defendants to propose a supplemental plan to ensure prompt processing of applicants as they enter the class. Finally, Plaintiffs request that the Court refer the parties to a magistrate judge to oversee the development and implementation of any plans Defendants propose.

## BACKGROUND

### I.     Defendants Delay the Adjudication of Afghan and Iraqi Special Immigrant Visa Applications.

Congress created the Afghan and Iraqi special immigrant visa (or "SIV") programs to enable people facing serious threats because of their service to the United States to immigrate to the United States with their families. *See* Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181 § 1244, 122 Stat. 395, 396-98 (2008); Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, § 602, 123 Stat. 807, 807-11 (2009). By late 2013, roughly six years after the creation of the Iraqi program, and four years after the creation of the Afghan program, it was clear that the Defendant agencies' delays in adjudicating applications were undermining the purpose of the programs: Representative Earl Blumenauer lamented that programs created "to help . . . people . . . to be able to escape to safety" "ha[d] been hampered by what c[ould] only be charitably described as

'bureaucratic ineptitude.'" 159 Cong. Rec. 13543 (2013) (noting that the State Department "can't even tell us how many thousands of people are in the backlog"). Senator Jeanne Shaheen remarked, "The stories we are hearing about the backlog are entirely inexcusable. Applicants ought to be able to cut through the redtape and bureaucratic nightmare to get their visas processed quickly and more efficiently . . . ." 159 Cong. Rec. 14745 (2013).

On December 26, 2013, addressing the delays, Congress instructed the Secretaries of State and Homeland Security to, within 120 days:

> improve the efficiency by which applications for special immigrant visas . . . are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

Pub. L. No. 113-66 §§ 1218-19, 127 Stat. 910, 914 (2013). Though Congress cautioned that this directive should not be "construed to limit the ability of a Secretary . . . to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time," Congress did not otherwise qualify it. *Id.* Congress also required the Secretaries of State and Homeland Security to publish on a quarterly basis reports that specified, among other things, "the reasons for the failure to process any applications that have been pending for longer than 9 months," and average wait times for applicants within stages of the multi-stage SIV application process. Pub. L. No. 113-66 §§ 1218-19, 127 Stat. 912, 915 (2013).[1] On January 28, 2014, the Secretary of State wrote to all consular

---

[1] The stages consist, broadly, of a request for approval by the relevant State Department Chief of Mission, or their designee (referred to as "COM"), a petition on Form I-360 to U.S. Citizenship and Immigration Services (or "USCIS," a sub-agency of the Department of Homeland Security), and a visa application to the State Department. *See id.* Only the visa stage requires in-person processing, while earlier stages are completed electronically and processed remotely. Contrary to

posts advising them of the December 2013 legislative amendment and explaining that it "mean[t] that a qualified applicant who is eligible for an SIV should receive it no later than nine months from the date that [the State Department's National Visa Center] declare[d] the applicant's [Chief of Mission] application documentarily complete." *See* Decl. of Olivia P. Greene ("Greene Decl." attached to this memorandum) Ex. 17, at 4.

Despite Congress's directive, SIV applicants experienced persistent delays far exceeding nine months. Class representatives' cases illustrate the extent and consequences of these delays. When this lawsuit was filed, for example, Jane Doe Delta had already waited sixteen months for a decision by the Chief of Mission (or "COM"), the first stage of the SIV application process. *See* Jane Doe-Delta Decl. ¶ 13, ECF No. 3-8. John Doe Echo waited over fifteen months for COM to (erroneously) deny his application; he successfully appealed that denial and progressed to the interview stage, only to spend another two-and-a-half years in government-controlled processing, with no decision in sight. *See* John Doe-Echo Decl. ¶¶ 9-11, ECF No. 3-9. Meanwhile, they and their families lived in increasing fear of deadly reprisals. *See, e.g.*, John Doe-Alpha Decl. ¶ 13, ECF No. 3-5; Jane Doe-Delta Decl. ¶ 14. As Plaintiffs later learned, despite Congress requiring Defendants to ensure that applications would not wait in government control for longer than nine months, and to explain in public quarterly reports their failure to adjudicate any longer-pending applications, Defendants had no process for ensuring that Plaintiffs' applications would be timely considered or—failing that—for identifying the applications as unduly delayed.

## II.    The Court Holds Defendants' Delays To Be Unlawful at Summary Judgment.

In 2018, Plaintiffs filed suit on behalf of a putative class of all people who have applied for an Afghan or Iraqi SIV by submitting an application for COM approval, and whose applications

---

Defendants' assertion, *see* Mot. 3, the 14-step process set out in Defendants' public quarterly reports is a function of agency policy; it was not established by Congress.

have been in government-controlled steps for longer than nine months. *See* Am. Compl. ¶ 66, ECF No. 23. In counts 1 and 2 of the five-count Amended Complaint, Plaintiffs sought a declaration that Defendants have unreasonably delayed the processing and adjudication of their SIV applications and those of the other class members, and an injunction compelling Defendants to take the unreasonably delayed agency action. *See id.* ¶¶ 68-77.

Plaintiffs moved for a preliminary injunction on counts 1 and 2 in September 2018 and sought expedited discovery in support of that motion regarding the nature and extent of the delays faced by the class. *See* ECF Nos. 34, 35. Following limited discovery and supplemental briefing, the Court heard oral argument on July 26, 2019. At argument, the Court requested the parties' positions on advancing the trial on the merits and consolidating it with the preliminary injunction hearing under Rule 65(a)(2) of the Federal Rules of Civil Procedure. Tr. of July 26, 2019 Hearing ("Tr."), at 5:7-19, ECF No. 72. Plaintiffs objected on the ground that additional discovery was needed to assess the magnitude of delays across the SIV process, given the limitations of Defendants' processing data, which did not track applicants across all application stages. *See id.* at 5:20-6:3, ECF No. 72; *see also Afghan & Iraqi Allies v. Pompeo*, No. 18-cv-01388 (TSC), 2019 WL 4575565, at *3 n.5 (D.D.C. Sept. 20, 2019) ("*Afghan & Iraqi Allies II*"). Defendants did not object to consolidation. *See* Tr. 6:9-16. The Court ultimately advanced Plaintiffs' motion to a trial on the merits. *See* Tr. 7:22-8:13.

On September 20, 2019, the Court granted Plaintiffs summary judgment on counts 1 and 2. In concluding that Defendants' delays warranted relief, the Court cited the six factors set out in *Telecommunications Research & Action Center v. F.C.C.*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"):

1.  Whether a "rule of reason" governs the time an agency takes to make a decision;
2.  Whether Congress has provided in the enabling statute a timetable or other indication of the speed with which it expects

the agency to proceed, thus supplying content for the rule of reason;

3.  The affected sphere of regulation, because delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

4.  The effect of expediting delayed action on agency activities of a higher or competing priority;

5.  The nature and extent of the interests prejudiced by the delay; and

6.  Any impropriety of the agency, although the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Afghan & Iraqi Allies II*, at *5-11 (citing *TRAC*, 750 F.2d at 79-80).

The Court concluded that the first two factors weighed in favor of Plaintiffs. *See Afghan & Iraqi Allies II*, at *6-8. The Court cited the nine-month statutory benchmark, evidence that applicants waited longer—and on average much longer—than nine months, and Defendants' failure to "proffer[] a time frame for when they expect to adjudicate Plaintiffs' applications." *Id.* at *2-4 & n.7, *6-8. The Court also recognized several "potential problems with Defendants' method of tracking and reporting SIV application processing" in their congressionally mandated quarterly reports, including "Defendants' policy of excluding pending cases in [their] calculation of average processing times," of reporting on the time the National Visa Center (or "NVC") takes to "respond to any communication" "instead of capturing the time [NVC] takes to review an application," and of "exclud[ing] time spent awaiting the adjudication of a COM appeal"—all of which led to inaccurate portrayals of the delays. *Id.* at *3-4. Rejecting Defendants' suggestions otherwise, the Court explained that it was "clear that Congress did not intend to give Defendants an unbounded, open-ended timeframe in which to adjudicate SIV applications." *Id.* at *8.

As to the third and fifth *TRAC* factors, which go to prejudice, the Court concluded that they weighed in Plaintiffs' favor as well. *See id.* at *8-9. The Court credited Plaintiffs' evidence "that the delays (1) place Plaintiffs' lives in danger, (2) cause Plaintiffs to live with the stress and anxiety

of trying to protect themselves and their families from danger, (3) prevent Plaintiffs from adequately planning for the future, and (4) harm national interests because delays undermine other countries' trust in this country's commitments," noting also that delays compromise the application process by preventing clearance of deserving applicants, "because the passage of time makes it more difficult to obtain the requisite verifications and information to pass background checks." *Id.*

The Court concluded that the fourth TRAC factor—the effect of expediting delayed action on other activities of a higher or competing priority—was "either neutral or weigh[ed] in favor of Plaintiffs." *Id.* at *9-11. Defendants, the Court noted, "did not proffer any specific agency activities that would be adversely affected" if Plaintiffs were to be granted relief. *Id.* at *9. Reasoning that it was unnecessary to its decision, the Court did not address whether Defendants had engaged in any impropriety, the sixth factor. *See id.* at *6.

Based on this analysis, the Court granted Plaintiffs declaratory and injunctive relief: it ruled that "Defendants' delays in the processing and adjudication of the SIV applications of the Plaintiffs and members of the Class are unreasonable" in light of the applicable law, and ordered Defendants to "submit a plan for promptly processing and adjudicating the applications of current class members" within thirty days after the Court resolved the pending class certification dispute. Order, Sept. 20, 2019, ECF No. 76 ("Summ. J. Order"). The Court rejected Defendants' argument that this relief was "programmatic" in nature, as well as the suggestion that "Defendants' recent efforts to improve the application process . . . obviate[d] the need for judicial monitoring." *Afghan & Iraqi Allies II*, at *5 n.9, *8, *11 & n.14.

## III.   The Court Enters the Approved Adjudication Plan.

On May 21, 2020, following Defendants' unsuccessful motion for reconsideration of the Court's summary judgment order under Federal Rule of Civil Procedure 59(e), *see Afghan & Iraqi Allies v. Pompeo*, No. 18-cv-01388 (TSC), 2020 WL 587878 (D.D.C. Feb. 5, 2020) ("*Afghan &*

*Iraqi Allies III*"), the Court's certification of the class, *see Afghan & Iraqi Allies v. Pompeo*, 334 F.R.D. 449 (D.D.C. 2020) ("*Afghan & Iraqi Allies IV*"), and the Court's rejection of Defendants' initial proposed adjudication plan as "misguided and inadequate," Order, Apr. 15, 2020, ECF No. 106 ("Apr. 2020 Order"), the parties jointly submitted a proposed adjudication plan for the prompt processing and adjudication of applications of then-current class members, *see* ECF No. 111-1. Because Defendants did not track the time applicants awaited government action, the parties relied on an approximation to identify class members. *See id.* at 1 n.1 ("no class identification methodology will perfectly capture class members given the manner in which Defendants maintain records for SIV applicants"). At the time, the parties identified roughly 10,000 applicants as members of the class. *See id.* at 2-7 & n.2 (identifying a sum of 9,877 class members and noting that this did not reflect the total number).

The parties proposed a series of performance standards for Defendants to meet as they processed these class members' applications to completion in accordance with the processing steps Defendants had established. For example, the parties agreed that NVC would complete its review of an applicant's COM submission within 15 days, and that COM, in turn, would adjudicate a class member's application or appeal within 120 days of receiving it from NVC. *See id.* at 2. At the immigrant visa interview stage, the parties agreed that the State Department would offer the class member "the next available interview" within 10 days of determining that their application was complete, and that the State Department "w[ould] schedule the interview within 60 days of contacting the applicant unless the applicant request[ed] a different interview location or interview time or unless there [we]re reasonable circumstances for the delay as explained in the Progress Reports." *Id.* at 5. The parties "acknowledge[d] that as of the date of the submission of the plan the Visa Unit at the U.S. Embassy in Afghanistan [wa]s closed and consular services in Iraq [we]re

severely limited," and that interviews generally were not available in any other locations, either, due to the COVID-19 pandemic. *Id.* Of the fourteen total steps outlined by Defendants, the parties did not prescribe any performance standards for steps 1, 6, 9, or 14, which were characterized as "applicant-controlled." *Id.* at 2-7.

The parties agreed that Defendants would report quarterly on their performance by accounting for class member adjudications in the ten government-controlled steps[2] and describing Defendants' actual performance in instances in which they failed to meet the performance standards. *See* ECF No. 111-1, Progress Report Template. If Defendants failed to meet a performance standard, they were to explain why their performance did not meet the target and include actions they would take to bring their performance in line with the standard. *See id.* at 7-8. The proposal also included a meet-and-confer process for the parties to attempt to resolve any concerns Plaintiffs had about Defendants' performance. *See id.* at 8.

The Court ordered the parties' proposal as the Approved Adjudication Plan (or "Plan") on June 14, 2020. *See* Order, ECF No. 113.

## IV. Defendants' Performance Under the Plan Exposes Their Deficient Recordkeeping and Underscores the Need for Monitoring.

While the Plan was in effect, Defendants consistently failed to meet performance standards. In reports filed between October 2020 and July 2021, Defendants reported that they did not meet the performance standards for the COM approval stage, the visa interview stage, or the administrative processing stage for either the Afghan or Iraqi programs. *See* Greene Decl. ¶¶ 4, 10-11, 20, 26. At the COM approval stage, the reported average processing times for class members were also significantly longer than the reported averages for adjudications in the

---

[2] The parties agreed that Defendants would chart numbers of class members in addition to reporting compliance in narrative for only a subset of these steps. *See* ECF No. 113-1, at 2 n.2.

corresponding public quarterly reports, which pertained to the general pool of all applicants. *See id.* ¶ 34 (discrepancies of 670 days, 68 days, 227 days, and 296 days, respectively). By the first half of 2021, Defendants reported that they also were not meeting benchmarks at step 2 (receipting COM submissions) and step 8 (sending visa application packets) in the Afghan program. *See id.* ¶ 16. Despite failing to meet performance standards, Defendants did not report steps they planned to take to improve performance, as required by the Plan. *See id.* ¶¶ 6, 12, 21; Joint Status Report 15, Mar. 5, 2021, ECF No. 136 ("Mar. 2021 Joint Status Report") (Pls.' statement).

Defendants' reports were also riddled with errors. *See* Defs.' Notice of Lodging Corrected Progress Report, ECF No. 121; Defs.' Notice of Errata, ECF No. 141; Defs.' Notice of Errata, ECF No. 142; Defs.' Notice of Lodging Corrected Progress Reports, ECF No. 149. During the Court-ordered meet-and-confer process, Plaintiffs raised numerous issues evident from the face of the reports and from information provided by class members. For example, after receiving the first progress report, Plaintiffs notified Defendants of numerous class members who were awaiting interview scheduling but not reflected in Defendants' report. *See* Greene Decl. ¶ 6. In a corrected filing, Defendants acknowledged that they had failed to include these applicants because of a tracking error. *See* Defs.' Notice of Lodging Corrected Progress Report, ECF No. 121. The meet-and-confer process surfaced further deficiencies in Defendants' recordkeeping, including Defendants' mistaken view that approval of one applicant's I-360 petition had been revoked, and that two other applicants had been scheduled for visa interviews in Europe—where they resided— when in fact the State Department had erroneously scheduled those interviews in Kabul. *See* Greene Decl. Ex. 2, at 3-5 (rows 2, 4, 5); *id.* Ex. 3, at 3-5 (rows 2, 4, 5).

Following receipt of the second and third progress reports, Plaintiffs continued to notify Defendants of discrepancies in the reported number of class members at multiple steps, including

Defendants' apparent failure to account for thousands of applicants at the COM adjudication step. *See* Greene Decl. ¶¶ 13-19. Defendants never resolved these discrepancies. *See id*. In July 2021, after receiving the fourth report, Plaintiffs informed Defendants that class counsel had been contacted by an Iraqi class member who was awaiting adjudication of his COM appeal, contrary to Defendants' reporting throughout the four previous reporting cycles that no Iraqi applicants were pending at the COM stage. *See id.* ¶ 22. Plaintiffs provided the applicant's case number and asked Defendants to confirm that no additional Iraqi class members were pending at that step. *See id.* Ex. 6, at 3. Defendants responded in August that they were unaware of any additional Iraqi class members pending at that step, only to report in November that they had identified 19 additional cases. *See id.* ¶¶ 24-25. By the time they filed their errata with the Court in December 2021, Defendants had identified 31 cases that had seen no movement because "Embassy Baghdad did not realize that there were additional cases pending action." *See* Notice of Lodging Corrected Progress Reports 2, ECF No. 149.

## V.     Defendants Seek Relief from the Summary Judgment Ruling and the Plan.

On August 12, 2020, Defendants filed a notice of appeal from the Court's orders under 28 U.S.C. § 1292(a)(1). *See* Notice of Appeal, ECF No. 117. Following Plaintiffs' motion to dismiss the appeal as untimely, *see* D.C. Cir. Doc. No. 1864954, the D.C. Circuit's referral of the motion to the merits panel, *see* D.C. Cir. Doc. No. 1901010, and issuance of a briefing schedule, *see* D.C. Cir. Doc. No. 1909703, Defendants moved to voluntarily dismiss their appeal the day their opening brief was due, *see* D.C. Cir. Doc. No. 1913922; *see also Afghan & Iraqi Allies v. Blinken*, No. 20-5251, 2021 WL 4765441 (D.C. Cir. Sept. 16, 2021) (dismissing the appeal).

In March 2021, Defendants sought a stay of litigation and reporting under the Plan in this Court, representing "that the litigation may become moot due to recent Executive and Administrative actions." Mar. 2021 Joint Status Report 2-4, 8 (Defs.' statement). Defendants also

contended that the Court should grant the stay because future "programmatic or policy changes
. . . may counsel a Rule 60(b) order." *Id.* at 5. In their request for relief, Defendants did not mention
the ongoing COVID-19 pandemic or any actions they were taking in light of the impending
withdrawal of U.S. troops from Afghanistan. *See* Mar. 2021 Joint Status Report 2-6 (Defs.'
statement); *compare id.* at 17-18 (Pls.' statement) ("As the United States moves toward
withdrawing troops from Afghanistan, class members will find themselves in even greater peril
. . . ."). The Court declined to grant the requested stay. *See* Min. Order, May 27, 2021.

On October 19, 2021, with "thousands" of class members still awaiting final adjudication
under the Plan[3]—and with an untold but likely substantial number of applicants having since
entered the class—Plaintiffs consented to a sixty-day stay of Defendants' obligations under the
Plan, as well as of Plaintiffs' ability to enforce the Court's orders. The stay was intended to "allow
the Parties to pursue the possible resolution of this case, which would include, among other things,
a revised or new plan, as appropriate, in light of changed circumstances, for the prompt processing
and adjudication of all class members' SIV applications and that [would] allow[] the Court and
Plaintiffs to evaluate Defendants' progress in doing so." Joint Stipulation 2-3, Oct. 19, 2021, ECF
No. 144 ("Oct. 2021 Joint Stip."); *id.* ¶ 8. The parties stipulated that during the stay Defendants
would "continue the prompt processing of class members' applications to the best of their ability"
and provide to Plaintiffs limited reporting on processing. *Id.* ¶¶ 1-5. The parties further stipulated
that "Defendants' obligations under the Approved Adjudication Plan [would] recommence upon
the conclusion of the stay." *Id.* ¶ 9. After two consensual time-limited extensions of the stay,
Plaintiffs informed Defendants that they would consider a brief additional stay only if Defendants

---

[3] Defendants have provided no evidence to dispute that thousands of these class members still
await final adjudication and have refused to provide an accounting of the status of their cases.

agreed to account for the status of applications covered by the Plan—and that they otherwise did not believe a further stay to be an appropriate precondition to continued settlement negotiations. *See* Joint Status Report 6, Mar. 16, 2022, ECF No. 154 ("Mar. 2022 Joint Status Report") (Pls.' Statement). Settlement talks ceased on March 16, 2022, when Defendants informed Plaintiffs that they were unwilling to provide this accounting. *See* Mar. 2022 Joint Status Report 1 (Defs.' Statement); *id.* at 6 (Pls.' Statement).

On March 15, 2022, the Court *sua sponte* extended the stay until further order of the Court and ordered the parties to file a joint status report and proposed order by March 16, 2022. *See* Min. Order, Mar. 15, 2022. In the joint status report, and in a motion that they filed the same day, Defendants again advocated for a stay on the ground of potential mooting events, explanations of which they promised to provide "in due course." *See* Mar. 2022 Joint Status Report 2-3 (Defs.' statement); Defs.' Mot. for Leave to Respond 8, ECF No. 155; *see also* Defs.' Opp to Pls.' Cross-Mot. 10, ECF No. 159. By minute order dated April 28, 2022, the Court granted Defendants' stay request, denied Plaintiffs' cross-motion to lift the stay, and ordered the parties to file another joint status report by May 13, 2022. *See* Min. Order, Apr. 28, 2022.[4]

In that joint status report, Defendants conceded that none of the supposed mooting events that they had previously cited rendered any aspect of the case moot. *See* Joint Status Report, May 13, 2022, ECF No. 162 ("May 2022 Joint Status Report"). They informed the Court that they intended to file a motion under Rules 54(b) and 60(b) of the Federal Rules of Civil Procedure imminently. *See id*. On May 24, 2022, Defendants filed a motion for relief from the Court's summary judgment order and the Approved Adjudication Plan, arguing that the Court should reconsider and revise its grant of summary judgment in Plaintiffs' favor and relieve Defendants of

---

[4] Plaintiffs filed a notice of appeal of that order on June 22, 2022. *See* ECF No. 165.

any obligation to provide relief to Plaintiffs. *See* Defs.' Mot. for Relief, ECF No. 163 ("Mot.").

## VI.   In the Meantime, Harm Has Escalated.

Notwithstanding Congress's directives, this lawsuit, and the Court's orders, Defendants' processing times have remained stubbornly high. All Iraqi class members applied by September 30, 2014 (the deadline for new applications)—in other words, at least seven-and-a-half years ago. As for Afghan applicants, even with numerous deficiencies in reporting that misrepresent and likely undercount delays, *see Afghan & Iraqi Allies II*, at *3-4; Greene Decl. ¶¶ 31, 37, the reported aggregate of average processing times has been well in excess of nine months since at least July 2016—when Defendants began reporting time in calendar days rather than business days.[5] *See* Greene Decl. ¶ 40. Specifically, the reported aggregate averaged 667.5 days (22 months), fluctuating between a high of 996 days (33 months) and a low of 374 days (12 months). *See id.*

Defendants' continuing processing delays have had severe costs and, as the Court predicted, "the probability of actual harm and the related stress [have been] compounded each day an applicant waits for an adjudication." *Afghan & Iraqi Allies II*, at *9. With the withdrawal of U.S. forces from Afghanistan now complete, applicants' longstanding fears about the consequences of being left behind have come to fruition. *See, e.g.*, Mot. for Prelim. Inj., Exs. 6-7,

---

[5] Because Defendants aggregate average times by quarter (*i.e.*, they calculate the total by adding up the average processing times for each government-controlled step in a given quarter), the reported total is at best a loose approximation of the time applicants have waited for adjudication across time. The Iraqi reports illustrate this problem: The reported total in January 2022 was 440 days, which encompasses virtually no time at the first stages of the application process because, among other things, no new applicants have entered the program since September 30, 2014. *See* Greene Decl. ¶ 31. *Contra* Mot. 15-16, 26-27 (suggesting that this figure marks an improvement). Any current applicant, however, has experienced lengthy total delays when accounting for time their applications were pending at earlier stages of the process during earlier quarters. *See, e.g.*, *Afghan & Iraqi Allies II*, at *3 ("The Iraqi class members have waited over 5 years for an initial decision on their COM application."). In addition, the reporting only of averages makes it impossible to know whether and how many applications are languishing beyond the average.

ECF Nos. 34-18, 34-19 (2013 and 2012 articles describing Afghan applicants' fears). Afghans affiliated with the U.S. government have been forced into hiding and have faced threats, assaults, and revenge killings. *See* Greene Decl. Ex. 24 ("W. Decl.") ¶¶ 25-26; *id.* Ex. 13 (report on statements by U.N. official). Though Defendants have refused to provide clear data[6] on the number of SIV applicants who were assisted in the U.S. government's evacuation efforts in Afghanistan, the available information suggests that only a small portion were helped. *See* Greene Decl. Ex. 12 (majority of applicants left behind); *id.* Ex. 15 (large portion of people included in SIV figure were CIA affiliates who had not applied for SIVs). Applicants from Iraq, where the war officially ended in 2011, continue to be exposed to harm. For example, an Iraqi class member whose case has been pending since early 2014 continues to receive threatening messages, and a close associate of his was recently murdered. *See* Greene Decl. Ex. 26 ("A. Decl.") ¶¶ 2-3, 33-37. Meanwhile, due to Defendants' delays, three of his children are no longer eligible to immigrate with him. *See id.* ¶ 43.

Delays not only put lives at risk, but also have led applicants to face additional obstacles that they would not have confronted had their applications been adjudicated in a timely fashion. As cases stretch on, delays beget delays: applicants may find themselves facing duplicative

---

[6] Defendants have masked the true numbers with inconsistent reports and inflated figures that group SIV applicants with SIV holders and/or individuals "expected" to apply for SIVs, along with any derivative relatives. In their filings with the Court, Defendants provide three accounts that conflict in subtle but significant ways. *Compare* Brooks Decl. ¶ 7 (evacuation included "33,000 Afghan nationals who either had pending SIV applications at the time of the evacuation or who have since been determined to be SIV eligible" [*i.e.*, who have pending applications or have not yet applied]), *with* Evans Decl. ¶ 18, ECF No. 163-3 (evacuation included "3,000 . . . Afghan SIV holders [*i.e.*, who already have SIVs] and an additional estimated 30,000 [who] are eligible to apply for Special Immigrant status and are expected to do so" [*i.e.*, who have not yet applied]), *with* Lafferty Decl. ¶ 10, ECF No. 163-9 (estimated 36,821 SIV applicants [*i.e.*, who have pending applications] and 3,290 SIV holders [*i.e.*, who already have SIVs] were relocated (misciting an agency report that makes clear that former figure includes individuals who are "known to be eligible to apply . . . , had not yet applied . . . , and are expected to do so," *see* Greene Decl. Ex. 19, at 4)).

requests for information, *see* A. Decl. ¶¶ 20-21, 31, a baby might be born, creating new logistical hurdles, *see* W. Decl. ¶¶ 16-18, 29, 32, or facts may become more difficult to verify, *see Afghan & Iraqi Allies II*, at *9. Applicants who might have already immigrated to the United States had their applications been processed timely have instead faced the effects of the COVID-19 pandemic, new embassy closures, and new processing bottlenecks on the adjudication of their applications. *See* A. Decl. ¶¶ 28-29; W. Decl. ¶¶ 14, 31. Current reports indicate that the National Visa Center is now taking over nine months to even open COM applications, appeals, and any related correspondence. *See* Greene Decl. Ex. 25 ("S. Decl.") ¶¶ 4-6, 9. And those whose cases might already have been denied are being barred from pursuing other pathways to safety, like the United States' related refugee pathway for U.S.-affiliated Afghans, as they continue waiting for an SIV adjudication. *See* Greene Decl. Ex. 20 (State Department instructions explaining, "If you are eligible for the [SIV], you must apply for the [SIV]. The P-2 [refugee] Designation is only available to Afghan nationals who do **not** qualify for a [SIV].").

Congress, for its part, has remained resolute in its support of the SIV programs and its insistence on prompt processing. On July 29, 2021, in an emergency bill passed with overwhelming bipartisan support in the context of the withdrawal of U.S. troops from Afghanistan, rapid Taliban advances, and the COVID-19 pandemic, Congress expanded SIV eligibility[7] and increased the number of available visas while underscoring—through an amendment explicitly

---

[7] Congress restored the one-year employment eligibility threshold that had been in place until late 2015 for applicants applying after September 30, 2015. *Compare* Pub. L. No. 114-92 § 1216(a)(2), 128 Stat. 1045 (2015) (requiring one year or two years of employment depending on application date). It also eliminated the requirement of "sensitive and trusted" employment for personnel employed by the International Security Assistance Force (a NATO-led force). The requirement of "sensitive and trusted" employment for individuals employed instead by or on behalf of the U.S. government had been eliminated on December 20, 2019, having been introduced through a 2016 amendment. *Compare* Pub. L. No. 114-328 § 1214(a), 130 Stat. 2479 (2016) (adding qualifying language), *with* Pub. L. No. 116-92 § 1219(a), 133 Stat. 1636 (2019) (eliminating it).

mentioning COM approval—that the nine-month timeline that it set in 2013 encompasses all stages of the SIV process. *See* Emergency Security Supplemental Appropriations Act, 2021, Pub. L. No. 117-31 §§ 401(a)(1)(A), 401(a)(2)(B)(ii), 401(a)(2)(D)(3), 135 Stat. 309, 315-16; 167 Cong. Rec. S5156 (daily ed. July 29, 2021) (98 to 0 vote in the Senate). The bill set to rest Defendants' position, taken throughout this litigation—and contrary to its own internal guidance, *see supra* Bkgd. I—that the nine-month timeline pertains only to the last stage of the SIV application process. *See, e.g.*, Defs.' Mot. for Recons. 6-15, ECF No. 79. As Senator Shaheen emphasized when the President signed the bill into law, "We must send a strong message to our current and future allies: If you stand by our side on the battlefield, we will have your back." 167 Cong. Rec. S5214 (daily ed. July 30, 2021).

## ARGUMENT

## I.     THE COURT SHOULD DENY DEFENDANTS' MOTION.

The Court should deny Defendants' request for reconsideration of the Court's summary judgment decision under Rule 54(b) or, in the alternative, for vacatur or modification of the Court's orders under Rule 60(b). Rule 60(b) governs a court's review of final orders and is the applicable standard here. Not only does Rule 60(b) preclude Defendants from relitigating the merits of the Court's summary judgment order, as they attempt to do here, but it also provides no basis for vacatur or modification in their favor. Even if the Court applies the "as justice requires" standard under Rule 54(b), it should deny Defendants' motion because Defendants have failed to meet their burden under that rule. If the Court is inclined to credit Defendants' arguments under either Rule 60(b) or 54(b), Plaintiffs are at the very least entitled to discovery into the allegedly changed circumstances described by Defendants and their effect on the SIV programs, the Plan, and the Court's unreasonable delay analysis.

### A.    The Court Should Analyze Defendants' Request for Relief Under Rule 60(b).

The Court should analyze Defendants' motion under Rule 60(b) rather than Rule 54(b).

Rule 60(b) governs relief from "a final judgment, order, or proceeding," and the Court's summary

judgment order was final within the plain meaning of the term: it was "the ultimate disposition of

. . . individual claim[s]." *See Curtiss-Wright Corp. v. Gen. Elec. Co*., 446 U.S. 1, 7-8 (1980)

(internal quotation marks omitted) (contemplating that an order may be "final" even if it is not

ultimately entered as a final judgment under Rule 54(b)). Courts in this district have applied Rule

60(b) in their review of orders finally resolving individual claims within a multi-claim action. *See*

*Goldstein v. Treasury Inspector Gen. for Tax Admin.*, 278 F. Supp. 3d 131, 138 (D.D.C. 2017)

(reviewing order granting partial summary judgment under Rule 60(b)); *Johnson v. Ashcroft*, 223

F. Supp. 2d 116, 117 (D.D.C. 2002) (reviewing order dismissing some but not all claims under

Rule 60(b)). *But see Shapiro v. Dep't of Just.*, No. 12-cv-313 (BAH), 2020 WL 5970640, at *2-3

(D.D.C. Oct. 8, 2020) (reviewing under Rule 54(b) an order, among other things, granting in part

defendant's and denying plaintiff's summary judgment motions). In fact, Defendants previously

moved for reconsideration under Rule 59(e)—which sets a time limit for reconsideration of final

decisions, after which a request for relief is to be made under Rule 60(b), *see Comput. Pros. for*

*Soc. Resp. v. U.S. Secret Serv.*, 72 F.3d 897, 902-03 (D.C. Cir. 1996)—and the Court reviewed the

order under Rule 59(e) in deciding that motion. *See Afghan & Iraqi Allies III*, at *1.

Review under Rule 60(b) is appropriate for the additional reason that the Court's summary

judgment decision involved immediately appealable injunctive relief. Rule 54(b) exists to govern

treatment of an interim ruling that is not immediately appealable in a case with multiple claims: a

court may certify an appeal in that case, or otherwise the ruling remains subject to reconsideration

until final judgment. *See* Fed. R. Civ. P. 54(b); *see also Curtiss-Wright Corp.*, 446 U.S. at 8

(explaining that Rule 54(b) allows the district court to act as a "dispatcher" to determine "when

each final decision . . . is ready for appeal" (internal quotation marks omitted)). But the Court's decision was immediately appealable under 28 U.S.C. § 1292(a)(1), rendering certification for appeal unnecessary and Rule 54(b) superfluous. *See Decatur Liquors, Inc. v. Dist. of Columbia*, No. Civ.A. 04-1971 (RMC), 2005 WL 607881, at *2 n.1 (D.D.C. Mar. 16, 2005) ("injunctive orders are generally considered to be outside the scope of Rule 54(b)"). Multiple courts in this circuit have declined to apply Rule 54(b) even to preliminary injunctions because such injunctions are similarly "directly appealable order[s]" under 28 U.S.C. § 1292(a)(1). *See N.S. v. Hughes*, No. 1:20-cv-101-RCL, 2020 WL 4260739, at *1 (D.D.C. July 24, 2020); *Fox Television Stations, Inc. v. Filmon X LLC*, 968 F. Supp. 2d 134, 139-40 (D.D.C. 2013); *see also Petties v. Dist. of Columbia*, 662 F.3d 564, 571 (D.C. Cir. 2011) (remanding for district court review of preliminary injunction and related orders under Rule 60(b)(5)). *But see Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 319 F. Supp. 3d 70, 85 (D.D.C. 2018) (applying Rule 54(b) and noting that the nonmoving party did not object).

## B.    Defendants Have Failed To Carry Their Burden Under Rule 60(b).

Defendants seek termination or modification of the Court's summary judgment order and the resulting Court-ordered Plan under Rule 60(b)(5) and (6). *See* Mot. 36-43. Under these provisions, Defendants may not relitigate the merits of the Court's summary judgment order— rather, they may only seek relief from the consequences of the order, and only under limited circumstances. *See Horne v. Flores*, 557 U.S. 433, 447 (2009) (Rule 60(b)(5) "may not be used to challenge the legal conclusions on which a prior judgment or order rests"); *Yi Tao v. Roberts*, No. 18-1233, 2021 WL 3856620, at *3 (D.D.C. Aug. 30, 2021) (denying Rule 60(b)(6) motion as the plaintiff's "latest attempt to relitigate her case").

Relief from an injunction under Rule 60(b)(5) "may be warranted when changed factual conditions make compliance with the [injunction] substantially more onerous"; "when a[n

injunction] proves to be unworkable because of unforeseen obstacles"; "or when enforcement would be detrimental to the public interest." *N.L.R.B. v. Harris Teeter Supermarkets*, 215 F.3d 32, 35 (D.C. Cir. 2000) (internal quotation marks omitted). In addition, fulfillment of the objectives of the injunction can constitute changed circumstances warranting relief, but only "[i]f the party seeking modification or vacatur can establish that the 'objective of the [district court's] order . . . has been achieved' *and* [that] 'a durable remedy has been implemented.'" *Evans v. Fenty*, 701 F. Supp. 2d 126, 148 (D.D.C. 2010) (quoting *Horne*, 557 U.S. at 450). In any of these scenarios, the enjoined party must also establish that "the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992). While Rule 60(b)(6) authorizes district courts to grant relief for "any other reason justifying relief," this "catch-all" provision and the other grounds for relief in Rule 60(b) are mutually exclusive—and courts should grant relief under the catch-all only in "extraordinary circumstances." *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007).

The Court should deny Defendants' request for relief under Rule 60(b)(5) and (6).

### 1.  Defendants have not implemented a durable remedy or otherwise fulfilled the purpose of this Court's orders.

Defendants' claimed efforts to "improve" SIV processing "where possible," Mot. 42, do not warrant relief because Defendants have not fully achieved the purpose of the Court's orders or instituted a durable remedy. *See LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 112 (D.D.C. 2010), *aff'd sub nom. LaShawn A. v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011) (denying motion to terminate because of defendants' failure to demonstrate durable compliance with mandates underlying the relevant order).

As to the purpose of the Court's orders, the Court-ordered relief is meant to ensure that class members—Afghan and Iraqi SIV applicants who have already waited longer than the

statutorily permitted timeframe for adjudication in dangerous and uncertain circumstances—have their delayed applications processed to completion promptly. *See Afghan & Iraqi Allies II*, at *11 (granting relief to "aid Plaintiffs in their quest for an adjudication"); Summ. J. Order (requiring a plan for "promptly processing and adjudicating the applications of current class members"). It is undisputed that thousands of class members are still awaiting adjudication, *see supra* n.3, and that Defendants have never met, and are not now meeting, the Plan's processing benchmarks, *see* Mot. 43 (acknowledging that Defendants are not now following the Plan); *supra* Bkgd. IV. This alone shows that the object of the Court's orders has yet to be attained. *See Evans*, 701 F. Supp. 2d at 171 (concluding the same where defendants conceded they were not in compliance with orders in question). *Compare Petties*, 662 F.3d at 570-71 (remanding defendant's 60(b) motion for reconsideration where district court failed to consider "systemic evidence" of yearslong compliance and plaintiffs conceded that "few if any" class members were at risk of harm).

In any event, Defendants' descriptions of discrete changes that they have made (even if the Court were to credit Defendants' evidence, which it should not, *see infra* Arg. I.D.) do not support their claim that processing times have improved. For example, Defendants assert increased throughput specifically at the COM stage, but this change could be leading to unnecessary and time-consuming appeals or new applications depending on the quality of adjudications, and in any case is being offset by increasing delays at other steps. *See* Greene Decl. ¶¶ 38-39 & Ex. 11; *Evans*, 701 F. Supp. 2d at 176 (denying motion premised on supposed structural improvements when "results [in recent monitoring reports] [we]re, at best, uneven, and it [wa]s far too soon to determine whether the structural changes, some of which [we]re still in the implementation phase, w[ould] have the desired impacts on the safety, health and welfare of the class members").

Defendants' request fails for the separate and additional reason that the incremental

changes Defendants cite are reversible:  thus, they have not implemented a "durable remedy" that "gives the Court confidence that defendants will not resume their violations of plaintiffs' . . . rights once judicial oversight ends." *Evans*, 701 F. Supp. 2d at 171.

> **2.   Defendants have failed to show that relief is substantially more onerous.**

Defendants have not shown that changed facts have made compliance "substantially more onerous." *Harris Teeter Supermarkets*, 215 F.3d at 36.  Defendants' brief and declarations allude to the burdens of reporting under the Plan, *see* Mot. 6 & n.4, 18;  Brooks Decl. ¶¶ 71-77, ECF No. 163-1; Petrovich Decl. ¶ 15, ECF No. 163-4; Schubert Decl. ¶ 16, ECF No. 163-5; Nolan Decl. ¶ 18, ECF No. 163-6; Martin Decl. ¶¶ 6, 20, ECF No. 163-8.  Any claimed burden, however, is of Defendants' own making, *see supra* Bkgd. II-IV (describing Defendants' continued refusal to create a system to track the time they spend processing an application), and burdens associated with monitoring injunction compliance do not constitute changed circumstances warranting modification. *See LaShawn A.*, 701 F. Supp. 2d at 102 ("The costs of monitoring . . . are not properly considered to be obstacles."); *Agostini v. Felton,* 521 U.S. 203, 216 (1997) (anticipated costs of compliance with an injunctive order are not changed circumstances),

Defendants' claims regarding the burdens of compliance reporting are also unsupported by the record: their descriptions of the burdens are internally inconsistent, *see* Martin Decl. ¶¶ 6, 20 (describing a supposedly burdensome process yet conceding that systems updates will render that process obsolete), and vague, *see, e.g.*, Brooks Decl. ¶ 73 (reporting hours spent by "State Department staff" on "litigation-related efforts" without specifying who was involved or the nature of the work); Schubert Decl. ¶ 16 (stating simply that "producing the information requires Unit staff to spend time and resources" and that this "detracts" from case processing). Even if these descriptions are credited, the resources Defendants expend appear to be relatively minimal compared to other investments. *Compare* Brooks Decl. ¶ 73 (141-181 hours/week on "litigation-

related matters"), *with id.* ¶¶ 74-76 (2,276 hours/week in same period on "processing SIV applications," "increasing the efficiency of SIV processes," and "interagency processes").

Defendants' complaint that the Plan requires them to report compliance with "obsolete" steps, Mot. 29, is also misleading. The only step Defendants suggest is obsolete is notifying applicants of COM decisions (step 5), *see* Mot. 22, which still occurs but now happens automatically. Under the Plan, Defendants could continue to report themselves in compliance with the five-day timeframe for this step.

### 3.   Defendants have failed to show that relief is unworkable.

Defendants have not shown that the Plan is "unworkable because of unforeseen obstacles." *Harris Teeter Supermarkets*, 215 F.3d at 36. Defendants point to embassy closures and suspensions of service in Kabul and Baghdad, but as Defendants informed the Court in 2019, "suspensions are not infrequent," *see* Defs.' Resp. Opp. Pls.' Prelim. Inj. Suppl. 11-12, ECF No. 70, and SIV applicants have appeared for interviews in countries other than Afghanistan and Iraq since the beginning of the programs, *see* Wilson Decl. Ex. 7, ECF No. 34-19 (article noting that in the first years of the Afghan program, all applicants traveled to Pakistan for interviews); Wilson Decl. Exs. 3-4, ECF Nos. 34-15, 34-16 (State Department websites accessed Sept. 6, 2018 anticipating that an applicant might "have difficulty entering another country for [their] visa interview"). In fact, when Defendants proposed and agreed to the Plan in May 2020, Embassy Baghdad had been closed for several months and visa services in Kabul and worldwide were suspended because of the COVID-19 pandemic.[8] *See* Proposed Adjudication Plan 5, ECF No. 111-1 (acknowledging embassy closures); Corrected Progress Report, ECF No. 121-1 (noting that

---

[8] Defendants cannot rely on events that preceded their proposal of the Plan to justify their request for relief due to changed circumstances. *Compare Rufo*, 502 U.S. at 385 ("modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree") *with* Mot. 39-40 (pointing to changed circumstances "[s]ince . . . 2019").

Embassy Baghdad had been closed since December 2019); *cf. Twelve John Does v. Dist. of Columbia*, 861 F.2d 295, 298 (D.C. Cir. 1988) ("predictable changes in circumstances" do not constitute significant changed conditions warranting modification).

Most importantly, though, Defendants do not explain how these closures or any other developments render the Plan "unworkable." From the time of the Plan's adoption, Defendants reported on their compliance with the timeframes for scheduling and conducting interviews and provided any relevant context for the number of interviews scheduled, such as embassy closures, other COVID restrictions, or case transfers. *See, e.g.*, ECF Nos. 121-1, 133-1. In fact, the Plan explicitly gives Defendants flexibility, providing that interviews will be scheduled within a certain timeframe "unless the applicant requests a different interview location or unless there are reasonable circumstances for the delay as explained in the Progress Reports." Approved Adjudication Plan 5, ECF No. 113-1. Defendants' further suggestion that delays in interviews make it "no longer possible" to timely complete subsequent stages of the application process, Mot. 40, is misguided given that their obligation to complete a processing step under the Plan is not triggered until the prior step has been completed.[9]

Defendants also fail to explain the significance of the alleged increase in new applications from Afghan nationals, beyond vague claims of a "tax[]" on Defendants' resources. Mot. 40. By Defendants' own admission, a substantial portion of the inquiries received beginning in August 2021 are not, in fact, SIV applications, *see* Petrovich Decl. ¶ 11 (reporting that Defendants

---

[9] Plaintiffs note that step 13, administrative processing, timely completion of which Defendants claim is "no longer possible after the suspension of operations at Embassy Kabul," Mot. 40, is conducted remotely, as are all of the pre-interview processing steps. *See, e.g.*, A. Decl. ¶¶ 24-25, 29-32; W. Decl. ¶¶ 7-8, 11-13, 27 (describing applicant experience). And contrary to Defendants' reference to their "responsibility under Step[] . . . 14," Mot. 40, the Plan does not set any performance benchmark for that step. *See* Bkgd. III.

addressed over 120,000 emails even though they did not contain SIV application materials), and Defendants receipted only 3,908 complete applications between August and December 2021, *id.* ¶ 13. By way of comparison, within weeks of the "Uniting for Ukraine" parole program being announced in April 2022, the government had received 19,000 applications and approved nearly 6,000 people to travel to the United States. *See* Greene Decl. Ex. 16 (letter from members of Congress on disparate treatment of Afghans); *id.* Ex. 14 (article describing processing numbers). To the extent Defendants' concern is that they will fail to meet the benchmarks for COM approval, it is unclear why this would render the Plan unworkable when the Plan provides an opportunity for Defendants to explain deficient performance. *See* Approved Adjudication Plan 7-8, ECF 113-1.

### 4. Defendants have failed to show that relief is detrimental to the public interest.

Defendants have not shown that continued enforcement of the Plan would be "detrimental to the public interest." *Harris Teeter Supermarkets*, 215 F.3d at 36. Again avoiding the question of how any changed circumstances affect the Plan, Defendants' argument on this front appears to be that the Plan "plac[es] authority over immigration policy in the control of class counsel and the courts, indefinitely." Mot. 38. Despite Defendants' repeated and adamant mischaracterizations, this case does not involve programmatic relief; rather, Plaintiffs seek to compel the final adjudication of class members' applications, which Defendants have yet to accomplish. *See Afghan & Iraqi Allies II*, at *5 n.9, *8 (rejecting Defendants' previous mischaracterizations).

### 5. Defendants have failed to show that vacatur in full or modification is suitably tailored to the supposed harms Defendants describe.

Even if Defendants could show that relief is warranted here (they cannot), Defendants have failed to show that the remedies they seek are "suitably tailored" to the circumstances that they describe. *Rufo*, 502 U.S. at 393. As to vacatur, contrary to Defendants' hyperbole, the SIV programs are basically the same as they were when the Plan was entered. *Compare* Mot. 2

("Defendants are managing Afghan and Iraqi SIV programs unrecognizable from those than existed in 2019 and 2020); *id.* 20 (medical exam waiver at step 14, which is not encompassed by the Plan, "fundamentally changed the SIV program for those inside Afghanistan"); *id.* 40 (limited consular services at Embassy Baghdad, in place since January 2020, "fundamentally chang[e] how the agencies implement the Iraqi SIV program"), *with* Greene Decl. Exs. 9-10 (in most recent quarterly reports, same outline of application process). Defendants fail to explain what, if anything, about the Plan is unworkable or unnecessary, let alone to demonstrate that terminating the entire Plan—which includes numerous distinct benchmarks—is "suitably tailored" relief.

As to modification of the Plan, the Court should reject Defendants' attempt to circumvent their burden to justify the remedy they seek. *See* Mot. 43-45 (suggesting that Defendants make their "modification proposal" in the future). The Court cannot consider (nor can Plaintiffs respond to) the question whether a modification is suitably tailored, and thus, whether it should be ordered, without Defendants proposing one. *See LaShawn A.*, 701 F. Supp. 2d at 110 (motion to modify not suitably tailored when Defendants failed to offer "specific proposals" regarding what to change); *Evans*, 701 F. Supp. 2d at 161 n.34 (rejecting modification request where defendants had "made no effort to offer a modification suitably tailored to the arguably changed circumstances").

### 6.    Defendants have failed to justify relief under Rule 60(b)(6).

Because Defendants have failed to show that changed circumstances have made relief "unworkable" or "substantially more onerous" under Rule 60(b)(5), their request for relief under Rule 60(b)(6) on the ground that "intervening events render compliance impracticable," Mot. 42-43, should also be denied; Rule 60(b)(6) requires an even "more compelling" showing of hardship, which Defendants have failed to offer here, *see Twelve John Does*, 841 F.2d at 1140. And regardless of the substance of their argument, Defendants, having dismissed their appeal, may not now use Rule 60(b)(6) as an alternate route for obtaining relief from the consequences of the

Court's summary judgment order. *See Salazar v. Dist. of Columbia*, 633 F.3d 1110, 1122 (D.C. Cir. 2011) ("Rule 60(b)(6) relief is not a substitute for appeal." (internal quotation marks omitted)).

### C.   Even If the Court Is Inclined To Entertain Defendants' Request Under Rule 54(b), Defendants Have Failed To Show That Justice Requires Reconsideration.

Even if the Court decides that review under Rule 54(b) is appropriate, the Court should deny reconsideration.[10] Courts grant reconsideration under Rule 54(b) only "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011). In reviewing motions for reconsideration, courts are mindful that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Hall & Assocs. v. E.P.A.*, 210 F. Supp. 3d 13, 18 (D.D.C. 2016) (internal quotation marks omitted). Courts are reluctant to permit a losing party to use such a motion "as an opportunity to reargue facts and theories upon which a court has already ruled," or "as a vehicle for presenting theories or arguments that could have been advanced earlier." *Dunlap*, 319 F. Supp. 3d at 81 (internal quotation marks omitted). Thus, courts will typically deny a Rule 54(b) motion unless the movant, who bears the burden, points to "an intervening change in the law," "discovery of new evidence not previously available," "a clear error in the first order," or—as Defendants contend—"a controlling or significant change in the facts since the submission of the issue to the

---

[10] The Court should also deny Defendants' informal request for judgment in their favor. *Compare* Mot. 2 (requesting the Court "revise" its summary judgment ruling and "enter judgment for Defendants"), *with* Defs.' Proposed Order, ECF No. 163-10 (including only vacatur of Court's ruling or modification of the Plan as proposed relief). There is no procedural basis on which to grant judgment to Defendants. The Court granted summary judgment to Plaintiffs after converting the hearing on their preliminary injunction motion into a merits hearing, with Defendants' consent and over Plaintiffs' objection. *See supra* Bkgd. II. Defendants did not and have not moved for summary judgment, they do not assert that the new facts they raise are undisputed, and they do not attempt to meet any legal standard for summary judgment. The Court must provide notice and an opportunity to respond before it can grant summary judgment to a nonmovant. *See* Fed. R. Civ. P. 56(f) (summary judgment for a nonmovant may only be granted "[a]fter giving notice and a reasonable time to respond"). In the event the Court eventually concludes that it cannot maintain its summary judgment ruling, the case should proceed to pre-trial discovery.

court." *Banks v. Booth*, 518 F. Supp. 3d 57, 62 (D.D.C. 2021) (cleaned up).

Here, the Court should deny Defendants' request for reconsideration because, despite Defendants' attempt to show a change in facts, the key facts remain the same. In granting summary judgment in favor of Plaintiffs, the Court pointed to (1) Congress's nine-month statutory timeframe, *see Afghan & Iraqi Allies II*, at *6-7; (2) the fact that class members waited longer, and on average far longer, than nine months for government processing and adjudication, *see id.* at *2-4, *6; (3) Defendants' inability to proffer a time frame for completing processing, *see id.* at *8; and (4) the various resulting harms to applicants and U.S. national interests, *see id.* at *8-9, to conclude that the first, second, third, and fifth *TRAC* factors weighed in Plaintiffs' favor. And the Court concluded that the fourth *TRAC* factor was either neutral or weighed in Plaintiffs' favor because (5) "Defendants did not proffer any specific agency activities that would be adversely affected" were Plaintiffs to be granted relief. *Id.* at *9. Each of these key facts remains undisputed.

In attempting to show a "significant change," Defendants point to unreliable and inapposite evidence. *See also infra* Arg. I.D. When evaluating whether there has been a controlling or significant change in facts, courts consider the quality of the evidence proffered and the extent to which it is material to the key questions in dispute. For example, a court may conclude that new declarations containing testimony not subject to cross-examination are insufficient to establish that "justice requires" reconsideration. *See, e.g.*, *Saint-Jean v. Dist. of Columbia*, No. 08-1769 (ABJ), 2016 WL 10829006, at *2 (D.D.C. Oct. 7, 2016). And it may reject new facts as not sufficiently "significant" to warrant reconsideration if they do not address the core issues in dispute. *See, e.g.*, *Banks*, 518 F. Supp. 3d at 63 (denying reconsideration when "ongoing systemic deficiencies undermine[d] Defendants' claim of 'significant or controlling' changed factual circumstances"); *Dunlap*, 319 F. Supp. 3d at 85 (factual development does not warrant reconsideration because it

"does not affect the premise of the Court's . . . opinion"). Defendants have provided no basis to disturb the Court's prior *TRAC* analysis.

1.    **There is no basis to disturb the Court's conclusion that the "rule of reason" factors (1 and 2) favor relief.**

The first and "most important" *TRAC* factor asks this Court to assess whether Defendants' adjudication timeframe is "governed by a 'rule of reason,'" and the second provides that the content of such a rule may be found in a "timetable or other indication . . . in the enabling statute." *TRAC*, 750 F.2d at 80; *In re Core Commc'ns, Inc*., 531 F. 3d 849, 855 (D.C. Cir. 2008). In arguing that these factors now weigh in their favor, Defendants misconstrue the applicable law and fail to provide any evidence of "significant changes" that warrant disturbing the Court's prior analysis.

The key facts remain the same as when the Court granted summary judgment:

- Congress continues to set a nine-month timeframe for Defendants' processing and adjudication of SIV applications, and indeed reaffirmed this timeframe as recently as July 2021.

- Thousands of applicants have been waiting longer that nine months for a final adjudication, with average wait times far exceeding the statutory timeframe. Any class members covered by the Plan whose cases remain pending have, if anything, experienced only further delays since the Court issued its summary judgment order, granted class certification, and approved the Plan. As to the experience of individuals who have since entered the class, Defendants' processing bottlenecks at NVC, as well as their vague report that "[t]he average processing time for an Afghan SIV application was 587 days[11] during the second quarter of fiscal year 2022" (a figure that "is not

---

[11] Defendants erroneously claim that 587 days demonstrates a "significant acceleration" by comparing it to findings the Court made regarding Defendants' processing times in its summary judgment ruling. Mot. 16; *see also id.* at 26-27. The Court's findings in its summary judgment ruling were based on Plaintiffs' analysis of government data obtained via limited discovery, not Defendants' public reporting, *see Afghan & Iraqi Allies II*, at *2-3; indeed, in April 2019, when

yet final and is subject to change"), Vermillion Decl. ¶ 13 & n.1, ECF No. 163-7, indicate that extreme delays persist. *See also* Greene Decl. ¶ 39 (publicly reported times from 2016 to 2022).

- Defendants still have not proffered a timeframe for when they expect to adjudicate Plaintiffs' SIV applications, which is not surprising given that Defendants do not track applicant wait times across the SIV process. *See, e.g.*, Petrovich Decl. ¶ 15 (complaining of the need to "track individual class members manually throughout multiple government IT systems" under the Plan); *supra* Bkgd. II-IV. In fact, Defendants seek relief from the Plan precisely because they wish to avoid tracking and reporting on their progress toward final decisions. *See, e.g.*, Mot. 6-7, 29-30.

Defendants urge the Court to take a "flexible" approach that excuses their delay based on changed circumstances notwithstanding their undisputed failure to meet the nine-month timeframe set by Congress and their inability to articulate any timeframe on which applicants can expect a decision. *See* Mot. 24-27. But contrary to Defendants' suggestion, the "rule of reason" inquiry requires courts to assess whether the time the agency is taking to act comports with a "rule"—or in other words, "whether the agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale." *Afghan & Iraqi Allies II*, at *6 (internal quotation marks omitted); *see also Potomac Elec. Power Co. v. Interstate Com. Comm'n*, 702 F.2d 1026, 1034 (D.C. Cir. 1983) (explaining that "there must be a 'rule of reason' to govern the time limit to administrative proceedings" and emphasizing the need to avoid "uncertainty" and "sap[ping] the public confidence in an agency's ability to discharge its responsibilities"). As before, Defendants fail to show that their processing times are tethered to Congress's nine-month timeline at all, let alone "governed" by it. *See In re People's Mojahedin Org. of Iran*, 680 F.3d

---

that data was obtained, Defendants reported a lower average processing time of 564 days. *See* Greene Decl. Ex. 9 (Afghan Apr. 2019 Report), at 81.

832, 837 (D.C. Cir. 2012) (concluding first two factors weighed in favor of relief because a twenty-month failure to act "plainly frustrate[d] the congressional intent" of prompt action manifest in "[t]he specificity and relative brevity of the 180-day deadline"); *Afghan & Iraqi Allies II*, at *8 ("It is clear that Congress did not intend to give Defendants an unbounded, open-ended timeframe in which to adjudicate SIV applications.").[12]

Examination of the assortment of supposedly "significant" developments identified by Defendants demonstrates the shortcomings of Defendants' argument. First, none of the claimed processing improvements, *see* Mot. 14-16, 19-24, are in fact "significant": as described above, they have not resolved "ongoing systemic deficiencies" in Defendants' processing times, *Banks*, 518 F. Supp. 3d at 63; *see also supra* Arg. I.B.1., and mirror previous efforts that the Court concluded did not counsel against relief, *see Afghan & Iraqi Allies II*, at *11 & n.14 ("recent efforts to improve the application process . . . do not obviate the need for judicial monitoring"); *see also In re Pub. Emps. for Envtl. Resp.*, 957 F.3d 267, 273 (D.C. Cir. 2020) (granting mandamus in face of action that was "too little, too late").

As to claimed processing impediments:

- As explained above, *see supra* Arg. I.B.3., embassy closures that prevent applicants from being interviewed in Kabul and Baghdad are not new. *See* Mot. 12-14, 16-17. Further, Defendants' complaint that an applicant's inability to travel for visa interviews results in delays is perplexing given that Defendants argue that such time does not constitute time the applicant awaits government action and thus should not be counted against the government in calculating

---

[12] As before, *see* Pls.' Reply Supp. Prelim. Inj. Suppl. 6, ECF No. 71, Defendants rely on cases that did not involve a statutory timeline for the allegedly delayed agency action, *see Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003); *Cutler v. Hayes*, 818 F.2d 879 (D.C. Cir. 1987); *Grand Canyon Air Tour Coal. v. F.A.A.*, 154 F.3d 455 (D.C. Cir. 1998), and thus cannot support Defendants' proposition that the nine-month timeline is irrelevant.

processing time in the first place, *see, e.g.*, Mot. 1, 8, 13, 17 (contending these are applicants' delays); *see also* Greene Decl. Ex. 9 (Afghan Jan. 2022 Report), at 165 & n.12 (same).

- Defendants' troubles at the National Visa Center, *see* Mot. 12-13, far from justifying delays, point to the very "bureaucratic ineptitude" and "bureaucratic nightmare," *supra* Bkgd. I, that Congress sought to address in imposing a timeline. As a matter of policy, Defendants rely on a small number of email addresses as the exclusive means for SIV applicants to submit materials and make requests at multiple stages of processing. *See, e.g.*, Greene Decl. ¶¶ 49-53 & Exs. 20-23 (directing applicants to AfghanSIVApplication@state.gov and NVCSIV@state.gov). Defendants widely advertised those addresses for, among other things, "[g]eneral inquiries" during a crisis; were predictably flooded with inapposite messages from desperate people; and—over nine months in—have yet to come up with an effective plan for addressing the problem. *See id.* (guidance that encouraged and continues to encourage email traffic to backlogged inboxes); Petrovich Decl. ¶¶ 8, 11 (acknowledging that email addresses were "one of the few publicly available contact points for non-U.S. citizens" and that the agency elected to answer over 120,000 emails between mid-August and late October that "did not include SIV application materials"); S. Decl. ¶¶ 4, 6-8 (Afghan class member statement that as of June 18, 2022, the application they submitted on August 27, 2021 had not been receipted and that they had received no guidance on what to do).

- The legislative amendments that Defendants cite, *see* Mot. 20-21, did not disturb the nine-month timeframe. *See Afghan & Iraqi Allies IV*, at 465 (reasoning that because "nothing in [a prior] amendment eliminate[d] the 9-month timetable or in any way relieve[d] Defendants of that obligation, the amendment [did] not undermine . . . the court's remedy").

- To the extent Defendants claim that the COVID-19 pandemic or an increase in applications following the withdrawal of U.S. troops from Afghanistan have contributed to delays, *see* Mot.

13-14, 17-18, 20, 26, these factors cannot not justify delays, either. Congress was well aware of the pandemic and the security situation in Afghanistan in July 2021, when it most recently reinforced the nine-month statutory timeframe, and in fact explicitly invited new applications by making available thousands of additional visas and expanding eligibility. *See Afghan & Iraqi Allies II*, at *7 (rejecting the argument that complexity justified delays because Congress acknowledged the complexity when setting the nine-month benchmark).[13]

All of Defendants' arguments regarding impediments fall short for the additional reason that Defendants fail to connect the dots by "establish[ing] how much of the delay is attributable" to them. *Id.* at *8. In sum, Defendants have failed to establish that justice requires the Court to reconsider its conclusion that factors 1 and 2 weigh in favor of relief.

### 2. There is no basis to disturb the Court's conclusion that the prejudice factors (3 and 5) favor relief.

Defendants have not disputed the Court's finding that delays cause immense harms to applicants and U.S. national interests. *See* Mot. 27-31. If anything, such harms have grown more severe. *See supra* Bkgd. VI. In contending that the Court should nonetheless revisit its conclusion that the prejudice factors support relief, Defendants make a series of inapposite arguments that

---

[13] Defendants rely on a handful of cases to suggest that the pandemic is reason enough to consider their delays reasonable, regardless of actual impact. *See* Mot. 18. None supports the point. Critically, none of the cases involved an application for which Congress has prescribed an adjudication timeline. *See Murway v. Blinken*, No. 21-1618 (RJL), 2022 WL 493082, at *1 (D.D.C. Feb. 16, 2022) (granting motion to dismiss in fiancé visa case where there was no statutory timeframe for adjudication and petition had been filed during the pandemic); *Khan v. Blinken*, No. 21-1683 (JEB), 2021 WL 5356267, at *1 (D.D.C. Nov. 17, 2021) (same); *Zaman v. U.S. Dep't of Homeland Sec.*, No. 19-3592 (ABJ), 2021 WL 5356284, at *8 (D.D.C. Nov. 16, 2021) (granting motion to dismiss in family visa case where there was no statutory timeframe for adjudication); *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 165 (D.D.C. 2021) (same). Here, to the extent that pandemic restrictions exacerbated Defendants' delays—which Defendants have not carried their burden to show—that could not excuse Defendants' preexisting delays. *See Salazar v. Dist. of Columbia*, No. 93-cv-452 (TSC), 2022 WL 990742, at *4 (D.D.C. Mar. 31, 2022) (Chutkan, J.) (considering the marginal effect of the COVID-19 pandemic and concluding that penalties for deficient performance were still warranted because performance issues pre-dated the pandemic).

they either could have raised earlier or that they previously made and the Court rejected.

First, Defendants argue that foreign affairs and national security considerations warrant reconsideration of the Court's analysis of these factors. *See* Mot. 27-29. But whether foreign affairs or national security are implicated has no bearing on the relevant analysis—that is "whether human health and welfare are at stake" (factor 3) (which they are) and "the nature and the extent of interests prejudiced by delay" (factor 5) (here, severe and widespread harms to personal and national interests). *See Afghan & Iraqi Allies II*, at *8 (internal quotation marks omitted).[14] In any case, this argument simply repackages arguments that the Court previously rejected.  *See Afghan & Iraqi Allies II*, at *7, *9 n.12 (observing that "Congress was patently aware of the national security implications" and "competing priorities" when it imposed the nine-month timeframe, and that Defendants "have not demonstrated how these considerations, which exist in every immigration-related delay case, are unique").

Second, Defendants contend that new declarations that describe the resources that they devote to Court-ordered monitoring and reporting require the Court to reconsider its analysis, relying on a cynical (and again irrelevant) suggestion that Plaintiffs would be better off without the relief that they have sought from the Court. *See* Mot. 29-31 (speculating that relief "*may* actually hinder Defendants' ability to quickly process applications" (emphasis added)).

---

[14] The cases Defendants cite are inapposite. *See Skalka v. Kelly*, 246 F. Supp. 3d 147, 153-54 (D.D.C. 2017) (concluding that the plaintiffs' interests were "of the most sensitive kind and most certainly involve[d] 'human health and welfare'" but denying relief in light of analysis of distinct *TRAC* factors); *Harisiades v. Shaughnessy*, 342 U.S. 580, 581 (1952) (holding that due process did not preclude deportation of a lawfully present non-citizen due to prior Communist Party membership); *Mathews v. Diaz*, 426 U.S. 67, 69 (1976) (holding that immigration status and residency duration conditions on eligibility for Medicare were constitutional); *Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 296-98 (D.D.C. 2016) (discussing statutory provision requiring Defendants to "make a reasonable effort to provide . . . protection," and concluding that Congress's language showed that assessment of "reasonable" effort was committed to agency discretion).

Defendants ignore the benefits of the Court's orders for class members, including judicial recognition of Defendants' unreasonable delay and Plaintiffs' right to relief (which Defendants continue to deny) and the increased transparency and accountability that the plan-progress report remedy yielded. *See supra* Bkgd. IV (describing errors and lost applications identified through the Plan's reporting and meet-and-confer process). In any case, to the extent Defendants find reporting and monitoring unduly burdensome, such burdens are of Defendants' own making and within their power to change. *See supra* Arg. I.B.2. Defendants' own example is a case in point: They complain in their brief that for USCIS to report on its processing times, four employees must spend an average of ninety hours a week "manually updat[ing] and/or evaluat[ing] data." Martin Decl. ¶ 6. Even if the Court were to accept this statistic at face value, which it should not, *see infra* Arg. I.D., the declaration on which Defendants rely makes clear that USCIS can and has in fact fixed the problem by employing technology that "w[ill] allow for semi-automated reporting under the terms of the existing adjudication plan . . . within the fiscal year." Martin Decl. ¶ 20.

Defendants' third argument—that legislative and executive involvement in the SIV programs somehow weighs against judicial intervention, *see* Mot. 30-31; *see also id.* at 18-19— again is inapposite and recycles arguments the Court previously rejected. *See Afghan & Iraqi Allies II*, at *9 n.12, *11 n.14 (rejecting the suggestions that "Congress' exercise of oversight precludes judicial intervention" and that Defendants' own "efforts to improve the application process . . . obviate the need for judicial monitoring"). Thus, Defendants have failed to show that justice requires the Court to reconsider its conclusion that factors 3 and 5 weigh in favor of relief.

### 3.   There is no basis to disturb the Court's conclusion that the competing priorities factor (4) favors relief, or is at the very least neutral.

As to the fourth *TRAC* factor, Defendants still do not establish "specific, proffered activities

[that] will be de-prioritized, in error, if [Plaintiffs are] successful."[15] *Afghan & Iraqi Allies II*, at

*9. Instead, Defendants argue that the Court should reconsider its analysis of this factor because

their "commitment" to addressing "global events"—such as the Taliban seizure of Afghanistan,

the "Ukrainian refugee crisis, COVID-19 visa backlog, the civil war in Ethiopia, and the lack of

consular services in Moscow"—"necessarily has implications for the resources that can be

dedicated to SIV processing." Mot. 33-34. In so doing, Defendants fail to show that parallel agency

commitments of this nature are new, or to draw any specific connection between their ability to

respond to global events and the relief that is due to the class. This is understandable given the

flexibility inherent in the plan-progress report remedy, and the fact that Defendants were bound

by the Plan until October 2021, after many of the events to which they point arose. And regardless

of effect, as the Court noted in rejecting another version of this argument, "Congress was aware of

the competing priorities when it imposed the 9-month time limit." *Afghan & Iraqi Allies II*, at *9

n.12 (citing *In re People's Mojahedin Org. of Iran*, 680 F.3d at 837); *see also In re Pub. Emps. for

Envtl. Resp.*, 957 F.3d at 275 ("difficult[y]" complying with relief, including because other projects

have competing needs, "doesn't make mandamus relief inappropriate"). Defendants have failed to

show that justice requires the Court to reconsider its conclusion that the fourth *TRAC* factor weighs

---

[15] For this reason, Defendants' reliance on *Center for Science in the Public Interest v. F.D.A.*, 74
F. Supp. 3d 295 (D.D.C. 2014), is misplaced.  In that case, the agency action that the plaintiffs
sought to compel was rulemaking on their own detailed labeling recommendations regarding
mercury levels in fish.  *See id.* at 297, 305.  The court declined to intervene because the FDA was
engaged in contemporaneous efforts to update the substance of its mercury-related
recommendations based on emerging scientific research (which would affect its eventual response
to plaintiffs' labeling recommendations) and had provided a "general endpoint" at which time it
would be able to respond to the plaintiffs' petition.  *Id.* at 305-306.  And the court specified that
"further delay could well become unreasonable" and urged the FDA to act promptly once the
specified task was completed.  *Id.* at 306.  In this case, Defendants have provided no such
competing project and certainly have provided no timeframe for their adjudication of class member
applications.

in favor of relief, or is at the very least neutral.

    **4.**    **Though there is no need for the Court to evaluate the impropriety factor (6), this factor would favor relief.**

Because Defendants have failed to show that reconsideration of any other factor is warranted, there is no reason for the Court to reconsider its conclusion that analysis of the impropriety factor is unnecessary. As before, Plaintiffs are entitled to relief regardless of whether Defendants acted in good faith.

Even if the Court were to evaluate this factor, the "good faith" actions to which Defendants point would not counsel against relief for Plaintiffs.[16] As an initial matter, although Defendants claim that they have "continuously labored to complete all SIV application steps as expeditiously as possible since September 2019," Mot. 35, their submissions tell a different story: following the Court's adoption of the Plan, Defendants failed to meet key benchmarks in every reporting period, their performance was often *worse* for class members than the general population of SIV applicants, and they repeatedly refused to provide any information about whether and how they planned to meet the benchmarks in the future. *See supra* Bkgd. IV. *Compare* Mot. 19-24 (describing efforts beginning in the spring of 2021, more than a year after the Court granted summary judgment). Even if Defendants had expeditiously processed class member applications,

---

[16] The cases Defendants cite do not support their argument. In *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105 (D.D.C. 2005), the court declined to intervene in part based on a very detailed evidentiary showing of the agency's remedial efforts, including projected timelines for resolving the backlog in applications. *See id.* at 116. Here, Defendants cite general process changes and resource investments without attempting to tie them to any schedule for adjudicating class member applications. In *American Hospital Association v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016), the D.C. Circuit reversed the district court's dismissal of a mandamus action for lack of jurisdiction and directed it to weigh the equities on remand, noting that it could issue a writ of mandamus, wait to do so, or ask for status reports on the progress of relevant issues. *Id.* at 192-93. Critically, the appeals court observed that "more than a year after its first denial and with the problem only worsening—[the district court] might find it appropriate to issue a writ of mandamus ordering the Secretary to cure the systemic failure to comply with the deadlines." *Id.* at 193.

it is unclear why that would weigh against judicial intervention. Defendants have been under a court order to promptly process class member applications in accordance with benchmarks at each stage of the application process, a remedy that implicitly and explicitly contemplates that Defendants will take steps to improve their performance. *See Banks*, 518 F. Supp. 3d at 64 (declining to treat changes made while under an injunction as warranting reconsideration).

If anything, Defendants' conduct since the Court entered summary judgment points to their recalcitrance. Defendants' processing times are nowhere near the nine-month timeframe set by Congress, and over eight years after Congress enacted a specific timeline for adjudication, Defendants freely admit that they have not developed a way to tell how long they take to adjudicate any SIV application. And despite the Court identifying numerous deficiencies in Defendants' reporting and recordkeeping, Defendants continue to publicly report their average processing times in the same deficient manner. *See* Greene Decl. ¶¶ 31, 37 (noting these and several additional deficiencies and discrepancies). Such facts indicate that Defendants have "no current intention of complying with the law," *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013), and are acting with "utter indifference" to the congressional timeline, *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). *See also, e.g.*, Greene Decl. Ex. 18, at 34 (June 8, 2020 statement by the self-identified Senior Coordinating Official for the Afghan SIV program to the State Department Office of Inspector General that "[t]he law contains no consequence for the processing of an application not being completed in nine months"). Though there is no reason for the Court to reconsider the sixth *TRAC* factor, this factor would favor relief.

### D.    Plaintiffs Should Have the Opportunity To Take Discovery If the Court Is Inclined To Grant Defendants' Motion in Any Part.

Defendants have failed to meet their burden to justify relief under either Rule 60(b) or Rule 54(b). To the extent the Court is inclined to conclude otherwise, however, Plaintiffs are entitled to

discovery to oppose Defendants' request and enable meaningful judicial review. *See Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 131 (D.D.C. 2012) (observing that "[e]quity would not be achieved if a court decided simply to rubber-stamp an enjoined party's unsupported self-assessment of its compliance with a court order" and allowing discovery on the defendant's Rule 60(b)(5) motion). Defendants' motion relies on nine declarations covering topics that have yet to be subjected to discovery. This evidence should be discounted because it is unverifiable and unreliable.

Among other things, the declarations:

- lack proper foundation, *see, e.g.*, Brooks Decl. ¶ 3; Petrovich Decl. ¶ 1 (failing to specify the basis for the contents of the declaration, whether the declarant's personal knowledge, review of information in their official capacity, or other);

- include statistical information without citation or explanation, *see, e.g.*, Petrovich Decl. ¶ 12 (stating that "productivity in the SIV Unit . . . increased 20-25 percent");

- rely on hyperbolic and self-serving characterizations, *see, e.g.*, Brooks Decl. ¶ 7 (describing State Department efforts as "herculean"); and

- are inconsistent with each other, *see, e.g.*, *supra* n.6; *infra* n.17 (contrasting statements).

To take one example, Defendants cite a declaration from Maren Brooks to argue that Defendants have "process[ed] an extraordinary volume of SIV applications" as they respond to "changed circumstances." Mot. 41 (citing Brooks Decl. ¶ 8). But the data set forth in the relevant paragraph, purportedly showing increased application volumes and increased throughput over time, lack basic context and foundation: There is no explanation of how the declarant compiled the data (or even whether they did), what the underlying data were, or the assumptions underlying the data. The points in time included in the table (June 2020, June 2021, December 2021, and

March 2022) are randomly spaced. The figures for one metric ("number of cases processed by NVC") are not comparable because Defendants use different criteria for different time periods (for June 2020, number of cases processed versus, for more recent time periods, number of "case reviews conducted," which includes "each time an SIV applicant submits additional documents to complete their case"[17]). And certain figures are qualified as "estimates" "subject to change." *See* Brooks Decl. ¶ 8 n.1. *See generally Saunders v. White*, 191 F. Supp. 2d 95, 132 (D.D.C. 2002) ("[W]hen submitting statistical evidence, a party must make the evidence meaningful to the trier of fact. . . . Simply presenting numerical compilations to the court is not sufficient." (internal quotation marks omitted)); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

As explained above, the Court should deny Defendants' motion outright because the evidence Defendants provide is not relevant and does not meet their burden. But if the Court were not inclined to do so, Plaintiffs should be permitted discovery before this facially deficient information can be used against them. Specifically, Plaintiffs should be afforded the opportunity to, at minimum, seek documentary evidence supporting or undermining Defendants' claimed changes and examine the declarants as to the basis for their far-ranging and minimally supported assertions. This will allow Plaintiffs to develop the record and respond to Defendants' claims

---

[17] Other evidence submitted by Defendants, moreover, contradicts Defendants' characterization of the "case reviews" statistic.  Contrary to the suggestion that this figure is limited to review of SIV application materials, another declarant explains that "NVC receives many communications that do not include application materials" and there is "no efficient way to distinguish application-related communications from non-application related communications." Petrovich Decl. ¶ 5. Indeed, according to that person, NVC responded to "more than 120,000 emails" between August and October 2021, "that did not include SIV application materials." *Id.* ¶ 11.

regarding changed circumstances, the Plan, and the Court's unreasonable delay analysis.

## II.   THE COURT SHOULD ENFORCE AND CLARIFY ITS ORDERS.

It is plain from the record that further intervention is needed to ensure that class members can benefit from the Court's orders. Plaintiffs respectfully move this Court to enforce the September 2019 Summary Judgment Order; February 2020 Class Certification Order; April 2020 Order; and Plan, as well as to clarify the Summary Judgment Order.[18] Specifically, Plaintiffs request that the Court: (a) order Defendants to account for the status of class member applications subject to the Plan; (b) order Defendants to propose a plan for tracking and reporting the time they take to process an application within and across all government-controlled stages of the application process; (c) clarify the scope of the Court's injunctive relief and order Defendants to propose a plan for promptly processing and adjudicating applications of class members not covered by the Plan; and (d) issue a referral to a magistrate judge to oversee the development and implementation of any new plans. Pursuant to Local Civil Rule 7(m), Plaintiffs conferred with Defendants, who stated that they would oppose Plaintiffs' cross-motion.

### A.   An Accounting Is Necessary Because Nearly One Year Has Passed Since Defendants Reported on the Status of Class Members' Applications.

A district court has the equitable authority to issue additional orders to enforce an existing injunction. *See Damus v. Wolf*, No. CV 18-578 (JEB), 2020 WL 601629, at *2 (D.D.C. Feb. 7,

---

[18] For the Court to enforce its orders, it would need to lift the stay of the Plan and Plaintiffs' ability to enforce the Court's orders. Plaintiffs maintain that the stay is procedurally improper and unsupported by the record and reiterate and incorporate by reference their arguments in support of their cross-motion to lift the stay, ECF Nos. 156, 160, and in recent joint status reports, *see* ECF Nos. 154, 162. Defendants' most recent filings only underscore why the stay should not have been entered and should not be in place: none of the supposed "mooting events" that Defendants foreshadowed materialized, *see* Joint Status Report, ECF No. 162, and Defendants have now failed to establish grounds for relief under the federal rules, *see* Arg. I. Because the stay is not warranted, the Court should exercise its authority to lift the stay immediately; the Court has the authority to lift the stay *sua sponte*, *see Marsh v. Johnson*, 263 F. Supp. 2d 49, 52-53 (D.D.C. 2003) (lifting the stay *sua sponte* and retroactively), and thus need not wait until briefing concludes to do so.

2020) (citing *Hutto v. Finney*, 437 U.S. 678, 687 (1978)).[19] Because Defendants have not reported on the status of applications subject to the Plan since their last progress report in July 2021, the Court and Plaintiffs lack important insight into the status of Defendants' processing. Once Defendants' obligations under the Plan resume, Plaintiffs request that the Court order Defendants to provide, within thirty days and as specified in the attached proposed order, an accounting of the number of applicants who were class members as of May 21, 2020 (as identified in Part I of the Plan) and whose applications remain pending—including how many await processing at each step of the SIV application process, and the length of time they have been pending at designated steps. Such information is needed to evaluate Defendants' performance under the Plan going forward, including by providing a baseline against which to interpret progress reports following the gap in reporting and by highlighting processing steps or applications that may require special attention.

## B. Additional Relief Is Necessary So That the Court and the Parties Can Meaningfully Evaluate Defendants' Compliance.

Plaintiffs further request that the Court order Defendants to propose a plan for tracking and reporting the time they take to process an application within and across all government-controlled stages of the application process so that the parties and the Court have a sound basis for "evaluat[ing] Defendants' progress in remedying unreasonable delays," Apr. 2020 Order, and thus of ensuring "prompt[] processing and adjudicati[on]," Summ. J. Order; *see also* Approved Adjudication Plan 7-8 (requiring progress reports). *See, e.g.*, Order, *Kirwa v. U.S. Dep't of*

---

[19] The Court has the authority to issue additional relief to effectuate its orders, but even if Plaintiffs' requests are construed to involve a modification, the Court has the authority to order one under Rule 60(b)(5). *See Salazar v. Dist. of Columbia*, 896 F.3d 489, 498 (D.C. Cir. 2018) (a district court "retain[s] the authority to prevent evasion and ensure effectuation of the order it entered" and may "fortif[y]" the order's terms in service of its "intended result"); *Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 26-27 (D.D.C. 2000) (court's authority is broad, "particularly where the enjoined party has not 'fully complied with the court's earlier orders'" (quoting *Hutto*, 437 U.S. at 687)).

*Defense*, No. 17-01793 (ESH), ECF No. 71 (D.D.C. Feb. 21, 2018) (referring case to magistrate judge "for purposes of developing an improved reporting system concerning the . . . class").

Defendants' deficient reporting, and the minimal application tracking that underlies it, are preventing the Court and the parties from monitoring Defendants' discharge of their obligation to promptly advance class members through the application process—a critical component of the plan-progress report remedy that the Court ordered. For each reporting period, Defendants failed to provide accurate and timely reporting in accordance with the Plan, filing reports that were internally inconsistent, did not account for numerous class members, and misrepresented their compliance with the Plan's performance standards. *See supra* Bkgd. IV. Defendants' monitoring failures have already significantly compounded delays for applicants who have slipped through the cracks. For example, in December 2021, Defendants identified 31 Iraqi class members at the COM stage who had been missed in each of Defendants' four prior progress reports. *See* Notice of Lodging of Corrected Progress Reports 2, ECF No. 149. As a result of this "inadvertent human error," these Iraqi applicants—each of whom necessarily applied for COM approval more than seven years earlier—waited another eighteen months from the time the Plan was entered for their applications to be considered by a decisionmaker. *See id*. This example and others, *see supra* Bkgd. IV, raise the prospect that an unknown number of additional class members have similarly been languishing off Defendants' radar and denied the benefit of this Court's orders.

The Court should grant relief to ensure that the Court and the parties have a means of assessing Defendants' progress in processing and adjudicating Plaintiffs' applications.

## C. Clarification Is Necessary So That All Class Members Are Able To Obtain Relief.

In granting relief in Plaintiffs' favor, the Court: (a) ruled that "Defendants' delays in the processing and adjudication of the SIV applications of the Plaintiffs and members of the Class are unreasonable" in light of the applicable law, Summ. J. Order; (b) ordered Defendants to submit

and implement a plan to promptly process and adjudicate applications of "current class members" within thirty days of the resolution of the class certification dispute, *id.*; and (c) subsequently certified a class of "all people who have (1) applied for an Afghan or Iraqi SIV . . . by submitting an application for Chief of Mission ("COM") approval, and (2) whose applications have been awaiting government action for longer than 9 months," Order, Feb. 5, 2020, ECF No. 89 ("Class Cert. Order"). The Plan that the parties proposed and that the Court ordered identified covered current class members on the date of the proposal (May 21, 2020).[20]

Plaintiffs request that the Court clarify the scope of its injunction—namely, the meaning of "current class members," Summ. J. Order—to ensure that *all* members of the certified class, for whom the costs of delays are as great as ever, are able to obtain relief. *See All. of Artists & Recording Cos. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 418-19 (D.D.C. 2016) (granting clarification where order was "reasonably susceptible to differing interpretations with respect to the particular factual situation" and there was "real uncertainty about the scope of the ruling" (internal quotation marks omitted)). Although Plaintiffs had hoped that Defendants would avoid further delays in response to the Court's orders, Afghan SIV applicants have continued to enter the class, *see supra* Arg. I.C.1., which, unlike the Plan, includes no date reference, *see* Class Cert. Order; *see also* Oct. 2021 Joint Stip. 2-3 (explaining that the parties were exploring a negotiated resolution that would provide relief to "all class members"). If Defendants continue to take longer than nine months to adjudicate SIV applications, Afghan SIV applicants may potentially enter the class until this case concludes and the Court enters final judgment. *See* Fed. R. Civ. P. 23(c)(3)(A) (the judgment in a (b)(2) class action must describe the class). Thus, Plaintiffs request that the

---

[20] The parties were forced to identify such class members by a series of proxies (*e.g.*, all applicants who had submitted an application for COM approval at least nine months prior) given the limitations of Defendants' recordkeeping. *See supra* Bkgd. III.

Court clarify that its injunctive relief covers "current class members" as they enter the class that the Court certified—not only "current class members" as of the date of the Plan's proposal.

To the extent the Court's order of injunctive relief for "current class members" encompasses class members who entered the class after the Plan was proposed, Plaintiffs request that the Court direct Defendants to fulfill their obligation under the Court's injunction by "submit[ting] a plan for promptly processing and adjudicating the applications of current class members" not covered by the existing Plan, including a methodology for identifying applicants prospectively if and when they become "current class members." *See* Summ. J. Order. If the Court clarifies otherwise, additional proceedings may be necessary to ensure that applicants who have entered the class since May 21, 2020 are able to seek relief.

**D.      Referral to a Magistrate Judge Would Efficiently Resolve Issues Concerning the Development and Implementation of Any Plans Proposed by Defendants.**

Plaintiffs further request that the Court refer the parties to a magistrate judge to oversee the development and implementation of any plans proposed by Defendants.

## CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion and grant Plaintiffs' cross-motion. A proposed order is attached.

Dated: June 24, 2022
       New York, New York

/s/ Kathryn Austin

Kathryn Austin (D.D.C. Bar No. NY0331)
Deepa Alagesan (D.D.C. Bar No. NY0261)
Alexandra Zaretsky (D.D.C. Bar No. NY0434)
Mariko Hirose (D.D.C. Bar No. NY0262)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 4th Floor
New York, New York 10004
Telephone: (516) 296-0688
kaustin@refugeerights.org
dalagesan@refugeerights.org
azaretsky@refugeerights.org
mhirose@refugeerights.org

Melissa S. Keaney (D.D.C. Bar No. CA00064)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
P.O. Box 2291
Fair Oaks, California 95628
Telephone: (916) 546-6125
mkeaney@refugeerights.org

/s/ Olivia P. Greene

Linda H. Martin (D.D.C. Bar No. NY0210)
David Y. Livshiz (D.D.C. Bar No. NY0269)
Olivia P. Greene (admitted *pro hac vice*)
Wang Jae Rhee (admitted *pro hac vice*)
FRESHFIELDS BRUCKHAUS DERINGER
US LLP
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
linda.martin@freshfields.com
david.livshiz@freshfields.com
olivia.greene@freshfields.com
wangjae.rhee@freshfields.com

*Attorneys for Plaintiffs and the Class*