**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

AFGHAN AND IRAQI ALLIES,

        Plaintiffs,

        v.

ANTONY J. BLINKEN, *et al.*,

        Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:18-cv-01388-TSC

**DEFENDANTS' REPLY IN SUPPORT
OF THEIR MOTION FOR RELIEF FROM THE
COURT'S SUMMARY JUDGMENT ORDER AND THE
APPROVED ADJUDICATION PLAN AND OPPOSITION TO PLAINTIFFS'
<u>CROSS-MOTION TO ENFORCE AND CLARIFY THE COURT'S ORDERS</u>**

## TABLE OF CONTENTS

**Page**

GLOSSARY...................................................................................................viii

INTRODUCTION..............................................................................................1

SUPPLEMENTAL FACTUAL BACKGROUND .................................................1

ARGUMENT......................................................................................................4

I.   THE COURT SHOULD REVISE ITS UNDUE DELAY DETERMINATION AND VACATE THE INJUNCTION TO ACCOUNT FOR CHANGED LAW AND FACTS UNDER RULE 54(B) .................................................................4

   A.   There Are Good Reasons to Revise the *TRAC* Analysis and Grant Defendants' Motion under Rule 54(b) ...........................................................4

   B.   Factors 1 and 2 Favor in the *TRAC* Analysis Favor Defendants Because the Agencies' Implementation of the SIV Program Is Reasonable Given the Circumstances .................................................................................8

      i.   Global Events and Major Improvements to the SIV Program in Response to Executive Orders and Statutory Changes Shape the Rule of Reason ....8

      ii.   The Nine-Month Benchmark Is Pertinent But Not Mandatory ................15

   C.   Factors 3 and 5 Favor Defendants Because Delays in Processing SIVs Are Not Egregious, Especially Where the Program Implicates Foreign Affairs, Immigration, and National Security Decision-Making .......................................16

   D.   Factor 4 Favors Defendants Because Compelling the Agencies to Transfer Further Resources to SIV Processing Would Undermine the Agencies' Ability to Act on Competing Priorities ...........................................................20

   E.   Factor 6 Favors Defendants Because They Have Acted in Good Faith .............21

II.   ALTERNATIVELY, IF THE COURT FINDS THAT RULE 54(b) DOES NOT APPLY, DEFENDANTS ARE ENTITLED TO RELIEF UNDER RULE 60(b)(5) AND (b)(6)..................................................................................22

   A.   Control of the SIV Program Should Be Returned to the Political Branches ....22

**B.**    **Applying the Previous Orders Prospectively Is No Longer Equitable** .............**25**

**C.**    **Compliance with the Injunction Is No Longer Practicable** ...............**28**

**III.**    **IF THE COURT OPTS TO MODIFY THE PLAN, IT SHOULD ALLOW DEFENDANTS TO PROPOSE A NEW PLAN** ...............................................**29**

**IV.**    **DISCOVERY IS INAPPROPRIATE** ...........................................................**30**

**V.**    **THE COURT SHOULD DENY PLAINTIFFS' CROSS-MOTION TO ENFORCE AND CLARIFY ITS PRIOR ORDERS BECAUSE PLAINTIFFS ACTUALLY SEEK TO MODIFY AND EXPAND THE APPROVED ADJUDICATION PLAN** ..**33**

   **A.**    **Plaintiffs Fail to Meet Their Burden to Seek Clarification and Enforcement of the Court's Orders Because They Ask the Court to Modify the Plan** ...............**33**

      **i.**    **Plaintiffs' "Clarification" Motion Improperly Seeks to Modify the Plan** **33**

      **ii.**    **Plaintiffs' Motion to Enforce Seeks to Add New Requirements and Plaintiffs Have Delayed Bringing an Enforcement Action** ........................**36**

   **B.**    **Plaintiffs' Renewed Request for the Court to Lift the Stay Is Improper** .........**38**

   **C.**    **Plaintiffs Fail to Meet Their Burden to Seek Relief under Rule 60(b)(5)** ..........**39**

   **D.**    **The Court Should Not Assign a Magistrate Judge to Oversee and Implement a Hypothetical Future Plan** .......................................................................**40**

**CONCLUSION** ....................................................................................................... **41**

# TABLE OF AUTHORITIES

## CASE LAW

*Ackerman v. United States*,
340 U.S. 193 (1950)..................................................................................... 28

*All. Artists & Recording Cos. v. Gen. Motors Co.*,
306 F. Supp. 3d 413 (D.D.C. 2016) ............................................... 34, 35, 36

*Bankers Mortg. Co. v. United States*,
423 F.2d 73 (5th Cir. 1970) ........................................................................ 28

*Banks v. Booth*,
518 F. Supp. 3d 57, 63 (D.D.C. 2021) ...................................................... 7, 8

*Califano v. Yamasaki*,
442 U.S. 682 (1979)..................................................................................... 28

*Cobell v. Norton*,
224 F.R.D. 266 (D.D.C. 2004)...................................................................... 7

*Cobell v. Norton*,
240 F.3d 1081 (D.C. Cir. 2001) ............................................................. 10,11

*Cobell v. Norton*,
355 F. Supp. 2d 531 (D.D.C. 2005) .............................................................. 5

*Committee on Oversight and Government Reform v. Holder*,
No. 12-cv-1332, 2014 WL 1266266 (D.D.C. Sept. 9, 2014).................... 35

*Computer Professionals for Social Responsibility v. U.S. Secret Service*,
72 F. 3d 897 (D.C. Cir. 1996) ....................................................................... 6

*Cutler v. Hayes*,
818 F.2d 879 (D.C. Cir. 1987) .................................................................... 10

*Dayton Bd. of Educ. v. Brinkman*,
433 U.S. 406 (1977)..................................................................................... 28

*Decatur Liquors, Inc. v. Dist. of Columbia*,
No. 04-cv-1971 (RMC), 2005 WL 607881 (D.D.C. Mar. 16, 2005)........ 39

*Evans v. Fenty*,
701 F. Supp. 2d 126 (D.D.C. 2010) ............................................................ 23

*Goldstein v. Treasury Inspector Gen. for Tax Admin.,*
   278 F. Supp. 3d 131 (D.D.C. 2017) ................................................. 6

*Griggs v. Provident Consumer Discount Co.,*
   459 U.S. 56 (1982) ......................................................................... 39

*Grynberg v. BP P.L.C.,*
   No. 08-cv-301 (JDB), 2016 WL 11472270 (D.D.C. Mar. 1, 2016) ........................ 31

*Heartland Reg'l Med. Ctr. v. Leavitt,*
   415 F.3d 24 (D.C. Cir. 2005) ................................................. 36, 38

*\*Horne v. Flores,*
   557 U.S. 433 (2009) ......................................................... 23, 24

*\*In re Barr Labs., Inc.,*
   930 F.2d 72 (D.C. Cir. 1991) ................................................. 20, 21

*In re People's Mojahedin Org. of Iran,*
   680 F.3d 832 (D.C. Cir. 2012) ................................................... 10

*Int'l Ladies' Garment Workers' Union v. Donovan,*
   733 F.2d 920 (D.C. Cir. 1984) ................................................... 36

*Johnson v. Ashcroft,*
   223 F. Supp. 2d 116 (D.D.C. 2002) ............................................ 6

*Keepseagle v. Vilsack,*
   102 F. Supp. 3d 205 (D.D.C. 2015) .......................................... 31

*Kiakombua v. McAleenan,*
   No. 19-cv-1872, 2019 WL 4051021 (D.D.C. Aug. 21, 2019) ..................... 32

*LaShawn A. v. Fenty,*
   701 F. Supp. 2d 84 (D.D.C. 2010) ........................................... 24

*LaShawn A. v. Gray,*
   412 F. App'x 315 (D.C. Cir. 2011) ......................................... 24

*Mobarez v. Kerry,*
   187 F. Supp. 3d 85 (D.D.C. 2016) ........................................ 17, 21

*N.A. Sales Co., Inc. v. Chapman Indus. Corp.,*
   736 F.2d 854 (2d Cir. 1984) ............................................... 34, 35

iv

*N. Air Cargo v. U.S. Postal Serv.*,
  789 F. Supp. 2d 120 (D.D.C. 2011) ................................................................... 34, 35

*Petties ex rel. Martin v. Dist. of Columbia*,
  662 F. 3d 564 (D.C. Cir. 2011) ............................................................................ 14

*Potomac Elec. Power Co. v. Interstate Com.,*
  *Comm'n*, 702 F.2d 1026 (D.C. Cir. 1983) ........................................................... 10

*Pub. Emps. For Env't,*
  *Resp.*, 957 F.3d ................................................................................................... 25

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*,
  427 F. Supp. 3d 37 (D.D.C. 2019) ...................................................................... 37

*\*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 ........................................................................................................ 26

*Saint-Jean v. District of Columbia*,
  No. 08-cv-1769, 2016 WL 10829006 (D.D.C. 2016) ........................................... 7

*Salazar v. District of Columbia*,
  633 F.3d 1110, 1122 (D.C. Cir. 2011) ...................................................... 14, 29, 37

*Shapiro v. Dep't of Justice*,
  No. 12-cv-313 (BAH), 2020 WL 5970640 (D.D.C. Oct. 7, 2016) ......................... 6

*Skalka v. Kelly*,
  246 F. Supp. 3d 147 (D.D.C. 2017) ..................................................................... 16

*\*Telecomm. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ........................................................................ *passim*

*Twelve John Does v. Dist. of Columbia*,
  861 F.2d 295 (D.C. Cir. 1988) ............................................................................. 27

*United States v. All Assets Held at Bank Julius Baer & Co.*,
  308 F. Supp. 3d 186 (D.D.C. 2018) ....................................................................... 5

*United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*,
  315 F. Supp. 3d 90 (D.D.C. 2018) ....................................................................... 34

*United States v. DeFries*,
  129 F.3d 1293 (D.C. Cir. 1997) .......................................................................... 39

*United States v. Philip Morris USA Inc.*,
    793 F. Supp. 2d 164 (D.D.C. 2011) .................................................................. 33, 34

*WildEarth Guardians v. Bernhardt*,
    No. 16-cv-1724 (RC), 2019 WL 3253685 (D.D.C. July 19, 2019) ........................................... 6

*Yanofsky v. Dep't of Commerce*,
    No. 16-cv-951 (KBJ), 2019 WL 5110502 (D.D.C. Apr. 25, 2019) ................................... 36, 38

### FEDERAL STATUTES

8 U.S.C. § 1202(e) ........................................................................................... 20

8 U.S.C. § 1153(f) ............................................................................................. 2

8 U.S.C. § 1154(a)(1)(G) ..................................................................................... 2

### FEDERAL RULES OF CIVIL PROCEDURE

*Fed. R. Civ. P. 54(b) .................................................................................... *passim*

Fed. R. Civ. P. 56(c)(4) .................................................................................... 31

*Fed. R. Civ. P. 60(b)(5) ............................................................................... *passim*

*Fed. R. Civ. P. 60(b)(6) ............................................................................... *passim*

Fed. R. Civ. P. 62.1(a)(1)-(2) .............................................................................. 39

### FEDERAL REGISTER

Executive Order 14,012 ................................................................................. 9, 19

Executive Order 14,013 ................................................................................. 9, 19

### MISCELLANEOUS

U.S. Dep't of Homeland Security, *DHS and DOS Announce Exemptions Allowing Eligible
    Afghans to Qualify for Protection and Immigration Benefits,*
    https://www.dhs.gov/news/2022/06/14/dhs-and-dos-announce-exemptions-allowing-eligible-
    afghans-qualify-protection-and .................................................................................. 3

U.S. Dep't of State, *Ongoing Efforts to Support Afghan Special Immigrant Visa Applicants, Statement by Secretary of State Antony J. Blinken and Secretary of Homeland Security Alejandro N. Mayorkas*, https://www.state.gov/ongoing-efforts-to-support-afghan-special-immigrant-visa-applicants/ ..................................................................................................... 2

USCIS, *Green Card for an Afghan Who Was Employed by or on Behalf of U.S. Government* (last visited Jul. 25, 2022), https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html ................................................................................................... 2

U.S. Dep't of State, *Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government, Step 5 – Submit Petition* (last visited Jul. 25, 2022), https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html ................................................................................................ 1, 2

U.S. Dep't of State, *Special Immigrant Visas for Iraqis - Who Were Employed by/on Behalf of the U.S. Government* (last visited Jul. 25, 2022), https://www.uscis.gov/green-card-for-an-afghan-employed-behalf-us-government .................. 8

*\*Pursuant to Local Rule 7(a), an asterisk in the margin to the left of the case identifies cases or authorities on which counsel chiefly relies.*

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| AAPA | Afghan Allies Protection Act of 2009 |
| ASIV | Afghan Special Immigrant Visa Unit |
| COM | Chief of Mission |
| ESSAA | Emergency Security Supplemental Appropriations Act, 2021 |
| NVC | National Visa Center |
| RCIA | Refugee Crisis in Iraq Act of 2007 |
| SIV | Afghan and Iraqi Special Immigrant Visa |
| *TRAC* | *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) |
| USCIS | U.S. Citizenship and Immigration Services |

## INTRODUCTION

The Approved Adjudication Plan ("Plan") no longer reflects the reality of the Afghan and Iraqi Special Immigrant Visa ("SIV") program and therefore should no longer exist in its current form. Plaintiffs' Opposition and Cross-Motion (ECF No. 168) ("Pls.' Opp.") fails to appreciate how substantially the Executive and Congress already oversee—and have already changed—the SIV program. Plaintiffs seek to *add* judicial oversight through a cross-motion to enforce and clarify, which is really a motion to modify the injunction. Defendants are not unreasonably delaying the processing of SIV applications, and new judicial oversight would improperly invade Defendants' province to manage this important foreign policy program. The Court should therefore grant Defendants' Motion for Relief from the Court's Summary Judgment Order and the Approved Adjudication Plan ("Defs.' Mot.") (ECF No. 163), revise its interlocutory order from September 20, 2019 pursuant to Rule 54(b), and vacate the Plan. Alternatively, the Court should terminate or modify those orders under Rules 60(b)(5) or (b)(6). The Court should also deny Plaintiffs' cross-motion.

## SUPPLEMENTAL FACTUAL BACKGROUND

Defendants are improving the SIV program and their processing of SIV applications so quickly that material circumstances have changed even since they filed their motion and Plaintiffs responded. Since Plaintiffs filed their cross-motion last month, Defendants have implemented a change to Afghan SIV application processing that consolidates the Chief of Mission ("COM") approval phase and Form I-360 Petition phase to improve program efficiency.[1] Previously, Defendant Department of State handled the COM phase of the Afghan

---

[1] *See* U.S. Dep't of State, *Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government, Step 5 – Submit Petition*, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-

SIV process, which covered Steps 1–4 of the Plan. In that phase, the COM or his or her designee "conduct[s] a risk assessment of the alien and an independent review of records maintained by the United States Government or hiring organization or entity to confirm employment and faithful and valuable service to the United States Government prior to approval of the petition under this section." Afghan Allies Protection Act of 2009 ("AAPA") § 602(b)(2)(D)(i). U.S. Citizenship and Immigration Services ("USCIS") handled the Form I-360 petition phase of the Afghan SIV process, which covered Plan Steps 6–7. *See* 8 U.S.C. §§ 1154(a)(1)(G), 1153(f); AAPA § 602(b)(1)(A).

On July 20, 2022, the Department of State and USCIS consolidated those phases to improve program efficiency. *See supra* note 1; U.S. Dep't of State, *Ongoing Efforts to Support Afghan Special Immigrant Visa Applicants, Statement by Secretary of State Antony J. Blinken and Secretary of Homeland Security Alejandro N. Mayorkas*, https://www.state.gov/ongoing-efforts-to-support-afghan-special-immigrant-visa-applicants/ ("Today the U.S. Department of State and U.S. Department of Homeland Security are announcing a change to the SIV Program that will simplify and streamline the application process for Afghan applicants.") (last visited July 25, 2022). As of that date and going forward, a single form—the DS-157—already required for COM adjudication, will also be treated as the statutorily-required petition, collapsing the COM and petition stages of the Afghan SIV process into one. *Supra* note 1. Under this new streamlined process, the Department of State's National Visa Center ("NVC") reviews all required documents for COM approval, including Form DS-157, to evaluate, in a single processing step, whether the applicant has submitted all required items for both COM and

---

employed-us-gov.html (last visited July 25, 2022); *see also USCIS, Green Card for an Afghan Who Was Employed by or on Behalf of U.S. Government,* https://www.uscis.gov/green-card-for-an-afghan-employed-behalf-us-government (last visited July 25, 2022).

petition approval. *Id.*; *cf.* ECF No. 113-1 at 2 (showing that Plan Step 2 covers review of documents in the COM application only for completeness). Once a case is deemed documentarily complete, the Department of State's Afghan Special Immigrant Visa Unit ("ASIV") receives the case from NVC and undertakes any necessary verification. The COM or the COM's designee then makes a decision regarding both the COM application and, immediately afterward, the petition. *Supra* note 1; *cf.* ECF No. 113-1 at 2–3 (showing that Plan Steps 3–4 cover COM application review only). Because the AAPA requires COM approval before a petition can be approved, the COM approval must precede the petition approval (even if by moments), decisions on the COM application and the petitions are made in close temporal proximity. Once the COM or the COM's designee has made a decision, NVC notifies the applicant of approval or denial for both the COM application and the petition simultaneously and, for approvals, sends an instruction packet to the applicant to continue SIV processing. *Supra* note 1; *cf.* ECF No. 113-1. at 3–4 (showing that USCIS, not NVC, reviewed I-360 Petitions at Plan Steps 6–7). The current Plan Steps 6–7 will now be relevant for only a small subset of applicants with applications pending before July 20, 2022.

Furthermore, on June 14, 2022, the Secretary of State and the Secretary of Homeland Security, in consultation with the Attorney General, exercised their congressionally provided discretionary authority to create three new case-by-case exemptions related to terrorism-related inadmissibility grounds. The exemptions specifically apply to "Afghans who supported U.S. military interests, specifically Afghan allies" and are intended to support the expeditious processing of SIV applications, amongst other aims. U.S. Dep't of Homeland Security, *DHS and DOS Announce Exemptions Allowing Eligible Afghans to Qualify for Protection and Immigration Benefits*, https://www.dhs.gov/news/2022/06/14/dhs-and-dos-announce-

exemptions-allowing-eligible-afghans-qualify-protection-and ("'We remain committed to our Afghan allies and processing Special Immigrant Visa applications as expeditiously as possible, while always protecting our national security. We are working closely with our interagency partners to do so, and today's announcement is an important step forward in that endeavor,' said Secretary of State Antony J. Blinken[.]") (last visited July 25, 2022).

In addition, Defendants recently made permanent an adjustment to COM processing procedures designed to ensure that no Afghan SIV applicant, regardless of priority tier, will wait too long for a decision on their COM application. Although COM applications will continue to be processed in accordance with the tiered prioritization scheme, the ASIV Unit will dedicate 20% of its processing time to the longest pending, documentarily complete cases at the COM stage, regardless of where such cases may fall within the tiers. *See* Ex. A, Supplemental Declaration of Melissa A. Schubert ("Suppl. Schubert Decl.") ¶ 5. As of June 30, 2022, this effort has reduced the average processing time across all tiers to 82 days at Plan Step 4. *See id.* ¶ 6.

## ARGUMENT

I.   **THE COURT SHOULD REVISE ITS UNDUE DELAY DETERMINATION AND VACATE THE INJUNCTION TO ACCOUNT FOR CHANGED LAW AND FACTS UNDER RULE 54(b)**

A.   **There Are Good Reasons to Revise the *TRAC* Analysis and Grant Defendants' Motion under Rule 54(b)**

As an initial matter, although Defendants would be entitled to relief under Rule 60(b), *see infra* Part II, Rule 54(b) applies here. That rule is very broad: "any order or other decision, however designated, that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." Fed. R. Civ. P. 54(b). And the rule plainly encompasses the order at issue here. The Court's September 20, 2019 order (ECF Nos.

75–76) and the corresponding Plan (ECF No. 113) adjudicated fewer than all claims asserted in this case. Defs.' Mot. at 10. The September 2019 order granted relief to Plaintiffs only as to Counts 1 and 2 of the Amended Complaint and *did not* enter judgment on any other counts. Indeed, earlier this year, the Court denied without prejudice Defendants' motion to dismiss Counts 3, 4, and 5, and motion to enter final judgment on Counts 1 and 2. Minute Order (Jan. 11, 2022). The September 2019 order and Plan are therefore, under the plain text of Rule 54(b), "subject to revision at any time" under that rule's deferential standard.

Plaintiffs argue that the Rule 54(b) standard does not apply, Pls.' Opp. at 18, but they fail to acknowledge the pertinent orders "adjudicate[d] fewer than all the claims" and are therefore within Rule 54(b)'s plain text. *See* Fed. R. Civ. P. 54(b). Plaintiffs' more specific arguments likewise lack merit. First, Plaintiffs argue that Defendants' previous motion for reconsideration, which cited Rule 59(e), somehow bars Defendants from now moving for relief based on developments that have arisen since that motion was filed. Pls.' Opp. at 18. But as Plaintiffs have previously acknowledged, final judgment has not been entered in this matter. *See* ECF No. 132 at 8 n.1 (calling "illogical and baseless" the notion "that the Court's earlier orders somehow resolves Counts III-V"); ECF No. 162 at 11 (Plaintiffs indicating that they "expect that they would again oppose" a motion by Defendants to dismiss Counts 3, 4, and 5). Indeed, Plaintiffs *just* told the D.C. Circuit that their "claims regarding the Defendant Agencies' failures to designate SIV coordinators remain pending." Pls.' Mot. for Summ. Reversal, Stay Pending Appeal, and Expedited Consideration at 6 n.3, No. 22-5183 (D.C. Cir. filed June 29, 2022). The September 2019 order may therefore "be revised at any time before entry of a judgment adjudicating all the claims," Fed. R. Civ. P. 54(b), for any "good reason[]" the Court should identify. *United States v. All Assets Held at Bank Julius Baer & Co.*, 308 F. Supp. 3d 186, 193

(D.D.C. 2018) (citing *Cobell v. Norton*, 355 F. Supp. 2d 531, 540 (D.D.C. 2005)).

To argue that Rule 59(e) should apply, Plaintiffs cite several cases, each of which is inapposite. In *Computer Professionals for Social Responsibility v. U.S. Secret Service*, 72 F.3d 897, 902–03 (D.C. Cir. 1996), the court concluded that an untimely motion for reconsideration under Rule 59(e) may be treated as a motion under Rule 60(b). But that case involved a *final* judgment, and there were no outstanding claims left. *See id*. Accordingly, *Computer Professionals* never analyzed or discussed Rule 54(b). Here, by contrast, the Court's order and corresponding Plan did not end the litigation. Because they fall under the terms of Rule 54(b), that rule applies. *See, e.g.*, *Shapiro v. Dep't of Justice*, No. 12-cv-313 (BAH), 2020 WL 5970640, *2 (D.D.C. Oct. 7, 2016) (ruling on "a summary judgment motion that ensures that litigation will continue in the District Court" under the Rule 54(b) standard) (alterations in original); *WildEarth Guardians v. Bernhardt*, No. 16-cv-1724 (RC), 2019 WL 3253685, at *2 (D.D.C. July 19, 2019) ("Because the May 29, 2019 minute order did not dispose of all claims and all parties in the instant suit, the voluntary remand to BLM is not final. Rule 54(b) thus provides the relevant legal standard under which the Court evaluates Plaintiffs' arguments."). Nor does Plaintiffs' citation of cases in which litigants sought Rule 60(b) relief undermine Rule 54(b)'s use here. *See* Pls.' Opp. at 18. For example, in *Goldstein v. Treasury Inspector Gen. for Tax Admin.,* 278 F. Supp. 3d 131, 138 (D.D.C. 2017), the plaintiff moved for relief under Rule 60(b) to vacate partial entry of summary judgment in favor of the defendants; but the parties and the court did not address the viability of Rule 54(b). Likewise, *Johnson v. Ashcroft*, 223 F. Supp. 2d 116, 116–17 (D.D.C. 2002) does not address Rule 54(b), and the "final" order being challenged there had dismissed individual defendants from the suit, which is not the case here. Although Defendants earlier invoked Rule 59(e), they could have invoked Rule 54(b) instead or

6

in addition.

Second, Plaintiffs argue that Rule 54(b) does not apply because "Rule 54(b) exists to govern treatment of an interim ruling that is not immediately appealable in a case with multiple claims." Pls.' Opp. at 18. But the provision of Rule 54 that they cite is not at issue in Defendants' motion. Plaintiffs focus on the *first* sentence of Rule 54(b), allowing the Court to direct "entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b); *see, e.g.,* Pls.' Opp. at 19. In contrast, Defendants' motion relies upon the *second* sentence of Rule 54(b), which gives courts wide authority to revise interlocutory orders. Fed. R. Civ. P. 54(b). The purpose of *that* portion of Rule 54(b) is to provide courts "broad discretion" to determine whether or not "justice requires" revision when fewer than all claims have been adjudicated. *Cobell v. Norton*, 224 F.R.D. 266, 272–73 (D.D.C. 2004).

Third, Plaintiffs argue that, even if Rule 54(b) applies here, the Court should deny reconsideration because "the key facts remain the same." Pls.' Opp. at 28. That argument simply ignores reality; the world in which the SIV program operates and the program itself is dramatically different than it was in 2019. *See, e.g.*, Defs.' Mot. at 12–20 (describing significant global events in Afghanistan and Iraq, disruptions to embassy operations in Baghdad and Kabul including the full suspension of operations at Embassy Kabul, ongoing COVID-19 pandemic hurdles, and SIV program improvements in response to Executive Orders and legislative amendments since the Court's analysis under *Telecomm. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984)). Plaintiffs' reliance on *Saint-Jean v. District of Columbia* and *Banks v. Booth* is misplaced. *See* Pls.' Opp. at 28. In *Saint-Jean v. District of Columbia*, No. 08-cv-1769, 2016 WL 10829006, at *2 (D.D.C. 2016), the defendant argued that "superficial

commonalities" identified in the district court's prior ruling "between persons hired in the

regular course of business and court appointed officials, do not establish an agency relationship."

The district court concluded that the court's prior ruling did not make the finding that an agency

relationship had been established, and thus the "state of affairs ha[d] not changed" as to genuine

disputes of material fact between the parties in a way that would warrant Rule 54(b) relief. *Id.* In

*Banks v. Booth*, the district court concluded that "systemic deficiencies" with respect to medical

care, social distancing, and status of sanitation efforts at Department of Corrections facilities

undermined any claim of "significant or controlling" changed factual circumstances. 518 F.

Supp. 3d 57, 63 (D.D.C. 2021). These cases simply highlight that Rule 54(b) determinations are

highly case-specific. In this case, Defendants' motion details numerous key facts that have

changed since the Court ordered relief.

> **B.     Factors 1 and 2 Favor in the *TRAC* Analysis Favor Defendants Because the
> Agencies' Implementation of the SIV Program Is Reasonable Given the
> Circumstances**

Because Rule 54(b) applies, the Court has broad authority to revisit its earlier

determination that the agencies were unreasonably delaying SIV adjudications, as well as its

earlier remedy tailored to that delay. *See TRAC*, 750 F.2d at 80 (standard for assessing

unreasonable delay). All of the relevant factors, evaluated in light of currently operative facts,

demonstrate that the agencies are not engaged in unreasonable delay.

> i.     *Global Events and Major Improvements to the SIV Program in Response
> to Executive Orders and Statutory Changes Shape the Rule of Reason*

*TRAC* Factor 1, which assesses whether the speed of agency action conforms to a rule of

reason, strongly favors Defendants. Defendants have reduced the total average processing time to

587 days for the Afghan SIV program and 462 days for the Iraqi SIV program in the second

quarter of Fiscal Year 2022. Defs,' Mot. at 15; *see supra* note 1 (Report of the Afghan SIV

Program – April 2022); U.S. Dep't of State, *Special Immigrant Visas for Iraqis - Who Were*

*Employed by/on Behalf of the U.S. Government,* https://travel.state.gov/content/travel/en/us-

visas/immigrate/special-immg-visas-iraqis-employed-us-gov.html (Report of the Iraqi SIV

Program – April 2022) (last visited July 25, 2022). With respect to the Afghan SIV program,

Defendants dissolved the COM committee and streamlined the letter of recommendation and

credible threat determination approval process, significantly altering the COM approval phase of

the Plan. *See* Defs.' Mot., Ex. A ("Brooks Decl.") at 9. Even since filing their motion,

Defendants collapsed the COM and I-360 phases so that in practice a decision to approve or deny

both applications will occur simultaneously. *See supra* at 2.

      Defendants accomplished these streamlining actions while at the same time responding to

significant changes to the adjudication environment. Executive Orders 14,012 and 14,013 and

the Emergency Security Supplemental Appropriations Act ("ESSAA") imposed additional

Executive Branch and legislative oversight and reporting requirements upon Defendants. *See*

Defs.' Mot. at 19. As Defendants' motion explains, events in Afghanistan and Iraq have also

significantly complicated the processing of SIV applications, *see id.* at 12–19: for example, the

United States was required to suspend operations at Embassy Kabul and in-person visa

processing for the public at Embassy Baghdad, and completion of Plan Steps 11–14 must

therefore now rely on each SIV applicant's ability and resources to travel outside of Afghanistan

or Iraq. These new circumstances resulting from world events or actions outside Defendants'

control counsel for a revised *TRAC* analysis.

      These changes inform the rule of reason that the Court must apply at Factor 1 and render

the Court's previous determinations, which relied on the state of affairs in September 2019,

outdated. The changes demonstrate that Defendants are continually improving the SIV program's

efficiency despite significant challenges. And notably, many of these improvements occurred after the Plan was stayed, demonstrating that the Plan was not the impetus for these changes. Further counseling in favor of a revised analysis of TRAC factor 1 are both the influx of resources the Defendants have invested in the SIV program as well as the exponential increase in demand. *See* Defs.' Mot. at 14. These resource investments are particularly significant, including, for example, increased staffing to process SIV applications at the NVC's SIV Unit, the ASIV Unit, and for USCIS's Service Center Operations Directorate. *See* Brooks Decl. ¶ 21; Defs.' Mot., Ex. F, Declaration of Connie L. Nolan Decl. ¶¶ 5–6. In fact, NVC had projected approximately 140 staff either fully trained as SIV case processers or in training by this summer. Defs.' Mot., Ex. D, Declaration of Peggy Petrovich ¶ 11.

Plaintiffs' contrary arguments are belied by the record. First, Plaintiffs argue that Congress "continues to set a nine-month timeframe for Defendants' processing and adjudication of SIV applications." Pls.' Opp. at 29–30; Declaration of Olivia P. Greene ("Greene Decl.") (ECF No. 168-1) at 15–16. Plaintiffs' reliance on the nine-month benchmark conflates *TRAC* Factors 1 and 2. The mere existence of a statutory timeline does not mean judicial intervention is warranted whenever that timeline is not met, especially when that timeline is itself non-mandatory. *See* Defs.' Mot. at 25–26. *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012), which Plaintiffs cite, underscores that point. *See id.* at 837 ("[A] violation of a statutory deadline does not alone justify judicial intervention.") (internal citations and quotations omitted); *see also* Defs.' Mot. at 25–26 (discussing *Cutler v. Hayes*, 818 F.2d 879, 897 (D.C. Cir. 1987), and listing several cases in which the D.C. Circuit concluded that time periods longer than those at issue here did not constitute unreasonable delay). Courts instead look to the totality of the circumstances —and not simply whether an agency strictly meets a statutory timeframe—

10

to determine whether an agency's delay is unreasonable. Defs.' Mot. at 25; *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (an injunction to remedy unreasonable delay is appropriate only upon a showing that the delay is "egregious"); *Cf. Potomac Elec. Power Co. v. Interstate Com. Comm'n*, 702 F.2d 1026, 1034 (D.C. Cir. 1983) (a pre-*TRAC* decision involving an 8-year delay in addressing a single administrative decision over a tariff dispute). Defendants do not suggest "that the nine-month timeline is irrelevant," as Plaintiffs claim, Pls.' Opp. at 31 n.12, but it is well established that statutory indications regarding adjudicatory timeframes—which are assessed as part of Factor 2, not Factor 1—are not dispositive. *See infra* at 15.

Second, Plaintiffs argue that Defendants' changes are ineffective, emphasizing that average processing times have continued to exceed nine months, Pls.' Opp. at 14, and critiquing Defendants' reliance on aggregate average times and other methods of data reporting, *see id.* at 14–15 & nn.5–6; Greene Decl. at 10–11. *See also* Proposed Brief of Afghan-American Foundation as Amicus Curiae, ECF No. 170-1 at 2; Proposed Brief of Association of Wartime Allies and Veterans for American Ideals as Amici Curiae, ECF No. 171-1 at 2 ("[SIV applicants] continue to experience egregious delays in the SIV process."). But Plaintiffs fail to acknowledge that the Plan reporting, by definition, covers a closed group of applicants who entered the class before May 21, 2020, and thus whose applications have been pending the longest, so it is entirely reasonable that their processing times would differ from the broader SIV population. *See* ECF No. 113-1. As such, the quarterly public reports provide the truest indication of the Government's performance in SIV processing, and those reports demonstrate that average processing times have fallen. Again, the Court's task here is to look at the *totality* of the circumstances. *See Cobell*, 240 F.3d at 1095. What matters for the Court's revised *TRAC* analysis is that Defendants have achieved reasonable processing times when measured against a

rule of reason informed by unprecedented circumstances and ongoing actions by Defendants to improve the SIV program through resource investments and streamlining measures. *See* Defs.' Mot. at 12–15.

Plaintiffs assert that Defendants' increased throughput at the COM stage "could be leading to unnecessary and time-consuming appeals or new applications depending on the quality of adjudications . . . ." Pls.' Opp. at 21. But this allegation is not borne out by the approval/non-approval data for COM applications. In fact, approval ratings are *higher* now than they were previously. *See* Suppl. Schubert Decl. ¶ 7.

Plaintiffs also suggest that the improvements Defendants have made are "reversible," Pls.' Opp. at 21–22, but Defendants continue to streamline the SIV program, including since Defendants filed their Motion and while the Plan has been stayed. *See supra* at 2–3. Changes that Defendants made some time ago, such as dissolving the COM committee in August 2021, making a blanket credible threat determination on August 25, 2021 for all noncitizens employed in Afghanistan by or on behalf of the U.S. government, the International Security Assistance Force, or any successor mission, and various IT improvements initiated in the summer of 2021 have all proven durable. *See* Brooks Decl. ¶ 21; Defs.' Mot., Ex. E, Declaration of Melissa A. Schubert ¶¶ 5–9. Plaintiffs identify no changes by Defendants to improve or streamline SIV processing that Defendants have reversed.

Plaintiffs' argument is also misplaced because, given the iterative nature of the process changes and improvements Defendants have undertaken (all while Defendants have been managing the exponential surge in applications since the U.S. withdrawal), Defendants have not yet submitted a Congressional quarterly report that accounts for the major changes to the Afghan SIV program since the filing of Defendants' motion. Defendants anticipate that processing times

will continue to improve given Defendants' collapsing of the COM and petition stages. *See supra* at 2. Plaintiffs critique aspects of Defendants' operations, discussing, for example, an email inbox that the Department of State set up for SIV applicants to submit materials and requests for status updates in public-facing updates during the tumultuous period leading up to the U.S. withdrawal from Afghanistan. Pls.' Opp. at 32. But Plaintiffs' attempts at disparagement only highlight the humanitarian crisis and rapidly evolving circumstances to which the Department of State was required to respond before, during, and after the U.S. withdrawal from Afghanistan. *Id.* Plaintiffs cite no authority for the proposition that they or the Court should micromanage how the Department controls its own email inbox and public-facing communications during a fast-developing international crisis.

Third, Plaintiffs argue that Defendants' changes, even if effective, are insignificant. *See, e.g.*, Pls.' Opp. at 31 ("[N]one of the changed processing improvements . . . are in fact 'significant.'"). But Defendants' assiduous efforts, amid a litany of global events, suspension of embassy operations at Embassy Kabul, and continued security impediments at Embassy Baghdad, have allowed them to continue processing *thousands* of SIV applications at a reasonable pace. For example, despite new SIV case creations nearly quadrupling between August 1 and December 21, 2021, Defendants still were able to reduce average processing times for new applications and reapplications by 265 days at the COM phase alone for the second quarter of Fiscal Year 2022. Defs.' Mot. at 41.

Plaintiffs brush aside the suspension of operations at Embassy Kabul as "not new." Pls.' Opp. at 1, 31. Far from a temporary suspension of operations for COVID-19-related precautions, *see* Brooks Decl. ¶ 28, the United States has now entirely withdrawn its presence in Afghanistan and there is no clear indication if or when relations with the Taliban will normalize, and

13

Defendants must contend with these issues on top of all the other, more recent challenges. *See* Pls.' Opp. at 31–33 (discounting the effect of the suspension of embassy operations in Kabul and Baghdad and the pandemic); *id.* at 23 n.8 (claiming that such evidence is categorically prohibited). Plaintiffs also try to suggest that Congress was aware of these concerns when it retained a reference to nine months in its July 2021 legislative amendment, *id.* at 33, but that ignores the many changes that post-date July 2021 (including the fall of Kabul and suspension of operations at Embassy Kabul in August 2021). These are not "marginal" challenges. *Id.* at 33 n.13 (citing *Salazar*, in which the court tailored an injunction modification based on the changed circumstances of the pandemic). Despite the many challenges thrown at Defendants and the SIV program, Defendants have managed to reduce average case processing times appreciably due to significant resource investments and ongoing efforts to streamline the program in every possible way.

Fourth, Plaintiffs' opposition fails to respond to the significant improvements to the Iraqi SIV program since 2019. *See, e.g.,* Pls.' Opp. at 14. Defendants reduced the total average processing time to 462 days for the Iraqi SIV program in the second quarter of Fiscal Year 2022. *See supra* at 8. Defendants improved processing times despite the security situation at Embassy Baghdad, which impedes SIV applicants' abilities to schedule visa processing interviews. Furthermore, Defendants are winding down this program, meaning that there are fewer applicants in the pipeline and that judicial oversight is now particularly unwarranted. *See Petties ex rel. Martin v. Dist. of Columbia*, 662 F. 3d 564, 569–70 (D.C. Cir. 2011) (finding a reduced need for an injunction where the class of individuals who were threatened by special education placements had diminished).

Fifth, Plaintiffs rely heavily on this Court's findings under the prior *TRAC* analysis, but

the point of Defendants' motion is that the record has changed significantly since 2019. Pls.'

Opp. at 31 (complaining that Defendants' May 2022 arguments "mirror[] previous efforts that

the Court concluded did not counsel against relief" back in September 2019). Rule 54(b) gives a

court broad latitude to revisit past rulings in light of new circumstances. Plaintiffs' argument also

ignores the many improvements since the Court's orders. *See, e.g.*, Defs.' Mot. at 33 (discussing

how the agencies implemented pre-fly medical exams and electronic proof of visa issuance

instead of a passport foil in August 2021); *see id.* at 17 (discussing how Defendants utilized

Consulate Erbil and Embassy Ankara to facilitate Iraqi SIV interviews in March 2020); *see supra*

at 2–3 (discussing SIV program changes that have occurred even since Defendants filed their

Motion in May 2022).

ii.	*The Nine-Month Benchmark Is Pertinent But Not Mandatory*

*TRAC* Factor 2 also favors Defendants. The AAPA's and RCIA's nine-month timetable is

not mandatory, a point that Plaintiffs do not dispute. Defs.' Mot. at 25–26 ("[T]he RCIA and

AAPA provide only that the agencies 'should' complete processing under the specified terms.");

*see* Pls.' Opp. at 29. The Court should also consider the timetable's history: Congress explicitly

included the COM approval phase in that nine-month period for the first time in mid-2021,

almost two years after the Court's last examination of Factor 2. *See* ESSAA § 401(a)(3).

Plaintiffs argue that Congress was aware of the state of the SIV program when it passed the

ESSAA, Pls.' Opp. at 16–17, but fail to reckon with Congress's decision not to upgrade

Defendants' obligation from "should" to "shall" or to eliminate the longer-than-nine-months

flexibility for national-security vetting. *See* Defs.' Mot. at 25–26. The Court last analyzed the

nine-month timeframe in September 2019 and June 2020 when it laid the timeframe against a

then-fourteen-step program. *See* Plan at 2. But the fourteen steps the Court relied on are no more.

15

*See supra* at 2 (discussing the Plan step overhaul in July 2022). Moreover, by its terms the timeframe only applies to steps that are "under the control" of the Defendants. Since the Court last applied the timeframe, key steps—such as the ability of the Department of State to schedule SIV applicants for interview—are no longer "under the control" of the Defendants but instead rely on the applicant being able to travel and appear at an immigrant visa processing post. *See infra* at 19–20, 23, 26–27 (discussing the impact of the suspension of operations at Embassy Kabul and security situation at Embassy Baghdad on Defendants' ability to control the progress of applicants at the visa stage of the process). These changes underscore why the Court should not mechanically apply the nine-month figure here.

### C.   Factors 3 and 5 Favor Defendants Because Delays in Processing SIVs Are Not Egregious, Especially Where the Program Implicates Foreign Affairs, Immigration, and National Security Decision-Making

*TRAC* Factors 3 and 5, which consider the nature of the interests at stake, favor Defendants because management of the SIV programs, especially in the current circumstances in Afghanistan and Iraq, implicates significant considerations of national security, public safety, and foreign relations that must be considered alongside the class's interests. *See* Defs.' Mot. at 28. Courts must avoid "substantial intrusion" into the political branches' management of immigration policies. *Skalka v. Kelly*, 246 F. Supp. 3d 147, 154 (D.D.C. 2017). Those concerns are particularly acute here, as the Afghanistan and Iraq security situations significantly complicate Defendants' ability to routinely process SIV applications as contemplated by the Court's orders from more than two years ago. Defs.' Mot. at 28; *see id.*, Brooks Decl. ¶¶ 45–63 (discussing recent Taliban restrictions on movement that impedes U.S. facilitated relocation flights); *id.*, Defs.' Mot., Ex. B, Declaration of Daniel Mickelson ("Mickelson Decl.") ¶¶ 14–26 (highlighting recent attacks on the Embassy Baghdad compound). Further, rather than facilitate expeditious processing of SIV applications, the monitoring and reporting requirements that the

Plan imposed on Defendants divert resources from Defendants' processing of SIV applications. Defs.' Mot. at 29; *see id.* (describing how the Plan unduly burdens Defendants by requiring them to track individual class members manually throughout multiple government IT systems).

Plaintiffs discount the foreign policy and public safety interests at play. First, Plaintiffs argue that Defendants mischaracterize "whether human health and welfare are at stake" and "the nature and the extent of interests prejudiced by delay," Pls.' Opp. at 34, but they misapprehend the situation in Afghanistan and Iraq. Defendants understand and appreciate the risk of harm SIV applicants face. *See, e.g.*, Brooks Decl. ¶¶ 45–63. That is why Defendants have placed such a priority on processing the massive surge of SIV applications Defendants received beginning in August 2021 around the time of the U.S. troop withdrawal; the safety concerns of these new applicants must be considered alongside the interests of the class. Defs.' Mot. at 7 (describing the approximately 41,581 applications pending at the pre-COM phase as of May 10, 2022). That risk of harm is inextricably linked to the foreign affairs and national security considerations Defendants have faced over the past year. At bottom, Plaintiffs are asking the Court to superintend Defendants' response to the withdrawal of U.S. troops. But the Court cannot "traverse the thicket of thorny foreign-policy issues" that "would impermissibly encroach upon the discretion that the Constitution affords the political branches to conduct foreign affairs." *Mobarez v. Kerry*, 187 F. Supp. 3d 85 (D.D.C. 2016). Although the Court considered Defendants' "obligation to balance national security with individual eligibility for a visa" before issuing the Plan, ECF No. 75 at 11, later developments—including Defendants' management of how to pivot after operations at Embassy Kabul were suspended as well as the surge of requests following the fall of Kabul—highlight more now than ever the gravity of the interests the United States must weigh.

17

Plaintiffs contend that the burdens imposed by the Plan are justified, asserting that it provides "increased transparency and accountability." Pls.' Opp. at 34–35. But the Plan has turned into an untenable obligation, hindering the agencies' ability to continue their iterative efforts to streamline the SIV process and adjudicate SIV applications, therefore undermining both the Court's and Congress's intentions. And there will remain plenty of transparency and accountability if the Court vacates the Plan: Defendants are required to submit a publicly available report to Congress setting out the average processing times at each step of the Afghan and Iraqi SIV program. *See* AAPA § 602(b)(11)(A), (B); RCIA § 1248(f), (g). These reports, which assess the average processing times within each step of the SIV program and compare Defendants' progress to the nine-month benchmark under the AAPA and RCIA, already provide significant "transparency and accountability" to Plaintiffs and the public. *See* Pls.' Opp. at 35.

The additional burdens that the Plan imposes—including by requiring Defendants to meet separate, rigid benchmarks at *each* of the Plan's fourteen steps—are not warranted. These benchmarks are based on processing times and circumstances from over two years ago and do not reflect the reasonable pace of today's Afghan and Iraqi SIV program, nor do they reflect the actual steps of the program as they stand today. As one example, those fourteen steps anticipate actions of the COM committee and Form I-360 adjudications; the former no longer exists and the latter will be relevant for only a small subset of Afghan SIV applicants going forward. Defs.' Mot. at 22; *see supra* at 2 (describing the many changes to the SIV program steps in July 2022 alone). Further, the time dedicated to the progress report follow-up and Plan-required meet and confers diverts resources from expeditiously processing SIV applications. Defs.' Mot. at 29–30 (computing an average of 231 hours per week of time taken at both the Department of State and USCIS to comply with the Plan and litigation-related efforts).

18

In addition to transparency and accountability by the congressional quarterly reports, Defendants will draft a comprehensive new report on the SIV program in July 2022, as required by the ESSAA amendment. *See* ESSAA § 401(c). This report will include information on the total number of Afghan SIVs issued from 2008 to 2021, average processing times, the number of pending applications at different phases, the number of individuals approved of the total number of applications processed by the COM from 2008 to 2021, and the number of successful appeals from 2008 to 2021. *Id.* Two Executive Orders in 2021 also require Defendants to submit reports to the President on immigration benefits and the SIV program. *See* Defs.' Mot. at 19–20 (discussing Executive Orders 14,012 and 14,013). These reports underscore that Afghan and Iraqi SIV programs advance under the watchful eye of both the Executive branch and, as Plaintiffs have acknowledged, the Legislative branch. *See* Pls.' Opp. at 16 ("Congress, for its part, has remained resolute in its support of the SIV programs.").

Second, Plaintiffs argue that country conditions and the suspension of operations at Kabul and Baghdad are irrelevant because most SIV processing is conducted remotely. Pls.' Opp. at 3 n.1; *id.* at 24 n.9. But in addition to ignoring the fact that all SIV applications must undergo the full immigrant visa application process, which by statute requires in-person processing, Plaintiffs' position disregards the massive influx of applications Defendants received beginning in August 2021 as a result of the U.S. withdrawal, as well as the limitations on Defendants' ability to control the pace of processing at the visa stage without any consular presence in Afghanistan or any public-facing in-person immigrant visa services in Iraq. Defs.' Mot. at 7. For the earlier stages of the process, remote methods allow Defendants to continue processing, but this remote capability does not mitigate the impact of the application surge resulting from the situation in Afghanistan and the resulting resource decisions Defendants must

make in light of competing priorities. *See infra* at 20–21. More importantly, the visa stage of the process has been fundamentally altered and the pace at which applicants are able to proceed to visa interview and issuance is now largely outside Defendants' control, since applicants must now travel outside Afghanistan to meet the requirement to appear *in person* at an embassy or consulate. *See* 8 U.S.C. § 1202(e). This required in-person appearance necessarily impacts the remainder of the SIV process; if applicants are unable to travel outside Afghanistan to make this appearance, their application will not be able proceed to administrative processing or later steps. Applicants are also limited in where they can go for the statutorily required appearance. As Division Chief Mickelson pointed out, "[p]osts that are not Immigrant Visa-designated Posts do not have the requisite software or access to the necessary databases and other systems in order to process Immigrant Visas, nor is it technologically possible to transfer cases from an Immigrant Visa Post to a Post that is not Immigrant-Visa designated." Mickelson Decl. ¶ 38. Nevertheless, the Department of State prioritizes SIV applicants at any immigrant visa-designated Post where the applicant appears. Factors 3 and 5 thus favor Defendants.

### D.   Factor 4 Favors Defendants Because Compelling the Agencies to Transfer Further Resources to SIV Processing Would Undermine the Agencies' Ability to Act on Competing Priorities

Factor 4 weighs in Defendants' favor because Defendants have a primary role in determining how to direct their scarce and finite resources. Defs.' Mot. at 32; *see In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991) ("The agency is in a unique—and authoritative— position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."). Defendants must balance their facilitation of the SIV program with several competing (often urgent) mission demands, including performing the necessary diplomatic work to facilitate relocation efforts, Defs.' Mot at 33 (discussing Defendants' deployment of approximately 400 personnel worldwide to support relocation efforts and work to enter into

agreements with many countries to facilitate relocations), managing the Ukrainian refugee crisis, processing the COVID-19 visa backlog, monitoring the civil war in Ethiopia, and responding to the lack of consular services in Moscow, *id.*; Vermillion Decl. ¶ 15. These circumstances have changed dramatically since the Court conducted its *TRAC* analysis in 2019. Defs.' Mot. at 34.

Plaintiffs do not succeed in downplaying Defendants' competing obligations. Although Plaintiffs suggest that relevant "agency commitments" are not "new," Pls.' Opp. at 36, Defendants have explained that they are, for example, working to assist refugees and other populations from the Russian invasion of Ukraine that occurred in March 2022. *See* Vermillion Decl. ¶ 15. Plaintiffs are simply mistaken to suggest that Defendants have not identified a "competing project" of the sort at issue in *Center for Science in the Public Interest*, Pls.' Opp. at 36 n.15; Defendants provided myriad such examples in their motion, as just explained. *See, e.g.*, Defs.' Mot. at 33; *see also* Pls.' Opp. at 24 (acknowledging a "substantial" number of inquiries Defendants must address from individuals seeking immigration benefits besides SIVs). Although Plaintiffs attempt to second-guess Defendants' management of their competing priorities, the D.C. Circuit has emphasized that agencies should have a primary role in determining how to direct their scarce and finite resources. Defs.' Mot. at 32; *see, e.g.*, *Barr Labs.*, 930 F.2d at 76. Particularly in the sensitive areas of foreign relations and national security, neither Plaintiffs nor the Court should second-guess Defendants' balancing of resources for SIV and non-SIV applications. *See Mobarez*, 187 F. Supp. 3d at 85 (commenting on how the government chooses to prioritize resources "would impermissibly encroach upon the discretion that the Constitution affords the political branches to conduct foreign affairs").

## E.     Factor 6 Favors Defendants Because They Have Acted in Good Faith

Finally, Defendants have responded in good faith to these extraordinary circumstances. For example, Defendants worked assiduously to facilitate departures from Afghanistan during

Operation Allies Welcome, including by quickly configuring pre-fly medical exams, providing medical services, and providing, for the first time ever, electronic proof of visa issuance instead of a passport foil. *See* Defs.' Mot. at 35. Factor 6 favors them.

The evidence undermines Plaintiffs' suggestion that Defendants have not acted in good faith. *See* Pls.' Opp. at 37. Although Plaintiffs argue that Defendants have mismanaged the program over the past eight years, *see id.* at 32, they cannot dispute that Defendants have worked continuously to process all SIV applications and that they have implemented many resource-intensive measures to streamline their process for doing so. *See* Defs.' Mot. at 35.

In sum, the *TRAC* factors favor the Government. This Court should revise its summary judgment decisions on Counts 1 and 2 of the Amended Complaint and vacate the Approved Adjudication Plan pursuant to Rule 54(b).

## II. ALTERNATIVELY, IF THE COURT FINDS THAT RULE 54(b) DOES NOT APPLY, DEFENDANTS ARE ENTITLED TO RELIEF UNDER RULE 60(b)(5) AND (b)(6)

Even if Rule 54(b) does not apply, Defendants are entitled to relief from the Court's orders under Rule 60(b)(5) and (b)(6). *See* Pls.' Opp. at 18 ("The Court should analyze Defendants' request for relief under Rule 60(b)").

### A.   Control of the SIV Program Should Be Returned to the Political Branches

Rule 60(b)(5) permits the Court to relieve Defendants from the Plan if "a significant change either in factual conditions or in law renders enforcement detrimental to the public interest." *See* Defs.' Mot. at 36 (citations and internal quotations omitted). Since the summary judgment order was entered in 2019, Congress and the Executive have actively engaged with the SIV program through statutory amendment and administrative overhaul. *See id.* at 38. Continued enforcement of the Plan—with its demands on Defendants' time to track, create, and provide data, and its demands for meeting benchmarks no longer rooted in reality—interferes with the

22

government's ability to allocate resources and improve its programs. *Id.*; *see id.* at 37–38 (discussing Supreme Court case law that identifies the perils of institutional reform litigation). The Court should take a "flexible approach" to ensure that Defendants' processes are not frustrated by judicial supervision, especially where the government is "fulfilling its obligations under the [law] by other means." *See Horne v. Flores*, 557 U.S. 433, 439 (2009).

Plaintiffs make three general arguments as to why continued judicial supervision is warranted, none of which are availing. First, Plaintiffs argue that Defendants "have not fully achieved the purpose of the Court's orders or instituted a durable remedy" because class members are still awaiting adjudication and Defendants have not met the Plan's processing benchmarks. Pls.' Opp. at 20–21. Plaintiffs' arguments misunderstand the Plan and ignore courts' wariness of limitless institutional reform measures.

The Plan's purpose was to provide a remedy to certain class members at a time when the United States maintained a presence in Afghanistan and SIV applications were processed in a routine manner. The Plan's fundamental underpinnings have now been obviated: for example, Plan Steps 11–14 contemplate that Defendants schedule and adjudicate interviews in Afghanistan, which is no longer possible given the suspension of operations at Embassy Kabul. *See* Defs.' Mot., Ex. C, Declaration of Mark R. Evans ("Evans Decl.") ¶¶ 22, 41. The Plan also contemplates that COM processing and approval and Form I-360 adjudications will occur separately, within separate agencies, and fails to account for the world crises that have reshaped both agencies' operations since the Plan was issued in June 2020. *See* Defs.' Mot. at 40; Brooks Decl. ¶ 16. Defendants continue to address SIV processing changes in response to these global affairs.

Second, Plaintiffs cite nothing undermining the flexible approach that courts must take in

reconsidering institutional reform orders. Plaintiffs' reliance on *LaShawn A. v. Fenty* and *Evans v. Fenty* only underscores the need to reevaluate the orders at issue here. *See* Pls.' Opp. at 20–21. In both cases, the plaintiffs identified concrete indicia of noncompliance with court orders. *See, e.g.*, *LaShawn A. v. Fenty*, 701 F. Supp. 2d 84, 110 (D.D.C. 2010) (finding "no reason" the court should "accept a level of compliance that falls short of" specified "benchmarks"), *aff'd sub nom.*, *LaShawn A. v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011). Here, by contrast, a Plan progress report has not been filed since July 2021. Pls.' Opp. at 2; *see infra* at 36–37 (explaining why Plaintiffs' cross-motion to enforce is meritless). Further, Defendants have implemented "structural changes" to the SIV program amid the global challenges of 2020, 2021, and 2022. *Cf. Evans v. Fenty*, 701 F. Supp. 2d 126, 176 (D.D.C. 2010); *see* Defs.' Mot. at 21–23 (discussing the increased staffing and technological improvements at ASIV, streamlined processes for letters of recommendation at the COM phase, dissolution of the COM committee, and operational changes to USCIS's I-360 Request for Evidence procedure); *supra* at 2 (discussing additional changes to the COM, I-360, and visa interview Plan steps).

Third, Plaintiffs argue that Defendants have failed to show that continued enforcement of the Plan would be "detrimental to the public interest." Pls.' Opp. at 25. Plaintiffs deny that this case "involve[s] programmatic relief," *id.* but this litigation in fact underscores the very concerns the Supreme Court has highlighted: that the "longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with" politically accountable officials' prerogatives. *Horne*, 557 U.S. at 439. And although Plaintiffs suggest that they merely "seek to compel the final adjudication of class members' applications," Pls.' Opp. at 25, the Plan sets out timing benchmarks for 14 steps of the SIV process, many of which are now outdated in light of subsequent developments.

Indeed, Plaintiffs' actions under the Plan's meet-and confer-procedures demonstrate the intrusive level of supervision that they contemplate. *See, e.g.*, Greene Decl., Ex. 4, at 10 (seeking questions on a wide range of topics such as asking Defendants to "provide a fulsome explanation of how individuals at each step of SIV processing…are impacted…by the Executive Orders"); *id.* at 10 (seeking "an explanation of why additional government-controlled processing after Step 13 is not occurring earlier in the application process to prevent additional government-caused delay); *id.*, Ex. 6 at 8 (demanding that Defendants "[p]rovide an update on any processing changes at other government-controlled steps"). Plaintiffs made such program-wide inquiries throughout the period that Defendants filed Plan progress reports. *See id.* at 8–10 (making 45 separate requests to Defendants).

### B.    Applying the Previous Orders Prospectively Is No Longer Equitable

It is no longer equitable for the Court to keep the Plan in place because there have been significant, unanticipated changes in circumstances since 2019. *See* Defs.' Mot. at 40. The Plan can no longer be considered "equitable" because it requires Defendants to meet timing benchmarks that do not account for the current realities of SIV processing. *See In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 274 (D.C. Cir. 2020*) (*"Mandamus relief can't make money grow on trees."*).

Plaintiffs err in disputing that relief has become substantially more onerous. First, Plaintiffs question whether "changed facts have made compliance substantially more onerous." Pls.' Opp. at 22–23. As discussed above and in Defendants' Motion, however, the Plan requires Defendants to report on steps that are largely unrecognizable from June 2020. *See* Defs.' Mot. at 22 (discussing changes to COM employment verification and dissolution of the COM committee); *id.* at 23 (discussing USCIS's new Request for Evidence process for I-360

adjudications); *id.* at 13, 40 (discussing unanticipated third-country engagement for visa interviews); *see supra* at 2 (discussing SIV program improvements in July 2022 which affect Steps 2 through 7). It is impossible to provide statistics on a nonexistent case-processing stage.

Second, Plaintiffs err in disputing the burdens of reporting under the Plan. Plaintiffs mistakenly dismiss Defendants' expenditure of up to 231 hours *per week* on "litigation-related" matters as "minimal," Pls.' Opp. at 22; as Defendants have explained, that is time that could be spent adjudicating class members' SIV applications. Plaintiffs also wrongly claim that Defendants have been "internally inconsistent" by describing the burdens of compliance reporting while also making improvements to reporting systems. *See id.* Defendants' ability to make improvements across the SIV process does not justify the burdens that Plan reporting imposes upon Defendants. *See* Defs.' Mot., Ex. H, Declaration of Evelyn Martin ¶¶ 6, 20; Brooks Decl. ¶¶ 71–77.

Third, Plaintiffs dispute that the Plan is "unworkable because of unforeseen obstacles." Pls.' Opp. at 23. Plaintiffs are mistaken to argue that the changed circumstances Defendants cite occurred prior to the implementation of the Plan. *Id.*; *see Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 385 (1992) ("modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree"). The COVID-19 pandemic and the security situation at Embassy Baghdad adversely affected Defendants' ability to implement the Plan as soon as it went into force. *See* ECF No. 113-1 at 5 ("The parties acknowledge that the Department of State suspended all routine visa services worldwide due to COVID-19 [and] that as of the date of the submission of the [Plan,] the Visa Unit at the U.S. Embassy in Afghanistan is closed and consular services in Iraq are severely limited."). But the U.S. withdrawal of troops from Afghanistan and subsequent formal suspension of operations of the Embassy (which was

entirely distinct from COVID-related pauses in interviewing), Defs.' Mot. at 12, the execution of

the largest airlift in U.S. history, *id.*, the first time the Department of State implemented foil-less

visas, *id.* at 33, and further attacks on Embassy Baghdad in January 2022, *id.* at 17, were far from

"predictable" when the Plan was implemented. *See Twelve John Does v. Dist. of Columbia*, 861

F.2d 295, 298 (D.C. Cir. 1988). And the Court and the parties could not have anticipated the

magnitude of disruptions caused by the COVID-19 pandemic and the security situation at

Embassy Baghdad when the Plan was commenced.

Fourth, Plaintiffs erroneously seek to minimize the significance of the "alleged increase

in new [SIV] applications" from Afghan nationals. Pls.' Opp. at 24. Defendants received a huge

surge in applications, including SIV applications, beginning in Fall 2021. Defs.' Mot. at 7

(describing the approximately 41,581 applications pending at the pre-COM phase as of May 10,

2022). The parties contemplated neither this acceleration of filings nor the extent to which

Defendants would be required to reallocate resources to assist Afghan SIV applicants and non-

applicants in Fall 2021. *See* Greene Decl., Ex. 19, *Department of Homeland Security Operation*

*Allies Welcome Afghan Evacuees Report* (Dec. 2021) (report to Congress on Afghan evacuees

not including SIV holders). This unprecedented surge in new applications means that Defendants

must process an even larger group of applicants at an even faster individual pace in order to

maintain average processing time reductions, and dramatically increases the resource burdens of

processing.

Fifth, Plaintiffs argue that if Defendants cannot meet Plan benchmarks, they can simply

use the Plan to explain those deficiencies. Pls.' Opp. at 25. But the key premise of Defendants'

motion is that the Plan benchmarks are no longer equitable in light of changed circumstances.

And indeed, Plaintiffs have exacerbated the reporting burdens on Defendants by turning the

Plan's meet-and-confer procedure into a programmatic inquiry that exceeds the scope of this litigation, imposing additional burdens on the agencies as they seek to work with Plaintiffs in good faith. *See generally* Greene Decl., Exs. 2–7 (examples of the parties' meet and confer correspondence). The time that Defendants must devote to reporting under the Plan and responding to Plaintiffs' inquiries undermines the Court's intent by diverting from Defendants' resources to adjudicate SIV applications. *See* Defs.' Mot. at 29–30 (calculating time spent on progress report submissions by State and USCIS); *see supra* at 25 (discussion of Plaintiffs' meet and confer inquiries).

The Court should terminate the Plan under Rule 60(b)(5).

## C.     Compliance with the Injunction Is No Longer Practicable

Alternatively, the Court should grant relief under Rule 60(b)(6) because the changes to the SIV program over the past two years make this an "extraordinary case." *See Ackerman v. United States*, 340 U.S. 193, 199 (1950). This Court should reexamine the injunction in light of its duty to ensure "that justice be done in light of all of the facts." *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970); *see* Defs.' Mot. at 43. That reexamination includes an assessment of whether the injunction is properly tailored to the harm alleged, as an injunction "should be no more burdensome to the defendant than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) ("A federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the [legal] violation.") (citations omitted). The Plan should not remain in place when intervening events have rendered compliance impracticable. *See* Defs.' Mot. at 12–14, 16–17.

Plaintiffs are mistaken to contend that Defendants' request for Rule 60(b)(6) relief should be denied because Defendants have failed to show that changed circumstances have made relief

"unworkable or "substantially more onerous" under Rule 60(b)(5). *See supra* at 22–28 (explaining why relief is warranted under Rule 60(b)(5)).

Plaintiffs also miss the mark in arguing that a Rule 60(b)(6) motion represents an improper "alternative route" to relief because Defendants dismissed their appeal of the Court's orders in September 2021. Pls.' Opp. at 26–27. A party's entitlement to relief under Rule 60 does not depend on whether it appealed the underlying order, and Plaintiffs' reliance on *Salazar v. District of Columbia* is misplaced. That case held that "a lack of diligence" will preclude a finding of extraordinary circumstances, 633 F.3d 1110, 1122 (D.C. Cir. 2011), but did not address circumstances like these, where extraordinary changes in the underlying facts have rendered compliance impracticable and where Defendants' responses to those changes are ongoing.

The Court should therefore terminate the Plan under Rule 60(b)(6) in the alternative.

## III.    IF THE COURT OPTS TO MODIFY THE PLAN, IT SHOULD ALLOW DEFENDANTS TO PROPOSE A NEW PLAN

Should the Court find termination inappropriate, the Court should allow Defendants the opportunity to propose a new Plan within 30 days of resolving Defendants' motion. *See* Defs.' Mot. at 43–44. Defendants are uniquely poised to advise the Court about the appropriate contours of a new plan. *See id.* The Court previously permitted Defendants to propose a plan first, recognizing that Defendants are keenly aware of what is feasible and what may be "more intrusive than necessary." ECF No. 75 at 18; *see* Defs.' Mot. at 44 (outlining the many instances in which Plaintiffs agreed that Defendants should submit a plan). Plaintiffs likewise appear to agree that Defendants should have the opportunity to propose a modification in the first instance. Pls.' Opp. at 26.

Plaintiffs claim that Defendants are "attempt[ing] to circumvent their burden to justify the remedy they seek." Pls.' Opp. at 26. But there is nothing improper about Defendants' request to propose a plan within 30 days of the date of the Court's resolution of this motion. As Plaintiffs and the Court each acknowledged in 2019, Defendants are in the best position to know how any revision to the Court's previous orders may be properly implemented so to not be unduly burdensome to Defendants or impede Defendants' ability to continue processing SIV applications at a reasonable pace. Changes to the SIV program's structure in July 2022 further counsel providing Defendants an opportunity to propose modifications to the Plan. As discussed, Defendants are constantly improving the SIV visa-application program, and they are best situated to propose modifications that would account for changes to their procedures.

After the Court updates its *TRAC* analysis to account for developments transpiring over the last three years, Defendants will be in a better position to propose any future proceedings; until then, Defendants cannot know what new plan might address the Court's current concerns and findings. Accordingly, and so that Defendants may incorporate any revised assessment of delay by the Court into an appropriately tailored Plan, Defendants request that the Court allow Defendants to propose a new plan within 30 days of resolution of Defendants' motion if the Court decides not to terminate the September 2019 summary judgment decision and the June 2020 Plan.

## IV.   DISCOVERY IS INAPPROPRIATE

In their opposition, Plaintiffs seek discovery on numerous issues relating to the many changed circumstances that Defendants describe. Pls.' Opp. at 40. As a threshold matter, Plaintiffs fail to include this as a form of relief in their proposed order, *see* Pls.' Proposed Order

(ECF No. 168-28), and they have not separately moved for this relief. For that reason alone, the Court should deny their request.

In any event, the Court should deny discovery because Plaintiffs ignore both this case's procedural posture and the applicable standard for Defendants' motion. A court should consider granting discovery at this stage of a case only in the narrowest of situations. *See Grynberg v. BP P.L.C.*, No. 08-cv-301 (JDB), 2016 WL 11472270, at *2 (D.D.C. Mar. 1, 2016) ("Discovery pending decision on a Rule 60(b) motion is limited to situations relevant to providing the applicable basis for relief from judgment."); *see, e.g.*, *Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 218 (D.D.C. 2015) (finding that the level of class-member opposition to a competing motion for modification was not relevant to any basis for relief from judgment under Rule 60, but rather spoke to defects in or changed circumstances regarding the underlying judgment).

First, Plaintiffs argue that additional discovery is necessary at this late juncture so that Plaintiffs may assess the speed of Defendants' application-processing. *See id.* at 39. But the Court should not grant discovery where judicial oversight is unnecessary. *See supra*. Defendants last submitted a quarterly progress report in this litigation in July 2021. ECF No. 138. Since then, Defendants have continued to confront major global events and a surge in SIV applications, *see supra*, all while maintaining a reasonable processing pace. Defendants prioritized the SIV program in the spirit of the Court's September 2019 order without the Plan's remedial reporting obligation oversight. Their Congressional reports (and the forthcoming ESSAA report) continue to explain how Defendants have navigated these challenges. *See* Defs.' Mot. at 6 n.1.

Second, Plaintiffs cite Rule 56(c)(4) as a basis for discovery, but Defendants have not moved for summary judgment under Rule 56. *See* Pls.' Opp. at 40 (citing Fed. R. Civ. P. 56(c)(4) for their basis that additional discovery is necessary); *see id.* at 27 n.10 (implying incorrectly that

the Court should review Defendant's motion under Rule 56). Rules 54(b) and 60(b) supply the relevant standard; Rule 56 procedures are inapplicable. *Cf. Kiakombua v. McAleenan*, No. 19-cv-1872, 2019 WL 4051021, at *2 (D.D.C. Aug. 21, 2019) ("This Court is unaware of any precedent for applying the standards of Rule 56 to an agency's certification of the administrative record, and Plaintiffs point to none.").

Third, Plaintiffs' request for additional discovery improperly seeks reconsideration of this Court's previous decision that additional discovery is unnecessary. Plaintiffs previously filed a Motion for Expedited Discovery that sought leave to propound requests for production of documents and to notice depositions of Defendants' corporate representatives. ECF No. 35. The Court granted that motion. ECF No. 49. At the hearing on Plaintiffs' Motion for a Preliminary Injunction, Plaintiffs argued that "there is additional discovery to conduct in this case." Mot. Prelim. Inj. Hr'g. Tr. 5:21–23 (July 26, 2019) (ECF No. 72). The Court, however, found that "there ha[d] been sufficient discovery for [the Court] to issue a ruling." *Id.* at 6:21–22. Since the Court's ruling, Plaintiffs have not tried to propound additional discovery even after Defendants have submitted reports to Congress and filed four quarters' worth of progress reports under the Plan. Rightly so: these progress reports require Defendants to submit reporting at each of the fourteen SIV steps and proffer remedial action for steps as to which Defendants are not in compliance. For Plaintiffs to now seek additional discovery almost three years after the Court's ruling is both untimely and out of place. Their request, which is not contained in a proposed order or separate motion, should be denied. Alternatively, if the Court determines Plaintiffs have made a sufficient showing of need, any discovery should be narrowly tailored and sharply limited.

**V.    THE COURT SHOULD DENY PLAINTIFFS' CROSS-MOTION TO ENFORCE AND CLARIFY ITS PRIOR ORDERS BECAUSE PLAINTIFFS ACTUALLY SEEK TO MODIFY AND EXPAND THE APPROVED ADJUDICATION PLAN**

Plaintiffs separately move to "enforce" the existing Plan and "clarify" the Court's September 2019 Summary Judgment Order. In reality, Plaintiffs are seeking to modify and expand the Plan without carrying the burden associated with such a request. Plaintiffs ask the Court to adopt new requirements that are nowhere established in the Plan, including (1) a new accounting for the status of class member applications; (2) a new plan to track and report processing times across all government-controlled stages of the application process (technology that does not exist); (3) expanding the scope of the Plan beyond those who were pending more than nine months as of May 21, 2020; and (4) a new requirement that a magistrate judge oversee the development and implementation of new plans. ECF No. 168 at 41. Plaintiffs' cross-motion should be denied.

**A.    Plaintiffs Fail to Meet Their Burden to Seek Clarification and Enforcement of the Court's Orders Because They Ask the Court to Modify the Plan**

Plaintiffs claim that they seek to "clarify" the Court's orders, including the meaning of "current class members." Pls.' Opp. at 43. But Plaintiffs have been operating under the order for almost three years and submitted a draft Plan, jointly with Defendants, without claiming any ambiguity at that time. *Id.* at 44. They also seek to "enforce" the Court's orders. *Id.* at 41. However, they identify no provision of any Court order that they believe that Defendants are currently violating. The Court should accordingly deny Plaintiffs' requests.

*i.    Plaintiffs' "Clarification" Motion Improperly Seeks to Modify the Plan*

Plaintiffs are not truly seeking to clarify anything. "The general purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend." *United States v. Philip Morris USA Inc.*, 793 F. Supp. 2d 164, 168 (D.D.C. 2011).

"Although such a motion cannot open the door to re-litigating a matter that the court has considered and decided, courts in this circuit have encouraged parties to file motions for clarification when they are uncertain about the scope of a ruling." *United States v. All Assets Held at Bank Julius, Baer & Co., Ltd.*, 315 F. Supp. 3d 90, 99 (D.D.C. 2018) (internal quotations and citations omitted). A party meets the "threshold requirements for seeking clarification" where a court's order "is reasonably susceptible to differing interpretations." *All. of Artists & Recording Cos. v. Gen. Motors Co.*, 306 F. Supp. 3d 413, 416 (D.D.C. 2016). By clarifying the scope of a previously issued preliminary injunction, a court "add[s] certainty to an implicated party's effort to comply with the order and provide[s] fair warning as to what future conduct may be found contemptuous." *See N.A. Sales Co., Inc. v. Chapman Indus. Corp.*, 736 F.2d 854, 858 (2d Cir. 1984). A court considering a motion for clarification should not "entertain new factual and legal issues beyond the scope of" the court's original order. *N. Air Cargo v. U.S. Postal Serv.*, 789 F. Supp. 2d 120, 123 (D.D.C. 2011). Attempts to use such a motion to seek relief from a Court's order may be treated as a Rule 60(b) motion. *Philip Morris*, 793 F. Supp. 2d at 168.

Plaintiffs fail to identify any provision of this Court's orders that is susceptible of multiple interpretations. They fail to identify any ambiguity or a provision that "create[s] real uncertainty about the scope" about *any* of the Court's orders at issue. *See All. of Artists & Recording Cos.*, 306 F. Supp. 3d at 418–19. Plaintiffs say that they find confusing the term "current class members" in the Court's summary judgment order. Pls.' Opp. at 44 ("Plaintiffs request that the Court clarify the scope of its injunction . . . ."). But the Court clearly defined the class in 2019, ECF No. 47 at 2, and early 2020, ECF No. 89, and notably, Plaintiffs helped craft and *consented* to the entry of relief based on that term—months *after* it was introduced. At no time during their joint submission of the Plan did Plaintiffs express confusion about the meaning

34

of "current class members." Even in their current brief, they do not identify any "differing interpretations," *see All. of Artists & Recording Cos.*, 306 F. Supp. 3d at 419, that a reasonable person would draw from the class definition in the Court's order. Nor do they indicate that clarity is now necessary for them to avoid contempt. *See N.A. Sales*, 736 F.2d at 858. They claim that there is ambiguity because "Afghan applicants have continued to enter the class" since the May 21, 2020 cutoff date in the Plan, Pls.' Opp. at 44, but new factual and legal issues cannot justify a grant of a motion for clarification. *See N. Air Cargo*, 789 F. Supp. 2d at 123.

Plaintiffs instead seek to *modify* the injunction, attempting to interpose an *additional* requirement because they believe the Plan's definition of "current class members" should include individuals who entered the class after May 21, 2020. But the Court's order is not susceptible to any ambiguity, as evidenced by Plaintiffs' submission jointly with Defendants of an adjudication plan using that cutoff date. ECF No. 111. Plaintiffs can neither undo the strategic choices they made in agreeing to the Plan nor avoid the burden of justifying a modification of the Plan by asking the Court to "clarify" its underlying order without showing significant changed circumstances. Even if the September 2019 summary judgment order were unclear on this point—and it is not—the Court's Plan resolved any ambiguity by applying itself to class members who had entered the class before May 21, 2020. ECF No. 113-1.

Plaintiffs' requested clarification thus mirrors that rejected in *Committee on Oversight and Government Reform v. Holder*, No. 12-cv-1332, 2014 WL 1266266, at *1 (D.D.C. Sept. 9, 2014), in which the plaintiffs sought clarification that similarly attempted to impose new requirements. In that case, the court had ordered the defendant to describe material withheld under the deliberative process privilege in a manner sufficient to enable the resolution of any privilege claim. *Id.* In their clarification motion, the plaintiffs asked the court to order defendants

to specify the dates of any decision. *Id.* The court denied the motion because "the motion does not actually indicate that there was anything unclear about the order . . . rather [plaintiff] seeks to modify the order by adding [a new] requirement." *Id.* In contrast, in *Alliance of Artists & Recording Cos.*, 306 F. Supp. 3d at 416, the court granted a clarification motion where it found that its order "plausibly could be read in either party's favor," which "create[d] real uncertainty about the scope of the ruling." *Id.* at 419. Plaintiffs' unhappiness with the Plan's current strictures does not "meet the threshold requirement for seeking clarification." *Id.* at 416; if they wish to expand the class, they must seek that relief.

ii.    *Plaintiffs' Motion to Enforce Seeks to Add New Requirements and Plaintiffs Have Delayed Bringing an Enforcement Action*

Separately, a court has the inherent power to enforce compliance when a "prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it." *Yanofsky v. Dep't of Commerce*, No. 16-cv-951 (KBJ), 2019 WL 5110502, at *2 (D.D.C. Apr. 25, 2019). This stems from "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." *Int'l Ladies' Garment Workers' Union v. Donovan,* 733 F.2d 920, 922 (D.C. Cir. 1984). A plaintiff can prevail on a motion to enforce only insofar as "the relief to which the plaintiff is entitled under [her] original action and the judgment entered therein." *Yanofsky*, 2019 WL 5110502, at *2 (quoting *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005)) (brackets omitted). The D.C. Cir. made clear in *Heartland* that if the original judgment does not address a question, that question is not properly raised in a motion to enforce judgment. 415 F.3d at 30; *see id.* at 33 ("Accordingly, if Heartland is to obtain further relief, it must seek it through a separate [Administrative Procedure Act] challenge to [the agency's] post *Heartland I* decision, rather than through a motion to enforce the *Heartland I* judgment itself."). As a corollary, a "motion to enforce the

judgment does not provide a means for a court to reconsider its judgment or for a plaintiff to raise new arguments that should have been offered in prior proceedings." *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 427 F. Supp. 3d 37, 41 (D.D.C. 2019).

As an initial matter, the Court's stay order prevents Plaintiffs from moving to enforce the Plan. *See* Minute Order (Apr. 28, 2022). For that reason alone, the Court should deny Plaintiffs' motion. Furthermore, Plaintiffs' "enforcement" motion seeks to add two entirely new requirements in reporting processing times across all government-controlled steps and seeks to hale a magistrate judge into this case to oversee the development and implementation of a new injunction. Pls.' Opp. at 42. These proposals in no way enforce the existing Plan. Plaintiffs bear the burden of proving noncompliance on a motion to enforce, but they fail to identify a single line in a single Court order that Defendants are allegedly violating. *See Yanofksy*, 2019 WL 5110502, at *2 (requiring the "prevailing plaintiff [to] demonstrate[] that a defendant has not complied with a judgment entered against it"). Plaintiffs' speculation about future, hypothetical noncompliance with the Court's orders, *see* Pls.' Opp. at 43 (speculating on the "unknown number of additional class members . . . similarly languishing off Defendants' radar"), is plainly insufficient, as Plaintiffs have not shown that Defendants are actually violating a Court order. *Cf. Salazar*, 236 F. Supp. 3d at 416–17 (denying a motion to enforce for prospective alleged noncompliance where the defendants' compliance efforts "appear[ed] to be working quite well"). To the contrary, since the Plan was imposed, Defendants have successfully led the Afghan and Iraqi SIV programs through major global shifts and implemented many improvements and resource investments at the COM approval, I-360, and visa interview stages. *See supra* at 2. Defendants implemented even further improvements in July 2022. *Id.* (identifying the

interagency changes between Department of State and USCIS). Such developments underscore that Plaintiffs have not shown any noncompliance.

Nor do Plaintiffs identify any provision in the Court's order that Defendants should be ordered to follow. "[T]he relief to which the plaintiff[s] [are] entitled under [their] original action and the judgment entered therein" is the Court-approved Plan, not a new modified plan. *See Yanofsky*, 2019 WL 5110502, at *2. It is plain that Plaintiffs' enforcement request, like their clarification request, is really a backdoor Rule 60(b) motion. Their request is therefore inappropriate and not properly before the Court. *See Heartland Reg'l Med. Ctr.*, 415 F.3d at 30.

## B.   Plaintiffs' Renewed Request for the Court to Lift the Stay Is Improper

Even if Plaintiffs' submission truly sought enforcement and clarification, it should be denied. The Court has prohibited Plaintiffs from moving to enforce. If they wish to do so, they must first request leave—as Defendants did when they wished to respond to the Court's minute order on mooting events, but the Court had stayed the parties' obligations to respond to that minute order. *See* Minute Order (Jan. 11, 2022). Plaintiffs attempt to circumvent the Court's previous order by asking the Court to consider lifting the stay *sua sponte* to enforce the prior orders. *See* ECF 168 at 41 n.18. Meanwhile, Plaintiffs have appealed from the Court's minute order, simultaneously seeking appellate relief that would in effect reinstate the Plan if reversed, while they also ask this Court to significantly expand the injunctive relief under the Plan. Such competing and potentially conflicting relief in two different courts counsels against this Court granting Plaintiffs' motion.

Moreover, given that Plaintiffs have, in substance, moved this Court to lift the stay *and* asked the Court of Appeals to lift the stay, this Court has no jurisdiction to consider their request unless and until the appeal ends. As the D.C. Circuit has explained, "[t]he filing of a notice of

appeal, including an interlocutory appeal, 'confers jurisdiction on the court of appeals and

divests the district court of control over those aspects of the case involved in the appeal." *United

States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (citing *Griggs v. Provident Consumer

Discount Co.*, 459 U.S. 56, 58 (1982)). Subject to narrow exceptions for frivolous appeals or an

interlocutory appeal from a non-appealable order, "the district court does not regain jurisdiction

over those issues until the court of appeals issues its mandate." *Id*. at 1302–03; *see also Decatur

Liquors, Inc. v. Dist. of Columbia,* No. 04-cv-1971 (RMC), 2005 WL 607881, at *2 (D.D.C.

Mar. 16, 2005) (in considering a motion to dissolve an interlocutory order on a preliminary

injunction, finding it "inadvisable for this [district] Court, absent changed circumstances or a

change in the law, to reconsider and dissolve a preliminary injunction issued . . . where the

propriety of its initial determination is also under review by the D.C. Circuit."). The parties are

briefing stay-related and jurisdictional issues before the D.C. Circuit, and that court's future

rulings may provide clarity here. This Court may therefore, at most, deny Plaintiffs' request

without prejudice or defer it. *See* Fed. R. Civ. P. 62.1(a)(1)–(2) ("If a timely motion is made for

relief that the court lacks authority to grant because of an appeal that has been docketed and is

pending, the court may: (1) defer considering the motion; (2) deny the motion").

### C.  Plaintiffs Fail to Meet Their Burden to Seek Relief under Rule 60(b)(5)

Plaintiffs acknowledge that the Court may construe their request as seeking the Plan's

modification under Rule 60(b)(5) and assert, without justification, that the Court should grant

their motion. *See* Pls.' Opp. at 42 n.19. But Plaintiffs do not outright ask for modification, likely

because they cannot satisfy Rule 60(b)(5)'s requirement to show "significant changed

circumstances"; indeed, they argue that the Court should deny Defendants' motions because "the

key facts remain the same." Pls.' Opp. at 28. Plaintiffs could, like Defendants did, file a properly

supported motion to modify the Plan. But they have not done so, and their request for relief

under Rule 60(b)(5) should be denied.[2]

**D.      The Court Should Not Assign a Magistrate Judge to Oversee and Implement a Hypothetical Future Plan**

Because the Court should grant Defendants' motion to vacate the Plan, judicial oversight

is unnecessary and Plaintiffs' request for referral to a magistrate judge is moot. *See supra* at 22–

23 (discussing the perils of institutional reform litigation). *Contra* Pls.' Opp. at 45. Judicial

oversight is unwarranted even if the Court does not vacate the Plan; Plaintiffs have long been

able to bring concerns to Defendants, and Defendants have responded. *See* Defs.' Motion for

Leave to Respond to the Court's May 27, 2021 Order, ECF No. 155 at 10 n.1. Indeed, Plaintiffs

never had to file a motion to enforce in this case, even when the Plan was in effect. That

demonstrates that it is unnecessary to conscript other judges in this District into supervisory

roles. Plaintiffs' request rings especially hollow where Defendants are already monitored by both

the Executive Branch and Congress. *See supra* at 9 (discussion of recent Executive Order and

ESSAA reporting requirements). Furthermore, even if the Court were eventually to order the

entry of a new adjudication plan, it would be premature to decide now whether a magistrate

judge's assistance would be warranted.[3]

Plaintiffs' request for supervision by a magistrate judge should be denied.

---

[2] Even if Plaintiffs did properly place a Rule 60(b) motion before the Court, the motion would rely on stale allegations regarding outdated Plan progress reports that would not justify modifying the Plan.

[3] This matter bears no resemblance to *Kirwa v. Dep't of Defense*, No. 17-cv-1793 (ESH), ECF No. 71 (D.D.C. Feb. 21, 2018), *see* Pls.' Opp. at 42–43, in which the Court granted plaintiffs' motion in part to maintain consistency across dockets with a related case's compliance reporting requirements.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion, ECF No. 163, and

deny Plaintiffs' cross-motion, ECF No. 168.


Dated: July 25, 2022                              Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Principal Deputy Assistant Attorney General
                                                  Civil Division

                                                  WILLIAM C. PEACHEY
                                                  Director, Office of Immigration Litigation
                                                  District Court Section

                                                  YAMILETH G. DAVILA
                                                  Assistant Director

                                                  STEVEN A. PLATT
                                                  Senior Litigation Counsel

                                                  SEAN L. KING
                                                  VAUGHN D. SPENCER
                                                  Trial Attorneys

                                                  */s/Ruth Ann Mueller*
                                                  RUTH ANN MUELLER
                                                  D.C. Bar No. 1617339
                                                  Trial Attorney
                                                  U.S. Department of Justice, Civil Division
                                                  Office of Immigration Litigation
                                                  District Court Section
                                                  P.O. Box 868, Washington D.C. 20044
                                                  202-598-2445
                                                  ruth.a.mueller@usdoj.gov

                                                  *Counsel for Defendants*