**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFGHAN & IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>                              Plaintiffs,<br><br>        v.<br><br>ANTONY J. BLINKEN, *et al.*,<br><br>                              Defendants. | Case No. 1:18-cv-01388-TSC |

**BRIEF OF AFGHAN-AMERICAN FOUNDATION AS AMICUS CURIAE
IN SUPPORT OF PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'
MOTION FOR RELIEF FROM THE COURT'S ORDERS AND
<u>CROSS-MOTION TO ENFORCE AND CLARIFY THE COURT'S ORDERS</u>**

James M. Koukios
(D.C. Bar No. 477072)
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-1590
JKoukios@mofo.com

*Counsel for Amicus Curiae Afghan-American Foundation*

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ............................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................... 3

ARGUMENT ............................................................................................................................... 3

I.      THE AFGHAN SPECIAL IMMIGRANT VISA PROGRAM WAS CREATED
        TO RESPOND TO THE HARMS FACED BY AFGHAN ALLIES ............................... 4

II.     GRANTING DEFENDANTS' MOTION WILL FURTHER HARM U.S.
        ALLIES WHO QUALIFY FOR SPECIAL IMMIGRANT VISA STATUS ................... 5

CONCLUSION ........................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Case**

*Afghan & Iraqi Allies v. Pompeo*,
 No. 18-cv-01388 (TSC), 2019 WL 4575565 (D.D.C. Sept. 20, 2019)......................................3

**Statutes**

Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, § 602, 123 Stat. 807 .......................2, 4

Matters Relating to Foreign Nations, Pub. L. No. 113-66 §§ 1218-19, 127 Stat.
 910, 914 (2013)...........................................................................................................2, 4

**Other Authorities**

Rule 54(b) ...................................................................................................................2

Rule 60(b) ...................................................................................................................3

## INTEREST OF AMICUS CURIAE[1]

The Afghan-American Foundation (AAF) is a national non-profit organization that represents and advances the interests of Afghans and Afghan-Americans through advocacy, research, education, and engagement. AAF advocates for the interests of Afghans and Afghan-Americans at the federal, state, and local levels.[2] Since the start of the current crisis in Afghanistan, AAF has led and participated in Afghanistan-focused meetings at the White House and with senior leadership at the Department of State, the Department of Homeland Security, and the Department of Health and Human Services. It is also on the Steering Committee of Evacuate Our Allies, a leading coalition of trusted human rights, religious, and refugee organizations working alongside veterans and frontline civilians to evacuate, welcome, and support the resettlement of as many at-risk Afghans as possible. AAF has also sought to monitor matters before the courts to identify issues of importance to its constituency and opportunities to offer perspectives that may otherwise go unheard.

The issue before this Court is crucial to AAF, its members, and those for whom it advocates, including the Afghan community in the United States a population that numbered nearly 400,000 before the current crisis[3] and has grown to nearly half a million people within the

---

[1] All parties have consented to the filing of this amicus curiae brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae or their counsel made a monetary contribution to the preparation or submission of this brief.

[2] *See, e.g.*, Joseph M. Azam, *Wars Don't End for Abandoned American Allies,* The Hill (June 3, 2022), https://thehill.com/blogs/congress-blog/3511494-wars-dont-end-for-abandoned-american-allies%E2%80%AF/.

[3] Mustafa Babak, *Constituency Building Among Afghan Diaspora - final report*, One Soc'y Found. (Sept. 19, 2019).

last year.[4]  In 2009, through the Afghan Allies Protection Act, Congress created a special immigrant visa (SIV) program for Afghan citizens and nationals facing serious threats because of their service to the U.S. Government to immigrate to the United States with their families. Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, § 602, 123 Stat. 807.  In 2013, Congress amended the Act, enacting a nine-month timeline for processing SIVs.  Matters Relating to Foreign Nations, Pub. L. No. 113-66 §§ 1218-19, 127 Stat. 910, 914 (2013).  In 2021, Congress passed a bipartisan emergency bill in light of the withdrawal of U.S. troops from Afghanistan to emphasize that SIV processing should take no more than nine months. Emergency Sec. Supplemental Appropriations Act, 2021, Pub. L. No. 117-31 §§ 401(a)(1)(A), 401(a)(2)(B)(ii), 401(a)(2)(D)(3), 135 Stat. 309, 315-16; 167 Cong. Rec. S5156 (daily ed. July 29, 2021) (98 to 0 vote in the Senate).  Unfortunately, Defendants have failed to meet the Congressional timeline, and qualified applicants continue to face years-long delays in the processing of their SIV applications, undermining Congressional intent and increasing the risks to applicants and their families.  This Court entered an Adjudication Plan for Defendants to meet performance standards to ensure prompt processing of SIV applications that have been unreasonably delayed.  ECF No. 113.  Defendants now request relief from the Court's Adjudication Plan and summary judgment order.  ECF No. 163.

Like Plaintiffs, AAF, its members, and those for whom it advocates are deeply concerned that failing to timely process SIV applications will compound existing challenges currently facing SIV-qualified Afghans to whom commitments have been made by the United States for

---

[4] *See* Dept. of Homeland Security, *Operation Allies Welcome Announces Departure of Last Afghan Nationals from Fort McCoy, Wisconsin* (Feb. 15, 2022), https://www.dhs.gov/news/2022/02/15/operation-allies-welcome-announces-departure-last-afghan-nationals-fort-mccoy (confirming "more than 74,400 Afghan evacuees" have been welcomed to the United States).

over two decades.  Accordingly, AAF submits this brief in support of Plaintiffs' Combined Opposition to Defendants' Motion for Relief from the Court's Orders and Cross-Motion to Enforce and Clarify the Court's Orders and to assist the Court in understanding the nature and extent of the harm caused by Defendants' continued failure to timely process SIV applications.

## SUMMARY OF ARGUMENT

In 2009, Congress established an SIV program for Afghan applicants facing serious threats because of their service to the U.S. mission in Afghanistan.  There are and have been significant delays in processing SIVs.  *See*, *e.g., Afghan & Iraqi Allies v. Pompeo*, No. 18-cv-01388 (TSC), 2019 WL 4575565 at *2-4 (D.D.C. Sept. 20, 2019).  As this Court found in 2019, "Congress did not intend to give Defendants an unbounded, open-ended timeframe in which to adjudicate SIV applications."  *Id*. at *8.  Now, nearly three years after this Court granted summary judgment in favor of Plaintiffs, Defendants move this Court for relief/reconsideration based on changed circumstances.  Granting Defendants' motion would further harm SIV applicants impacted by Defendants' failure to timely process SIV applications.  As reflected in this brief, SIV applicants have been and continue to be harmed by Defendants' action and inaction, and AAF respectfully requests this Court decline Defendants' invitation to revisit this Court's prior rulings, which remain as important today as when they were issued.

## ARGUMENT

The Court should deny Defendants' request for reconsideration of the Court's summary judgment decision under Rule 54(b) or, in the alternative, for vacatur or modification of the Court's orders under Rule 60(b).  Under either standard of review, the Court's orders should not be reconsidered or modified.  *See* Pls.' Opp. To Defs.' Mot. § I.B., ECF No. 168.

I.       **The Afghan Special Immigrant Visa Program Was Created to Respond to the Harms Faced by Afghan Allies**

After 9/11, the United States declared a global war on terror and heavily relied upon Afghan nationals for its military operations in Afghanistan.  For over 20 years, the U.S. Government directly and indirectly employed hundreds of thousands of Afghan citizens and nationals as part of the United States' mission in Afghanistan.[5]  These individuals served in various capacities, including as interpreters and translators, to further American military, diplomatic, humanitarian, and development efforts in the country.  In recognition of their service, Congress created the Afghan SIV program to protect those who served the U.S. Government and subsequently faced threats to their safety by enabling them to immigrate to the United States with their families.  *See* Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, § 602, 123 Stat. 807.  Congress amended this law in 2013 to set a nine-month timeline, Matters Relating to Foreign Nations, Pub. L. No. 113-66 §§ 1218-19, 127 Stat. 910, 914 (2013), and again in 2021 to emphasize that this timeline applies to the entire SIV application process, Emergency Sec. Supplemental Appropriations Act, 2021, Pub. L. No. 117-31 §§ 401(a)(1)(A), 401(a)(2)(B)(ii), 401(a)(2)(D)(3), 135 Stat. 309, 315-16; 167 Cong. Rec. S5156 (daily ed. July 29, 2021). Afghans who served the U.S. Government are eligible to immigrate to the United States with SIVs after they have worked on behalf of the U.S. Government or the International Security

---

[5] U.S. Dep't of State, Bureau of Consular Affs., *Special Immigrant Visas for Afghans – Who Were Employed by/on Behalf of the U.S. Government*, https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html (last visited June 22, 2022); *see generally*, Lauren Leatherby and Larry Buchanan, *At Least 250,000 Afghans Who Worked With U.S. Haven't Been Evacuated, Estimates Say*, N.Y. Times (Aug. 25, 2021), https://www.nytimes.com/interactive/2021/08/25/world/asia/afghanistan-evacuations-estimates.html.

Assistance Force (ISAF) for a period of at least 12 months so long as they meet all other requirements of the program.[6]

As of May 2022, 40% of SIV applicants are still awaiting a visa interview.[7]  Even by Defendants' own estimates, the processing time for SIV applications is now a staggering two years[8]—260% longer than the timeline Congress imposed.  Some SIV applicants are in the United States and could face deportation should their parolee status expire prior to the full adjudication of their SIV application.  Many others are refugees in third countries and face a myriad of risks.  A significant number still remain in Afghanistan, many living in hiding from the Taliban.  Specific instances of the harm faced by Afghan SIV applications are described below.

## II.    Granting Defendants' Motion Will Further Harm U.S. Allies Who Qualify for Special Immigrant Visa Status

To support its motion, Defendants point to the efforts they have made to improve the processing of SIV applications while under this Court's order.  To explain their continued shortcomings, Defendants rely heavily on changed circumstances, that is, the Taliban takeover of Afghanistan and the COVID-19 pandemic.  *See, e.g.*, Defs.' Mot. for Relief at 11-14, ECF No. 163.  These changed circumstances, however, make it more imperative—not less—that Defendants process SIV applications in a timely manner.  That is to say nothing of the fact that

---

[6] *See* Daniel F. Runde & Elena I. Méndez Leal, *The Case for Expediting Special Immigrant Visas amid a Transition of Power in Afghanistan,* U.S. Ctr. for Strategic & Int'l Stud. (Aug. 16, 2021), https://www.csis.org/analysis/case-expediting-special-immigrant-visas-amid-transition-power-afghanistan.

[7] Kim Staffieri et al., Ass'n of Wartime Allies, *The Left Behind Afghans - Focus on Women* (June 1, 2022),
https://www.wartimeallies.co/_files/ugd/5887eb_2f0405096b9243aa9b28608ba8b3d756.pdf.

[8] U.S. Dep't of State, Bureau of Consular Affs., *Report to Congress on Joint Department of State/Department of Homeland Security Report: Status of the Afghan Special Immigrant Visa Program* (Jan. 2022), https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q1-January-2022.pdf.

many of the circumstances that have changed in Afghanistan have changed as a direct result of decisions made and events set into motion by Defendants. The U.S. Government had a choice on how and when it departed from Afghanistan; SIV applicants did not.

Since August 2021, Afghanistan has become the world's largest humanitarian crisis. Afghans now make up the third largest refugee group in the world, with more than 2.6 million registered refugees outside of Afghanistan, mostly living in the neighboring countries of Iran and Pakistan.[9] There are also an estimated 3.4 million internally displaced Afghans.[10] According to recent estimates by Human Rights Watch, the UN Development Program, and Save the Children, the Afghan economy's real GDP could contract by as much as 13% and as much as 97% of the country could end up living in poverty.[11] In addition, close to 98% of Afghans, including children, are not consuming enough food[12] and are already suffering from malnutrition as the country faces "a very real famine risk in 2022."[13] It is expected that by the end of 2022, nearly the entire population of Afghanistan will be malnourished and living in poverty, and that

---

[9] *Afghanistan*, U.N. High Comm'r for Refugees, https://www.unhcr.org/en-us/afghanistan.html (last visited June 22, 2022).

[10] Special Inspector General for Afghanistan Reconstruction, *Quarterly Report to the United States Congress 87* (Apr. 30, 2022), https://www.sigar.mil/pdf/quarterlyreports/2022-04-30qr.pdf.

[11] U.N. Dev. Program, *97 percent of Afghans could plunge into poverty by mid 2022, says UNDP* (Sept. 9, 2021), https://www.undp.org/press-releases/97-percent-afghans-could-plunge-poverty-mid-2022-says-undp.

[12] *15 million Afghans received WFP food assistance so far in 2021; massive uplift needed as economy disintegrates*, World Food Program (Dec. 14, 2021), https://www.wfp.org/news/15-millions-afghans-receive-wfp-food-assistance-so-far-2021-massive-uplift-needed-economy.

[13] *Afghanistan: To avert a catastrophe, agriculture assistance is urgently needed*, Food and Agric. Org. of the U.N. (Nov. 11, 2021), https://www.fao.org/newsroom/detail/afghanistan--agricultural-assistance-farmers-drought/en. *See generally Afghanistan: The Humanitarian Crisis and U.S. Response*, U.S. Senate Comm. on Foreign Rel. (Feb. 9, 2022), www.foreign.senate.gov/hearings/afghanistan-the-humanitarian-crisis-and-us-response020922; *Afghanistan: Economic Roots of the Humanitarian Crisis*, Hum. Rts. Watch (Mar. 1, 2022), www.hrw.org/news/2022/03/01/afghanistan-economic-roots-humanitarian-crisis.

"[u]naddressed, the current humanitarian crisis could lead to more deaths than twenty years of war."[14]

Women in Afghanistan are particularly vulnerable.  As a result of the economic crisis described above, prices for basic needs such as food have increased dramatically. [15] Unfortunately, this increase in prices is often coupled with total loss of income as most women, many of whom were primary earners for their households, have lost their jobs due to Taliban policies that restrict women's access to employment.[16]  Compounding the economic and food crisis facing all Afghans, women are also subject to the Taliban's wholesale reversal of women's rights, including restrictions on freedom of movement, expression, and association as well as new barriers to healthcare and education.[17]  Women comprise an estimated 7-10% of the SIV-eligible population[18] and the increased risks they face in Afghanistan must be considered.

The SIV applicant pool is largely made up of Afghans who worked with U.S. forces in Afghanistan, as well as their families.  More than 300,000 Afghans have been affiliated with U.S. forces over the past 20 years, many being led to believe by the U.S. Government that America would honor its commitment to provide special immigrant status and facilitate their resettlement.  Yet most Afghan SIV applicants have been forced to wait for years and in some cases nearly a decade for the processing of their applications and adjudication of their requests for safe passage.  Removing the requirements of this Court's prior orders would only serve to make this situation worse.  Detailed below are the experiences of five Afghans who applied for

---

[14] *Afghanistan Facing Famine*, Hum. Rts. Watch (Nov. 11, 2021), https://www.hrw.org/news/2021/11/11/afghanistan-facing-famine.

[15] *Afghanistan: Taliban Deprive Women of Livelihoods, Identity*, Hum. Rts. Watch (Jan. 18, 2022), https://www.hrw.org/news/2022/01/18/afghanistan-taliban-deprive-women-livelihoods-identity.

[16] *Id.*

[17] *Id.*

[18] *See* Kim Staffieri et al. (June 1, 2022), supra note 7.

SIVs.  Their accounts are representative of the large population of SIV applicants and SIV-eligible individuals whose fates hang in the balance of this Court's decision.  For their safety and for the safety of their relatives and acquaintances who are still in harm's way in Afghanistan, these individuals asked to remain anonymous.  Their stories, while extraordinary, are not unique.[19]

## Applicant 1

Applicant 1 began his almost six-year-long career with the United States military in Kabul in 2011 with the Marines and served as a translator with various other outfits including the Air Force, Civilian Advisors, and the Special Forces.  Beginning in 2012, Applicant 1 and his family began to receive threats from the Taliban.  The Taliban called his father and "told him they were going to kill [Applicant 1] because [he] was working with the United States."  On several occasions since, the Taliban have gone to Applicant 1's family home to question and threaten his father.  The first time the Taliban arrived, to protect himself and those living with him, his father felt he had no choice other than to lie and deny Applicant 1's existence.  The second time the Taliban came, his father complied and told them his son had gone to the United States.  The Taliban continue to go to Applicant 1's family home to question his father as to why Applicant 1 went to the United States and why he would assist the U.S. Government.  Applicant 1 secured passage out of Afghanistan via the tumultuous evacuation at the Kabul airport during the Taliban's takeover in 2021.  Upon arriving in America, Applicant 1 received the status of

---

[19] AAF acknowledges the assistance of The 5ive Pillars Organization and Afghan Refugee Relief in organizing these interviews.  These organizations are two of the many Afghan-led organizations that are working directly with Afghans resettling in the United States, including significant populations of SIV recipients and families of SIV applicants left behind in Afghanistan.

humanitarian parolee, meaning he is subject to deportation should his parolee status expire prior to the full adjudication of his SIV.

He and his family are currently living with an American host family in California. Applicant 1 works part-time at a restaurant while he continues to look for permanent housing for himself and his family.  He began the SIV application process in September 2021 and, nearly ten months later, Applicant 1 received his first and only update so far:  a case number.  His case is still pending and he has no way to check its status, leaving him and his family in perpetual uncertainty.

Applicant 1 stated that he remains concerned that if his SIV application is rejected and he is returned to Afghanistan, the Taliban would follow through on their numerous death threats. The fact that Applicant 1 has now traveled to and lived in the United States makes him an even more significant target for the Taliban.  Applicant 1 constantly fears for the lives and well-being of his family that remain in Afghanistan, expressing that he feels their lives are "jeopardized because of [him]."  Because the Taliban are aware he is in the United States, his family feels they must "walk[] on eggshells" to avoid retaliation.

**Applicant 2**

Applicant 2 served the U.S. military in Afghanistan collecting intelligence on the Taliban.  Both he and other Afghans working with the U.S. military, intelligence, and diplomatic communities "received threats from the Taliban" for their work.  Believing his life to be in danger as a result, Applicant 2 first applied for an SIV in 2016.  While waiting for approval, Applicant 2 continued to receive threats from the Taliban.  They would "call him" and "drop letters at his home" stating that "if [he] didn't stop working with Americans" the Taliban would "kill [him] and take care of [his] family" as well.  Friends and family have told Applicant 2 that

the Taliban have asked them about him and stated that the Taliban "would find [Applicant 2] and kill him if he didn't stop his work for the United States government."

Applicant 2 did not receive his visa to travel to the United States until 2020. While Applicant 2 waited, he was forced to "live his life like a thief," keeping "his commute a secret because he was afraid [the Taliban] would find and kill him" as they had done to his colleagues. Applicant 2 recounts stories of his coworkers targeted by the Taliban who were killed by mines placed under their cars and next to their homes. During this time, Applicant 2 lived in a constant "state of anxiety and fear" for his life and the lives of his family.

In January 2020 Applicant 2 and his family finally received their visas to travel to the United States and contacted the International Organization for Migration (IOM) to assist with travel arrangements. Unfortunately, this coincided with the beginning of the COVID-19 pandemic and travel was all-but impossible to arrange. Their visas ultimately expired before they were able to secure flights. Applicant 2 then reapplied.

In July 2020, while waiting to receive their second set of visas, his wife learned she was pregnant. Concerned about what this would mean for the child, Applicant 2 and his wife contacted the U.S. embassy and were assured that there would be no issues since their visas had already been approved. In April 2021 after finally receiving his visa, Applicant 2 made the difficult decision to travel to the United States alone. Contrary to assurances from the U.S. embassy, Applicant 2's infant son, who was born in April 2021, was not covered by the family's visas. In October 2021, Applicant 2's wife was forced to choose between protecting the safety and well-being of her three daughters or remaining with her six-month old son in Kabul. She and her three daughters ultimately traveled to the United States, leaving her infant son with extended family in Afghanistan.

The separation from their son has been one of the most difficult and damaging aspects for Applicant 2 and his wife.  His wife is "very depressed, can't function, and can't eat" as a result. Applicant 2 struggles with having placed the burden of caring for his son on his family in Afghanistan.  He is also concerned for the safety and well-being of his son and other family members still in Kabul as the situation there is dire.  Applicant 2 is no longer able to work in the United States due to an injury and has been forced to borrow money from a friend to send secretly to his family and son just to provide for their most basic necessities.  If the Taliban were to find out about this, they would take the money from his family.  As a result, his family has been forced to lie when asked directly if they were receiving money from Applicant 2, putting their lives in further danger.

Currently, Applicant 2 lives with his wife and their three daughters in the United States. He and his wife still have no idea when they will be reunited with their infant son.  Applicant 2 has reached out to the U.S. embassy and the State Department and has gotten no response.

**<u>Applicant 3</u>**

Applicant 3 began working with the United States as part of the effort to house U.S. personnel in Afghanistan following the start of the war in 2001.  He worked in construction and helped build U.S. military bases across Afghanistan.  Applicant 3 also helped with the provision of water and electricity to the bases after their completion.  Applicant 3 cited his desire to help rebuild his home country as his motivation for working with the U.S. Government; he did not want the resources the U.S. provided to feel like a handout, he wanted to contribute.

Following the fall of Kabul, Applicant 3 began to look for a way to get his family out of Afghanistan.  He chose to seek refuge in the United Arab Emirates, where he had a visa and hoped to find work, initially leaving his wife and children with his family in Khost Province.

Applicant 3's trip to the UAE was fraught with danger.  He first attempted to leave from the airport in Kabul.  After not being able to do so, he decided to leave Afghanistan to travel to the UAE via Uzbekistan, which required a long overland trip.  Applicant 3 recounts being "afraid for [his] own life" while he passed through "5 or 6 separate Taliban check points" along the way.  At each checkpoint he was interrogated and his person and car were searched.  Some of these interrogations were "harsh because the Taliban would imply that [he] worked for the United States government or [the] Afghanistan civilian government."  Eventually, Applicant 3 was able to secure passage to the UAE from Uzbekistan and was joined by his family after he was able to secure visas for them.  In the UAE, Applicant 3 found out that his application was denied.

Applicant 3 appealed his SIV application while in the UAE.  Living in the UAE while waiting for his SIV approval has been extremely challenging for Applicant 3.  He and his family are surviving on the money they originally brought with them, as his "assets are in the hands of the Taliban," who refuse to release his money.  He does not have access to a car, has been unable to find work, and his brother has been unable to sell the land Applicant 3 owns in Afghanistan, leaving him without any real assets or income while he is in the UAE.  Applicant 3 sees coming to the United States as a much-needed opportunity for his family.  He hopes the U.S. Government "can save and support [him and his family]."  Reflecting on his service for the United States in Afghanistan, Applicant 3 remarked that he "worked side by side" with the government, "standing shoulder to shoulder [to] rebuild the country."  Applicant 3 remains in the UAE with his wife and children while they await the processing of his SIV, which he applied for in 2020.

**Applicant 4**

Applicant 4 was born in Kabul, Afghanistan, and is currently in the United States on an SIV. It took Applicant 4 over three years to receive his SIV and travel to the United States. During this time, Applicant 4 was forced to travel to other countries for the safety of his family.

Applicant 4 began working for the U.S. Army in Kabul in 2014, eventually being promoted to a supervisory position. Working with the U.S. military in Afghanistan was difficult and made him a target for the Taliban. Applicant 4 explained that his neighbors and others around him "thought it was not good to work with the U.S. Government or any other government [besides Afghanistan's]." Given these sentiments, Applicant 4 felt unsafe, particularly because his family was with him in Afghanistan at the time. Applicant 4 began to limit his travel to just to and from work in Kabul and was fearful because he traveled the same way every day and "people would know [him] by face [and] by car, making him an easy target." Nevertheless, he took the job because of the possibility of a safe life with his family in the United States.

In 2017, Applicant 4 decided to apply for an SIV. While working as a translator for U.S. Special Forces, Applicant 4 realized that "Afghanistan is not going to get back to normal life [and] due to this situation and other countries, [things] will get worse, not [better]." Around this time, Applicant 4 began receiving threatening text messages, presumably from the Taliban. Applicant 4 felt he had no "other choice but to flee," feeling that he "faced a threat."

While his SIV application remained pending in 2018, Applicant 4 began to feel an increasing sense of dread and the realization sunk in that he could "not survive anymore in Afghanistan." This fear drove him to leave Afghanistan while his SIV was pending, traveling first by foot to Turkey and later to Greece by sea. Applicant 4 remained in Turkey for roughly nine months while he continued to seek updates about his SIV application. As a migrant in

Turkey, Applicant 4 was treated poorly, facing discrimination "because of [his] skin color." Applicant 4 eventually made the difficult journey to Greece where he faced an equally poor situation for another ten months.

While in Greece he received word that his SIV application would be denied despite having a recommendation from his supervisor detailing his work responsibilities and assuring the authorities he was not "a threat to the United States." For one and a half years, he continued to ask why his application would be denied and was ultimately told the reason was "insufficient documents." His case was officially denied in 2019. Starting the entire process again, it took Applicant 4 six months to receive his COM approval and another seven months before he was able to travel to the United States with his wife.

**<u>Applicant 5</u>**

Applicant 5 served as a translator for the U.S. military forces beginning in 2003. Applicant 5 applied for his SIV in 2016 and received approval following years of delays. Before he could leave Afghanistan, however, his SIV approval was incorrectly rescinded. Applicant 5 immediately appealed this decision and was ultimately successful. However, during the time his SIV was rescinded, the Taliban were harassing his family and searching his home. Applicant 5 feared the Taliban would seek to harm him and his family because of his years of service to the U.S. Government.

For his own safety while his SIV appeal was pending, Applicant 5 fled Afghanistan and traveled to India as a refugee. He was stuck in India for nine months and was not permitted to work and thus was unable to provide for his family during this time. Applicant 5 recalls getting rejected from jobs, owing money to the Indian government, and constantly worrying that he would be unable to ever travel to the United States. Had Applicant 5's SIV application been

processed in a timely manner—and not incorrectly rescinded—he would not have had to endure this trying period.

In 2022, following the ultimate final approval of his SIV appeal, Applicant 5 arrived in the United States and has been here for a little over one month.  He lives in an apartment subsidized by the government and aims to find employment soon.  Unfortunately, the threats from the Taliban directed at Applicant 5 and his loved ones have not ended.  Applicant 5 still has family in Afghanistan who live under the ever-present threat of retaliation by the Taliban.  In fact, when a picture of Applicant 5 was posted on Facebook celebrating his arrival in the United States, the Taliban asked his brother how Applicant 5 made it to the United States.  Applicant 5's brother had to lie and tell them that he had not spoken with him in months to avoid suspicion.  Applicant 5 estimates that if he had not been able to escape before the Taliban takeover, there was a 90% chance "that the Taliban would come to find me and . . . you know what they do."

\* \* \*

The experiences of Applicants 1-5 are not unique.  The situation in Afghanistan is one of the most significant humanitarian crises of this century.[20]  The rapid withdrawal of U.S. troops left many SIV-eligible Afghan citizens and nationals stranded.[21]  Now that the United States has withdrawn from Afghanistan, there are numerous reports of Taliban forces going door-to-door

---

[20] *See* Clayton Thomas, Cong. Rsch. Serv., *Afghanistan: Background and U.S. Policy: In Brief* 9-11 (June 22, 2022), https://crsreports.congress.gov/product/pdf/R/R45122/51.

[21] *See U.S. Withdrawal from Afghanistan and Afghan SIVs*, Just for Immigrants (last visited June 30, 2022), https://justiceforimmigrants.org/what-we-are-working-on/immigration/u-s-withdrawal-from-afghanistan-and-afghan-sivs/ ("over 17,000 Afghans who served our country and their families are at risk of being left behind while they wait for their applications to be processed."); Abigail Hauslohner, *Thousands of Afghan Families Remain Severed After Messy U.S. Exit*, The Wash. Post (June 10, 2022), https://www.washingtonpost.com/national-security/2022/06/10/afghan-families-separated-biden/ ("American military personnel tasked with securing the airport routinely encountered Afghans at the gates who had been separated from family members.").

exacting revenge on Afghans who worked with U.S. forces and the Afghan government.[22] Countless other Afghans are in limbo in precarious situations around the world and at risk of deportation back to Afghanistan.

Afghan citizens and nationals who applied for SIVs—regardless of whether their applications were granted—have endured life-changing hardships due to processing delays. Some, like Applicants 4 and 5, found themselves waiting for extended periods of time in third countries as they awaited decisions on their SIV applications, often relying on what little they brought.[23]  Some, like Applicants 2, 4 and 5, have been impacted by delays resulting in traumatic family separations, even if their SIV applications were eventually granted.  Further cases of human rights violations, family separation, and displacement are a certainty for those SIV-eligible Afghan citizens and nationals forced to accept the U.S. Government's failure to timely process SIV applications.

## CONCLUSION

For the reasons set forth above, relieving the Defendants from their obligation under the Court's prior orders will cause significant harm to SIV-eligible Afghan citizens and nationals like those SIV applicants above.  The Court should decline Defendants' invitation to revisit the Court's prior orders.

---

[22] Kylie Atwood et al., *First Flight of Afghans Who Risked Lives to Help American Troops Arrive in U.S.*, CNN (July 30, 2021), https://www.cnn.com/2021/07/30/politics/afghan-siv-arrival/index.html. *See* Special Inspector General for Afghanistan Reconstruction, *Quarterly Report to the United States Congress* 122-23 (Jan. 30, 2022), https://www.sigar.mil/pdf/quarterlyreports/2022-01-30qr.pdf.

[23] *See* Daniel F. Runde & Elena I. Méndez Leal (Aug. 16, 2021), supra note 6.  ("[i]n 2021 alone, over 270,000 Afghans have been displaced. By the end of July, an estimated 30,000 Afghans were fleeing Afghanistan each week even prior to last weekend's events."); *Evacuations from Afghanistan: What is the Afghan Special Immigrant Visa (SIV) Program?,* Int'l Rescue Comm. (Aug. 2, 2021), https://www.rescue.org/article/evacuations-afghanistan-what-afghan-special-immigrant-visa-siv-program ("[N]early 200,000 people have been internally displaced in the first half of the year and displacement levels are likely to soar due to natural disasters such as drought.").

Dated: July 1, 2022                    Respectfully submitted,[24]

/s/ James M. Koukios
James M. Koukios
(D.C. Bar No. 460978)
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-1590
JKoukios@mofo.com

*Counsel for Amicus Curiae Afghan-American Foundation*

---

[24] With assistance from Morrison & Foerster LLP summer associates Patrick Byxbee, Holly Chaisson, Allison Magnarelli, and Talia Plofsky.

## <u>CERTIFICATE OF COMPLIANCE</u>

In compliance with Local Rule 7(o)(5) and FRAP 29(a)(4), amicus Afghan-American Foundation (AAF) confirms that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.  AAF confirms that no party's counsel authored this brief in whole or in part.  AAF confirms that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  AAF confirms that no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

Further, this brief complies with the local rules of the United States District Court for the District of Columbia for the following reasons:

1.      This brief complies with the type-volume limitation of Local Rule 7(o)(4) because it does not exceed 25 pages.

2.      This brief complies with the typeface requirements of Local Rule 5.1(d) because this brief has been prepared in a proportionally-spaced typeface using the Microsoft Office Word 2016 Word processing software in a 12-point Times New Roman type style.

Dated: July 1, 2022

/s/ James M. Koukios
(D.C. Bar No. 477072)
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-1590
JKoukios@mofo.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2022, I filed this Brief with the United States District Court for the District of Columbia using the CM/ECF system, which will cause it to be served on all counsel of record.


Dated: July 1, 2022

<u>/s/ James M. Koukios</u>
(D.C. Bar No. 477072)
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-1590
JKoukios@mofo.com