**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AFGHAN AND IRAQI ALLIES UNDER SERIOUS
THREAT BECAUSE OF THEIR FAITHFUL SERVICE
TO THE UNITED STATES, ON THEIR OWN AND ON
BEHALF OF OTHERS SIMILARLY SITUATED,

                            Plaintiffs,

v.

ANTONY BLINKEN, *et al.*,

                            Defendants.

Case No. 1:18-cv-1388-TSC

---

**BRIEF OF ASSOCIATION OF WARTIME ALLIES**
**AND VETERANS FOR AMERICAN IDEALS AS AMICI CURIAE**
**IN SUPPORT OF PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'**
**MOTION FOR RELIEF FROM THE COURT'S ORDERS AND**
**CROSS-MOTION TO ENFORCE AND CLARIFY THE COURT'S ORDERS**

In accordance with Local Civ. Rule 7(o)(1)-(2), Association of Wartime Allies ("AWA")

and Veterans for American Ideals ("VFAI"), a project of Human Rights First, file the instant brief

as *amici curiae* in the above-referenced matter and in support of Plaintiffs' Combined Opposition

to Defendants' Motion for Relief from the Court's Orders and Cross-Motion to Enforce and Clarify

the Court's Orders (Dkt. Nos. 168, 169).

## INTRODUCTION

The concept of the Latin phrase *nemo resideo*, typically described in English as "leave no

one behind," is almost as old as warfare itself.  Greek mythology portrayed heroes who rescued

those captured by enemies.  Two (2) millennia later, with its continental roots planted in the French

and Indian War, the precept was first implemented by Robert Rogers, commander of the famous

"Rogers Rangers," who were trained for raiding and close combat behind enemy lines.  As

Commander Rogers led his "600-man militia" through battle, he promised to account for every member of his militia following a battle—leave no man behind.  In early colonial America, this mythology morphed into legends, and about a century later, images of the United States Cavalry riding to the rescue of captured civilians began to appear in motion pictures.  With the advent of mechanized warfare and early aviation, the military gained a practical ability to go around or over the enemy to bring back stranded comrades or liberate prisoners of war.

Today the phrase is often attributed to the elite United States Army Rangers, who have the language in their creed:  "I will never leave a fallen comrade to fall into the hands of the enemy." Similar language can be found in the Soldier's Creed:  "I will never leave a fallen comrade."  Same in the Airman's Creed:  "I will never leave an Airman behind."  The Latin version, *nemo resideo*, is the motto of the United States Marine Corps Personnel Retrieval and Processing ("PRP") Company, a Unit charged with retrieving the remains of fallen servicemembers from the battlefield.  The ethos of "no man left behind" runs deep within military culture, customs, and tradition; it is a bedrock value and commitment in service with United States Armed Forces.

\* \* \*

Despite Congress's express directive, Special Immigrant Visa ("SIV") applicants and their families continue to experience egregious delays in the SIV process.  This delay often jeopardizes the lives or safety of those courageous individuals who served alongside United States Soldiers, Sailors, Marines, Airmen, and other United States forces in perilous theaters of combat operations.  These SIV applicants are now marooned across the globe, desperate and struggling to survive, all without the protection of United States military personnel who by virtue of their orders were forced to abandon them in a dangerous theater of operations.  Those same military personnel solemnly promised to protect these SIV applicants, many of whom served as interpreters and a commander's most reliable eyes-and-ears and boots on the ground; in doing so, they became some

of our most trusted and invaluable allies and comrades.  As a result of the Government's continued failure to properly administer the SIV program and egregious delays that caused countless applicants to be left behind and continue to cause harm, many Veterans who bravely served our Nation in combat operations are now tirelessly serving the mission and the precept of "no man left behind" here on the home-front, in mental agony, as they struggle to save those left behind in a race against time and hostile forces in pursuit.  SIV applicants deserve better.  Our Veterans deserve better.

Within this context, the Government requests relief from the Court's Orders—aligned with Legislative intent—requiring the Government to more timely adjudicate SIV applications that were already delayed.  <u>See</u> Motion for Relief from the Court's Summary Judgment Order and the Approved Adjudication Plan (Dkt. No. 163) ("Government Motion").  With this background in mind, along with the *infra* discussion, AWA and VFAI urge this Court to deny the Government Motion and grant Plaintiffs' Cross-Motion to Enforce and Clarify the Court's Orders (Dkt. Nos. 168, 169).

## **FACTS & BACKGROUND**

## I.  **<u>Association Of Wartime Allies & Veterans For American Ideals</u>.**

AWA has been a preeminent advocacy organization for Special Immigrant Visa ("SIV") eligible individuals since 2019.  AWA is an alliance of individual Veterans, United States civilian subject-matter experts, and other organizations in support of our wartime allies who provided invaluable support to the United States military and coalition forces and supporting operations during armed conflicts in their home countries of Afghanistan and Iraq.  These allies served alongside military personnel at great personal risk, in many cases directly saving American lives or preventing casualties.  Service by these allies alongside United States military and coalition

forces has resulted in ongoing extreme risk to their own lives and to the safety of their families, particularly now that the United States has withdrawn protective forces from Afghanistan and Iraq.

AWA has worked to support Afghan and Iraqi applicants through the SIV process, as well as evacuate and rescue Afghans following withdrawal of the United States from Afghanistan on August 31, 2021.  In light of its direct involvement assisting Afghans and Iraqis who have served alongside the United States military, United States Government agencies, and coalition forces during operations in Afghanistan and Iraq, AWA has unique, informed, and first-hand knowledge and perspective regarding the detrimental impact of the Government's continued failure to meet the congressionally-prescribed processing period for SIVs, not just on SIV-eligible Afghan and Iraqi citizens and nationals, but also on Veterans struggling to aid, assist, and help their former interpreters and other allies find safety and protection in the United States with grave impacts on their mental health and wellness following periods of service in a hostile combat zone.

Similarly, VFAI, a project of Human Rights First, is a coalition of Veterans who continue their service to America by upholding, defending, and advocating for human rights at home and abroad.[1]  VFAI members believe that honor, courage, commitment, duty, and country are not just words, but values worth defending.  VFAI members seek to continue serving our country by advocating for policies that are consistent with the ideals that motivated them to serve in the first

---

[1] Human Rights First is a non-governmental organization established in 1978 that works to ensure United States leadership on human rights globally and compliance domestically with this country's human rights commitments.  Human Rights First, working closely with Veterans, retired military leaders and other organizations, was instrumental in advocating for enactment of the bipartisan Refugee Crisis in Iraq Act in 2007, and subsequently issued reports and analysis identifying problems impeding the effective implementation of the Iraqi SIV and resettlement programs, as well as necessary reforms.  See Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181 § 1244, 122 Stat. 395, 396-98 (2008).  In the Afghan context, Human Rights First has advocated for refugee resettlement and an effective SIV program for Afghan nationals at risk of persecution and is currently running a *pro bono* legal representation project offering legal orientation and representation to refugees evacuated from Afghanistan since summer 2021.

place.  VFAI is focused on improving the SIV program for applicants who served alongside United States and coalition forces, as well as protecting refugees and countering Islamophobia.

Throughout and following the withdrawal of United States forces from Afghanistan, VFAI organized multiple coalitions of Veterans, civil society, and immigration groups to serve the interests of Afghans affected by actions of the United States government.  VFAI played a critical role in creating a space for Veterans to work with the Executive Branch as it planned, developed, and executed relocation efforts assisting vulnerable Afghans.  To this day, VFAI and the coalitions it leads, in conjunction with AWA and others, continue to meet as partners with White House officials demonstrating the value of Veteran voices.

The involvement of VFAI in the SIV process and its connections with SIV applicants and recipients constitutes relevant expertise and a stated concern for the issue at stake along with its capacity to provide unique information as *amicus curiae* in this matter.  As VFAI is comprised of Veterans currently assisting Afghan allies, its members have collective first-hand knowledge and perspective on how adjudicatory delays detrimentally affect not only SIV applicants but also the mental health and wellbeing of Veterans who are actively involved with the SIV process struggling mightily to afford safety and protection to their trusted former interpreters and allies left behind in Afghanistan.  VFAI has a deep and accurate grasp and understanding regarding impacts of the Government's failure to adequately administer the SIV program and how the Government's malfeasance in this process has negatively affected both SIV applicants and Veterans alike.

## II.   CONTINUED DELAY BY DEFENDANTS IN THE SIV PROCESS.

The Special Immigrant Visa ("SIV") program was created, tailored, and established to promote the security and safety of Afghans and Iraqis who face serious dangers and threats that are correlated to their service to the United States.  See Refugee Crisis in Iraq Act of 2007, Pub. L. No. 110-181 § 1244, 122 Stat. 395, 396-98 (2008); Afghan Allies Protection Act of 2009, Pub.

L. No. 111-8, § 602, 123 Stat. 807, 807-11 (2009).  Despite these programs being enacted to provide a clear route for Afghans and Iraqis to lawfully obtain visas to relocate to safety in the United States, systemic adjudication delays caused by Defendants have not allowed this program to fulfill their initial goals.

In order to address and resolve the lack of adjudication on the part of Defendants, Congress directed the Secretary of State, Secretary of Homeland Security, and Secretary of Defense to abide by the following:

> improve the efficiency by which applications for special immigrant visas . . . are processed so that all steps under the control of the respective departments incidental to the issuance of such visas, including required screenings and background checks, should be completed not later than 9 months after the date on which an eligible alien submits all required materials to complete an application for such visa.

See Pub. L. No. 113-66 §1218, 127 Stat. 910 (2013).  Yet SIV applicants and their families continue to experience egregious delays in the SIV process.  This delay often jeopardizes the lives or safety of those courageous individuals who served alongside United States Soldiers, Sailors, Marines, Airmen, and other United States forces in perilous theaters of combat operations.  As a result of the Government's continued failure to properly administer the SIV program and egregious delays in the process, many Veterans who bravely served our Nation in combat operations are now tirelessly struggling to save those left behind in a race against time and enemy forces.  See Ben Kesling, U.S. Military Veterans Rush to Help Afghan Interpreters Escape, WALL STREET JOURNAL (Aug. 17, 2021); Megan K. Stack, The Veterans Struggling to Save Afghan Allies, THE NEW YORKER MAGAZINE (Aug. 30, 2021); Paige Pfleger, Watching Afghanistan Fall Reminds These Veterans of Who They Left Behind, NATIONAL PUBLIC RADIO (Aug. 26, 2021); Kim Staffieri, et al., Afghan Interpreters Risked Their Lives to Help the U.S. – We Must Not Abandon Them, TIME (Apr. 16, 2021) (attached as **Composite Exhibit A**).

### III.     SIV APPLICANTS CONTINUE TO FACE CONSTANT DANGER DUE TO CONTINUING DELAYS IN THE SIV PROCESS.

Events surrounding the withdrawal of United States military forces from Afghanistan illustrate the harms to SIV applicants presented by continued delays plaguing the SIV process.[2] Since the United States withdrew troops on August 31, 2021, leaving countless SIV applicants behind, an alarming number of Afghans have reported that they have faced economic hardship due to the evacuation, lost their jobs, and are struggling to support themselves and their families.  Some SIV applicants have been detained by the Taliban in connection with service to the United States, and a number have even reported imprisonment by the Taliban in connection with service with United States military and coalition forces.  See Kim Staffieri, et. al., The Left Behind Afghans, ASSOCIATION OF WARTIME ALLIES (Feb. 1, 2022) (attached as **Exhibit B**).  Some SIV applicants have been severely beaten and tortured by the Taliban; others have been killed.  See Photograph of Class Member (attached as **Exhibit C**).  While Afghans are forced to remain in Afghanistan or displaced globally following the withdrawal of United States troops on August 31, 2021, they face physical and emotional harm directly imposed by the Taliban, and they continue to suffer from extreme financial hardships.  These harms will likely persist for as long as there are egregious delays in the SIV process.

### DISCUSSION

Due to processing delays and lack of planning, thousands of SIV applicants were left behind following withdrawal of United States forces from Afghanistan; these applicants continue to wait for decisions while suffering under dire circumstances because of these delays.  Veterans

---

[2] While the instant brief focuses mostly on adverse impact to Afghan SIV applicants and the Veterans serving them, the facts and circumstances presented apply with equal force to Iraqi SIV applicants, as detailed in Plaintiffs' Combined Opposition to Defendants' Motion for Relief from the Court's Orders and Cross-Motion to Enforce and Clarify the Court's Orders (Dkt. Nos. 168, 169) at pp. 14-17.

who have served in Afghanistan now face undue moral dilemmas and obligations thrusting undue financial, logistical, mental, and emotional burdens upon their lives as civilians.  Veterans believe they have a solemn, moral, and ethical responsibility to aid our Afghan allies left behind. The resulting intense pressure to serve the immense need has caused Veterans significant emotional stress as they volunteer in droves to shoulder responsibility for rescuing and protecting Afghan allies in light of systemic problems in the Government's administration of the SIV process.  Rather than implementing and abiding by the Court ordered plan designed and tailored to timely adjudicate SIV applications, the Government's repeated failure to process applications expeditiously has directly resulted in Veterans having to shoulder heavy burdens they should not have to in a civilian capacity.  These Veterans are exhausting their own time, resources, and energy to save Afghans allies forced to somehow survive pending lengthy delays in the SIV process.

I.      **DUE TO CONTINUING DELAYS IN THE SIV PROCESS, VETERANS HAVE TAKEN IT UPON THEMSELVES TO PROVIDE AID AND SUPPORT TO AFGHAN ALLIES LEFT BEHIND.**

Despite tireless efforts on behalf of scores of Veterans to aid and assist our deserving allies, the Government has continued to demonstrate inaction, ineptitude, callousness, and lack of concern for applicants desperately relying on the SIV process.  In particular, as Veteran Peter Lucier observed about a recent botched update by the State Department to its posted instructions for Afghan SIV applicants,

> It is evident to anyone who is familiar with the SIV program that this is an issue that Defendants do not take seriously. Publishing information without conducting basic fact-checking and spreading it to thousands of at-risk Afghans—who face persecution and starvation everyday—is an indication of the institutional callousness and disregard Defendants have for those who have applied for the SIV program.

See Declaration of Peter Lucier ("Lucier Declaration") (attached as **Exhibit F**) at ¶¶ 10, 11 (averring that the State Department website for Afghan SIV applicants contains material errors);

see also UNITED STATES DEP'T OF STATE, Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government (attached as **Exhibit G**) (incorrectly stating that SIV applicants must have served United States forces for two (2) years, among other errors). The Government's mismanagement of the SIV program has dramatically increased delays for SIV applicants, thus requiring Veterans to step in and assist this vulnerable population. See, e.g., Lucier Declaration at ¶ 12.

In connection with AWA, retired United States Marine Corps Reserves ("USMCR") Colonel Eric Terashima, recounts his experience and the turmoil he has faced due to systemic delays in the SIV program. See Declaration of Eric Terashima ("Terashima Declaration") (attached as **Exhibit D**). Colonel Terashima served in the USCMR for a total of thirty (30) years with his last deployment to Afghanistan from 2019 to 2020, where he was Commander of a Forward Operating Base ("FOB"). Id. at ¶ 3. A few months prior to the withdrawal of United States troops from Afghanistan, one of Colonel Terashima's interpreters contacted him requesting help. Id. at ¶ 4. The interpreter and his family had an insufficient amount of money to fund the medical clearance required by the Government to properly apply for the SIV program. Id. at ¶ 3. In response, Colonel Terashima sent a total of $2,400.00 USD in personal funds to the interpreter and his family and launched a "GoFundMe" page to collect additional funds for future costs. Id. Colonel Terashima's interpreter eventually received a SIV but required further financial and logistical help for travel to the United States. Id. at ¶ 5. Following two (2) tumultuous days of arranging flights and coordinating with a travel agent, Colonel Terashima then drove to Dallas, Texas from his home in North Carolina to greet and welcome his interpreter and his family to the United States. Id. Colonel Terashima repeated this process multiple times assisting other interpreters and their families in need for assistance relating to the SIV program. Id. at ¶¶ 4-9.

-9-

Unfortunately, Colonel Terashima's experience is neither novel nor unique. There are a multitude of other Veterans who have dedicated significant time and effort to providing aid to our Afghan allies in response to systemic delays in the SIV process.

For instance, Veteran Hanna Tripp, who served in the United States Air Force from 2009 to 2014 as an Aerial Gunner, with multiple deployments to Iraq and Afghanistan, has tirelessly worked to assist Afghans left behind and marooned due to continuing delays and inadequate administration of the SIV program. See Declaration of Hanna Tripp ("Tripp Declaration") (attached as **Exhibit E**) at ¶ 4. Veteran Tripp has spent months providing support to Afghan allies from coordinating evacuations to organizing a *pro bono* immigration clinic for Afghan refugees. Id. at ¶¶ 5-8. Veteran Tripp is currently the Director of Operations at Afghan Medical Professionals Association of America and works to provide medical and mental healthcare for displaced Afghans. Id. Veteran Tripp, along with other Veterans, has had to work overtime to provide meaningful support to Afghans due to delays in the SIV process.

Similarly, Veteran Lucier, who served as an Infantry Rifleman in the United States Marine Corps from 2008 to 2013, including a deployment to Afghanistan, has volunteered countless hours to assist Afghan allies seeking refuge following the Taliban overthrow of the Afghan government following the withdrawal of United States forces from Afghanistan. See Lucier Declaration at ¶ 3. Veteran Lucier has voluntarily supported Afghans through multiple organizations, such as Team America Relief ("TAR") and AWA, in order to meaningfully assist those Afghans in dire need of assistance and support pending delays in the SIV program. Id. at ¶¶ 4-8. Through this work, Veteran Lucier was forced by necessity to become knowledgeable about the SIV process in order to guide Afghan allies to safety. Id.

These Veterans are merely a representative handful of those Veterans currently assisting Afghan allies through the SIV process or helping them to survive in the harsh and perilous

environment of present-day Afghanistan and/or third countries pending adjudicatory delays. Veterans also assist those SIV applicants continuing to suffer from the adverse impacts of adjudicatory delays in the United States, such as family separation or their inability to achieve permanent immigration status in the United States. There are countless other Veterans who have engaged in similar efforts to assist Afghans as well as Iraqis suffering mightily due to continuing delays in the SIV process.

## II.   DUE TO CONTINUING DELAYS IN THE SIV PROCESS, VETERANS ARE EXPERIENCING SEVERE EMOTIONAL DISTRESS ADVERSELY AFFECTING THEIR PHYSICAL AND MENTAL HEALTH AND WELLBEING.

The Government's delay in processing SIV applications has prevented the Afghans this program was designed to protect from securing permanent immigration status in the United States and required extensive support by the Veteran population, which in turn has directly and detrimentally impacted the physical and mental health of those Veterans assisting. These Veterans are confronted with the moral dilemma of whom to help and how to help, the reality of woefully inadequate resources and operational capacities, and the same life-or-death decisions and consequences they courageously encountered in combat zones.

Veteran Tripp's experience is a key example of the detrimental impact of the Government's derelict SIV processing. After consistently working over twenty (20) hour days to support Afghan allies, Veteran Tripp suffered from a stroke. See Tripp Declaration at ¶ 10. While being wheeled into the Emergency Department from an ambulance, Veteran Tripp continued to staff teleconferences assisting Afghans up until she lost the ability to speak. Id. Veteran Tripp continued her efforts assisting Afghans from her hospital bed the morning following the stroke. Id.

The weight of emotional strain on the Veteran population assisting Afghans—combined with an overwhelming sense of hopelessness—is equally debilitating. For instance, Colonel

Terashima has received numerous friend requests on social media platforms, such as Facebook, from Afghans desperately pleading for help.  See Terashima Declaration at ¶¶ 8-12.  The profound moral weight felt by Colonel Terashima flowing from the constant bombardment or urgent pleas for assistance by Afghan allies, has been "extremely emotionally and mentally taxing."  Id. at ¶ 9.  Colonel Terashima feels that the United States has "abandoned [Afghans] and their families amidst a humanitarian crisis in a country where an enemy force, the Taliban, hunts for them daily . . . a matter of life or death."  Id. at ¶ 10.  Similarly, Veteran Lucier "rarely sleep[s] more than a few hours a night these days" because his "sense of duty to those left behind will not allow [him] to be at ease."  See Lucier Declaration at ¶ 23.  Moreover, Veteran Lucier describes how "long adjudicatory delays wreak moral injury upon the souls of Afghan Veterans . . . ." as direct result of the Government's inadequate administration of the SIV process:

> Afghan Veterans like myself . . . are already deeply and irreparably wounded by our wartime experiences.  On television, we watched as the Afghan government we had fought and bled for, the same government which our comrades in arms had given their limbs for, the same government we missed our children's birthdays, holidays, and family time for, and for which some paid the ultimate sacrifice giving up their lives to protect, swiftly fell to the Taliban enemy.  I can personally attest to the incredible wounds, trauma, stress, and confusion this causes and its significant aggravation to the mental health and wellness of Veterans and servicemembers alike.

Id. at ¶ 20.  The experience and sentiments of Colonel Terashima and Veteran Lucier are shared widely by Veterans across the Nation.  See Tripp Declaration at ¶ 13; see also Exhibit A.

## III.   THE COURT SHOULD AFFIRM AND ENFORCE ITS PRIOR ORDERS AND ENFORCE UTILIZATION OF AN ADJUDICATION PLAN.

Having reviewed the record, facts, and circumstances underlying this matter, and upon briefing and presentation of argument by the Parties, this Court entered Summary Judgment in favor of Plaintiffs and directed an Adjudication Plan intended to provide relief for Plaintiffs who are detrimentally affected by the Government's failures in administration of the SIV process.  See

Order dated September 20, 2019 (Dkt. No. 76).  However, as Plaintiffs have outlined, Defendants have failed to abide by such plan adequately which has resulted in further harms.

Either way, as detailed above, the continuous failure of the Government to process SIV applications in accordance with its statutory and court-ordered obligations has a multi-faceted set of consequences.  This failure not only imposes harms upon Afghans, but has detrimentally impacted the Veteran population as well, which is performing duties mandated to the Government by endlessly working to provide our Afghans allies with the necessary support they need to survive in hostile territory while navigating the SIV process as currently administered.

Under Telecommunications Research & Action Center v. FCC ("TRAC"), 750 F.2d 70, 80 (D.C. Cir. 1984), "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake."  In this context, the "human health and welfare" of both our allies and Veterans are clearly at stake.  While the Government they serve has expressed indifference to the suffering involved, Veterans are sustaining palpable physical and mental injuries in this process.  See Lucier Declaration at ¶¶ 17-19; Tripp Declaration at ¶¶ 13-14; Terashima Declaration at ¶ 9.  As a result, this Court should enforce  its prior Orders intended to make sure applicants harmed by the Government's delays finally receive decisions on their SIV applications, for which they have been waiting far too long.

## CONCLUSION

For the reasons set forth above, AWA and VFAI, in their capacity representing the interests of Veterans as *amici curiae,* respectfully request the Court deny the Government's Motion for Relief from the Court's Summary Judgment Order and the Approved Adjudication Plan (Dkt. No. 163) and grant Plaintiffs' Cross-Motion to Enforce and Clarify the Court's Orders (Dkt. Nos. 168, 169).  The Government must be compelled to honor its commitment to assist Afghan and Iraqi

allies via the SIV program thus serving the interests and ideals of its greatest citizens—our

Veterans—who are now working tirelessly to ensure "no man left behind."

Dated July 11, 2022                                        Respectfully submitted,

**DEMPSEY LAW, PLLC**

 s/ Christopher W. Dempsey
CHRISTOPHER W. DEMPSEY
D.D.C. No. AR0006
221 N Hogan Street, Suite 368
Jacksonville, Florida 32202
Telephone:  (904) 760-6272
Fax:  (904) 587-0372
Email: chris@cdempseylaw.com

***Counsel for AWA and VFAI***

## **CERTIFICATE OF COMPLIANCE**

In compliance with Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4), *amici curiae* AWA and AFAI confirm they have no parent corporation and that no publicly held corporation owns ten (10) percent or more of its stock.  AWA and VFAI confirm that no Party's counsel authored this brief in whole or in part.  AWA and VFAI further confirm that no Party or their counsel contributed money that was intended to fund preparing or submitting this brief.  AWA and VFAI confirm that no person—other than the *amici curiae*, its members, or its counsel—contributed money that was intended to fund preparing or submitting the instant brief.

Additionally, this brief complies with the local rules of the United States District Court for the District of Columbia for the following reasons:  (1) this brief complies with the type-volume limitation of Local Civil Rule 7(o)(4) because it does not exceed twenty-five (25) pages; and (2) this brief complies with the typeface requirements of Local Civil Rule 5.1(d) because this brief has been prepared in a proportionally-spaced typeface using the Microsoft Office Word processing software in a 12-point Times New Roman type-style.

Dated July 11, 2022                                      Respectfully submitted,

**DEMPSEY LAW, PLLC**

 s/ Christopher W. Dempsey
CHRISTOPHER W. DEMPSEY
D.D.C. No. AR0006
221 N Hogan Street, Suite 368
Jacksonville, Florida 32202
Telephone:  (904) 760-6272
Fax:  (904) 587-0372
Email: chris@cdempseylaw.com

***Counsel for AWA and VFAI***

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2022, I filed the foregoing with the United States District Court for the District of Columbia via CM/ECF, which will cause the same to be served on all counsel of record in this matter.

Dated: July 11, 2022                                    Respectfully submitted,

**DEMPSEY LAW, PLLC**

 s/ Christopher W. Dempsey
CHRISTOPHER W. DEMPSEY
D.D.C. No. AR0006
221 N Hogan Street, Suite 368
Jacksonville, Florida 32202
Telephone:  (904) 760-6272
Fax:  (904) 587-0372
Email: chris@cdempseylaw.com

***Counsel for AWA and VFAI***

# EXHIBIT A

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/u-s-military-veterans-rush-to-help-afghan-interpreters-escape-11629232144

U.S.

# U.S. Military Veterans Rush to Help Afghan Interpreters Escape

## American retreat has brought feelings of anger, guilt and frustration to many veterans who feel the U.S. has betrayed Afghan allies

*By Ben Kesling*  Follow

Aug. 17, 2021 4:29 pm ET

Marine Corps veteran Peter James Kiernan has been helping his Afghan interpreter apply for a U.S. visa since 2015. On Monday, he urged the man to burn the trove of documents he had helped him painstakingly collect over a decade to prove he worked for the U.S., as the Taliban took over Kabul and reports came in that they were conducting house-by-house searches.

Mr. Kiernan is angry and frustrated. "I wish I knew who to blame," he said. "I can't wait until we hold these people to account for this betrayal. There were definitely people in power who decided this was not a priority."

The Afghan interpreter spent Monday hiding in Kabul with his wife and three children, said Mr. Kiernan, who now spends much of his day calling people, hoping to shake loose visas so that his old colleague can fly out before it is too late. He says he calls his friend in Afghanistan every 12 hours to check in.



Many military veterans say they forged lasting bonds with Afghan interpreters who ate meals with them, bunked alongside them and, on occasion, saved their lives. The Taliban's victory over Afghan forces this week has left tens of thousands of American allies stuck and at risk, and is prompting frantic efforts by military vets to get their former colleagues out. It has brought feelings of bitterness and guilt to many veterans who feel bonded to their Afghan friends and has even left them embarrassed by how the U.S. has seemingly abandoned those who were so loyal.

"Some of these guys are absolutely special," Mr. Kiernan said of Afghans who helped Americans during the 20-year military presence there. "It's not like we didn't know this was coming. I'm especially bitter that we've forsaken the bonds of camaraderie and abandoned our allies."

President Biden said Monday that he stood by his decision to withdraw U.S. troops from Afghanistan, though he said the exit has been "far from perfect." The administration also said some 22,000 Afghans could be relocated in coming weeks, though the mechanism for that process was left undefined, even as thousands scramble for safety.

National security adviser Jake Sullivan said Tuesday that the Taliban said they would allow safe passage for people to travel to the airport, even as reports from Kabul indicate the group had set up checkpoints.



Like Mr. Kiernan, Afghanistan war veteran Doug Livermore hasn't been sleeping much over the past few days. He finds himself sometimes spending 20 hours a day fielding calls, answering emails and trying to help Special Immigrant Visa applicants get to and then resettle in the U.S.

The former Army Special Forces officer is now a board member of No One Left Behind, a nonprofit whose mission is "ensuring that America keeps its promise to our interpreters from Iraq and Afghanistan." He found time to talk about the past 48 hours when his computer crashed late Monday night and he was forced to take a break.

"These are folks who invested in the American dream even before they became Americans, when they were fighting alongside us," Mr. Livermore said. The organization began in 2013 when an Afghan interpreter struggled through the SIV process and launched it to help others like him. The organization ramped up its efforts to evacuate Afghan interpreters after former President Donald Trump announced the pullout early last year. "That was our clarion call," he said.

They bought tickets for commercial airlines and worked to speed visas, but all that fell apart over the past week, as the Taliban quickly took control of the country. On Sunday, after the Taliban captured Kabul, the capital, No One Left Behind was flooded with emails and desperate calls for help.

Many of those calls are coming from U.S. veterans who have reconnected with their interpreters.



Ismail Hussainy, who spent four years working as an interpreter, adviser and guard for a security contractor under the U.S. Army Corps of Engineers at Bagram Airfield, said he has been trying to get a visa since 2014. His application was denied after his former supervisor who wrote his reference letter died, and Mr. Hussainy said he couldn't find another American to vouch for him.

"Our life is in danger," Mr. Hussainy said Monday by phone from Kabul, where he is living with his wife, four children and parents.

He recently reconnected with an American colleague from his time in Bagram, Ryan Jackson, who pledged to serve as his reference and help with the visa process.



Mr. Jackson has been scouring the internet looking for contacts but has mostly found generic inboxes and phones that go unanswered. "I don't know where we're supposed to go from here," Mr. Jackson said Monday. "You can't get any point of contact."

Andrew Darlington, who served two tours in Afghanistan as a Marine, has also been working to get his interpreter, Sayed Obaidullah Amin, on a flight out of the country and has spent the past few days fighting with "Obaid" over the phone to get him to go wait for a flight at the airport. That would mean leaving his wife and children behind.

"You will be killed by the Taliban," Mr. Darlington wrote in a text.

"I will go alone," Obaid finally replied, resigned to leaving behind his family.

But Obaid couldn't ultimately carry through with such a wrenching choice. As of Tuesday, he had rejoined his family, choosing to wait together with them in Kabul, Mr. Darlington said.

Mr. Darlington, like many others trying to get people out, wants the stories of delay and confusion to reach U.S. leadership quickly.

## "These are folks who invested in the American dream even before they became Americans, when they were fighting alongside us.

— Afghanistan war veteran Doug Livermore

"Please put pressure on Washington to get their asses in gear," he said. "These guys don't have time."

Mr. Kiernan said Afghans like his interpreter helped America achieve its missions.

In one instance on a night raid, the Marines thought they got bad intelligence because they couldn't find the Taliban fighter they were told was there, said Mr. Kiernan. His interpreter noticed a woman in a burqa was holding a screaming baby, yet making no effort to calm the child. So the interpreter sidled up to the mother and asked about the baby. A halting answer came back in a baritone.

"He knew it was a man," Mr. Kiernan recalled. "The guy threw the baby and ran."

The interpreter lunged and caught the child, as the Marines nabbed the militant.

"That guy had seen him and could pick him out of a lineup," Mr. Kiernan said, noting that the Taliban have released prisoners as they swept through the country in recent days.

According to Mr. Kiernan, the Afghan interpreter was in Herat when that city was on the verge of falling last week, so he took his family and fled to Kabul. Mr. Kiernan said the interpreter told him he burned all the commendations, letters of recommendation and other paperwork he has collected over the years from Americans, scrubbed his social media and is now deleting his text messages and call history regularly in case the Taliban shows up at his door.

"I'm most furious with this administration," Mr. Kiernan said. "It's not all on [Mr. Biden's] shoulders, but we've known for months there were allies out there whether journalists or interpreters. They extended their hands when we needed it."

*—Sara Randazzo contributed to this article.*

NEWS DESK

# THE VETERANS STRUGGLING TO SAVE AFGHAN ALLIES

*For many who served in Afghanistan, the flawed evacuation efforts have brought feelings of shame and betrayal.*

**By Megan K. Stack**

August 30, 2021



*People evacuated from Kabul walk past a U.S. Air Force plane, at Pristina International Airport, in Kosovo. They were flown in from Ramstein Air Base, in Germany.* **Photograph by Visar Kryeziu / AP / Shutterstock**

I t was past midnight, but lights burned and phones buzzed in an unremarkable office suite a block from the White House. The bland offices of a defense-contracting firm had been turned into a makeshift operations center where some dozen volunteers, on laptops and phones, were making a desperate effort to evacuate people from Afghanistan. Tactical flowcharts and lists of people stashed in safe houses on the other side of the planet covered dry-erase boards; a detailed diagram of the Kabul airport hung in the conference room; a digital clock showed the minutes slipping past in Afghanistan time.

Matt Zeller roamed the office in flip-flops, frowning into his phone, groaning out expletives, and announcing disquieting scraps of uncorroborated information to anyone within earshot. He received a report that a Taliban representative had been in the air-traffic-control tower at the Kabul airport since the day before. The gates at the airport were closed again. "He better not be asleep," he hollered into the phone. "He better not."

---

**Sign up for The Daily.**

Receive the best of *The New Yorker*, every day, in your in-box.

E-mail address

Your e-mail address

Sign up

By signing up, you agree to our User Agreement and Privacy Policy & Cookie Statement.

---

A former Army reservist and C.I.A. analyst who served in Afghanistan in 2008, Zeller has toiled for years as an advocate for Afghans endangered by their work for the United States. In 2013, Zeller and Janis Shinwari, an Afghan interpreter whom Zeller credits with saving his life in a shoot-out with the Taliban, founded

No One Left Behind, a nonprofit that helps Afghans apply for special immigrant visas and resettle in the United States. But the Afghan S.I.V. program has been continually beset by bureaucratic delays and opaque vetting. By the time President Biden took office, there was a backlog of about twenty thousand Afghan families who had asked to be considered for the visas, saying that their lives would be in danger if the Taliban took over. Many of them had been waiting for years.

When Biden announced his plans to withdraw troops from Afghanistan this spring, No One Left Behind was among an improbable alliance of refugee groups, veterans' organizations, and U.S. lawmakers who warned the Administration that it was not evacuating allies fast enough. Now their fears had come true. The Afghan government crumbled before the United States had completed the withdrawal, leaving tens of thousands of vulnerable people entitled to resettlement in the United States with little chance of escape. In response, volunteers—many of them veterans, reservists, or active-duty military—developed sprawling, loosely interconnected rescue networks with miraculous speed. They scrambled for donations, tracked down charter planes, and enlisted old friends in Kabul to help guide at-risk Afghans onto evacuation flights. It's difficult to know the extent of the work, but organizers say that thousands of Americans are involved.

Most of the volunteers have concentrated on the problem and promise of Hamid Karzai International Airport. As soon as Kabul fell to the Taliban, on August 15th, thousands of people rushed there: U.S. citizens, holders of green cards and special visas, young men who had no documents but were desperate enough to try their luck. The result was a miserable carnival of stampedes and shoot-outs and sewage that flooded the streets. Marines fired tear gas to try to quell the mob and closed down the gates in seemingly random patterns.

"The gates are like a terrible game of Whac-A-Mole," Adam DeMarco, an Army veteran who, with a group of West Point graduates, engineered the evacuation of

a handful of Afghan alumni and their families, and also other allies, said. "Some open. Some don't. The times fluctuate."

Last Monday, as the August 31st deadline to complete the evacuations drew near, the U.S. said that it was prioritizing citizens and green-card holders; on the ground, troops and State Department officials turned back S.I.V. applicants at gates and checkpoints. Another terrible twist came a few days later, when the Taliban announced that Afghan nationals would be barred from approaching the airport. The White House press secretary, Jen Psaki, assured reporters that S.I.V. applicants would still be able to leave. The Biden Administration, she said, had instructed the Taliban to allow Afghan allies to pass through the checkpoints. But that statement took on a troubling cast when Politico reported that U.S. officials had given the Taliban a list of names, including those of vulnerable Afghan allies.

People in the airport were being put on planes, but that was hardly the whole story. Some charter planes took off with row upon row of empty seats. Afghans might be saved if they could reach the airport, but, by and large, they couldn't get there.

"We're running the D.M.V. from hell," Zeller said.

Sitting alone in the kitchen of the defense-contracting firm's office, looking disoriented, almost woozy, was a man who preferred to give his first name only: Nazar. A thirty-six-year-old who had started translating for U.S. troops at seventeen, Nazar had touched down in the United States that day, after an anguished escape from Afghanistan. His long-anticipated flight had come at a steep price: he'd left behind his wife and his three children, all of whom are under seven, for the simple but immutable reason that he couldn't get them through the crush of people to the airport gates.

The whole family had secured U.S. visas and commercial plane tickets to fly out on August 17th. Two days before that, the Taliban seized Kabul, and the flight was cancelled. The family stripped their packed luggage down to a few backpacks and tried to approach the airport, suffering for hours in crowds so tight that

Nazar's wife told him she was suffocating. They returned home and tried again the next day, but the crowds had only thickened. Finally, outside the airport, they made an excruciating decision: Nazar would travel alone, in hopes that he could get the rest of the family out later.

Nazar described passing through checkpoints where Taliban guards cursed him as an infidel and whipped people with chains, and being hit with tear gas by U.S. marines. Gun battles erupted; his left thigh was grazed by a bullet. He saw an amputee getting trampled on by the crowd and a man weeping for his children, and he was ashamed because he'd moved past all that desperation and shoved his way into the airport.

"I've seen hell with my eyes," he said quietly.

Zeller was nineteen on September 11, 2001. He came from a line of veterans stretching back to the American Revolutionary War; he enlisted, he said, because both his family's history and the terrorist attacks imbued him with a sense of obligation to his country. "I bought into it. I really believed we could make a difference. And it turns out . . .," he trailed off. "What you realize is, you come home, and you don't come back the same person. I wasn't prepared for any of that. And I don't think you really can be."

He said, of the years he's spent trying to deliver Afghan allies to safety, "I feel like this is atoning for all the shit that I did previously."

For many veterans of the post-9/11 wars, leaving their allies behind is a deep, even intolerable, wound. Many describe a reaction that is graver than anger or sorrow; they talk about the personal shame of having betrayed the men and women who served with them, an act that is anathema to their military training and ethos and, more broadly, undercuts the values they thought they were defending.

"Do you understand what it's like to have people send you messages saying, 'You promised me you'd get me out,' 'I'm being hunted,' 'You can't get me out,' 'Why are you betraying me?,' 'You left me behind'?" Zeller said. "Imagine now it's someone you served with and there's nothing you can do about it."

In the early years of No One Left Behind, Zeller said that he found his staunchest supporters among Vietnam veterans, who still bore the scars of having abandoned their own allies. Zeller recalled that when he was lobbying lawmakers over problems with the S.I.V.-application process, in 2013, John McCain erupted angrily that it was going to be "another Vietnam." For years, McCain led efforts to increase the number of S.I.V. visas. "Isn't it unconscionable for us not to allow them to come to the United States if they want to," he once said, "after what they did for us?"

"When we go over there in these small teams, we tell the people we work with, 'You can trust us. We'll be there for you.' How many people have we looked in the eyes?" George Adams, who fought in the Middle East and Africa, said. "This is going to be a huge mental-trauma disaster for the military."

Adams was working with vulnerable Afghans this past weekend, focussing on a few families of Afghan-American service members who remain trapped in the country. He'd already had to accept that he would not be able to evacuate the elderly parents of a U.S. reserve-services member, and he had started talking to them about strategies to stay safe for the time being.

"It's over," he said on Saturday. "They're screwed. We're screwed."

Despite the chaos at the airport, the U.S. government had evacuated a hundred and fourteen thousand people by Sunday, and officials promised they would keep working to get more out. Secretary of State Anthony Blinken suggested that some might travel overland and cross the border into neighboring countries; the United

States and other governments said they'd received assurances from the Taliban that Afghans who had their travel documents in order would be allowed to leave.

But the official promises did little to assuage the emotions of the volunteers. Jen Wilson, who usually runs a nonprofit for veterans but is now overseeing an ad-hoc mission to rescue U.S. citizens and green-card holders, Afghan allies, and other vulnerable people from the north by aircraft, told me that, in her view, the flawed evacuation efforts had put veterans into an intolerable position. "The entirety of the moral weight and the moral burden lies squarely on the shoulders of our men and women in uniform," she said. Wilson knew of three veterans of the Afghanistan war who had died by suicide during the past two weeks. (I'd also heard this from two other sources.) One of them, she said, left behind a pregnant wife.

"It's the most hopeless, helpless, frustrating, infuriating experience of their lives," she said. "To them, it's 'If I can get him out, it won't have been for nothing.' "

On Thursday, a suicide attack on the crowds outside the Kabul airport killed thirteen U.S. service members and an estimated hundred and seventy civilians. Hours later, I returned to the defense-contracting firm's offices in Washington, where I hoped to meet Safi Rauf, the leader of that evacuation effort. At the time of the attack, Rauf had been guiding a bus with dozens of people toward the airport gate to catch a charter flight. Separately, he was coaxing a family of thirteen forward on foot. He'd quickly sent the bus back to a safe house and dispatched someone to pick up the family. Meanwhile, in an incident that Rauf still hasn't disentangled, his cousin was shot and injured by a Taliban soldier. "Bad day," he told me.

A slim and restless Afghan-American Special Operations veteran, Rauf was born in a refugee camp in Peshawar, Pakistan, just across the Afghan border. He grew

up crossing regularly into Afghanistan with his veterinarian father, who travelled to Khost to treat cattle. Rauf immigrated to Nebraska as a teen-ager, following an older sister, and enrolled in a public high school. He enlisted after graduation and spent years helping to hunt Taliban in Afghanistan before coming back to the United States and attending college at Georgetown. He had planned to start medical school at the University of Nebraska in the fall, but he told me he'd just decided to defer his admission for a year so that he could focus on the evacuation efforts. It disgusted him, he said, that the U.S. was leaving people behind.

I wondered what it was like for someone whose life trajectory had been sketched by the Afghan war to watch, now, as the U.S. government walked away.

"It just feels so strange," he said. "We were at war, and they were killing our soldiers, and now it's like we're begging them to let us get out with a little bit of our dignity. And they're saying, 'Look what we did to a superpower like the U.S. We brought them to their knees.' "

A gloomy silence fell between us. Look, Rauf said suddenly, gesturing at the big screen where Kabul time still flashed: 7 A.M.

"It's just daylight in Kabul," he said. "I'm afraid of what we're going to find."

*This post has been updated to remove the name of a security firm that assisted in the evacuation effort, owing to safety concerns.*

---

# NEW YORKER FAVORITES

- Snoozers are, in fact, underlines.
- The book for children that is an amphibious celebration of same-sex love.
- Why the last snow on Earth may be red.
- The case for not being born.
- A pill to make exercise obsolete.



HOURLY NEWS

ON AIR

PLAYLIST

WNFM News 89.9
On Air Now

 

DONATE

NATIONAL

# Watching Afghanistan Fall Reminds These Veterans Of Who They Left Behind

August 26, 2021 · 5:00 AM ET

Heard on Morning Edition

PAIGE PFLEGER

FROM  

3-Minute Listen

PLAYLIST

Download

Transcript



U.S. soldiers enter a compound for a security meeting in Shah Joy District, Zabul Province, Afghanistan in the fall of 2010.
*Alex Dudley*

Timothy Griffin has been having a lot of long nights.

"I probably have not slept since it happened," Griffin says, "since I woke up and the headline was Afghan president flees the country, Taliban are in Kabul."

Griffin did a tour in Afghanistan under an Obama-era program where he learned Pashto to help the Americans better communicate with Afghans. He was stationed out of Fort Campbell, an Army base outside of Nashville, Tenn.

He says he hasn't been sleeping so that he can bridge the time difference with the translators he worked with during his tour.

"Some of them are trapped in Kabul trying to get on one of those planes," he says. "Some of them are, unfortunately, too far away from Kabul to even attempt to get out."

Griffin has been trying to put their names in front of politicians and the U.S. State Department — anyone who could help them escape.

## "We decided to completely abandon them"

He says his heartbreak about what is happening in Afghanistan is eclipsed by worry for those translators.

Even though he believes it was time to withdraw, he wishes more could have been done for the people being left behind.

Griffin says there is a "weird duality" in the way people assume there were only two options with Afghanistan: stay 20 more years, or abandon the country.

"We decided to completely abandon them," even though, as he puts it, there were "a million other options."

This is a familiar refrain for veterans who served in Afghanistan: More could have been done.

They walk around with constant reminders of their service — a list of physical injuries from what they did, or emotional scars from what they saw and who they lost. Now, those wounds feel fresh again as they watch two decades of work unravel in days.

"It's a little hard not to be cynical," says Alex Dudley, a veteran who spent six months in Zabul Province in 2010.

Dudley lives in Nashville now. When he heard the news, his thoughts turned to one of his friends and fellow soldiers who died years ago.

"If we hadn't been over there, he'd still be alive," Dudley says. "It's kind of hard to talk about."

He tears up, apologizing, and says his friend didn't die in combat.

"He did end up taking his own life," Dudley says. "The situation he was in, he would not have been there if we had not been in Afghanistan."

## Remembering the good

Healthcare providers worry the government collapse in Afghanistan might push more veterans into crisis. They are encouraging those who served to seek help and to check in with one another.

That's what Dudley has been doing. If his friend were still alive, he believes he would probably feel the same way he does — let down.

"You feel like there was something else we could have done," he says. "But at the same time we've been there for 20 years, and I don't think another 20 years would have necessarily made a difference."





Students at a girls school in Shah Joy District, Zabul Province, Afghanistan where U.S. soldiers handed out school supplies in 2010.

*Alex Dudley*

During his time in Afghanistan, Dudley carried his camera with him, taking photos. His images show little girls in brightly colored clothing, staring inquisitively at the camera. Their small hands grip the green pencils he handed out.

He laughs as he remembers helping one girl fend off a bully who was trying to take her pencil.

"Helping to provide those opportunities for those young girls…I definitely from time to time still think about that experience and wonder where those girls are," Dudley says. "Especially within recent events."

Those memories were once comforting, but now they're also a source of worry.

That's why veteran Ross Schambon prefers not to think about Afghanistan at all.

## Leaving Afghanistan behind

"It was a complete waste," he says.

He criticizes President Biden for the withdrawal, saying he should have left more troops in place to stand up to the Taliban.

"They just kind of lay down. They're laying down for everything," Schambon says. "Whereas the previous president, he actually had a backbone."

Schambon has unsentimental opinions about the war. He says he has to.

He served in Afghanistan with the Rakkasans out of Fort Campbell and moved back to Glasgow, Ky., after his service. In his brigade combat team, he was a military sniper. He remembers watching from a mountain top as one of his fellow soldiers was hit by a mortar and died.

He is reminded of the things he saw with every step he takes — he has stress fractures in his legs, bone fragments in his knees, damage to his lower back and more. But he tries to ignore the pain and the memories, and move forward.

"I've got my kids to think about," he says. One is 6 and the other is 10 months. They are his future, he says.

The war is over, and no matter the outcome, he says he just wants to leave it in the past.

*U.S. Veterans struggling with the news out of Afghanistan can talk to a counselor at the Veterans Crisis hotline. The number is 1-800-273-8255*

# More Stories From NPR

Case 1:18-cv-01388-TSC-MAU   Document 177   Filed 09/12/22   Page 37 of 127



# 4th of July Sale
# Subscribe for 99¢

Sale ends 7/10

SUBSCRIBE NOW

# Afghan Interpreters Risked Their Lives to Help the U.S. We Must Not Abandon Them



Interpreters, from left, Afiqullah, Irshadullah and Said Hussein, all working for the U.S. army, meet in Jalalabad, Afghanistan, on Oct. 20, 2012. They applied for a U.S. visa through the Afghan SIV program.   Mikhail Galustov—The Washington Post/Getty Images

BY **KIM STAFFIERI AND MATT ZELLER** APRIL 16, 2021 6:00 AM EDT

**4th of July Sale**
**Subscribe for 99¢**
Sale ends 7/10

**SUBSCRIBE NOW**

IDEAS

*Staffieri is the co-founder of The Association of Wartime Allies, an organization dedicated to assisting SIV applicants through their resettlement and real-time assistance to more than 9,500 members. Zeller is a U.S. Army veteran. He is also Co-Founder of No One Left Behind, a Truman National Security Project Fellow, and an Adjunct Fellow at the American Security Project. He is the author of Watches Without Time (Just World Books, 2012), which chronicles his experience serving as an embedded combat adviser with the Afghan security forces in Ghazni, Afghanistan, in 2008.*

W hen America sent its sons and daughters off to fight in Afghanistan and Iraq, it enlisted a second Army in the fight against global terrorism— local allies, to help build bases, support our forces, and perhaps most vitally, interpret. These interpreters served as our cultural and linguistic bridge to the society around us. We could not have performed our jobs without them, and many of us are only alive today because these friends and allies helped us when called upon.

As the U.S. prepares to exit Afghanistan in September 2021, the government must honor the promise it made to these heroes. They created the Special Immigrant Visa program in 2008 and 2009 to ensure America offered immigration and citizenship to those Afghans and Iraqis who worked as interpreters, or who were employed by, or on behalf of, the U.S. in their respective countries.

If these indispensable workers gave the U.S. at least two years of honorable service, if an American soldier or official could vouch for them, and if they could pass the most arduous background check in U.S. immigration law, then the government would grant them and their immediate family members (their spouses and children) visas to immigrate to America.

Tens of thousands of Afghans and Iraqis accepted these terms and fulfilled their end of the bargain. And to date, the U.S. has granted more than 89,000 individuals Special Immigrant Visas.

Even so, more than 18,000 applicants in Afghanistan alone are awaiting decisions on their applications, with an average family size of four. Most of

them have been waiting for at least four years, despite Congress directing the government to process their visa applications in nine months or less.

4th of July Sale
Subscribe for 99¢
Sale ends 7/10

SUBSCRIBE NOW

These bureaucratic delays mean the U.S. has so far failed to honor its end of the SIV deal.

For years, we've worked on the case of an interpreter, who for safety reasons we'll call Sayed. Sayed worked for almost a decade with U.S. military forces in Afghanistan and has been waiting over six years for his visa. Three years ago, the U.S. confirmed that Sayed met all qualifications for the visa. In November 2020, the U.S. returned his case for secondary review to, once again, affirm his qualifications. Four American service members who served with Sayed as his direct supervisors have written letters to support his case. To date none of them have been contacted to reaffirm his service, despite their repeated attempts to show support for Sayed.

Another interpreter we've worked with, whom we'll call Abdul, has seen almost a dozen coworkers kidnapped, attacked, and killed by insurgent forces over their roles. Abdul himself was injured in a blast. Taliban insurgents once showed up knocking at the door of his home. He fulfilled his employment obligation more than two years ago, yet like Sayed, the U.S. also returned his case for a secondary review. The U.S. then denied his visa because his American supervisor could not, once again, verify his recommendation letter. His supervisor is not available due to the fact that he's currently held captive by the Taliban.

Anyone who worked with the U.S. Army in Iraq and Afghanistan has likely effectively excommunicated themselves from the society around them. Their peers may view them as American spies, traitors, and even apostates.

Our enemies are hunting them down and murdering them and their families—as examples of what happens to America's friends. With U.S. departure now set, the government must create a safe exit for our allies and to process their applications immediately and efficiently.

To do that, the Biden administration and Congress must remove the SIV program's cap on visas and its sunset provision, resume processing applications from Iraqi applicants, and hammer out evacuation methods for bringing the Afghan applicants to a safe place while they wait for their visas to be issued.

**4th of July Sale**
**Subscribe for 99¢**
Sale ends 7/10

SUBSCRIBE NOW

If and when Afghanistan collapses, rapid air evacuations will be necessary. History provides a model for how the U.S. should move forward. In 1975 and 1996 the U.S. evacuated its Vietnamese and Kurdish allies, respectively, to Guam. They lived in safety while their permanent visa applications were processed. We should do the same now for our allies in Afghanistan, while there is still time.

Our Afghan wartime allies live in fear that each day might be the day that the Taliban and their hit teams catch up with them and their families. They worry that the U.S. government will fail them—and thus far, for too many, we have.

In the early days of the SIV program, the government processed and issued visas in less than nine months. This mission is not impossible, we have done it before, we can do it again. We can save these people. All we have to do is have the courage and conviction to do the right thing.

**CONTACT US AT** LETTERS@TIME.COM.

*TIME Ideas hosts the world's leading voices, providing commentary on events in news, society, and culture. We welcome outside contributions. Opinions expressed do not necessarily reflect the views of TIME editors.*

# EXHIBIT B

# The Left Behind Afghans

The Association of Wartime Allies (AWA) has been the preeminent advocate for Special Immigrant Visa (SIV) eligible individuals since 2019.  AWA currently offers interactive, real-time support and education to upwards of 17,000 SIV principal applicants in an effort to enable them to navigate the complexities of the Special Immigrant Visa process with as few delays (or denials) of their applications as possible. AWA also works directly with the US Department of State, Consular services, National Visa Center  and numerous US based legal and resettlement organizations to offer a robust network of support to SIV applicants and recipients.

In April 2021, AWA members Kim Staffieri and Matt Zeller authored a white paper in partnership with the Truman Project, Human Rights First, Veterans For American Ideals, and the International Refugee Assistance Project that outlined the urgent need to begin early, coordinated and safe evacuation efforts of the 81,000 SIV applicants and qualified family members that were in the system prior to August 2021. From the efforts to promote this paper and its recommendations came the coalition of organizations that would birth the Evacuate Our Allies (EOA) coalition in May 2021.

AWA watched with looming dread the growing humanitarian crisis over the Summer of 2021 as the Taliban swiftly regained Afghan province by Afghan province in the vacuum left by the withdrawal of US Forces coupled with the delay of any coordinated US government led evacuation effort. During this crisis, utilizing communication on Facebook Groups, AWA tracked over 11,000 principal applicants and their family members, a total population of 76,000 people (an estimated 94% of all applicants prior to August 2021). Since the US withdrawal from Afghanistan on August 31, 2021, the situation of those we assist in Afghanistan has become increasingly and perilously desperate. We have continued to collect demographic data on individuals and their locations in Afghanistan waiting for their visa or extraction. AWA holds the most comprehensive data set on those SIV Eligible individuals left behind in Afghanistan.

While we commend the United States for evacuating some 82,000 Afghan Allies that otherwise may not have made their way to safe haven in the United States, we must never lose focus on those left behind. The following is AWA's status update of the SIV applicants who currently remain in Afghanistan - six months and counting after the end of the official US evacuation. Of the thousands surveyed, they convey a universal desperation - they are dismayed and exasperated that the United States failed to evacuate the vast majority of our SIV eligible allies. **The results of our survey show that of the estimated 81,000 SIV applicants in Afghanistan with visa applications pending as of August 15, 2021 (the day Kabul fell), 78,000 remain left behind.**

## Population Statistics

In our most recent survey, we gathered results from 3,988 applicants in the AWA network and asked questions about geography, demographics, and their overall disposition between 14FEB2022 and 19FEB2022. We gathered a total of 10,803 dependents' information tied to the primary applicant. The typical applicant is on average a 34-year-old male, with a 23-year-old wife, and between one and two children. The typical age of the applicants' children is eight. 25.6% reported having no dependents.

We collected data on both applicants who are still in Afghanistan and those who made it out. 90.5% are located within Afghanistan, mostly in Kabul (73.3% of the 90.5% (2644)). In prior surveys, Afghans who remained in



Afghanistan found about 50% currently in Kabul and 50% in the provinces outside of Kabul. The increase in the numbers of SIV applicants in Kabul are likely due to the following two reasons:

1. applicants have been fleeing the countryside to Kabul, and/or,
2. we have lost communication with applicants outside the major population centers.



We will seek to determine the specificity of the increase in future surveys. Of those applicants who are out of Afghanistan, the majority are in Pakistan (45%).

The visa application status breaks down as follows:

- 48% are still waiting for Chief of Mission Approval
- 30% are waiting for an interview
- 9% are waiting for other administrative hurdles
- Only 13 have a printed visa in hand

All SIVs that hold printed visas or "Issued" status face a time hurdle that results in their visas expiring and returning to a status of "REFUSED." As of the date of this report, it has been over six months since these applicants were left behind. A current medical exam is a requirement of a US visa, these exams have a six month term of validity. In the time that passed since the United States abandoned them, their medical exams have expired. The medical exam expiration is but one example of the numerous bureaucratic challenges faced by SIV applicants. These challenges remain the greatest obstacle to exfiltration that the United States can currently influence - i.e. the Taliban clearly control who can and cannot get on a plane in the country, but the United States controls how arduous the paperwork/task one needs to complete in order to qualify for a life saving visa.

## Major findings

SIV applicants left behind face tremendous risks of violence and substantial economic hardship. Their lives have been devastated by being left behind with seemingly no verifiable path to safety. In the six months since the evacuation, of those surveyed, **nearly 30% have been imprisoned by the Taliban at some point** and **52% have been stopped and questioned**. **Neary all have faced diminished economic opportunity** because of the evacuation with **88% reporting loss of job** and **94% reporting economic hardship**. **Over 70% reported going without food at least once in the last month – nearly 20% reported going without meals 10+ times in the last month.**


ASSOCIATION OF
AWA
WARTIME ALLIES



How many times in the last month have you had to skip meals because you didn't have / couldn't afford food?

**77% reported going without heat in the last month**. Fear has gripped the SIV population, with **84% reporting going without medical care due to angst about leaving the home and receiving reprisals from the Taliban**. Fueling this fear, **77% have witnessed some form of physical violence against others for their service to the United States.**

## Conclusion

It is hard to understate the dire situation our left behind Afghan allies face in Taliban held Afghanistan – statistics and numbers only illuminate so much. The stories behind the numbers define the true sentiment of the situation on the ground in Afghanistan. To quote one of the respondents:

> **"We are suffering the worse days of our life, I never go outside of my living area. I have [not] left my home since the Taliban took over the country... Some of my [family] has provided food and other necessities for me and my kids. I have faced economic hardship, I will not be able to [feed] my kids in near future, and I lost my job furthermore I cannot walk freely in the city/village because the Taliban will arrest me."**

Time is running out for this population. Only swift action by the United States – expedite their visas, remove bureaucratic obstacles like costly medical exams that expire before they can be of any use, fund charter flights, send US government flights to remove SIVs from Afghanistan, etc. – will ensure that these people are safe. The Association of Wartime Allies is proud to continue to serve the SIV applicants who remain left behind. Each of our members is someone who served the United States in some capacity. To us and those who served with them, they are no different than American born veterans – one's placement in the birth lottery is not important, what matters is what one does with their life. These people choose to serve their country and ours in partnership, knowing full well the deadly risks that service entailed. They did their part, now we must do ours. Thus far, we've left some 78,000+ behind. We cannot leave them behind in Taliban hell, to do so would be akin to abandoning a soldier on the battlefield. We can and must save them.



Appendix















| Selected Comments: Spelling and Grammar not adjusted to preserve record |
|---|
| There is always fear to visit town and i can not go back to my hometown after withdrawal of international forces from afganistan |
| I am hidden and life of me and my family extremely in danger due to my affiliation with US government. |
| Tackling financial issues for the past 1 year and my bank in Afghanistan has also freezed my account and all international transactions. The bank has been refusing to transfer my funds to Turkey stating they do not have funds until the USA unfreeze the Afghan assets |
| We are under house arrest, Our economic problems are increasing day by day. |
| Please Assist me! I am passing through the bad days of my life because of my faithful service with US in Afghanistan. I applied to SiV and my case was fortunately approved by the NVC and it was scheduled for the in the interview but due to the collapse it was cancelled.<br>I hope one day we can walk freely without fears,I hope one day we can go to shoping with kids with out fears,I hope one day we can speak freely without fears,I hope one day we can take our kids to school,I hope one day we can go to work with out fears.Being in hidden will kill us. |
| Taliban are looking after me they searched my house in Herat on 18 Nov 2021 I was hidden in Kabul then in 22 and 23 of Dec 2021 they came to my previous house asked about me the house owner called me that Taliban are looking after you I told them that he was tenant here he is not living here. I am hiding me somewhere with my family to safe my life and my family. |
| I am not safe in Afghanistan because of my employment with U.S. army as an interpreter |
| Since US has lifted Afghanistan I lost my job , and I can't live here because of working with USG me and my wife life is in danger ! |
| I and my family are stuck in Farah, Afghanistan in a very difficult situation, we need to leave here as soon as. please help and evacuate us from here. |
| Currently I live in a plastic tent, I left my home couple months a go due to home search by TBs, I went to Parwan but TBs ordered village elders to expulse outsiders from their village I came back to Kabul, I couldn't go back to my home and I didn't had that much budget to rent a house now I live in unbuild park inside a plastic tent, behind my friends wall. |
| We really need your help and support in this bed situation so please help as before to kill by Taliban |
| I am in hide I don't go any where all time at home scare to find by taliban |
| I have changed my locations many times, because our area was searched so many times where i was living, now i am some where else in Kabul.<br>I have been followed two three times and also been asked about my job but i did not have any evidence to find i worked for USG.<br>I have submitted all my documents to NVC for approval, i have worked as Interpreter for ███████ which is belong to ████████, I request to please consider my docoments so i can get my approval since i am waiting for more than 3 years.<br>My last job was An Advisor in Zabul province, i have LOR and HR from my direct Supervisor and Olive group. |
| I am now in living in severe psychological conditions, full of stress and depression. I am also in need of severe economic aid. |
| I am under serious threat because Taliban have been searching for those who have worked for the US government especially linguists, Taliban targets people who had affiliations with US government in an appropriate time and find different excuses for their killings and then make it Seems as they were not involved in the killings |
| Poverty and lack of job opertunties for me make me in bad situation. |
| I passed my interview in the U.S Embassy in kabul and |



I was wait for my medical. So as a result of my service and support for the USG mission in Afghanistan I have suffering and continues to suffer threat to me and my family's life by Taliban. Me and my children are really frightened for our life's and waiting in fear of our brutal killing by Taliban. I would like to humbly request you to please help us get out & save our lifes.

Dear sir, all my brothers served ISAF forces and we completely left our home in Helmand and its completely destroyed by the Talibans and just one of my brother made it to the US through siv programme .

We did what we could for you and U.S government. Now it is you, who decides on us. I wish you to make a fair decision.

I worked for Arizona Star Construction Company for two years as a cleaner. I wish that US do not forget us and do not left us behind. I served honestly for US for many years. Please don't leave us behind for God sake just save my three children.
Thank you

We are living in stress. Many time I was going to receive passport to my family. But I couldn't because the Taliban lash me.

The main point with my family is that my wife and tow sons are not having their passports..
You know in this situation it's not possible to arrange thier passports plz do something for us ...
There is no hope ...

I successfully passed my interview at the US Embassy in Kabul on 19-May-2021, and since I am waiting for a visa, When the Taliban capture Kabul
They warned me that we would kill you because you were a translator with the Americans. for this reason I leave my house and hide in the house of my relatives

When the Taliban took Control of Afghanistan, I lost my job. We were already in danger and I am under threat and I need your help to save my family.

I and my family are stuck in Farah, Afghanistan in a very difficult situation, we need to leave here as soon as. please help and evacuate us from here.

I am in bad situation right now no jobs no money even not for eat in my house. I am always worry about my life. I wish this message help me as soon as possible I wish to evacuate from here soon. Thanks a lot for your support.

I am a woman with three child and my hasband died in suicide attach by Taliban. I lost everything I had and my only hope is USA. Please help me!

I am a woman it is extremely hard for me to live afterward in Afghanistan because I have worked with USG as Translator, in these days TBs are killing womens who have worked before so I am waiting from the 6 months for my COM Approval but till that time to get my COM i know i will be killed so please I am kindly requesting of you to work on mu case and please send me my COM and please help me and save my life as I have three little kids pleaelse

I am in critical situation, i am changing my location every 30 days to protect ourselves from the Taliban target killing, I am three family members only, me with my wife and minor daughter, we don't have the places to protect ourselves correctly and don't have money to buy something for eat for my minor daughter or warm clothes for winter, this situation hit me pretty hard.

Target killing and Taliban retaliation against those who supported the US Mission is getting worse day by day

Due to my services for the U.S forces/Gov my Family and I are living in a terrible situation with fear and frustration. The Taliban are behind the U.S allies to find them, torture and kill them. We are going through a very difficult time. We are under Taliban direct threat and right now hiding somewhere in Kabul. Please help up, save our life and evacuate us from this terrible situation.

As of my jobs with USG I am feeling very scared to not lose my life, My every family mamber is in a bad and scary situation either I am changing my house every month still anyone knocking our door my kids are crying and telling me that Taliban will come and kill you. Hope you understand our situation.



# EXHIBIT C



# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>                              Plaintiffs,<br><br>v.<br><br>ANTHONY BLINKEN, *et al.*,<br><br>                              Defendants. | Case No. 1:18-cv-1388-TSC |

## <u>DECLARATION OF ERIC TERASHIMA</u>

1.      My name is Eric Terashima, Colonel, United States Marine Corps (Retired).  I am over eighteen (18) years of age. I have personal knowledge of the facts set forth in this declaration. If called upon, I would testify competently to the facts stated herein.

2.      I am providing this declaration in support of the Brief of Association of Wartime Allies ("AWA") and Veterans for American Ideals ("VFAI"), a project of Human Rights First, as Amicus Curiae in Support of Plaintiffs' Combined Opposition to Defendants' Motion for Relief from the Court's Orders and Cross-Motion to Enforce and Clarify the Court's Orders (Dkt. No. 168).

3.      I served in the United States Marine Corps for thirty (30) years with my last deployment being to Afghanistan.  I served as a Forward Operating Base ("FOB") Commander Afghanistan from 2019 to 2020.  During this time, there were around twenty (20) Afghans working and residing on my FOB twenty-four (24) hours a day.

4.      A few months prior to the United States evacuation from Afghanistan, one of my interpreters contacted me requesting help.  The United States Embassy in Kabul required $600.00 USD per person to receive medical clearance and his family lacked the sufficient funds and resources to pay for this expense.  I sent my interpreter $2,400.00 USD for his family of four (4) to fund their medical clearance process then launched a "GoFundMe" page to raise funds for future costs associated with the Special Immigrant Visa ("SIV") process.  Fortunately, a few weeks later, my former interpreter received his SIV.

5.      After two (2) frustrating, tiring days trying to book flights for my interpreter and his family to relocate to the United States, I was ultimately able to book them flights and coordinate their travel with a travel agent helping me through this process.  Once my former interpreter and his family arrived in the United States, I drove to Dallas, Texas from my home in North Carolina to welcome him and his family to the United States.

6.      I provided this same logistical and financial help assisting SIV applicants or those with approved SIVs several more times.  Then on August 31, 2021, following withdrawal of United States Armed Forces from Afghanistan, urgent efforts began to evacuate our Afghan allies left behind.

7.      An interpreter I worked with in Afghanistan tried to evacuate by going to the Hamid Karzai International Airport the day that the attack at Abbey Gate occurred.  I advised him to leave the airport and return to his place of residence approximately one (1) hour before the attack took place.  I have no idea how to help that interpreter receive his SIV.  But I have been financially supporting him since.

8.      Similar to many other Veterans, witnessing the withdrawal of the United States from Afghanistan and desperate evacuation efforts following, was nothing less than torturing.  During this time, my electronic mail was flooded every single day with desperate pleas for help from Afghans who served as our allies alongside United States and Coalition Forces in theater.  Unfortunately, I was unable to help any escape.  However, four (4) other Afghan interpreters and their families were ultimately evacuated.  I have provided them support and assistance throughout their SIV process.

9.      At this moment, I am staffing a multitude of requests from Afghans desperately in need of help.  However, I am myself unable provide these Afghans the support they urgently need.  It is extremely emotionally and mentally taxing to be met with pleas for help and have no way of providing aid to our Afghan allies, who are now in heightened peril solely by virtue of their assistance to the United States and its military operations.

10.      We promised these Afghan allies we would ensure they and their families would be protected and kept safe.  Unfortunately, we have instead abandoned them and their families amidst a humanitarian crisis in a country where an enemy force, the Taliban, hunts for them daily.  This is a matter of life or death for most SIV applicants.

11.      I have spent countless hours researching and networking to seek out resources that could provide guidance through this process, but to no avail I have found nothing meaningful.

12.      I firmly believe that providing an efficient, expeditious, and clear pathway to assist allies left behind in Afghanistan, by and through the SIV process, so they can find safety and security in the United States, can and will help Veterans and their mental health and wellness during this process.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July __1__, 2022.

ERIC TERASHIMA
COL, USMCR (RET.)
Email: ekt27617@msn.com

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED, | |
| Plaintiffs, | Case No. 1:18-cv-1388-TSC |
| v. | |
| ANTHONY BLINKEN, *et al.*, | |
| Defendants. | |

<u>**DECLARATION OF HANNA TRIPP**</u>

1.      My name is Hanna Tripp. I am over eighteen (18) years of age. I have personal knowledge of the facts set forth in this declaration.  If called upon, I would testify competently to the facts stated herein.

2.      I am providing this declaration in support of the Brief of Association of Wartime Allies ("AWA") and Veterans for American Ideals ("VFAI"), a project of Human Rights First, as Amicus Curiae in Support of Plaintiffs' Combined Opposition to Defendants' Motion for Relief from the Court's Orders and Cross-Motion to Enforce and Clarify the Court's Orders (Dkt. No. 168).

3.      I am currently the Director of Operations at the Afghan Medical Professionals Association of America—an organization that provides medical and mental healthcare for displaced Afghans.

4.      My prior, relevant experience entails serving in the United States Air Force from 2009 to 2014 as an AC-130 Aerial Gunner and C-5 Loadmaster; I was deployed to Iraq with multiple deployments to Afghanistan.  I have worked as a Veteran Caseworker for Congressman Seth Moulton (D-MA) and was a "The Mission Continues" fellow for Congressman Joseph P. Kennedy III (D-MA).  In a volunteer capacity, I am currently the Board Treasurer for the Greater Boston Veterans Collaborative.  I am also a Senior Policy Advisor with Minority Veterans of America.

5.      Since August 15, 2021, I have been involved in multiple efforts relating to the current humanitarian crisis in Afghanistan.  Among other initiatives, I directly coordinated evacuations and started up a pro-bono immigration clinic for Afghan refugees. Through this work, I have assisted in relocation efforts for over fifteen-hundred (1,500) Afghan refugees, and my organization has provided medical care to over five-hundred (500) Afghans.

6.      The Special Immigrant Visa ("SIV") process has proven to be extremely flawed. Veteran organizations and non-governmental organizations ("NGO") have flagged numerous issues during weekly stakeholder meetings that have been ignored or severely minimized by the Government.  These SIV-related failures entail extreme delays in processing, lost applications, little to no communication, and conflicting information.  These issues have yet to be improved upon over the last ten (10) months.

7.      In fact, it seems as if the United States has made it more difficult for our Afghan allies to reach safety by forcing applications to be processed overseas without expanding the capacity to do so, mandating health screenings, and enforcing stricter documentation.  The way in which the situation in Afghanistan has been addressed and handled starkly contrasts with the response to the Ukrainian crisis.

8.      These failures are elucidated through the suffering of just a single family I have been working with.  I met this family through a female SIV applicant who had requested medical assistance following a sexual assault instance at a Taliban checkpoint. Through her, I was introduced to her brother who was a post Chief of Mission ("COM") approval SIV applicant; we had to find a neurologist for him after he was severely tortured with electricity which led to seizures and significant cognitive issues.  The other member of this specific family is their sister who was eight (8) months into a high-risk pregnancy—she ultimately suffered a miscarriage.  However, this miscarriage could have prevented if she had access to the most rudimentary medical treatment and care.  This was not her only loss—her husband, another SIV pending applicant, was abducted by the Taliban and is now assumed dead.

9.      Not only has the currently flawed SIV application process posed many harms and risks to Afghan applicants themselves, but those, like myself, who have expended their time, energy, and efforts to assist these Afghans, have dealt with significant health and moral consequences.  All these consequences flow from having to unexpectedly take on the role of the Government making good on its promises to keep safe Afghan allies that served alongside United States and Coalition Forces in Afghanistan.

10.     Indeed, at the end of August 2021, I suffered a stroke as a result of working twenty (20) hours or longer each day to assist our Afghan allies.  During the stroke, I continued to work on ensuring that a widowed SIV holder and her family were able to safely board a plane.  Her daughter was hit by a United States tear gas grenade outside of the airport a day prior and was left critically injured suffering from third-degree burns.  Given the absence of efforts and support from the Government, I was making calls while simultaneously being wheeled into the Emergency Room from the ambulance—I continued these efforts up until the point I lost my ability to speak.  The next morning, I continued working from my hospital bed.  The last ten (10) months have been even more mentally taxing.

11.     With little guidance from the Government, Veterans, such as myself, have had to continuously make life or death decisions regarding who to prioritize given the constraints of time and resources.  Though I can say my efforts have undoubtedly saved lives, there have also been failures that will continue to haunt me—this should not be our burden to bear in the first place.

12.     As a result of stringent interpretation of the law and abysmal communications, Veterans, like myself, have been forced to notify SIV applicants that they will have to abandon and leave family members behind.  Further, without Government support, it is on Veterans to ensure that Afghans have food, shelter, and medicine—basic necessities—while they wait for the Government to process their application.  More often than not, we have to watch the people we care deeply about starve in real time while simultaneously listening to the Government downplay the suffering they are experiencing.  For me, this is a betrayal, if not criminally negligent, and it is unforgivable to attempt to silence the suffering of our Afghan allies to justify the inaction by the Government that we consistently bear witness to in the context of the SIV process.

13.     I work with Veterans daily both within and outside of Afghan resettlement efforts, and every single one has struggled with the consequences of abandoning those who are not only our allies but our friends and comrades in arms.

14.     Veterans and private citizens alike have upheld the promises made to our allies and the people of Afghanistan.  It is my sincere hope that our Nation finally lives up to its solemn responsibilities and promises related to the SIV process.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July  1 , 2022.

_____
HANNA TRIPP
Email:  hanna@ampaa.org

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED, | |
| Plaintiffs, | Case No. 1:18-cv-1388-TSC |
| v. | |
| ANTONY BLINKEN, *et al.*, | |
| Defendants. | |

---

## DECLARATION OF PETER LUCIER

1.      My name is Peter Lucier.  I am over eighteen (18) years of age. I have personal knowledge of the facts set forth in this declaration.  If called upon, I would testify competently to the facts stated herein.

2.      I am providing this declaration in support of the Brief of Association of Wartime Allies ("AWA") and Veterans for American Ideals ("VFAI"), a project of Human Rights First, as Amicus Curiae in Support of Plaintiffs' Combined Opposition to Defendants' Motion for Relief from the Court's Orders and Cross-Motion to Enforce and Clarify the Court's Orders (Dkt. No. 168).

3.      I served as an 0311 infantry rifleman in the United States Marine Corps from 2008 to 2013.  In 2011, I was deployed to Afghanistan with 1st Light Armored Reconnaissance Battalion.  After an honorable discharge from active service, I received my undergraduate degree from Montana State University, graduating with a Bachelor's in Arts in Political Science in 2018. Following one (1) year of service as a volunteer high school English teacher, I began law school at St. Louis University School of Law, where I graduated with a Juris Doctor degree in May 2022.

4.      I have been actively involved in Veteran issues since 2014 as an active member of Common Defense as well as serving on the Veteran Advisory Council of Everytown for Gun Safety.  I have written on Veteran issues, defense, national security, civil military relations, and moral injury for The New York Times, Washington Post, Foreign Policy Magazine, America Magazine, and other media outlets.

5.      Beginning in August of 2021, I became active in the nascent volunteer efforts to assist Afghans seeking safe passage from their home country after the Taliban overthrew the previous government of Afghanistan. Since the fall of Kabul, I have volunteered with Team America Relief ("TAR"), a fiscally sponsored not-for-profit organization at which I serve as the strategic partnerships team lead in addition to serving on their Advisory Board.

6.      TAR maintains a database of 16,000 families, totaling more than 70,000 Afghan individuals, who have registered for assistance in relocation.  Among those 16,000 families, there are more than 4,000 primary applicants for Special Immigrant Visas ("SIV"), which represent more than 15,000 individuals who would be eligible for Lawful Permanent Resident ("LPR") status in the United States as either primary applicants or derivatives.  In addition, more than 1,000 others have been identified as eligible for the SIV program as primary applicants, representing more than 4,000 additional total Afghan nationals who would be eligible for LPR status as either primary applicants or derivatives.

7.      I have also been active as a volunteer with AWA since January.  I met co-founder Kim Staffieri through the AfghanEvac coalition, an umbrella organization which brought together more than one-hundred eighty (180) organizations, such as TAR and AWA, to share real-time updates, facilitate critical information flows, and increase cross-organizational collaboration.

8.      My role at TAR increasingly required more than passing familiarity with the SIV process.  Ms. Staffieri and her team represent one of the greatest stores of institutional wisdom and experience anywhere in the United States when it comes to the frustrating, baffling, bewildering, and often capricious process to be issued a SIV.

9.      In the world of the SIV process and assisting others through such process, unfortunately, new obstacles arise every day.

10.     A recent example of the careless attitude toward the SIV process and its vulnerable applicants entails the United States Department of State website displaying incorrect information. An updated page on the website for Afghan SIV applicants contained and continues to contain outright misstatements of the law.  For example, the website stated on its main page, and in linked PDF COM instructions, that the statutory requirement for the length of service to qualify for an SIV was two (2) years instead of one (1).  Even though the main page has since been corrected, the linked PDF COM instructions are still incorrect. In addition, the State Department website still incorrectly states that there remains a "sensitive and trusted" service requirement for those SIVs who served on ISAF contracts.

11.     Before we can even begin to address the adjudicatory delays, it is evident to anyone who is familiar with the SIV program that this is an issue that Defendants do not take seriously. Publishing information without conducting basic fact-checking and spreading it to thousands of at-risk Afghans—who face persecution and starvation everyday—is an indication of the institutional callousness and disregard Defendants have for those who have applied for the SIV program.

12.     Yet another problem had manifested the morning after I became aware of the spread of misinformation on behalf of the Government.  Notice of action regarding a Chief of Mission ("COM") approval application now takes ten (10) to eleven (11) months at a minimum and often takes longer in reality.  Such delay has posed numerous problems for a specific applicant I have assisted.  The applicant had waited the egregiously long waiting time for a response just to have been wrongfully denied COM approval.  The denial was made on the basis that there was a lack of sufficient employment length, despite having provided a valid HR letter documenting more than one (1) year of service and citing the service on a United States contract that had lasted longer than one (1) year.  A brief investigation quickly highlighted the Government's mistake.  The adjudicator had only looked at the initial contract and saw a period of performance of less than one (1) year.  However, the contract had been modified and amended no less than six (6) times, and the total length of the contract was in excess of four (4) years. The modifications to the contract are easily visible on standard government contract databases. Yet an adjudicator had made a careless error, failed to take a few extra seconds to thoroughly investigate their own records, and as a result, issued a denial for an eligible candidate who had presented an otherwise perfected package.  As a result of that denial, it will now be another ten (10) to twelve (12) months, or more, before the SIV applicant's case can proceed.

13.     There is no room for careless errors, such as this one, as there is a food shortage in Afghanistan, the country faces famine, violence due to factions is one the rise, and those who have worked for the United States government are constantly targeted.  An additional twelve (12) months in Afghanistan can mean the death of an applicant, their spouse, or their children as is happening every day.

14.     Yet improper denials and inefficient, unorganized processing by the Government has continued.  Some SIV applicants are simply waiting and waiting just for an update on their case.  Some SIV applicants who applied in July 2021 have yet to receive an original notice from the National Visa Center that their application has been received despite many letters of inquiry.

15.     There are other SIV applicants who await notice from United States Citizenship and Immigration Services ("USCIS") regarding their Form I-360, Petition for Special Immigrant applications.  The system is so notoriously unreliable that, anecdotally, more than half of I-360 Petitioners will not even receive an automated response when they have submitted their Petition.

16.     Processing times have only increased, not decreased, since the fall of Kabul, contrary to Defendants' claims that they are improving the efficiency with which cases are processed.

17.     Adjudicatory delays not only seriously impact the health and wellness of Afghan applicants and their families; they also have a tremendous impact on the health and wellness of Veterans and servicemembers.

18.     During the period prior to the fall of Kabul in August 2021, and for the several months since, I have been in contact with hundreds of Veterans, all of them frantically attempting to assist those Afghans with whom they served.

19.     I have personal knowledge of fellow Marine Corps veterans who have invested a great deal of their personal time, talent, and treasure, to support Afghans who are suffering from long delay times.  The longer an applicant is pending COM approval, or awaiting the next phase in their immigration, the more money and effort a Veteran or servicemember must pour into supporting that applicant.  The end of support by a Veteran or servicemember could mean starvation or death to the applicant.

20.     These long adjudicatory delays wreak moral injury upon the souls of Afghan Veterans like myself, who are already deeply and irreparably wounded by our wartime experiences.  On television, we watched as the Afghan government we had fought and bled for, the same government which our comrades in arms had given their limbs for, the same government we missed our children's birthdays, holidays, and family time for, and for which some paid the ultimate sacrifice giving up their lives to protect, swiftly fell to the Taliban enemy.  I can personally attest to the incredible wounds, trauma, stress, and confusion this causes and its significant aggravation to the mental health and wellness of Veterans and servicemembers alike.

21.     For many Veterans, such as myself, saving our war time allies from persecution and death is the last act of honor left available to us.  Our efforts in war failed.  But our promises to those who served and labored alongside us need not fail.  However, in the effort, as stated, our last effort, we are failing.  As a country.  And Defendants, who seek relief from process they created yet now claim is unduly burdensome, continue to fail in their statutory duty, which would allow Veterans like myself to reclaim some shred of honor, all of which would ease the moral injury from which we uniquely suffer.

22.     By way of example, I recall a Marine Corps veteran who I know well.  The interpreter with whom he worked finally made it to the United States after more than four (4) years of trying to assist with his SIV application.  The applicant met all of the qualifications for a SIV.  Even so, processing delays, and improper denials, dragged the case on.  Eventually, only a few weeks ago, this interpreter was able to arrive in the United States.  However, he did not do so as an SIV applicant.  He was paroled in.  He still must wait at least months and likely years for his SIV application to process so that he can adjust status to achieve permanent immigration status in the United States.  The relief of the Veteran, and the Veteran's family, was great upon his interpreter's long-awaited arrival.  However, their relief is fleeting and only temporary, just like that interpreter's lawful immigration status in the United States.  The Veteran and his interpreter should never have had to wait so long for their reunion in the first place.

23.     I rarely sleep more than a few hours a night these days.  Too much of my own time is spent on this effort.  My own sense of duty to those left behind will not allow me to be at ease. The incredible toll this has taken on my career, my education, and my mental health  and wellbeing is great.  I am not alone.  The burden similarly rests upon so many Veterans and servicemembers like myself.  We know the truth.  The truth is that the undue burden is not one imposed by this Court on Defendants.  Instead, the undue burden is that which the Defendants have placed on Afghan applicants, as well as the Veteran and servicemember population, who are doing the job that Defendants have failed to do consistent with the express intent of Congress.  Defendants continue to fail to carry out our Legislature's statutory intent, and now seek relief from the

performance standards and reporting requirements, which are intended to remedy delays, and are designed to ensure prompt processing.  Without such relief as previously granted, applicants to the SIV program will continue to experience the types of harms I have described above – harms which are serious, and often life threatening. Defendants have continuously shown at best malfeasance in the performance of their duties in connection with SIVs and, at worst, a palpable unwillingness to provide accurate data and consistent reporting of the numbers to cast them in a more favorable light.

24.     It is my fervent hope that the Court, for the foregoing reasons, decline to grant the relief that Defendants seek.  Defendants have not met the burden of proof required to show cause for relief. Defendants have not taken even minimal measures to relieve the unwarranted and egregious delays in the SIV process.  Their failure to do so has had and will continue to have an ongoing deleterious effect on the life and welfare of both Afghan applicants, and Veterans and servicemembers such as myself.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 8, 2022.


/s/ *Peter Lucier*_____
PETER LUCIER
Email: peter@teamamericarelief.org

# EXHIBIT G

The Wayback Machine - https://web.archive.org/web/20220630011402/https://travel.state.gov/content/travel/en/u...

# Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government

For information about visa operations at Embassy Kabul, please visit: **https://af.usembassy.gov/visas/**

## Afghan SIV Program Update

The Emergency Security Supplemental Appropriations Act, 2021, as enacted on July 30, 2021, authorized 8,000 additional Special Immigrant Visas (SIVs) for Afghan principal applicants, for a total of 34,500 visas allocated since December 19, 2014. The Department of State's authority to issue SIVs to Afghan nationals under section 602(b) of the Afghan Allies Protection Act of 2009, as amended (the "Act"), will continue until all visa numbers allocated under the Act are issued.

**Important Notice: Transferring SIV Cases from Embassy Kabul to Another Post**

Operations at U.S. Embassy Kabul have been suspended since August 31, 2021.  We are unable to provide visa services, including visa interviews, in Afghanistan at this time.  Applicants with an approved I-360 petition, who are ready to schedule their SIV interview at a U.S. embassy or consulate outside Afghanistan, should reach out to NVC NVCSIV@state.gov to have their case transferred. Please do not request that your case be transferred to a country you will not be able to travel to. Please note that SIV interviews can only be transferred to U.S. embassies or consulates with immigrant visa processing capacity and that we cannot help you enter or obtain a visa for a third country.  Applicants still undergoing COM or I-360 processing do not need to transfer their case.

Your interview will be scheduled after you submit all required documents, making your case documentarily

required documents, making your case documentarily complete, and the receiving post has notified NVC they have interview capacity.  NVC will send you an email notification when your interview is scheduled. SIV interviews are  being prioritized by posts worldwide. However, interview wait times may vary post to post even for SIVs due to COVID-19 and other capacity limitations.

If you had an interview scheduled at Embassy Kabul and were unable to complete the interview due to the suspension of operations, you may email the nearest U.S. embassy or consulate with immigrant visa processing capacity that you are able to travel to and request an interview transfer. For contact information, please visit https://usembassy.gov. The response times may vary depending on the U.S. embassy or consulate. If you did not have an interview scheduled at Embassy Kabul, do not contact a U.S. embassy or consulate directly as they will be unable to transfer your interview.

---

Important Notice: Litigation Matter    

---

### Special Immigrant Visa Application Process

Overview

   Step 1 - Collect Chief of Mission Documents

   Step 2 - Scan Collected Documents

   Step 3 - Submit Documents

   Step 4 - Receive Decision

   Step 5 - Submit Petition

   Step 6 - NVC Processing

   Step 7 - Complete Online Visa Application (DS-260)

   Step 8 - Collect Documents

   Step 9 - Scan Collected Documents

**Step 10: Submit Documents**

**Step 11: Interview Steps**

**Step 12: Arrival in the United States**

**Quarterly Reports on Status of Afghan Program**

**References – U.S. Laws**

## Overview

A special immigrant is a person who qualifies for lawful permanent residence under one of several programs. Section 602(b) of the Afghan Allies Protection Act of 2009, as amended, is a special immigrant program, which authorizes the issuance of Special Immigrant Visas (SIVs) to Afghan nationals who meet certain requirements:

- have been employed in Afghanistan for a period of at least two years between October 7, 2001 and December 31, 2023
  - by, or on behalf of, the U.S. government; or
  - by the International Security Assistance Force (ISAF), or a successor mission (1) in a capacity that required you to serve as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a successor mission, or (2) to perform sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a successor mission;
- have provided faithful and valuable service to the U.S. government, or ISAF, or a successor mission, as applicable, which is documented in a positive letter of recommendation or evaluation from your senior supervisor or the person currently occupying that position, or a more senior person, if your senior supervisor has left the employer or has left Afghanistan; and
- have experienced or be experiencing an ongoing serious threat as a consequence of their employment.
- apply no later than December 31, 2023

apply no later than December 31, 2020.

For more information about the relevant U.S. laws, see
[References - U.S. Laws](#).

In addition to the information on this website, U.S.
Citizenship and Immigration Services (USCIS) has posted
on its website a fact sheet and information on [Form I-360](#)
petitions for this program.

This program is completely distinct from another program
authorizing SIVs for certain Iraqi and Afghan
translators/interpreters who worked directly with the United
States Armed Forces or under COM authority, although
some translators and interpreters may qualify under both
programs. For information on that program, see [Special
Immigrant Visas for Iraqi and Afghan
Translators/Interpreters](#).



**Important Notice: Project Rabbit
Assistance for SIV Applicants Employed
by DoD Contractors**

### Step 1 - Collect Chief of Mission Documents

After you review the requirements for this program, you
must collect the six (6) documents required to support your
application for this program. Review the detailed [Applicant
Guidelines for Chief of Mission Approval](#) for the required
documents. *Please do not submit anything other than what
is listed unless we ask you to do so.*

**Important Notice on Missing Documents:** If after reviewing
the FAQs and a required document is unavailable, you must
submit a detailed written explanation when you submit your
application. The Chief of Mission designee will review your
case.

[Back to Overview](#)

### STEP 2 - Scan Collected Documents

Once you have collected all the necessary documents, you
must scan and save them.

In order to scan your documents, you will need access to a computer and scanner or a smartphone with an internet connection. Note: If you choose to use a public computer, be sure to delete your scanned documents once you have finished uploading them.

In order to ensure your case does not experience delays in processing, follow these guidelines when scanning your documents:

Requirements:

**Single File Size and Type**

Acceptable file types include .pdf (preferred) .jpg, and .jpeg

Each individual file (scanned document) must be no larger than 4 MB (megabytes).

Scan your multiple page documents, such as your letter of recommendation, as one file. If the document size is more than 2 MB, compress the file.

"Zipped" files, modifiable PDFs, or password-protected files will not be accepted.

**Image Quality**

Your scans must:

Include the front and back side of any document that has stamps, seals, or writing on the back.



Include a certified translation of your tazkera with your original (i.e. foreign language) document in a single file.

Be clear, easily seen and read, and no parts of the document are cut off.




Oriented so it can be read across the screen without the need to rotate the document.



Most scanning programs offer a preview function so you can make sure the document is easily read. If you cannot read the scanned document, re-scan it at a higher resolution. Keep in mind this means the saved file will be larger and you may need to compress the file before you upload it.

## Compressing a File

Compression means saving your document in a smaller file size. This not only allows the file to take up less space on your hard drive but also means it can be uploaded or e-mailed much faster. However, not all file types are easily compressed. Most computer operating systems include an option to compress a file. This option is often found under "File" or "Save," or appears when you right-click on a file name in a navigation screen. Look on the "Help" tool in your computer operating system for more information on what is available to you.

There is also third-party compression software available, both at no cost and for purchase. Please remember, the Department of State cannot accept files that have been "zipped."

Once you have scanned your required documents, then continue to Step 3: Submit Documents.

Back to Step 1

**STEP 3 - Submit Documents**

After you have scanned all of the required documents, attach each scan to an email and send it to AfghanSIVApplication@state.gov. The email's subject line must contain the principal applicant's name as it is written in the passport or tazkera, plus the applicant's date of birth using the following format: DAY-MONTH-YEAR.

When you submit your application, you will receive an automatic response confirming the receipt.

Once NVC review your case, you will receive an email stating one of the following:



Corrections Required                              ⊕

Documentarily Complete                            ⊕

Back to Step 2

**Step 4 - Receive Decision**

Once the Chief of Mission designee has made a decision on your application, they will inform the NVC. The NVC will then notify you via email to the address you provided in your application.

You will receive an email with one of the following:



Back to Step 3

### Step 5 - Submit Petition

Once you receive your Chief of Mission Approval, you must submit the following package of documents directly to the U.S. Citizenship and Immigration Services (USCIS) Nebraska Service Center:

- A completed Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant. [NOTE: To be properly filed, the Form I-360 must include your original signature.]
- A copy of your passport or tazkera showing that you are a national of Afghanistan, along with a certified English translation, if the document is not in English.
- A copy of the letter of recommendation that you sent to NVC when you applied for Chief of Mission (COM) Approval.
- A copy of your Chief of Mission approval
- If you are in the United States when you file the petition, a copy of the front and back of your paper Form I-94, Arrival/Departure Record. If you entered the United States after the automation of Form I-94, and your Arrival/Departure Record was created electronically, you may obtain a paper Form I-94 at http://www.cbp.gov/travel/international-visitors/i-94-instructions.

To learn more about USCIS and to access forms and instructions, please click here.

Back to Step 4

**Step 6 - NVC Processing**

After USCIS approves your petition, they will transfer your case to the Department of State's National Visa Center (NVC). NVC will send you a Welcome Letter by e-mail. With the information in this letter, you can log in to our Consular Electronic Application Center (CEAC) to complete your Application for Immigrant Visa and Alien Registration (Form DS-260) and submit your supporting documents.

Once you submit forms and supporting documents to NVC, we will review your case to ensure you provided all the documentation required to schedule the immigrant visa interview. Interviews are based on the availability of appointments offered at the Embassy/Consulate. Operations at U.S. Embassy Kabul have been suspended since August 31, 2021.  We are unable to provide visa services, including visa interviews, in Afghanistan at this time

You must provide an email address to facilitate communication with NVC. You may contact NVC by email at NVCSIV@state.gov.

*Important Notice: Termination of Registration:*

Immigration and Nationality Act (INA) section 203(g) provides that the "Secretary of State shall terminate the registration (petition) of any alien who fails to apply for an immigrant visa within one year" of notice of visa availability. The petition may be reinstated if, within two years of notice of visa availability, the alien establishes that the "failure to apply was for reasons beyond the alien's control." Therefore, if you do not respond to notices from NVC within one year you risk termination of your petition under this section of law and would lose the benefits of that petition, such as your priority date.

If you believe that you have an approved petition, but you have not been contacted by NVC, or you have questions about your pending SIV case after the petition has been approved, please email NVC at NVCSIV@state.gov or call 1-603-334-0828 and provide your U.S. Citizenship and Immigration Services (USCIS) receipt number, full name, and date of birth. Customer Service Representatives at NVC are available from 7:30 a.m. to midnight (EST).

Back to Step 5

## Step 7 - Complete Online Visa Application (DS-260)

After receiving your NVC Welcome Letter, you and each
qualified family member immigrating with you must
complete the Application for Immigrant Visa and Alien
Registration (Form DS-260). You may wish to preview a
sample DS-260 (PDF - 13.9 MB) before beginning.

To complete your Application for Immigrant Visa and Alien
Registration, log into your case in CEAC and click the
'START NOW' under IV Application on your summary page.

Submitting Form DS-260 does not formally execute a visa
application. The visa application is not formally made until
the visa applicant(s) is interviewed by a U.S. consular
officer.

After submitting Form DS-260 online, you must print the
confirmation page and bring it to your interview. You can
print this from CEAC any time after you complete your DS-
260 application.

Back to Step 6

## Step 8 - Collect Documents

After you complete your DS-260(s), you and each family
member immigrating with you MUST collect the civil
documents required to support your visa application.

Your civil documents MUST be issued by the official issuing
authority in your country. Please refer to the Document
Finder to learn about the civil document requirements for
each country.

Please note that all documents not written in English, or in
the official language of the country from which you are
applying, must be accompanied by certified translations.
The translation must include a statement signed by the
translator stating that:

- The translation is accurate, and
- The translator is competent to translate.

Important Notice on Missing Documents: If a required

document is unavailable per the [country-specific guidelines](#), you do not need to scan the document into your CEAC. However, if you cannot obtain a required document for another reason, you must submit a detailed written explanation to NVC when you scan your other documents. During your visa interview, the consular officer will determine whether you must obtain the missing document before a visa can be issued. As a general rule, any document that is listed as "available" on the [country-specific guidelines](#) must be reviewed by a consular officer. Failure to obtain all required documents will delay your case.

- A copy of the biodata page from the passport of each applicant;
- Scanned copies of a birth certificate/tazkera for each applicant, and any other civil documents showing the relationship between you and your spouse and/or minor children (e.g. marriage (Nikah Khet) and divorce certificates, adoption decrees, etc.);
- Police certificates are **NOT** required if you are a resident of Afghanistan. However, if you have lived in a different country for more than 12 months since reaching the age of 16, then you must submit a police certificate from the authorities of that locality. See additional information how to obtain a [police certificate](#).
- A completed [Refugee Benefits Election Form (PDF - 364 KB)](#). Please refer to our [Frequently Asked Questions](#) for more information resettlement benefits;
- A completed [DS-0234, Special Immigrant Visa Biodata Form (PDF - 312 KB)](#) for each family member immigrating with you.

[Back to Step 7](#)

## Step 9: Scan Collected Documents

Once you have collected all the necessary documents, you must scan and save them.

In order to scan your documents, you will need access to a computer and scanner or a smartphone with an internet connection. Note: If you choose to use a public computer, be sure to delete your scanned documents once you have

7/7/22, 4:55 PM
Case 1:18-cv-01988-TSC-MAU Document 177 Filed 06/12/22 Page 78 of 127
Special Immigrant Visas for Afghans Who Were Employed by/on Behalf of the U.S. Government

be sure to delete your scanned documents once you have
finished uploading them.

In order to ensure your case does not experience delays in
processing, follow these guidelines when scanning your
documents:

Requirements:

**Single File Size and Type**

Acceptable file types include .pdf (preferred) .jpg, and .jpeg

Each individual file (scanned document) must be no larger
than 4 MB (megabytes).

Scan your multiple page documents, such as your letter of
recommendation, as one file. If the document size is more
than 2 MB, compress the file.

"Zipped" files, modifiable PDFs, or password-protected files
will not be accepted.

**Image Quality**

Your scans must:

Include the front and back side of any document that has
stamps, seals, or writing on the back.

 

Include a certified translation of your tazkera with your
original (i.e. non-English language) document in a single
file.

Be clear, easily seen and read, and no parts of the
document are cut off.





Oriented so it can be read across the screen without the need to rotate the document.



Most scanning programs offer a preview function so you can make sure the document is easily read. If you cannot read the scanned document, re-scan it at a higher resolution. Keep in mind this means the saved file will be larger and you may need to compress the file before you upload it.

### Compressing a File

Compression means saving your document in a smaller file size. This not only allows the file to take up less space on your hard drive but also means it can be uploaded or e-mailed much faster. However, not all file types are easily compressed. Most computer operating systems include an option to compress a file. This option is often found under "File" or "Save," or appears when you right-click on a file name in a navigation screen. Look on the "Help" tool in your computer operating system for more information on what is available to you.

There is also third-party compression software available, both at no cost and for purchase. Please remember, the Department of State cannot accept files that have been

"zipped."

## Step 10: Submit Documents

After you have scanned all of the required documents, attach each scan to an email and send it to NVCSIV@state.gov. The email's subject line must contain the case number provided on your Welcome Letter.

When you submit your application, you will receive an automatic response confirming the receipt.

Once NVC reviews your case, you will receive an email stating one of the following:

### Corrections Required

If NVC determines you did not submit the correct forms and/or documents, you will receive a notification requesting additional information and/or corrections to your documents. When you receive this email, follow the instructions to provide additional information or to correct documents.  Reply to the email at <u>NVCSIV@state.gov</u> with the new documents. Do not change the subject line of the email.

Please remember to follow the scanning requirements in Step 9 for your corrections.

**Important Notice on Missing Documents:** If you are unable to provide the NVC with the missing information requested, you must submit a detailed written explanation to the NVC. During your visa interview, the consular officer will determine whether you must obtain the missing document before a visa can be issued.

| Documentarily Complete |  |

## Step 11: Interview Steps

After the National Visa Center (NVC) schedules your visa interview appointment, they will send you an email noting the appointment date and time.  **After you receive an**

interview Appointment Letter from NVC, you must take the following steps BEFORE the interview date.

| | ALL +/— |
|---|---|
| Is a personal interview required? | ⊕ |
| If I am in Afghanistan, can my interview be conducted at the U.S. Embassy in Kabul? | ⊕ |
| May my family accompany me or follow to join me in the United States? | ⊕ |
| What happens if the principal applicant dies after approval of the petition? | ⊕ |
| What documents should I bring to the visa interview? | ⊕ |
| May an attorney or other representative accompany me to the visa interview? | ⊕ |
| Will the U.S. government pay the cost of my travel to the interview or provide | ⊕ |

accommodations at the interview site?

Can the U.S. Embassy arrange for my entry visas and guarantee admission to another country for my visa interview?   ⊕

Is there a visa application fee?   ⊕

Will I receive my visa on the same day as my interview?   ⊕

Is a medical examination required for SIV applicants?   ⊕

My question wasn't answered here. Where can I get more information about my pending visa?   ⊕

**Step 12: Arrival in the United States**

ALL **+**/**—**

As an Afghan Special Immigrant Visa (SIV) recipient, am I eligible for any benefits?   ⊕

How do I apply to receive these benefits?  ⊕

What are my resettlement options?  ⊕

How do I obtain a travel loan?  ⊕

What if I have to travel immediately and cannot arrange travel through the International Organization for Migration (IOM)?  ⊕

At what point can I begin to make travel arrangements, sell property, and/or give up my job?  ⊕

How will I know which agency is responsible for providing services to me in the U.S.?  ⊕

If I elect to receive refugee benefits, what help will I receive once I am in the U.S., and from whom?  ⊕

What if I already have a file with UNHCR or a UN number? What should I do? 

Are other benefits available to me, if I decline benefits from the Department of State? 

If admitted to the United States, do I get U.S. citizenship? If so, how long does it take? 

**Quarterly Reports on Status of Afghan Program**

2022

- Report of the Afghan SIV Program - January 2022 (PDF - 195 KB)

2021

- Report of the Afghan SIV Program - October 2021 (PDF - 138 KB)
- Report of the Afghan SIV Program - July 2021 (PDF - 151 KB)
- Report of the Afghan SIV Program - April 2021 (PDF - 183 KB)
- Report of the Afghan SIV Program- January 2021 (PDF - 265 KB)

2020

- Report of the Afghan SIV Program - October 2020 (PDF - 1.3 MB)
- Report of the Afghan SIV Program - July 2020 (PDF - 342 KB)
- Report of the Afghan SIV Program - April 2020 (PDF - 249 KB)
- Report of the Afghan SIV Program - January 2020

[Report of the Afghan SIV Program - January 2020](#)
(PDF - 123 KB)

## 2019

- [Report of the Afghan SIV Program - October 2019](#)
  (PDF - 1.3 MB)
- [Report of the Afghan SIV Program - July 2019](#) (PDF -
  309 KB)
- [Report of the Afghan SIV Program - April 2019](#) (PDF -
  308 KB)
- [Report of the Afghan SIV Program - January 2019](#)
  (PDF - 56 KB)

## 2018

- [Report of the Afghan SIV Program - October 2018](#)
  (PDF - 154 KB)
- [Report of the Afghan SIV Program - July 2018](#) (PDF -
  329 KB)
- [Report of the Afghan SIV Program - April 2018](#) (PDF -
  148 KB)
- [Report of the Afghan SIV Program - January 2018](#)
  (PDF - 256 KB)

## 2017

- [Report of the Afghan SIV Program - October 2017](#)
  (PDF - 207 KB)
- [Report of the Afghan SIV Program - July 2017](#) (PDF -
  100 KB)
- [Report of the Afghan SIV Program - April 2017](#) (PDF -
  119 KB)
- [Report of the Afghan SIV Program - January 2017](#)
  (PDF - 211 KB)

## 2016

- [Report of the Afghan SIV Program - October 2016](#)
  (PDF - 204 KB)
- [Report of the Afghan SIV Program - July 2016](#) (PDF -
  203 KB)
- [Report of the Afghan SIV Program -  April 2016](#) (PDF -
  133 KB)
- [Report of the Afghan SIV Program - January 2016](#)
  (PDF - 211 KB)

## 2015

- [Report of the Afghan SIV Program - October 2015](#) (PDF - 162 KB)
- [Report of the Afghan SIV Program - July 2015](#) (PDF - 131 KB)
- [Report of the Afghan SIV Program - April 2015](#) (PDF - 239 KB)
- [Report of the Afghan SIV Program - January 2015](#) (PDF - 213 KB)

### 2014

- [Report of the Afghan SIV Program - October 2014](#) (PDF - 212 KB)
- [Report of the Afghan SIV Program - July 2014](#) (PDF - 202 KB) (Sent to Congress December 2014)
- [Report of the Afghan SIV Program - April 2014](#) (PDF - 205 KB) (Sent to Congress July 2014)

### 2013

- [Report of the Afghan SIV Program-FY-2013](#) (PDF - 246 KB)

[Back to Top](#)

### References – U.S. Laws

The chart below contains a list of U.S. laws relevant to Special Immigrant Visas (SIVs) for eligible Iraqi or Afghan nationals who were employed by or on behalf of the U.S. government in Iraq or Afghanistan, respectively. You can find more detailed information about each of these laws by going to the [National Archives Office of the Federal Register](#) website.

| | Law: | Information about the Law: |
|---|---|---|
| | | This law, signed on July 30, 2021, amends the Afghan SIV program by adding 8,000 additional visas and extending the program through December 31, 2023. Congress also amended the requirements for employment that would qualify a principal alien under this |

| 1 | H.R. 3237, Emergency Supplemental Appropriations Act, 2021, Public Law 117-31 | a principal alien under this program, such that the required period of service is one year for all qualified applicants and removed the requirement for a principal alien under this program who was employed by ISAF or a successor mission to have performed "sensitive and trusted" activities for U.S. military personnel. The amendment also established that all steps of the SIV process, including the COM application process, must be completed within 9 months, with the exception of high-risk cases for which satisfaction of national security concerns requires additional time. The amendment also permitted written appeal of a COM denial more than 120 days after that denial at the discretion of the Secretary of State. The amendment also authorized the Secretary of State and the Secretary of Homeland Security to jointly issue a blanket one-year, extendable waiver of the medical exam requirement for Afghan SIVs prior to issuance of an immigrant visa or admission to the United States. Additionally, among other changes, the amendment provides for Afghan and Iraqi SIV eligibility for surviving spouses and children of Afghan and Iraqi principals who had submitted an applicant for COM approval prior to their death. |
| | Consolidated | This law, signed on December 27, 2020, amends the Afghan |

| 2 | Appropriations Act, 2021, Section 7076 of Pub. L. 116-260 | SIV program by adding 4,000 additional visas and extending the program through December 31, 2022. |
| 3 | National Defense Authorization Act for Fiscal Year 2021 (Div. A., Pub.L. 116-283), Section 1212(b) | This legislation, which became law on January 1, 2021, extends one of the reporting requirements of this program to January 31, 2023. |
| 4 | National Defense Authorization Act for FY 2020, Section 1219 of Pub. L. 116-92 | This law, signed on December 20, 2019, amends the Afghan SIV program by adding 4,000 additional visas and extending the program through December 31, 2021. Congress also amended the requirements for the type of employment that would qualify a principal alien under this program. Among other things, the NDAA for FY 2020 removed a previous requirement for a principal alien who was employed by or on behalf of the United States Government in Afghanistan to have performed "sensitive and trusted activities" for the United States Government in Afghanistan. |
| 5 | Consolidated Appropriations Act, 2019, Section 7076 of Pub. L. 116-6 | This law, signed on February 15, 2019, amends the Afghan SIV program by adding 4,000 additional visas, conditioned on the development and implementation of a prioritization process for Afghan special immigrant visas and the submission of three reports to the appropriate congressional committees. |
| 6 | John S. McCain National Defense Authorization Act for FY 2019, Section | This law, signed on August 13, 2018, amends the Department of State's reporting requirements and eliminated the requirement for a database |

| | | the requirement for a database of federal contractors in Afghanistan. |
|---|---|---|
| 7 | National Defense Authorization Act for FY 2018, Section 1213 of Public Law 115-91. | This law, signed on December 12, 2017, authorizes the issuance of 3,500 additional visas to Afghan principal applicants with no end date by which they must be issued. |
| 8 | Consolidated Appropriations Act for FY 2017, Section 7083 of Public Law 115-31 | This law, signed on May 5, 2017, authorizes the issuance of 2,500 additional visas to Afghan principal applicants with no end date by which they must be issued. |
| 9 | National Defense Authorization Act for FY 2017, Section 1214 of Public Law 114-326 | This law, signed on December 23, 2016, extends and amends the Afghan SIV Program.  It authorizes the issuance of 1,500 additional visas to principal applicants with no end date by which they must be issued.  It also extends the date by which applicants must apply for Chief of Mission approval from December 31, 2016 to December 31, 2020.  It amends eligibility for Afghans employed by or on behalf of the U.S. government who submit an application for Chief of Mission approval on or after December 23, 2016 to applicants whose employment required them to serve as an interpreter or translator for personnel of the Department of State or USAID; to serve as an interpreter or translator for U.S. military personnel; or to perform sensitive and trusted activities for the U.S. government. |
| | | This law, signed on November 25, 2015, extends and amends the Afghan SIV Program. It |

| 10 | National Defense Authorization Act for FY 2016, Section 1216 of Public Law 114-92 | authorizes the issuance of 3,000 additional visas to principal applicants with no end date by which they must be issued. It also extends the date by which applicants must apply for Chief of Mission approval from December 31, 2015 to December 31, 2016 and increases the required length of service from one year to two years between October 7, 2001 and December 31, 2016. It expands SIV program eligibility to certain Afghans who were employed by a successor mission to the International Security Assistance Force (ISAF). |
| 11 | National Defense Authorization Act for FY 2015, Section 1227 of Public Law 113-291 | This law, signed on December 19, 2014, extended the Afghan SIV Program. It authorized the issuance of 4,000 visas to principal applicants by September 30, 2016. It also extended the date by which applicants must apply for Chief of Mission approval from December 31, 2014 to December 31, 2015 and expanded SIV program eligibility to certain Afghans who were employed by the International Security Assistance Force (ISAF). |
| 12 | Emergency Afghan Allies Extension Act of 2014, Section 1 of Public Law 113-160 | This law, signed on August 8, 2014, extended the Afghan SIV Program. It authorized the issuance of 1,000 visas to principal applicants by December 31, 2014. It also extended the date by which applicants must apply for Chief of Mission approval from September 30, 2014 to |

| | | September 30, 2014 to December 31, 2014. |
|---|---|---|
| 13 | The Consolidated Appropriations Act, 2014, Section 7034(o) of Division K, Title VII of Public Law 113-76 | This law, signed on January 17, 2014, extended the Afghan SIV Program. It authorized the issuance of 3,000 visas to principal applicants in fiscal year (FY) 2014 and allowed that any unissued visas from FY 2014 be allocated to FY 2015. It also established that the employment period must have commenced on or after October 7, 2001 and been completed on or before December 31, 2014 and that applicants must apply for Chief of Mission approval no later than September 30, 2014. |
| 14 | The National Defense Authorization Act for Fiscal Year 2014, Section 1219 of Division A, Title XII, Subtitle B of Public Law 113-66 | This law included provisions for: consideration of a credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the U.S government, as a factor in a determination of whether an applicant has experienced or is experiencing an ongoing serious threat as a consequence of employment by the U.S. government; not more than one written appeal of a COM denial, within 120 days of receiving the denial letter; and representation during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative. |
| | | This law allowed up to 1,500 Afghan nationals who provided faithful and valuable service to the U.S. government, while |

| 15 | The Afghan Allies Protection Act of 2009, Section 602(b) of Division F, Title VI, of the Omnibus Appropriations Act, 2009, (Public Law 111-8) | employed by or on behalf of the U.S. government in Afghanistan after October 7, 2001, for not less than one year, and who have experienced or are experiencing an ongoing serious threat as a consequence of that employment, to receive special immigrant visas (SIVs) annually through FY 2013, with the allocation of any unused visas from FY 2013 to FY 2014. The period of qualifying employment was later extended under subsequent legislation. See law above. |
| --- | --- | --- |
| 16 | The Consolidated Appropriations Act, 2008 (Public Law 110-161 of December 26, 2007) | This law initially made Afghan and Iraqi SIV holders eligible for the same resettlement assistance, entitlement programs, and other benefits as refugees admitted under the U.S. Refugee Admissions Program for up to six (6) months from their date of admission or date of adjustment if applying domestically. The period of eligibility was later extended under subsequent legislation. See law below. |
| 17 | The Omnibus Appropriations Act, 2009 (Public Law 111-8 of March 10, 2009) | This law extended the period of eligibility of Afghan SIV holders for resettlement assistance, entitlement programs, and other benefits to up to eight (8) months from their date of admission or date of adjustment if applying domestically. For Afghan SIV holders already in the U.S. to be eligible for uninterrupted benefits for an additional two |

7/7/22, 4:55 PM
Case 1:18-cv-01388-TSC-MAU   Document 177   Filed 06/12/22   Page 93 of 127
Special Immigrant Visas for Afghans - Who Were Employed by/on behalf of the U.S. government

(2) months beyond the original six months (6) allowed under previous law, you must have been admitted to the U.S. on or after September 10, 2008, or if applying domestically, have a date of adjustment of September 10, 2008 or later.

Back to Top

The Wayback Machine - https://web.archive.org/web/20220707204526/https://travel.state.gov/content/travel/en/u...

# Special Immigrant Visas for Afghans - Who Were Employed by/on Behalf of the U.S. Government

For information about visa operations at Embassy Kabul, please visit: **https://af.usembassy.gov/visas/**

## Afghan SIV Program Update

The Emergency Security Supplemental Appropriations Act, 2021, as enacted on July 30, 2021, authorized 8,000 additional Special Immigrant Visas (SIVs) for Afghan principal applicants, for a total of 34,500 visas allocated since December 19, 2014. The Department of State's authority to issue SIVs to Afghan nationals under section 602(b) of the Afghan Allies Protection Act of 2009, as amended (the "Act"), will continue until all visa numbers allocated under the Act are issued.

**Important Notice: Transferring SIV Cases from Embassy Kabul to Another Post**

Operations at U.S. Embassy Kabul have been suspended since August 31, 2021.  We are unable to provide visa services, including visa interviews, in Afghanistan at this time.  Applicants with an approved I-360 petition, who are ready to schedule their SIV interview at a U.S. embassy or consulate outside Afghanistan, should reach out to NVC NVCSIV@state.gov to have their case transferred. Please do not request that your case be transferred to a country you will not be able to travel to. Please note that SIV interviews can only be transferred to U.S. embassies or consulates with immigrant visa processing capacity and that we cannot help you enter or obtain a visa for a third country.  Applicants still undergoing COM or I-360 processing do not need to transfer their case.

Your interview will be scheduled after you submit all required documents, making your case documentarily

required documents, making your case documentarily complete, and the receiving post has notified NVC they have interview capacity.  NVC will send you an email notification when your interview is scheduled. SIV interviews are  being prioritized by posts worldwide. However, interview wait times may vary post to post even for SIVs due to COVID-19 and other capacity limitations.

If you had an interview scheduled at Embassy Kabul and were unable to complete the interview due to the suspension of operations, you may email the nearest U.S. embassy or consulate with immigrant visa processing capacity that you are able to travel to and request an interview transfer. For contact information, please visit https://usembassy.gov. The response times may vary depending on the U.S. embassy or consulate. If you did not have an interview scheduled at Embassy Kabul, do not contact a U.S. embassy or consulate directly as they will be unable to transfer your interview.

| Important Notice: Litigation Matter |  |
|---|---|

## Special Immigrant Visa Application Process

Overview

Step 1 - Collect Chief of Mission Documents

Step 2 - Scan Collected Documents

Step 3 - Submit Documents

Step 4 - Receive Decision

Step 5 - Submit Petition

Step 6 - NVC Processing

Step 7 - Complete Online Visa Application (DS-260)

Step 8 - Collect Documents

Step 9 - Scan Collected Documents

[**Step 10: Submit Documents**](#)

[**Step 11: Interview Steps**](#)

[**Step 12: Arrival in the United States**](#)

[**Quarterly Reports on Status of Afghan Program**](#)

[**References – U.S. Laws**](#)

## Overview

A special immigrant is a person who qualifies for lawful permanent residence under one of several programs. Section 602(b) of the Afghan Allies Protection Act of 2009, as amended, is a special immigrant program, which authorizes the issuance of Special Immigrant Visas (SIVs) to Afghan nationals who meet certain requirements:

- have been employed in Afghanistan for a period of at least one year between October 7, 2001 and December 31, 2023
  - by, or on behalf of, the U.S. government; or
  - by the International Security Assistance Force (ISAF), or a [successor mission](#) (1) in a capacity that required you to serve as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF, or a [successor mission](#), or (2) to perform sensitive and trusted activities for U.S. military personnel stationed at ISAF, or a [successor mission](#);
- have provided faithful and valuable service to the U.S. government, or ISAF, or a [successor mission](#), as applicable, which is documented in a positive letter of recommendation or evaluation from your senior supervisor or the person currently occupying that position, or a more senior person, if your senior supervisor has left the employer or has left Afghanistan; and
- have experienced or be experiencing an ongoing serious threat as a consequence of their employment.
- apply no later than December 31, 2023

- apply no later than December 31, 2020.

For more information about the relevant U.S. laws, see
References - U.S. Laws.

In addition to the information on this website, U.S.
Citizenship and Immigration Services (USCIS) has posted
on its website a fact sheet and information on Form I-360
petitions for this program.

This program is completely distinct from another program
authorizing SIVs for certain Iraqi and Afghan
translators/interpreters who worked directly with the United
States Armed Forces or under COM authority, although
some translators and interpreters may qualify under both
programs. For information on that program, see Special
Immigrant Visas for Iraqi and Afghan
Translators/Interpreters.



Important Notice: Project Rabbit
Assistance for SIV Applicants Employed
by DoD Contractors

### Step 1 - Collect Chief of Mission Documents

After you review the requirements for this program, you
must collect the six (6) documents required to support your
application for this program. Review the detailed Applicant
Guidelines for Chief of Mission Approval for the required
documents. *Please do not submit anything other than what
is listed unless we ask you to do so.*

**Important Notice on Missing Documents:** If after reviewing
the FAQs and a required document is unavailable, you must
submit a detailed written explanation when you submit your
application. The Chief of Mission designee will review your
case.

Back to Overview

### STEP 2 - Scan Collected Documents

Once you have collected all the necessary documents, you
must scan and save them.

In order to scan your documents, you will need access to a computer and scanner or a smartphone with an internet connection. Note: If you choose to use a public computer, be sure to delete your scanned documents once you have finished uploading them.

In order to ensure your case does not experience delays in processing, follow these guidelines when scanning your documents:

Requirements:

**Single File Size and Type**

Acceptable file types include .pdf (preferred) .jpg, and .jpeg

Each individual file (scanned document) must be no larger than 4 MB (megabytes).

Scan your multiple page documents, such as your letter of recommendation, as one file. If the document size is more than 2 MB, compress the file.

"Zipped" files, modifiable PDFs, or password-protected files will not be accepted.

**Image Quality**

Your scans must:

Include the front and back side of any document that has stamps, seals, or writing on the back.

 

Include a certified translation of your tazkera with your original (i.e. foreign language) document in a single file.

Be clear, easily seen and read, and no parts of the document are cut off.

 

Oriented so it can be read across the screen without the need to rotate the document.



Most scanning programs offer a preview function so you can make sure the document is easily read. If you cannot read the scanned document, re-scan it at a higher resolution. Keep in mind this means the saved file will be larger and you may need to compress the file before you upload it.

## Compressing a File

Compression means saving your document in a smaller file size. This not only allows the file to take up less space on your hard drive but also means it can be uploaded or e-mailed much faster. However, not all file types are easily compressed. Most computer operating systems include an option to compress a file. This option is often found under "File" or "Save," or appears when you right-click on a file name in a navigation screen. Look on the "Help" tool in your computer operating system for more information on what is available to you.

There is also third-party compression software available, both at no cost and for purchase. Please remember, the Department of State cannot accept files that have been "zipped."

Once you have scanned your required documents, then continue to Step 3: Submit Documents.

Back to Step 1

**STEP 3 - Submit Documents**

After you have scanned all of the required documents, attach each scan to an email and send it to AfghanSIVApplication@state.gov. The email's subject line must contain the principal applicant's name as it is written in the passport or tazkera, plus the applicant's date of birth using the following format: DAY-MONTH-YEAR.

When you submit your application, you will receive an automatic response confirming the receipt.

Once NVC review your case, you will receive an email stating one of the following:



Back to Step 2

**Step 4 - Receive Decision**

Once the Chief of Mission designee has made a decision on your application, they will inform the NVC. The NVC will then notify you via email to the address you provided in your application.

You will receive an email with one of the following:



Back to Step 3

**Step 5 - Submit Petition**

Once you receive your Chief of Mission Approval, you must submit the following package of documents directly to the U.S. Citizenship and Immigration Services (USCIS) Nebraska Service Center:

- A completed Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant. [NOTE: To be properly filed, the Form I-360 must include your original signature.]
- A copy of your passport or tazkera showing that you are a national of Afghanistan, along with a certified English translation, if the document is not in English.
- A copy of the letter of recommendation that you sent to NVC when you applied for Chief of Mission (COM) Approval.
- A copy of your Chief of Mission approval
- If you are in the United States when you file the petition, a copy of the front and back of your paper Form I-94, Arrival/Departure Record. If you entered the United States after the automation of Form I-94, and your Arrival/Departure Record was created electronically, you may obtain a paper Form I-94 at http://www.cbp.gov/travel/international-visitors/i-94-instructions.

To learn more about USCIS and to access forms and instructions, please click here.

Back to Step 4

## Step 6 - NVC Processing

After USCIS approves your petition, they will transfer your case to the Department of State's National Visa Center (NVC). NVC will send you a Welcome Letter by e-mail. With the information in this letter, you can log in to our Consular Electronic Application Center (CEAC) to complete your Application for Immigrant Visa and Alien Registration (Form DS-260) and submit your supporting documents.

Once you submit forms and supporting documents to NVC, we will review your case to ensure you provided all the documentation required to schedule the immigrant visa interview. Interviews are based on the availability of appointments offered at the Embassy/Consulate. Operations at U.S. Embassy Kabul have been suspended since August 31, 2021.  We are unable to provide visa services, including visa interviews, in Afghanistan at this time

You must provide an email address to facilitate communication with NVC. You may contact NVC by email at NVCSIV@state.gov.

*Important Notice: Termination of Registration:*

Immigration and Nationality Act (INA) section 203(g) provides that the "Secretary of State shall terminate the registration (petition) of any alien who fails to apply for an immigrant visa within one year" of notice of visa availability. The petition may be reinstated if, within two years of notice of visa availability, the alien establishes that the "failure to apply was for reasons beyond the alien's control." Therefore, if you do not respond to notices from NVC within one year you risk termination of your petition under this section of law and would lose the benefits of that petition, such as your priority date.

If you believe that you have an approved petition, but you have not been contacted by NVC, or you have questions about your pending SIV case after the petition has been approved, please email NVC at NVCSIV@state.gov or call 1-603-334-0828 and provide your U.S. Citizenship and Immigration Services (USCIS) receipt number, full name, and date of birth. Customer Service Representatives at NVC are available from 7:30 a.m. to midnight (EST).

[Back to Step 5](#)

## Step 7 - Complete Online Visa Application (DS-260)

After receiving your NVC Welcome Letter, you and each qualified family member immigrating with you must complete the Application for Immigrant Visa and Alien Registration (Form DS-260). You may wish to preview a sample [DS-260 (PDF - 13.9 MB)](#) before beginning.

To complete your Application for Immigrant Visa and Alien Registration, log into your case in [CEAC](#) and click the 'START NOW' under IV Application on your summary page.

Submitting Form DS-260 does not formally execute a visa application. The visa application is not formally made until the visa applicant(s) is interviewed by a U.S. consular officer.

After submitting Form DS-260 online, you must print the confirmation page and bring it to your interview. You can print this from [CEAC](#) any time after you complete your DS-260 application.

[Back to Step 6](#)

## Step 8 - Collect Documents

After you complete your DS-260(s), you and each family member immigrating with you MUST collect the civil documents required to support your visa application.

Your civil documents MUST be issued by the official issuing authority in your country. Please refer to the [Document Finder](#) to learn about the civil document requirements for each country.

Please note that all documents not written in English, or in the official language of the country from which you are applying, must be accompanied by certified translations. The translation must include a statement signed by the translator stating that:

- The translation is accurate, and
- The translator is competent to translate.

Important Notice on Missing Documents: If a required

document is unavailable per the [country-specific guidelines](#), you do not need to scan the document into your CEAC. However, if you cannot obtain a required document for another reason, you must submit a detailed written explanation to NVC when you scan your other documents. During your visa interview, the consular officer will determine whether you must obtain the missing document before a visa can be issued. As a general rule, any document that is listed as "available" on the [country-specific guidelines](#) must be reviewed by a consular officer. Failure to obtain all required documents will delay your case.

- A copy of the biodata page from the passport of each applicant;
- Scanned copies of a birth certificate/tazkera for each applicant, and any other civil documents showing the relationship between you and your spouse and/or minor children (e.g. marriage (Nikah Khet) and divorce certificates, adoption decrees, etc.);
- Police certificates are **NOT** required if you are a resident of Afghanistan. However, if you have lived in a different country for more than 12 months since reaching the age of 16, then you must submit a police certificate from the authorities of that locality. See additional information how to obtain a [police certificate](#).
- A completed [Refugee Benefits Election Form (PDF - 364 KB)](#). Please refer to our [Frequently Asked Questions](#) for more information resettlement benefits;
- A completed [DS-0234, Special Immigrant Visa Biodata Form (PDF - 312 KB)](#) for each family member immigrating with you.

[Back to Step 7](#)

## Step 9: Scan Collected Documents

Once you have collected all the necessary documents, you must scan and save them.

In order to scan your documents, you will need access to a computer and scanner or a smartphone with an internet connection. Note: If you choose to use a public computer, be sure to delete your scanned documents once you have

be sure to delete your scanned documents once you have finished uploading them.

In order to ensure your case does not experience delays in processing, follow these guidelines when scanning your documents:

Requirements:

**Single File Size and Type**

Acceptable file types include .pdf (preferred) .jpg, and .jpeg

Each individual file (scanned document) must be no larger than 4 MB (megabytes).

Scan your multiple page documents, such as your letter of recommendation, as one file. If the document size is more than 2 MB, compress the file.

"Zipped" files, modifiable PDFs, or password-protected files will not be accepted.

**Image Quality**

Your scans must:

Include the front and back side of any document that has stamps, seals, or writing on the back.

 

Include a certified translation of your tazkera with your original (i.e. non-English language) document in a single file.

Be clear, easily seen and read, and no parts of the document are cut off.

 

 

Oriented so it can be read across the screen without the need to rotate the document.



Most scanning programs offer a preview function so you can make sure the document is easily read. If you cannot read the scanned document, re-scan it at a higher resolution. Keep in mind this means the saved file will be larger and you may need to compress the file before you upload it.

## Compressing a File

Compression means saving your document in a smaller file size. This not only allows the file to take up less space on your hard drive but also means it can be uploaded or e-mailed much faster. However, not all file types are easily compressed. Most computer operating systems include an option to compress a file. This option is often found under "File" or "Save," or appears when you right-click on a file name in a navigation screen. Look on the "Help" tool in your computer operating system for more information on what is available to you.

There is also third-party compression software available, both at no cost and for purchase. Please remember, the Department of State cannot accept files that have been

"zipped."

## Step 10: Submit Documents

After you have scanned all of the required documents, attach each scan to an email and send it to NVCSIV@state.gov. The email's subject line must contain the case number provided on your Welcome Letter.

When you submit your application, you will receive an automatic response confirming the receipt.

Once NVC reviews your case, you will receive an email stating one of the following:

### Corrections Required

If NVC determines you did not submit the correct forms and/or documents, you will receive a notification requesting additional information and/or corrections to your documents. When you receive this email, follow the instructions to provide additional information or to correct documents. Reply to the email at NVCSIV@state.gov with the new documents. Do not change the subject line of the email.

Please remember to follow the scanning requirements in Step 9 for your corrections.

**Important Notice on Missing Documents:** If you are unable to provide the NVC with the missing information requested, you must submit a detailed written explanation to the NVC. During your visa interview, the consular officer will determine whether you must obtain the missing document before a visa can be issued.

Documentarily Complete 

## Step 11: Interview Steps

After the National Visa Center (NVC) schedules your visa interview appointment, they will send you an email noting the appointment date and time.  **After you receive an**

interview Appointment Letter from NVC, you must take the following steps BEFORE the interview date.

ALL **+**/**—**

Is a personal interview required?   ⊕

If I am in Afghanistan, can my interview be conducted at the U.S. Embassy in Kabul?   ⊕

May my family accompany me or follow to join me in the United States?   ⊕

What happens if the principal applicant dies after approval of the petition?   ⊕

What documents should I bring to the visa interview?   ⊕

May an attorney or other representative accompany me to the visa interview?   ⊕

Will the U.S. government pay the cost of my travel to the interview or provide

accommodations at the interview site?

Can the U.S. Embassy arrange for my entry visas and guarantee admission to another country for my visa interview?      ⊕

Is there a visa application fee?      ⊕

Will I receive my visa on the same day as my interview?      ⊕

Is a medical examination required for SIV applicants?      ⊕

My question wasn't answered here. Where can I get more information about my pending visa?      ⊕

**Step 12: Arrival in the United States**

ALL +/—

As an Afghan Special Immigrant Visa (SIV) recipient, am I eligible for any benefits?      ⊕

How do I apply to receive these benefits?    ⊕

What are my resettlement options?    ⊕

How do I obtain a travel loan?    ⊕

What if I have to travel immediately and cannot arrange travel through the International Organization for Migration (IOM)?    ⊕

At what point can I begin to make travel arrangements, sell property, and/or give up my job?    ⊕

How will I know which agency is responsible for providing services to me in the U.S.?    ⊕

If I elect to receive refugee benefits, what help will I receive once I am in the U.S., and from whom?    ⊕

What if I already have a file with UNHCR or a UN number? What should I do? 

Are other benefits available to me, if I decline benefits from the Department of State? 

If admitted to the United States, do I get U.S. citizenship? If so, how long does it take? 

**Quarterly Reports on Status of Afghan Program**

2022

- [Report of the Afghan SIV Program - January 2022](#) (PDF - 195 KB)

2021

- [Report of the Afghan SIV Program - October 2021](#) (PDF - 138 KB)
- [Report of the Afghan SIV Program - July 2021](#) (PDF - 151 KB)
- [Report of the Afghan SIV Program - April 2021](#) (PDF - 183 KB)
- [Report of the Afghan SIV Program- January 2021](#) (PDF - 265 KB)

2020

- [Report of the Afghan SIV Program - October 2020](#) (PDF - 1.3 MB)
- [Report of the Afghan SIV Program - July 2020](#) (PDF - 342 KB)
- [Report of the Afghan SIV Program - April 2020](#) (PDF - 249 KB)
- [Report of the Afghan SIV Program - January 2020](#)

(PDF - 123 KB)

## 2019

- [Report of the Afghan SIV Program - October 2019](#)
  (PDF - 1.3 MB)
- [Report of the Afghan SIV Program - July 2019](#) (PDF - 309 KB)
- [Report of the Afghan SIV Program - April 2019](#) (PDF - 308 KB)
- [Report of the Afghan SIV Program - January 2019](#) (PDF - 56 KB)

## 2018

- [Report of the Afghan SIV Program - October 2018](#) (PDF - 154 KB)
- [Report of the Afghan SIV Program - July 2018](#) (PDF - 329 KB)
- [Report of the Afghan SIV Program - April 2018](#) (PDF - 148 KB)
- [Report of the Afghan SIV Program - January 2018](#) (PDF - 256 KB)

## 2017

- [Report of the Afghan SIV Program - October 2017](#) (PDF - 207 KB)
- [Report of the Afghan SIV Program - July 2017](#) (PDF - 100 KB)
- [Report of the Afghan SIV Program - April 2017](#) (PDF - 119 KB)
- [Report of the Afghan SIV Program - January 2017](#) (PDF - 211 KB)

## 2016

- [Report of the Afghan SIV Program - October 2016](#) (PDF - 204 KB)
- [Report of the Afghan SIV Program - July 2016](#) (PDF - 203 KB)
- [Report of the Afghan SIV Program -  April 2016](#) (PDF - 133 KB)
- [Report of the Afghan SIV Program - January 2016](#) (PDF - 211 KB)

## 2015

- [Report of the Afghan SIV Program - October 2015](#) (PDF - 162 KB)
- [Report of the Afghan SIV Program - July 2015](#) (PDF - 131 KB)
- [Report of the Afghan SIV Program - April 2015](#) (PDF - 239 KB)
- [Report of the Afghan SIV Program - January 2015](#) (PDF - 213 KB)

### 2014

- [Report of the Afghan SIV Program - October 2014](#) (PDF - 212 KB)
- [Report of the Afghan SIV Program - July 2014](#) (PDF - 202 KB) (Sent to Congress December 2014)
- [Report of the Afghan SIV Program - April 2014](#) (PDF - 205 KB) (Sent to Congress July 2014)

### 2013

- [Report of the Afghan SIV Program-FY-2013](#) (PDF - 246 KB)

[Back to Top](#)

### References – U.S. Laws

The chart below contains a list of U.S. laws relevant to Special Immigrant Visas (SIVs) for eligible Iraqi or Afghan nationals who were employed by or on behalf of the U.S. government in Iraq or Afghanistan, respectively. You can find more detailed information about each of these laws by going to the [National Archives Office of the Federal Register](#) website.

| | Law: | Information about the Law: |
|---|---|---|
| | | This law, signed on July 30, 2021, amends the Afghan SIV program by adding 8,000 additional visas and extending the program through December 31, 2023. Congress also amended the requirements for employment that would qualify a principal alien under this |

| | | |
|---|---|---|
| | | a principal alien under this program, such that the required period of service is one year for all qualified applicants and removed the requirement for a principal alien under this program who was employed by ISAF or a successor mission to have performed "sensitive and trusted" activities for U.S. military personnel. The amendment also established that all steps of the SIV process, including the COM application process, must be completed within 9 months, with the exception of high-risk cases for which satisfaction of national security concerns requires additional time. The amendment also permitted written appeal of a COM denial more than 120 days after that denial at the discretion of the Secretary of State. The amendment also authorized the Secretary of State and the Secretary of Homeland Security to jointly issue a blanket one-year, extendable waiver of the medical exam requirement for Afghan SIVs prior to issuance of an immigrant visa or admission to the United States. Additionally, among other changes, the amendment provides for Afghan and Iraqi SIV eligibility for surviving spouses and children of Afghan and Iraqi principals who had submitted an applicant for COM approval prior to their death. |
| 1 | H.R. 3237, Emergency Supplemental Appropriations Act, 2021, Public Law 117-31 | |
| | Consolidated | This law, signed on December 27, 2020, amends the Afghan |

| | | |
|---|---|---|
| 2 | Appropriations Act, 2021, Section 7076 of Pub. L. 116-260 | SIV program by adding 4,000 additional visas and extending the program through December 31, 2022. |
| 3 | National Defense Authorization Act for Fiscal Year 2021 (Div. A., Pub.L. 116-283), Section 1212(b) | This legislation, which became law on January 1, 2021, extends one of the reporting requirements of this program to January 31, 2023. |
| 4 | National Defense Authorization Act for FY 2020, Section 1219 of Pub. L. 116-92 | This law, signed on December 20, 2019, amends the Afghan SIV program by adding 4,000 additional visas and extending the program through December 31, 2021. Congress also amended the requirements for the type of employment that would qualify a principal alien under this program. Among other things, the NDAA for FY 2020 removed a previous requirement for a principal alien who was employed by or on behalf of the United States Government in Afghanistan to have performed "sensitive and trusted activities" for the United States Government in Afghanistan. |
| 5 | Consolidated Appropriations Act, 2019, Section 7076 of Pub. L. 116-6 | This law, signed on February 15, 2019, amends the Afghan SIV program by adding 4,000 additional visas, conditioned on the development and implementation of a prioritization process for Afghan special immigrant visas and the submission of three reports to the appropriate congressional committees. |
| 6 | John S. McCain National Defense Authorization Act for FY 2019, Section | This law, signed on August 13, 2018, amends the Department of State's reporting requirements and eliminated the requirement for a database |

| | 1222 of Pub. L. 115-232 | the requirement for a database of federal contractors in Afghanistan. |
|---|---|---|
| 7 | National Defense Authorization Act for FY 2018, Section 1213 of Public Law 115-91. | This law, signed on December 12, 2017, authorizes the issuance of 3,500 additional visas to Afghan principal applicants with no end date by which they must be issued. |
| 8 | Consolidated Appropriations Act for FY 2017, Section 7083 of Public Law 115-31 | This law, signed on May 5, 2017, authorizes the issuance of 2,500 additional visas to Afghan principal applicants with no end date by which they must be issued. |
| 9 | National Defense Authorization Act for FY 2017, Section 1214 of Public Law 114-326 | This law, signed on December 23, 2016, extends and amends the Afghan SIV Program. It authorizes the issuance of 1,500 additional visas to principal applicants with no end date by which they must be issued. It also extends the date by which applicants must apply for Chief of Mission approval from December 31, 2016 to December 31, 2020. It amends eligibility for Afghans employed by or on behalf of the U.S. government who submit an application for Chief of Mission approval on or after December 23, 2016 to applicants whose employment required them to serve as an interpreter or translator for personnel of the Department of State or USAID; to serve as an interpreter or translator for U.S. military personnel; or to perform sensitive and trusted activities for the U.S. government. |
| | | This law, signed on November 25, 2015, extends and amends the Afghan SIV Program. It |

| 10 | National Defense Authorization Act for FY 2016, Section 1216 of Public Law 114-92 | authorizes the issuance of 3,000 additional visas to principal applicants with no end date by which they must be issued. It also extends the date by which applicants must apply for Chief of Mission approval from December 31, 2015 to December 31, 2016 and increases the required length of service from one year to two years between October 7, 2001 and December 31, 2016. It expands SIV program eligibility to certain Afghans who were employed by a successor mission to the International Security Assistance Force (ISAF). |
| 11 | National Defense Authorization Act for FY 2015, Section 1227 of Public Law 113-291 | This law, signed on December 19, 2014, extended the Afghan SIV Program. It authorized the issuance of 4,000 visas to principal applicants by September 30, 2016. It also extended the date by which applicants must apply for Chief of Mission approval from December 31, 2014 to December 31, 2015 and expanded SIV program eligibility to certain Afghans who were employed by the International Security Assistance Force (ISAF). |
| 12 | Emergency Afghan Allies Extension Act of 2014, Section 1 of Public Law 113-160 | This law, signed on August 8, 2014, extended the Afghan SIV Program. It authorized the issuance of 1,000 visas to principal applicants by December 31, 2014. It also extended the date by which applicants must apply for Chief of Mission approval from September 30, 2014 to |

| | | September 30, 2014 to December 31, 2014. |
|---|---|---|
| 13 | The Consolidated Appropriations Act, 2014, Section 7034(o) of Division K, Title VII of Public Law 113-76 | This law, signed on January 17, 2014, extended the Afghan SIV Program. It authorized the issuance of 3,000 visas to principal applicants in fiscal year (FY) 2014 and allowed that any unissued visas from FY 2014 be allocated to FY 2015. It also established that the employment period must have commenced on or after October 7, 2001 and been completed on or before December 31, 2014 and that applicants must apply for Chief of Mission approval no later than September 30, 2014. |
| 14 | The National Defense Authorization Act for Fiscal Year 2014, Section 1219 of Division A, Title XII, Subtitle B of Public Law 113-66 | This law included provisions for: consideration of a credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the U.S government, as a factor in a determination of whether an applicant has experienced or is experiencing an ongoing serious threat as a consequence of employment by the U.S. government; not more than one written appeal of a COM denial, within 120 days of receiving the denial letter; and representation during the application process, including at relevant interviews and examinations, by an attorney or other accredited representative. |
| | | This law allowed up to 1,500 Afghan nationals who provided faithful and valuable service to the U.S. government, while |

| 15 | The Afghan Allies Protection Act of 2009, Section 602(b) of Division F, Title VI, of the Omnibus Appropriations Act, 2009, (Public Law 111-8) | employed by or on behalf of the U.S. government in Afghanistan after October 7, 2001, for not less than one year, and who have experienced or are experiencing an ongoing serious threat as a consequence of that employment, to receive special immigrant visas (SIVs) annually through FY 2013, with the allocation of any unused visas from FY 2013 to FY 2014. The period of qualifying employment was later extended under subsequent legislation. See law above. |
| 16 | The Consolidated Appropriations Act, 2008 (Public Law 110-161 of December 26, 2007) | This law initially made Afghan and Iraqi SIV holders eligible for the same resettlement assistance, entitlement programs, and other benefits as refugees admitted under the U.S. Refugee Admissions Program for up to six (6) months from their date of admission or date of adjustment if applying domestically. The period of eligibility was later extended under subsequent legislation. See law below. |
| 17 | The Omnibus Appropriations Act, 2009 (Public Law 111-8 of March 10, 2009) | This law extended the period of eligibility of Afghan SIV holders for resettlement assistance, entitlement programs, and other benefits to up to eight (8) months from their date of admission or date of adjustment if applying domestically. For Afghan SIV holders already in the U.S. to be eligible for uninterrupted benefits for an additional two |

| | | (2) months beyond the original six months (6) allowed under previous law, you must have been admitted to the U.S. on or after September 10, 2008, or if applying domestically, have a date of adjustment of September 10, 2008 or later. |

Back to Top

# HOW TO APPLY FOR CHIEF OF MISSION APPROVAL

### Special Immigrant Visa Program for Afghan Nationals
### Embassy of the United States of America – Kabul, Afghanistan

## GENERAL GUIDELINES

To apply for Chief of Mission (COM) approval for the Special Immigrant Visa (SIV) program, you must have access to email; have the ability to scan and save all of the required documents from the list as PDF files; and be able to submit these documents via email.

After you have gathered all of the required documents listed below, attach them to an email and send it to AfghanSIVApplication@state.gov. The email's subject line must contain the principal applicant's name as it is written in the passport or tazkera, plus the applicant's date of birth using the following format: DAY-MONTH-YEAR.

Do not include family member information in the subject line of your email.

We will send all communication and instructions related to this application to you via email. We recommend that you use the same email address to correspond with us throughout the process.

## REQUIRED DOCUMENTS

Applicants must submit the below six (6) items in their document package. *Please do not submit anything other than what is listed below unless we ask you to do so.* Specifically, do not submit photographs, certificates of appreciation, training certificates, resumes, or academic transcripts. These documents have no bearing on your COM approval application and will not be considered.

Failure to submit all of the required documentation <u>exactly</u> as requested below may significantly delay review of your application for COM approval. While this list specifies the documents required of all applicants, we may request additional information and documentation should questions arise during processing.

## 1.  Verification of Employment in Afghanistan

*A) If you were employed by or on behalf of the U.S. government:*

You must submit a letter from your employer's Human Resources (HR) department confirming that you were employed by, or on behalf of, the U.S. government in Afghanistan between October 7, 2001, and December 31, 2022, for at least two years.

The letter must contain all of the information below:

- ☐ Your full name.
- ☐ Your date of birth.

☐ Information on the U.S. government contract or subcontract held by your employer, if applicable. This should include project name; contract number; the period of performance of the contract; and the name of the prime contractor.  If available, a copy of the contract between your employer and the U.S. government or a copy of the subcontract between your employer and the company that maintains a contract with the U.S. government should be provided.

☐ Your job title.

☐ Your job location.

☐ The date you started working for the employer (DD-MM-YYYY).

☐ The date you stopped working for the employer (DD-MM-YYYY).

☐ The reason for separation if you are no longer employed.

☐ The name of the author completing the letter, his or her signature, and his or her contact information including corporate email (or alternate email if no longer with the organization).

☐ A thorough description of your work duties and the location where you performed those duties. If applicable, this should include an explanation of how your position required you to:

    o Serve as an interpreter or translator for personnel of the Department of State or the United States Agency for International Development in Afghanistan, particularly if it included duties that required traveling away from the embassy with such personnel;

    o Serve as an interpreter or translator for U.S. military personnel in Afghanistan, particularly if this work required traveling off-base; or

**B) *If you were employed by the International Security Assistance Force (ISAF), or a successor mission:***

You must submit a letter from your employer confirming that you were employed by ISAF, or a successor mission, between October 7, 2001, and December 31, 2022, for at least two years. If you were directly hired by ISAF, or a successor mission, this letter must be from ISAF Headquarters HR, or the successor mission HR, regardless of where you were stationed in Afghanistan. If you were hired by an ISAF member nation, or a successor mission member nation, this letter must come from the department or agency that hired you. **Note:** *Private contractors and subcontractors with ISAF or a successor mission or member nations other than the United States do NOT qualify.*

The letter must contain all of the information below:

☐ Your full name.

☐ Your date of birth.

☐ An English language copy (or English translation) of the contract between you and your employer. If you were hired on a personal services agreement (PSA) or a personal services contract (PSC), you must submit an English language copy of the agreement or contract.

☐ Your job title.

☐ Your job location.

☐ The date you started working for ISAF, or a successor mission (DD-MM-YYYY).

☐ The date you stopped working for ISAF, or a successor mission (DD-MM-YYYY).

- ❑ The reason for separation if you are no longer employed.
- ❑ The name of the HR representative completing the HR letter, his or her signature, and his or her contact information including corporate email (or alternate email if no longer with the organization).
- ❑ A description of your work duties. If applicable, this should include how your position required you to:
  - Serve as an interpreter or translator for U.S. military personnel while traveling off-base with U.S. military personnel stationed at ISAF or a successor mission, or

## 2. Letter of Recommendation

### A) If you were employed by or on behalf of the U.S. government:

You must submit a letter from a direct U.S. citizen supervisor who knew you personally. The supervisory period should overlap with the period of employment noted in your employment letter. The letter should be dated and signed by your supervisor. It must contain all of the information below:

- ❑ Your full name.
- ❑ Your date of birth.
- ❑ Your badge number (if available).
- ❑ Your job title.
- ❑ Your job location.
- ❑ Confirmation that the recommender was/is your supervisor and knew you personally.
- ❑ The date the author of the letter began supervising you (DD-MM-YYYY).
- ❑ The date the author of the letter stopped supervising you (DD-MM-YYYY).
- ❑ The supervisor's name, title, corporate or U.S. government/military email address and personal email address.
- ❑ Justification for recommending you for COM approval, i.e., that you provided faithful and valuable service to the U.S. government.
- ❑ The supervisor's explanation of any ongoing serious threat you have experienced or are experiencing as a consequence of your employment by or on behalf of the U.S. government.
- ❑ The supervisor's opinion on whether you pose a threat to the national security or safety of the United States.
- ❑ The supervisor's description of your work duties. This statement should be personalized to the specific duties you performed, including a description of where you performed those duties. If applicable, your supervisor should also address how your position required you to:
  - o Serve as an interpreter or translator for personnel of the Department of State or the United States Agency for International Development in Afghanistan, particularly if those duties required traveling away from the embassy with such personnel;
  - o Serve as an interpreter or translator for U.S. military personnel in Afghanistan, particularly if those duties required traveling off-base; or

If the above recommendation is not possible to obtain from a U.S. citizen supervisor who knows you personally, you should provide a letter of recommendation signed by your non-U.S. citizen supervisor and co-signed by the U.S. citizen who is responsible for the contract. The U.S. citizen who co-signs must indicate that, based on his or her relationship with your contract or sub-contract supervisor, he or she is confident that the information provided is correct. The U.S. citizen co-signer must also certify that, to the best of his or her knowledge, you present no threat to the national security or safety of the United States.  The recommendation must contain the U.S. citizen co-signer's work and personal email address so he or she may be contacted if additional information is needed.

***B)  If you were employed by the International Security Assistance Force (ISAF), or a successor mission:***

You must submit a letter from a member of the U.S. military who personally supervised you. The letter should be dated and signed. It must contain all of the information below:

- ☐ Your full name.
- ☐ Your date of birth.
- ☐ Your badge number (if available).
- ☐ Your job title.
- ☐ Your job location.
- ☐ The date the author of the letter began supervising you (DD-MM-YYYY).
- ☐ The date the author of the letter stopped supervising you (DD-MM-YYYY).
- ☐ The supervisor's name, title, rank, U.S. government/military email address, and personal email address.
- ☐ Justification for recommending you for COM approval, i.e., that you provided faithful and valuable service to the U.S. government.
- ☐ The supervisor's explanation of any ongoing serious threat you have experienced or are experiencing as a consequence of your employment by ISAF or a successor mission.
- ☐ The supervisor's opinion on whether you pose a threat to the national security or safety of the United States.
- ☐ The supervisor's description of your work duties, including, if applicable, how your position required you to:
  - o Serve as an interpreter or translator for U.S. military personnel in Afghanistan while traveling off-base; or

### 3.  Form DS-157, Supplemental Nonimmigrant Visa Application

The form is available online at https://eforms.state.gov/Forms/ds157.pdf. You must complete the entire form. It is important that you follow the instructions at the bottom of this page when completing the DS-157.

**4.  Evidence of Afghan Nationality**

You must submit a scanned photocopy of your tazkera <u>with an English translation</u>. Alternatively, the biographic data page of your Afghan passport is acceptable evidence of Afghan nationality.

**5.  Statement of Threats Received as a Consequence of Your Employment**

You must write, sign, and date a brief statement describing the threat you face or have faced as a result of your employment by or on behalf of the U.S. government in Afghanistan or by ISAF or a successor mission.  Although statements provided by other parties may be included, you <u>must</u> provide your own statement.  Please provide as many details as possible.

Section 1219 of Public Law 113-66 provides that a credible sworn statement depicting dangerous country conditions, together with official evidence of such country conditions from the U.S. government, should be considered as a factor in a determination of whether an applicant has experienced or is experiencing an ongoing serious threat as a consequence of employment by the U.S. government.

**6.  Employee Badge(s)**

If available, submit a scanned copy of any identification badges you have held during any periods of employment by or on behalf of the U.S. government, or by ISAF or a successor mission.

**NEXT STEPS AND QUESTIONS**

Once you have submitted your complete COM approval application packet via email to AfghanSIVApplication@state.gov, please allow up to eight (8) weeks for a response confirming that the National Visa Center (NVC) has received your documents. Once NVC reviews your COM approval application packet, we will let you know if anything is missing or incomplete.

If you have further questions about the Afghan SIV program, please first review the information online at https://travel.state.gov/content/travel/en/us-visas/immigrate/special-immg-visa-afghans-employed-us-gov.html. If you cannot find the answer to your question, please email AfghanSIVApplication@state.gov.

**TIPS TO PREVENT DELAYS IN PROCESSING YOUR APPLICATION**

Ensure that the scanned copies of documents you provide are clear.  Print your documents in black ink on white paper before scanning them.

Use the same spelling of your name on all documents and email correspondence. The spelling should match how your name is written in your passport or tazkera.  You should list aliases after your correct name.

Letters of recommendation are very important in the SIV application process. Please ask your supervisor to be as detailed and complete as possible in describing your work and to write a letter that is specific to your accomplishments and responsibilities.

## INSTRUCTIONS FOR COMPLETING FORM DS-157

Form DS-157 is the Supplemental Nonimmigrant Visa Application.  The form is available online at https://eforms.state.gov/Forms/ds157.pdf. Please read and follow the below instructions carefully when completing Form DS-157.

If the form does not provide sufficient space for your response, you may use additional sheets of paper. Do not leave any boxes blank.  All questions must contain an appropriate response or your application will be delayed.

*Below are instructions for each numbered question:*

1.  Enter your family name or surname as it appears in your passport or tazkera. Do not enter names that appear after d/o or s/o.  If you have only one name, please enter that name here.

2.  Enter your first name as it appears in your tazkera or passport (if any).  If there is only one name in your passport, enter "FNU" (First Name Unknown) here.

3.  Write your full name in Dari exactly as it appears in your tazkera or passport.

4.  Enter your clan or tribal name. If you do not have a clan or tribal name, write "none."

5.  Enter any names/aliases you have used.

6.  Enter your date of birth as it appears in your tazkera or passport.

7.  Enter your place of birth as it appears in your tazkera or passport.

8.  Enter your passport number (if any).

9.  Enter all tazkera numbers you have ever used.

10. Check the appropriate box.

11. Enter your spouse's full name.  If you are unmarried, write "N/A."

12. Enter your father's full name as it appears in his tazkera or passport.

13. Enter your mother's full name as it appears in her tazkera or passport.

14. Enter your email address and phone number.

15. List the full names and dates of birth of all your children under the age of 21 as it appears in their tazkera.  If you do not have children, under the age of 21 write "N/A."

16. List all the countries you have visited during the past 10 years and the year of the visit (for example, China 2004, Italy 2007).  If you have never traveled outside of Afghanistan, write "none."

17. List all the countries that have issued you a passport, including your current one.  If you have

never been issued a passport and do not hold a current passport, write "none."

18. Check the appropriate box to note whether you have ever lost a passport or had one stolen.

19. List the requested information for your last five employers, including your current employer. If you have had only one employer or no employer before your current job, you should explain that in the box. List your previous employers regardless of whether they have a connection to the United States. Please explain your job if you were self-employed. Please state specifically your employer's name, the job location, and your job title. If you do not have your previous supervisor's email address, enter 'N/A.'

20. Check the appropriate box to note whether you have ever applied for Chief of Mission approval. If so, enter the case number(s) associated with your previous application(s).