# Exhibit 11

to the Declaration of Deepa Alagesan in Support of Plaintiffs'
Objections to Defendants' Proposed Revised Adjudication Plan

*Afghan and Iraqi Allies Under Serious Threat Because of Their Faithful Service to
the United States v. Blinken, et al.*, Case No. 18-cv-01388-TSC

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -

AFGHAN AND IRAQI ALLIES

UNDER SERIOUS THREAT

BECAUSE OF THEIR FAITHFUL

SERVICE TO THE UNITED

STATES, ON THEIR OWN AND

ON BEHALF OF OTHERS          Case Number:

SIMILARLY SITUATED,          1:18-cv-01388

      Plaintiffs,

vs.

ANTONY BLINKEN, et al,

      Defendants.

- - - - - - - - - - - - - -

REMOTE DEPOSITION

of

CATHERINE McGEARY

VOLUME II

Monday, February 27, 2023

Reported by: Robin LaFemina, RPR, CLR

Job No. SY 6667

Page 280

```
 1                     McGeary
 2      Q.     And that includes both paper
 3  copies of documents and any electronic
 4  documents.
 5             Can you agree to that?
 6      A.     Yes.
 7      Q.     Do you have a cell phone or
 8  other electronic devices with communications
 9  capabilities with you in the room?
10      A.     I don't personally, but there
11  are in the room.
12      Q.     I just ask that you don't use
13  any devices during the deposition to
14  communicate unless I ask you to do so or you
15  or your counsel let me know that you're
16  doing so.
17             Can you agree to that?
18      A.     Okay.
19             MS. HIROSE:  I'm just going to
20         pause and make sure -- can the court
21         reporter -- Court Reporter, can you
22         hear everything okay?
23             THE COURT REPORTER:  I was going
24         to say that she's not very clear, I'm
25         sure you're hearing it the same way.
```

Page 281

```
 1                    McGeary

 2      Can we go off the record for a second?

 3              MS. HIROSE:  Yes.  Let's go off

 4      the record.

 5              (Whereupon, a brief recess was

 6      taken.)

 7  CONTINUED BY MS. HIROSE:

 8      Q.    Okay.

 9              To make sure we understand each

10  other, I'm going to make sure we're in

11  agreement on a few terms.

12              I will refer to the Department

13  of State as State or DOS.

14              Is that okay?

15      A.    Okay.

16      Q.    I will refer to the National

17  Visa Center as NVC.

18              Is that okay?

19      A.    Yup.

20      Q.    I will refer to the Chief of

21  Mission as COM; is that okay?

22      A.    Yes.

23              MS. HIROSE:  And for the court

24      reporter, that's C-O-M, COM.

25      Q.    I will refer to immigrant visas
```

Page 282

1                        McGeary

2    as IV.

3              Is that okay?

4        A.    Okay.

5        Q.    Sorry.  Could you give a verbal

6    answer?

7        A.    I said okay.

8              MS. DAVILA:  She means yes or

9        no.

10             THE WITNESS:  Oh.

11       Q.    Oh, okay.  Sorry.  I couldn't

12   hear.

13             I will refer to the Special

14   Immigration Visa for Afghans and Iraqi

15   Nationals who are employed by or on behalf

16   of the U.S. Government as SIV.

17             Is that okay?

18       A.    Yes.

19       Q.    I understand that the State

20   Department has a contract with a company

21   that supports SIV processing at the NVC; is

22   that right?

23       A.    Yes.

24       Q.    That company is called LDRM?

25       A.    It is.

Page 283

```
 1                       McGeary
 2        Q.      I'll refer to the company that
 3   has the SIV processing contract for NVC as
 4   LDRM.
 5                Okay?
 6        A.      Okay.
 7        Q.      And I'll refer to the people who
 8   work for LDRM as contractors.
 9                Is that okay?
10        A.      Okay.
11        Q.      I will refer to the United
12   States Citizenship & Immigration Services as
13   USCIS.
14                Is that okay?
15        A.      Yes.
16        Q.      I will refer to the Department
17   of Homeland Security as DHS.
18                Is that okay?
19        A.      Yes.
20        Q.      Great.
21                Do you understand that you're
22   being deposed as a representative of the
23   State Department today?
24        A.      Yes.
25        Q.      And that's different from the
```

Page 284

1                     McGeary

2    deposition a couple of weeks ago when you

3    were testifying in your personal capacity?

4         A.      Yes.

5         Q.      What did you do to prepare for

6    today's deposition?

7         A.      I talked with a few of my staff

8    here at NVC, some of my colleagues at the

9    State Department and legal counsel and

10   reviewed related documents.

11        Q.      Which staff at NVC did you speak

12   with to prepare for the deposition?

13        A.      I spoke with my assistant

14   director, the consular officer who oversees

15   our Afghan visa and immigrant scheduling

16   programs, immigrant visa scheduling and

17   post-liaison programs.

18        Q.      Ms. McGeary, did you also

19   mention that you spoke to a contractor in

20   preparing for the deposition?

21        A.      Yes.  It's our contractor who

22   works for the company that -- it's a

23   different contractor, not LDRM, it's a

24   contractor that kind of monitors the

25   quality, helps the government monitor the

1                        McGeary

2    that the COM committee said was missing or

3    otherwise rendered their case unapprovable.

4         Q.    Is that also written down in the

5    SOP for processing of the COM application

6    e-mails that you just mentioned?

7         A.    I do not have the SOP in front

8    of me.

9         Q.    Would you expect that the

10   criteria for documentarily -- sorry.

11   Withdrawn.  Start again.

12              Would you expect that the

13   criteria for being documentarily complete

14   for appeals would be in the SOP that

15   pertains to the processing of the COM

16   application e-mails?

17              MS. DAVILA:  Objection,

18         ambiguous.  Objection, compound.

19         A.    I would expect it to be in the

20   SOP or related training materials.

21              MS. HIROSE:  I'd like to mark

22         for the record a request for the

23         production of the SOP, the COM

24         application e-mails that Ms. McGeary

25         just mentioned and related training

Page 309

                              McGeary

1

2       materials to the extent that the

3       criteria for being documentarily

4       complete for appeals appears in the

5       training materials.

6              MS. DAVILA:  Counsel, will you

7       be sharing that document or --

8              MS. HIROSE:  We can follow up

9       after the deposition with our requests.

10             MS. DAVILA:  Okay.  The

11      Government would object to that request

12      and note the scope that the Court

13      ordered regarding this 30(b)(6)

14      Deposition.

15      Q.     Ms. McGeary, we were just

16   talking about the difference in the text

17   between the description of Step 2 between

18   the Proposed Plan and the Previous Plan;

19   right?

20      A.     That's correct.

21      Q.     Is it fair to say that the

22   change in text does not reflect a change in

23   internal processing?

24      A.     There has been no -- well, I

25   would say -- I think I need to step back

```
1                      McGeary
2    because the original -- the -- what did we
3    call it -- the original plan?
4         Q.    The Previous Plan.
5         A.    Right.  The Previous Plan.
6    Thank you.  The Previous Plan was submitted
7    in 2020 and there has been a good deal that
8    has changed between 2020 and the submission
9    of this Proposed Plan, which was submitted
10   in February of 2023, including our -- the
11   very system we use for -- that NVC uses for
12   the COM application e-mail process, so I
13   can't state that there's been no change in
14   process, but that's -- if that's what you
15   asked me.
16        Q.    But the change in language to
17   the description of Step 2 in the Proposed
18   Plan was made to align with NVC's use of
19   what it does at this stage?
20             MS. DAVILA:  Objection,
21        ambiguous.
22        A.    It's not our view on what we do.
23   It rather reflects on what the processor is
24   doing at that stage of the process.
25        Q.    Looking at the Plan Performance
```

Page 311

1                          McGeary

2      Standard column at Step 2, do you see the

3      Proposed Plan uses 15 business days as the

4      benchmark?

5          A.     Yes.

6          Q.     And do you see that the Previous

7      Plan used 15 days as the Performance

8      Standard?

9          A.     Yes.

10         Q.     Why was that change made in the

11     Proposed Plan?

12         A.     The change was made, again, to

13     align with the actual practice, which is

14     that the contractor's Performance Standard

15     is evaluated in terms of business days.  At

16     this point in time, the contractor is

17     meeting or exceeding that Performance

18     Standard.

19         Q.     How was the State Department

20     previously reporting compliance with the

21     step under the Previous Plan?

22         A.     How was the Department reporting

23     compliance?

24         Q.     Yes.

25         A.     I will need to review the

1                    McGeary

2   related report.  I am aware that there was a

3   series of -- what is it called -- meet and

4   confer about this, the topic of business

5   versus calendar days, and, therefore, this

6   is -- we don't see this as really a change

7   to the Plan, but just a change in the

8   description.

9        Q.    Are you saying that the State

10  Department was always reporting compliance

11  based on business days under the Previous

12  Plan?

13       A.    Again, I don't have the report

14  in front of me.  What I'm saying is that the

15  contractor -- the contractor's Performance

16  Standard always has been business days, and

17  also that I am aware that there -- this

18  topic of business versus calendar days was

19  subject to some meet and confer meetings

20  under the Plan.

21       Q.    Okay.  We'd like to share a

22  document which we will screen share and

23  we'll also send to you by e-mail, to counsel

24  and to the court reporter.

25            MS. HIROSE:  And for counsel and

Page 313

1                        McGeary

2          the court reporter, this is ECF 138,

3          which should be in the most recent

4          e-mail from Ms. Holland attaching

5          potential exhibits.

6                    MS. DAVILA:  Can we go off the

7          record for a second?

8                    MS. HIROSE:  Sure.

9          Q.    We are screen sharing with you a

10     document -- if you scroll all the way up.

11     Thank you.

12                    So at the top of the document,

13     it says Document 138, page 1 Of 2.

14                    Do you see the document,

15     Ms. McGeary?

16          A.    I do.

17                    MS. HIROSE:  Could we mark this

18          as Exhibit 30 for the record, please.

19                    (Exhibit 30, Defendants' Notice

20          of Lodging Progress Report, Document

21          138, marked for identification, as of

22          this date.)

23                    MS. HIROSE:  Sorry.  Could we go

24          off the record for a second?

25                    (Whereupon, a discussion was

Page 316

1                           McGeary

2        Q.      So under II.A.  Standards Met,

3     it says:  For the period of this Progress

4     Report, Defendants met the performance

5     standards in the Joint Adjudication Plan for

6     government-controlled Steps 2, 3, 5, 7, 8,

7     10, and 12.

8                Do you see that?

9        A.      I do.

10       Q.      How did NVC determine that it

11    met the Performance Standard for

12    government-controlled Step 2 for the

13    purposes of that report?

14               MS. DAVILA:  Objection.  The

15          Government is going to lodge a standing

16          objection to the extent that

17          Plaintiffs' questions about the old

18          Plan and old report filed before

19          November of 2022 are beyond the scope

20          permitted for this deposition.  The

21          Government and Plaintiffs were clearly

22          admonished by the magistrate that any

23          discovery or inquiries into the old

24          Plan were not permitted in this

25          30(b)(6) and that any questions should

1                    McGeary

2        be focused on justification for the new

3        Plan.  I note that for the record in

4        the event that we need to reach out to

5        the magistrate concerning scope.

6        Q.    You can answer the question,

7   Ms. McGeary.

8              MS. DAVILA:  We are directing

9        the witness not to respond in order to

10       effectuate an order of the Court

11       regarding the scope of discovery.

12       Would counsel like to go off the record

13       to have a colloquy?

14             MS. HIROSE:  Yes, please.

15             MS. DAVILA:  Okay.  I will ask

16       the witness to leave the room.

17             (Whereupon, a discussion was

18       held off the record.)

19             MS. DAVILA:  Counsel, if you

20       would like to restate your question,

21       I'll instruct the witness to answer.

22   CONTINUED BY MS. HIROSE:

23       Q.    Ms. McGeary, we were looking at

24   what's been marked Exhibit 30, page 6 of 12.

25       A.    Okay.

Page 318

1                          McGeary

2       Q.      How did NVC determine that it

3   met the Performance Standard for

4   government-controlled Step 2 for the

5   purposes of this report?

6       A.      All right.  Well, I need to have

7   in front of me government-controlled Step 2,

8   what it says.  Where is that?  Is this the

9   old Plan?

10      Q.      The Previous Plan is Exhibit 1

11  and Step 2 is at page 3 of 14 of Exhibit 1.

12      A.      Okay.

13              MS. DAVILA:  Let the record

14          reflect that the witness is looking at

15          ECF Number 113-1, page 2.

16      A.      And this progress report is

17  dated -- it covers the period until June 30,

18  2021.  Right?  Okay.  So how would NVC have

19  assessed its performance under the progress

20  report?  It would have assessed it by

21  looking at the amount of time that the

22  contractor would have taken to review the

23  submitted documents for the COM application

24  that was submitted by e-mail I believe

25  under -- yes -- under the old e-mail system,

1                    McGeary

2    and they would have, it says here -- again,

3    so it says complete within 15 days, but I

4    already discussed the fact that I'm aware

5    there's a subsequent discussion about

6    business days versus calendar days, so,

7    again, the contractor is assessed based on

8    business days.

9         Q.    So when NVC was reporting

10   compliance in Exhibit 30, was it reporting

11   compliance based on business days?

12        A.    I mean, I would need to review

13   the discussions in the meet and confer

14   records maybe where that was discussed,

15   whether or not the subject of business and

16   calendar days and how we were assessing it

17   at that point in time came up.  I would

18   just definitely say that the contractor

19   has 10 business days to do this step,

20   10 business days approximates 15 calendar

21   days.  I don't have the math in front of me.

22        Q.    Did the State Department ever

23   report compliance at Step 2 based on

24   calendar days?

25             MS. DAVILA:  Objection,

Page 320

1                    McGeary

2        repetitive.

3        A.      I can't state whether or not the

4    State Department ever reported based on

5    calendar days or business days, but as I

6    mentioned, the business days and calendar

7    days more or less align, and I am aware that

8    this was a subject of discussion as well.

9             MS. HIROSE:  I'd like to mark

10       for the record this question for

11       supplemental testimony.

12            THE WITNESS:  For what?

13            MS. DAVILA:  We couldn't hear

14       that.  What was that last line?

15            MS. HIROSE:  I'd like to mark

16       for the record this question for

17       supplemental testimony.

18            MS. DAVILA:  The Government

19       objects to that request.

20       Q.      Is it the State Department's

21   position that it would be easier to report

22   compliance in business days than calendar

23   days?

24       A.      It's --

25            MS. DAVILA:  Objection.

1                    McGeary

2       Misstates testimony.

3       A.      Right, it's not a matter of

4   whether it would be easier or not, it just

5   aligns with the actual practice in the

6   contract where the contractor's performance

7   is measured by business days, and, again, as

8   I mentioned, the contractor is meeting or

9   exceeding the Performance Standard as

10  proposed.

11      Q.      So the only reason that the

12  State Department changed the performance

13  standard at Step 2 of the Proposed Plan is

14  to align with the contract that the

15  Department has with LDRM?

16              MS. DAVILA:  Objection.

17      Misstates testimony.

18      A.      It's not the only reason.  I'm

19  aware that they're -- in the context of

20  reporting, the issue of business and

21  calendar days came up, so in the interest of

22  reducing the scope for confusion, we

23  proposed aligning, and with what is in the

24  contract, which is business days, so we

25  would be talking the same language.

Page 329

1                         McGeary

2    yes or no because it is -- you're reducing

3    it to one of the points that I articulated.

4         Q.    Yes, I'm asking about that one --

5         A.    (Indiscernible due to

6    over-speaking.)

7               MS. DAVILA:  Objection.  Counsel

8         has interrupted the witness.  Witness,

9         will you please complete your answer?

10        A.    As I mentioned, it's one of the

11   points, but not exclusively.

12        Q.    Yes.  That's great.

13               MS. DAVILA:  Have you completed

14        your answer?

15        Q.    Now I am just asking about that

16   point.

17               MS. DAVILA:  Counsel, I was

18        asking the witness if she had completed

19        her answer.

20               Have you completed your answer?

21               THE WITNESS:  Yes.

22               MS. DAVILA:  Counsel, your

23        question.

24        Q.    So focusing on another point

25   that you mentioned, you said that you wanted

1                    McGeary

2    to make sure that the standard is clear for

3    all parties; is that right?

4              MS. DAVILA:  Objection,

5         ambiguous.

6         A.    Again, we want to make sure that

7    there's accuracy in reporting and that the

8    reporting doesn't become again a subject of

9    confusion, again, are we talking calendar or

10   business days.

11             MS. HIROSE:  Could the court

12        reporter please read back my question?

13             (Whereupon, the requested

14        portion of the record was read back

15        by the reporter.)

16        Q.    And, Ms. McGeary, could you

17   please answer the question that I asked?

18             MS. DAVILA:  Objection,

19        ambiguous.

20        A.    Yes, we want to make sure it's

21   clear for all parties, but that's not the

22   only reason.

23        Q.    So just focusing on making sure

24   that the standard is clear for all parties,

25   would that be achieved by making clear that

Page 331

1                         McGeary

2     the standard is in calendar days?

3                 MS. DAVILA:  Objection,

4         ambiguous.  Objection, calls for

5         speculation.

6     A.      Again, it would be, which could

7     have a negative downstream effect in the

8     accuracy of reporting writ large.

9     Q.      So for purposes of NVC, it would

10    be clearer to use business days?

11    A.      It would be more straightforward

12    to use business days because it would not

13    involve any scope for confusion with the

14    contractor as to what we're asking them to

15    report and it would assist in consistency.

16    Q.      And that's because the contract

17    with LDRM uses business days?

18    A.      Yes, the contract with LDRM uses

19    business days.

20    Q.      To be clear, the problem you're

21    describing with reporting in calendar days

22    is the same problem that existed at the time

23    that the Previous Plan went into effect?

24                MS. DAVILA:  Objection,

25        ambiguous.  Objection, misstates

Page 332

```
 1                       McGeary

 2       testimony.  Objection, calls for

 3       speculation.

 4       A.      I am aware that there was

 5  confusion sometimes in the reporting as to

 6  whether the reporting was based on calendar

 7  days or business days, so yes, that was a

 8  challenge.  The report in calendar days

 9  created a layer of the consistency,

10  potential consistency.

11       Q.      Were there any internal changes

12  made within NVC since the Previous Plan that

13  would make it more difficult to report in

14  calendar days?

15               MS. DAVILA:  Objection.

16       Ambiguous.

17       A.      Again, there are multiple

18  changes made between the Previous Plan and

19  the Proposed Plan.  There's no change made

20  as to the, you know, Performance Standard

21  for the contractor, which is business days.

22       Q.      If we can move on to a document

23  marked Exhibit 24.

24               THE WITNESS:  Do you know which

25       one that is?
```

Page 333

1                    McGeary

2       Q.    I'm sorry.  It's not 24.

3   It's -- oh, yes.  Sorry.  Exhibit 24.

4   You've already looked at it before.

5       A.    Okay.  What's the other name of

6   it?  Sorry.

7       Q.    It is the Proposed Plan.  It

8   says Document 207-1 at the header on the

9   first page.

10      A.    Okay.  I have it.

11      Q.    Okay.

12            So could you look at page 6 of

13  17, Step 3 under the Afghan Allies

14  Protection Act of 2009.

15            And in the Description, it says

16  NVC marks completed application or appeal as

17  document complete and COM staff processed

18  the application or appeal for review.

19            Do you see that?

20      A.    Yes.

21      Q.    Do you understand yourself to be

22  designated to testify about the part that

23  follows COM staff process in that Step 3?

24      A.    I --

25            MS. DAVILA:  Objection,

Page 334

                    McGeary

1        ambiguous.

2        A.     If -- you're asking me if I'm

3   testifying on behalf of the COM process for

4   ASIV.

5        Q.     I'm asking if you're prepared to

6   testify today on behalf of the State

7   Department about the part of the step

8   involving COM staff.

9             MS. DAVILA:  Objection,

10        ambiguous.

11             Counsel, what's -- perhaps what

12        step or I don't know if we want to go

13        off the record, just --

14             MS. HIROSE:  Okay.  We can go

15        off the record.

16             (Whereupon, a discussion was

17        held off the record.)

18             (Whereupon, a brief recess was

19        taken.)

20   CONTINUED BY MS. HIROSE:

21        Q.     So, Ms. McGeary, we're looking

22   at Exhibit 24 at page 6 of 17 and step 3 of

23   the Afghan Allies Process.

24             Are you prepared to testify as


1                        McGeary

2    should be 15 business days at Step 5?

3        A.     The contractor, according to the

4    contract, has 10 business days to perform

5    that step and the 15 business days, as I

6    mentioned, is to allow for the possibility

7    of a, you know, an increased influx from --

8    of COM approval so they can remain on

9    timeliness.

10       Q.     Is the NVC seeing increased

11   volumes of cases at this step right now?

12       A.     Increases compared to what?

13       Q.     That's a good question.  I'm

14   going to withdraw that question on my

15   behalf.

16              How did the State Department

17   determine that expected increase in cases

18   would require the Performance Standard to be

19   changed to 15 business days?

20       A.     So I'll state again that the

21   contract requires the contractor to perform

22   the step within 10 business days and that

23   level of performance and the importance of

24   timeliness in the context of processing

25   Afghan SIV, in this case immigrant visa

1                        McGeary

2    applications, is a subject of very frequent

3    conversation between the Government and the

4    contractor, and the contractor has made

5    multiple interventions, including with the

6    State Department's systems improvement, also

7    their own staffing cross-training and

8    alignment in an effort to remain within

9    timeliness, and, as I mentioned, it is

10   within timeliness, meaning 10 business days.

11   However, knowing again the unprecedented

12   interest in the Afghan SIV program and thus

13   the huge influx of COM applications that

14   came into NVC and were processed, returning

15   to timeliness on October 7 of this past

16   year, we can only conclude that they will

17   be -- there will be an increase in volume

18   coming out of COM in terms of approvals.

19   That would then generate work in this step

20   of the process, which is the IV step.  We

21   want to make sure that while the contractor

22   and we have every intent of remaining within

23   10 business days or less, that we're not

24   going to then have to make modifications

25   when we do face that influx.

Page 349

1                     McGeary

2     Q.     Have you analyzed the volume of

3 the expected increase in COM approvals that

4 will be coming to NVC at this step?

5            MS. DAVILA:  Objection,

6     ambiguous.

7     A.     There would be a degree of

8 speculation because we know the levels of --

9 the numbers of cases that were sent for COM

10 review, but the pace of the review, whether

11 or not the case meets the requirements for

12 approval, would all be factors that would

13 ultimately determine the volumes.  We want

14 to be prepared for the likely scenario that

15 there will be an increase in COM approvals

16 coming for the IV stage of the process here

17 at NVC.

18     Q.     Okay.

19            But the State Department hasn't

20 calculated any expected numbers or anything

21 like that coming into Step 5?

22     A.     Well, I would note again that my

23 colleague from the -- from ASIV is going to

24 testify on behalf of the Department as

25 relates to the COM part of the process, the

Page 350

1                    McGeary

2    COM review.  I would say it's only prudent

3    planning, as they say.

4         Q.    Could you help me understand why

5    the State Department chose five -- chose to

6    add five business days to the contractor's

7    timeliness standard rather than, say, one

8    business day or more business days?

9         A.    Once again, knowing the

10   unprecedented interest in the program and

11   the massive volumes that NVC processed from

12   the closure of our NVC in Kabul and onwards,

13   that we know that that would at one point

14   result in either COM approvals or denials

15   coming back to NVC either through possible

16   appeals or through the IV application.

17        Q.    But there's no particular

18   calculations that resulted in five business

19   days as the number of business days to add

20   to that timeliness standard that the

21   contractor is currently meeting?

22             MS. DAVILA:  Objection,

23        ambiguous.  Objection, misstates

24        testimony.

25        A.    Well, each case is an individual

Page 351

1                          McGeary
2    case, so it would stand to reason that the
3    COM committee -- there's no way just to give
4    an exact number of volumes because, again,
5    it depends on whether or not that specific
6    applicant met the requirement or did not.
7    We're allotting sufficient time in our view
8    to, again, with the full intent of sticking
9    to the contractually required 10 business
10   days, but not to have to go back and make
11   more modifications should the volumes mean
12   that the contractor will need additional
13   time to process these cases.
14        Q.   Sure.  I think -- I just wanted
15   to make sure there was no calculation
16   anywhere for the additional time because, if
17   so, I would ask for that to be produced.
18        A.    (Indiscernible due to
19   over-speaking.)
20             MS. DAVILA:  Objection.  Asked
21        and answered.  Objection, counsel is
22        testifying.
23        Q.   Am I right that there's no
24   written calculation anywhere that I should
25   be asking for?

Page 352

1                    McGeary

2            MS. DAVILA:  Objection,

3       ambiguous.

4       A.     Once again, we were starting

5    with the basis in the contract, which is

6    10 business days, knowing that the

7    contractor is within timeliness or exceeding

8    timeliness on the 10 business days, also

9    knowing the huge influx of cases and

10   documentarily complete applications that

11   were sent or marked as such from NVC for COM

12   approval or COM -- sorry -- COM adjudication

13   meeting, that certainly we could anticipate

14   at some point in time seeing additional COM

15   approvals coming through the IV stage of the

16   process.  Whether -- I mean, it's not

17   possible to determine the rates or the

18   volume.  We were making our prudent planning

19   judgment here in allotting 15 business days.

20   There's too many unknowns at the COM stage

21   of the process to make that case.

22      Q.     Could you describe what's

23   involved in Step 5 of the Proposed Plan?

24      A.     Yes.  So Step 5 is the

25   preparation of the applicant for the

Page 353

1                        McGeary

2    immigrant visa interview.  That means

3    that -- I just have to have Step 4 in front

4    of me to make sure that I'm not talking

5    about Step 4 at the same time.

6              MS. DAVILA:  Let the record

7         reflect that the witness is referring

8         to document ECF Number 207-1.

9              THE WITNESS:  Yes.

10         A.    Yes, so that is -- the Step 5

11   would be then again handled through e-mail,

12   which is the IV phase of the process here at

13   NVC, so the applicant will have been

14   notified of their COM approval and, again,

15   told to complete their DS-260 and provide

16   the necessary immigrant visa document -- the

17   documentation needed for the immigrant visa

18   interview, and that could involve an

19   interface with the applicant.  Some

20   applicants might provide everything all at

21   once.  Other applicants might provide one

22   document one day, wait a couple of weeks,

23   provide the second document.  It's an

24   indeterminate amount of time that the

25   applicant will take to provide all the

Page 354

```
 1                   McGeary
 2  documents.
 3       Q.    That interfacing that you were
 4  just talking about, is that in --
 5       A.    It --
 6       Q.    -- Step 7 of the Proposed Plan?
 7       A.    I'm sorry.  Is the Proposed Plan
 8  the document that's marked 207-1?  Yes.
 9             So that's Step 6.  So Step 5 is
10  just basically sending the initial
11  instructions to the applicant.
12       Q.    So from the NVC perspective, is
13  that sending out an e-mail?
14       A.    Yes.
15       Q.    Is this a template e-mail that
16  goes out?
17       A.    Yes.  There's a -- I mean,
18  there's a letter that -- it's an e-mail
19  letter.
20       Q.    Is it individualized for each
21  applicant?
22       A.    It would have the applicant's
23  name on it.  I don't have it in front of me
24  to say exactly the content.
25       Q.    So Step 5 for NVC, NVC will see
```

Page 355

1                    McGeary

2    on the system that the case is ready for the

3    step and then it sends an e-mail with a

4    letter to the applicant?

5         A.    Yes.  And then Step 6 gets into

6    the other part I was talking about.

7         Q.    How is this Step 5 staffed at

8    the NVC?

9         A.    It is staffed by contractors.

10        Q.    And I believe at your last

11   deposition, you talked about Document Review

12   Unit, Case Processing Unit and Scheduling

13   Unit.

14              Do you remember that?

15        A.    Yes.

16        Q.    Is this staffed by one of those

17   units?

18              MS. DAVILA:  Objection,

19        ambiguous.  Objection, compound.

20              MS. HIROSE:  Let me rephrase.

21        Q.    Is Step 5 -- let me rephrase

22   again.

23              Which unit is Step 5 staffed by?

24        A.    So that should be the Case

25   Processing Unit.

Page 356

```
 1                    McGeary
 2        Q.    Is the Case Processing Unit
 3   handling Step 5 handling just Afghan SIV
 4   cases?
 5        A.    So the Case Processing Unit does
 6   not only handle Afghan SIV cases.  However,
 7   the contractor was under -- given technical
 8   guidance by the government to prioritize the
 9   processing of Afghan SIV applications.
10        Q.    What does that mean?
11        A.    That means the contractor was
12   given the guidance that the Afghan SIV
13   program and the timely processing is of
14   utmost importance, the Government cannot
15   dictate to the contractor how they respond
16   to that in terms of staffing.  However, the
17   contractor did respond by focusing on the
18   Afghan SIV cases as a priority.  Therefore,
19   making sure that they are timely.
20        Q.    When you say focusing on the
21   Afghan SIV cases as a priority, do you mean
22   working on SIV cases at Step 5 ahead of
23   other immigrant visa types?
24        A.    Again, I can't talk to exactly
25   the contractor's methodology for complying
```

1                    McGeary

2   with the government's technical guidance.  I

3   could only state that in terms of staffing

4   focus, the -- how they handle their incoming

5   queues produced the result of ensuring the

6   Afghan SIV processing is timely at that

7   stage of the process.

8        Q.    Is it fair to say that the State

9   Department changed the Performance Standard

10  at Step 5 for Afghan SIVs in the Proposed

11  Plan to align with its contract with LDRM

12  and because of the expected increase in

13  cases?

14       A.    Yes.  That's fair to say.

15       Q.    Is there any other reason that

16  the State Department changed the Performance

17  Standard at Step 5?

18       A.    Well, the process is utterly

19  different, of course, because in the

20  Previous Plan, it involved a USCIS petition,

21  and that portion -- that portion of time has

22  been completely eliminated, you know, from

23  the experience the applicant has in

24  proceeding with their COM, you know,

25  application and visa application, so that's

Page 358

```
 1                         McGeary

 2    changed as well.  We're taking into account

 3    the fact that this is based on the Form

 4    DS-157, again, the contractor being allotted

 5    10 business days and then the expected

 6    increase at one stage from -- of COM

 7    approvals that will come in for processing.

 8         Q.    Okay.

 9               And the change that you are

10    talking about in terms of the process being

11    different, is that accounted for by the

12    change in the beginning of the Performance

13    Standard that says upon receipt of the COM

14    approval and DS-157 petition?

15         A.    Yes.  That's a different process

16    from the Previous Plan which involved the

17    USCIS petition and the waiting part of it to

18    get the petition.

19         Q.    Okay.

20               But the change in the process in

21    terms of the DS-157 didn't affect the State

22    Department's change with respect to 15

23    business days?

24               MS. DAVILA:  Objection,

25          misstates testimony.
```

Page 359

```
 1                    McGeary
 2      A.    So, again, it's difficult to
 3  compare because the USCIS portion of the
 4  process and, therefore, the need of the
 5  applicant to interface not only with the
 6  State Department NVC, but also with DHS and
 7  USCIS, and the waiting involved at that
 8  stage has been completely eliminated.
 9  Therefore, this is only reflecting the time
10  the contractor has, which is 10 business
11  days to carry out this stage of the process
12  and allotting additional time for the
13  anticipated increased volume of COM
14  approvals.
15      Q.    Right.  But the change in
16  process in terms of DS-157 is accounted for
17  entirely by the revision in the first half
18  of the sentence, which says upon receipt of
19  COM approval and DS-157 petition; is that
20  right?
21          MS. DAVILA:  Objection,
22      repetitive.  Objection, misstates
23      testimony.
24      A.    So, again, I think what I'm
25  trying to make clear is that while this says
```

Page 368

1                          McGeary

2    the contractor is producing, do you mean

3    producing in this case?

4         A.     No.  I mean that they are the

5    ones who make them available for their

6    contract staff to do the work.

7              MS. HIROSE:  I'd like to mark

8         for the record request for the

9         production of the SOP related training

10        materials that reflect NVC's definition

11        of completeness at Step 7.

12             MS. DAVILA:  Objection.  Outside

13        the scope of this 30(b)(6) Deposition.

14        It is not the mechanism for an RFPD.

15             MS. HIROSE:  I would say that

16        this is within the scope of the

17        document requests that have already

18        been served, so we can meet and confer

19        with that at a later time.

20             MS. DAVILA:  You have our

21        objection.

22        Q.     Turning to the Performance

23   Standard at Step 7 for the Proposed Plan, do

24   you see that it references Form DS-260?

25        A.     Yes.

Page 369

```
 1                    McGeary
 2      Q.     And the Previous Plan did not
 3  specify DS-260?
 4      A.     It does not, but it says
 5  application.
 6      Q.     When it said upon receipt of the
 7  application in the Previous Plan, did that
 8  mean including Form DS-260?
 9            MS. DAVILA:  Objection.
10       Misstates the phraseology of the
11       Previous Plan.
12      A.     So the Revised Plan specifies
13  that the Form DS-260 is the immigrant visa
14  application.
15      Q.     And that was also the case under
16  the Previous Plan; right?
17      A.     Well, under the Previous Plan,
18  it just states upon receipt of the
19  application.  It did not specify DS-260.
20  However, that is the immigrant visa
21  application.
22      Q.     Do you see that at Step 7 of the
23  Proposed Plan the Performance Standard in
24  terms of the number of days at this step has
25  changed from the Previous Plan?
```

1                    McGeary

2           MS. DAVILA:  Objection,

3      ambiguous.

4      A.     While it says within 15 business

5      days, the other Plan said within 5 to 15, so

6      the end scope is still the same, which is

7      15, and it didn't specify which type of days

8      we're talking about, therefore, it's

9      possible it was the same.

10     Q.     Why did the State Department add

11     business days to Step 7 of the Proposed

12     Plan?

13     A.     That's a clarification to how

14     the days are being measured.  The other

15     previous adjudication plan is non-specific.

16     It says 15 days.  It doesn't say what type

17     of days.

18     Q.     Why is the State Department

19     clarifying to use business days instead of

20     calendar days?

21     A.     So in the interest of clarity as

22     to the Performance Standard and in the

23     interest of consistency of reporting, the

24     Department is specifying 15 business days

25     rather than leaving it vague and open to

1                         McGeary

2    interpretation.

3         Q.     And when you say interest of

4    consistency of reporting, what reporting are

5    you referencing?

6         A.     The reporting under the proposed

7    new plan.

8         Q.     Why did the State Department

9    propose using business days instead of

10   calendar days?

11        A.     So the Previous Adjudication

12   Plan does not state calendar days.  It

13   merely states days.  It's non-specific.

14        Q.     But the State Department chose

15   to propose business days here; correct?

16        A.     Yes.

17        Q.     And it chose to propose business

18   days instead of calendar days?

19        A.     Yes.

20        Q.     Why was that the case?

21        A.     Once again, the contract is

22   written in the terms of business days,

23   therefore facilitating or eliminating -- I

24   guess reducing the scope for reporting

25   errors and consistency in the interest of

1                    McGeary

2   not having confusion downstream as to what

3   is being measured and how.

4        Q.     What is the timeliness standard

5   under the contract at this step of the

6   Afghan SIV Process?

7        A.     It is 10 business days.  And the

8   contractor is meeting or exceeding that

9   standard.

10        Q.     Do you see how under the

11   Previous Plan there is a second paragraph

12   that says if the NVC determines that the

13   application is not complete, the NVC will

14   notify the applicant within 5 days of that

15   determination?

16        A.     Yes.

17        Q.     And that language does not exist

18   in the Proposed Plan?

19        A.     It does not.  I'm just referring

20   back to check what Step 11 says.  This

21   document at 113.  Let me get it out.  207.

22             MS. DAVILA:  Let the record

23        reflect that the witness is reviewing

24        the ECF Number 207-1.

25        A.     Right.  Okay.  Yes, I see that.

Page 373

1                    McGeary

2   It's condensed.

3       Q.    What do you mean it's condensed?

4       A.    So in Step 7, the process is

5   that there's just ongoing communication with

6   the applicant.  Again, some applicants

7   produce all their documents at once and

8   right away the, you know, the contractor

9   within 10 business days, oftentimes less,

10  can mark that for COM review as

11  documentarily complete.  Sometimes the

12  applicant provides one document at a time,

13  an indeterminate amount of time could

14  elapse, and there could be an indeterminate

15  number of interactions between NVC and the

16  applicant.  Therefore, at each point in

17  time, for instance, if the applicant is

18  writing and provides one document and then

19  they provide another document, once again,

20  the contractor has 10 business days to

21  respond to that second e-mail.  It's all by

22  e-mail.  And once the COM application is

23  complete, the applicant is notified.

24      Q.    So in the Proposed Plan at

25  Step 7, is the intention that 15 business

1                           McGeary

2    days includes the time it takes for NVC to

3    notify the applicant whether the application

4    is complete or not?

5         A.      For instance, the applicant is

6    sending, you know, might send two documents,

7    and so there will be a response within 10

8    business days, you've submitted two of the

9    five required documents.  Therefore, the

10   applicant will be notified that they have

11   not completed -- I mean, they have not

12   submitted all of the required documents.

13   So it's condensed in that sense.

14        Q.      So in your example, the

15   applicant will receive the notification

16   within the 10 business days?

17        A.      Right.  But, again, we're

18   allotting 15 to account for anticipated

19   increase in volume.

20        Q.      Okay.

21                And --

22        A.      Within.  Yeah, it's within, and

23   sometimes exceeds.

24        Q.      And so going back to what the

25   Performance Standard says for the Proposed

Page 375

```
 1                    McGeary
 2  Plan, the NVC -- start again.
 3              Going back to the Proposed
 4  Performance Standard for Step 7, is it
 5  intended to mean that NVC will determine
 6  whether the case is documentarily complete
 7  and notify the applicant of that
 8  determination within 15 days of business --
 9  15 days of receipt?
10              MS. DAVILA:  Objection,
11         ambiguous.
12         A.    So the description states NVC
13  reviews documents for completeness,
14  corresponding with applicant when additional
15  documentation is needed.
16         Q.    I'm on the Performance Standard.
17         A.    Right.  So I'm just saying it's
18  captured in the description what that step
19  is.  The step is described as to encompass
20  both review and correspondence with the
21  applicant.  Therefore, the standard applies
22  to that description.
23         Q.    Okay.
24              But the Performance Standard is
25  written as if the 15 business days applies
```

Page 376

1                      McGeary

2    only to the determination, but I understand

3    you to be saying it also includes telling

4    the applicant of the determination; is that

5    right?

6                 MS. DAVILA:  Objection.  Counsel

7         is testifying.  Objection, ambiguous.

8         A.      So if the applicant has not

9    submitted all of the required documentation,

10   then within -- well, in this case up to 15

11   business days, under the contract 10

12   business days, they will be notified that

13   there's something deficient.  If they could

14   present -- if that was the only remaining

15   document, then it's complete, but if there

16   is something still missing, then there will

17   be another interaction with the applicant.

18   Each time the applicant needs to produce

19   something that was deficient, the contractor

20   has 10 business days to respond to that,

21   up to 10 business days, in this case 15

22   business days to account for increasing

23   volumes.

24        Q.      But the 15 business days

25   includes the time that NVC has to notify the

1                    McGeary

2    applicant of whatever determination it made

3    under Step 7?

4         A.     Actually, you know, I want to

5    also correct something I said because I was

6    confusing the steps.  We're not talking

7    about the COM application process.  We're

8    talking about the visa application process.

9    So what I said about it's ready for COM

10   adjudication is not relevant, so my

11   apologies.  We're talking about the

12   immigrant visa step; right?  So the

13   immigrant visa step is -- it's the case that

14   it's documentarily complete for immigration

15   visa interview.  And yes, again, the same

16   applies, that if the applicant is missing

17   documents for the immigrant visa interview,

18   not, as I misstated, the COM review in this

19   step, then the contractor has 10 business

20   days to tell them that, you know, and say

21   that you're missing, you know, this, that or

22   the other document, and we're allotting 15

23   business days to account for possible

24   increased volume.

25        Q.     Okay.

Page 378

```
 1                    McGeary
 2           So I think I'm understanding
 3   that the Proposed Performance Standard at
 4   Step 7 is 15 business days to respond to the
 5   applicant; is that correct?
 6      A.     Yes.  To respond to the
 7   applicant.  And the response will include,
 8   for instance, congratulations, you've
 9   submitted all the -- I mean, I'm not saying
10   word for word what it says, but the effect
11   is congratulations, you meet the
12   requirements for, you know, the visa --
13   immigrant visa application or it will say
14   you're still missing something.
15                MS. HIROSE:  Could we go off the
16        record?
17                MS. DAVILA:  Yes.
18                (Whereupon, a discussion was
19        held off the record.)
20                (Whereupon, a brief recess was
21        taken.)
22   CONTINUED BY MS HIROSE:
23      Q.     Could I turn your attention to
24   Exhibit 24, which has the heading Document
25   207-1, and could you turn to page 7 of 17,
```

1                    McGeary

2    please.

3         A.     Okay.

4         Q.     Do you see at the bottom of page

5    7 of 17 Steps 7 and 8 of the Proposed Plan

6    for Afghan SIVs?

7         A.     Yes.

8         Q.     Does Step 7 have to be complete

9    before an applicant can inform NVC of an

10   alternate immigrant visa processing post in

11   Step 8?

12        A.     I would say it's possible for

13   the applicant to indicate before that where

14   they want to be interviewed, but that would

15   be the logical place to indicate it because

16   it's when their case is actually ready for

17   interview, so when the case is ready for

18   interview, that's normally when they would

19   say where they want to be interviewed.

20        Q.     If an applicant indicates before

21   Step 7 that they want to be interviewed at

22   another post, how is that handled by NVC?

23        A.     It depends on what you mean by

24   before, like at what stage.

25        Q.     I'll leave that for a second.

Page 380

```
 1                        McGeary
 2               How would the applicant know to
 3      inform NVC of an alternate immigration visa
 4      processing post at Step 8?
 5      A.      So it's both listed on the
 6      public guidance on travel.state.gov and also
 7      provided to them in their letter when they
 8      are told of which documents to prepare for
 9      the immigrant visa interview.
10      Q.      So that is the letter that goes
11      out to the applicants at Step 5 of the
12      process?
13      A.      Yes.
14      Q.      And how will the applicant know
15      what information they need to provide when
16      informing NVC of an alternate visa
17      processing post?
18      A.      I'm not clear --
19              MS. DAVILA:  Objection.
20      A.      -- what you mean.
21              MS. DAVILA:  Objection,
22      ambiguous.  You may answer.
23              THE WITNESS:  Yeah, I wasn't
24      clear on the question.
25      Q.      At Step 8 where it says
```

Page 386

1                        McGeary

2    to be processed versus the applicant

3    becoming documentarily complete and ready

4    for interview?

5        Q.    Yes.

6              So how many applicants are

7    informing NVC of alternate immigrant visa

8    processing posts?

9        A.    Aha.  So in that case, if you're

10   going to ask -- you are asking specifically

11   how many applicants inform us, not how many

12   are scheduled at any given post?

13       Q.    Correct.

14       A.    Right.  Well, that would be --

15   that would require review of e-mail

16   correspondence.  We don't track that data

17   separately.

18       Q.    Is there a difference between

19   how many applicants inform NVC of an

20   alternate scheduling post and how many are

21   scheduled -- I think I -- well, actually,

22   could you answer if you can?

23             MS. DAVILA:  Objection,

24       ambiguous.

25       A.    So if the case is documentarily

Page 387

```
 1                          McGeary
 2   complete and ready for interview and the
 3   applicant states where they would like to
 4   have the interview take place, that would
 5   launch the scheduling phase of the process,
 6   but I'm not sure -- see -- I'm not sure
 7   exactly what you're asking me to state.
 8         Q.      Do you have a sense -- withdraw.
 9                 Is it accurate to say that only
10   SIV applicants who can or have gotten out of
11   Afghanistan can complete Step 8 of the
12   Proposed Plan?
13         A.      Applicants who are able to
14   appear at an IV processing post will be
15   scheduled for interview according to the
16   scheduling guidelines.  However, we have no
17   operating embassy in Kabul, so there's no
18   appointment that can be scheduled in Kabul.
19         Q.      So only applicants who are able
20   to appear at an IV processing post outside
21   of Kabul can complete Step 8?
22         A.      Well, the applicant could
23   complete Step 8 by stating where they intend
24   to appear even if they're not there at that
25   point in time.
```

1                    McGeary

2        Q.     Is it actually --

3        A.     Actually if they are in

4    Afghanistan, they can still complete Step 8

5    by stating where they intend to appear.

6        Q.     Is the number of SIV applicants

7    who complete Step 8 a subset of those who

8    reach Step 7 of the Proposed Plan?

9        A.     Yes; because a case can be

10   documentarily complete and for one reason or

11   another or any type of IV case, the

12   applicant may not decide to proceed to

13   interview, or they could decide to proceed

14   to interview at a time in the future.  So

15   yes, just becoming documentarily complete

16   means yes, an interview could be scheduled.

17       Q.     And if the applicant is --

18       A.     (Indiscernible due to

19   over-speaking.)

20              MS. DAVILA:  Objection.  The

21         witness has not completed her answer.

22       Q.     I'm sorry.  Go ahead.

23       A.     Right.  So it could be scheduled

24   for interview, but, again, because we have

25   no operating embassy in Kabul, they do need

Page 389

1                        McGeary

2      to indicate where they would intend to be

3      interviewed.

4          Q.    So if the applicant is in

5      Afghanistan and cannot presently get out of

6      Afghanistan, they are not able to move on to

7      Steps 8 and 9 and onwards of the complete

8      Plan?

9              MS. DAVILA:  Objection,

10         compound.  Objection, misstates

11         testimony.

12         A.    So as I said, they could move to

13     Step 8 by stating where they intend in the

14     future to appear.  Because they're in

15     Afghanistan doesn't mean that they can't

16     state where they intend to appear in the

17     future, but their interview cannot be

18     scheduled until they have communicated that

19     because there is no -- we have no

20     functioning embassy in Kabul or in

21     Afghanistan writ large.

22         Q.    So I think you stated that in

23     order to give me a sense of how many people

24     are informing NVC of alternate immigration

25     visa processing posts, you would have to

Page 390

```
 1                     McGeary
 2   track e-mails; is that right?
 3        A.     I believe so.
 4             MS. DAVILA:  Objection,
 5        misstates testimony.
 6        A.     I believe that we would have to
 7   check e-mails.  If you're asking what you
 8   specifically asked, how many applicants per
 9   month are informing NVC of where they would
10   like to have an interview scheduled, so they
11   would do that by e-mail, therefore, we would
12   have to check e-mails.  We don't record that
13   separately.
14        Q.     Do you have a sense of whether
15   that number is in the tens or hundreds or
16   thousands?
17        A.     I really do not.  It would
18   require review, as I said, of e-mail.  We
19   can definitely see where cases have been
20   assigned so we can see how many cases were
21   assigned to any given post in that period of
22   time.  But we can't see how many applicants.
23   You asked specifically how many applicants
24   had requested.  I don't have that data in
25   front of me.  We don't have that data.
```

Page 391

1                    McGeary

2      Q.     Is it okay if I use the term

3  third country to refer to not Afghanistan

4  and not the United States?

5      A.     Yes.

6      Q.     Some of the applicants are in

7  third countries when they start out the

8  application process; right?

9      A.     That is my -- yes, there are

10  those who start the SIV application process

11  presumably from somewhere other than

12  Afghanistan or the United States.

13      Q.     And that was always the case

14  even before the U.S. Embassy in Kabul

15  closed?

16      A.     I don't have that data.  It was

17  the case that they could.  I believe so.

18      Q.     Do SIV applicants who are in

19  third countries when they start the SIV

20  application process have to take the action

21  in Step 8?

22      A.     So you're saying applicant -- an

23  applicant who is in a third country, do they

24  need to inform us of where they would like

25  to be interviewed?  Yes.

1                       McGeary

2    will provide an interview date to the

3    applicant, it states that one will be

4    provided, and the time frame --

5         Q.     Is --

6              MS. DAVILA:  Counsel is

7         interrupting the witness.  Please

8         finish your answer.

9         A.     Right.  It does state the time

10   frame for doing so, for providing the

11   interview date, and it states that NVC will

12   provide interview date.

13        Q.     So what you were talking about

14   doesn't say when the interview date will be?

15             MS. DAVILA:  Objection, asked

16        and answered.  Repetitive, cumulative.

17        I'd like to mark the transcript at this

18        point.

19        A.     So the plan describes the

20   scheduling process and the scheduling

21   process does not enable the Department to

22   list the specific date in advance of when an

23   applicant will be scheduled for interview.

24   It depends on various factors.  It depends

25   on at which point in time the applicant

1                         McGeary

2   became documentarily complete, it depends on

3   the availability at the target post, the

4   adjudicatory capacity of the target post, it

5   depends on the, you know, which dates are

6   available, depending on how many also Afghan

7   SIV applicants are in the queue ahead of

8   that particular applicant, so there are

9   various factors to consider and a specific

10  date cannot be provided.  However, it does

11  state the commitment that NVC will provide

12  an interview date to the applicant based on

13  the scheduling cycle and that in a case

14  where a -- there's a post that has a demand

15  exceeding the capacity for interview, as

16  soon as the post does report that they have

17  the capacity, then NVC will once again

18  schedule, tell the applicant within 60

19  calendar days when they will have their

20  interview.  That's why the commitment is

21  phrased in terms of the scheduling cycle to

22  reflect the actual processing on the ground.

23           At this time, it's probably also

24  relevant to note the Department provides

25  assistance to the CARE program to applicants

1                         McGeary

2    in an endeavor to make sure they're able to

3    make it to their interviews.

4         Q.    Does the NVC's contract with

5    LDRM contain any timeliness standards

6    related to Step 9 of the process?

7         A.    Scheduling -- the contract

8    doesn't include timeliness standards for

9    scheduling because, again, it's based on the

10   scheduling cycle.  So the contractor works

11   with posts, again using the Power BI tool

12   that posts have to have access to the cases

13   that are at NVC that have become

14   documentarily complete and for which a visa

15   is available and for them then to use that

16   to report to NVC by e-mail their scheduling

17   capacity for the next scheduling cycle.

18   Based on those two bits of information, NVC

19   works to schedule cases at a post.  Also

20   taking into account the guidance that Afghan

21   SIV applicants have priority scheduling.

22        Q.    Why did the State Department

23   change the Performance Standard at Step 9 of

24   the Afghan SIV Process from what it was in

25   the Previous Plan at Step 11, which is on

Page 432

1                         McGeary

2   page 6 of 14 of Exhibit 1?

3             MS. DAVILA:  Let the record

4        reflect the witness is referring to ECF

5        Document 113.

6        A.     All right.  So the changes to

7   this section in terms of NVC scheduling the

8   applicant more accurately reflect the

9   current process for scheduling, which,

10  again, is based on the scheduling cycles,

11  and let's see what this says.  This also --

12  I mean, yeah, based on the scheduling cycles

13  and based on the reality that if a post

14  doesn't have capacity, then a case cannot be

15  scheduled.

16       Q.     Has the scheduling cycles

17  process changed since the Previous Plan?

18       A.     The scheduling cycles have not

19  changed.  However, what did occur was a

20  global pandemic that severely restricted the

21  capacity of our posts overseas and generated

22  a worldwide immigrant visa scheduling

23  backlog and non-immigrant -- well, interview

24  backlog I guess I would say.  So this Plan,

25  of course, was submitted, you know, at the

Page 433

1                    McGeary

2    beginning of the pandemic, but that backlog

3    compounded over time.

4         Q.    And you said that the Proposed

5    Plan was changed based on the reality that

6    if a post doesn't have capacity, then a case

7    cannot be scheduled --

8         A.    That's right.

9         Q.    -- but was that the case at the

10   time of the Previous Plan?

11              MS. DAVILA:  Objection,

12        compound.

13        A.    It has remained the case that if

14   a post does not have capacity, then an

15   interview cannot be scheduled.  However, the

16   number of posts where demand exceeded

17   capacity due to the pandemic, you know,

18   physically increased the number of posts

19   that had a capacity deficit.

20        Q.    So are you saying that the State

21   Department changed the Performance Standard

22   at Step 9 of the Afghan SIV Process because

23   of the interview backlogs for immigrant

24   visas and non-immigrant visas?

25        A.    Not only, but it reflects

Page 434

1                          McGeary

2    reality that if a post -- that, one, a

3    reality that in the -- the post was still

4    recovering and worldwide there's still an

5    effort to return to pre-pandemic

6    adjudicatory capacity, for one.  And, two,

7    the fact is and has always been the case

8    that if there is no capacity at a post, then

9    the interview cannot be scheduled.  We don't

10   want to schedule an interview at NVC and

11   then have an applicant appear and there's

12   nobody to interview them.

13        Q.    Are there any other reasons that

14   the State Department changed the Performance

15   Standard at Step 9 of the Afghan SIV

16   Process?

17        A.    I mean, the step that's written

18   reflects the current procedure.

19        Q.    So no other reasons?

20        A.    No.

21        Q.    And we'd like to introduce

22   Exhibit 32, which is an Excel document, so I

23   think it may be easiest if you are able to

24   open from your computer.  It was one of the

25   files e-mailed to counsel earlier today.

Page 435

1                    McGeary

2              MS. DAVILA:  Are you able to

3        share it in the chat?

4              MS. HIROSE:  It's marked

5        Confidential, so it depends on you if

6        you'd like that.

7              MS. DAVILA:  Let's see if we

8        have it.

9              MS. HIROSE:  It's Defendant

10        3634.  That's the Bates number.

11              MS. DAVILA:  Mariko, can you

12        hear me?

13              MS. HIROSE:  Yes.

14              MS. DAVILA:  Are we off the

15        record?  Sorry.

16              MS. HIROSE:  We can go off the

17        record.

18              (Whereupon, a discussion was

19        held off the record.)

20              MS. HIROSE:  I'd like to mark

21        the Excel document titled

22        DEFLD-00003634 as Exhibit 32 for the

23        record, please.

24              (Exhibit 32, Excel document

25        titled DEFLD-00003634, marked for

Page 436

1                          McGeary

2          identification, as of this date.)

3          Q.     Ms. McGeary, does this file look

4    familiar to you?

5          A.     It looks similar to a file

6    that's familiar to me; yes.

7          Q.     What is this file?

8          A.     So the file is labeled January

9    2023 Scheduling & Backlog Dashboard.

10         Q.     Who prepares this file?

11         A.     I mean, if it is the file that's

12   used at NVC, then it is prepared by the

13   contractor according to a -- what do you

14   call it -- formula basically.

15         Q.     And what is the file used for?

16         A.     The file is used to basically

17   allow NVC to see the capacity at any given

18   post and also to enable us to report on

19   cases scheduled.

20         Q.     Is this file prepared on a

21   monthly basis?

22         A.     Yes.

23         Q.     I'm going to go to the tab

24   marked SIV(SQ) Backlog.

25                Do you see the Excel spreadsheet

Page 437

1                              McGeary

2    with dates on the top row and post codes on

3    the left-hand side column?

4         A.    Yes.

5         Q.    Are you familiar with this tab

6    of Exhibit 32?

7         A.    I'm aware that it exists.  I'm

8    not the one who would operationally use it

9    on a daily basis.

10        Q.    Do you know what this tab shows?

11        A.    Well, it says SIV(SQ), so that's

12   Afghan SIV backlog, so that would normally

13   show the cases that were pending

14   adjudicatory capacity at a given post for

15   that time frame that's listed in the top

16   whatever the month, September '21, month and

17   year it looks like.

18        Q.    I'm going to scroll down to the

19   row titled KBL.

20              Do you see that KBL?  Do you see

21   that row on the screen that's highlighted

22   now?

23        A.    Yes.

24        Q.    Does KBL stand for Kabul?

25        A.    Yes.

1                         McGeary

2        Q.      What does it mean for Kabul to

3   be showing 21,067 as the number under the

4   column for January '23?

5        A.      So that would be the number of

6   documentarily complete cases for IV interview

7   that are pending scheduling, so, therefore,

8   pending the applicant's notification of

9   where they would like to be interviewed.

10       Q.      And if you could look at the row

11  that says ISL, we'll scroll up, do you see

12  that row, it's highlighted now?

13       A.      Yes.

14       Q.      Is ISL Islamabad?

15       A.      Yes.

16       Q.      So does this tab show that the

17  backlog of SIV cases at Islamabad is 387 as

18  of January 2023?

19       A.      That's what's marked there; yes.

20       Q.      And we're going to go now to the

21  tab that's labeled Capacity.

22               Are you familiar with this tab?

23       A.      Once again, I'm familiar that it

24  exists, but as the director, I'm not the one

25  operationally that would be using it.

Page 439

1                        McGeary

2        Q.      So I'm going to scroll again to

3   the row that's labeled ISL, and do you see

4   that in October 2019 Islamabad had a

5   capacity to interview 1,775 slots?

6        A.      That's what it says; yes.

7        Q.      And if we scroll all the way to

8   the right, do you see that in January of

9   2023, Islamabad had 830 slots available?

10       A.      That's what it says; yes.

11       Q.      So is the interview capacity at

12  Islamabad lower than it has been in the

13  past?

14       A.      I mean --

15              MS. DAVILA:  Objection,

16       ambiguous.

17       A.      I mean, you would have to scroll

18  back and compare the interview capacity that

19  is listed here on a monthly basis.

20  Definitely interview capacity fluctuates for

21  any number of reasons.

22       Q.      But interview capacity --

23       A.      (Indiscernible due to

24  over-speaking.)

25       Q.      I'm sorry.  Were you saying

Page 440

1                    McGeary

2  something else?

3      A.    Yes.  At every post it

4  fluctuates.

5      Q.    But interview capacity at

6  Islamabad has been higher at points in the

7  past than it was in January 2023?

8              MS. DAVILA:  Objection,

9      ambiguous.

10     A.    The capacity that's listed on

11 this chart, I mean, it's -- you can compare,

12 it's at some points higher, some points

13 lower.

14     Q.    Is it the post that makes a

15 determination as to its interview capacity?

16     A.    Yes, it is.

17     Q.    Is there -- withdraw that

18 question.

19             MS. HIROSE:  I will put away

20     this exhibit for now and introduce

21     DEFLD-00001772 as an exhibit.  And I'd

22     like to mark that as Exhibit 33 for the

23     record, please.

24             (Exhibit 33, cable dated October

25     21, 2021 bearing Bates Nos.

Page 441

1                      McGeary

2          DEFLD-00001772 -- 1781, marked for

3          identification, as of this date.)

4               MS. DAVILA:  Could you please

5          repeat the -- you said DEF 1 --

6               MS. HIROSE:  772.

7               MS. DAVILA:  Let the record

8          reflect we've handed the printout of

9          the exhibit to the witness.

10              Counsel, it's fine if you'd like

11         to put it on the screen as well.

12    Q.     Do you have in front of you a

13   document that says DEFLD-00001772 on the

14   bottom right-hand corner on the first page?

15   A.     Yes.

16   Q.     And is it a 10-page document?

17   A.     Yes.

18   Q.     I'm going to ask you if you

19   recognize it, so please take the time to

20   review it and let me know when you're done.

21   A.     Okay.

22   Q.     Do you recognize Exhibit 33?

23   A.     Yeah.  I mean, I recognize it as

24   department guidance that was transmitted to

25   post in October 2021.

Page 442

1                    McGeary

2       Q.     Is this guidance currently in

3    effect?

4       A.     I don't have in front of me the

5    latest guidance, whether this guidance was

6    superseded by more recent guidance, but I'm

7    aware of similar guidance being in effect.

8    It prioritizes, as I said, Afghan SIV

9    interviews.

10      Q.     Okay.  You can keep that there

11   with you.

12            MS. HIROSE:  I'm going to

13         introduce as Exhibit 34 for the record

14         DEF 1782.

15              (Exhibit 34, cable dated

16         December 22, 2021 bearing Bates Nos.

17         DEFLD-00001782-1786, marked for

18         identification, as of this date.)

19            MS. DAVILA:  Let the record

20         reflect we've passed a paper copy of

21         the exhibit to the witness.

22            MS. HIROSE:  Okay.

23      Q.     And this document should be

24   labeled DEFLD-00001782 on the bottom right.

25              Do you see that?

Page 493

1                        McGeary

2    completeness.  Step 3, NVC sends completed

3    application.  And then to Step 6 again and

4    Step 7 and onwards.  So the NVC parts of the

5    process for SIV are twofold.  It's both the

6    application side in general and then the

7    immigrant visa side.

8        Q.     Which unit at NVC would handle

9    Iraqi SIV applicants at Step 2?

10       A.     This is so hypothetical.  So, I

11   mean, right now I don't believe there's any

12   in Step 2.  If there were to be applicants,

13   I mean, we created a separate unit for SIV

14   COM, which is within timeliness.  It would

15   really depend.  Like for some reason if

16   there was to be a huge amount of demand,

17   then it would be specific for any program,

18   specific staffing that the contractor would

19   assign to be able to accommodate it.  That

20   doesn't exist right now for the Iraqi

21   program.

22       Q.     Does NVC receive appeals from

23   COM denials for Iraqi applicants?

24       A.     It is possible.

25       Q.     Which unit would process those

Page 494

1                        McGeary

2     appeals?

3          A.      So they would come into the

4     e-mail box, and, again, the review would

5     entail making sure that whatever document

6     was deemed to be deficient in the

7     application process is, in fact, present and

8     it wasn't a duplicate -- like basically the

9     applicant didn't just resubmit the same

10    document that had already been denied, but

11    there's no other evaluation that is

12    performed because NVC is -- NVC's portion of

13    the process is purely administrative and it

14    would be sent back to the COM designee for

15    adjudication.  That's the general appeals

16    process for SIV cases.

17         Q.      The e-mail box that Afghan --

18    sorry.  Withdraw that.

19                 The e-mail box that Iraqi SIV

20    applicants would use is that same e-mail box

21    as the Afghan SIVs?

22         A.      Honestly, I need to confirm.

23    But it is handled by e-mail, the same

24    general type of process.

25         Q.      Is it handled by the same unit

Page 495

```
 1                    McGeary
 2   that handles Afghan SIVs?
 3        A.     I think, again, we're dealing
 4   with a hypothetical, but the Afghan SIV --
 5   SIV COM was kind of surged to be able to
 6   handle the influx of Afghan SIV applicants,
 7   so whether or not the contractor would
 8   handle it through that box or separately,
 9   I'm not sure, but I do know that all e-mail
10   correspondence boxes that exist at NVC are
11   fully within term limits.
12        Q.     Do you see how at Step 2 of the
13   Iraqi process, the Proposed Performance
14   Standard uses business days?
15        A.     I see that.
16        Q.     Is that for the same reason that
17   the Proposed Plan for the Afghan Process
18   uses business days?
19        A.     It is.
20        Q.     Do you see at the next step for
21   the Proposed Performance Standard, it says
22   five business days?
23        A.     I see that.
24        Q.     Does the Proposed Plan use
25   business days for the same reason that the
```

Page 496

1                     McGeary

2    NVC uses business days at other steps in the

3    Proposed Plan?

4         A.    Yes.  Yes.

5         Q.    And at Step 7 of the Iraqi plan,

6    which is on the next page, page 4 of 17,

7    bottom of the page --

8         A.    Okay.

9         Q.    -- do you see what I'm looking

10   at?

11        A.    I do.

12        Q.    Do you see that the Performance

13   Standard at Step 7 of the Iraqi process says

14   15 business days?

15        A.    I do.

16        Q.    And this is a change from

17   5 days, which was in the Previous Plan at

18   Step 8?

19             MS. DAVILA:  Let the record

20        reflect that the witness is referring

21        to ECF Document 113.

22        A.    Yes, I see that.

23        Q.    Why did the State Department

24   make this change in the Proposed Plan?

25        A.    It reflects the reality of

1                        McGeary

2    contractor's time allotted for that step.

3        Q.    Is the same unit handling Afghan

4    SIV applications at this step also handling

5    Iraqi SIV applications?

6        A.    So, I mean, again, I think it

7    would depend on -- the contractor adjusts

8    routinely the way that it manages its

9    workload based on demand, and so I -- it

10   would depend on what level of demand, you

11   know, and then the contractor would either

12   break down units or assign individuals or

13   perhaps, you know, keep them in the same

14   pool together with Afghans depending on

15   ability to keep posts (indiscernible).  It

16   really is adjusted based on, you know,

17   workload and demand.

18       Q.    So LDRM could adjust how it's

19   handling Iraqi applications at Step 7

20   depending on circumstances?

21             MS. DAVILA:  Objection, calls

22        for speculation.  Objection,

23        repetitive.

24       A.    So, as I mentioned, for

25   instance, due to the volumes of Afghan SIVs,

Page 498

```
 1                    McGeary
 2   the Government gave technical direction to
 3   the contractor that the prioritization
 4   within the context of processing of all
 5   types of immigrant visas at this stage
 6   should be, you know, basically the
 7   prioritization should be given to processing
 8   Afghan SIVs to make sure that they remained
 9   in timeliness given the volumes.  If the
10   same issue were to occur with Iraqi SIVs,
11   quite possibly there would be similar
12   technical guidance and the contractor would
13   respond accordingly.  There's not been any
14   surge for Iraq SIV immigrant visa
15   pre-processing steps.
16       Q.    Does the prioritization mean
17   that Afghan SIVs are being prioritized over
18   Iraqi SIVs at Step 7 of the Proposed Plan?
19            MS. DAVILA:  Objection,
20       mischaracterizes testimony.  Objection,
21       calls for speculation.  Objection,
22       ambiguous.
23       A.    So the contractor across the
24   board has the timeliness imperative of 10
25   business days for any type of immigrant visa
```

1                    McGeary

2   pre-processing at that step, the immigrant

3   visa step, and because of the massive demand

4   and rate of documentarily complete

5   application approvals of Afghan SIV cases,

6   we gave additional direction that not to

7   allow the Afghan SIV program to -- sorry --

8   to do everything in the contractor's power

9   to make sure that the Afghan SIV program

10  remains in timeliness.  We've not had a

11  similar issue, as I mentioned, for the Iraq

12  program.  Were we to have one, we would

13  definitely address that with the contractor

14  in terms of technical guidance.  It's not a

15  case of prioritizing one over any others.

16  It's just a matter of making sure that that

17  one group given the volume is not exceeding

18  that 10 business days.

19       Q.     Is it --

20       A.     (Indiscernible due to

21  over-speaking.)

22       Q.     I'm sorry, go ahead.

23       A.     I said despite the volume, they

24  should be making sure that it does not

25  exceed the 10 business days.

Page 500

```
 1                    McGeary

 2        Q.    Is it the case that the

 3   Performance Standard for Iraqi SIVs at

 4   Step 7 has increased to 15 business days

 5   because of the volume of Afghan SIV

 6   applicants from the Department's

 7   perspective?

 8        A.    No.  I wouldn't state that.

 9   Again, what I state is aligning with the

10   reality of the contractor having already

11   10 business days in order to perform that

12   function for any case writ large and for

13   consistency.

14        Q.    And why were the five additional

15   business days added to the Iraqi SIV process

16   over what the contractor requires -- I'm

17   sorry.  I'll start again.

18             Why did the State Department add

19   five business days for the Iraqi SIV process

20   over what the contract requires for LDRM at

21   Step 7 of the Proposed Plan?

22             MS. DAVILA:  Objection,

23        ambiguous.  Objection, repetitive.

24        A.    So once again, it's for

25   consistency to align with reality that the
```

Page 501

1                    McGeary

2  contractor already has 10 business days and

3  we're not adding 5 days to put in, and the

4  reality is the processing occurs much faster

5  than that.  It is to allow for, you know,

6  any kind of incoming volumes.

7       Q.    But the incoming volumes is not

8  about the Iraqi SIVs; correct?

9            MS. DAVILA:  Objection,

10       ambiguous.

11       A.    That would be hypothetical.

12  We're aware absolutely we can anticipate

13  huge incoming volumes of Afghan SIVs, that's

14  a given fact.  Whether or not we have higher

15  volumes of other types of SIVs or IVs,

16  again, the 15 business days is to allow for

17  that eventuality.

18       Q.    Is it fair to say that there

19  won't be a surge in volume of Iraqi SIVs

20  given that the application period has closed

21  for the Iraqi program?

22            MS. DAVILA:  Objection,

23       misstates testimony.  Objection, calls

24       for speculation.  Objection, asked and

25       answered.

Page 502

1                         McGeary

2         A.      So there's no separate Iraq SIV

3    unit that the contractor has.  So the

4    contractor is drawing from the same pool of

5    individuals who are handling the Afghan SIV,

6    I'm talking about the IV side of the process

7    now, the Afghan SIV and any other immigrant

8    visas.  Within that, depending on need

9    volumes, the government at any point in time

10   can give technical direction to the

11   contractor stating make sure that you

12   prioritize these to make sure that they stay

13   within the -- your contractual timeliness,

14   and that right now is the case for Afghan

15   SIVs and the contractor is within time

16   limits.  So, again, it really depends on the

17   scenario, and this is to account for the

18   fact that there is no separate Iraq unit.

19   It's the same unit.

20        Q.      So it accounts for the possible

21   increase in volume from IV applications

22   other than SIV applicants -- other than

23   Iraqi SIV applicants?

24        A.      It accounts for the possible

25   increased volume of workload for that unit,

Page 503

1                           McGeary

2    primarily due to most likely Afghan SIVs;

3    yes.  But, again, this is within.  It's not

4    saying that a case will not be routinely

5    completed before that time.

6          Q.    On the next page, which is page

7    5 of 17, Step 9, do you see that in the

8    third column it refers to completeness?

9          A.    I'm sorry.  What page are you on

10   now?

11         Q.    5 of 17.

12         A.    Okay.  Uh-huh.

13         Q.    Do you see that the description

14   for Step 9 uses the word completeness?

15         A.    Yes.

16         Q.    Is the State Department using

17   that word completeness in the Proposed Plan

18   for the same reason that it used that word

19   for the Afghan Plan?

20         A.    So the term documentarily

21   complete is the standard term that we use at

22   NVC to describe the -- whether or not the

23   applicant has met the criteria to proceed to

24   the next step.

25         Q.    And that's why the State

Page 504

1                        McGeary

2    Department used that term in Step 9 of the

3    Iraqi Plan?

4         A.     Correct.

5         Q.     And do you see that in the

6    Performance Standard column of Step 9 of the

7    Iraqi Plan, it uses 15 business days as the

8    standard?

9         A.     Yes, I see that.

10        Q.     Is the State Department using

11   that Performance Standard for the same

12   reasons that it is using that standard for

13   the Afghan SIV program in the Proposed Plan?

14        A.     Yes.

15        Q.     And for Step 9, when it says on

16   the Performance Standard that NVC will

17   determine whether the case is documentarily

18   complete within 15 days of receipt, does

19   that include notifying the applicant whether

20   they are documentarily complete or not?

21        A.     Yes.  So similar to the process

22   that I described for the Afghan SIV process,

23   an applicant could provide documents all at

24   once or bit by bit depending on varying time

25   frames, they could provide a document that

Page 505

1                        McGeary

2    doesn't meet the reciprocity and, therefore,

3    is not able to be considered complete, and

4    each time there is an exchange with the

5    applicant and the contractor has 10 business

6    days and within 15 business days to account

7    for potentially increased volume.

8         Q.     The contractor has 10 business

9    days under its contract to respond to the

10   applicant?

11        A.     Right.  To respond to the

12   applicant and the response could say

13   depending -- it depends on what the

14   applicant's provided.  I mean, maybe they

15   provided one document.  They might say, yes,

16   thank you for this one document, you still

17   are missing four.  Maybe they provided them

18   all and they'll say okay, your case is

19   documentarily complete, then we'll move to

20   the next step.  It depends.

21        Q.     Okay.

22               And under the Proposed Plan,

23   Step 9, the Proposed Performance Standard is

24   that the NVC will respond to the applicant

25   within 15 business days?

Page 506

1                      McGeary

2        A.      Yes.

3        Q.      Turning to Step 10 of the Iraqi

4    Plan, do you see that the Performance

5    Standard says 10 business days?

6        A.      I do.

7        Q.      Does the standard use 10

8    business days for the same reasons that

9    business days is used throughout the

10   Proposed Plan for NVC?

11       A.      So the use of proposed business

12   days is because the contractor works within

13   business days contractual requirement; yes.

14       Q.      At Step 10, are interviews being

15   scheduled at Embassy Baghdad as of now?

16       A.      I believe there's limited

17   capacity at Embassy Baghdad, but I'm not

18   sure where they're being scheduled right now

19   writ large without consulting the scheduling

20   worksheet.  Again, not having the cases to

21   schedule, I don't deal with that on a

22   regular basis.

23       Q.      Is Embassy Baghdad open for

24   interviews at this point?

25       A.      I think because the scheduling

1                     McGeary

2    workbook is a definitive document we used to

3    determine post capacity for interview, we

4    can reopen that document and check what it

5    says.

6         Q.    Okay.  So we can screen share,

7    this is Exhibit 32, DEFLD 3634.

8              Is this the document you were

9    just referring to --

10        A.    Yes.

11        Q.    -- Ms. McGeary?

12        A.    Yes, it is.

13        Q.    And what should we look at to

14   determine?

15        A.    So BGH, which is Baghdad, and

16   look at the capacity, it says providing

17   zero -- well, that's -- we need to scroll

18   over to the time -- to the current time

19   frame because that was during COVID.  No.

20   It is -- it has no capacity listed.

21        Q.    When Embassy Baghdad opens, will

22   Iraqi SIV cases have to be transferred there

23   if applicants want to be interviewed there?

24        A.    That's a complicated question,

25   so I'm unaware right now based on current

Page 508

1                          McGeary

2    information whether or not there are cases

3    pending there.  I would assume that if there

4    were, the applicants would have given their

5    desire to be notified of their desire to be

6    interviewed elsewhere, so it could be

7    there's no pending cases there.  Again, we

8    don't have -- I mentioned I believed there

9    was like one case pending in NVC's queue

10   which is pending applicant action, so this

11   is kind of like a hypothetical question

12   right now.

13        Q.    Could we go to the SIV(SQ)

14   Backlog tab.  And do you see the row

15   highlighted BGH?

16        A.    I do.

17        Q.    Okay.

18              And it looks like there are no

19   cases pending at Baghdad right now.

20        A.    It does appear to be the case.

21        Q.    Well, for Kabul there were many

22   cases pending there even though it's closed?

23              MS. DAVILA:  Objection,

24        ambiguous.

25        A.    So I think I want to once again

1                        McGeary

2    and it starts in the previous page, but

3    it's -- there's a section that says:  For

4    purposes of this Revised Adjudication Plan,

5    Defendants will include all Afghan and Iraqi

6    SIV applicants in their reporting.

7              Do you see that?

8        A.    Yes.

9        Q.    I'm going to ask about that and

10   first just focus on the class members who

11   are covered by the Previous Plan.  So if you

12   could also pull out Exhibit 1, which is

13   Document 113.

14       A.    Okay.

15       Q.    Page 2 of 14.

16             Do you see that numbered list on

17   that page?

18       A.    Yes.

19       Q.    And it continues to the

20   following page?

21       A.    Yes, it does.

22       Q.    Do the parameters listed here

23   accurately describe how Defendants

24   identifies class members for purposes of the

25   Previous Plan?

Page 516

1                          McGeary

2        A.     I'm reading it.  So, I mean, the

3   parameters were what the Government

4   endeavored to follow when it came to

5   identifying class members, but it

6   experienced a number of complications in

7   implementing that -- those parameters.

8        Q.     Can you describe the

9   complications you're talking about?

10        A.     Definitely.  One such

11   complication is the very nature of -- well,

12   the complex nature of the SIV pipeline or

13   lifeline even I guess you can call it, the

14   very number of agencies and offices that are

15   involved throughout the lifeline of an SUV

16   application, the number of systems used by

17   each one of those agencies and offices and

18   that they differ, the discreet systems.  The

19   inability by some of those systems to even

20   have any interface with the other systems

21   when it comes to any possible tracking, the

22   fact that the very manual nature of the

23   assignment of a tracking identifier to the

24   cases created inconsistencies and gaps in

25   the reporting that were noted as well by the

1                    McGeary

2    Plaintiffs, the fact that the systems do

3    not -- are not designed to track applicants

4    in that fashion and there is no way without

5    going into case notes to determine whether

6    or not a case is pending government action

7    or pending applicant action at any given

8    step of the process.  A host -- a whole host

9    of complications.

10       Q.    You mentioned the manual nature

11   of the assignment of a tracking identifier.

12            Could you describe what you mean

13   by that?

14       A.    Yes.  For instance, under the --

15   we're not calling it the old plan, we're

16   calling it the prior plan, the --

17       Q.    The Previous Plan.

18       A.    Previous Plan.  Thank you.  I

19   was looking for that word.  The Previous

20   Plan.  The process involved, first of all,

21   USCIS.  So USCIS has their own systems and

22   its own methodology for assigning case

23   numbers or other codes to a case.  Once a

24   case arrives at NVC, it has to be input into

25   NVC's systems, which would involve another

```
 1                    McGeary
 2  set of systems and another set of codes.  If
 3  we're talking about NVC's private process
 4  only, the very first interaction is the
 5  applicant writing an e-mail to NVC, so the
 6  very first identifier would be an e-mail.
 7  After that, the applicant would be assigned
 8  a unique case number.  That case number
 9  would prevail up until the point where the
10  case becomes documentarily complete --
11  sorry.  And then that case is entered into
12  the (SQ)SIV system, but when it is
13  documentarily complete upon review, then
14  ASIV, that is the office in the State
15  Department that is responsible for the COM
16  adjudication process, uses another system
17  and would have to manually assign a case
18  number in that system or some kind of
19  identifier.  For NVC's purposes only, NVC
20  had attempted to track class members by
21  putting an indicator I believe with a 77 or
22  99, I can't remember which one of the two
23  apply to Afghan cases, into the tax number
24  field, and then was able to identify how
25  long an applicant has spent in NVC.
```

Page 519

```
 1                    McGeary
 2   However, we are not able easily to
 3   differentiate between the time the applicant
 4   spent in a NVC, thus U.S. government-
 5   controlled part of the process, and which
 6   part was actually pending applicant action.
 7   I talked about the back and forth that
 8   ensues when it comes to collecting
 9   documents, for instance.  In some cases, the
10   applicant provides them right away, in other
11   cases it could take a day, weeks, months,
12   longer to receive the documents, meaning the
13   Government can take no action.
14              I'm trying to think what else.
15   Basically the only way to determine whether
16   or not a case is pending government or
17   applicant action is to look into the case
18   notes and see what happened with that.
19              So it's basically the fact that
20   there's -- each one of the government
21   processes uses an entirely different system
22   and you have to basically start all over
23   again and manually enter a tracking number,
24   which will not survive to the next step.
25   Therefore, it makes the entire process very
```

Page 520

1                    McGeary

2    much prone to human error.

3        Q.     To make sure I'm understanding,

4    the manual identifying number is a number

5    specific for class member reporting

6    purposes?

7        A.     For -- I can speak only for NVC.

8    For class members, there was an

9    identifier -- specific identifier issued and

10   that was input into the tax identification

11   number field, but, again, as I said, first

12   there's an e-mail that comes in, then there

13   is a case number that's assigned, then the

14   case goes into (SQ)SIV, goes to COM.  Once

15   it comes out of -- and ASIV has got their

16   very own system and own way of tracking

17   identifying cases.  Comes back into NVC for

18   IV processing.  In the old way, there is a

19   USCIS petition involved and they're tracking

20   their system.  So honestly it really depends

21   on processors manually entering a number at

22   any given step of the process to be able to

23   track how long an applicant has spent in

24   that step.  However, it does not at all

25   state how long the applicant has spent in

Page 521

1                          McGeary

2    government-controlled parts of the process,

3    without going into case notes.  Again,

4    manually, case by case.

5        Q.    You were able -- you said that

6    NVC was able to identify how long an

7    applicant has spent in NVC.

8               Did you mean in NVC total across

9    both the pre-COM and the IV process?

10       A.    Well, that would be again a

11   manual process adding and using different

12   systems.  And, once again, we can't

13   differentiate between the time the applicant

14   would have spent in something that is

15   pending, government action versus pending

16   applicant's action.

17       Q.    Other than having to transfer

18   information across systems, was the

19   identification of class members a one-time

20   thing?

21            MS. DAVILA:  Objection,

22       ambiguous.  Objection, mischaracterizes

23       testimony.

24       A.    It's not an automated process if

25   that's what you're asking.

1                    McGeary

2        Q.     And --

3        A.     And it is subject to human error

4   because, as has been noted in the various

5   meet and confer exchanges, that there's been

6   discrepancies noted, and what's the plainest

7   believed to be the number of applicants at

8   any part of the process and what the

9   government is reporting for the very reason

10  that human error definitely is entered into

11  the equation the more times you have to

12  manually enter a process, the more systems

13  you have to manually transfer an identifier

14  to, and including systems that actually have

15  no interface and no ability to do that.

16  It's not the way that they were designed

17  basically.

18       Q.     Other than transferring the

19  information across systems -- withdraw that

20  question.  Maybe I'll just step back and

21  ask, how did NVC implement the parameters on

22  page 2 of 14 of Exhibit 1 initially?

23       A.     So the first step reflects the

24  number of -- I mean, that's the e-mail,

25  initial COM application e-mail process, and

1                    McGeary

2    already expanded the scope to include others

3    who had applied after May 22 of 2020.

4         Q.    So I hear you to be saying there

5    are three justifications for Defendants'

6    changes to class member accounting.  One,

7    the system design issues.  Two, the expanded

8    scope of class members covered by the

9    Proposed Plan.  And, three, the volume of

10   SIV applicants.

11            Is that fair?

12            MS. DAVILA:  Objection,

13        mischaracterizes the testimony.

14        A.    There's the element of human

15   error that is magnified at every time that

16   you need to report on an expanding set of

17   class members at any given stage of a

18   process in various -- in several different

19   U.S. Government offices using several

20   different U.S. Government systems.  There is

21   the huge volumes, as I mentioned.  There is

22   the fact that the scope was expanded.

23   Therefore, possibly requiring many different

24   possibly even daily updates to the scope and

25   the reporting, and then also the reporting

1                         McGeary

2    burden because this very manual process and

3    the reports basically require a tremendous

4    amount of bandwidth on the part of the very

5    U.S. Government officials who -- and very

6    contractors who are responsible for ensuring

7    smooth processing of these applications and

8    who are working consistently and constantly

9    on ways to improve the process and

10   facilitate the ability of Afghan and Iraqi

11   applicants to make their way through the

12   entire process.

13        Q.     Are there any other

14   justifications for changes to class member

15   reporting in the Proposed Plan?

16        A.     Well, there's the accuracy

17   argument, as I mentioned, not to constantly

18   have to have confusion as to, you know, why

19   are -- why does our data not match the

20   Plaintiffs' data.

21        Q.     Anything else?

22        A.     Those are the main reasons.

23        Q.     You mentioned the fact that the

24   systems were not designed for class member

25   reporting as one justification for changing

```
 1                    McGeary
 2   class member reporting; is that right?
 3              MS. DAVILA:  Objection,
 4       mischaracterizes testimony.
 5       A.     So there are system impediments
 6   because there are many systems involved, as
 7   I mentioned, and a manual process along each
 8   step of the way and there are systems that
 9   are not connected to some of the other
10   systems and creating a greater obstacle.
11   The larger systems that the Department uses
12   are designed to process a certain stage of
13   an immigrant visa application.  They're not
14   designed for the purpose of reporting.
15   They're designed for the purpose of
16   pre-processing and processing and scheduling
17   and having an applicant attend an interview
18   and have an immigrant visa adjudication
19   made.  The purpose is really focused on the
20   process, not on reporting.  That's how the
21   systems are designed.
22       Q.     Did those system impediments
23   that you just spoke about exist at the time
24   that the Previous Plan went into effect?
25       A.     They did.
```

Page 529

```
 1                      McGeary
 2      Q.      Could the State Department
 3  continue to identify class members covered
 4  under the Previous Plan using the method
 5  that it used previously?
 6              MS. DAVILA:  Objection,
 7          repetitive.  Objection, ambiguous.
 8      A.      So I have mentioned the
 9  impediments to accurate reporting and the
10  bandwidth involved in trying to make
11  reporting and the gap that ensues in ability
12  to differentiate between government-
13  controlled steps and applicant-controlled
14  steps.  So our focus, above all here at NVC
15  and in the State Department, is to make
16  every possible effort to ensure that the
17  Afghan SIV applicant is able to make their
18  way through the steps all the way up to
19  interview, and that's the focus -- very
20  concentrated focus of several offices with
21  which I collaborate and policy direction
22  from the highest levels of the State
23  Department, so our efforts really are
24  focused on being able to process these
25  cases.  To the extent that we have an
```

1                         McGeary

2     imperfect or a reporting requirement that

3     relies upon systems that are not connected

4     to begin with relies on a very manual

5     process will produce inaccuracies and will

6     definitely consume continued bandwidth, that

7     is, we prefer to direct honestly toward the

8     processing.  But is it theoretically

9     possible?  Yes, of course it's theoretically

10    possible, but the end result will be again

11    an imperfect product that possibly will

12    generate confusion and will consume

13    bandwidth.

14        Q.    And specifically with respect to

15    the class members that were covered under

16    the Previous Plan, are the impediments that

17    you mentioned just now the same as they were

18    when the State Department was doing class

19    member reporting under the Previous Plan?

20             MS. DAVILA:  Objection,

21         repetitive.  Objection,

22         mischaracterizes testimony.

23        A.    So the circumstances, as I

24    mentioned, did change between the Previous

25    Plan being formulated and now, the closure

Page 531

1                        McGeary

2    of our Embassy in Kabul, the huge surge in

3    demand of Iraqi and Afghan SIV applications

4    and interest, the Congress changing the

5    scope of the program, basically expanding

6    the ability or the -- I guess the

7    requirements for the SIV Program, the

8    pandemic, the worldwide pandemic that

9    resulted in backlog and staffing shortages

10   worldwide, constrained operations, also the

11   technical improvements that the State

12   Department has made in its ability to handle

13   the e-mails that we use both for the SIV COM

14   application process and for the IV side of

15   the process, the additional staffing that

16   the State Department applied across the

17   board including massive search staffing for

18   in NVC and elsewhere to handle the

19   applications, the fact that the contractor

20   is fully within timeliness to implement the

21   NVC portions of the process and has put in

22   place steps to continue to be in timeliness.

23   For all of these reasons, I think there's

24   vastly changed circumstances to, you know,

25   between the Previous Plan and now.

Page 532

1                        McGeary

2        Q.      Do those changed circumstances

3   affect the State Department's reporting with

4   respect to class members covered under the

5   Previous Plan?

6                MS. DAVILA:  Objection,

7           repetitive.  Objection, cumulative.

8           Objection, asked and answered.

9        A.      Again, we're -- the system's

10  limitations are what they are.  The manual

11  process does --

12       Q.      I --

13                MS. DAVILA:  Objection to

14          interrupting the witness.  Please

15          finish your answer.

16       A.      The manual process does

17  introduce in multiple steps the capacity for

18  human error and then discrepancies in

19  reporting.  Our focus absolutely is diverted

20  when it comes to bandwidth to be able to

21  collaborate on process and other

22  improvements that are ultimately going to

23  facilitate the ability of Afghans to move

24  their way through these processes and get

25  their immigrant NVC interview, which is

Page 536

1                    McGeary

2          MS. DAVILA:  Objection,

3      ambiguous.  Objection, repetitive.

4      Objection, calls for speculation.

5      Objection, asked and answered.

6      A.    I'm not sure I really understand

7  your question on how the volume would impact

8  the reporting burden.  The reporting burden

9  remains the same.  To the extent that

10 volumes increase, the reporting burden is

11 magnified as is the capacity for propensity

12 for human error.

13     Q.    You said to the extent that

14 volumes increase, the reporting burden is

15 magnified, and you're saying that's the case

16 if the reporting has to be done on the

17 increased volume; right?

18         MS. DAVILA:  Objection,

19     mischaracterizes testimony.  Objection,

20     ambiguous.  Objection, repetitive.

21     A.    So the individuals who had spent

22 nine months in the process as of the

23 original, you know, date, you know, at one

24 point -- again, like some of them are most

25 likely -- yes, they must have been through

1                       McGeary

2   the first process of NVC by now, but now

3   that volume is elsewhere, so that reporting

4   burden is magnified for that office in which

5   these applicants find themselves at this

6   point in time.  So, I mean, I'm not only

7   speaking for NVC, I'm speaking for any U.S.

8   Government office that has the obligation to

9   report on that class.  So wherever these

10  applicants are at this point in time in the

11  process, there is that reporting burden and

12  systems constraints.

13       Q.     If you look at page 2 of 17 on

14  Exhibit 24.

15       A.     You said 2 of 17?

16       Q.     Yes.

17       A.     Yes, I see it.

18       Q.     Do you see the sentence towards

19  the end of the page that says in addition

20  because multiple systems are involved,

21  tracking the same AAP Class from quarterly

22  report to quarterly report proved to be

23  difficult and unduly burdensome for

24  Defendants?

25       A.     Yes.

Page 538

1                           McGeary

2        Q.      And I understand AAP Class to

3   mean the class covered by the Previous Plan.

4   Is that your understanding as well?

5        A.      That's my understanding.

6        Q.      Is it the case that fewer

7   systems are involved now than when the

8   Previous Plan went into effect?

9        A.      To the extent that USCIS in the

10  interest of an expedited or more expedient

11  process for the applicant, that step was

12  removed.  There is no longer the USCIS part

13  of the step unless, and I can't speak for

14  USCIS, unless there are still class members

15  that are pending at USCIS.  I can't speak to

16  that.

17       Q.      The sentence talks about the

18  difficulty and burden for Defendants of the

19  quarterly reports.

20              Do you see what I'm talking

21  about?

22       A.      The one that starts in addition

23  and ends Defendants?

24       Q.      Yes.

25       A.      Yes.

1                    McGeary

2      Q.     Are there any difficulties and

3   burdens aside from what we just talked

4   about?

5      A.     I think I enumerated the

6   difficulties and burdens we face a few

7   times.

8      Q.     In the next sentence, it says:

9   This resulted in discrepancies that required

10  a significant amount of time and resources

11  on the part of Defendants to resolve.

12             Do you see that?

13     A.     I do.

14     Q.     What is this sentence talking

15  about?

16     A.     So this sentence refers to the

17  issue that I described previously where

18  because of the very manual process and the

19  very -- the multiple systems involved, human

20  error, for instance, is one factor, and I'm

21  aware of in the course of a meet and confer,

22  some of these discrepancies were brought to

23  the Department's attention, therefore, the

24  Department had to go back and try to

25  research why, what was the reason for the

```
 1                    McGeary
 2   discrepancy, which involved in many cases
 3   going back through case notes and manually
 4   searching through -- through the systems to
 5   try to resolve the apparent discrepancy,
 6   and so that does take time.  It's the same
 7   individuals again who are involved with
 8   giving technical direction to the
 9   contractor, the contractor who is
10   responsible for both quality control and for
11   processing and for guidance to the
12   processors and through -- go back through
13   the chain, everybody who needs to clear on,
14   I guess review the response that's provided.
15        Q.    So when this sentence is
16   referring to a significant amount of time
17   and resources, is it talking about time and
18   resources spent as a result of the parties'
19   meet and confer process in this litigation?
20        A.    Not only.  It also, as I
21   mentioned, refers to the fact that when
22   there's a discrepancy, there's a request to
23   put back -- if the discrepancy occurred in
24   NVC reporting, there would be normally a
25   request to NVC, well, the Plaintiffs say
```

Page 541

1                      McGeary

2   this, you said this, please explain, and

3   then there's research that ensues to try to

4   track down what exactly occurred and why

5   there's a discrepancy.  The discrepancy

6   could be based on manual, you know, the

7   manual process and operator error.  It could

8   be based on systems.  It could be based on

9   difference in interpretation of the data,

10  whether or not we're talking about a U.S.

11  government-controlled part of the process or

12  an applicant-controlled part of the process,

13  but I'm definitely aware that there were

14  these exchanges and that every time we have

15  to go back and verify data, that requires

16  bandwidth effort.

17      Q.     Were those discrepancies that

18  you're talking about discrepancies that were

19  pointed out by the Plaintiffs in this

20  litigation?

21      A.     I'm sure that there were -- I'm

22  aware that there were discrepancies pointed

23  out by Plaintiffs.  I don't know that that

24  was the full scope of the discrepancies

25  identified.  I know that the Department also

Page 542

1                      McGeary

2    identified discrepancies and reported them.

3    I don't have the list of the discrepancies

4    in front of me.

5         Q.    Did reviewing the discrepancies

6    as a result of this process result in

7    finding that certain SIV applications had

8    not been tracked accurately?

9              MS. DAVILA:  Objection,

10        ambiguous.  And objection, calls for

11        speculation.

12        A.    Again, I don't have the list of

13   discrepancies in front of me, but I believe

14   in some cases had to do with maybe a

15   tracking code that was not entered, again,

16   the manual process, human error.  That could

17   be one reason.  It could be down to the fact

18   that, again, these systems are not designed

19   to do that, so at every step of the way,

20   there's a new system, new team with

21   different office that's responsible for,

22   again, manually entering information and

23   reporting on it.  There could be various

24   reasons why there are discrepancies and

25   we're seeking to eliminate or at least we do

Page 543

1                        McGeary

2   scope -- you can't eliminate discrepancies,

3   I would say human error can always be a

4   factor in anything, but we are seeking to

5   reduce the scope for possible discrepancies

6   and, therefore, related burden both in the

7   reporting and in research that ensues when

8   there are discrepancies.

9        Q.     Could Defendants identify the

10  class members covered by the Proposed Plan

11  using the same method that it did for class

12  member reporting previously?

13              MS. DAVILA:  Objection,

14        repetitive.  Objection, asked and

15        answered.  Objection, cumulative.

16        Objection, calls for speculation.

17       A.     You're asking could we use the

18  same imperfect process again?

19       Q.     Yes.

20       A.     Of course we could.  We just

21  don't recommend doing so for the reasons I

22  discussed.

23       Q.     I guess, could Defendants

24  identify the class members covered by the

25  Proposed Plan using any methodology?

1                    McGeary

2            MS. DAVILA:  Objection,

3        mischaracterizes testimony.  Objection,

4        ambiguous.  Objection, calls for

5        speculation.

6            A.     So, once again, keeping in mind

7        that we were told to expand the scope of the

8        class members, that's a rolling scope and it

9        could result almost every day in addition of

10       class members.  Therefore, again, I've

11       talked about the difficulties that are

12       inherent in manual process, dealing with

13       large volumes, operator error, the systems

14       that are distinct depending on what phase of

15       the processor what office is handling the

16       information, the fact that even at least in

17       one case that system is walled off from the

18       others and has no ability to transfer such

19       information, the fact that the burden that

20       is -- that ensues on compiling the reports,

21       verifying the data and, again, accounting

22       for discrepancies, that distracts from the

23       ability to actually help facilitate these

24       cases moving through the system as opposed

25       to reporting on the fact that they're not

Page 545

```
 1                    McGeary

 2   moving through the system as fast as we

 3   would like -- as quickly as we would like.

 4        Q.    So is part of the State

 5   Department's decision not to report on class

 6   members based on the understanding that the

 7   Court Order requires Defendants to continue

 8   to identify new class members?

 9             MS. DAVILA:  Objection,

10        mischaracterizes testimony.  Objection,

11        ambiguous.  Objection, calls for a

12        legal opinion.

13        A.    So you don't word the

14   requirement to be -- to only report on the

15   prior class members.  We would experience

16   all the same difficulties that we had

17   discussed, and our position would still be

18   to propose that we would report on all

19   applicants rather than a specific class.

20        Q.    And that would be for the same

21   reasons that you object to class member

22   reporting under the Previous Plan?

23             MS. DAVILA:  Same objections.

24        A.    Yes.  The same obstacles and the

25   same rationale would apply.
```

Page 546

```
 1                        McGeary
 2        Q.      Turning to Exhibit 24, page 10
 3   of 17, do you see the heading Progress
 4   Reports?
 5        A.      I do.
 6        Q.      And do you see that in the first
 7   sentence under that heading, it says,
 8   Defendants shall file a progress report with
 9   the Court within 30 days of the end of the
10   90-day reporting period?
11        A.      Yes.
12        Q.      If you turn to Exhibit 1, page 8
13   of 14.
14        A.      Okay.  Okay.
15        Q.      Do you see that under the
16   heading Progress Reports, the first
17   sentence, it says:  Defendants shall lodge a
18   progress report with the Court within 10
19   days of the 90-day reporting period?
20        A.      Yes.
21        Q.      Why was that change made in the
22   Proposed Plan?
23        A.      Well, the reality is reporting
24   within 10 days creates an even greater
25   burden on the offices that are charged with
```

Page 547

```
 1                    McGeary
 2    overseeing the (indiscernible) and
 3    facilitating the Afghan SIV Program, and in
 4    some cases unrealistic and resulting in
 5    possibly even greater errors in data and
 6    what's being reported.  It was timeliness
 7    not sufficient.  There are multiple offices
 8    involved as I've discussed.  And multiple
 9    systems.
10         Q.     So these are the same problems
11    that existed under the Previous Plan?
12              MS. DAVILA:  Objection,
13         mischaracterizes testimony.  Objection,
14         ambiguous.
15         A.     Yes, the 10 days proved to be in
16    reality extremely burdensome and possibly
17    contributing to discrepancies.
18         Q.     Do Defendants start putting
19    together the progress report immediately
20    after the end of the 90-day reporting
21    period?
22              MS. DAVILA:  Objection,
23         ambiguous.
24         A.     I mean, I think the timeline for
25    compiling the report is designed to be able
```

Page 548

1                        McGeary

2    to file the report in a timely fashion.  I

3    can't speak to the exact if it begins the

4    second that the 90 days expired or what,

5    honestly.  But a --

6          Q.     How long --

7          A.     But if the report -- I was just

8    going to expand on my answer.  If the report

9    is supposed to cover a certain period of

10   time, clearly it can't be complete until at

11   least after the time has expired.

12         Q.     How long is it taking for

13   Defendants to compile the progress reports.

14                Withdraw.  Start again.

15                How long was it taking for

16   Defendants to compile the progress report

17   after the end of the 90-day reporting

18   period?

19         A.     I mean, I would state that the

20   aim would be to have it completed and filed

21   within the time that is required.  I don't

22   have the records in front of me to state

23   whether or not we had failed to do so, but I

24   believe that we compiled with the

25   requirement.  Again, just stating the burden

```
 1                    McGeary
 2   involved in multiple offices, who basically
 3   have to devote a significant amount of their
 4   bandwidth to the task of compiling and
 5   verifying a report and not to systems
 6   improvements, process improvements,
 7   processing and anything else that goes into
 8   the actual work of getting the Afghan SIV
 9   applicants through the process and to their
10   interview, so 10 days is a stretch, I mean,
11   it's lot on offices that handle quite a lot
12   to begin with, this obviously being a huge
13   priority for the State Department, but it's
14   not by any means exclusively what we do, and
15   it's complicated.  As I mentioned, it
16   involves multiple offices, multiple systems,
17   multiple levels of review, and 10 days is
18   just inadequate for both quality reasons and
19   for just burden reasons.
20        Q.     Is there any written guidance as
21   to how the agencies compile the progress
22   reports for this litigation?
23        A.     I mean, we compile them in
24   consultation with legal counsel.
25        Q.     Is there a policy somewhere that
```

Page 561

1                    McGeary

2      and the request?

3            MS. DAVILA:  To the question.  I

4      think we can -- it would be beneficial

5      to talk, but I think that the

6      Government's position is that the

7      witness has answered, but that the

8      question is ambiguous.

9            MS. HIROSE:  Okay.  Just to be

10     clear, the question that I would like

11     to mark for a supplemental answer is

12     the question that I asked at transcript

13     292-1, which was so Defendants' intent

14     under the Proposed Plan is to report at

15     Step 9 for awaiting interview

16     scheduling at Defendants' -- excuse

17     me -- that who have indicated that they

18     can appear at a third country post.

19           MS. DAVILA:  Understood.

20     Objection, ambiguous.

21           MS. HIROSE:  I'd like to

22     introduce Defendants DEFLD-00003767 as

23     Exhibit 36.

24           MS. DAVILA:  Counsel, before we

25     go into another document, maybe a brief

Page 562

1                    McGeary

2      break, could we go off the record five

3      minutes?

4           MS. HIROSE:  Sure.  That's fine.

5           MS. DAVILA:  I also wanted to

6      note that we, according to our clock,

7      we're running up against the end of the

8      deposition, I think 6:10, that's right,

9      I wanted to verify with Plaintiffs what

10     you have for seven hours.

11          MS. HIROSE:  Yes.  I think

12     you're right that we are pretty close

13     to the end.

14          MS. DAVILA:  Okay.  We're going

15     to take five minutes and we'll be back.

16          MS. HIROSE:  Okay.  Thank you.

17          (Whereupon, a brief recess was

18     taken.)

19          MS. HIROSE:  So before the

20     break, I was saying I wanted to

21     introduce document with Bates No.

22     DEFLD-00003767 as Exhibit 36 for the

23     record.

24          (Exhibit 36, Contract bearing

25     Bates No. DEFLD-00003767-3865, marked

1                       McGeary

2        for identification, as of this date.)

3              MS. DAVILA:  Let the record

4        reflect we've passed a paper copy of

5        3767 to the witness.

6   CONTINUED BY MS. HIROSE:

7        Q.    Do you recognize this document?

8        A.    Well, I believe -- I mean,

9   it's -- I can't say that I've like read

10  every page of this document, but the format

11  and the numbering is familiar to me.

12       Q.    And what is the document?

13       A.    Well, it's entitled Appendix 1,

14  Section B - Supplies or Services and Prices/

15  Costs, and it has an AQM code assigned to it.

16       Q.    What's the --

17             MS. DAVILA:  Let the record

18       reflect that the witness is reviewing

19       the document.

20       A.    I mean, it appears to be related

21  to the contract that the State Department

22  has with LDRM to perform visa support

23  services.  I can't say it is exactly the

24  contract not having the actual contract in

25  front of me.

Page 564

1                    McGeary

2      Q.     What's the significance of the

3   AQM code that you referenced?

4      A.     So acquisitions management is

5   the office within the State Department

6   that's responsible -- they're the

7   contracting officer for the visa support

8   services contract, and that's a code that

9   they would assign to a contract.  Again, I

10  can't state whether or not that's the exact

11  code that pertains to this contract.  It

12  just appears to be.

13     Q.     Can we turn to page 16 of this

14  document?

15     A.     Yes.

16     Q.     Do you see the section titled

17  Performance Requirements?

18     A.     Yes.

19     Q.     Does this contain the timeliness

20  requirements that you referenced during the

21  deposition today?

22            MS. DAVILA:  Objection,

23        ambiguous.

24     A.     So it says the contractor shall

25  complete basic processing unless as

Page 565

1                        McGeary

2    otherwise noted, for immigrant visa

3    petitions, including asylee/refugee

4    follow-to-join petitions, not more than

5    10 business days from receipt.  Yes.  Right.

6    It's the 10 business day requirement that I

7    discussed prior, previously.

8         Q.    And these timeliness

9    requirements are currently in effect?

10        A.    Yes.  I mean, I didn't look at

11   every single bullet, but you referred me to

12   the first bullet.  But yes, the timeliness

13   requirement is still in effect for the

14   contractor as relates to IV processing --

15   pre-processing.

16        Q.    A few times during this

17   deposition, you mentioned that the

18   contractor exceeding timeliness.

19        A.    Yes.

20        Q.    Does that mean the contractor is

21   taking less time than the 10 business

22   days --

23        A.    This many cases --

24        Q.    -- specified?

25        A.    Yes.  In many cases, yes, and in

1                    McGeary

2   this specific case, not the whole time frame

3   discussed under the Previous Plan clearly or

4   even the current -- well, the current plan

5   is the current plan.

6           MS. HIROSE:  I'd like to

7       introduce DEFLD-00003928 and mark this

8       as Exhibit 37 for the record.

9           (Exhibit 37, Attachment H -

10      Timeliness and Quality Acceptance

11      Criteria bearing Bates Nos.

12      DEFLD-00003928-3948, marked for

13      identification, as of this date.)

14          MS. DAVILA:  Hold on, counsel.

15      We're looking for that one.

16          Let the record reflect that the

17      witness has been handed 3928.

18      A.     Okay.

19      Q.     Do you recognize Exhibit 37?

20      A.     Again, it appears to be related

21   to the LDRM contract for visa for services.

22   I am not the contracting officer nor am I

23   the contracting officer representative.

24   Therefore, I can't attest to every line, but

25   I'm familiar with this type of document; yes.

1                    McGeary

2      Q.     Do you see under the timeliness

3   acceptance criteria there is a paragraph for

4   SIVs and there is a paragraph for COM?

5      A.     Yes, I see.

6      Q.     Is the criteria for SIV

7   currently in effect?

8      A.     So I would need to see the date

9   of this and also determine whether or not

10  there are subsequent contract modifications,

11  which there have been, but I can say that

12  definitely there are timeliness and quality

13  acceptance criteria that pertain to the

14  contract including SIV processing.

15     Q.     Can you say if the criteria

16  under COM is currently in effect?

17     A.     Well, again, this -- I am not

18  aware whether or not there were

19  subsequent -- there could have been, I don't

20  have my position here -- subsequent

21  modifications to the contract or change

22  orders that were made to the contract so

23  there could have been subsequent to this

24  change orders or other modifications to the

25  contract.  This, for example, refers to