# EXHIBIT 1



October 7, 2025

**VIA EMAIL**
Jaime A. Scott
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Washington, D.C. 20044
Jaime.A.Scott@usdoj.gov

           Re:     <u>Defendants' September 2025 Progress Report</u>

Dear Jaime:

      Plaintiffs write to provide notice to Defendants concerning deficiencies in the September 2025 progress report ("Progress Report," ECF No. 290), pursuant to the dispute resolution procedures set forth in the Court-ordered Revised Adjudication Plan ("RAP," ECF No. 272-1). Plaintiffs enclose a list of questions and concerns relating to Defendants' performance with respect to the Revised Adjudication Plan and Progress Report.

      Please let us know when Defendants are available to meet and confer, on or before **October 21, 2025**, as required by the RAP. To facilitate the resolution of these issues, Plaintiffs request that Defendants provide the additional information and explanations that Plaintiffs seek in advance of the meet-and-confer. Plaintiffs also request that agency representatives attend the meeting so that the parties can efficiently resolve their differences.

      We look forward to speaking with you soon.

                                                         Sincerely,

                                                         <u>/s/ Pedro Sepulveda, Jr.</u>
                                                         Pedro Sepulveda, Jr.
                                                          U.S. Litigation Fellow
                                                          International Refugee Assistance Project
                                                          One Battery Park Plaza, 33rd Fl
                                                          New York, NY 10004
                                                          psepulveda@refugeerights.org

cc: All counsel of record

**Issues for Resolution**

As a threshold matter, Defendants' Progress Report is deficient because it ignores the requirements of the RAP. Defendants are required to report on their performance under the RAP, as well as explain why their performance did not meet the standard for any particular step and include actions to be taken to improve their performance as appropriate. ECF No. 272-1 at 12. Most notably, even though action will be required to bring Defendants' performance into compliance, the Progress Report does not provide *any* remedial measures that Defendants plan to undertake to improve their performance at nearly all steps for which they failed to meet the performance standard. Moreover, as detailed below, Defendants' explanations for their noncompliance rely on justifications largely recycled from past progress reports and briefing on Defendants' proposed modifications to the adjudication plan. The Court has already found these explanations insufficient to justify extending or eliminating the timing benchmarks.

In the absence of any concrete proposals for immediate remedial action, Iraqi and Afghan class members will be subjected to further unreasonable delays throughout the SIV application process. Plaintiffs request that Defendants identify forward-looking remedial actions for each stage in the application process where Defendants' performance failed to meet the performance standard. Plaintiffs raise these and other deficiencies listed below in an effort to ensure the prompt and long-overdue adjudication of class members' applications.

**I.   Afghan Allies Protection Act of 2009 ("AAPA") Performance Standards**

**A.  *Chief of Mission ("COM") Approval: AAPA Step 4***

Plaintiffs are alarmed that, on average, applicants have been waiting for over five times longer (663 days) than the performance standard (within 120 calendar days) for a decision on their COM application or appeal. ECF No. 290 at 11. Defendants advance three main explanations for their failure to comply with the 120-day timeframe: (1) the influx of applications received between 2021 and 2023, following the 2021 U.S. withdrawal from Afghanistan; (2) their self-imposed adherence to a prioritization scheme that eschews first-in, first-out processing; and (3) their description of COM application review as "a time-intensive process with national security implications." *Id.* at 11-12. None of these explanations excuse Defendants' failure to process class members' COM applications within the RAP's benchmark.

The Court has already rejected each of these justifications. First, for instance, Defendants raised the influx of applications resulting from the U.S. withdrawal from Afghanistan to justify a proposal to abandon the 120-day timeline at Step 4 in the modified plan. *See, e.g.,* ECF No. 261 at 3-4. The Court nonetheless sustained the 120-day timeline, finding that eliminating the timing benchmark would run afoul of both the Court's prior rulings and Congress's instructions. *See* ECF No. 271 at 5-6.

Second, the Court has observed that Defendants' prioritization scheme does not relieve them of their legal obligation to process applications in line with the Court-ordered remedy. *See* ECF No. 88 at 28.

1

Third, Defendants cannot justify noncompliance with the timeline as to class members' cases merely because, in their view, the COM review process is inherently time-intensive, *see* ECF No. 290 at 12, as the Court was well aware of what the COM review process entailed when reaffirming the 120-day performance standard. Even if particular "high-risk" cases could require more time, *see* ECF No. 88 at 17-18, that would not justify widespread delays in *all* class members' cases.

Defendants also attribute their noncompliance to a recent 30% decrease in ASIV Unit staffing in May 2025. ECF No. 290 at 12. Defendants' voluntary staffing reduction cannot justify their failure to abide by the Court-ordered timeline, especially where Defendants have previously represented that *increased* staffing is a necessary remedial step to improve processing times.[1]

These explanations do not obviate the need for Defendants to provide forward-looking remedial measures that will ensure their compliance under the RAP. Even taken at face value, none of these issues will resolve without Defendants taking steps to decrease class members' wait times and bring their performance in line with the 120-day standard.

**Questions regarding Defendants' performance under AAPA Step 4**

Plaintiffs have the following questions and requests for information pertaining to Defendants' performance under Step 4 of the AAPA Plan:

1. The Progress Report provides only the average wait time for class members at Step 4, and no information on the rate of compliance. Plaintiffs therefore request that Defendants provide:

    a. The percentage of the COM applications and reapplications pending at the beginning of the reporting period that were adjudicated within the 120-day timeframe;

    b. The percentage of the COM appeals pending at the beginning of the reporting period that were adjudicated within the 120-day timeframe;

    c. The number of class member COM applications and reapplications that were adjudicated within the 120-day timeframe; and

    d. The number of class member COM appeals that were adjudicated within the 120-day timeframe.

2. What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?

---

[1] As Defendants note, between August 2021 and September 2023, they increased staffing in an effort to counteract the impact of the 2021 U.S. withdrawal from Afghanistan. ECF No. 290 at 12; *see also* ECF No. 261 at 5 ("Defendants acted decisively to address this massive influx of cases. Expending significant agency resources, they increased staffing of the unit responsible for processing COM applications from approximately 8 staff members in February 2021, to 50 staff in January 2023, to 150 staff [as of November 18, 2024].").

2

B. *NVC Instruction Packets: AAPA Step 5*

**Questions regarding Defendants' performance under AAPA Step 5**

Plaintiffs request clarification, as outlined below, regarding Defendants' description of their performance and explanation under AAPA Step 5 for their inability to send instruction packets to applicants within 10 business days, as required by the RAP. ECF No. 272-1 at 7.

1. Defendants state that some cases took longer than 10 days because NVC resent the instruction packet. ECF No. 290 at 13. Other than cases that had instruction packets resent, were there other cases in which Defendants did not meet the performance standard?
2. Defendants state that "NVC developed a workaround for [follow-to-join] cases early in the quarter which led to a higher-than-normal number of cases outside of the 10-day performance standard" and that "[t]his delay in follow-to-join applications is not anticipated moving forward." *Id.* at 13. Do Defendants anticipate that they will be able to send instructions to follow-to-join cases within the performance standard going forward?

C. *Visa Interviews: AAPA Step 9*

Defendants' performance at AAPA Step 9 demonstrates an overwhelming failure to schedule class members for interviews within the eight-day standard and to hold those interviews within the sixty-day standard. ECF No. 272-1 at 9. Defendants report that out of 780 cases awaiting interview scheduling at the beginning of the reporting period, only 20 cases were scheduled within the eight-day performance standard (a 2.5% compliance rate). ECF No. 290 at 9, 14. Additionally, Defendants report that out of 87 interviews scheduled, only 9 were scheduled within the 60-day performance standard (an approximately 10% compliance rate). *Id*. at 14.

When explaining their noncompliance, Defendants reiterate the justification they previously advanced in favor of modifying the timing benchmark at Step 9, namely that "the backlog of all immigrant visa cases (not just SIV cases) awaiting interview scheduling has . . . dramatically increased." ECF No. 261 at 8; *see* ECF No. 290 at 14. As it did with Defendants' proposal to eliminate the timing benchmark for Step 4, the Court considered this argument and rejected Defendants' request to dramatically change the timing benchmarks under Step 9 in its order adopting the revised plan. ECF No. 271 at 5-6. Moreover, the mere assertion that a post has a 'backlog' does not provide Plaintiffs or the Court with any useful information about the extent to which SIV interviews are being scheduled or deprioritized compared to other visa categories. Nor does an asserted backlog justify the fact that fewer than 20 Afghan class members *worldwide* had interviews scheduled at the end of the reporting period while thousands remain waiting. *See* ECF No. 290 at 9-10. Defendants also fail to provide any remedial actions that they are undertaking or plan to undertake to ensure that class members are scheduled for interviews and interviewed within the RAP's performance standards. *Id*. at 14.

**Questions regarding Defendants' performance under AAPA Step 9**

Plaintiffs have the following questions and requests for information pertaining to Defendants' performance under Step 9 of the AAPA Plan:

1. Which posts carried a scheduling backlog for Afghan SIVs during the reporting period?
2. For each post that carried a scheduling backlog for Afghan SIVs during the reporting period, Plaintiffs request the following information:
   a. The number of Afghan SIV interviews that were scheduled;
   b. The percentage of total visa interview slots allocated to Afghan SIVs, and/or the number of visa interview slots allocated to Afghan SIV interviews and the total number of visa interview slots.
3. What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?

D. *Administrative Processing: AAPA Step 11*

   i. Defendants' reporting at AAPA Step 11 is overinclusive

To begin with, Defendants' reporting under AAPA Step 11 appears to violate the requirements of the RAP. Footnotes 2 and 7 of the Progress Report suggests that Defendants are including cases that have been finally denied, such as individuals who had their COM approval withdrawn and did not successfully appeal. *See* ECF No. 290 at 5 n.2; *see id.* at 10 n.7. To the extent applicants have received final denials, they are not class members with cases pending at this step, and, accordingly, these cases should not be reported. Defendants' explanation also suggests that the reporting may include cases awaiting applicant action, which likewise should not be considered pending at this step. The Court has already rejected Defendants' assertion that they are unable to distinguish between applications within the government's control and applications within applicant control, and made clear that the benchmark does not apply to cases within applicant control.[2] ECF No. 271 at 8-9. Plaintiffs request that Defendants provide updated numbers for this reporting period that exclude applicants not awaiting government-controlled administrative processing.

   ii. Noncompliance due to third party coordination and limitations

Given these reporting deficiencies, Plaintiffs cannot ascertain the extent of Defendants' noncompliance with the reporting standard. Yet the information that is contained in the Progress Report indicates that Defendants are not taking sufficient steps to bring their performance in line with the standard. Defendants claim they have not complied with AAPA Step 11 because (i) they cannot impose requirements on third party agencies to complete their portion of the administrative processing stage, and (ii) their staff is working on training instead of processing work. But

---

[2] Defendants necessarily distinguish between cases undergoing administrative processing from cases pending applicant action for other purposes, such as to potentially 'terminate' inactive cases under INA 203(g) (8 U.S.C. § 1153(g)). *See* 9 FAM 504.13-2(A)(3) ("Applications refused under INA 221(g) for reasons other than administrative processing are subject to termination under 203(g)").

4

Defendants do not identify what remedial steps, if any, they are taking to achieve compliance with the 90-day timeframe for cases within the State Department's control, or to seek expedited processing from interagency partners.

### Questions regarding Defendants' performance under AAPA Step 11

Plaintiffs have the following questions and requests for information pertaining to Defendants' performance under Step 11 of the AAPA Plan:

1. Plaintiffs request that Defendants provide updated numbers for this reporting period that exclude applicants not awaiting government-controlled administrative processing.
2. Defendants state that 84% of cases requiring national security vetting were completed within the performance standard.
    a. Is this 84% of completed cases, or 84% of all cases pending national security vetting (including those that have not yet been completed)?
    b. Please provide the number of cases that were completed within the performance standard.
3. Defendants state that data on the performance standard is unavailable for cases that were refused for reasons other than national security vetting. ECF No. 290 at 15. However, under the original adjudication plan, Defendants also reported on cases for which consular officers requested guidance from the Office of the Legal Advisor. *See* ECF No. 244 at 3 n.3. Plaintiffs request that Defendants provide information on their performance with respect to other categories of administrative processing, including cases submitted to the Office of the Legal Advisor.
4. Under the RAP, Defendants must request expedition of third-party agency processing of class members' cases. ECF No. 271-1 at 10. How many expedite requests were submitted during the reporting period?
5. With respect to the delays stemming from additional staff training, how will the Defendants ensure that training of new and existing staff does not interfere with Defendants' compliance with the AAPA Step 11 performance standards in the future?
6. What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?

## II. Refugee Crisis in Iraq Act ("RCIA") Performance Standards

### A. *Administrative Processing: RCIA Step 12*

#### i. Defendants' reporting at RCIA Step 12 is overinclusive

Plaintiffs reiterate the same concerns raised under AAPA Step 11, *see supra* section (I)(D)(i), with respect to RCIA Step 12. Defendants' reporting under RCIA Step 12 appears to violate the requirements of the RAP by including individuals with final denials of COM approval; their inclusion renders the reporting practically useless as a gauge of how many applications

5

remain pending. The extent of the overinclusion is even more apparent in the RCIA portion of the Progress Report than in the AAPA portion: Despite listing over 1,200 Iraqi cases pending administrative processing in the Progress Report, Defendants' last report to Congress asserted that only 37 principal applicants were in administrative processing as of March 2025.[3] Plaintiffs request that Defendants provide updated numbers for this reporting period that exclude applicants not awaiting government-controlled administrative processing.

ii. Failure to meet performance standards

All Iraqi class members have now been waiting for decisions on their SIV applications for at least 10 years, and as Defendants note, there are only a "few class members" that are actually pending administrative processing. ECF No. 290 at 8. Given the egregious length of time that these applicants have been waiting, Plaintiffs request additional information regarding the cases that have been greater than one year.

**Questions regarding Defendants' performance under RCIA Step 12**

Plaintiffs have the following questions and requests for information pertaining to Defendants' performance under Step 12 of the RCIA Plan:

1. Plaintiffs request that Defendants provide updated numbers for this reporting period that exclude applicants who are not awaiting government-controlled administrative processing.
2. Under the RAP, Defendants must request expedition of third-party agency processing of class members' cases. ECF No. 271-1 at 6. How many expedite requests were submitted during the reporting period?
3. Defendants stated that 60% of cases requiring national security vetting were completed within the performance standard. ECF No. 290 at 7.
   a. Is this 60% of completed cases, or 60% of all cases pending national security vetting (including those that have not yet been completed)?
   b. Please provide the number of cases that were completed within the performance standard.
4. The Progress Report indicates that no Iraqi applicants completed interviews during the reporting period, but 11 applicants entered administrative processing. ECF No. 290 at 5. How is this possible?
5. Plaintiffs request the following information for the 22 "national security" cases that have been pending greater than one year:
   a. How long each applicant has been pending administrative processing;
   b. Whether each case is within the State Department's control.

---

[3] *See* Report to Congress on Process by which Applications for Special Immigrant Visas under Special Immigrant Status for Certain Iraqis Are Processed Section 1218 (g) of the National Defense Authorization Act of 2014 (2025 Q2) at 8, https://travel.state.gov/content/dam/visas/SIVs/Iraqi-Public-Quarterly-Report-Q2-April-2025.pdf.

6

6. What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?