# EXHIBIT 2



**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation

*Ben Franklin Station, PO Box 868*
*Washington, DC 20044*

October 28, 2025

**VIA EMAIL**

Pedro Sepulveda, Jr.
International Refugee Assistance Project
One Battery Park Plaza, 33rd Fl
New York, NY 10004
psepulveda@refugeerights.org

Re:   *Allies v. Rubio,* **No. 1:18-cv-01388-TSC (D.D.C.)**
      **Defendants' Progress Report (June 5, 2025 – Sept 3, 2025)**

Dear Mr. Sepulveda,

    This letter responds to Plaintiffs' letter dated October 7, 2025 regarding Defendants' Progress Report for the period of June 5, 2025 to September 3, 2025, ECF No. 290 (hereinafter, "Plaintiffs' letter"). As discussed via separate correspondence, the parties are scheduled to have a meet and confer on this matter on October 29, 2025 at 3pm.

    In advance of the parties' meet and confer to facilitate resolution, Defendants provide the following information. For each reference, Defendants use the same headings and numbering as Plaintiffs' letter, without conceding to Plaintiffs' characterization of the progress report.

    As a threshold matter, due to the lapse of appropriations at the Department of State, any further clarifications of Defendants responses are pending restoration of appropriations.

1

I.  **Afghan Allies Protection Act of 2009 ("AAPA") Performance Standards**
    A. **Chief of Mission Approval, Step 4**

    Plaintiffs' letter requests request the following:

1. "Plaintiffs request that Defendants provide:
    a. The percentage of the COM applications and reapplications pending at the beginning of the reporting period that were adjudicated within the 120-day timeframe;"

    **Answer**: 1.6%

    b. "The percentage of the COM appeals pending at the beginning of the reporting period that were adjudicated within the 120-day timeframe;"

    **Answer**: 26.9%

    c. "The number of class member COM applications and reapplications that were adjudicated within the 120-day timeframe; and"

    **Answer**: 45

    d. "The number of class member COM appeals that were adjudicated within the 120-day timeframe."

    **Answer**: 153

2. "What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?"

    **Answer**: Defendants continue to expand their use of advanced analytics and automation to streamline the COM review process and recordkeeping while maintaining accuracy and enhancing national security. As a result of these efforts, in Fiscal Year (FY) 2025, the Defendants issued decisions on 44,380 COM cases, a 10 percent increase from FY 2024 and a 70 percent increase from FY 2023.

    Defendants must ensure that measures implemented to facilitate the processing of Afghan SIVs, including COM applications, prioritize the protection of the national security of the United States. Each step in the COM process is designed to ensure that only those who qualify for Special Immigrant status receive COM approval. This process includes verification of letters of employment and recommendation, which can take time, but upholds the integrity of the SIV process and protects national security.

### B. NVC Instruction Packets, Step 5

Plaintiffs' letter requests request the following:

1. "Defendants state that some cases took longer than 10 days because NVC resent the instruction packet. ECF No. 290 at 13. Other than cases that had instruction packets resent, were there other cases in which Defendants did not meet the performance standard?"

    **Answer**: Yes, as explained below, other cases where the performance standard was exceeded include follow-to-join cases where an additional step was needed. NVC is not aware of other cases where the performance standard was exceeded.

2. "Defendants state that "NVC developed a workaround for [follow-to-join] cases early in the quarter which led to a higher-than-normal number of cases outside of the 10-day performance standard" and that "[t]his delay in follow-to-join applications is not anticipated moving forward." Id. at 13. Do Defendants anticipate that they will be able to send instructions to follow-to-join cases within the performance standard going forward?"

    **Answer**: Yes, NVC anticipates that the workaround will allow it to send instructions for follow-to-join cases within the 10-day performance standard moving forward.

### C. Visa Interview, Step 9

Plaintiffs' letter request the following:

1. "Which posts carried a scheduling backlog for Afghan SIVs during the reporting period?"

    **Answer**:
    1. Abu Dhabi
    2. Ankara
    3. Baghdad[1]
    4. Dushanbe
    5. Doha
    6. Frankfurt
    7. Islamabad
    8. Kigali

---

[1] Immigrant visa scheduling was suspended for portions of the reporting period at the U.S. Embassy in Baghdad, which includes scheduling for Afghan SIVs.

3

9. Muscat
10. Nairobi

2. "For each post that carried a scheduling backlog for Afghan SIVs during the reporting period, Plaintiffs request the following information:
   a. The number of Afghan SIV interviews that were scheduled;
   b. The percentage of total visa interview slots allocated to Afghan SIVs, and/or the number of visa interview slots allocated to Afghan SIV interviews and the total number of visa interview slots."

**Answer**:

1. **Abu Dhabi**
   a. Afghan SIVs scheduled: 45 cases/208 applicants
   b. Total number of appointments scheduled: 969 cases/1567 applicants
2. **Ankara**
   a. Afghan SIVs Scheduled: 60 cases/269 applicants
   b. Total number of appointments scheduled: 1011 cases/1636 applicants
3. **Baghdad**
   a. Afghan SIVs Scheduled: 24 cases/77 applicants
   b. Total number of appointments scheduled: 123 cases/193 applicants
4. **Dushanbe**
   a. Afghan SIVs Scheduled: 18 cases/36 applicants
   b. Total number of appointments scheduled: 69 cases/94 applicants
5. **Doha**[2]
   a. Afghan SIVs scheduled: 0
   b. Total number of appointments scheduled: 115 cases/198 applicants
6. **Frankfurt**
   a. Afghan SIVs Scheduled: 49 cases/197 applicant
   b. Total number of appointments scheduled: 421 cases/745 applicants
7. **Islamabad**
   a. Afghan SIVs Scheduled: 58 cases/302 applicants
   b. Total number of appointments scheduled: 2962 cases/4987 applicants
8. **Kigali**
   a. Afghan SIVs Scheduled: 34 cases/153 applicants
   b. Total number of appointments scheduled: 234 cases/634 applicants

---

[2] The Coordinator for Afghan Relocation Efforts (CARE) is no longer relocating individuals seeking Afghan SIVs to Camp As Sayliyah in Doha for their visa interviews. Individuals may request an interview at the U.S. Embassy in Doha if they can provide proof of their legal entry into Qatar.

4

    9. **Muscat**
       a. Afghan SIVs Scheduled: 7 cases/36 applicants
       b. Total number of appointments scheduled: 37 cases/78 applicants
    10. **Nairobi**
       a. Afghan SIVs Scheduled: 19 cases/92 applicants
       b. Total number of appointments scheduled: 1117 cases/1462 applicants

3. "What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?"

**Answer**: The Department of State is committed to protecting our nation and its citizens by upholding the highest standards of national security and public safety throughout the visa process. We process each visa application while adhering to the U.S. government's strict security safeguards. Every U.S. embassy and consulate must balance processing workload, available resources, and security vetting requirements when making scheduling decisions. Posts continually assess the allocation of interview slots based on the bilateral relationship with the foreign government, priorities across visa categories, no show rates, and other factors. Based on expertise on country conditions and the region in which they operate, posts are in the best position to balance these considerations when making decisions on how to allocate interview slots.

**D. Administrative Processing, Step 11**

Plaintiffs' letter requests request the following:

1. "Plaintiffs request that Defendants provide updated numbers for this reporting period that exclude applicants not awaiting government-controlled administrative processing.

**Answer**: Defendants have reported and provided an explanation for Step 11 in the September 2025 Progress Report.

2. "Defendants state that 84% of cases requiring national security vetting were completed within the performance standard.
    a. Is this 84% of completed cases, or 84% of all cases pending national security vetting (including those that have not yet been completed)?"

**Answer**: The data includes cases completed within the reporting period.

    b. "Please provide the number of cases that were completed within the performance standard."

**Answer**: Of the 25 cases where national security vetting was completed during the reporting period, 21 were completed within the performance standard.

3. "Defendants state that data on the performance standard is unavailable for cases that were refused for reasons other than national security vetting. ECF No. 290 at 15.

5

However, under the original adjudication plan, Defendants also reported on cases for which consular officers requested guidance from the Office of the Legal Advisor. *See* ECF No. 244 at 3 n.3. Plaintiffs request that Defendants provide information on their performance with respect to other categories of administrative processing, including cases submitted to the Office of the Legal Advisor."

**Answer**: During the reporting period, the time required to complete administrative processing on cases for which consular officers requested guidance from the Office of the Legal Adviser averaged 8 days. One hundred percent of such cases were completed within the 90-day performance standard.

4. "Under the RAP, Defendants must request expedition of third-party agency processing of class members' cases. ECF No. 271-1 at 10. How many expedite requests were submitted during the reporting period?"

**Answer**: The Department requests expedited third-agency processing for all Afghan SIV cases requiring national security vetting. The Department submitted expedite requests for the 78 cases that entered Step 11 for national security vetting during the reporting period.

5. "With respect to the delays stemming from additional staff training, how will the Defendants ensure that training of new and existing staff does not interfere with Defendants' compliance with the AAPA Step 11 performance standards in the future?"

**Answer**: The need for training may arise for various reasons, which are not always in Defendants' control. Defendants cannot always anticipate staff turnover and hiring timelines. Training may also be needed when Defendants assign existing staff to a new portfolio.

6. "What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?"

**Answer**: All cases that undergo national security vetting require interagency review. The Revised Adjudication Plan recognizes that the Department of State cannot require a third-party agency to complete their actions in any particular timeframe. Therefore, it is likely that there will continue to be complex cases that require longer periods of interagency review. Training of the staff that coordinate national security vetting may improve internal processing times of such cases going forward, but will not affect interagency processing times.

II. **Refugee Crisis in Iraq Act ("RCIA") Performance Standards**
    A. **Administrative Processing, Step 12**

Plaintiffs' letter requests request the following:

1. "Plaintiffs request that Defendants provide updated numbers for this reporting period that exclude applicants who are not awaiting government-controlled administrative processing."

   **Answer**: Defendants have reported and provided an explanation for Step 12 in the September 2025 Progress Report.

2. "Under the RAP, Defendants must request expedition of third-party agency processing of class members' cases. ECF No. 271-1 at 6. How many expedite requests were submitted during the reporting period?"

   **Answer**: The Department requests expedited third-agency processing for all Iraqi SIV cases requiring national security vetting. The Department submitted expedite requests for the 1 case that entered Step 12 for national security vetting during the reporting period.

3. "Defendants stated that 60% of cases requiring national security vetting were completed within the performance standard. ECF No. 290 at 7.
    a. Is this 60% of completed cases, or 60% of all cases pending national security vetting (including those that have not yet been completed)?"

   **Answer**: The data includes cases completed within the reporting period.

    b. "Please provide the number of cases that were completed within the performance standard."

   **Answer**: Of the 5 cases where national security vetting was completed during the reporting period, 3 were completed within the performance standard.

4. "The Progress Report indicates that no Iraqi applicants completed interviews during the reporting period, but 11 applicants entered administrative processing. ECF No. 290 at 5. How is this possible?"

   **Answer**: A refusal under INA 221(g) after the date of the interview may occur for a variety of reasons, such as when an applicant has overcome a prior refusal, but the consular officer determines that administrative processing is required. In such cases, the consular officer will enter a refusal under INA 221(g), and the case would be included in the report. Therefore, it is possible that an applicant was interviewed prior to the reporting period, was able to overcome a refusal prior to the reporting period, but then received a refusal under INA 221(g) during the reporting period. Such an applicant would be considered to have entered administrative processing during the reporting period.

5. "Plaintiffs request the following information for the 22 "national security" cases that have been pending greater than one year:
    a. How long each applicant has been pending administrative processing;

7

    b. Whether each case is within the State Department's control."

**Answer:** Cases in this Step have been pending between 17 and 97 months. 13 cases are within Department of State control. One case completed national security vetting on October 16, 2025.

6. "What remedial measures have Defendants undertaken or will Defendants undertake to achieve compliance with the plan benchmark?"

**Answer**: All cases that undergo national security vetting require interagency review. The Revised Adjudication Plan recognizes that the Department of State cannot require a third-party agency to complete their actions in any particular timeframe. Therefore, it is likely that there will continue to be complex cases that require longer periods of interagency review. Training of the staff that coordinate national security vetting may improve internal processing times of such cases going forward, but will not affect interagency processing times.

    Sincerely,

    BRETT A. SHUMATE
    Assistant Attorney General
    Civil Division

    RUTH ANN MUELLER
    Acting Assistant Director
    Office of Immigration Litigation

    DAVID J. BYERLEY
    Acting Senior Litigation Counsel

    RICHARD G. INGEBRETSEN
    JOSHUA A. CLEM
    Trial Attorneys

    */s/ Jaime A. Scott*
    JAIME A. SCOTT
    D.C. Cir. Bar No. 66335
    Trial Attorney
    U.S. Department of Justice,
    Civil Division
    Office of Immigration Litigation
    P.O. Box. 868, Washington, DC 20044
    Telephone: (202) 305-3620
    Email: Jaime.A.Scott@usdoj.gov