**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>     Plaintiffs,<br><br>    – against –<br><br>MARCO A. RUBIO, *et al.*,<br><br>     Defendants. | Case No. 18-cv-01388-TSC |

I, Stuart Wilson, hereby submit this declaration under penalty of perjury:

(1) I am employed by the U.S. Department of State (the "Department") as the Deputy Assistant Secretary for Visa Services in the Directorate of Visa Services (VO) within the Bureau of Consular Affairs (CA).

(2) Within VO, several offices are involved with the Special Immigrant Visa (SIV) program. The Office of Field Operations (F) provides policy and procedural guidance to consular officers in the field, drafts a variety of reports relating to the SIV program, and coordinates with other Department of State bureaus and other government agencies on SIV issues. The Office of Screening, Analysis, and Coordination (SAC) administers in-house security checks for some applicants and facilitates and coordinates other SIV applicants for interagency processing. The Office of Domestic Operations (DO), which includes the National Visa Center (NVC), handles pre-processing and case creation for the Chief of Mission approval process, inquiries from applicants and congressional offices, as well as SIV petition intake and visa application processing and scheduling. The Office of Information Management and Liaison (I) monitors and assists consular officers in the field with visa-related systems issues.

**Pause in processing of Afghan SIVs**

(3) Following the arrest of an Afghan national for the brutal November 26, 2025, attack on two National Guard members in Washington, D.C., the Department initiated a review of its security vetting of Afghan nationals with Afghan passports who are seeking nonimmigrant (NIVs) or immigrant visas (IVs) and validating its screening protocols for such applicants, including those related to ensuring an applicant's identity and eligibility for a visa under U.S. law. This includes applicants for Afghan SIVs. As of November 27, 2025, no visas will be issued to such applicants.

**NVC's scheduling of visa interviews**

(4) The NVC serves as the starting point for SIV applicants at two stages of the SIV process: 1) initial application for Chief of Mission (COM) approval and 2) post-petition immigrant visa (IV) application pre-processing. NVC's main form of communication with applicants and legal representatives is via email. In the COM phase of the SIV process, applicants email NVC to indicate their interest in applying for COM approval. NVC creates a COM case for every intending applicant that has expressed interest and submitted their name and date of birth. NVC then collects, reviews, and uploads required supporting documentation from applicants into SQSIV, a government system developed and used solely for processing Iraqi and Afghan SIV COM applications.

(5) The NVC is currently reviewing emails from individuals who are submitting COM applications or submitting additional information for a pending COM application within an average of 9 business days.

(6) For the second stage, NVC requests and collects required documents from individuals seeking an Afghan SIV and reviews them for completeness and legibility. When a case becomes documentarily complete, NVC schedules an immigrant visa interview at the designated processing post. For cases initially designated for processing in Kabul, NVC holds the case until an applicant requests transfer to another immigrant visa-designated processing post where the applicant is located or can travel.

(7) Posts provide NVC with scheduling capacity once per month. Once capacity is reached, scheduling ceases. NVC cannot meet the 8-day performance standard if a post has not allocated sufficient slots to accommodate a class member's interview.

(8) As of December 3, 2025, NVC paused all scheduling of interviews for Afghan nationals seeking IVs.

**Posts' determinations of how to allocate visa interview slots for Afghan SIVs**

(9) Every U.S. embassy and consulate must balance processing workload, available resources, and security vetting requirements when making scheduling decisions. Posts continually assess the allocation of interview slots based on the bilateral relationship with the foreign government, priorities across visa categories, the ability of applicants to successfully appear in person at the chosen interview location, and other factors. Based on this ongoing assessment and their expertise on country conditions and the region in which they operate, posts are in the best position to balance these considerations when making decisions on how to allocate interview slots.

(10) As of November 2025, most categories of immigrant visas must be scheduled at the location of the principal applicant's place of residence or nationality. However, interviews for Afghan SIVs are exempt from this requirement. The additional appointment flexibility afforded to Afghan SIVs has facilitated their faster processing because applicants could, if able, travel to a location with a shorter or with no backlog to be scheduled more quickly. While this flexibility may benefit applicants, there is a tradeoff for the Department's operations as a whole because posts that see fewer applicants for Afghan SIVs have less familiarity with these cases and may require more time to process them.

(11) As a percentage of overall immigrant visas ready for interview scheduling, Afghan SIVs have grown in the past several years as more applicants apply, and more cases complete the COM approval phase. This has resulted in increased demand for interviews at posts at which these individuals seek to apply.

(12) The Department has not relocated any Afghans from Afghanistan to an immigration processing platform since January 2025. Since that time, there has been increased demand for interviews by individuals seeking Afghan SIVs at certain posts. Because certain countries are more accessible to Afghans, posts in these countries have seen demand for interviews rise and, for posts where capacity is limited, they now have interview backlogs. Additionally, Afghans may face difficulty departing Afghanistan or entering the country in which the post is located. This can lead to no-shows to interviews.

(13) No-shows reduce the overall efficiency of the post because of the effort spent by local staff and consular officers in preparing and reviewing cases for interviews that never occur and, if post is not aware of the no-show ahead of time, post may not be able to offer the interview slot to another applicant.

(14) For example, after the Department decreased the assistance provided to Afghans pursuing U.S. immigration processes in Pakistan, the no-show rates for Afghan SIVs at the U.S. Embassy in Islamabad climbed from 8 percent in October 2025 to 14 percent in November 2025. Afghans may have difficulty traveling to Pakistan and remaining in country, which has been exacerbated by the government of Pakistan's campaign to deport those without status, including 1.8 million Afghan nationals since November 2023. Further, although Rwanda offers visa-on-arrival to Afghan nationals, such individuals may have difficulty both departing Kabul and entering Kigali, which has resulted in a high no-show rate for interviews in IV categories, including Afghan SIVs, at the U.S. Embassy in Kigali. The current no-show rate for Afghan applicants seeking IVs at the U.S. Embassy in Kigali is approximately 30 percent.

(15) Because many individuals seeking Afghan SIVs have requested that their cases be transferred to the U.S. Embassy in Islamabad, there is a significant backlog waiting to be scheduled. Post is unable to accommodate all such applicants due to limitations in staffing, the number of interview windows, and the need to consider the bilateral relationship when determining how to allocate visa interviews.

(16) As of December 8, 2025, there were 3,163 cases for class members, which involve a total of 17,231 principal and derivative applicants, that are awaiting interview scheduling at the U.S. Embassy in Islamabad. The U.S. Embassy in Islamabad has scheduled an average of 1,680 applicants for IV interviews per month for the last six months in all categories for all nationalities. This means that if the embassy only provided interview slots to class members and their derivatives, it would take over 10 months for all such applicants to be scheduled at the current pace. This would increase the backlogs for other categories and could affect the bilateral relationship with the Pakistani government.

(17) The wait times at posts where individuals seeking Afghan SIVs can appear varies significantly and even modest spikes in demand can create backlogs at smaller posts. For instance, there has been a surge in requests to transfer cases to the U.S. Embassy in Dushanbe and the U.S. Embassy in Kigali for the scheduling of interviews for Afghan SIVs.

(18) As of December 8, 2025, there were 136 cases for class members, which involve a total of 657 principal and derivative applicants, awaiting interview scheduling at the U.S. Embassy in Dushanbe. The U.S. Embassy in Dushanbe has scheduled an average of 33 applicants per month for IV interviews for the last six months in all IV categories for all nationalities. At this pace, it would take over 19 months for post to

schedule all class members and their derivatives for interviews if they only provided interviews to such applicants.

(19) As of December 8, 2025, there were 50 cases for class members, which involve a total of 248 principal and derivative applicants, awaiting interview scheduling at the U.S. Embassy in Kigali. The U.S. Embassy in Kigali has scheduled an average of 104 applicants per month for IV interviews for the last six months in all IV categories for all nationalities. At this pace, it would take over 2 months for post to schedule all class members and derivatives for interviews if they only provided interviews to such applicants. The increase in demand from individuals seeking Afghan SIVs at the U.S. Embassy in Dushanbe and the U.S. Embassy in Kigali has led to scheduling backlogs for Afghan SIVs and other IV categories because of these posts' limited space and staffing.

(20) The Department must balance various considerations when determining whether additional consular officers and other staff can be transferred to a post, including expense, space, training, language proficiency, demand at other posts, and bilateral relationships. To assist with the increased demand for Afghan SIVs, the Department sent two temporary duty staff from May to July 2025 to the U.S. Embassy in Kigali.

**Reporting on administrative processing**

(21) After an applicant is interviewed, his or her case may be refused under INA 221(g) and placed into administrative processing to resolve any questions on his or her eligibility for an Afghan or Iraqi SIV.

(22) Consular officers determine whether an applicant has met their burden of establishing eligibility for the visa under INA 291 and, if they do not, must refuse the application under INA 221(g). After the refusal, the consular officer may reconsider the applicant's eligibility for the visa based on additional information or upon the resolution of administrative processing.

(23) Consular systems do not automatically designate refusals under INA 221(g) into specific categories. Each refusal is a determination by the consular officer that the applicant had not met their burden. The officer's case notes may provide detail on why that determination was made, but may not always fit neatly into a specific category, nor clearly indicate whether the case is in applicant or government control.

(24) There are circumstances in which the consular officer initiates a process through the Department's systems, which generates a record. In such cases, the Department can report on that record to provide information on how long it took to complete that

administrative process. Such cases include cases in national security vetting and cases awaiting guidance from the Office of the Legal Adviser.

(25) The most accurate way to determine the reason for the 221(g) refusal would require a consular officer to read the case notes and, in some cases, to open related case files, such as the medical report or COM approval documentation. An experienced consular officer may take, on average, approximately five minutes to review each file and make a determination of why the case was refused and whether action is pending the applicant or the Department. Complex cases could take substantially longer to review and officers with less experience with Afghan and Iraqi SIVs may require training and take longer to review until they become familiar with these cases.

(26) Conducting such review would reduce the amount of time that consular officers would have to interview applicants and complete post-refusal processing. As a result, the processing times at other steps would be expected to increase if such review were conducted.

(27) Reviewing the case notes for each case would be prone to error, including because consular officers may not list every reason that a case is refused under INA 221(g) nor always indicate whether action is with the applicant or with post.

(28) Such review would need to be conducted each reporting period because new applicants may be refused under INA 221(g) and other applicants may overcome their refusals under INA 221(g). Therefore, this process would need to be at least partially repeated for each reporting period.

Dated: December 12, 2025

_____
Stuart Wilson
Deputy Assistant Secretary
Directorate of Visa Services
United States Department of State