**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED, | |
| | Case No. 18-cv-01388-TSC-MAU |
| Plaintiffs, | |
| | Judge Tanya S. Chutkan |
| – against – | Magistrate Judge Moxila A. Upadhyaya |
| MARCO A. RUBIO, *et al.*, | |
| Defendants. | |

**<u>DEFENDANTS' REPLY IN SUPPORT OF THEIR RESPONSE TO THE COURT'S
DECEMBER 23, 2025 ORDER</u>**

Defendants remain in compliance with the Afghan Allies Protection Act of 2009 ("AAPA"), Pub. L. No. 111-8, 123 Stat. 807 (2009) (codified at 8 U.S.C. § 1101 note) and this Court's Revised Adjudication Plan ("RAP"), and Defendants' implementation of Proclamation 10998 is wholly consistent with these concurrent obligations. Under the Secretary of State's lawful authority to administer and enforce the Immigration and Nationality Act ("INA") – 8 U.S.C. § 1104(a) – Defendants identified a need for internal review and enhanced security vetting processes in the wake of national security concerns. Defendants' response to these worldly events – a temporary suspension of Chief of Mission (COM) processing – is unreviewable.

**I.      The RAP Accounts for the Necessity of Internal Review and Enhancement of Security Vetting Processes.**

The court issued an adjudication plan remedy to "aid Plaintiffs in their quest for an adjudication without unduly intruding into Defendants' province." ECF No. 75 at 18. Here, Defendants' actions fall squarely within the confines of the RAP: they timely submitted quarterly

1

progress reports, ECF Nos. 290 (Sep. 23, 2025 Progress Report), 302 (Dec. 23, 2025 Progress Report), and those progress reports identified areas where Defendants met the processing benchmark, *see generally* ECF Nos. 290, 302, and, for areas that Defendants did not meet the benchmark, identified remedial measures as outlined in the RAP. *See* ECF No. 290 at 6-16, 302 at 6-17. The RAP anticipates that Defendants may not meet the performance standards and does not limit failure to meet performance standards to specific reasons or require a specific timeframe for remedy. ECF 272-1 at 12. A pause for an internal review and enhancement of security vetting is not inconsistent with that structure. *See Afghan & Iraqi Allies v. Pompeo*, 334 F.R.D. 449, 460 (D.D.C. 2020) ("Plaintiffs "do not seek to enforce the ninth-month timeframe in this action . . . []they challenge Defendants' failure to address and adjudicate their SIV applications *within a reasonable time*.") (internal citations omitted and emphasis added).  The AAPA accounts for Defendants' authority to address matters involving national security related to Afghan SIV processes. *See* AAPA § 602(b)(4)(B) (Nothing in this section shall be construed to limit the ability of the Secretary . . . to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time."); *see also Afghan & Iraqi Allies*, 103 F.4th 807, 817-18 (D.C. Cir. 2024) (finding that the AAPA "suggests that a nine-month timeline is appropriate *unless* a case presents distinctively high risks to the national security.").

Plaintiffs' frustration with any deference afforded to the Executive with the court ordered remedy does not meet the threshold for any non-compliance on Defendants' part. Plaintiffs argue that Defendants "suggest they are free to ignore the Revised Plan's timeframes . . . ." Plaintiffs' Response (Resp.) 5. This is not so. Defendants promptly alerted this Court and Plaintiffs to the pause with a Notice of Change in Material Facts because Defendants understood its potential

relevance to the RAP. *See generally* ECF No. 292; *see also* ECF No. 297 (Defs.' Notice of Supplemental Authority). That action demonstrates Defendants' understanding of their court obligations and what is permitted under the RAP.

Despite Plaintiffs' protestations against the role of the INA and AAPA in Defendants' compliance with the RAP, those statutory authorities cannot be overlooked where they establish a framework processing Afghan SIV applications. *See* Resp. 5 ("The Court should therefore disregard Defendants' brief insofar as it argues that the AAPA and INA provide independent bases to justify their processing suspension . . . ."). Further, the Executive branch must retain authority to make decisions related to the national security of the United States even if such decisions may affect the timing benchmarks contained in the RAP. As an exercise of the Court's equity powers, the RAP must still comply with the express statutory provision(s) enacted by Congress, and Defendants see no need for the Court to interpret the RAP as minimizing or abolishing Defendants' authority to address national security concerns in processes related to Afghan SIVs under the AAPA § 602(b)(4)(B). *See, e.g.*, *Goodluck v. Biden*, 104 F.4th 920, 924 (D.C. Cir. 2024) ("[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."). Furthermore, withdrawal of Defendants' motion to modify the RAP does not obviate the need for the Court to consider Defendants' authority to review processes for appropriate security vetting explicit in the statute. In sum, while the INA and AAPA do not excuse Defendants' from complying with the RAP, they are relevant to whether Defendants' actions fall within the range of discretion that it allows.

Plaintiffs' reliance on *Garcia-Ramirez v. U.S. Immigr. & Customs Enf't*, No. CV 18-508 (RC), 2025 WL 3563183, at *7 (D.D.C. Dec. 12, 2025), is unavailing. In that case, the district court found that U.S. Immigration and Customs Enforcement violated its statutory obligations and

a permanent injunction by introducing new guidance requiring placement of unaccompanied alien minors in adult detention upon turning 18 without an appropriate consideration of alternative detention programs as required by statute. *Id*. at 9-12. Defendants do not argue that the INA or AAPA absolve them of obligations under the RAP, nor have Defendants taken a position contrary to the AAPA. Rather, Defendants argue that the RAP should not be interpreted to eliminate Defendants' statutory authority to address national security concerns that implicate class members and which may arise in various steps of the Afghan SIV process. The existence of the timing benchmarks in the RAP does not exclude Defendants from pursuing other lawful considerations. *See* AAPA § 602(b)(4)(B). Accordingly, Defendants do not seek to "ignore" the Court's injunction, *see* Resp. 4-5, but rather to orient the Court towards exercising its equity power in a manner that does not infringe upon Defendants' clear statutory authority. *See, e.g.*, *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (The exclusion of aliens is a fundamental act of sovereignty," and "[t]he right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe."); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) (observing that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government."); *Wong Wing v. United States*, 163 U.S. 228, 233 (1896) ("[t]he power of Congress to . . . prescribe the terms and conditions upon which [aliens] may come to this country, and to have its declared policy in that regard enforced exclusively

4

through executive officers, without judicial intervention, is settled" – including instances in which there is some question about whether the applicant falls within "a class forbidden to enter the United States.") (citation omitted).

Additionally, Presidential Proclamation 10998 is not an excuse for non-compliance, but a response to an issue of national security. *See* 90 Fed. Reg. 59,717 (Dec. 19, 2025). To the extent that the Proclamation impacts Defendants' performance under the next progress report, it will be addressed there. The Proclamation is not the basis for the suspension on Afghan SIV related processes nor the continued pause on COM processing; however, the vetting and other national security related concerns identified in the Proclamation are shared by Defendants, particularly in the wake of violence. *See* Kapur Decl. (ECF No. 306-2) at ¶ 3 ("Following the arrest of an Afghan national for the brutal November 26, 2025, attack on two National Guard members in Washington, D.C., the Department of State paused COM processing beyond the initial receipt of COM applications, with indefinite effect."); *see also* Norris Decl. (ECF No. 306-1) at ¶ 4 ("As of [President Trump issuing Proclamation 10998], visa issuance to Afghan nationals, including . . . Afghan SIVS, has been suspended consistent with PP 10998."). Defendants' consideration of similar concerns as those underlying the Proclamation and the violent attack are illustrative of the authority that the Executive branch regularly exercises to ensure that processes and protocols related to national security concerns are adequate to safeguard the American people. Indeed, the Department goes on to say that it "intends to resume COM processing in coordination with interagency partners *once enhanced procedures are in place to better protect U.S. national security and public safety*." Kapur Decl. (ECF No. 306-2) at ¶ 4 (emphasis added).

## II.    Defendants' Actions Fall Within the Executive's Broad Statutory Authority

Furthermore, Defendants' actions fall within the broad discretion afforded the Executive

branch in matters relating to national security, particularly where, as here, Congress has clearly delegated such authority in the AAPA and INA. Plaintiffs argue that any discretion afforded by statue is undercut by Defendants' "self-imposed" policy decisions and that any supposed "indefinite delay suspending processing" that affords Defendants "as long as they deem appropriate to process SIV applications" is not contemplated by the AAPA or INA. *See* Resp. 9. This plainly ignores Defendants' arguments rooted in the AAPA and INA.

*First*, the AAPA expressly acknowledges the Secretary's authority to exceed the 9-month statutory timing benchmark when concerns of national security require additional time. *See* AAPA § 602(b)(4)(B). While Plaintiffs note the 9-month statutory timeframe identified in the statute, *see* AAPA § 602(b)(4)(A), their interpretation of the following paragraph renders meaningless the plain meaning of the language Congress elected to use when describing the timeframe and caveat relating to national security. *See* AAPA § 602(b)(4)(B) ("*Nothing in this section shall be construed to limit* the ability of the Secretary . . . to take *longer than 9 months* to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns requires additional time.") (emphasis added).

Additionally, this authority is further supported by the Secretary's broad statutory authority to administer the provisions of the Immigration and Nationality Act under 8 U.S.C. § 1104(a). *See* Defs.' Response (ECF No. 306) at 3-4. As previously noted in briefing, Defendants' decision-making relating to the adequacy of the national security measures at issue here, particularly in light of those concerns identified above, *see supra* at 4, is beyond the purview of this Court and, consequently, the RAP. *See, e.g.*, *United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (reaffirming that this area is "largely immune from judicial control"); *Harisiades*, 342 U.S. at 588-89 ("any policy toward aliens is vitally and intricately interwoven with contemporaneous policies

in regard to the conduct of foreign relations" and "[s]uch matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquire or interference."). Plaintiffs argue that this broad discretion is unmoored from any basis in law; nevertheless, their argument relies on the erroneous assumption that Defendants claim "near-limitless authority to indefinitely delay processing applications in section 1104(a)." Resp. 10. This ignores Defendants' actual argument, which is that the Secretary possesses broad authority to administer the INA. *See* 8 U.S.C. § 1104(a). In the context of the AAPA, that means administering the processes set forth in the AAPA while simultaneously exercising the authority explicitly delegated to Defendants over matters concerning national security risk review. *See supra* at 5. The RAP does not remove this discretionary authority and should not be read and enforced to produce that result.

Plaintiffs further rely on *N.L.R.B. v. Harris Teeter Supermarkets* to suggest that Defendants' lawful exercise of their authority to review internal processes for national security risk is an obstacle of their own making and, thus, not an appropriate consideration in determining whether Defendants have complied with the RAP. *See* 215 F.3d 32, 36 (D.C. Cir. 2000). This argument is inapposite because the identification of national security concerns is not a self-imposed hurdle; rather, it is an exercise of their lawful mandate to address concerns relating to national security and public safety which Congress baked into the AAPA explicitly. *See* AAPA § 602(b)(4)(A) ("Nothing in this section shall be construed to limit the ability of the Secretary . . . to take longer than 9 months to complete those steps incidental to the issuance of such visas in high-risk cases for which satisfaction of national security concerns *requires* additional time.") (emphasis). As evidenced by both the statute and the legal precedent, identifying concerns of national security continues to remain squarely with Congress and the Executive because they are

best positioned to make the determinations necessary to safeguard the United States from foreign bad actors. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 696 (2001) (noting that "terrorism or other special circumstances" might warrant "heightened deference to the judgements of the political branches"); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) ("courts traditionally have been reluctant to intrude upon the authority of the executive in military and national security affairs").

Again, the RAP should not be read to eliminate Defendants' authority to review internal security vetting processes and to address national security concerns when they identify such concerns affecting class members in the Afghan SIV process. In fact, Plaintiffs point to such consideration. *See, e.g.*, *Afghan & Iraqi Allies*, 103 F.4th at 817-18 (the AAPA "suggests that a nine-month timeline is appropriate *unless* a case presents distinctively high risks to the national security."). Contrary to Plaintiffs' assertions that "Defendants' desire to categorize all Afghans as threats to national security because of their nationality," Defendants have made no such claim. Defendants specifically identified an episode of violence prompting its initial security review. *See* McDonald Decl. (ECF No. 294-1) at ¶¶ 2-3; Kapur Decl. (ECF No. 306-2) at ¶ 3. Additionally, the Proclamation identifies several areas of concern which further justify Defendants' continued efforts to review their internal vetting processes and enhance its protocols. *See supra* at 5. Currently, the only process which remains suspended is COM processing beyond receipt of COM applications and Defendants intend to resume COM processing once enhanced security vetting procedures are in place. *See* Kapur Decl. (ECF No. 306-2) at ¶ 3-4. As noted in Defendants' initial response, Defendants did not cancel interviews already scheduled for December 2025 and January 2026 and have since "resumed scheduling interviews and processing expedite and transfer requests for Afghan nationals seeking NIVs or IVs (including SIVs)." Norris Decl. (ECF No. 306-1) at ¶ 3, 5.

## II.    Conclusion

In sum, Defendants' efforts to enhance the security vetting processes that occur at the COM approval stage are not in contravention of the RAP because Defendants possess the authority to identify and address national security concerns related to Afghan SIV processing, both the INA and AAPA set out that authority, and the RAP must account for the lawful exercise of that authority. As such, the Court should dismiss Plaintiffs' motion to enforce to allow an opportunity for Defendants to implement the appropriate review and enhancements necessary to address any national security concerns related to Afghan SIV processing.

Dated: January 20, 2026                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           ANTHONY P. NICASTRO
                                           Acting Director
                                           Office of Immigration Litigation

                                           RUTH ANN MUELLER
                                           DAVID J. BYERLEY
                                           Senior Litigation Counsel

                                           RICHARD G. INGEBRETSEN
                                           JAIME A. SCOTT
                                           Trial Attorneys

                                           */s/ Joshua A. Clem*
                                           JOSHUA A. CLEM (AR Bar #AR2023202)
                                           Trial Attorney
                                           U.S. Department of Justice, Civil Division
                                           Office of Immigration Litigation
                                           P.O. Box. 868, Washington, DC 20044
                                           Telephone: (202) 253-6762
                                           Email: Joshua.Clem2@usdoj.gov

                                           *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system to all counsel of record.


DATED: January 20, 2026                          Respectfully submitted,

                                                 */s/ Joshua A. Clem*
                                                 Trial Attorney
                                                 U.S. Department of Justice