## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES,** *on their own and on behalf of others similarly situated*, | |
| Plaintiffs, | No. 18-cv-1388 (TSC) |
| v. | |
| **MARCO RUBIO**, *et al.*, | |
| Defendants. | |

## <u>OPINION & ORDER</u>

During America's wars in Iraq and Afghanistan, many Iraqi and Afghan nationals provided faithful service to "the United States—often at great personal risk." *Afghan & Iraqi Allies v. Blinken (Afghan & Iraqi Allies IV)*, 103 F.4th 807, 811 (D.C. Cir. 2024). Congress recognized these individuals' brave sacrifice and required Defendants to expedite their visa applications. After Defendants failed to comply with Congress's directive, Plaintiffs—a class of Iraqi and Afghan nationals whose visa applications have been pending for an average of five years—brought this suit, claiming unreasonable delay. In 2020, the court entered an injunction ordering Defendants to promptly process class members' applications. Now, in the wake of the tragic shooting of two National Guardsmen, Defendants have announced that they will no longer obey the court's injunction. Because Defendants have cited no authority that permits them to disregard the clear commands of Congress and this court, the court will GRANT Plaintiff's Motion to Enforce the Revised Adjudication Plan, ECF No. 293.

## I.     BACKGROUND

To help Iraqi and Afghan nationals facing a "serious threat" because of their "faithful and valuable service to the United States," Congress enacted the Refugee Crisis in Iraq Act of 2007 and the Afghan Allies Protection Act of 2009 ("AAPA").  *See* Refugee Crisis in Iraq Act of 2007, Pub L. No. 110-181, §§ 1241–49, 122 Stat. 395; Afghan Allies Protection Act of 2009, Pub. L. No. 111-8, §§ 601–02, 123 Stat. 807.  Pursuant to these statutes, certain Iraqi and Afghan nationals are eligible for special immigrant visas ("SIV") to immigrate to the United States.  Frustrated by the slow pace at which Defendants were processing these SIV applications, Congress amended both statutes in 2013 and instructed Defendants that such applications should be processed within nine months, "except in cases involving unusual national-security risks."  *Afghan & Iraqi Allies IV*, 103 F.4th at 811; *see also* National Defense Authorization Act for Fiscal Year 2014, Pub. L. 113-66, §§ 1218–19, 127 Stat. 672, 910–15 (2013) (mandating that Congress "shall improve the efficiency" for processing visa applications "so that all steps under the control of [Defendants] should be completed" within nine months).  SIV applications nevertheless continued to languish.

In 2018, five SIV applicants sued on behalf of themselves and a class of similarly situated Afghan and Iraqi individuals.  Plaintiffs alleged that Defendants had unreasonably delayed the adjudication of their applications.  *See Afghan & Iraqi Allies v. Pompeo (Afghan & Iraqi Allies I)*, No. 18-cv-1388, 2019 WL 4575565, at *11 (D.D.C. Sept. 20, 2019).  The court agreed.  In 2019, it granted summary judgment to Plaintiffs with respect to their claims for unreasonable delay, emphasizing that the five-year average wait time endured by the class members far exceeded the nine-month benchmark set by Congress.  *Id.* at *6.  The court also stressed the severe hardship faced by Plaintiffs, whose lives and whose family's lives continue to be in danger because of Defendants' delay.  *Id.* at *8–9.  The court ordered Defendants to "submit a plan for promptly processing and adjudicating the applications of current class members."  *Id.* at *11.

In 2020, the court entered an injunction approving the first Adjudication Plan. *See* Order, ECF No. 113. Less than two years later, Defendants sought to terminate the injunction, citing changed circumstances brought about, in part, by the U.S. withdrawal from Afghanistan, the ensuing surge of visa applications, and the closure of the U.S. Embassy in Kabul. *See* Defs.' Mot. for Relief, ECF No. 163. The court declined to terminate the injunction, finding that Defendants' delays in processing SIV applications remained unreasonable despite the change in circumstances. *Afghan & Iraqi Allies v. Blinken (Afghan & Iraqi Allies III)*, 643 F. Supp. 3d 148, 157 (D.D.C. 2022). The court stressed that "even after the complications of recent years," Congress had amended the AAPA without modifying the nine-month benchmark it established in 2013. *Id.* at 155. The court determined, however, that "some modifications" to the Adjudication Plan were warranted to accommodate these complications. *Id.* The D.C. Circuit affirmed. *See Afghan & Iraqi Allies IV*, 103 F.4th at 811.

In June 2025, the court modified the injunction by issuing the Revised Adjudication Plan. *See* Revised Adjudication Plan ("RAP"), ECF No. 272-1. Like the original Adjudication Plan, the Revised Adjudication Plan set "timing benchmarks for the government-controlled steps of the SIV adjudication process," as well as "tracking and reporting requirements." *See Afghan & Iraqi Allies v. Rubio (Afghan & Iraqi Allies V)*, No. 18-cv-1388, 2025 WL 1591738, at *2 (D.D.C. 2025) (quoting *Afghan & Iraqi Allies III*, 643 F. Supp. 3d at 157). For Afghan nationals, the Revised Adjudication Plan "requires Defendants to complete the [Chief of Mission] review and decision process"—the first stage of the SIV application procedure—"within 120 calendar days." *Id.* at *3. At stage two—the "Form I-360 Petition adjudication process"—Defendants must adjudicate each petition within 60 calendar days, unless they issue a Request for Evidence or Notice of Intent to Deny. *See* RAP at 10. At stage three, Defendants must determine whether a visa application is

complete within ten days of receipt and, if it is, must offer the applicant an interview within eight business days and hold the interview within 60 calendar days of the date of contacting the applicant. *Id.* at 8–9.

The Revised Adjudication Plan further requires Defendants to submit periodic progress reports detailing their performance. RAP at 12. If "Defendants' performance does not meet the target timeframe," they must explain why and, "if appropriate," specify the actions they will take to come into compliance. *Id.* If Plaintiffs "on a good faith basis do not believe that Defendants' explanation or revised plan for adjudicating delayed applications is sufficient," they must meet and confer with Defendants "to attempt to resolve any differences." *Id.* "No party may file an enforcement motion or otherwise seek judicial relief related to the allegations of noncompliance until after this meet and confer." *Id.*

In September 2025, Defendants filed their first progress report under the Revised Adjudication Plan. *See* Defs.' Notice of Lodging Progress Report, ECF No. 290. Defendants concede that they "did not meet the [Revised Adjudication Plan] benchmarks for Chief of Mission ("COM") adjudications, visa interview scheduling, and administrative processing," but insist that they offered sufficient explanations and proposed adequate remedial actions. Defs.' Opp'n to Pls.' Mot. to Enforce at 4, ECF No. 294. For example, Defendants explained that nearly 15,000 class members have been pending at the COM review stage for, on average, 663 days, in part because the State Department reduced this past spring the amount of staff assigned to the Afghan Special Immigrant Visa Unit staffing by 30 percent. *See* Progress Report (Sept. 23, 2025) at 9, 11–12, ECF No. 290. But they promised to continue expanding "their use of advanced analytics and automation to streamline the COM review process." Defs.' Opp'n at 10; *see also* Decl. of S. Paul Kapur ¶ 9, ECF No. 294-2.

On October 29, 2025, the parties held a meet and confer to discuss Plaintiffs' dissatisfaction with Defendants' shortfalls. The following day, Plaintiffs notified Defendants that they "remain alarmed by the extent of Defendants' deficient performance at several processing steps" and by Defendants' failure to "identify actions . . . to process class members' applications in line with required timeframes." Pls.' Mot. to Enforce – Ex. 3 at 1, ECF No. 293-4.

In November 2025, after an Afghan national was arrested in the tragic shooting of two National Guardsmen, U.S. Citizenship and Immigration Services suspended decision-making on Form I-360 Petitions for Afghan nationals to facilitate a "re-review, potential interview, and re-interview of all [non-citizens] from high-risk countries." Decl. of Andrea McDonald ¶ 2, ECF No. 294-1. The State Department indefinitely suspended the Chief of Mission review and decision process for 7,619 class members. Decl. of S. Paul Kapur ¶ 12, ECF No. 294-2. The State Department also indefinitely stopped issuing SIVs to Afghan class members. *See* Defs.' Notice of Change of Material Facts, ECF No. 292. The State Department has since resumed scheduling visa interviews for Afghan SIV applicants, but COM processing and visa issuance remains indefinitely suspended. *See* Decl. of Jessica Norris ¶¶ 4–5, ECF No. 306-1; *see also* Suppl. Decl. of S. Paul Kapur ¶ 3, ECF No. 306-2.

In December 2025, President Trump issued Presidential Proclamation 10,998 pursuant to his authority under 8 U.S.C. § 1182(f) to "suspend the entry" of any non-citizens or any class of non-citizens if he finds that their entry "would be detrimental to the interests of the United States." Proclamation 10,988 amended President Trump's earlier proclamation, which had suspended the entry of non-citizens from Afghanistan but carved out an exception for Afghan special immigrant visa holders. *See* Pres. Procl. 10,949, 90 Fed. Reg. 24,497 (June 4, 2025). Proclamation 10,998 eliminated that exception. *See* Pres. Procl. 10,998, 90 Fed. Reg. 59,717 (Dec. 16, 2025).

Also in early December, Plaintiffs sent Defendants a series of questions regarding the effect of the above-described developments on class members.  *See* Pls.' Mot. to Enforce – Ex. 4, ECF No. 293-5.  Defendants confirmed that they had halted the processing of class members' COM applications and Form I-360 petitions and stated that the suspension was indefinite.  *Id.*  Soon thereafter, Plaintiffs filed the instant Motion to Enforce the Revised Adjudication Plan, which Defendants opposed.  *See* Defs.' Opp'n to Pls.' Mot. to Enforce, ECF No. 294.[1]  The court then ordered the parties to submit supplemental briefing addressing whether Defendants "have lawful authority to suspend the processing of special immigrant visas when they are under court order to promptly process such visas."  Min. Order (Dec. 23, 2025).  That supplemental briefing has since been filed, and Plaintiffs' Motion to Enforce is now ripe for decision.

## II.    LEGAL STANDARDS

"Federal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2004) (quoting *Hutto v. Finney*, 437 U.S. 678, 690 (1978)) (cleaned up).  To the contrary, a district court has "inherent power to enforce its judgments."  *Peacock v. Thomas*, 516 U.S. 349, 356 (1996); *see also Horn & Hardart Co. v. Nat'l Rail Passenger Co.*, 843 F.2d 546, 548 (D.C. Cir. 1988) ("[E]very court, with few exceptions, has inherent power to enforce its decrees and to make such orders as may be necessary to render them effective." (cleaned up)).  This power "is grounded in 'the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by the parties to a court proceeding.'" *Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984)).  Indeed,

---

[1]  Defendants also filed a Cross-Motion to Stay the Revised Adjudication Plan which they subsequently withdrew.  *See* Defs.' Not. of Withdrawal of Cross-Mot. to Stay, ECF No. 303.

without such authority, "the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution." *Peacock*, 516 U.S. at 356 (quoting *Riggs v. Johnson Cnty.*, 73 U.S. 166, 172 (1867)).

"The exercise of this authority is 'particularly appropriate' when a case returns to a court on a motion to enforce the terms of its mandate to an administrative agency." *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984)). "Judicial orders are . . . binding commands that the Executive Branch, no less than any other party, must obey." *J.G.G. v. Trump*, No. 25-5124, 2025 WL 3198891, at *2 (D.C. Cir. Nov. 14, 2025) (statement of Pillard, Wilkins, Garcia, J.J.). "Nothing can destroy a government more quickly than its failure to observe its own laws[.]" *Mapp v. Ohio*, 367 U.S. 643, 658 (1961).

Although "district courts have discretion when interpreting their orders and assessing whether an injunction has been violated," "district courts do not have discretion to overlook a proven violation, absent a recognized defense." *Potter v. District of Columbia*, 126 F.4th 720, 723–24 (D.C. Cir. 2025) (cleaned up). "A motion to enforce should be granted if a 'prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it.'" *Flaherty*, 17 F. Supp. 3d at 55 (quoting *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004)). In assessing whether a defendant has failed to comply with a court order, "the court is guided not only by the text of that order but also by its relevant opinions." *Anglers Conservation Network*, 387 F. Supp. 3d at 93 (citing *City of Cleveland v. FERC*, 561 F.2d 344, 346–47 (D.C. Cir. 1977)).

### III.     ANALYSIS

### A.  The court has jurisdiction over Plaintiffs' Motion to Enforce.

As an initial matter, the court must assure itself of jurisdiction over the Motion to Enforce notwithstanding Defendants' Notice of Appeal.  *See* Defs.' Not. of Appeal, ECF No. 304. Although a district court is generally "without jurisdiction to alter a judgment of its own while an appeal therefrom is ongoing," the judgment itself "remains operative" unless stayed and the district court "retain[s]" its "powers to enforce its unstayed judgment . . . throughout the pendency of the appeal."  *Deering Milliken, Inc. v. FTC*, 647 F.2d 1124, 1129 (D.C. Cir. 1978); *see also CFTC v. Escobio*, 946 F.3d 1242, 1251 (11th Cir. 2020) ("Absent entry of a stay, a district court retains jurisdiction to enforce its judgment—via contempt or other means—during the pendency of an appeal.").  Because the injunction has not been stayed, this court retains jurisdiction to resolve Plaintiffs' Motion to Enforce.[2]

### B.  Consular nonreviewability does not bar review.

Next, Defendants vaguely contend that their blanket suspension of visa processing for Afghan allies is a national security decision "beyond the purview of this court."  Defs.' Suppl. Br. at 4, ECF No. 306; *see also* Def.'s Opp'n at 7 (suggesting that Plaintiffs' challenge to the suspension of Afghan SIV processing "may require the court to intrude into decisions made by the Executive related to foreign affairs and national security").  "Of course, not every case touching on national security lies beyond judicial cognizance."  *Lee v. Garland*, 120 F.4th 880, 891 (D.C.

---

[2]  Also pending before the court is the parties' Joint Motion to Modify the Revised Adjudication Plan's Class Identification Methodology, ECF No. 282.  Because it is unclear whether the court has jurisdiction to grant this modification during the pendency of the appeal, the Joint Motion is DENIED without prejudice.  The parties may refile the Motion and cite a basis for the court's jurisdiction, refile the Motion following the conclusion of the appeal, or seek an indicative ruling under Federal Rule of Civil Procedure 62.1.

Cir. 2024); *see also Doc Soc'y v. Blinken*, No. 19-cv-3632, 2023 WL 5174304, at *11 (D.D.C. Aug. 11, 2023) ("Even in areas relating to foreign affairs and national security, actions may have a focus for judicial review," such as "where Congress has asserted control by putting restrictions in the operative statute." (cleaned up)). And Defendants have not adequately explained their claim that this case is insulated from judicial review. Instead, they cryptically cite several cases underpinning the doctrine of consular nonreviewability. *See* Defs.' Suppl. Br. at 4 (citing *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952)); Defs.' Reply at 4, ECF No. 308 (citing *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) and *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892)). But that doctrine is non-jurisdictional, *see Trump v. Hawaii*, 585 U.S. 667, 682 (2018), and thus subject to forfeiture. *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 304 n.3 (D.C. Cir. 2014). Accordingly, "by mentioning [their nonreviewability claim] only in the most skeletal way, leaving the court to do counsel's work, creature the ossature for the argument, and put flesh on its bones," Defendants have forfeited any claim that consular nonreviewability bars the court's review. *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024) (cleaned up).

In any event, consular nonreviewability offers Defendants no support. That doctrine simply recognizes that "Congress may delegate to executive officials the discretionary authority to admit noncitizens 'immune from judicial inquiry or interference.'" *Dep't of State v. Muñoz*, 602 U.S. 899, 908 (2024) (quoting *Harisiades*, 342 U.S. at 588). And because Congress has, in fact, granted consular officials the exclusive authority to decide whether to "issue or withhold a visa" in individual cases, consular nonreviewability shields individual visa determinations from judicial review. *See Baan Rao Thai Restaurant v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999)); *see also Knauff*, 338

U.S. at 543 (explaining that it is "not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude *a given alien*" (emphasis added)).

"But not every legal challenge that touches on the admission or exclusion of foreign nationals is foreclosed by consular nonreviewability." *Gomez v. Trump*, 485 F. Supp. 3d 145, 176 (D.D.C. 2020). Courts in this jurisdiction have consistently held that the "doctrine of consular nonreviewability is not triggered until a consular officer has made a *decision* with respect to a particular visa application." *Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 290 (D.D.C. 2016) (emphasis in original) (citing *Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997)); *see also Gomez*, 485 F. Supp. 3d at 176 (collecting cases). "When the [Executive] simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or deny applications but failing to act at all." *Nine Iraqi Allies*, 168 F. Supp. 3d at 290–91. Moreover, "it is well settled that when plaintiffs pursue forward-looking challenges to the lawfulness of regulations or policies governing [visa] decisions, courts may review them 'to assure that the executive departments abide by the legislatively mandated procedures.'" *Pietersen v. Dep't of State*, 138 F.4th 552, 560 (D.C. Cir. 2025) (quoting *Int'l Union of Bricklayers v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985)).

Applying those principles here, the court finds that the doctrine of consular nonreviewability does not bar it from enforcing Defendants' compliance with an injunction that, in turn, is designed to compel Defendants to adhere to their statutory obligations and process SIV applications with "the speed with which [Congress] expects the agency to" act. *Afghan & Iraqi Allies I*, 2019 WL 4575565, at *5 (quoting *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984)). As explained in more detail below, Congress has not given the Executive

unreviewable discretion to indefinitely suspend the processing of SIV applications for Afghan allies. To the contrary, Congress mandated "that the government 'shall' improve its efficiency so that it 'should' process the applications within nine months, except in cases involving unusual national-security risks." *Afghan & Iraqi Allies IV*, 103 F.4th at 811. Judicial involvement is therefore appropriate "to assure that the executive departments abide by the legislatively mandated procedures." *Pietersen*, 138 F.4th at 560 (quoting *Int'l Union of Bricklayers*, 761 F.2d at 801); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 (1986) (Courts "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").

### C. Plaintiffs have properly exhausted their meet-and-confer obligations.

Defendants do not dispute that Plaintiffs exhausted their meet-and-confer obligations with respect to the September progress report before filing the Motion to Enforce. *See* Defs.' Opp'n at 15. Instead, Defendants contend that the Motion to Enforce is premature insofar as it challenges the subsequent suspension of Afghan SIV processing. *Id.* Not so. Plaintiffs filed the Motion only after meeting and conferring with Defendants in October regarding Defendants' low compliance. *See* Pls.' Mot. to Enforce – Ex. 3 at 1, ECF No. 293-4. Defendants' subsequent announcement that they would suspend processing altogether is directly relevant to Plaintiffs' fully exhausted claim that Defendants have failed to identify adequate steps to come into compliance with the injunction. Defendants' unilateral decision to intensify their noncompliance did not require Plaintiffs to start the meet-and-confer process over at square one. In any event, the meet-and-confer process is designed to address situations where Defendants fail to offer sufficient explanations for low compliance with respect to particular benchmarks, not to delay enforcement

proceedings after Defendants unilaterally announce their intention to not comply with the injunction.

**D. Defendants' indefinite suspension of visa processing violates the injunction.**

The central purpose of the Revised Adjudication Plan is to bring Defendants into greater compliance with "Congress's instructions" that Afghan SIV applications be processed "within certain time parameters." *Afghan & Iraqi Allies V*, 2025 WL 1591738, at *3; *see also Afghan & Iraqi Allies I*, 2019 WL 4575565, at *11 (directing Defendants to "submit a plan for promptly processing and adjudicating the applications of current class members"). To that end, the Plan mandates that Defendants "will" complete COM processing within 120 days and "will adjudicate [Form I-360] petition[s] within 60 calendar days." RAP at 7, 9. Defendants' indefinite suspension of these processes is plainly inconsistent with the unambiguous terms of the injunction.

Defendants contend that the Revised Adjudication Plan "should not be interpreted to eliminate Defendants' statutory authority to address national security concerns." Defs.' Reply at 4. That is true enough. But Defendants cite no authority—statutory or otherwise—allowing them to unilaterally suspend processes that Congress has required them to expedite. To be sure, the Afghan Allies Protection Act provides that "[n]othing in this section shall be construed to limit the ability of" the Secretary of State and the Secretary of Homeland Security "to take longer than 9 months . . . in high-risk cases for which satisfaction of national security concerns requires additional time." AAPA § 602(b)(4). But this authority to take more time "in *cases* involving *unusual* national-security risks" is not a source of unbounded power to impose a blanket suspension. *Afghan & Iraqi Allies IV*, 103 F.4th at 811 (emphasis added). The court has already rejected such an argument as "tortured and untenable." *Afghan & Iraqi Allies I*, 2019 WL 4575565, at *7; *see also Afghan & Iraqi Allies III*, 643 F. Supp. 3d at 155 ("[T]he court has already

heard and rejected that line of argument.").  After all, the statute's structure "makes clear that Congress was patently aware of the national security implications when it set the 9-month time limit." *Afghan & Iraqi Allies I*, 2019 WL 4575565, at *7.  Congress balanced the risks to national security against countervailing interests in the prompt adjudication of visas by establishing a general requirement of expedited processing and a carefully limited exception for cases which "present[] *distinctively high risks*."  *See Afghan & Iraqi Allies IV*, 103 F.4th at 817 (emphasis added).[3]  Of course, "if the 'government credibly claims that *a particular case* is high risk' and requires additional time, a court should 'defer to the government's expertise in the area of foreign policy and national security.'"  *Afghan & Iraqi Allies v. Pompeo* ("*Afghan & Iraqi Allies II*"), 334 F.R.D. 449, 460 (D.D.C. 2020) (quoting *Nine Iraqi Allies*, 168 F. Supp. 3d at 295) (emphasis added) (cleaned up).  But the AAPA's narrow, case-by-case exception cannot justify the sweeping, non-individualized suspension that Defendants have imposed.

Next, Defendants cite 8 U.S.C. § 1104(a), which provides that:

> The Secretary of State shall be charged with the administration and the enforcement of the provisions of this chapter and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas; (2) the powers, duties, and functions of the Administrator; and (3) the determination of nationality of a person not in the United States. He shall establish such regulations; prescribe such forms of reports, entries and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out such provisions.

---

[3] Indeed, the D.C. Circuit noted that the court's original injunction "accommodated [delays in] *cases* requiring additional processing time to reconcile any national security concerns"— accommodations which the Revised Adjudication Plan maintained.  *Afghan & Iraqi Allies IV*, 103 F.4th at 812; *see also id.* at 818 (concluding that the court's refusal to terminate the injunction "reasonably address[ed]" Defendants' national security concerns).  For example, when Defendants refer an individual case to a third-party agency "to reconcile any national security concerns," the Revised Adjudication Plan does not set any timing benchmarks with respect to those cases, but only requires Defendants to report how many such cases have been pending beyond 120 days.  RAP at 9.

Defendants contend that this "broad authority" permits the Secretary of State to "implement[] a temporary cause [on visa processes] to conduct a review of . . . internal security vetting." Defs.' Suppl. Br. at 3. But it is well established that such a "'general grant of authority cannot displace the clear, specific text of' a statute." *Allegheny Def. Proj. v. FERC*, 964 F.3d 1, 16 (D.C. Cir. 2020) (quoting *Murray Energy Corp. v. EPA*, 936 F.3d 597, 627 (D.C. Cir. 2019)); *see also NLRB v. SW General, Inc.*, 580 U.S. 288, 305 (2017) ("It is a commonplace of statutory construction that the specific governs the general."). In enacting the AAPA, Congress specifically mandated that Defendants "shall" expedite visa processing for Afghan SIV applicants, "except in *cases* involving *unusual* national-security risks." *Afghan & Iraqi Allies IV*, 103 F.4th at 811 (emphasis added). Defendants' "cannot escape Congress's" specific mandate "by grasping at [the Secretary's] separate, more general authority" under § 1104(a). *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *see also id.* ("A 'general grant of rulemaking power cannot trump the specific provisions of the act.'" (quoting *NRDC v. Reilly*, 976 F.2d 36, 40 (D.C. Cir. 1992)).

Finally, Defendants disclaim any authority pursuant to Presidential Proclamation 10,998 to suspend COM and Form I-360 petition processing. They stress that they "are free to continue processing Afghan SIV applications" under the Proclamation, as the Proclamation only suspends entry—and purportedly also visa issuance—which "is distinct from the pause on the aforementioned visa processing." *See* Defs.' Suppl. Br. at 8; *see also id.* (noting that "the Proclamation is not the basis for the visa processing pauses referenced above" and "many of these processes have resumed notwithstanding the Proclamation"). Because "Plaintiffs do not seek to compel immediate visa issuance" and only "seek to enforce the Revised Plan's requirement that Defendants promptly process class members' applications at steps prior to visa issuance, including COM approval," Pls.' Suppl. Br. at 8 n.3, the court does not need to address whether the

Proclamation's suspension of *entry* for Afghan nationals permits Defendants to suspend *visa issuance* to them. The court holds only that Defendants' suspension of COM and Form I-360 petition processing violates this court's injunction, and neither the Proclamation nor the statutory provisions cited by Defendants excuse that noncompliance.

### E. Even before the suspension, Defendants failed to adequately comply with the Revised Adjudication Plan.

Plaintiffs contend that Defendants "failed to meet their obligations under the Revised Plan" even before the processing suspension. Pls.' Mot. to Enforce at 5. The court agrees. The September Progress Report shows that Defendants' performance fell significantly short of the benchmarks in several respects. When "Defendants' performance does not meet the standard for any particular step," they must explain why "and, if appropriate, include actions to be taken to improve performance to bring it in line with the standard." RAP at 12. Yet Defendants failed during the October meet-and-confer to identify actions that will meaningfully improve their compliance with respect to COM processing and interview scheduling, and offer none now. To the contrary, Defendants have *reduced* staffing in the Afghan Special Immigrant Visa Unit by 30 percent and have not explained why that reduction was appropriate considering their low rates of compliance with the Revised Adjudication Plan. *See* Progress Report at 11–12.

To start, the Revised Adjudication Plan requires the State Department to process COM applications and appeals within 120 calendar days. *See* RAP at 7. In September, Defendants reported that nearly 15,000 class members remained pending at this step and that they had been waiting, on average, 663 days for a decision. *See* Progress Report at 9, 11. To explain that significant shortfall, Defendants cited a surge in visa applications following the U.S. Government's withdrawal from Afghanistan in 2021 and Congress's directive in 2019 that Defendants should prioritize certain Afghan special immigrant visa applications, most of which were filed by non-

class members.  *See* Progress Report at 11–12.  This explanation is seriously deficient:  The court already considered and accommodated those very factors in devising the Revised Adjudication Plan.  *See Afghan and Iraqi Allies III*, 643 F. Supp. 3d at 155 (noting that "[i]n the wake of [the U.S.] withdrawal, the monthly volume of SIV cases inquiries surged by 816 percent, and the number of new cases grew by 443 percent" and concluding that this factor and others did not "justify ending court supervision of the government's adjudication process," but "does warrant some modifications to the adjudication plan").  And notably, Congress left the nine-month benchmark in place even as it implemented the prioritization scheme in 2019 and made other amendments to the AAPA in 2021.  *See Afghan & Iraqi Allies II*, 334 F.R.D. at 464–65; *see also Afghan & Iraqi Allies*, 643 F. Supp. 3d at 155 (noting that Congress "has declined to disturb [the nine-month benchmark] even after the complications of recent years").  Accordingly, it is not enough for Defendants to merely point to factors that the Revised Adjudication Plan already accounts for to explain their noncompliance with that Plan.  Moreover, although Defendants claim they will expand "their use of advanced analytics and automation to streamline the COM review process," Kapur Decl. ¶ 9, they have not concretely explained how this will meaningfully "improve performance *to bring it in line with the standard*," RAP at 12 (emphasis added), especially considering a 30 percent reduction in unit staffing, *see* Progress Report at 11–12.

Next, the Revised Adjudication Plan requires Defendants to schedule visa interviews within eight business days of determining that an application is complete.  *See* RAP at 9.  In September, Defendants reported that it took them, on average, sixty days to schedule an interview.  *See* Progress Report at 14.  Defendants explain that following the closure of the U.S. Embassy in Kabul, most class members seek to schedule their interviews at embassies located outside Afghanistan with a scheduling backlog.  *Id.*  Defendants note that these embassies must balance

the number of interview slots they offer to Afghan nationals with the need to maintain "the bilateral relationship with the foreign government" of the country in which the embassy in located by offering enough slots to citizens of that country, among other factors.  Decl. of Stuart Wilson ¶ 9, ECF No. 294-3.  Defendants state that "[i]n an attempt to assist with the increased demand" for interviews, they "sent two temporary duty staff from May to July 2025 to the U.S. Embassy in Kigali," where many Afghans seek to schedule interviews.  Wilson Decl. ¶ 19.  Defendants represent that they will continue to "assess the allocation of interview slots based on the bilateral relationship with the foreign government, priorities across visa categories, no show rates, and other factors."  *Id.* ¶ 14.  The court is not satisfied that such intangible or limited measures will meaningfully "improve performance *to bring it in line with the standard*."  RAP at 12 (emphasis added).  It will therefore "order Defendants to appear before the court for a conference . . . to address the actions Defendants plan to take to remedy their noncompliance" with respect to COM processing and interview scheduling.  Pls.' Mot. to Enforce at 11.

The court also agrees with Plaintiffs that Defendants have failed to satisfy their reporting obligations with respect to cases in administrative processing.  Specifically, instead of reporting the number of cases pending in administrative processing within the government's control, Defendants have reported all cases refused pursuant to 8 U.S.C. § 1201(g), which would include pending administrative-processing cases within the applicant's control as well as cases that have been permanently refused with "no further action . . . anticipated."  Progress Report at 5 n.2.  Such dramatically overinclusive reporting frustrates the ability of both Plaintiffs and this court to determine whether Defendants are complying with the requirement that they timely complete administrative processing over which they have control.  *See* RAP at 9.  Defendants have also failed to report their compliance with the benchmark for resolving government-controlled

administrative processing for issues not related to national security.  *See* Progress Report at 15–16.  Although they cite legitimate difficulties in ascertaining this data, the court is not satisfied based on Defendants' representations that they have reasonably attempted to find an efficient solution, especially as they tout their advances in the use of advanced analytics and automation.  The court will therefore order Defendants to attempt to resolve these reporting issues by the next progress report and, if necessary, propose a more detailed explanation for their inability to provide more targeted data in accordance with the Revised Adjudication Plan.

**F.  Plaintiffs' Motion for an Accounting of Class Members is denied.**

Finally, Plaintiffs move for an accounting of class members, which they say is "necessary" to allow the court to "assess Defendants' progress in achieving" the objectives of the Revised Adjudication Plan.  *See* Pls.' Mot. for Accounting of Class Members at 1, ECF No. 279.  But the Revised Adjudication Plan seeks only "to establish timing benchmarks for all government-controlled steps of the SIV adjudication process."  *Afghan & Iraqi Allies V*, 2025 WL 1591738, at *4.  The Plan already requires Defendants to periodically report data on the status of class members pending at those government-controlled steps.  *See* RAP at 12.  It is unclear how requiring Defendants to produce information about class members not pending at government-controlled steps is necessary for supervising compliance with the Revised Adjudication Plan.  To the contrary, Plaintiffs appear to be asking the court for additional injunctive relief—relief that the court cannot grant while Defendants appeal the injunction.  *See City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007) (noting the "crucial distinction" between expanding and enforcing a judgment pending appeal (quoting *Am. Town Ctr. v. Hall 83 Assocs.*, 912 F.2d 104, 110 (6th Cir. 1990)).  Accordingly, the court will deny Plaintiffs' Motion for an Accounting of Class Members.

## IV.    CONCLUSION

For the reasons explained above, it is hereby **ORDERED** that Plaintiffs' Motion to Enforce the Revised Adjudication Plan, ECF No. 293, is **GRANTED**; Plaintiffs' Motion for an Accounting of Class Members, ECF No. 279, is **DENIED**; and the parties' Joint Motion to Modify the Revised Adjudication Plan's Class Identification Methodology, ECF No. 282, is **DENIED** without prejudice.  Defendants shall immediately resume Chief of Mission and Form I-360 petition processing for class members, in accordance with the Revised Adjudication Plan.

It is further **ORDERED** that the parties shall appear before the court for a status conference on **February 24 at 2:00 p.m.**  Defendants shall be prepared to identify steps to meaningfully improve their compliance with the Revised Adjudication Plan's benchmarks for Chief of Mission processing and visa interview scheduling.  Defendants shall also attempt in good faith to resolve the aforementioned reporting issues by the next progress report.

It is **SO ORDERED**.


Date: February 6, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge