**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AFGHAN AND IRAQI ALLIES UNDER
SERIOUS THREAT BECAUSE OF THEIR
FAITHFUL SERVICE TO THE UNITED
STATES, ON THEIR OWN AND ON BEHALF
OF OTHERS SIMILARLY SITUATED,

                Plaintiffs,

      – against –

MARCO A. RUBIO, *et al.*,

                Defendants.

Case No. 18-cv-01388-TSC-MAU

Judge Tanya S. Chutkan

## JOINT STATUS REPORT

Plaintiffs and Defendants (hereinafter "Parties"), by and through undersigned counsel, respectfully file this Joint Status Report ("Report") pursuant to the Court's April 1, 2026, Minute Order. The Court ordered a "Joint Status Report due by 4/30/2026." Minute Order (April 1, 2026).

At the April 1 status conference, the Court directed the Parties to discuss information that Plaintiffs have sought regarding Steps 4 and 9 of the Revised Adjudication Plan ("Plan"), including regarding the proposals to address compliance issues at Steps 4 and 9 of the Plan that Plaintiffs had sent to Defendants in writing on March 27. Transcript of Status Conference, at 35:1-10, 36:3-10. The Parties met and conferred on April 16, April 21, and April 27.

The Parties write to apprise the Court of the status of the Parties' discussions, the outstanding areas of disagreement, and proposed next steps.

## Joint Position

In the month since the April 1 status conference, the Parties have met and conferred three times. At the first meet and confer on April 16, the Parties discussed Plaintiffs' proposed remedial

measures and Defendants' responses to nineteen questions from Plaintiffs. The second meet and confer on April 21 primarily focused on Defendants' Progress Report for the period of December 4, 2025, to March 4, 2026, but also briefly addressed progress on measures for the Report. On April 24, Defendants sent a letter to Plaintiffs proposing additional measures and countermeasures, along with written responses to questions from Plaintiffs. On April 27, the Parties met for a final time and discussed all outstanding proposed measures and areas of agreement.

At the conclusion of these discussions, the Parties are in agreement on the following additional measures to be taken by Defendants:

1. Defendants will begin providing to Plaintiffs on a monthly basis the number of COM decisions issued in the preceding month in cases pending beyond 120 days. This information will be provided by email by the close of business on the seventh day of the following month. If this date falls on a weekend or government holiday, the information will be provided on the next business day. This reporting will start with the month of April 2026 and continue until the Parties jointly agree otherwise or unless such reporting becomes contrary to any future court order.

2. Defendants have offered to update the standard scheduling language sent to all immigrant visa applicants to inform them of Presidential Proclamation 10998. The Parties have exchanged proposed language and will be prepared to provide an update to the Court on this issue during the May 7 status conference.

3. Defendants shared with Plaintiffs that their systems contain data on 212(f) refusals. The Parties have engaged in discussions regarding production of that data in some form to Plaintiffs.

As explained in the sections that follow, the Parties have been unable to agree on other outstanding areas of dispute.

**<u>Plaintiffs' Position</u>**

Despite Plaintiffs' best efforts, the Parties have not been able to agree upon measures to remedy Defendants' serious compliance issues at Steps 4 and 9 of the Plan. It is therefore imperative that the Court take action to ensure that Afghan class members, who applied for SIVs at minimum over four years ago, are able to move forward in the process as envisioned by the Plan. The backlog of applicants pending beyond the Plan's 120-day benchmark at the COM stage must have their applications adjudicated on a reasonable timeframe, and those who complete their visa interviews must be permitted to move on to the next step. To that end, Plaintiffs respectfully request that the Court adopt Plaintiffs' proposed interim metric for Step 4 and proposed clarification of the status of applicants who complete Step 9, as laid out in the attached Proposed Order.

1. **COM Approval (Step 4)**

Over 13,000 Afghan class members have been waiting for a decision on their COM applications or appeals for longer than the 120 days provided by the Plan, with all class members waiting an average of 669 days—well over five times the benchmark wait time. *See* March 2026 Progress Report, ECF No. 313, at 14; March 30, 2026 Joint Status Rep., ECF 314, at 4 n.1. After this Court ordered Defendants to identify actions to remedy their noncompliance, *see* Order Granting Mot. to Enforce, ECF No. 309 at 17, they agreed to restore the Afghan SIV Unit's staffing levels to what they were before a 30% reduction in staffing in 2025. But a reversion to the status quo, which Defendants have long known was insufficient to meet the 120-day benchmark, *see*

Defs.' Objections to Magistrate Judge Order, ECF No. 261 at 5, is insufficient to bring their performance into compliance.

In order to ensure that Defendants make meaningful progress towards achieving compliance with the 120-day timeframe at the COM approval stage, Plaintiffs proposed that the State Department process 4,000 COM cases from the class member backlog (i.e., those pending longer than the 120-day timeframe) per month until the backlog is eliminated. Defendants' counterproposal—a processing rate of 500 or 600 class members per month, with an option to reconsider later on—is dramatically less than what Defendants have already been doing over the past year. This counterproposal is consistent with Defendants' ongoing reluctance to treat the Plan as a binding court order that they must comply with and does nothing to ensure that long-pending class member COM cases get processed more quickly than they have been over the past year.

Plaintiffs' proposed interim metric of 4,000 cases per month is necessary to make measurable and meaningful progress in reducing the backlog at Step 4. Moreover, this metric is supported by precedent, which shows that it is both reasonable and attainable: In the second half of 2024, when the ASIV Unit had approximately 150 staff members, and even after its staffing decrease in the first half of 2025, Defendants processed an average of nearly 4,000 Afghan COM cases per month.[1] Between July and September 2025, when the ASIV Unit had only about 90 staff

---

[1] *See* Dep't of State, Report to Congress, Afghan Special Immigrant Visa Program, Fiscal Year 2024 Q4) https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-report-Q4-October-2024.pdf (11,954 processed July through September 2024); Fiscal Year 2025 Q1 https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q1-Jan-2025.pdf (11,174 processed October through December 2024); Fiscal Year 2025 Q2 https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q2-April-2025.pdf (12,321 processed January through March 2025); Fiscal Year 2025 Q3 https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q3-FY25.pdf (11,892 processed April through June 2025). Notwithstanding Defendants' statement that "after reaching 140 staff in April 2024, ASIV began to consistently issue an average of 4,000 COM

members, Defendants still processed an average of 2,900 per month.[2] *See* Veprek Decl., ECF No. 314-2, ¶ 29; *see also* Sept. 2025 Progress Report, ECF No. 290 at 12 (noting staffing decrease). Asking Defendants to commit to the same output level they had achieved *before* the Plan was even in effect is not unreasonable when the purpose of the Plan is to ensure that Defendants do *more* than continue the status quo.

In a good faith attempt to find common ground and to account for Defendants' concern that there will be a temporary reduction in processing capacity while new staff members are trained, Plaintiffs proposed an incremental increase in the metric over several months. Specifically, Plaintiffs proposed monthly metrics of processing at least 1,000 class member cases from the backlog in June, 2,000 in July, and 3,000 in August, before reaching the 4,000-per-month metric in September, and continuing to meet the 4,000-per-moth metric thereafter. With these metrics, the State Department would be on track to eliminating the existing class member backlog by the end of the year—still far behind the schedule envisioned by the Plan, but a marked improvement.

In sharp contrast, all Defendants are willing to commit to is processing 1,600 cases over three months, and then reevaluating this pace after September. Should Defendants continue at the same 600-case-per-month rate, it would take Defendants nearly two years to eliminate the backlog of over 13,000 class member COM applications. Defendants' protestations that they cannot commit to faster processing while training new staff and that they cannot anticipate what their

---

decisions per month in January 2025," in the three months after April 2024, the ASIV Unit was already processing an average of 3,300 per month. *See* Dep't of State, Report to Congress, Afghan Special Immigrant Visa Program, Fiscal Year 2024 Q3) https://travel.state.gov/content/dam/visas/SIVs/Afghan-Public-Quarterly-Report-Q3-July-2024.pdf.

[2] Dep't of State, Report to Congress, Afghan Special Immigrant Visa Program, Fiscal Year 2025 Q4 https://travel.state.gov/content/dam/visas/SIVs/Afghan%20Public%20Quarterly%20Report%20Q4%20October%202025.pdf.

processing capacity will be after onboarding new staff is a problem entirely of their own making: It is up to Defendants to identify what steps they will take to come into compliance with the Plan, yet they have consistently refused to lay out a meaningful plan for getting there. Since the April 1 status conference, Defendants have clarified that they believe staffing constraints—not the number of COM designees—are the limiting factor in their ability to complete COM cases.[3] But if that is the case, Defendants should be making plans to further increase staffing if the preexisting 150-person level is insufficient. Instead, Defendants have stated that they do not currently have plans to increase staffing after this initial hiring cycle.

As this Court has reaffirmed, the Plan is not optional or aspirational. Over ten thousand class members whose SIV applications this Court found to be already unreasonably delayed in 2022 are still waiting for a decision at this initial step in the process over three years later. Plaintiffs therefore respectfully ask the Court to adopt Plaintiffs' proposed interim metrics, as laid out in the attached Proposed Order, so that class members and the Court have a reasonable expectation of when their COM applications will be adjudicated.

### 2. Visa Interviews (Step 9)

This Court ordered the Plan in this case to ensure that class members' unreasonably delayed SIV applications are moved to a final decision as promptly as possible. At the moment, Defendants are not issuing visas to eligible SIV applicants because of Presidential Proclamation 10998, which

---

[3] This position differs from the position in the Veprek Declaration provided by Defendants prior to the April 1 Status Conference. The Veprek Declaration suggested that the bottleneck in processing applications was in part due to the number of COM designees, stating that "reviewing daily agendas incorporating more than 200 COM decisions would be impracticable without additional COM-designees." *See* Veprek Decl., ECF No. 314-2, ¶ 37. But after Plaintiffs asked for clarification, Defendants stated in the April 16 meet and confer that there were three COM officers with approval authority and the current processing constraint is the number of staff, not the number of COM approvers.

relies on INA Section 212(f) to temporarily bar the entry of most Afghans (and hundreds of thousands of others) to the United States. But that does not give Defendants a free pass to deviate from their obligations under the Plan at the steps prior to visa issuance. That includes Step 9, where Defendants may needlessly subject class members to even further delay by preventing class members from moving to the next step in the process even once the Section 212(f) suspension is lifted. Unfortunately, the Parties are unable to agree on the status of class members who complete interviews while the Section 212(f) suspension is in effect. The Court should therefore clarify that class members who complete Step 9 but are "refused" under Section 212(f) are considered pending at Step 10 until Defendants initiate administrative processing, and at minimum should require clear communication from Defendants to inform class members of the impact of the Section 212(f) Proclamation on their visa applications prior to applicants scheduling interviews.

### A. The Court should clarify that class members who complete Step 9, but are subject to 212(f), are waiting at Step 10.

Based on the information disclosed by Defendants, class members who proceed with a visa interview will almost certainly be subjected to even further delays as a result. According to Defendants, those who are eligible for an SIV "but for" the Proclamation are issued refusal notices under Section 212(f). The State Department issues Section 221(g) refusal notices to applicants who are required to submit additional documents, but even if they submit those, they too will be refused under Section 212(f). Defendants have suggested that these applicants will have to reapply for a visa (i.e., return to Step 6), and therefore reinterview. *See* 22 C.F.R. § 42.62(a) (visa applications must be signed before a consular officer). In other words, completing an interview now does nothing to help class members get closer to being issued an SIV, and instead pushes

them even further away.[4] Beyond the additional delay, this forces class members and their families to undertake what is often a difficult and costly journey to a U.S. embassy for an interview not once, but twice, as an exercise in futility. In effect, Defendants misread the Plan to justify imposing even *longer* delays for applicants by taking the position that class members who are "refused" under Section 212(f) must start over from Step 6.

Defendants' practice is profoundly unfair to class members and turns the purpose of the Plan on its head. The Plan does not set timeframes for certain steps of the SIV process in isolation: the entire purpose is to get class members' unreasonably delayed applications through the process and towards a final decision on an expedited and predictable timeline. *See Afghan & Iraqi Allies v. Pompeo*, No. 18-CV-01388 (TSC), 2019 WL 4575565, at *11 (D.D.C. Sept. 20, 2019) (ordering Defendants to submit "a plan for promptly processing and adjudicating the applications of current class members"). To accomplish that objective, it should be uncontroversial that the Plan requires Defendants to move class members from one step to the next. This is confirmed by the language of the Plan: After class members complete their visa interview, Step 10 of the Plan specifically provides that administrative processing, if needed, will be initiated. ECF 272-1 at 9. All class members who will ultimately be eligible for an SIV are being issued Section 212(f) refusal notices, yet they will still have to undergo administrative processing in order to receive an SIV, and are therefore pending at Step 10 until Defendants initiate administrative processing.[5]

---

[4] While Defendants have held out the possibility that class members could be considered for a "national interest" exception to the Section 212(f) suspension, *see* Proclamation No. 10949, 90 Fed. Reg. 24497 (June 4, 2025), Defendants stated that zero Afghan SIVs had been approved for the exception.

[5] Contrary to Defendants' suggestion, Plaintiffs' position does not depend on whether Defendants categorize a 212(f) refusal as 'administrative processing' or not. Step 10 captures the time after the interview and *before* Defendants initiate administrative processing.

The Section 212(f) Proclamation is a temporary suspension of entry, not a means by which Defendants can unilaterally end the congressionally created SIV program. Once the Section 212(f) Proclamation no longer bars the entry of Afghan SIVs, there is nothing stopping Defendants from revisiting those refusals and allowing them to proceed with Step 10. A Section 212(f) refusal notice is no more final than a 'refusal' under Section 221(g). *See Afghan & Iraqi Allies v. Pompeo*, No. 18-CV-01388 (TSC), 2019 WL 367841, at *9 (D.D.C. Jan. 30, 2019) (concluding that a refusal for administrative processing is not a final denial); *Nine Iraqi Allies v. Kerry*, 168 F. Supp. 3d 268, 283–89 (D.D.C. 2016) (same). Defendants cannot create a workaround to the Plan where even though administrative processing will be required for these class members to receive a final adjudication, Defendants have no obligation to allow them to proceed to Step 10 and can instead force them to repeat Steps 6 through 9, regardless of whether there is any actual need for a reinterview.

Defendants have yet to articulate the specific legal or practical obstacle that prevents them from holding these cases at Step 10. Defendants appear to suggest that policies in the Foreign Affairs Manual ("FAM") setting validity periods for certain visa-related documents and checks may prevent an applicant from moving to administrative processing and therefore excuse their additional delays in visa processing times, but this is a red herring. The fact that a document might expire and need to be resubmitted does not require an applicant to repeat the entire visa application process from Step 6.[6]  As this litigation has shown, applicants regularly wait months or years after their interview before their visas are issued, so documents often expire and need to be resubmitted. Plaintiffs do not argue that Defendants cannot require the resubmission of expired documents or

---

[6] As Defendants acknowledge, the State Department may request additional information from applicants without requiring them to complete a new visa application. *See* 22 C.F.R. § 42.63(c).

re-running of expired checks—merely that, once any such information is received, class members must be able to proceed with the process.

The Court should therefore clarify that class members who receive Section 212(f) refusal notices are at Step 10, awaiting the initiation of administrative processing. Given the current practical reality of the Section 212(f) Proclamation and the fact that some background checks expire, at this time Plaintiffs do not seek to insist that Defendants begin administrative processing within five days of each interview. However, the Court should at minimum clarify that under Step 10 of the Plan, Defendants are required to "initiate any government-controlled administrative processing within 5 business days of receipt of all necessary information or documentation"—such as the class member's passport or any updated documentation required for administrative processing—following the lifting of the Section 212(f) Proclamation. [7] For the Court's convenience, Plaintiffs have included the clarification they propose in the attached Proposed Order.

It is well within the Court's authority to make this clarification. Courts have the authority to issue orders enforcing their mandates and judgments. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). Included within "a court's power to administer its decrees is the power to construe and interpret the language of the judgment." *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39–41 (D.D.C. 2014) (quoting *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11–12 (D.D.C. 2004)). Here, Plaintiffs merely ask the Court to issue an order clarifying what should be obvious from the terms of the injunction: that class members who have

---

[7] Contrary to Defendants' suggestion, this clarification would not affect Defendants' ability to require a reapplication or reinterview in individual cases where warranted. Defendants presumably do not take the position that the Plan has thus far prevented them from, for example, requiring a particular class member to reinterview should the need for a reinterview arise during the administrative processing step, or, to use Defendants' example, to withdraw an applicant's COM approval in appropriate instances. But that is very different than requiring *all* class members who complete Step 9 to repeat steps in the process.

not received a final adjudication of their eligibility for an SIV, including those subject to the

Section 212(f) suspension, move to Step 10 after completion of Step 9, rather than be returned

back to Step 6.

**B. Class members must be informed of the impact of the Section 212(f) Proclamation at Step 9.**

The Court has the authority to direct notice to class members. *See* Fed R. Civ. P.

23(c)(2)(A) (for Rule 23(b)(2) class actions, courts "may direct appropriate notice to the class");

*see also* Fed. R. Civ. P. 23(d)(1)(B)(i) (courts may "require . . . giving appropriate notice to some

or all class members of . . . any step in the action"). Whether the Court orders Plaintiffs' requested

clarification or not, class members should not be left in the dark about the future of their SIV

applications when making the consequential decision whether to attend or postpone their visa

interview. Currently, although Defendants note the existence of the Section 212(f) Proclamation

on the State Department website, they do not mention it when emailing applicants to schedule a

visa interview. This understandably could prompt applicants to believe that they will be able to get

a visa after completing the visa interview.

As noted in the Parties' Joint Statement, the Parties have discussed language that could be

conveyed to applicants and continue to confer on this issue. Plaintiffs have requested that

Defendants inform Afghan SIV applicants when scheduling interviews that the State Department

is not currently issuing visas to Afghan nationals, including SIVs, and provide information on how

to request postponement of the interview. Specific information as to how this proclamation affects

Afghan SIVs is crucial because some class members, in light of the difficulties involved in getting

to an embassy, may decide that they prefer to wait for an interview until a visa can actually be

issued. If the Parties are unable to come to an agreement on this issue, Plaintiffs may seek the

Court's further intervention at the May 7 status conference to ensure that Defendants provide this critical information.

### C. The pending appeal does not give Defendants license to violate the Plan.

Defendants assert that this Court lacks jurisdiction to modify the Plan while their appeal is pending before the D.C. Circuit. Even if that were the case,[8] Defendants cannot simply violate this Court's orders based on an unlitigated claim that they should not be required to comply with the Plan as written due to changed circumstances.

To be clear, Plaintiffs do not seek to modify the Plan, and the filing of a notice of appeal does not automatically stay district court proceedings or suspend enforcement of injunctive relief. *See* Fed. R. Civ. P. 62(c); *see also Bo v. Blinken*, No. 22-cv-2331 (D.D.C. Nov. 16, 2022) (Minute Order denying stay pending resolution of appeal); 11A Wright and Miller, Federal Practice and Procedure § 2962 (3d ed. 2022). A party seeking to halt enforcement of a court-ordered injunctive plan during the pendency of an appeal must move for a stay and satisfy the well-established four-factor standard governing such relief, which Defendants failed to do here. *See* Fed. R. App. P. 8(a); Fed. R. Civ. P. 62(d). In the absence of a stay, the Court retains jurisdiction to carry out the injunction.

<u>**Defendants' Position**</u>

**Interim COM Metrics**

Defendants are unable to agree to Plaintiffs' proposed interim metrics for reasons previously provided to Plaintiffs and the Court. Defendants provided a counter-proposal to commit

---

[8] Plaintiffs first received Defendants' position on this issue at 5pm on April 29. While Plaintiffs do not believe it is necessary for the Court to resolve this question to rule on the enforcement-related issues pending before it, should the Court disagree, Plaintiffs would request an opportunity to brief their position.

to issuing COM decisions in 500 class member cases per month by July 2026, and 600 class member cases per month by September 2026. These proposed metrics are based on how many decisions Defendants have issued since processing resumed in January, balanced by the expected drop in COM decisions as experienced staff shift their attention to training and conducting rigorous quality control for new staff. Because the increasing number of class member cases that the Department of State's Afghan Special Immigrant Visa Unit (ASIV) is capable of reviewing per month will rely on the successful progression of new staff through ASIV's robust training program, Defendants are currently unable to anticipate the number of monthly class member COM decisions that can be expected beyond September 2026. The addition of 65 staff members will eventually free up current staff to receive more advanced training, qualifying them to make recommendations for COM approval/non-approval, resulting in more cases reaching the COM-designee for decision.

Defendants anticipate that once ASIV has 150 fully trained staff on board, it will have the capability to issue decisions in 1,000 class member cases per week. This is an expansion of the metric shared with the Court in the April 1, 2026, status conference, at which Defendants stated that ASIV at full capacity would be able to issue 1,000 decisions in total per week, not class member cases specifically. *See* ECF No. 316 (Apr. 1, 2026 Hr. Tr.) 14:19-20 ("[O]nce we have 150 people onboard, that would end up with about 200 cases per day . . ."). This ultimate capacity will align with the 4,000 class member decisions per month metric proposed by Plaintiffs. However, because reaching this metric will rely on the successful progression of new staff through ASIV's robust training program, Defendants are not able to anticipate precisely when 4,000 class member decisions per month will first be issued. For comparison, after reaching 140 staff in April 2024, ASIV began to consistently issue an average of 4,000 COM decisions per month in January 2025.

Hiring and training for the new staff is on track. Defendants expect all 65 new staff will be hired by May 15, 2026. At that time, 58 new staff are expected to have undergone some training and to have begun processing class member cases. By June 15, 2026, Defendants expect that all 65 new staff will have received some training and will be processing class member cases. As stated in the Decl. of Andrew Veprek ¶ 34, ECF No. 314-2, new staff members receive at least 90-120 days of training over an approximately 12-13-month period. During this period, their work is re-reviewed by an experienced caseworker to ensure accuracy and consistency. *Id*. Shortening the timeframe during which new hires' work is re-reviewed would jeopardize the accuracy and consistency of their COM adjudications. While Defendants anticipate that by fall 2026 the new staff will be sufficiently trained to meet daily processing metrics for the stage of processing in which they are working, *id*. at ¶ 35, this does not mean that ASIV staff will spend no further time in training or that re-review of new staff work will stop. Plaintiffs' allegation that Defendants should be able to reach 4,000 decisions a week by fall does not reflect the information Defendants have provided regarding the training process. While Defendants agree that 4,000 class member decisions per month is an appropriate metric to achieve compliance with the RAP and ultimately they expect to have capacity to reach that metric, reaching it by fall 2026 is simply not feasible due to realities of the training process.

Plaintiffs have failed to propose any alternate remedial measure to bring COM processing levels into compliance with the RAP other than suggesting interim metrics. Defendants' hiring plan first brought to the Court in February represents a $24.2 million commitment that is expected to ultimately bring Defendants to the exact processing capacity requested by Plaintiffs. *See* ¶ 32, ECF No. 314-2.

**INA 212(f) Refusals**

14

Defendants cannot unconditionally agree to consider the visa applications of class members who complete Step 10 and are denied under INA 212(f) to remain at Step 10 if Presidential Proclamation 10998 were rescinded.

Defendants disagree with Plaintiffs' position that was sent shortly before the April 27 meet and confer: "However, as provided by Step 10, class members are entitled to continue with administrative processing once they submit the required documentation, rather than be returned to Step 6 and required to complete the entire application and interview process over again." Plaintiff's position is based on a view that class members who are refused under INA 212(f) are at the interview/administrative processing step, but that fundamentally misunderstands the process. Applications refused under INA 212(f) are not in administrative processing. *See Thein v. Trump*, 2025 WL 2418402, at *5 (D.D.C. Aug. 21, 2025) (distinguishing between plaintiffs in administrative processing and plaintiffs whose applications have been adjudicated and denied under INA 212(f) because of Presidential Proclamation 10949). Defendants note that the plan performance standard in the RAP for Steps 10 and 11 refers to refusals under INA 221(g) and not refusals under other grounds. ECF No. 272-1 at 9-10. Therefore, any proposition to treat class members refused under INA 212(f) as at Step 10 is inconsistent with the RAP and is rather a remedial measure that Defendants are unable to commit to at this time.

Defendants would release guidance on handling of cases refused under INA 212(f) if the proclamation were rescinded. Defendants cannot commit to handling applications in any particular way. Defendants would need to consider the particular circumstances that exist at the time that the proclamation were rescinded and the decision on how to handle such refusals would require balancing concerns related to national security, efficiency, consistency, and program integrity.

Defendants note that they cannot hold a refused visa application in a state that would allow a consular officer to immediately re-adjudicate the application if the ground(s) of ineligibility no longer applied. For example, information provided by an applicant for an immigrant visa application may expire or become outdated. Medical exam results are valid for six or three months (9 FAM 302.2-3(C)), police certificates are valid for two years (9 FAM 504.4-4(A)(c)(3)), and other supporting documents that are subject to change are valid for one year (9 FAM 504.4-4(A)(c)(3)). A consular officer may also require an applicant to complete a new DS-260, be placed under oath again, and to biometrically sign the new application (9 FAM 504.7-4(C)(b)(1)(d)). Even if an applicant were not required to submit a new visa application (DS-260), a consular officer may review a previously refused application and determine that additional documents would be necessary for the applicant to establish his or her eligibility consistent with 22 CFR § 42.65. The consular officer may determine that a reinterview is required. *See* ECF No. 316 (Apr. 1, 2026 Hr. Tr.) 23:14-24:6 (discussion by the Court why reinterview may be reasonable). Defendants cannot speculate on the circumstances in which a consular officer may require additional information before making a new determination of eligibility.

Additionally, at the time of visa issuance, consular officers are required to certify that a check of the automated visa lookout system has been made, and that there is no basis under such system or list for the exclusion of such applicant. *See* Foreign Relations Authorization Act, Years 1994 and 1995, Pub. L. No. 103-236, § 140(c)(1)(B) (8 U.S.C. § 1182 note); 9 FAM 307.3-1. The automatic visa lookout system is continuously updated. A consular officer who fails to follow this procedure may have this noted in his or her record, which is considered as a serious negative factor in the officer's annual performance evaluation. Because information in systems may change between the date of the interview and any subsequent adjudication, a consular officer would violate

16

his or her obligations if he or she failed to check such systems and take appropriate actions on the later date when the applicant's eligibility is being reconsidered.

Plaintiffs note that the potential that class members would need to reapply after being refused under INA 212(f) would create a "workaround of the Plan" and "it should be uncontroversial that the Plan requires Defendants to move class members from one step to the next."

Presidential Proclamation 10998 is a legitimate exercise of executive authority, and it is not a "workaround of the Plan" for consular officers to implement that authority through proper refusal of visa applications. Plaintiffs' position appears to be that a proper refusal is a workaround if it prevents a class member from reaching the next step in the Plan. However, there are many instances in which a class member could be refused a visa under a ground other than INA 221(g) and never progress to Step 12. It is not a workaround that such class members do not progress to the next step, even if there exists a possibility that the applicant could submit further evidence and the refusal could be reconsidered.

Defendants also do not agree that it is uncontroversial that the Plan requires Defendants to move class members from one step to the next. Plaintiffs assume that information could never arise later in the process that could reflect on a class member's eligibility at an earlier step. However, for example, it may be discovered later in the process that a class member used a fake document to obtain COM approval at Step 4. Plaintiffs appear to believe that the Plan would require Defendants to disregard that information because it would effectively place the class member back at Step 4 if Defendants revoked his or her COM approval.

Defendants do not agree with Plaintiffs' characterization of INA 212(f) or the Plan and the Court should not order particular handling of cases refused under INA 212(f) so that Defendants can properly balance concerns related to national security, efficiency, consistency, and program integrity in any future decision. If Presidential Proclamation 10998 were rescinded, Defendants remain open to engaging with Plaintiffs on this topic.

**Jurisdiction Over Relief**

Pursuant to the Court's statements at the April 1 hearing that Defendants should move for relief if they believe they cannot comply with the RAP, it is Defendants' position that Defendants' appeal of the final judgment, *see* ECF Nos. 276, 304, divests this court of jurisdiction as to any further proceedings concerning the subject matter of the order on appeal. *See* ECF No. 316 (Apr. 1, 2026 Hr. Tr.) 35:13-15 ("If the Government believes that they cannot and should not comply with my revised adjudication plan, they may move . . . for relief[.]"). As the appeal encompasses the existence and nature of the RAP, this Court lacks jurisdiction to grant relief or modify the RAP. 28 U.S.C § 1292(a)(1).

Noticing an appeal, "including an interlocutory appeal, 'confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal." *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1997)). Subject to narrow exceptions for frivolous appeals or an interlocutory appeal from a non-appealable order, "the district court does not regain jurisdiction over those issues until the court of appeals issues its mandate." *Id.* at 1302-03; *see also DeFries*, 129 F.3d 1293 at 1303 ("The mandate rule prevents the waste of judicial resources that might result if a district court, prior to the issuance of the appeals court's mandate, proceeds with a case, ruling on motions and hearing evidence ... "); *Bombardier Corp. v. Nat'l R.R.*

18

*Passenger Corp.*, No. 02 7125, 2022 WL 31818924, at *1 (D.C. Cir. Dec. 12, 2002) (per curiam) ("A non-frivolous appeal from the district court's order divests the district court of jurisdiction ...."); *Decatur Liquors, Inc. v. Dist. of Columbia*, No. 04-cv-1971 (RMC), 2005 WL 607881, at *2 (D.D.C. Mar. 16, 2005) (finding it "inadvisable for this [District] Court, absent changed circumstances or a change in the law, to reconsider and dissolve a preliminary injunction issued . . . where the propriety of its initial determination is also under review by the D.C. Circuit.").

Here, the Court is confronting the same issues as the D.C. Circuit. Defendants are appealing the Court's order that adopted the RAP. *Afghan & Iraqi Allies v. Rubio*, No. CV 18-1388 (TSC) (MAU), 2025 WL 1591738 (D.D.C. June 5, 2025); ECF No. 304 (Defs.' Notice of Appeal). Therefore, this Court lacks the jurisdiction to grant, continue, modify, refuse, or dissolve the RAP. 28 U.S.C § 1292(a)(1).

Contrary to Plaintiffs' mischaracterization, and as affirmed by Defendants on the record at the April 1, 2026, hearing, there is no dispute that this Court has enforcement authority over the RAP. Rather, it is Defendants' position that this Court lacks jurisdiction either to modify the RAP to grant Defendants' relief if they are allegedly unable to comply, as the Court suggested, or to order any remedial measures requested by Plaintiffs that would serve to modify the scope of the RAP. That very issue is currently before the D.C. Circuit.

We disagree with Plaintiffs' assertion of a proposed order for this Report. Plaintiffs did not provide this proposed order until after close of business on April 30, 2025, and it does not reflect the views of Defendants.

Dated: April 30, 2026

Kimberly Grano (D.D.C. Bar No. NY0512)
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Guadalupe V. Aguirre (D.D.C. Bar No.
NY0665)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (646) 946-7453
kgrano@refugeerights.org
psepulveda@refugeerights.org
laguirre@refugeerights.org
gschwarz@refugeerights.org

Rebecca Kerr (D.D.C. Bar No. NY0267)
David Y. Livshiz (D.D.C. Bar No. NY0269)
Wang Jae Rhee (admitted pro hac vice)
FRESHFIELDS US LLP
3 World Trade Center,
175 Greenwich Street, 51st Floor
New York, NY 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
rebecca.kerr@freshfields.com
david.livshiz@freshfields.com
wangjae.rhee@freshfields.com

*/s/ Justin C. Simeone*
Justin C. Simeone (D.D.C. Bar No. 252751)
Carla Sung Ah Yoon (admitted pro hac vice)
FRESHFIELDS US LLP
700 13th Street, NW, 10th Floor
Washington, D.C. 20005
Telephone: (202) 777-4543
justin.simeone@freshfields.com
carla.yoon@freshfields.com

J. Mia Tsui (D.D.C. Bar No. CA00167)
FRESHFIELDS US LLP
855 Main St, Third Floor,
Redwood City, CA 94063
Telephone: (650) 618-9250
mia.tsui@freshfields.com

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CATHERINE M. RENO
Acting Assistant Director
Office of Immigration Litigation

RUTH ANN MUELLER
DAVID J. BYERLEY
Senior Litigation Counsel

JAIME A. SCOTT
JOSHUA A. CLEM
Trial Attorneys

*/s/ Larissa Johnson*
LARISSA JOHNSON
Trial Attorney (D.C. Bar No. 90034719)
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Telephone: (202) 598-9126
Fax: (202) 305-7000
Larissa.K.Johnson@usdoj.gov
*Attorneys for Defendants*

20

*Attorneys for Plaintiffs and Class Counsel*