# Exhibit 2

**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation

*Ben Franklin Station, PO Box 868*
*Washington, DC 20044*

August 25, 2026

**VIA EMAIL**

Pedro Sepulveda, Jr.
International Refugee Assistance Project
One Battery Park Plaza, 33rd Fl
New York, NY 10004
kgrano@refugeerights.org

**Re: *Allies v. Rubio,* No. 1:18-cv-01388-TSC (D.D.C.)**
**Plaintiffs' August 14, 2026 Letter Regarding August 2026 COM Report**

Dear Mr. Sepulveda, Jr.,

This letter provides responses to Plaintiffs' letter dated August 14, 2026 regarding the August 2026 notice of lodging Chief-Of-Mission (COM) monthly report (ECF No. 326) (hereinafter, "Plaintiffs' letter") and questions raised during the meet-and-confer on August 20, 2026 (hereinafter, "Meet-and-Confer"). For each reference to Plaintiffs' letter, Defendants use the same headings and numbering as the letter, without conceding to Plaintiffs' characterization of the progress report.

**<u>Questions from Plaintiffs' Letter</u>**

1. Do Defendants solely attribute their noncompliance for July 2026 to "the need for experienced staff to train recently onboarded staff [which] contributed to a month-on-month decrease in COM decisions."?

**Response**: No. In the August 2026 COM Report, Defendants noted the need for experienced staff to train recently onboarded staff, the increasing complexity of the remaining cases, and the need to review and revise cases affected by the June 25-26 systems outages as contributing factors.

2. Please clarify what Defendants mean by a "month-on-month decrease"?

**Response**: A decrease in the number of COM decisions issued in class member cases from June to July.

3. The August 2026 COM Report states only a combined total of 811 decisions issued in July 2026 without separately identifying how many were first-time applications, reapplications, or appeals. Please provide this breakdown for July 2026, and for June 2026 for comparison, so that Plaintiffs can assess whether the month-on-month decline is concentrated in a particular category of cases.

**Response**: The break-down requested by Plaintiffs is beyond the scope of reporting requirements set by the Court in either the RAP or May 8 order. While Defendants remain open to providing this information, they are unsure of the relevance to their court-ordered obligations and respectfully ask for additional explanation from Plaintiffs as to the need for this information, particularly if Plaintiffs intend to seek this information on an ongoing basis.

4. What concrete steps, other than seeking 20 additional Foreign Service Officers are Defendants taking to meet the Court's interim processing benchmarks for the upcoming months which require Defendants to process upwards of at least 3,000 class member COM cases including any process, technology, or procedural measures unrelated to staffing levels?

**Response**: Defendants believe that hiring additional staff is the most effective way to increase the rate of COM decisions issued, despite limited short-term benefits or even short-term decreases in throughput due to the need for experienced staff to provide training. Defendants have not identified a short-term fix that would allow them to increase the rate of decisions while maintaining necessary standards for national security and process integrity.

   a. What steps are Defendants taking to ensure that the onboarding of staff will not impair their ability to meet the Court's upcoming interim processing benchmarks which require processing upwards of 3,000 class member cases?

**Response**: As explained in the June 2026 Progress Report, experienced staff must devote time to training new personnel, which limits the short-term benefit of the additional staff. Not providing such training would be counterproductive because new staff would only be able to assist in the early stages of COM processing and there would be a bottleneck at the decision stage. Therefore, while such training may make it more difficult to issue decisions on 3,000 class member cases in August, it is necessary to realize the future benefits of hiring additional staff.

5. Defendants state they are seeking 20 additional Foreign Service Officers to further supplement their staffing.

   a. Please confirm whether this figure was selected with the expectation that it would be sufficient to meet the Court's upcoming interim processing benchmark of 3,000 or more class member COM cases per month.

**Response**: Defendants continue to evaluate whether additional staffing is likely to increase productivity. As noted in the Declaration from Andrew Veprek, ECF 314-2, rapid staffing increases may not result immediately in a higher rate of COM decisions issued, due to the need for experienced staff to train new staff and the need to ensure quality control, particularly because of the need to maintain strict national security standards for COM processing. It was determined that ASIV could accommodate the addition of 20 Foreign Service employees, which includes ensuring that such employees have sufficient oversight and training. Defendants expect that the Foreign Service employees will contribute to increasing the number of COM decisions issued, which is also dependent on their progress through ASIV's robust training program over a 12- to 13-month period.

   b. Please provide Defendants' progress so far, as of the date of the upcoming meet-and-confer, in filling and/or onboarding these additional positions?

**Response**: As of August 24, Defendants continue to extend offers to fill the 20 Foreign Service positions. Defendants onboarded one Foreign Service employee on August 12, and plan to onboard two additional employees on August 31, a fourth in September, and a fifth on October 13. Onboarding is dependent on when the employee can depart his or her previous Foreign Service assignment.

   c. What steps are Defendants taking to ensure that the hiring and onboarding of staff will not impair their ability to meet the Court's upcoming interim processing benchmarks which require processing upwards of 3,000 class member cases?

**Response**: See response to question 4.a. above.

   d. The August 2026 COM Report also attributes part of the July 2026 decline to newly trained staff being assigned "more complicated cases" requiring extended processing time. Please provide efforts, such as what case-assignment or triage practices, if any, Defendants are implementing to allocate case complexity across experienced and newly trained staff so as to avoid a continued month-on-month decline in total throughput as additional staff are onboarded and comply with the Court's order.

**Response**: Over time, the remaining casework tends to be more complex. This is because Defendants issue decisions as the required information is verified. Thus, the cases that remain tend to be those in which verification is most difficult and is the most time-consuming, such as where the qualifying employment was many years in the past and there are multiple layers of contracts that need to be verified to confirm the qualifying employment. Additionally, some class members have sought COM approval multiple times, which requires staff to review all documentation associated with all of the class member's current and previous applications, resolve contradictory information across multiple applications, confirm qualifying contracts and subcontracts, and ensure that dates of employment overlap with the dates of supervision listed in the most recently-submitted letter of recommendation as well as the dates of any relevant contracts for

at least one year. Staff also must review and resolve all fraud indicators. It is essential that new staff be trained on all types of cases. Therefore, there is no reasonable way to limit new staff members' exposure to more complex cases and it would be counterproductive to do so in the long-term.

e. The August 2026 COM Report states that recently onboarded staff undergo "a robust training program" lasting 12 to 13 months. Given that the Court's interim benchmarks require Defendants to process upwards of 3,000 or more class member COM cases per month in the coming months, please explain how the 20 additional Foreign Service Officers that Defendants are seeking will be able to contribute meaningfully to that volume on a timeline consistent with the Court's benchmarks, given a 12 to 13 month training period, and what interim measures Defendants intend to implement to bridge any resulting gap.

**Response**: See response to question 4. above.

6. Please clarify if Defendants also attribute their noncompliance for the month of July 2026 to "ASIV continu[ing] to find inaccurate or non-updated language agendas due to systems anomalies occurring during or resulting from the June 25-26 systems outages." If so, is this issue now resolved? If not, please explain and identify what steps Defendants are taking to address this issue?

**Response**: The relevant systems are now functioning properly, but the outages resulted in certain information not being properly saved. Defendants identified the cases that were on the June 25 and 26 agendas that were affected by the outages and have now issued COM letters for all of those cases. There may be cases at earlier COM processing stages that were affected by the outages, but Defendants are not specifically aware of how many (if any) such cases exist. If such cases exist, Defendants will identify and take appropriate action on them as they move through the COM process,

a. Please confirm whether the "inaccurate or non-updated language" issue is limited to cases that appeared on agendas during the June 25-26 systems outages, or whether it also affects class member cases at earlier stages of COM processing that have not yet reached the agenda stage.

**Response**: See response to question 6. above.

b. Please confirm whether the class member cases removed from the COM agenda due to inaccurate or non-updated language were otherwise ready for adjudication, and if so, why their removal was necessary rather than correcting the agenda language before the scheduled decision date.

**Response**: The COM-designee reviews cases included in a specific day's agenda in a single batch to ensure efficient use of ASIV resources and consistency in decision-making. When the COM-designee has a question about a specific case, that case is removed from the agenda for revision, permitting the COM-designee to issue decisions in the remaining cases. For the cases affected by the systems outages, Defendants removed them from the affected agendas rather than delay decisions in cases on those agendas that were not affected by the outages.

7. If Defendants attribute their noncompliance to other factors, please explain and identify the steps Defendants are taking to address those issues.

**Response**: As explained previously, while the Department expects the number of class member cases that ASIV is capable of reviewing per month to generally increase over time, the precise metric will be correlated to the successful progression of newly- and recently-onboarded staff through ASIV's robust training program over a 12- to 13-month period. The need for experienced staff to train newly- and recently-onboarded staff may result in a month-on-month decrease in COM decisions issued during one or more stages of their training, as trainers focus on training and conducting rigorous quality control rather than processing cases.

**<u>Questions from Meet-and-Confer</u>**

1. When did Defendants start soliciting applications for the additional Foreign Service employee hires?

**Response**: The announcement related to this hiring went live on July 6, 2026.

2. About how many COM applications that were not yet on an agenda were affected by the June outage?

**Response**: See response to question 6. above.

3. Does the agency have capacity to handle unforeseen challenges as they arise?

**Response**: The degree to which an unforeseen circumstance would affect Defendants' ability to issue decisions would depend on the nature of the circumstance. In some cases, Defendants may have the ability to continue their work largely unabated. However, other circumstances, such as a system outage, would affect the pace at which decisions can be issued given that staff rely on such systems to perform their work.

4. Have there been any system outages since June 25-26?

**Response**: While networks and systems occasionally go down, there hasn't been a Department-wide outage as occurred at that time.

5. What is the definition of a "complex case"? Can the number of such cases for class members be calculated?

**Response**: See discussion of such cases in response to question 5.d. above. In the course of processing a case, issues may arise that require significant time to resolve. Such cases would qualify as complex, but this is not a distinct category of cases nor are such cases designated as "complex" in Defendants' systems. Therefore, the number of "complex" cases cannot be calculated.

6. If so, what number of new staff are working on complex cases vs. standard cases?

**Response**: See response to prior question.

Dated: August 25, 2026

Sincerely,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY P. NICASTRO
Director
Office of Immigration Litigation

RUTH ANN MUELLER
DAVID J. BYERLEY
Senior Litigation Counsel

LARISSA K. JOHNSON
Trial Attorney

*/s/ Jaime A. Scott*
JAIME A. SCOTT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box. 868, Washington, DC 20044
Telephone: (202) 305-3620
Email: Jaime.A.Scott@usdoj.gov