**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AFGHAN AND IRAQI ALLIES UNDER SERIOUS THREAT BECAUSE OF THEIR FAITHFUL SERVICE TO THE UNITED STATES, ON THEIR OWN AND ON BEHALF OF OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>– against –<br><br>MARCO A. RUBIO, *et al.*,<br><br>Defendants. | Case No. 18-cv-01388-TSC-MAU<br><br>Judge Tanya S. Chutkan |

**JOINT STATUS REPORT**

Plaintiffs and Defendants (hereinafter "Parties"), by and through undersigned counsel, respectfully file this Joint Status Report pursuant to the Court's October 1, 2026 Minute Order. The Minute Order specifically states "The Joint Status Report shall update the court on the status of Defendants' compliance with the Revised Adjudication Plan. In addition, Defendants shall explain what steps they have taken in August, September, and October to add Foreign Service Officers to supplement ASIV's staffing, and what steps they will take in November to add more Officers. Defendants shall also explain why they have limited themselves to adding only twenty Foreign Service Officers to supplement ASIV's staffing." The Parties' positions are as follows.

**Defendant's Position**

In their most recent quarterly Progress Report, Dkt. No. 330, Defendants reported that they are in compliance with Refugee Crisis in Iraq Act of 2007 steps 2, 3, 4, 6, 7, 9, and 11 and Afghan Allies Protection Act of 2009 steps 2, 3, 5, 7, and 10. Defendants also reported full compliance with Form I-360 Petitions Reviewed by USCIS. To get into compliance with Iraq Act of 2007 steps 10 and 12, and Afghan Allies Protection Act of 2009 steps 4, 9, and 11, Defendants proffered rationale and remedial measures within the quarterly Progress Report. Defendants met and conferred with Class Counsel on October 21, 2026, regarding these reports and the monthly COM reports.

Defendants report the following information on COM processing, interview scheduling, and administrative processing.

## I. COM Processing

Defendants have consistently reported since the Spring on hiring efforts in the Department of State's Afghan Special Immigrant Visa Unit (ASIV). After hiring numerous contract staff, the Department has sought, and continues to actively recruit, Foreign Service Officers (FSO) for surge tour positions. New contract staff have been hired to fill any vacancies left by contract staff departures. ASIV engages regularly with the Department's Bureau for Human Resources and FSO networks and reposts the FSO position announcement in various fora. From August through mid-October 2026, ASIV onboarded five new FSOs on surge tours. In September 2026, ASIV separately secured the services of a temporary Office Management Specialist to handle administrative responsibilities, freeing additional caseworker time for COM review. The Department continues to believe that ASIV will be most effective with 150-200 total staff members, and that exceeding that number will result in a burden on expert staff related to training new hires, which outweighs the benefit of adding additional personnel. In addition, as noted, the Department continues to actively recruit for the 15 unfilled FSO surge tour positions, and believes approving a higher number at this time would have no concrete benefit.

Plaintiffs mischaracterize the training process in their position. In March 2026, Defendants provided information that "[n]ew staff members receive at least 90-120 days of training over an approximately 12-13 month period" during which "training in each stage of COM processing is interspersed with periods in which trainees put their newly learned skills to use in reviewing cases." Decl. of Andrew Veprek ¶ 34, Dkt. No. No. 314-2. Assistant Secretary of State Veprek's explanation of why this time period cannot be shorted holds true today: "Rushing the training and supervised practice period could result in incorrect decisions." *Id.*

In their position, Plaintiffs request that the Court order a plethora of remedies numbered 1-6. These remedies go significantly beyond Defendants' court-ordered obligations in the RAP and May 8, 2026 Order. Defendants have, in a good faith effort toward compliance, taken significant steps toward hiring described above. Defendants respectfully submit that a Joint Status Report is not the proper forum to seek further remedies, several of which Plaintiffs have never raised with Defendants directly including at a meet and confer on October 21, 2026. Defendants remain open to suggestions from Plaintiffs but such requests require more than a day for Defendants to evaluate and to seek the necessary clearances to provide full responses.

## II. Interview Scheduling

In April 2026, the National Visa Center (NVC) began scheduling an additional 25 percent capacity for Afghan SIV appointments at the U.S. Embassy in Islamabad. The 25 percent increase was achieved by reallocating immigrant visa interview slots. To reduce the time between when a case is determined to be documentarily complete and when it is scheduled, NVC began scheduling class members on a rolling basis outside of the regular monthly scheduling process in March 2026.

For the reporting periods after the Court's Order on February 6, 2026, Defendants provided the following data:

| | Number of Class Members awaiting | Number of Class Members | Average number of days | Average number of days between |
|---|---|---|---|---|

| | interview scheduling | completing the step | to schedule a case | scheduling and date of interview |
|---|---|---|---|---|
| March 5, 2026 to June 3, 2026 | Reduced from 4,080 to 3,577 | 607 | 706 | 36 |
| June 4, 2026 to September 2, 2026 | Reduced from 3,577 to 3,091 | 720 | 291 | 42 |

NVC consolidated scheduling of all Afghan SIV cases for the U.S. Embassy in Islamabad in March 2026, including local cases already assigned to post and cases in NVC's queue. Since that time, NVC has prioritized scheduling class members over non-class members and has scheduled class members based on their document complete date. As reported in the June 2026 Progress Report, the average number of days to schedule a case increased after NVC consolidated scheduling. Defendants reduced that number by over 58% from an average of 706 days in the June 2026 Progress Report to an average of 291 days in the September 2026 Progress Report.

Per the June 2026 and September 2026 Progress Reports, Defendants have reduced the number of class members awaiting interview scheduling by approximately 24%. This is true even with the reduced interview capacity caused by the conflict in the Middle East, which has resulted in suspension of routine visa operations at a number of posts that have a backlog of Afghan SIV class members seeking interviews.

## III. Administrative Processing

Following the Court's order on February 6, 2026, Defendants developed a methodology to provide greater detail on cases refused under INA section 221(g) (8 U.S.C. § 120l(g)), including whether those cases undergoing administrative processing were in applicant or government control. This was a substantial effort that required discussion of potential methodologies, review of a significant number of cases to determine the viability of using abbreviations to categorize cases as being in applicant or government control, discussion of how to categorize abbreviations, and development of customized queries to correctly categorize abbreviations and calculate the amount of time each abbreviation has been pending. Developing the queries was a complex and time-consuming effort. These queries consist of over 5,000 lines of code.

Defendants categorized cases as being in applicant or government control based on the abbreviation that a consular officer may enter when they refuse a case under INA 221(g) (8 U.S.C. § 120l(g). There is no perfect categorization because many actions will involve periods in both applicant and government control. Therefore, this categorization was done based on whether a particular abbreviation is more likely to involve an action that is primarily within the applicant's control or primarily within the government's control.

Starting with the March 2026 Progress Report, Defendants began including three numbers for the total number of cases in administrative processing at Step 12 of the Class Member Breakdown for the Refugee Crisis in Iraq Act (RCIA) of 2007 and Step 11 of the Afghan Allies

Protection Act (AAPA) of 2009. The first number includes all class members whose application was refused under INA section 221(g) (8 U.S.C. § 120l(g)). The second number includes class members in administrative processing whose application was refused under INA section 221(g) (8 U.S.C. § 120l(g)) and where the abbreviation(s) for the refusal entered by the consular officer include at least one reason associated with government control or where the abbreviation is unclear and where the abbreviations may also include at least one reason associated with applicant control. The third number includes class members in administrative processing whose application was refused under INA section 221(g) (8 U.S.C. § 120l(g)) and where the abbreviation(s) for the refusal include only reasons associated with government control or where the abbreviation is unclear. Defendants explained the limitations of their methodology in the progress reports.

In the Actual Performance section of the March, June, and September 2026 Progress Reports, Defendants included data on their performance for each of the abbreviations associated with government control and broke the data down between cases that also had at least one abbreviation associated with applicant control and cases that only had abbreviations associated with government control or where the abbreviation was unclear. Defendants provided these alternate metrics because there is no single methodology that can accurately capture the precise amount of time that any individual class member has been awaiting government action following a refusal under INA section 221(g) (8 U.S.C. § 120l(g)). Thus, Defendants developed multiple queries to provide the most insight possible into the periods of applicant and government control. The significance of Defendants' effort can be partially measured by the effect that these additional disclosures have had on the length of the progress reports filed with the Court. The average length of the progress reports increased by approximately 6 pages in March 2026 when Defendants implemented these changes.

| Progress Report | Length in pages |
|---|---|
| September 2025 | 18 |
| December 2025 | 19 |
| March 2026 | 23 |
| June 2026 | 27 |
| September 2026 | 24 |

For the September 2026 Progress Report, Defendants engaged in further efforts to remove cases from its reporting on the AAPA of 2009 that were not in government control. This effort was to address Plaintiffs' and the Court's concern about class members whose COM approval has been withdrawn and, thus, where no further action is anticipated. See Dkt. No. 309 at 17 ("Defendants have reported all cases refused pursuant to 8 U.S.C. § 1201(g), which would include… cases that have been permanently refused with 'no further action . . . anticipated.'"). Defendants developed a methodology to match data between the system where visa refusals are contained (IVO) and the system where COM status of Afghan SIVs is maintained (SQ-SIV). When data was matched, Defendants excluded cases from Step 11 for this report when they could confirm that COM approval had been withdrawn. While Defendants were unable to match all cases, they expect that a majority of cases where COM approval has been withdrawn were excluded. This contributed to the lower number of cases in administrative processing as of June 4, 2026, as compared to the

numbers reported as of June 3, 2026, in the June 2026 Progress Report. Due to the updated methodology, Defendants excluded a total of 683 cases from the AAPA of 2009 section of the September 2026 Progress Report that would have been included under the prior methodology. This effort has provided a more accurate picture of the actual number of cases that may be in government control.

Plaintiffs request that the Court order Defendants to conduct manual review of Iraqi SIVs who were refused under INA 221(g) for administrative processing and identify specific remedial measures for such class members who were refused for reasons unrelated to national security vetting. Defendants note that manual review and implementation of any remedial measures would likely involve demands on staff at the U.S. Embassy in Baghdad, which is the designated processing post for Iraqi immigrant visas, including SIVs. Due to the conflict in the Middle East, the U.S. Embassy in Baghdad has restricted consular operations and is not currently conducting routine visa processing. See https://iq.usembassy.gov/visas/https://iq.usembassy.gov/visas/. Until that changes, the Embassy may have limited ability to review cases for reporting purposes or to engage in efforts related to administrative processing. When a post operates at limited capacity, the consular section prioritizes services to U.S. citizens over visa processing.

In addition to the concern noted in the preceding paragraph, Defendants have expended significant time and resources developing methodologies for improved reporting on administrative processing following the Court's February 6, 2026 order. Their efforts are fully in compliance with the Court's order and the Court should not grant Plaintiffs' first request for a new reporting methodology. Further, Plaintiffs' request for a manual review of Iraqi members should not be granted, as Defendants are still engaged in efforts to identify a technical solution for identifying COM withdrawals of Iraqi class members.

**<u>Plaintiffs' Position</u>**

Defendants list their compliance with multiple steps of the Revised Adjudication Plan (RAP) for both the Afghan and Iraqi SIV. But this list serves only to obscure their continued noncompliance at key steps in the SIV process: Afghan RAP Step 4, Chief-Of-Mission (COM) processing and Afghan and Iraqi RAP, Steps 11 and 12, administrative processing, where class member cases continue to languish.[1] Notwithstanding Defendants' years of insistence that increased staffing will lead to compliance, their staffing and their processing both have stalled.

## I. Afghan RAP Step 4, COM Processing

Defendants' performance at Afghan RAP Step 4 has been particularly abysmal, as these numbers show:

[1] The Parties remain in conversation about the nature of Defendants' compliance with the Afghan and Iraqi RAP Interview Scheduling steps. Plaintiffs do not raise their concerns with these steps in this update to the Court in order to, respectfully, focus the Court's attention to Defendants' significant delays at Afghan RAP Step 4, COM processing and Afghan and Iraqi RAP, Steps 11 and 12, administrative processing.

- Over 13,000 Afghan class members have been waiting for a decision on their COM applications or appeals for longer than the RAP's 120-day timing benchmark .
- All class members have been waiting an average of 666 days—over five times the benchmark wait time. *See* September 2026 Progress Report, ECF No. 330, at 10, 12.

In May 2026 this Court ordered Defendants to meet interim COM processing benchmarks to remedy their poor performance under the RAP, *see* ECF No. 318 at 1–2, but Defendants have failed to meet even those remedial benchmarks. *See, e.g.,* ECF No. 325 at 1 (916 cases processed against 1,000); ECF No. 326 at 1 (811 cases processed against 2,000); ECF No. 329 at 1 (752 cases processed against 3,000); ECF No. 331 at 1 (1,214 cases processed against 3,000). Across the four months reported to date, Defendants have issued 3,693 decisions against a cumulative benchmark of 9,000—roughly 41 percent of what the Court ordered. *See* ECF No. 325 at 1; ECF No. 326 at 1; ECF No. 329 at 1; ECF No. 331 at 1.

***Staffing.*** Defendants' sole solution to improving COM processing timelines is to hire additional ASIV staff. Defendants state that the ASIV unit is most effective with between 150-200 total staff, but Defendants have only committed to recruiting an additional 20 Foreign Service Officers. If all 20 positions were filled, this would bring the total ASIV unit staff numbers to 165-180 staff, at least 20 staff short of Defendants' stated upper range. Defendants have neither provided a rationale for this deficit nor set COM processing targets for when 20 additional ASIV staff are trained.

***Training.*** In any event, over the past four reporting periods, that hiring has, on average, corresponded with *reduced* COM processing as new hires receive *over a year* of training.[2] In fact, Defendants' invocation of the March 2025 Declaration of Andrew Veperk, ECF No. 314-2 at 34, only underscores the issues with their staffing strategy. While Assistant Secretary Veprek asserted that 12 to 13 months of training is necessary to avoid "incorrect decisions," Defendants fail to reconcile this timeline with their reliance on temporary Foreign Service Officers serving two-year surge tours. Because FSO tours are only two years, this means that they are fully-trained for under half of their tour. October 20, 2026 Response to Plaintiffs' October 6 and October 13, 2026 Letters ("Defs.' Oct. 20, 2026 Letter") at 8; ECF No. 331 at 2. Under Defendants' model, every incoming FSO will spend more than half their tour in training before achieving full productivity, only to rotate out shortly thereafter. This creates a permanent cycle of training and diversion of senior adjudicators from their COM processing responsibilities to the detriment of Afghan class members.

---

[2] Further reducing productivity, Defendants have represented that significant ASIV resources have been devoted to withdrawing previously granted COM approvals rather than adjudicating pending applications and appeals. Defendants describe withdrawals as a "quality control process [that] adds to the COM workload," ECF No. 330 at 14, and excluded 683 cases from their most recent Step 11 reporting because COM approval had been withdrawn. Defs.' Oct. 20, 2026 Letter at 4. Defendants provide no information about how long this process will take nor their plan for reallocating this ASIV staff once it is completed.

To date, Defendants have not explained whether they can reduce the lengthy training period for new staff, even though in 2023 they represented that the entire training process for new staff takes approximately 90 days, a quarter of their current training time. *See* Declaration of Melissa Schubert, ECF No. 261-2 ¶ 4. Defendants attribute the longer training period to ASIV's absorption of "employment and recommendation verification, fraud prevention, and other workload previously handled by other parts of the Department," as well as the complexity of the remaining caseload. Defs.' Oct. 20, 2026 Letter at 7. But Defendants do not say when those functions were transferred to ASIV, why they could not be returned to—or supported by—the Department components that previously performed them, or whether training could be shortened by assigning specialized functions such as fraud review to dedicated personnel. *Id.* Moreover, while Defendants represent that trainees process live cases under supervision at earlier stages of COM review, Defs.' Oct. 20, 2026 Letter at 8, Defendants have never quantified that contribution, and monthly output declined from June through August while the spring hires were in training. *See* ECF No. 325; ECF No. 326; ECF No. 329.

***Attrition.*** Defendants' reliance on new hires is further undercut by attrition: six contract staff left ASIV between June and September 2026, five of them through resignation, forfeiting the training investment already made in them. Defs.' Oct. 20, 2026 Letter at 2. Defendants also provide no substantive information about their efforts to recruit for the unit beyond precatory statements that they "continue to actively recruit" and repost the position announcement. Defs.' Oct. 20, 2026 Letter at 8.

***

The past four months have made clear that Defendants' current plan to hire more ASIV staff is not workable as Defendants' sole solution to their noncompliance. Plaintiffs appreciate that Defendants retained a temporary Office Management Specialist in September 2026 to handle administrative responsibilities, "freeing additional caseworker time for COM review." Defs.' Oct. 20, 2026 Letter at 7. That measure suggests that adjudicative capacity can be increased with more administrative assistance.

To that end, Defendants should (1) consider authorizing overtime for fully trained staff; (2) assign support personnel to non-decisional tasks such as document organization and employment-verification preparation; (3) stagger onboarding to limit the number of senior staff diverted to training at any one time; (4) identify the specific recruitment steps Defendants will take in November 2026; (5) explain why ASIV cannot be staffed to the 200-person level Defendants identify as effective; and (6) disclose the share of ASIV's processing capacity devoted to COM withdrawal cases and the projected length of this process. Plaintiffs respectfully request that the Court ask Defendants to provide an update to the Court and Plaintiffs as to whether Defendants will commit to any of Plaintiffs' listed proposals and/or that they shall identify counterproposals to aid in remedying their COM processing capabilities.

Defendants' accusation that Plaintiffs have sought an improper "plethora of remedies" without conferring misconstrues Plaintiffs' request. Plaintiffs do not seek new substantive mandates outside of the RAP. Rather, Plaintiffs ask the Court to direct Defendants to state whether they will adopt Plaintiffs' proposed common-sense operational measures—or offer counterproposals of their own—to cure their ongoing failure to meet the Court's remedial benchmarks. Each proposal addresses Defendants' own stated obstacles: for example, assigning administrative support to document verification would build on Defendants' use of a temporary Office Management Specialist to "free caseworker time," and staggering onboarding would address training burden Defendants cite to resist hiring. Defendants cannot miss Court-mandated benchmarks by thousands of cases, refuse to consider any operational efficiencies beyond hiring, invite Plaintiffs to suggest solutions, and then cry foul when Plaintiffs present constructive proposals to Defendants.

## II. Afghan and Iraqi RAP Administrative Processing

Defendants fare no better in resolving class member cases stuck at the administrative processing steps under both the Afghan and Iraqi RAPs. Much of the Parties' discussions related to Defendants' failure to improve administrative processing delays for each plan pertains to Defendants' improper reporting. Cleaning up the data for both plans is one aspect of the work necessary for Plaintiffs and the Court to ascertain the full extent of Defendants' delays. This includes reporting on cases undergoing other categories of administrative processing—beyond Defendants' primary reporting on administrative processing related to national security concerns—as well as reporting on the overall time spent by class members in *all* government-controlled administrative processing categories, as opposed to just the time spent in the most recently-completed category of administrative processing, which has been Defendants' practice to date. Defendants' piecemeal and selective reporting vastly understates the amount of time class members are pending at this step, overstates Defendants' compliance with the RAP's 90-day benchmark, and does little to ensure that Defendants are identifying appropriate concrete steps to improve their compliance with the RAP's timing benchmarks overall. For Iraqi SIV applicants in particular, it is imperative, and in Defendants' best interests, that reporting for the Iraqi RAP is accurate to ensure that to ensure the final remaining Iraqi class members can finally have their cases adjudicated (now 10 years after the program stopped accepting applications) and to move this portion of the case closer to resolution.

The data aside, Plaintiffs seek answers about *when* the cases stuck at this step, for months to several years now, will be brought to a prompt resolution.

***Iraqi class members.*** Of the 194 to 373 class members pending at this step, *zero* class members completed administrative processing within the 90-day timing benchmarks set at this step by the RAP for the period of June 4, 2026 to September 2, 2026. September Progress Report, ECF No. 330 at 5, 8.

Defendants stated they "did not identify any delays due to potential technical or procedural hang-ups for Iraqi SIVs in their control." Defs.' Oct. 20, 2026 Letter at 5. Defendants also cannot say when, or whether, they will remove Iraqi class members whose COM approval has been withdrawn from their reporting: they are "continuing to discuss potential methodologies," *id.*, and have not responded to Plaintiffs' July 24, 2026 proposal that Defendants manually review those cases. *Id.*

***Afghan class members.*** Defendants state that they were "unable to identify specific remedial measures that would benefit cases refused for administrative processing for reasons not related to national security vetting." ECF No. 330 at 22. Defendants further confirm that there is "no standard process involving third-party agencies" for cases refused for reasons unrelated to national security vetting and "no formal expedite process for them," Defs.' Oct. 20, 2026 Letter at 6, notwithstanding the Revised Plan's requirement that Defendants request expedited processing of class-member cases pending beyond the relevant benchmark. And Defendants "cannot provide a specific timeframe" for cases in which a consular officer has flagged concerns about the basis for COM approval. *Id.* at 5.

***

In light of the above, Plaintiffs reiterate their request to Defendants that they (1) provide the total time that Afghan and Iraqi class members spend in government-controlled administrative processing in addition to the time spent in the most recently completed category of administrative processing, (2) engage in a one-time manual review of Iraqi class member cases in administrative processing in which COM approval has been finally withdrawn, and (3) identify specific remedial measures, including expedite requests, for class members pending in administrative processing for reasons unrelated to national security vetting. Plaintiffs additionally request that the Court order Defendants to provide an update to the Court and Plaintiffs as to whether Defendants will commit to any of the aforementioned items and/or that they identify counterproposals to remedy their compliance with the administrative processing steps in both the Afghan and Iraqi SIV plans.

**<u>Conclusion</u>**

The Parties respectfully submit this Joint Status Report.

Dated: October 23, 2026

/s/ *Pedro Sepulveda*
Pedro Sepulveda (D.D.C. Bar No. NY0637)
Kimberly Grano (D.D.C. Bar No. NY0512)
Guadalupe Aguirre (D.D.C. Bar No. NY0665)
Ghita Schwarz (D.D.C. Bar No. NY0663)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, New York 10004
Telephone: (646) 946-7453
psepulveda@refugeerights.org
kgrano@refugeerights.org
laguirre@refugeerights.org
gschwarz@refugeerights.org

Rebecca Kerr (D.D.C. Bar No. NY0267)
David Y. Livshiz (D.D.C. Bar No. NY0269)
Wang Jae Rhee (admitted pro hac vice)
FRESHFIELDS US LLP
3 World Trade Center,
175 Greenwich Street, 51st Floor
New York, NY 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
rebecca.kerr@freshfields.com
david.livshiz@freshfields.com
wangjae.rhee@freshfields.com

J. Mia Tsui (D.D.C. Bar No. CA00167)
FRESHFIELDS US LLP
855 Main St, Third Floor,
Redwood City, CA 94063
Telephone: (650) 618-9250
mia.tsui@freshfields.com

*Attorneys for Plaintiffs and Class Counsel*

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

CATHERINE M. RENO
Assistant Director
Office of Immigration Litigation

RUTH ANN MUELLER
DAVID J. BYERLEY
Senior Litigation Counsel

JAIME A. SCOTT
Trial Attorney

*/s/ Larissa K. Johnson*
LARISSA JOHNSON
Trial Attorney (D.C. Bar No. 90034719)
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
Telephone: (202) 598-9126
Fax: (202) 305-7000
Larissa.K.Johnson@usdoj.gov

*Attorneys for Defendants*