**U.S. Department of Justice**
Civil Division
Office of Immigration Litigation

*Ben Franklin Station, PO Box 868*
*Washington, DC 20044*

October 20, 2026

**VIA EMAIL**

Pedro Sepulveda, Jr.
International Refugee Assistance Project
One Battery Park Plaza, 33rd Fl
New York, NY 10004
psepulveda@refugeerights.org

**Re: *Allies v. Rubio,* No. 1:18-cv-01388-TSC (D.D.C.)**
**Collected Responses to Questions from Plaintiffs**

Dear Mr. Sepulveda,

This letter provides responses to Plaintiffs' letter dated October 6, 2026, regarding Defendants' Quarterly Progress Report for the period of June 4, 2026, to September 2, 2026, Dkt. No. 330, Plaintiff's letter dated October 13, 2026, regarding Defendants' COM Report for the month of September, Dkt. No. 331, and questions received via email on August 14 and September 28. For reference, Defendants use the same headings and numbering as Plaintiffs' letters.

**Letter Regarding Quarterly Progress Report (Received October 6, 2026)**

AAPA Step 4 (COM approval)

1. Defendants report that six contract staff hired in spring 2026 resigned between June and August. September 2026 Report at 13. While Defendants have argued that hiring is the most effective way to improve their performance at the COM stage in the long term, any such efficiencies would of course be lost if there continues to be high turnover among new hires. We ask that Defendants provide additional information about staff turnover at ASIV and any efforts being taken to reduce turnover.

**Response:** Defendants mistakenly reported that six contract staff hired in spring 2026 resigned between June and August 2026. In fact, while six contract staff departed from ASIV between June and September 2026, five individuals resigned and the remaining individual was terminated for reasons unrelated to COM processing.

a. What is the current average tenure of COM-adjudication staff at ASIV, and how does current turnover compare to historical levels (i.e., is turnover accelerating)?

**Response**: ASIV was established in 2016 and its staff consists of contractors, Civil Servants, and Foreign Service Officers (FSOs) who have onboarded at various times since 2019. Contractors may leave for any number of reasons including, but not limited to, pursuing direct federal employment, termination, or changes to the federal contract under which the contractor is employed. FSOs and Civil Servants also may leave ASIV, or indeed the Department, for any number of reasons including retirement, to pursue another Civil Service job, or—most frequently—to transfer to another Foreign Service assignment. Most Foreign Service domestic assignments, including in ASIV, are for two years, though many of the FSOs currently serving in ASIV have extended in their current positions or have served multiple Foreign Service tours in the office. Of the 53 contract staff onboarded to support ASIV in 2023 (when significant hiring took place), 35 remain (a retention rate of 66 percent over a three-year period). Of ASIV's current four Civil Servants, two joined ASIV in 2019, one in 2020, and one in 2022.

b. Does the turnover problem extend to the Foreign Service Officers on temporary assignment as well as contract staff, or is it limited to one category?

**Response**: The Department rejects the premise of a "turnover problem" in ASIV with regard to contractors, civil servants, or Foreign Service Officers.

c. Given the resignations, has Defendants' projected timeline for reaching the Court-ordered processing benchmarks been revised, or do Defendants maintain that the original projections still hold despite this turnover?

**Response**: At this stage, Defendants have no reason to believe that the recent departure of contract staff will affect the Department's timeline for reaching the Court-ordered processing benchmarks. New contract staff have been hired to fill the vacancies left by staff departures.

2. In light of this information about staff turnover, Plaintiffs also renew the question raised at the parties' July 22, 2026 meet-and-confer regarding whether Defendants will consider hiring additional staff beyond current levels if those levels prove insufficient to meet the Revised Plan's benchmarks.

**Response**: The Department continuously reviews staffing allocation, including with regard to COM processing.

RCIA Step 10 (Visa Interview)

3. Defendants state that "routine" visa processing is not occurring. *Id.* Are any visa interviews being offered at the U.S. Embassy in Baghdad at this time?

**Response**: The U.S. Embassy in Baghdad is not currently conducting routine immigrant visa processing. See https://iq.usembassy.gov/visas/.

4. Are there any limitations on the immigrant visa processing posts to which Iraqi SIV applicants can have their cases transferred? For example, are Iraqi SIV applicants required to prove residency in another country in order to transfer their case to a post in that country? If so, please explain why such a residency requirement is necessary and if it can be waived.

**Response**: The U.S. Embassy in Baghdad is the designated processing post for Iraqi applicants. An applicant may contact NVC at CANVCIraqSIVApplication@state.gov to request a change of interview venue. Iraqi SIV applicants are not required to provide evidence of their residency in another country to make such a request.

5. Has the applicant pending interview been provided information about how to request that their case be transferred to a new immigrant visa processing post?

**Response**: On June 10, 2026, the applicant was provided instructions on how to request a different post by contacting NVC through https://nvc.state.gov/inquiry.

AAPA Step 9 (Visa Interview)

6. Plaintiffs request confirmation that NVC is still providing all class members with the notice required in the Court's May 20, 2026 Order (ECF No. 322) at the time of interview scheduling.

**Response:** Defendants confirm this language is still being sent.

7. Plaintiffs also request that Defendants provide an update on the current operational status of, and any anticipated timeline for resuming routine visa interview processing at, the posts identified in the September 2026 Report as not having resumed routine operations following the recent regional conflict: the U.S. Embassies in Abu Dhabi, Baghdad, Doha, Kuwait, and Muscat, and Riyadh. September 2026 Report at 15–16.

**Response:** At this time, there are still no routine visa services being provided at the U.S. Embassies in Abu Dhabi, Baghdad, Doha, Muscat, and Riyadh. The Department of State cannot speculate as to when routine visa services will resume at these posts.

<u>AAPA Step 11 / RCIA Step 12 (Administrative Processing)</u>

8. The parties previously discussed improving the data by excluding cases that had been returned to COM for withdrawal of approval. Plaintiffs seek clarification as to those efforts:
    a. For the Afghan Plan, Defendants indicated that "Defendants undertook an effort for this reporting period to remove cases from Step 11 when it could be confirmed that a class member's COM approval has been withdrawn." September 2026 Report at 11, 19.
        i. How many cases were excluded from the data as a result of this process?

**Response:** In the September 2026 Progress Report, a total of 683 cases were excluded from the number of cases in administrative processing at the beginning and at the end of the reporting period. There was one case excluded that would have been considered as completing the step and another case excluded that would have been considered as entering the step during the reporting period.

ii. To confirm, is there any other reason for the discrepancy between the number of cases reported pending as of June 3, 2026 in the previous progress report and the number of cases reported pending as of June 4, 2026 in this progress report?

**Response**: The exclusion of the 683 cases in which COM approval was withdrawn fully accounts for the discrepancy between the pending case counts reported as of June 3, 2026, in the June 2026 Progress Report and as of June 4, 2026, in the September 2026 Progress Report. Defendants identified no other reasons for the discrepancy.

iii. Can Defendants clarify what is meant by "if the consular officer has not yet returned the case for potential revocation of the COM approval"? *Id.* at 19. Are those cases in which the officer has identified a potential issue with the COM approval but has not yet formally transferred the case back to NVC/ASIV? How long could a case potentially be in this position?

**Response:** Defendants provided actual performance data for cases where the consular officer refused the visa application under INA 221(g) and entered an abbreviation that indicated concern about the basis for COM approval. This could include cases where the consular officer has concerns about the validity of the qualifying employment, the authenticity of submitted documents, or determines that the COM approval should be returned for potential withdrawal. Abbreviations do not provide detail on the consular officer's specific concerns nor are they definitive that the consular officer will in fact return the case to ASIV for reconsideration of COM approval.

Defendants removed cases from reporting when they could identify that the class member's COM approval had been withdrawn. Even where the consular officer returns the case for reconsideration of the COM approval, there may be periods of time where, for example, the consular officer requests further information from the class member, post conducts an investigation, or ASIV considers whether the facts provided by

post are a basis for withdrawal. As a result, Defendants cannot provide a specific timeframe for such cases. There are many factors that may affect timing, including the complexity of the case, the availability of documents, and the class member's responsiveness to requests.

b. For the Iraqi Plan, Defendants previously stated that "Defendants are still working to determine if there is a feasible process to determine whether COM approval has been withdrawn for Iraqi SIV class members." Defs.' Aug. 14, 2026 Letter at 4. Plaintiffs presume that Defendants have not undertaken such a process for the Iraqi class member data because there has been no decrease in the number of cases pending at this step. Please clarify where development of a potential process for the Iraqi Plan data stands now.

**Response:** Defendants are continuing to discuss potential methodologies for identifying such cases.

i. If no automated process is possible, will Defendants consider Plaintiffs' proposal from their July 24, 2026 letter that Defendants manually review the Iraqi cases in administrative processing to remove cases that, at the time of the clean-up, have had their COM approval withdrawn? Plaintiffs reiterate that performing this clean-up is necessary to enable both the parties and the Court have an accurate view of how many Iraqi class members are actually remaining.

**Response:** See response to prior question.

9. For those Afghan class members completing administrative processing during the reporting period, how many subsequently received a 212(f) refusal?

**Response:** All 44 class members who completed Step 11 were refused under INA 212(f).

10. Plaintiffs are concerned that no Iraqi class members completed administrative processing during the reporting period. As to cases undergoing national security vetting, Defendants indicated that "The Department of State continuously reviews the status of cases undergoing national security vetting to identify delays due to potential technical or procedural hang-ups that may be within its control. When such cases are identified, the Department takes appropriate action to ensure timely completion of such vetting." September 2026 Report at 8–9. During the reporting period, did the State Department take any such action in any class member cases (whether in national security vetting or another type of administrative processing)? To be clear, Plaintiffs are not asking for any individualized case information, but rather to understand if any movement has occurred in these cases.

**Response**: During the reporting period, Defendants did not identify any delays due to potential technical or procedural hang-ups for Iraqi SIVs in their control.

11. Plaintiffs ask Defendants to confirm whether the review and expedition efforts described in the September 2026 Report are limited to cases undergoing national security vetting, see *id.* at 8–9, 21–22, or whether comparable efforts to identify and resolve technical or procedural delays are also undertaken for administrative processing cases involving fraud-related investigations, post-specific

actions, or other non-national-security bases, consistent with Defendants' obligation under the Revised Plan to request that third-party agencies expedite processing of all class member cases pending beyond the relevant benchmark.

**Response:** There is no standard process involving third-party agencies for cases that have been refused under INA 221(g) for reasons not related to national security vetting. There may be isolated instances in which a consular officer determines that the facts of a case merit communication with a third-party agency. Because these would be individual communications rather than cases submitted in a queue for review, there is no formal expedite process for them.

<u>AAPA Step 12 (Visa Issuance)</u>

12. To clarify the reporting methodology used, are Defendants reporting only the number of visas issued to Afghan class members and their derivatives, or would the number reported include all Afghan SIV applicants and their derivatives?

**Response**: The number reported is for class members and, thus, only includes principal applicants. There was one child derivative of a class member who was granted a national interest exception and who was subsequently issued a visa during the reporting period.

   a. If this number includes only class members and their derivatives, how many Afghan SIVs were issued to non-class members?

**Response**: There were no Afghan SIVs issued to non-class members during the current reporting period.

13. Do Defendants track whether a request for a national interest exception to the Presidential Proclamation has been made in a given case?

**Response**: Defendants do not track whether an applicant requests a national interest exception. National interest exceptions are handled on a case-by-case basis. The consular officer determines whether to submit a request for a national interest exception to the Assistant Secretary for approval. Consular officers submitted three such requests during the reporting period.

   a. If so, how many requests for a national interest exception were made by Afghan class members and/or SIV applicants during the reporting period?

**Response:** N/A

**<u>Letter Regarding September 2026 COM Report (Received October 13, 2026)</u>**

1. Is the 12-13 month training timeline the estimated amount of time it will take to train each staff member from the date of onboarding?

**Response:** Yes, ASIV estimates that each new staff member requires approximately 12-13 months to be fully trained on all aspects of COM case processing.

2. How did Defendants decide upon the 12-13 month training timeline?

**Response:** The training timeline varies from staff member to staff member, based on their progression through the processing stages. The Department's recent experience has been that, on average, it requires 12-13 months for a staff member to be fully trained on all aspects of COM case processing. Some staff members may master all aspects of COM case processing more quickly or more slowly than others.

3. Has the training timeline increased over time? If so, when and why did the increase occur?

**Response**: Over time, ASIV has absorbed employment and recommendation verification, fraud prevention, and other workload previously handled by other parts of the Department. As a result, the training timeline has increased. The complexity of the remaining workload also contributes to the longer training timeline. For example, as of October 2026, 63 percent of class members have sought COM approval multiple times, which requires staff to review all documents associated with each of the class member's applications, resolve contradictory information across multiple applications, confirm qualifying contracts and subcontracts, and ensure that dates of employment overlap with the dates of supervision listed on the letter of recommendation and any relevant contracts for at least one year. Staff also must review and resolve all fraud indicators across all current and previous applications.

4. Your response from September 21 stated that 17 ASIV staff members process COM withdrawal cases as a part of their duties
   a. How much of their duties? Is this a distinct caseload?

**Response**: ASIV management assigns daily workflows based on staff readiness and availability, and the types of cases prepared to be handled at each stage of processing. While COM withdrawal cases do comprise a distinct caseload, the amount of time employees spend working on these cases is highly variable.

   b. Has the number of staff members assigned to COM withdrawal cases, or the amount of ASIV's processing capacity devoted to COM withdrawal cases, changed over time, including since the Revised Plan went into effect in September 2025?

**Response**: Yes, ASIV constantly reevaluates the existing volume of case work at various stages of case processing in order to allocate staffing to achieve the most efficient use of personnel.

5. Please explain what steps Defendants have taken in August, September, and October to add Foreign Service Officers to supplement ASIV's staffing, and what steps will be taken in November to add more Officers.

**Response:** The Department continues to actively recruit the remaining Foreign Service Officers (FSO) for surge tour positions, with ASIV engaging regularly with the Department's Bureau for Human Resources and FSO networks and reposting the position announcement in various fora. From August through mid-October 2026, ASIV onboarded five new FSOs on surge tours. In September 2026, ASIV separately secured the services of a temporary Office Management Specialist to handle administrative responsibilities, freeing additional caseworker time for COM review.

6. Please explain why Defendants have limited themselves to adding only twenty Foreign Service Officers to supplement ASIV's staffing.

**Response:** The Department continues to believe that ASIV will be most effective with 150-200 total staff members, and that exceeding that number will result in a burden on expert staff related to training new hires, which outweighs the benefit of adding additional personnel. In addition, as noted, the Department continues to actively recruit for the 15 unfilled FSO surge tour positions. Approving a higher number at this time would have no concrete benefit.

7. Please explain what specific recruitment, clearing, and onboarding schedule supports Defendants' projection that all 20 Foreign Service Officers positions will be filled by "late autumn 2026."

**Response:** The Department never projected that "all 20 Foreign Service Officers positions will be filled by late autumn 2026." The Department has referenced efforts to recruit 20 FSOs in temporary positions and noted that if all positions were filled by late autumn 2026, it would bring ASIV to 165-180 total staff.

8. The October 2026 COM Report states that a fifth Foreign Service Officers was scheduled to onboard on October 13, 2026. Please confirm whether this officer in fact onboarded.

**Response:** Yes, the fifth FSO onboarded on October 13 as planned.

9. Defendants state that Foreign Service Officers are being sought for "up to two years," but that ASIV staff require a "12- to 13-month" training program. Please explain:

    1. Whether the temporary Foreign Service Officers will also undergo the full 12- to 13-month training program, or whether their training be expedited.

**Response:** The Department estimates that staff joining ASIV – whether contractors, Civil Servants, or FSOs – require 12-13 months of training to be fully trained on all aspects of COM case processing.

    2. If temporary Foreign Service Officers must undergo 12–13 months of training, what is Defendants' rationale for assigning temporary staff who will spend more than half of their maximum two-year assignment in training?

**Response:** As previously discussed, while undergoing training, new staff process live cases under supervision at earlier stages of the COM review process until they are sufficiently skilled to work at the later stages.

**<u>Question Received by Defendants' Counsel Via Email From Plaintiffs' Counsel on August 14, 2026</u>**

1. Thank you for providing this response regarding DAS-T employment verification. However, we have seen several cases in which the denial letter cites the lack of DAS-T verification as the basis for the withdrawal of COM approval, such as by stating that "the COM-designee is no longer able to independently verify your employment through an employer verification program . . ." (see attached example). This has caused confusion for applicants. This means applicants would not know that their particular letter-writer, as opposed to their lack of inclusion in the database, was the issue

leading to their denial and would not know they needed to seek a letter from a different person when appealing. This issue occurred in the following cases:

[cases omitted]

Given Defendant's July 21 confirmation that employer participation in DAS-T does not require an applicant's employment to be verified through the DAS-T portal rather than through direct verification, we would ask Defendants to evaluate if the denials on this basis were made in error. Additionally, given the confusion this has caused for applicants, we would ask for these cases to be reopened to provide the applicants an opportunity to submit new employment letters or letters of recommendation if needed.

**Response**: Thank you for bringing these cases to our attention. While we believe that this question is outside the scope of this litigation, we have re-reviewed these cases and have identified no errors in the COM review process. Additional correspondence with the applicants will be forthcoming in any cases under appeal.

2. Additionally, we would like to follow up on the Defendants' previous response from July 6 regarding denials of appeals of withdrawals of COM approval on different bases than the withdrawals themselves, in which Defendants indicated that Plaintiffs could bring to your attention errors in case processing. We have identified several other cases where the appeal was denied on a different basis than the withdrawal, preventing the applicant from addressing the second ground for denial in any appeal. We ask that the agency consider reopening these cases (some of these applicants are also listed above):

   [cases omitted]

**Response**: Thank you for bringing these cases to our attention. While we believe that this question is outside the scope of this litigation, we have re-reviewed these cases and have identified no errors in the COM review process.

**<u>Question Received by Defendants' Counsel Via Email From Plaintiffs' Counsel on September 28, 2026</u>**

**Response to Questions 1-4**: The Department's responses are included above under "Letter Regarding September 2026 COM Report (Received October 13, 2026)." Questions 1-4 are identical in that letter and the September 28 email.

Additionally, we have learned about a class member whose COM application has been pending for an extremely long period of time: over five years since he originally submitted his application, and over four years since NVC notified him that his application was complete. NVC has continued to indicate that the case is pending. We ask that Defendants check on the status of this case and identify the cause for this particularly egregious delay so that the case can be adjudicated promptly. Here is the class member's information:

Name: W[redacted] A[redacted]
DOB: [redacted]
NVC Case #: [redacted]
Application submitted: August 19, 2021
NVC confirmed receipt: August 31, 2022

**Response:** NVC created a COM case for this alien in August 2022 and referred the case to ASIV for COM review in September 2022. The Department non-approved the COM application in December 2024 and informed the alien via email to the address on file with NVC. The alien appealed in March 2025 and the appeal application is currently pending COM review.

Sincerely,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY P. NICASTRO
Director
Office of Immigration Litigation

RUTH ANN MUELLER
DAVID J. BYERLEY
Senior Litigation Counsel

LARISSA K. JOHNSON
Trial Attorney

/s/ Jaime A. Scott
JAIME A. SCOTT
Trial Attorney
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box. 868, Washington, DC 20044
Telephone: (202) 305-3620
Jaime.A.Scott@usdoj.gov